UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL L. TAYLOR and PETER M. TAYLOR, | |
| *Petitioners*, | |
| *v.* | Case No. 1:20-cv-11272 |
| JEROME P. MCDERMOTT, Sheriff, Norfolk County, Massachusetts, and JOHN GIBBONS, United States Marshal, District of Massachusetts, | **Leave to file granted on July 7, 2020 (Doc. 10)** |
| *Respondents.* | |

**MEMORANDUM IN SUPPORT OF PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

Factual Background ............................................................................................................ 2

    I.     The Taylors Have Deep Roots in the Community .......................................... 2

    II.    The Taylors' Unlawful Arrest and Detention are Facially Apparent from the Warrants  3

    III.   COVID-19 is especially dangerous to Imprisoned Individuals ....................... 6

Legal Standards ................................................................................................................ 10

    I.     Preliminary Injunctive Relief ....................................................................... 10

    II.    Habeas Relief ............................................................................................... 10

Argument ......................................................................................................................... 11

    I.     The Taylors face irreparable harm ................................................................ 11

    II.    The Taylors will likely succeed on the merits of their Petition .................... 13

        A.   The Taylors were improperly arrested and detained because the U.S. complaints and extradition requests do not state a claim for an extraditable offense under Japanese law. ................................................................................................................ 13

        B.   Magistrate Judge Cabell should have promptly granted the Taylors bail ...................... 21

        C.   The Taylors should be released based on the unacceptable risk to their health and safety posed by the COVID-19 pandemic. ............................................................... 31

    III.   The balance of hardships and public interest justify release ......................... 34

Conclusion ....................................................................................................................... 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACA Int'l v. Healey*,
    2020 WL 2198366 (D. Mass. May 6, 2020) ..........................................................................10

*Baez v. Moniz*,
    2020 WL 2527865 (D. Mass. May 18, 2020) ........................................................................32

*U.S. ex rel. Bailey v. U.S. Commd. Officer of Ofc. of Provost Marshal, U.S. Army*,
    496 F.2d 324 (1st Cir. 1974) ................................................................................................10

*Barbecho v. Decker*,
    2020 WL 1876328 (S.D.N.Y. Apr. 15, 2020) ......................................................................12

*In re Extradition of Boeyink*,
    2004 WL 6074945 (E.D. Va. Jan. 28, 2004) .......................................................................16

*Brito v. Barr*,
    415 F. Supp. 3d 258 (D. Mass. 2019) ..................................................................................34

*Brodheim v. Veal*,
    2010 WL 4878816 (E.D. Cal. Nov. 17, 2010) .....................................................................11

*Caltagirone v. Grant*,
    629 F.2d 739 (2d Cir. 1980) .................................................................................................13

*Carroll v. United States*,
    267 U.S. 132 (1925) .............................................................................................................16

*Collins v. Univ. of New Hampshire*,
    664 F.3d 8 (1st Cir. 2011) ....................................................................................................16

*Comm. for Pub. Counsel Servs. v. Chief Justice of Trial Ct.*,
    142 N.E.3d 525 (Mass. 2020) ...........................................................................................8, 33

*Coronel v. Decker*,
    2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) .....................................................................34

*Coscia v. Town of Pembroke*,
    659 F.3d 37 (1st Cir. 2011) ..................................................................................................32

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) .............................................................................................................32

*Devitri v. Cronen*,
  289 F. Supp. 3d 287 (D. Mass. 2018) ...................................................................10

*Drumm v. McDonald*,
  2016 WL 111411 (D. Mass. Jan. 11, 2016) ......................................11, 22, 28, 31

*Matter of Extradition of Drumm*,
  150 F. Supp. 3d 92 (D. Mass. 2015) .............................................................22, 27

*In re Extradition of Molnar*,
  182 F. Supp. 2d 684 (N.D. Ill. 2002) ..................................................................31

*In re Extradition of Orellana*,
  2000 WL 1036074 (S.D.N.Y. July 26, 2000) ......................................................15

*Matter of Extradition of Russell*,
  805 F.2d 1215 (5th Cir. 1986) ............................................................................15

*In re Extradition of Skaftouros*,
  643 F. Supp. 2d 535 (S.D.N.Y. 2009) ......................................................13, 14, 15

*Matter of Extradition of Toledo Manrique*,
  2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ....................................................29

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No.
70 of Alameda Cty.*,
  415 U.S. 423 (1974) ............................................................................................10

*Grinis v. Spaulding*,
  2020 WL 2300313 (D. Mass. May 8, 2020) .........................................................32

*Hilton v. Kerry*,
  754 F.3d 79 (1st Cir. 2014) .................................................................................11

*Ali v. Napolitano*,
  2013 WL 3929788 (D. Mass. July 26, 2013) .......................................................10

*Jean v. Mass. State Police*,
  492 F.3d 24 (1st Cir. 2007) .................................................................................10

*Jimenez v. Cronen*,
  317 F. Supp. 3d 626 (D. Mass. 2018) ..................................................................11

*Jimenez v. Nielsen*,
  326 F.R.D. 357 (D. Mass. 2018) ..........................................................................11

*Jimenez v. Wolf*,
  No. 18-10225-MLW, Dkt. No. 506 (D. Mass. Mar. 26, 2020) ..............................9

*Kin-Hong v. United States*,
926 F. Supp. 1180 (D. Mass.), *supplemented*, 927 F. Supp. 517 (D. Mass. 1996), *rev'd on other grounds*, 83 F.3d 523 (1st Cir. 1996)...............23

*Leavitt v. Corr. Med. Servs., Inc.*,
645 F.3d 484 (1st Cir. 2011)......................................................32

*Martinez v. McAleenan*,
385 F. Supp. 3d 349 (S.D.N.Y. 2019)..........................................11

*In re Metzger*,
17 F. Cas. 232 (S.D.N.Y. 1847)..................................................14

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................10

*Parretti v. United States*,
122 F.3d 758 (9th Cir. 1997) .....................................................15

*Parretti v. United States*,
143 F.3d 508 (9th Cir. 1998) .....................................................15

*Preminger v. Principi*,
422 F.3d 815 (9th Cir. 2005) .....................................................34

*Quadrelli v. Moniz*,
2020 WL 3051778 (D. Mass. June 8, 2020)..................................9

*Ramirez v. U.S. I.C.E.*,
310 F. Supp. 3d 7 (D.D.C. 2018) ...............................................11

*In re Rob[b]ins*,
27 F. Cas. 825 (D.S.C. 1799) .....................................................14

*Sahagian v. United States*,
864 F.2d 509 (7th Cir. 1988) .....................................................14

*Salerno v. United States*,
878 F.2d 317 (9th Cir. 1989) .....................................................28

*Savino v. Souza*,
2020 WL 1703844 (D. Mass. Apr. 8, 2020)......................9, 12, 32, 33

*Savino v. Souza*,
2020 WL 2404923 (D. Mass. May 12, 2020).................................34

*Thakker v. Doll*,
2020 WL 1671563 (M.D. Pa. Mar. 31, 2020)..................................9

*United States v. Calabrese*,
    2020 WL 3316139 (D. Mass. June 18, 2020) ...........................................................8

*United States v. Castaneda-Castillo*,
    739 F. Supp. 2d 49 (D. Mass. 2010) ...................................................................28

*United States v. Garlock*,
    2020 WL 1439980 (N.D. Cal. Mar. 25, 2020)...........................................................9

*United States v. Kattar, et al.*,
    Criminal No. 91-cr-10247-DPW (D. Mass. 1991) ....................................................25

*United States v. Kin-Hong*,
    83 F.3d 523 (1st Cir. 1997).............................................................................28

*United States v. Lawrence*,
    3 U.S. (3 Dall.) 42 (1795) .............................................................................14

*United States v. Pena*,
    2020 WL 2798259 (D. Mass. May 29, 2020) ...........................................................9

*United States v. Ramirez*,
    2020 WL 2404858 (D. Mass. May 12, 2020) ...........................................................9

*United States v. Ramnath*,
    533 F. Supp. 2d 662 (E.D. Tex. 2008)...................................................................27

*United States v. Ramos*,
    2020 WL 1478307 (D. Mass. Mar. 26, 2020) ...........................................................9

*United States v. Stephens*,
    2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ......................................................7, 9

*United States v. Williams*,
    611 F.2d 914 (1st Cir. 1979)...........................................................................23

*In re Washington*,
    2007 WL 128906 (W.D.N.Y. Jan. 12, 2007) ..........................................................15

*Wong Sun v. United States*,
    371 U.S. 471 (1963).....................................................................................16

*Xochihua-Jaimes v. Barr*,
    __ F.3d ___, 2020 WL 3564033 (9th Cir. Mar. 23, 2020).............................................9

*Zhenli Ye Gon v. Holt*,
    774 F.3d 207 (4th Cir. 2014) ..........................................................................11

**Statutes**

18 U.S.C. § 2 .................................................................................................20

18 U.S.C. § 3 .................................................................................................20

18 U.S.C. § 3142(g) .......................................................................................22

18 U.S.C. § 3184 ......................................................................................*passim*

28 U.S.C. § 2241 ...................................................................................9, 10, 11

**Other Authorities**

19 C.F.R. § 122.75a(b)(1)(i) ..........................................................................26

Christopher D. Man, *Extradition and Article III: A Historical Examination of "the Judicial Power of the United States,"* 10 Tul. J. Int'l & Comp. L. 37 (2002)..................14, 34

Roberto Iraola, *The Federal Common Law of Bail in International Extradition Proceedings*, 17 Ind. Int'l & Comp. L. Rev. 29 (2007)...........................................28

U.S. Const., amend. IV ..............................................................................*passim*

## INTRODUCTION

Petitioners Michael and Peter Taylor have been unlawfully held in federal custody in the Norfolk County Correctional Center for more than six weeks on facially flawed provisional arrest warrants and extradition requests; they should not be in custody *at all*.

For starters, the government filed two complaints for provisional arrest in this District at the request of the government of Japan, pursuant to the Treaty on Extradition Between the United States of America and Japan, Mar. 3, 1978, 31 U.S.T. 892, T.I.A.S. No. 9625 ("Treaty").  (*See* Ex. 1 (M. Taylor Compl.) and Ex. 2. (P. Taylor Compl.) (collectively, "U.S. Complaints").) Although Magistrate Judge Cabell issued warrants in good faith based on the information he had at the time, it is now apparent that the U.S. Complaints fail to state a claim for an extraditable offense.  In particular, although the U.S. Complaints purport to allege violations of Article 103 of the Japanese Penal Code, that provision is inapplicable, as it does not criminalize the act of bail jumping and thus cannot criminalize aiding bail jumping.  That is confirmed not only by the Taylors' expert, but by the fact that Japan has itself has not filed charges against the Taylors under Article 103.  Indeed, Japan has *never* applied that provision under similar circumstances and now is seeking to amend the law to cover these acts.

Japan has now submitted its formal extradition requests, but Japan's requests make clear that all operative documents at the time the arrest and extradition was requested make no reference to Article 103 and the references to Article 103 now are contained in documents recently prepared for these proceedings which contain only conclusory assertions that the Taylors violated Article 103.  These filings are unaccompanied by an indictment, criminal complaint, or other charging document alleging such an offense.  Further, the investigative materials provided in support of Japan's extradition request show that Japanese authorities were not even investigating a potential

1

violation of Article 103, but only a misdemeanor immigration offense.  The investigative materials prepared in January and February actually state: "violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II)."  That section, a misdemeanor offense, would not support extradition.  Immediate release is warranted.

Even assuming the Taylors were properly arrested, holding them without bail on a tenuous charge in a jail that has been plagued by COVID-19 violates their Fifth and Eighth Amendment rights.  This is especially the case because neither is a risk of flight and there are undoubtedly conditions under which they can be released.

In view of these factors, on June 8, 2020, the Taylors moved to quash the provisional arrest warrants, or in the alternative, for bail.  (Ex. 5 ("Mots. to Quash").)  Magistrate Judge Cabell heard arguments on the Motions to Quash two weeks later, on June 22, 2020.  (*See* Ex. 8 (Tr. of Mots. Hr'g).)  However, in the weeks since the argument, Judge Cabell has not ruled.  All the while, the Taylors have sat in jail, improperly deprived of their liberty and at risk of exposure to the COVID-19 virus.  This is an exact illustration of the maxim *justice delayed is justice denied*.

For these reasons and those discussed below, this Court must, at the very least, release the Taylors subject to reasonable conditions until they can have their day in court.

## FACTUAL BACKGROUND

### I.    THE TAYLORS HAVE DEEP ROOTS IN THE COMMUNITY

Michael Taylor and his son, Peter Taylor, are both natural-born U.S. citizens.  Michael is a decorated military veteran, having served in the Special Forces for over a decade.  Around 1993, Michael founded a private protective services firm, which has diligently served clients domestically and abroad, including the United States government.  Michael's company has safely repatriated American citizens abducted overseas, including young children and journalists.

Michael is a lifelong resident of Massachusetts, and has lived in the same home in Harvard, Massachusetts, with his wife and three children since 1991.  He cares for his adoptive stepfather, a disabled veteran, who suffers from diabetes and limited mobility.  Michael also coaches youth and high school football and is a highly regarded and well-known mentor to young men—many of whom come from dysfunctional or broken homes.

Peter Taylor is 27 years old and is also a lifelong resident of Massachusetts.  He is a 2011 graduate of Lawrence Academy, where he played football and basketball.  After high school, Peter enrolled at Bentley University, majoring in economics and finance.  When his family's assets were frozen as a result of criminal proceedings against his father in Utah, it was not possible for Peter to continue his studies at Bentley.  He decided to enroll at the Lebanese-American University in Byblos, Lebanon, where his family had a modest condominium nearby.  Peter commuted to the university and studied banking and finance; he graduated with a bachelor's degree in 2015.  For the past several years, Peter has intermittently resided in Lebanon with his brother, including for the majority of the last 15 months.  Peter considers Massachusetts to be his home and plans ultimately to reside in Massachusetts.

## II.     THE TAYLORS' UNLAWFUL ARREST AND DETENTION ARE FACIALLY APPARENT FROM THE WARRANTS

The genesis of this matter were financial charges brought in Japan against Carlos Ghosn Bichara, the former Chairman of the Board of Directors and/or Chief Executive Office of Nissan.  After being charged, Ghosn was released on various conditions.  The government alleges that several months after the Tokyo District Court released Ghosn on bail, "[o]n December 29, 2019, [the Taylors] and other individuals helped Ghosn flee from Japan[.]"  (U.S. Compls. ¶ 7(a); *see also id.* ¶¶ 7(c)-(m) (providing details from Japanese authorities of the Taylors' alleged role in Ghosn's departure).)  Japan issued warrants for the Taylors' arrest on January 30, 2020, and

renewed the warrants on February 28, 2020.  (U.S. Compls. ¶ 6.; *see* Exs. A and B (Warrants).)

The Taylors learned about the Japanese warrants when they were in Lebanon, a country without an extradition treaty with Japan.  (Ex. E, Marino Decl. ¶ 3.)  Shortly after learning of the charges, the Taylors discussed the matter with their U.S. counsel, who informed them that there is an extradition treaty between the United States and Japan, and that Japan would likely seek extradition if they returned to the United States.  (*Id.* ¶¶ 2-5.)  Nevertheless, understanding the risks, the Taylors returned to their home in Harvard, Massachusetts, in March 2020.

Two months later, on May 6, 2020, the government filed complaints for provisional arrest in this District.  (*See* U.S. Compls.)  Based on the information in the Complaints, Magistrate Judge Cabell issued arrest warrants the same day.  (*See* Exs. 3 and 4, Mots. for Detention at 4.)

The U.S. Complaints provide a bare-bones discussion of the alleged crimes under Japanese law.  They specifically allege as follows:

> According to the information provided by the Government of Japan, Michael [and Peter] Taylor [have] been charged under Article 103 of the Japanese Penal Code with enabling the escape of Carlos Ghosn Bichara ("Ghosn"), who was indicted in Japan for financial crimes and had been released on bail pending his trial.

(U.S. Compls. ¶ 5.)  As detailed below, however, neither violating one's bail conditions (bail jumping) nor assisting someone to violate the conditions of his release is a crime in Japan.  The fact that this conduct is not an offense in Japan most likely explains why the Japanese government made no mention of Article 103 in the arrest warrants that Japan issued for the Taylors.  (*See* Exs. A and B.)

Instead, the Japanese Arrest Warrants only allege that the Taylors broke Japanese immigration laws by helping Ghosn board a private jet and leave Japan's territory "[w]ithout receiving confirmation by immigration officer[s]."  (*Id.* at Annex 3.)  The warrants purport this to be a violation of Articles 71 and 25 of the Immigration Control and Refugee Recognition Act.  (*Id.*

at 2.)  Despite Japan's actual charge being immigration-related, the U.S. government specifically disclaimed the immigration charges as forming the basis for the request for provisional arrest. (U.S. Compls. ¶ 5 n.1.)  The U.S. government's concession is one of necessity, as the immigration offenses are only punishable as a misdemeanor, and therefore, are not extraditable offenses under the Treaty.  (*See* Treaty Art. II.)

The Taylors were arrested on May 20, 2020.  (*See* Exs. 3 and 4 at 4.)  They have been held in federal custody at the Norfolk County Correctional Center ever since.

On June 8, 2020, the Taylors moved to quash the U.S. arrest warrants and requested their immediate release.  (*See* Ex. 5.)  Among other things, the Taylors pointed out that they had not been charged in Japan under Article 103, and that Article 103 cannot be used in Japan to punish individuals for aiding bail jumping.  (*Id.* at 11-16.)  The Taylors also noted that the government could not seek extradition for the immigration offense because it did not carry a sufficiently significant penalty under the Treaty.  (*Id.* at 16-17.)  In the alternative, the Taylors requested bail pending the formal extradition hearing.  (*See id.* at 17-33.)

The Taylors explained that even if there were a proper basis to extradite the Taylors under Article 103, it is an offense with a three-year maximum penalty under any circumstance, and few first offenders ever receive the maximum sentence.  (*Id.* at 24; *see* Ex. 7 (Reply) at 4.)  The Taylors noted that there is a real chance, with extended extradition proceedings in court and federal agencies, that the Taylors could end up being detained to make their valid challenge to the extradition request for longer than they would be sentenced in Japan.

Following extensive briefing, Magistrate Judge Cabell held oral arguments on June 22, 2020.  (Ex. 8, 6/22/2020 Hr'g Tr.)  Despite the Court's recognition that the motions required

resolution come "as soon as practicable" and promise to rule "quickly" (*id.*, 58:1-4), Magistrate Judge Cabell has yet to rule.

Japan filed its formal requests for extradition on June 29, 2020. (*See* Exs. F and G, Extradition Reqs.) In its requests, although the Japanese government asserted that the Taylors had violated Article 103 of the Japanese Penal Code, it did not say that the Taylors had been charged under that provision, or provide any further explanation. (*Id.* at EX-Taylor, M.-00030; EX-Taylor, P.-00030.)

## III.   COVID-19 IS ESPECIALLY DANGEROUS TO IMPRISONED INDIVIDUALS

COVID-19 is a novel, highly infectious disease that spreads "[t]hrough respiratory droplets produced when an infected person coughs, sneezes, or talks."[1] "[D]roplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs."[2] In addition, "[i]t may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes."[3] To date, at least 2.9 million people in the United States have been infected with COVID-19, and upwards of 125,000 people have died of the disease.[4] There are currently "no drugs or other therapeutics presently approved by the U.S. Food and Drug Administration (FDA) to prevent or treat COVID-19."[5] Instead, "[t]he best way to prevent illness is to avoid being exposed to this virus."[6]

---

[1] CDC, How COVID-19 Spreads, *available at* https://go.usa.gov/xfctj (last accessed 7/6/2020).

[2] *Id.*

[3] *Id.*

[4] Johns Hopkins University, COIVD-19 Cases by County, *available at* https://coronavirus.jhu.edu/us-map (last accessed 7/6/2020).

[5] CDC, Information for Clinicians on Investigational Therapeutics for Patients with COVID-19, *available at* https://go.usa.gov/xfcQV (last accessed 7/6/2020).

[6] CDC, How to Protect Yourself and Others, *available at* https://go.usa.gov/xfcQp (last accessed 7/6/2020).

The CDC has identified certain factors that put individuals at a greater risk of complications from COVID-19.  Individuals at heightened risk include those with asthma, kidney disease, lung disease, or diabetes.[7]  The CDC reports that among COVID-19 patients with chronic conditions, hospitalizations were six times higher and deaths were 12 times higher, compared to other patients.[8]

Confined individuals—including those in jails—have seen disproportionate rates of infection and death.  As a CDC study explains, detention facilities, in particular, "face significant challenges in controlling the spread of highly infectious pathogens such as SARS-CoV-2," including "crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated or detained persons, and transport of incarcerated or detained persons in multiperson vehicles for court-related, medical, or security reasons."[9]  *See also United States v. Stephens*, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop.") (collecting authorities).

The extreme danger of transmission in the detention environment is reflected in national and state statistics.  For example, the rate of infections of prisoners in institutions managed by the U.S. Bureau of Prisons outpaces the national average nearly six-fold.[10]  In Massachusetts state and

---

[7] CDC, People of Any Age with Underlying Medical Conditions, *available at* https://go.usa.gov/xfcQe (last accessed 7/6/2020).

[8] E. Stokes et al., Coronavirus Disease 2019 Case Surveillance – United States, January 22 – May 30, 2020 (June 19, 2020), *available at* https://go.usa.gov/xfcUD.

[9] M. Wallace et al., COVID-19 in Correctional and Detention Facilities — United States, February-April 2020 (May 15, 2020), *available at* https://go.usa.gov/xfcem.

[10] *See* Federal Defenders of New York, BOP-Reported Positive Tests for COVID-19 Nationwide, *available at*: https://federaldefendersny.org/ (last accessed 7/6/2020).

county facilities, as of July 2, 2020, 655 inmates and 366 staff were infected with the virus, and at least nine inmates had died.[11]

There is an active COVID-19 outbreak underway at the Norfolk County Correctional Center, where the Taylors are being held. As of May 26, 2020, four inmates and staff members tested positive for COVID-19.[12] By July 2, 2020, that number had grown to 36.[13] Because of the slow incubation time of the disease and the possibilities for false-negative results, the actual number of inmates and staff infected with COVID-19 at the jail may be much higher. Tragically, a Norfolk County Correctional Center inmate succumbed to the disease on July 2, 2020.[14]

Recognizing the dangerous situation unfolding in Massachusetts correctional facilities, on April 3, 2020, the Supreme Judicial Court of Massachusetts ordered "that the risks inherent in the COVID-19 pandemic constitute a changed circumstance within the meaning of" state law, thereby allowing trial judges to consider bail determinations for pretrial detainees. *Comm. for Pub. Counsel Servs. v. Chief Justice of Trial Ct.*, 142 N.E.3d 525, 529 (Mass. 2020). Going even further, the Supreme Judicial Court determined that "[t]o decrease exposure to COVID-19 within correctional institutions, any individual who … has not been charged with … a violent or serious offense … is entitled to a rebuttable presumption of release." *Id.*

Federal courts in Massachusetts have reached similar conclusions to the Supreme Judicial Court, and have ordered the release of pretrial detainees and prisoners. *See, e.g.*, *United States v. Calabrese*, 2020 WL 3316139, at *2 (D. Mass. June 18, 2020) (granting compassionate release for

---

[11]  ACLU of Massachusetts, Tracking COVID-19 in Massachusetts Prisons & Jails, https://data.aclum.org/sjc-12926-tracker/ (last accessed 7/6/2020).

[12] *Id.*

[13] *Id.*

[14] The Patriot Ledger, Norfolk County Jail Inmate Dies in Hospital from COVID-19 a Month After Hospitalization (July 2, 2020), https://www.patriotledger.com/news/20200702/norfolk-county-jail-inmate-dies-in-hospital-from-covid-19-month-after-hospitalization.

55-year-old prisoner with no specific health risks and noting that "the virus can appear suddenly

and spread quickly in the prison population"); *United States v. Pena*, 2020 WL 2798259, at *9 (D.

Mass. May 29, 2020) (indicating intent to grant compassionate release upon remand from First

Circuit based on COVID-19 risk to prisoner); *United States v. Ramirez*, 2020 WL 2404858, at *1,

*9 (D. Mass. May 12, 2020) (granting compassionate release based, in part, on "the COVID-19

pandemic that has spread like wildfire throughout the world"); *United States v. Ramos*, 2020 WL

1478307, at *6 (D. Mass. Mar. 26, 2020) (granting pretrial release with conditions in recognition

of the health risk posed by COVID-19); *Jimenez v. Wolf*, No. 18-10225-MLW, Dkt. No. 506 (D.

Mass. Mar. 26, 2020) (ordering release of immigrant detainee in the midst of the COVID-19

pandemic and noting that "being in a jail enhances risk" and that in jail, "social distancing is

difficult or impossible"); *see also Quadrelli v. Moniz*, 2020 WL 3051778, at *1 (D. Mass. June 8,

2020) (certifying class of Section 2241 petitioners incarcerated at Plymouth County Correctional

Facility); *Savino v. Souza*, 2020 WL 1703844, at *1 (D. Mass. Apr. 8, 2020) (recognizing the

"especially grim moment" presented by the COVID-19 pandemic and certifying a class action

brought by detainees at the Bristol County House of Correction in order to address "the health and

safety of the petitioners—as well as the other inmates, staff, and the public.").[15]

---

[15] Courts across the country have likewise released certain inmates—especially pretrial detainees—on conditions to protect them and the community from the COVID-19 pandemic. *See, e.g.*, *Xochihua-Jaimes v. Barr*, __ F.3d ___, 2020 WL 3564033, at *1 (9th Cir. Mar. 23, 2020) (ordering immediate release of immigration detainee "[i]n light of the rapidly escalating public health crisis"); *Thakker v. Doll*, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020) (releasing detainees on their own recognizance and recognizing "that the status quo of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly"); *United States v. Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided."); *United States v. Stephens*, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (ordering the release of inmate in Federal Bureau of Prisons custody due, in part, based on the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" which places inmates, in particular, at "heightened risk").

## LEGAL STANDARDS

### I.   PRELIMINARY INJUNCTIVE RELIEF

Rules 65(a) and (b) enable a petitioner to seek temporary and/or preliminary injunctive relief in order to "preserv[e] the status quo and prevent[] irreparable harm" until a matter can be decided on the merits. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974). "In considering the motion for a preliminary injunction [or a temporary restraining order], a district court weighs four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean v. Mass. State Police*, 492 F.3d 24, 26-27 (1st Cir. 2007); *see also ACA Int'l v. Healey*, 2020 WL 2198366, at *3 (D. Mass. May 6, 2020) ("The standard for issuing a temporary restraining order is the same as for a preliminary injunction.") (quotations and citation omitted). "[W]hen the Government is the opposing party," as here, the balance of hardships and public interest prongs merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018).

### II.  HABEAS RELIEF

The "great writ," codified under 28 U.S.C. § 2241, enables a prisoner to seek release when "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "The custody requirement 'is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty.'" *Ali v. Napolitano*, 2013 WL 3929788, at *2 (D. Mass. July 26, 2013) (quoting *U.S. ex rel. Bailey v. U.S. Commanding Officer of Office of Provost Marshal, U.S. Army*, 496 F.2d 324, 325-26 (1st Cir. 1974)). In the extradition setting, because direct appeal is unavailable, petitions for habeas corpus are the

appropriate vehicle to challenge improper arrests and bail decisions. *See, e.g.*, *Hilton v. Kerry*, 754 F.3d 79, 81 (1st Cir. 2014); *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014) ("Because § 3184 does not provide for direct review of extradition decisions, a fugitive's only avenue to challenge the decision is to file a petition for habeas corpus review under 28 U.S.C. § 2241."); *Drumm v. McDonald*, 2016 WL 111411, at *1 n.1 (D. Mass. Jan. 11, 2016) ("Bail decisions in an extradition proceeding are … challenged by way of invocation of the Great Writ.").

## ARGUMENT

The Taylors readily meet each of the prongs for temporary and preliminary injunctive relief.  Therefore, the Court should immediately order their release.

## I.  THE TAYLORS FACE IRREPARABLE HARM

Without an injunction, the Taylors face two distinct irreparable harms without action by the Court: (1) they will continue to be unlawfully detained and deprived of their freedom at the insistence of the government on the basis of flawed warrants; and (2) they may suffer severe injury, or death, as a result of the COVID-19 outbreak that is currently ravaging the Norfolk County Correctional Center.

*First*, it goes without saying that "[u]nlawful detention causes irreparable harm to petitioners and their families." *Jimenez v. Nielsen*, 326 F.R.D. 357, 361 (D. Mass. 2018); *see also, e.g.*, *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 371 (S.D.N.Y. 2019) (collecting cases); *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 657 (D. Mass. 2018) ("Any unjustified loss of liberty for even one more day would be a particularly painful form of irreparable harm to them and to the United States citizens who love them."); *Ramirez v. U.S. I.C.E.*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018) ("Courts in this and other jurisdictions have found that deprivations of physical liberty are the sort of actual and imminent injuries that constitute irreparable harm."); *Brodheim v. Veal*, 2010 WL 4878816, at *1 (E.D. Cal. Nov. 17, 2010) ("The court finds that this potential harm to the respondent is

heavily outweighed by the irreparable injury of continued unlawful incarceration of petitioner."). The government entered the Taylors' home, arrested them, and has since deprived them of their liberty for over a month—all based on defective warrants and now defective extradition requests. At the same time, the Taylors' family—including Michael's ailing stepfather—have been without them during that time.  It is difficult to conceive of a much more significant and irreparable harm.

*Second*, the Taylors also face immediate and irreparable risk of harm to their health and safety as a result of the COVID-19 pandemic.  *See, e.g.*, *Barbecho v. Decker*, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) ("[I]rreparable harm exists where, as here, petitioners face imminent risk to their health, safety, and lives.") (quotations and citation omitted).  This Court recently emphasized the risk that detainees are exposed to from the pandemic: "In this moment of worldwide peril from a highly contagious pathogen, the government cannot credibly argue that the Detainees face no 'substantial risk' of harm (if not 'certainly impending') from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe."  *Savino*, 2020 WL 1703844, at *4.  The risk of COVID-19 is not merely hypothetical; as discussed above, the number of inmates and staff infected with COVID-19 at the Norfolk County Correctional Center has skyrocketed from four people to 36 since late May, and at least one inmate has died.  The risk is further exacerbated by Michael Taylor's lung surgery, which places him at a significantly higher likelihood of hospitalization and death from complications should he contract the disease.[16]

---

[16] *See* E. Stokes et al., Coronavirus Disease 2019 Case Surveillance – United States, January 22 – May 30, 2020 (June 19, 2020), *available at* https://go.usa.gov/xfcUD.

## II.    THE TAYLORS WILL LIKELY SUCCEED ON THE MERITS OF THEIR PETITION

The Taylors have shown a high likelihood of success on the merits of their Petition.  As explained below, in arresting the Taylors, the government has violated each of the Constitution, the Treaty, and 18 U.S.C. § 3184.  Moreover, even if the Taylors were properly arrested, Magistrate Judge Cabell violated the Taylors' rights by failing to rule on, and thereby denying, their request for reasonable bail.  And finally, at the very least, the Taylors must be released to protect their health and safety as a result of the COVID-19 pandemic.

### A.    The Taylors were improperly arrested and detained because the U.S. complaints and extradition requests do not state a claim for an extraditable offense under Japanese law.

The government improperly arrested the Taylors based on the incorrect premise that they had violated Article 103 of the Japanese Penal Code and had been charged in Japan under that provision.  Japan has not charged the Taylors under that section, and for good reason:  The Taylors' alleged conduct did not violate Article 103.  The U.S. Complaints therefore lacked probable cause under the Treaty and Fourth Amendment and further violated 18 U.S.C. § 3184.  The Japanese Extradition Requests citing Article 103 are also defective and lack probable cause.

At a *minimum*, the government was required to allege in the U.S. Complaints that the Taylors committed an extraditable offense before seeking their arrest.  Two sources require that the government demonstrate probable cause before obtaining a warrant for provisional arrest: (1) the Treaty itself and (2) the Fourth Amendment.  *See, e.g.*, *Caltagirone v. Grant*, 629 F.2d 739, 747 (2d Cir. 1980) (concluding that the extradition treaty between the United States and Italy requires a showing of probable cause prior to provisional detention); *In re Extradition of Skaftouros*, 643 F. Supp. 2d 535, 547 (S.D.N.Y. 2009) (noting that the government must show probable cause under the Fourth Amendment even where it is not required to do so by a treaty).

*First*, courts have interpreted treaty language to require a showing of probable cause prior to a provisional detention.  For example, here, Article III of the Treaty provides:

> Extradition shall be granted only if there is sufficient evidence to prove either that there is *probable cause* to suspect, according to the laws of the requested Party, that the person sought has *committed the offense for which extradition is requested* or that the person sought is the person convicted by a court of the requesting Party.

(emphases added).   Likewise, courts have interpreted language identical to Article IX's requirement that a party requesting a provisional arrest provide "such further information as may be required by the laws of the requested Party" as requiring a showing of probable cause.  *See, e.g.*, *Sahagian v. United States*, 864 F.2d 509 (7th Cir. 1988) (observing that "the procedures set forth in [the treaty] did not deprive [plaintiff] of any constitutional rights" because "the federal officials obtained [plaintiff's] provisional arrest and detention pending extradition after obtaining an arrest warrant from a magistrate based upon a showing of probable cause," "[a]s contemplated by [the treaty]").

*Second*, where a treaty does not already do so, the Fourth Amendment binds preliminary detentions in the United States to the probable cause standard."  *Skaftouros*, 643 F. Supp. 2d at 547.[17]  The Fourth Amendment to the Constitution, of course, guarantees that "no warrants shall issue [] but upon probable cause, supported by oath or affirmation[.]"  U.S. Const., amend. IV.

---

[17] Even before the Extradition Act was passed, Presidents recognized the need to utilize courts to issue arrest warrants in the extradition context, rather than proceed by executive order, and federal judges found Article III of the Constitution self-executing in giving them authority to effectuate extradition treaties.  *See, e.g.*, *In re Rob[b]ins*, 27 F. Cas. 825, 826-27, 832-33 (D.S.C. 1799).  As early as 1795, the Supreme Court recognized the authority of federal judges to refuse an Executive Branch request to extradite.  *United States v. Lawrence*, 3 U.S. (3 Dall.) 42, 53 (1795).  Federal courts recognized that the involvement of federal judges in issuing arrest warrants in furtherance of an extradition, by constitutional necessity, requires that judges comply with the Fourth Amendment in issuing such arrest warrants.  *In re Metzger*, 17 F. Cas. 232, 233 (S.D.N.Y. 1847); *see* Christopher D. Man, *Extradition and Article III: A Historical Examination of "the Judicial Power of the United States,"* 10 Tul. J. Int'l & Comp. L. 37 (2002) (analyzing early extradition law to show the need for judicial involvement and compliance with the Fourth Amendment).

The government does not dispute the application of the Fourth Amendment here.  (*See* Ex. 6 (Gov't Opp'n) ("To be clear, the government certainly does not dispute the applicability of the Fourth Amendment's Warrant Clause and its command that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]'").)

The leading discussion on the topic is the Ninth Circuit's opinion in *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), even though the opinion was subsequently withdrawn under the fugitive disentitlement doctrine when Parretti fled the United States, 143 F.3d 508, 509 (9th Cir. 1998) (en banc).  There, after determining that the applicable treaty with France did not contain any textual requirement for probable cause prior to a provisional arrest, the court reached the constitutional question and held that probable cause is required by the Fourth Amendment. *Parretti*, 122 F.3d at 770-73.  According to the court, the Warrant Clause's provision that "*no* warrant issue but on probable cause is immutable."  *Id.* at 771 (emphasis in original).  Thus:

> The Warrant Clause cannot be interpreted as allowing a lesser standard for arrests made for the purpose of enforcing treaty obligations than for arrests made for the purpose of enforcing our own domestic laws.  It speaks of probable cause as a necessary condition of every arrest warrant, regardless of the governmental purpose served by the arrest.  And it could be no other way.

*Id.*  The court went on to find that the government had not met the probable cause standard in that case, as its "showing consisted of nothing more than naked allegations."  *Id.* at 775.

Since *Parretti*, virtually every court that has addressed the constitutional question has agreed that the Fourth Amendment requires a showing of probable cause prior to a provisional arrest pursuant to an extradition treaty.  *See, e.g.*, *Skaftouros*, 643 F. Supp. 2d at 547; *In re Extradition of Orellana*, 2000 WL 1036074, at *1 (S.D.N.Y. July 26, 2000).  In addition, many other courts have assumed, without deciding, that the Fourth Amendment requires probable cause. *See, e.g.*, *Matter of Extradition of Russell*, 805 F.2d 1215, 1217 (5th Cir. 1986) (assuming probable cause requirement without deciding); *In re Washington*, 2007 WL 128906, at *3 (W.D.N.Y. Jan.

12, 2007) (same); *In re Extradition of Boeyink*, 2004 WL 6074945, at *2 (E.D. Va. Jan. 28, 2004) ("[A] showing of probable cause may nevertheless be constitutionally required.").

Whether the Court determines that the Treaty itself or the Fourth Amendment required the government show probable cause, to meet that standard, the government must allege, at the very least, that the Taylors committed a crime on which they may be extradited.  As the Supreme Court has explained, "[t]he quantum of information which constitutes probable cause [is] evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed." *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925).  Put another way, "[p]robable cause exists if the facts and circumstances within the issuing judge's knowledge and of which they had reasonably reliable information would suffice to warrant a prudent person believing that a person has committed a crime." *Collins v. Univ. of New Hampshire*, 664 F.3d 8, 15 (1st Cir. 2011) (quotations, citation, and alterations omitted).

Finally, beyond probable cause, the statute implementing the extradition process (18 U.S.C. § 3184) also required the government to allege that the relator committed an extraditable offense prior to arrest.  *Id.*  The provision says: "[A]ny magistrate judge authorized so to do by a court of the United States, … upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government *any of the crimes provided for by such treaty or convention*, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged[.]" *Id.* (emphasis added).

Here, the government cannot establish probable cause or comply with 18 U.S.C. § 3184 because neither the U.S. Complaints nor the extradition requests allege that an extraditable crime was committed.  Instead, they only reference Article 103, but that provision does not apply, and Japan has not charged the Taylors with violating it.

The U.S. Complaints assert that the Taylors "helped Ghosn flee from Japan while he was released on bail pending trial for financial crimes" (U.S. Compls. ¶ 7(a)) and allege that they thus have been charged "under Article 103 of the Japanese Penal Code with enabling the escape of [Mr. Ghosn], who was indicted in Japan for financial crimes and had been released on bail pending his trial" (*id.* ¶ 5).   The extradition requests (not the provisional arrest complaints) now have a reference that states: "[T]he conduct of [the Taylors] constitutes the crime of enabling the escape of criminals pursuant to Article 103 of the Penal Code[.]"  (Ex. F at EX-Taylor, M.-00030; Ex. G at EX-Taylor, P-00030.)  As Dr. William B. Cleary, a law professor at Hiroshima Shudo University in Hiroshima, Japan, sets forth in his declaration (Ex. C), Article 103 makes it a crime punishable by up to three years' imprisonment to harbor or enable the "escape" of another person who has "committed a crime" punishable with a fine or greater punishment or "escaped from confinement." (*Id.*, ¶ 12; *see also* Art. 103, Japanese Law Translation Database System, Ministry of Justice, Japan.[18])

This is where the government's case falls apart.  The term "escape," as used in Article 103, is a precise term of art under Japanese law that derives its meaning from Articles 97 (titled "Escape") and 98 (titled "Aggravated Escape").  (Ex. C ¶ 10.)[19]  As used under those provisions, "escape" means that an individual has either fled the scene of a crime to evade police apprehension, or broken out of "confinement," which, in turn, refers to the physical restraints imposed on one's movement in a prison, jail, or other such detention facility.  (*See, e.g.*, Ex. H, *Jokai Keiho* (3d Edition) (2013) *Kobun-Do*.)

---

[18] *Available at* http://www.japaneselawtranslation.go.jp/law/detail/?id=1960&re=02&vm=04.

[19] In fact, the Japanese word for "escape" that is used in Articles 97 and 98—"toso"— is the same word that is used to describe the Taylors' alleged conduct in Annex 3 to Japan's arrest warrants. (Exs. A and B, Annex 3.)

There is not a single instance where Article 97 or 98 has been applied to bail jumping—because bail jumping is plainly not a crime in Japan.  (Ex. C ¶ 10.)  Japan has never prosecuted anyone, including Ghosn, for "escaping" bail conditions.[20]   In fact, numerous investigative documents turned over by the Japanese government in support of the extradition requests reveal that Japan was only investigating "the case of suspected violations of the Immigration Control and Refugee Recognition Act by suspect Carlos Ghosn Bichara[.]"  (*See, e.g.*, Ex. F at EX-Taylor, M.-00051; EX-Taylor, M.-00127; EX-Taylor, M.-00160; Ex. G at EX-Taylor, P.-00051; EX-Taylor, P.-00127; EX-Taylor, P.-00160.)  There is no mention of Article 103.  (*See id.*)

To the contrary, in the wake of Ghosn's departure from Japan, numerous news articles have reported on the fact that what Mr. Ghosn did was not a crime.  (*See, e.g.*, *id.*, internal exhibits attached.)  As one such article explains, "[u]nder current law, [the] 'crime of escape' only applies to jail or detention facility escapees, not those who flee while out on bail."  (*Id.*, Internal Ex. C.) Another article agreed: "The current criminal law, 'flight offenses,' targets inmates in prisons.  For this reason, it does not apply when in bail such as Ghosn."  (Ex. J (Jiji News Article).)

Recognizing this fact, the Japanese government has been scrambling to criminalize bail jumping.  On March 6, 2020, referring to Ghosn's departure from Japan, the Japanese Minister of Justice told the legislature's Legal Committee that the Ministry had "recently consulted with the Legal Council on the establishment of criminal law to ensure the escape of these persons."  (Ex. K.) She continued, "[i]n the future, based on the results of the deliberation, we will proceed with *the necessary legislation*."  (*Id.*)  Thereafter, on June 15, 2020, a committee of the Japanese Ministry of Justice met to discuss the establishment of new penalties for [] escape … [while] on bail."

---

[20] Indeed, Japan has not issued a warrant for Ghosn's arrest for escaping his bail conditions.  The "red notice" posted to Interpol indicates only the underlying financial crime charges for which he was released on bail in Japan.  (*See* Ex. I.)

(Ex. J; Ex. L.)  These references make clear that on the day the Taylors were arrested, they could not be properly charged under Article 103.

In charging the Taylors with violating Article 103, the United States is attempting to transform Japanese law to criminalize the act of *helping* someone engage in an act that is not *itself* criminal.  Apart from raising profound due process and fairness concerns (which makes the United States' case for detention even more tenuous), this charge is unfounded as a matter of Japanese criminal law.  Even assuming that the United States' allegations were true, the Taylors cannot be said to have violated Article 103 because they did not harbor or enable Ghosn—who was free on bail—in fleeing the scene of a crime or escaping confinement.  (Ex. C ¶ 14.)  Like Articles 97 and 98, Article 103 has never been interpreted or understood to apply to assisting someone to violate their bail conditions.  (*Id.* ¶¶ 13-14.)  In fact, recent Japanese cases establish that Article 103 is only chargeable when one harbors or enables "escapes" within the traditional meaning of the term—*i.e.*, fleeing the scene of a crime, or breaking out of a detention facility.[21]  Japanese scholars and practitioners reviewing this case have agreed.  (*See* Ex. M ("Helping someone jump bail isn't a crime in Japan … said Yunhai Wang, a professor of criminal law at Hitotsubashi University graduate school in Tokyo.  Nobuo Gohara, a former prosecutor and vocal critic of Japan's criminal-justice system, concurred[.]")  The statute simply has no application to assisting someone to

---

[21] *See, e.g.*, Osaka Dist. Ct., Judgment, Apr. 27, 2018 (Hanrei-Jiho) No. 2400, *aff'd*, Osaka High Ct., Judgment, Sept. 25, 2018 (Hanrei-Jiho) No. 2406 (defendant violated Article 103 where he hid fugitive seeking to evade initial police apprehension); Saitama Dist. Ct., Judgement, July 16, 2014 (Saikou Saibansho Keiji Hanreishu), *aff'd*, Tokyo High Ct., Judgement, July 8, 2015 (Saikou Saibansho Keiji Hanreishu) (defendant violated Article 103 by disposing of evidence in effort to thwart friend's initial capture by police); Osaka Dist. Ct., Judgment, Apr. 17, 2003 (Hanrei-Taimuzu) No. 1127 (defendant violated Article 103 by harboring fugitive in home in order to prevent another's arrest while warrant outstanding); Yokohama Dist. Ct., Judgment, Jan. 30, 2015, No. 28230737 (defendant violated Article 103 by assisting another in escaping detention facility); Tokyo Dist. Ct., Judgment, May 22, 1992, No.28166476 (defendant violated Article 103 by helping another escape police car while in custody).

figuratively "escape" his or her bail conditions.  At bottom, just as Ghosn's violation of his bail conditions was not a crime under Japanese law, neither was any assistance rendered by the Taylors.

In the proceedings before Magistrate Judge Cabell, the government—relying on the unsworn declaration of the Japanese prosecutor—was unable to show that Article 103 has ever been used in circumstances such as these.  (*See* Ex. 5 at 27-31.)  In fact, Dr. Cleary was able to distinguish each of the cases cited by the government and Japanese prosecutor that supposedly supported the application of Article 103.  (Ex. D, ¶¶ 4-5.)  Dr. Cleary concluded that the government's cases show only that "Article 103 … applies to instances where one enables another person to escape apprehension by law enforcement."  (*Id.* ¶ 5.[22])

Charging the Taylors with violating Article 103 is at odds with other parts of Japan's Penal Code as well.  Article 63 of that Code provides: "The punishment of an accessory shall be reduced from the punishment for the principal."  (Ex. C ¶ 15; *see* Art. 63, Penal Code, Japanese Law Translation Database System, Ministry of Justice, Japan.[23])  But the legal theory underlying Japan's current extradition request would charge an accessory in *excess* of the principal—an outcome that is both unjust and illogical.[24]  If the principal (Ghosn) committed no crime and could

---

[22] *See* Judgment of Tokyo Dist. Ct., Feb. 16, 1999, hanji vol. 1000, p. 325 (defendants violated Art. 103 by fabricating documents that enabled their fellow gang members to escape arrest); Judgment of S. Ct., Mar. 17, 1960, Kei-Shu vol. 14, No. 3, p. 351 (defendant violated Art. 103 by helping his friend evade arrest); Judgment of Osaka Dist. Ct., May 10, 2000 (defendant violated Art. 103 by assisting an individual whose bail was revoked).

[23] Available at http://www.japaneselawtranslation.go.jp/law/detail/?id=1960&re=02&vm=04.

[24] Under United States law, the punishment for an aider and abettor to a crime is commensurate with—not excessive of—the penalty of a principal.  *See* 18 U.S.C. § 2.  And the punishment for an accessory after-the-fact is less than the punishment for a principal.  *See* 18 U.S.C § 3 ("Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.").

receive no punishment for jumping bail, it is contrary to Article 63 for the Taylors to be subject to criminal punishment for assisting him.[25]  The Taylors' arrest, therefore, is exceptional.

Importantly, the government cannot now fall back on the misdemeanor immigration offense that has been charged in Japan to support extradition.  (*See* Exs. 3 and 4, ¶ 5 n.1.)  The United States has explicitly rejected seeking the Taylors' extradition on the basis of Articles 25 and 71 of the Immigration Control and Refugee Recognition Act.  But even if the government did not disclaim Articles 25 and 71, they would be inadequate.  The Treaty only permits extradition for offenses "punishable by the laws of both Contracting Parties by death, by life imprisonment, or by deprivation of liberty for a period of *more than one year*[.]"  Treaty, Art. II (emphasis added).  Violations of Articles 25 and 71 are misdemeanors.

While a genuine Article 103 violation carries a maximum punishment of three years, Article 63 limits the punishment that can be imposed on the Taylors for assisting Ghosn to violate the Immigration Control and Refugee Recognition Act to less than that imposed on Ghosn, which in turn, is limited to imprisonment of not more than one year.  As a result, the actual offense with which the Japanese have charged the Taylors would still not establish probable cause for an extraditable offense as that offense is a mere misdemeanor.

**B.    Magistrate Judge Cabell should have promptly granted the Taylors bail.**

Even if the Court finds that the Taylors were properly arrested, it must order their release because Magistrate Judge Cabell improperly delayed granting the Taylors bail.  As noted above,

---

[25] Moreover, even if Mr. Ghosn had escaped from confinement and thus committed the crime of escape, a violation of Article 97 is a misdemeanor.  (*See* Art. 97, Penal Code, Japanese Law Translation Database System, Ministry of Justice, Japan, *available at* http://www.japaneselawtranslation.go.jp/law/detail/?id=1960&re=02&vm=04.)   Under Article 63, the Taylors necessarily would be subject to punishment less than that faced by Mr. Ghosn, and the offense would not be a non-extraditable misdemeanor in any event.

"bail decisions in an extradition proceeding are properly challenged by way of invocation of the Great Writ." *Drumm*, 2016 WL 111411, at *1 n.1.

The Bail Reform Act does not apply to extraditions; rather, the question of bail in extradition cases is governed by federal common law. *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (Cabell, M.J.). We acknowledge that the federal common law generally recognizes a presumption against bail in extradition cases,[26] but that presumption may be overcome if a defendant proves both that (1) he is neither a flight risk, nor a danger to the community; and (2) there are "special circumstances" that justify release on bail. *See, e.g.*, *id.* The Taylors easily satisfy both requirements.

### 1. The Taylors are not flight risks.

The Taylors are not flight risks and have no reason or incentive to evade these proceedings.

Although the Bail Reform Act is not controlling in extradition cases, its standards for evaluating an individual's risk of flight provide a useful frame of reference, 18 U.S.C. § 3142(g):

> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

---

[26] Despite this acknowledgment of the current state of the law, which is binding on this Court, defense counsel maintains that this legal understanding is outdated and unconstitutional, and seeks to preserve the issue in case of appeal. The Eighth Amendment creates a presumption for bail and that constitutional requirement is applicable to all federal judges when addressing bail issues, and such a constitutional right cannot be abrogated by treaty. Early extradition cases mistakenly treated extradition matters as some sort of exchange among sovereigns in which the individual at issue was a mere pawn, with relatively few rights. Following the expansion of constitutional rights generally in the intervening decades, extradition law has been slow to catch up in providing relators the full scope of the constitutional rights to which they are entitled, including under the Eighth Amendment. *See, e.g.*, Man, *supra* note 17, at 115.

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Because there exists a presumption against bail in extradition cases under current law, one seeking release must rebut this presumption by demonstrating that he is a "tolerable bail risk." *See United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979). This burden can be met in two ways: (1) by establishing that he does not present a risk of flight, or (2) by demonstrating that there exist conditions of release that will reasonably assure his presence at future proceedings. *Kin-Hong v. United States*, 926 F. Supp. 1180, 1189-90 (D. Mass.), *supplemented*, 927 F. Supp. 517 (D. Mass. 1996), *rev'd on other grounds*, 83 F.3d 523 (1st Cir. 1996). Here, the charged offense involves no violence or drugs. In fact, the statute on which the extradition request is premised, Article 103, contemplates a *maximum* penalty under any circumstance of no more than three years' imprisonment and a fine of not more than 300,000 yen (which is the equivalent of approximately US$2,770).

In the extradition case, the government unfairly and inaccurately described the Taylors as "extraordinary" flight risks and "expert[s]" on the subject (Ex. 6 at 15-17), speculating without any basis that they might flee the country "in order to avoid justice," or escape "to an underground

domestic location" (*id.* at 17).   In fact, six factors confirm that the Taylors would fully and completely participate in these proceedings.

*First*, and perhaps most tellingly, the Taylors' conduct since Japan issued its arrest warrants confirms that they are not flight risks.   One fact undermines the government's fantastical argument: *The Taylors were in Lebanon*, a country with no extradition treaty with Japan and the place to which the government suggests the Taylors would escape, when they learned about the Japanese arrest warrants.   (Ex. E (Marino Decl.) ¶¶ 2-3.)   Knowing of the warrants and U.S. extradition treaty, the Taylors returned to the United States to the place the U.S. Marshal's Service would look first—their Massachusetts home.   (*Id.* ¶¶ 4-5.)

*Second*, Michael Taylor's history demonstrates that he is not a flight risk.   Michael is a decorated military veteran, having served in the Special Forces for over a decade.   He founded a private protective service firm in or about 1993, American International Security Corporation, and has diligently performed services for clients, including the United States Government, domestically and internationally for many years.

Ignoring Michael's service to this country, in the extradition case, the government seized upon a public integrity case brought against Michael in Utah seven years ago.   But that case actually demonstrates Michael's respect for the law and that he is not a flight risk.   For starters, when the charges were filed in U.S. District Court in Salt Lake City, Michael was overseas in the Middle East, in a country with no extradition treaty with the United States.   The charges against him were extremely serious and he was potentially facing life imprisonment if convicted.   He could have remained outside the country.   However, Michael voluntarily returned to the United States and travelled to Utah to address the charges against him.   Moreover, although Michael was detained initially in that case, after the court accepted Michael's plea, both the government and the

court agreed to release him on conditions (*for 16 months*), and Michael fully complied with the Court's conditions of release.  (*See* Ex. N (Order Setting Conditions of Release).)  Furthermore, the government did not dispute that Michael *returned* to Utah from a country without an extradition treaty (as he has done here) to face the charges against him.

Moreover, in seeking detention, the government made passing references to Michael's involvement in the "extraction" of certain individuals from foreign countries and his ability to bribe foreign officials.  It is true that Mr. Taylor has, at the request of, or with the knowledge of, federal law enforcement, successfully rescued and safely returned young children and journalists abducted abroad to the United States.[27]  But those skills, which have proven of great value to the U.S. military, federal law enforcement, prominent U.S. businesses, and the American public generally, are hardly blameworthy.  The Court must not allow Michael's service to his country to be weaponized against him by an ungrateful sovereign.

*Third*, Peter Taylor is not in any sense a flight risk, and the government hardly argued otherwise in the extradition case.  Peter is a native-born U.S. citizen and lifelong resident of Massachusetts with strong local ties.  He is 27 years of age, and has no criminal history.  As noted above, he is a 2011 graduate of Lawrence Academy and graduated with a bachelor's degree from the Lebanese-American University in Byblos, Lebanon in 2015.

---

[27] Mr. Taylor has assisted law enforcement in other ways over the years.  For several years beginning in the late 1980s, Michael Taylor worked with federal law enforcement as an undercover operative infiltrating an organized criminal organization that was involved in the importation of a large quantity of hashish into the United States, as well as money laundering and other serious offenses.  As a result of Mr. Taylor's efforts, the government was able to seize over 2,000 kilograms of high-quality hashish (with a street value of over $100,000,000) and obtain indictments against 12 individuals.  *United States v. Kattar, et al.*, Criminal No. 91-cr-10247-DPW (D. Mass. 1991).  The lead defendant in the case was sentenced to 10 years in federal prison.  Over the years, Mr. Taylor has agreed to use his knowledge of and connections in the Middle East to assist various law enforcement agencies in a number of other investigations and operations.

After college, Peter returned to Massachusetts and started a remote tutoring business for students in Lebanon.  He occasionally travelled back to Lebanon to visit with family and friends, and to start a new business.  In or about January 2019, Peter started a digital marketing business. He has spent the majority of the past 15 months residing with his older brother in Lebanon and working on his digital marketing business and his father's Vitamin 1 business.  He has engaged in business travel primarily to the United Arab Emirates, and occasional travel for pleasure to locations in Europe.

Despite spending much of his time in Lebanon over the past 15 months, Peter has regularly returned to the family home in Massachusetts.  His domicile and primary residence are in Harvard, Massachusetts.  His goal has been to return to Massachusetts full-time.

The government has made much hay of the fact that Peter planned to return to Lebanon on May 20, 2020.  That trip, however, was for business reasons totally unconnected to this case.  In addition, Peter booked his ticket ten days before he planned to leave.  Booking a regular commercial air ticket more than a week in advance is the last thing a person fleeing the country would do.  *See* 19 C.F.R. § 122.75a(b)(1)(i) (requiring airlines to disclose international passenger manifests).

*Fourth*, the Taylors are not dangers to the community.  The government appeared to agree with this as to Peter, but for Michael, says that he "was previously found to be" dangerous in the Utah proceeding.  (Ex. 6 at 2.)  That is misleading at best.  Although the Utah court initially expressed apprehension that Michael would interfere with the proceedings given the nature of the charges, that same court subsequently released him (without requiring any bond) for more than 16 months pending sentencing.  (*See* Ex. N.)  The Utah court's initial concerns were never realized,

and Michael has not shown himself to be any danger to the community in the intervening seven years.

*Fifth*, the Taylors have no incentive to flee.  At the very most, as explained above, the Taylors face three years' imprisonment in Japan (less time, really, given that Japan sentences accessories more leniently than principals).  *See* Art. 63.  A quick sampling of Japanese cases suggests that defendants seldom receive the maximum punishment.[28]  That would hardly motivate anyone to become a fugitive from his own country for the rest of his life.

*Sixth*, the Court can impose reasonable conditions to assure the Taylors' compliance with supervised release.  *See Drumm*, 150 F. Supp. 3d at 97; *see also United States v. Ramnath*, 533 F. Supp. 2d 662, 670-71 (E.D. Tex. 2008) (holding that the risk of flight could be negated by imposing special conditions of release despite finding the "presence of some evidence of flight risk").  The government suggests that it would not be enough for the Taylors to surrender their passports and agree to GPS monitoring.  Although we disagree that those conditions are inadequate, the Taylors are willing to agree to further reasonable conditions (*e.g.*, posting the property of others who would risk their assets to assure the Court of the Taylors' appearance).

### 2.  The Taylors have shown that special circumstances justify their release.

Furthermore, the Taylors have shown four special circumstances that individually and collectively justify their release.

---

[28] *See, e.g.*, Osaka Dist. Ct., Judgment, Apr. 27, 2018, P. 109 of Law Cases Reports (Hanrei-Jiho) No. 2400 (sentenced to term of imprisonment of one year and eight months), *aff'd in part*, Osaka High Court, Judgment, Sept. 25, 2018; P. 72 of "Law Cases Reports (Hanrei-Jiho) No. 2406 (sentence reduced to one year and two months' imprisonment); Saitama Dist. Ct., Judgment, July 16, 2014; P. 499 of Saikou Saibansho Keiji Hanreishu (S. Ct. Reports (criminal cases )) vol. 71-3 (sentenced to term of imprisonment of two years' imprisonment); Osaka Dist. Ct., Judgment, Mar. 30, 2012, cited from Case No. 28181846 of "D1-Law.com Hanreitaikei" (sentenced to term of imprisonment of one year and six months); Osaka Dist. Ct., Judgment, Apr. 17, 2003; P. 264 of Law Times Reports (Hanrei-Taimuzu) No.1127 (sentenced to term of imprisonment of one year and ten months).

The ultimate determination of whether "special circumstances" exist is a fact-specific and fact-intensive question committed to the Court's discretion. *Drumm*, 2016 WL 111411, at *3. Generally speaking, to be "special," a circumstance must be atypical, that is, it must be "more or less unique to the supplicant and not be one that is applicable to extraditees generally." *Id.* The circumstances that courts have held constitute "special circumstances" justifying bail in extradition proceedings include (1) a substantial likelihood of success in resisting extradition, (2) the likelihood of success in defending against the action in the requesting country, (3) the availability of bail for the underlying charges in the requesting country, and (4) the requesting country's allowance of admission to bail for those facing an extradition hearing for the same offense. Roberto Iraola, *The Federal Common Law of Bail in International Extradition Proceedings*, 17 Ind. Int'l & Comp. L. Rev. 29, 41 (2007) (compiling cases); *see also United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (specifically listing "substantial claims showing a high probability of success on the merits" and where "the requesting country would grant bail in a comparable extradition case" among judicially recognized special circumstances).

***Likelihood of success on the merits***:  The probability of success against the underlying charge on which extradition is requested first appeared as a special circumstance in *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989), which stated in *dicta* that special circumstances include "the raising of substantial claims upon which the appellant has a high probability of success[.]" *Id.* at 317.  Several courts, including this Court and the First Circuit, have noted that the probability of success can be a special circumstance. *See, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 524-25 (1st Cir. 1997); *Castaneda-Castillo*, 739 F. Supp. 2d at 56 (D. Mass. 2010).  This factor is plainly relevant as a defendant with little reason to fear conviction has little reason to flee.

As detailed above, the offense on which the U.S. Complaints and extradition requests are premised is not, in fact, an actual criminal offense under Japanese law or one that Japan has charged the Taylors with violating.  To the extent that the Taylors have been charged with an immigration offense, extradition is unavailable under the Treaty because the maximum penalty is one year or less.  Therefore, the Taylors are likely to prevail in the extradition proceeding.

*COVID-19*:  As explained above, the COVID-19 pandemic that has shaken the world has created special challenges for detention facilities.  The Norfolk County Correctional Center has three dozen confirmed cases of COVID-19 among prisoners and staff, and at least one inmate has died of the disease.

Michael Taylor, who is 59 years of age, had part of his left lung surgically removed several years ago.  From time to time, he experiences breathing difficulties as a result of his physical condition.  If he were to contract the virus, which, given the present situation at the jail is a distinct possibility, he could face very serious medical complications.  That risk is confirmed by the CDC, which reports that people—like Michael—with certain conditions are six times more likely to be hospitalized with COVID-19 complications and 12 times more likely to die of those complications than others.

Other courts have taken notice of the extreme danger of COVID-19, including in the extradition context.  In *Matter of Extradition of Toledo Manrique*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020), the court determined that "[t]he risk that [the relator] will contract COVID-19 while in jail is a special circumstance that warrants bail."  *Id.* at *1.

That case is especially notable because the court reached its decision in spite a number of factors, including that (1) the relator, Alejandro Toledo Manrique, the former President of Peru, was deemed to be a flight risk with considerable means; (2) there were no reported cases of

COVID-19 at the facility where Toledo was being held; (3) there was no dispute that Toledo had been charged with an extraditable crime (bribery); and (4) Toledo had no risk factors for COVID-19 complications, apart from age.  *Id.* By contrast, (1) the Taylors are not and have not been adjudged to be flight risks; (2) there is currently a COVID-19 outbreak underway at the Norfolk County Correctional Center, where the Taylors are being held; (3) there is a significant dispute among the parties as to whether the Taylors have been charged with an extraditable offense in Japan; and (4) Michael Taylor has a heightened risk of complications from COVID-19 because of an earlier lung surgery.

> ***Michael Taylor should be released to care for his stepfather***: Michael Taylor's adoptive stepfather, Robert Taylor, is 81 years old, widowed, and lives alone a very short distance from the Taylor family home in Harvard, Massachusetts.  Michael's father has various health issues.  He is a disabled veteran suffering from severe hypertension, diabetes, and limited mobility.  He is overweight and suffered a heart attack not long ago.  Michael Taylor serves as his sole caregiver. He visits with his father on a daily basis, attends to his medical and personal needs, buys food and groceries for him, helps him to prepare meals, insures he takes his medications as prescribed, and also takes other necessary steps to protect him from contracting the COVID-19 virus.  He is clearly in the category of persons most vulnerable to the pandemic.

Michael and Peter Taylor are the only family members available to care for and attend to the needs of Michael's elderly father.  These past couple of weeks, while the Taylors have been detained, have been a real struggle for the family, and they have had to call upon the assistance of Mr. Taylor's middle son (Oliver) and neighbors to assist and temporarily look after Mr. Robert Taylor.  This arrangement cannot continue for long and is certainly not a long-term solution.

In the extradition proceeding, the government did not dispute the hardship imposed on Michael's stepfather while Michael is in jail, but it refused to acknowledge that it is a special circumstance.  (Ex. 6 at 16.)  Michael's need to care for his stepfather, however, plainly meets the definition; there can be no question that Michael's caregiving is not "applicable to extraditees generally."  *Drumm*, 2016 WL 111411, at *3.  At the very least, it is another factor that cuts in favor of a finding of special circumstances.  *See In re Extradition of Molnar*, 182 F. Supp. 2d 684, 689 (N.D. Ill. 2002) (relator's financial support for his ill mother was a factor justifying release).

*A Lebanese prosecutor has cleared the Taylors of wrongdoing*:  Further highlighting the lack of a crime, Lebanon actually investigated the facts surrounding Mr. Ghosn's departure from Japan and *acquitted* the Taylors of any wrongdoing.  (*See* Ex. O, Decl. of Attorney Naoum Toubia Farah.)  This corroborates the points above regarding the lack of a crime.  It is also independent grounds defeating extradition.  Article IV, Section 2 of the Treaty provides that: "The requested Party may refuse extradition when the person sought has been tried and acquitted, or has undergone the execution of punishment in a third State for the offense for which extradition is requested."  The Taylors, therefore, have been investigated for this same alleged event by the Republic of Lebanon, and they have been adjudicated and acquitted.  The United States government as a whole, including this Court, should be careful not to offend the Republic of Lebanon by rejecting its finding in this matter, which is precisely why this provision of the treaty exists.  If Japan has any quarrel with the Republic of Lebanon's conclusion, that is a matter for the governments of Japan and Lebanon to address among themselves.

**C.    The Taylors should be released based on the unacceptable risk to their health and safety posed by the COVID-19 pandemic.**

Regardless of the foregoing, the Court should also release the Taylors to protect them from the extreme risk to their health and safety posed by the COVID-19 pandemic.

"The due process guarantee of the Constitution obliges the government 'to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health.'" *Savino*, 2020 WL 1703844, at *6 (quoting *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011)).[29]   The principle underlying this is that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the … Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).   "To succeed on [a deliberate indifference] claim, the petitioners 'must satisfy both a subjective and objective inquiry: [Petitioners] must show first, 'that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety,' and second, that the deprivation alleged was 'objectively, sufficiently serious.'" *Grinis v. Spaulding*, 2020 WL 2300313, at *2 (D. Mass. May 8, 2020) (quoting *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011)) (alterations in *Grinis*).

Here, release is necessary because Respondents are aware of the COVID-19 pandemic and the outbreak in the Norfolk County Correctional Center, but have taken inadequate steps to protect the Taylors from serious injury or death.   At the outset, there can be no dispute that the administration at the jail is aware of the COVID-19 outbreak at the jail.   (*See* Ex. 6, internal Ex. D (Boomhower Decl.) ¶¶ 7-18.)   According to publicly released data, as of May 26, 2020, four inmates and staff members tested positive for COVID-19.[30]   By July 2, 2020, that number had

---

[29] Deliberate indifference cases are typically brought by prisoners under the Eighth Amendment and pre-trial detainees under the Fifth Amendment. *See Baez v. Moniz*, 2020 WL 2527865, at *6 (D. Mass. May 18, 2020).   The two standards are "not all that far apart." *Id.* (quotations and citation omitted).

[30] *Id.*

grown to 36.[31]   The risks of COVID-19, including those to inmates, are virtually inescapable in the media.

Respondents have also taken insufficient steps to protect the Taylors.   Although the CDC says that "[t]he best way to prevent illness is to avoid being exposed to this virus,"[32] that is virtually impossible in the jail, where the inmates are in close proximity to each other, share facilities, and are unable to take other steps to protect themselves.

It is because of facts like these that the CDC has concluded that prisons "face significant challenges in controlling the spread of highly infectious pathogens such as SARC-CoV-2."[33]   *See also Savino*, 2020 WL 1703844, at *4 ("In this moment of worldwide peril from a highly contagious pathogen, the government cannot credibly argue that the Detainees face no 'substantial risk' of harm (if not 'certainly impending') from being confined in close quarters in defiance of the sound medical advice that all other segments of society now scrupulously observe.").   As discussed more fully above (at 8), Courts in Massachusetts and across the country have taken drastic actions to protect detainees and prisoners from the disease.   *E.g.*, *Comm. for Pub. Counsel Servs.*, 142 N.E.3d at 529 (establishing presumption of release for most pretrial detainees).

The danger is even more concrete for Michael Taylor, who is at a heightened risk for complications based on an earlier lung surgery.   The CDC reports that hospitalizations were six times higher and deaths were 12 times higher among COVID-19 patients with chronic conditions, like Michael, compared to other COVID-19 patients.[34]

---

[31] *Id.*

[32] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[33] https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm.

[34] https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w.

For these reasons, the Court should immediately release the Taylors, subject to reasonable conditions, to protect them from the COVID-19 outbreak at the jail.

## III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST JUSTIFY RELEASE

The balance of hardships and public interest both support release because the Taylors have been improperly detained and denied bail, while their release presents no risk to public safety.

Initially, "'public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.'"  *Brito v. Barr*, 415 F. Supp. 3d 258, 270 (D. Mass. 2019) (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)); *see also, e.g.*, *Coronel v. Decker*, 2020 WL 1487274, at *7 (S.D.N.Y. Mar. 27, 2020) ("[P]ublic interest is best served by ensuring the constitutional rights of persons within the United States are upheld.").  Put simply, the public has an undeniable interest in the Taylors not being held in jail in violation of the Constitution, laws, and treaties of the United States.  Allowing otherwise would transform the American system into something unrecognizable.

Moreover, the public has a keen interest in protecting the Taylors' health and preventing the further spread of the COVID-19 pandemic.  As this Court explained in *Savino*, "allowing harm to befall the Detainees is contrary to the public interest[.]"  *Savino v. Souza*, 2020 WL 2404923, at *10 (D. Mass. May 12, 2020).  Reducing the population at the jail will also help reduce the spread of COVID-19, and ultimately help protect the community as a whole.

The government's interest, by contrast, is virtually non-existent.  Where the government has unlawfully arrested and detained the Taylors, it is hard to conceive of a rationale that could possibly justify keeping them behind bars.  And even if the Taylors are being lawfully held, the government's interest in keeping them detained without bail is minimal.  As explained above, the Taylors are not dangerous to the community and will fully participate in these proceedings.  The Taylors are willing to agree to any and all reasonable conditions of release.

## **CONCLUSION**

For the reasons explained above, the Court should grant the Taylors' immediate release because they were arrested and detained without probable cause in violation of the Constitution, the Treaty, and the laws of the United States.  In the alternative, the Court should grant the Taylors' immediate release, subject to reasonable conditions, because Magistrate Judge Cabell improperly denied them bail, and to protect them from the COVID-19 outbreak at the Norfolk County Correctional Center.

Dated:  July 7, 2020

Respectfully submitted,


By their attorneys,

*/s/  Paul V. Kelly*
Paul V. Kelly (BBO No. 267010)
Jackson Lewis, P.C.
75 Park Plaza
Boston, MA  02110
Tel (617) 367-0025
paul.kelly@jacksonlewis.com


*/s/ Abbe David Lowell (by permission)*
Abbe David Lowell (*pro hac vice*)
Christopher D. Man
Zachary B. Cohen
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel. (202) 282-5875
adlowell@winston.com

*Counsel for Michael and Peter Taylor*

*/s/ Robert Sheketoff*
Robert Sheketoff (BBO# 457340)
One McKinley Square
Boston, MA  02119
Tel. (617) 367-3449
sheketoffr@aol.com

*/s/ Daniel Marino (by permission)*
Daniel Marino (*pro hac vice*)
dmarino@marinofinley.com
Tillman J. Finley (*pro hac vice
forthcoming*)
tfinley@marinofinley.com
MARINO FINLEY LLP
800 Connecticut Avenue, N.W., Suite 300
Washington, DC  20006
Tel.  202.223.8888

*Counsel for Michael L. Taylor*

<u>/s/James P. Ulwick (by permission)</u>
James P. Ulwick (*pro hac vice*)
KRAMON & GRAHAM PA
One South Street, Suite 2600
Baltimore, MD  21202
Tel. (410) 752-6030
JUlwick@kg-law.com
*Counsel for Peter M. Taylor*

37

## CERTIFICATE OF SERVICE

I, Paul V. Kelly, certify that service of this motion was made on the above date by and through the ECF filing system.

*/s/ Paul V. Kelly*
Paul V. Kelly