UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL L. TAYLOR and PETER M. TAYLOR, | ) ) ) | |
| *Petitioners,* | ) ) | |
| *v.* | ) ) | Case No. 4:20-cv-11272-IT |
| JEROME P. MCDERMOTT, Sheriff, Norfolk County, Massachusetts, and JOHN GIBBONS, U.S. Marshal, District of Massachusetts, | ) ) ) ) ) | Leave to File Excess Pages Granted on July 22, 2020 |
| *Respondents.* | ) | |

**RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION FOR A
PRELIMINARY INJUNCTION AND RESPONSE TO HABEAS PETITION**

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………………...……1

BACKGROUND………………………………………………………………...………5

    I. LEGAL BACKGROUND………………………………………………….…..…..5

    II. STATEMENT OF THE FACTS……………………………………….…..…..5

    III. PROCEDURAL HISTORY………………………………………………...8

    IV. RULING UNDER REVIEW……………………………………………8

ARGUMENT………………………………………………….………………………10

    I. STANDARD OF REVIEW……………………………...………………...10

    II. PETITIONERS HAVE NOT CARRIED THEIR BURDEN TO SHOW HABEAS OR INJUCTIVE RELIEF IS WARRANTED……………………………………………..11

        A. Petitioners have not shown a substantial likelihood of success on the merits………………………...……………………………………………………11

            1. Petitioners' independent probable cause arguments are not properly before the Court and lack merit……..…………………………………….…...…..11

            2. Magistrate Judge Cabell properly found Petitioners did not overcome the strong presumption against bail in international extradition cases …………...13

                a. Magistrate Judge Cabell properly found Petitioners had not carried their burden to show special circumstances warranted their release……………………………………………………...……..13

                    i. Petitioners have not shown a high likelihood of success, even if such a factor could theoretically constitute a special circumstance……………………………...……………………13

                    ii. Magistrate Judge Cabell properly found Petitioners' other claims did not constitute special circumstances warranting their release……………………………………………………..24

                b. Magistrate Judge Cabell properly found Petitioners have not carried their burden to show they are not flight risks……………………..27

        B. The balance of the equities does not favor injunctive relief……………………32

CONCLUSION………………………………………………………………………...33

# TABLE OF AUTHORITIES

## Cases

*Animal Science Products, Inc. v. Herbei Welcome Pharmaceutical Co. Ltd.*,
138 S. Ct. 1865 (2018) ..................................................................................................... 20, 21, 22, 23

*Artukovic v. Rison*, 784 F.2d 1354 (9th Cir. 1986) .................................................................. 32

*Basic v. Steck*, 819 F.3d 897 (6th Cir. 2016) ........................................................................... 21

*Blasko v. Thomas*, 2019 WL 1081209 (E.D. Cal. Mar. 7, 2019) ............................................. 22

*Bolanos v. Avila*, No. 09–1208, 2009 WL 3151328 (D.N.J. Sept. 24, 2009) ........................... 25

*Borodin v. Ashcroft*, 136 F. Supp. 2d 125 (E.D.N.Y. 2001) .................................................... 31

*Boyer v. United States*, 14-cr-10163, 2020 WL 1978190 (D. Mass. Apr. 24, 2020) ................. 25

*Cavalier Coach Corp. v. Foxx*, No. 14–cv–12499, 2014 WL 2711922 (D. Mass. June 13, 2014) ............ 10

*Cornea v. U.S. Attorney General*, 771 F. App'x 944 (11th Cir. 2019) ..................................... 21

*Drumm v. McDonald*, No. 15-cv-14221, 2016 WL 111411 (D. Mass. Jan. 11, 2016) ................... 5, 11, 24

*Emami v. U.S. Dist. Court*, 834 F.2d 1444 (9th Cir. 1987) ..................................................... 16

*Espinoza v. Sabol*, 558 F.3d 83 (1st Cir. 2009) ...................................................................... 10

*Factor v. Laubenheimer*, 290 U.S. 276 (1933) ....................................................................... 15

*Fernandez v. Phillips*, 268 U.S. 311 (1925) .................................................................. 3, 5, 12, 23

*Flynn v. Barr*, No. 20-cv-60610 (S.D. Fla. 2020) ................................................................... 25

*Glucksman v. Henkel*, 221 U.S. 508 (1911) ........................................................................... 16

*Grin v. Shine*, 187 U.S. 181 (1902) ................................................................................... 15, 21

*Hilton v. Kerry*, 754 F.3d 79 (1st Cir. 2014) ............................................................................ 5

*Hoxha v. Levi*, 465 F.3d 554 (3d Cir. 2006) ............................................................................. 5

*In re Assarsson*, 635 F.2d 1237 (7th Cir. 1980) ............................................................. 15, 16, 22

*In re Drumm*, 150 F. Supp. 3d 92 (D. Mass. 2015) ............................................................ 11, 27

*In re Extradition of Azizi*, Case No. 5:14-xr-90282, 2014 WL 1995083 (N.D. Cal. May 13, 2014) ....... 30

*In re Extradition of Blasko*, No. 1:17-MC-00067, 2018 WL 6044921 (E.D. Cal. Nov. 19, 2018) .......... 22

*In re Extradition of Budrys*, No. 19-M-179, 2019 WL 1958566 (N.D. Ill. May 2, 2019) .................... 26, 27

*In re Extradition of Handanovic*, 829 F. Supp. 979 (D. Or. 2011) ....................................................16

*In re Extradition of Kyung Joon Kim*, No. 04-cv-3886, 2004 WL 5782517 (C.D. Cal. July 1, 2004) ..........27

*In re Extradition of Lui*, 913 F. Supp. 50 (D. Mass. 1996) ...........................................................13

*In re Extradition of Martinelli*, 263 F. Supp. 3d 1280 (S.D. Fla. 2017) ..........................................32

*In re Extradition of Nezirovic*, No. 7:12-mc-39, 2013 WL 5202420 (W.D. Va. Sept. 16, 2013) ..............22

*In re Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562 (N.D. Ill. Oct. 3, 2018) .......20, 22, 30

*In re Lam*, 2009 WL 1313242 (E.D. Cal. May 12, 2009) .............................................................16

*In re Smyth*, 61 F.3d 711 (9th Cir. 1995) ............................................................................23

*In re Toledo Manrique*, No. 19-mj-71055, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ........................25

*In the Matter of the Extradition of Michael L. Taylor*, Case No. 20-MJ-1069 (D. Mass) ..............................2

*In the Matter of the Extradition of Peter M. Taylor*, Case No. 20-MJ-1070 (D. Mass) ..................................2

*Jimenez v. Aristiguieta*, 314 F.2d 649 (5th Cir. 1963) ..............................................................32

*Jimenez* v. *Quarterman*, 555 U.S. 113 (2009) ..................................................................18

*Kaiser v. Rutherford*, 827 F. Supp. 832 (D.D.C. 1993) .............................................................16

*Kin-Hong v. United States*, 926 F. Supp. 1180 (D. Mass. 1996) ..................................................11

*Koskotas v. Roche*, 931 F.2d 169 (1st Cir. 1991) ..................................................................22

*Lo Duca v. United States*, No. 95-cv-713, 1995 WL 428636 (E.D.N.Y. July 7, 1995) ...........................26

*Martinez v. United States*, 828 F.3d 451 (6th Cir. 2016) ..........................................................12

*Melia v. United States*, 667 F.2d 300 (2d Cir. 1981) ..............................................................21

*Molton v. Gronolsky*, No. 13-cv-12397, 2014 WL 3828897 (D. Mass. July 31, 2014) ...........................12

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002) ................................10

*Nezirovic v. Holt*, 990 F. Supp. 2d 594 (W.D. Va. 2013) ...................................................5, 25, 27

*Nken v. Holder*, 556 U.S. 418 (2009) ...............................................................................33

*Noeller v. Wojdylo*, 922 F.3d 797 (7th Cir. 2019) ..........................................................5, 21, 22

iii

*NuVasive, Inc. v. Day*, 954 F.3d 439 (1st Cir. 2020) ..................................................10

*Parretti v. United States*, 143 F.3d 508 (9th Cir. 1998) ..............................................32

*Patterson v. Wagner*, 785 F.3d 1277 (9th Cir. 2015) ...................................................26

*Risner v. Fowler*, No. 3:19-cv-03078, 2020 WL 2110579 (N.D. Tex. May 1, 2020)..........24, 31

*Sainez v. Venables*, 588 F.3d 713 (9th Cir. 2009) ..................................................17, 21

*Schmeer v. Warden of Santa Rosa Cty. Jail*, No. 3:14-cv-285,
2014 WL 5430310 (N.D. Fla. Oct. 22, 2014)........................................................22

*United States v. Guzman*, 15-cr-10338, 2020 WL 1974332 (D. Mass. Apr. 24, 2020)..............25

*United States v. Hardy*, No. 18-cr-10261, 2020 WL 3495505 (D. Mass. June 26, 2020) ..........25

*United States v. Kin-Hong*, 110 F.3d 103 (1st Cir. 1997) ........................................12, 15

*United States v. Kin-Hong*, 83 F.3d 523 (1st Cir. 1996) ....................................5, 11, 13

*United States v. Latulippe*, No. 08-mj-59, 2008 WL 2704230, (D.N.H. July 3, 2008) ..............25

*United States v. Michael L. Taylor*, No. 2:12-cr-645 (D. Utah) ..................................28, 31

*United States v. Michael Taylor*, No. 12-cr-00502 (D. Utah Aug. 22, 2013)...............28, 29, 31

*United States v. Nolan*, No. 08–M–97, 2009 WL 4544699 (N.D. Ill. Dec. 1, 2009) ................25

*United States v. Oladimu*, 1:01-cr-10198, 2020 WL 1866253 (D. Mass. Apr. 14, 2020)...........25

*United States v. Perez*, 15-10256, 2020 WL 1991161 (D. Mass. Apr. 22, 2020)....................25

*United States v. Pink*, 315 U.S. 203 (1942) ...............................................................23

*United States v. Risner*, No. 3:18-mj-765, 2018 WL 6809796 (N.D. Tex. Dec. 27, 2018)...........13, 27

*United States v. Snyder*, No. 13-mj-7082, 2013 WL 1364275 (D. Ariz. Apr. 3, 2013)...........25, 26

*United States v. Taylor*, Nos. 12-4186 & 12-4187, 2013 WL 2466627 (10th Cir. June 10, 2013) ...........28

*United States v. Yassine*, 574 F. App'x 455 (5th Cir. 2014) ........................................30

*Valentino v. United States Marshal*, No. 4:20-cv-304, 2020 WL 1950765 (S.D. Tex. Apr. 15, 2020) ......24

*Vo v. Benov,* 447 F.3d 1235 (9th Cir. 2006) ..............................................................26

*Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7 (2008) .........................................10

*Wright v. Henkel*, 190 U.S. 40 (1903) ...........................................................................................................32

**Statutes**

18 U.S.C § 1512 ...........................................................................................................................................19

18 U.S.C § 1621 ...........................................................................................................................................19

18 U.S.C. § 1001 ..........................................................................................................................................19

18 U.S.C. § 3184 ...........................................................................................................................2, 5, 12, 23

18 U.S.C. § 3186 .............................................................................................................................................5

18 U.S.C. § 3190 ..........................................................................................................................................20

28 U.S.C. § 2241(c)(3) ............................................................................................................................ 10, 11

**Other Authorities**

DOJ Press Release, "Japanese Investment Company Executives Extradited on Charges Relating to $1.5 Billion Ponzi Scheme," *available* at https://www.justice.gov/opa/pr/japanese-investment-company-executives-extradited-charges-relating-15-billion-ponzi-scheme (last visited July 19, 2020)..............................................................................................................................................................33

Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. TREATY DOC. NO. 97-8 (1981), Art. 9(3)(a) ...........................................................................................................................15

Japanese Penal Code, Article 103 .......................................................................................................passim

Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892 ...................................................................................................................................passim

The Respondents, Jerome P. McDermott, Sheriff, Norfolk County, Massachusetts, and John Gibbons, U.S. Marshal, District of Massachusetts, through their undersigned counsel, respectfully submit this memorandum of law in opposition to Michael L. Taylor's and Peter M. Taylor's ("Petitioners") "Motion for Preliminary Injunction" and in response to their "Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief."[1]

## **INTRODUCTION**

Petitioners are international fugitives from justice. They are alleged to have entered Japan's sovereign territory for the sole purpose of enabling the escape of Carlos Ghosn Bichara ("Ghosn"), the multimillionaire former CEO and Chairman of the Board of Directors of Nissan Motor Co., Ltd. ("Nissan"), who was indicted in Japan for committing financial crimes. Petitioners' alleged plot to smuggle Ghosn out of Japan was one of the most brazen and well-orchestrated escape acts in recent history, involving a dizzying array of luxury hotel meetups, fake personas, bullet train travel, and the chartering of a private jet. Ultimately, Ghosn was hidden in a large black box, spirited out of Japan in the private jet without detection by Japanese authorities, and transported to Lebanon. Lebanon has no extradition treaty with Japan and thus Ghosn was able to thwart Japan's criminal process. Petitioners, for their part, were paid handsomely by Ghosn. Bank records reflect wire transfers in October 2019 totaling $862,500 from Ghosn to a company managed by Peter Taylor.[2] Then, in the first five months of this year, Ghosn's son, Anthony Ghosn, made cryptocurrency payments to Peter Taylor totaling approximately $500,000.[3] Recently, Ghosn told reporters that he is "helping everyone who stood by me as much as I can, financially and in any way I can."[4]

---

[1] *See* Docket Entry (DE) 1 ("Petition or "Pet.") and DE 2, 38 ("Motion").

[2] *See* Ex. A (wire transfer records) and Ex. B (corporate record).

[3] *See* Ex. C (Coinbase letter dated July 20, 2020). Coinbase included in its submission to Japan a digital, unsigned version of the letter, in addition to the signed version, because the scanning of the signed version lessened the clarity of the included charts.

[4] *See* Ex. D, *Carlos Ghosn Helping Those Who Helped Him Flee to Lebanon*, ASSOCIATED PRESS, July 12, 2020.

Ghosn escaped on December 29, 2019. On January 30, 2020, the Tokyo District Court issued arrest warrants for Petitioners. Upon learning that Petitioners had flown to Massachusetts from Dubai, United Arab Emirates, the government of Japan submitted to the United States requests for their provisional arrests under the countries' bilateral extradition treaty (the "Treaty").[5] The United States acted on those requests by filing complaints in this District and obtaining arrest warrants issued by Magistrate Judge Cabell. Those arrest warrants were executed on May 20, 2020, the same day that Peter Taylor was supposed to return to Lebanon, where he had been living for the past 15 months. Japan submitted its formal requests for Petitioners' extraditions within the Treaty deadline.

On June 8, 2020, nearly three weeks after their arrests, Petitioners filed a motion seeking to quash the arrest warrants or to be released on bail pending extradition proceedings.[6] Petitioners' principal argument was based on matters of pure Japanese law which they characterized as "close and complicated," and "highly technical."[7] On July 7, 2020, Magistrate Judge Cabell denied the motion in an electronic order, which was followed by a written opinion dated July 10, 2020 ("Op.").[8]

The Petition and Motion should both be denied. As a threshold matter, Petitioners are improperly attempting to bypass the extradition proceedings by seeking a probable cause determination from this Court before Magistrate Judge Cabell decides that issue at the statutorily required extradition hearing. *See* 18 U.S.C. § 3184. As the Supreme Court has made clear, it is the habeas court that reviews a Magistrate Judge's probable cause determination, not the other way

---

[5] *See* Ex. E, Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T. 892.

[6] *See In the Matter of the Extradition of Michael L. Taylor*, Case No. 20-MJ-1069 (D. Mass), DE 17; *In the Matter of the Extradition of Peter M. Taylor*, Case No. 20-MJ-1070 (D. Mass), DE 17. All citations to these extradition dockets will begin with the prefix "EX DE." As the dockets are substantially similar, citations will only reference 20-MJ-1069.

[7] *See* EX DE 28 (Reply Brief) at 8; EX DE 33 at 1 (Reply to Government's Response.)

[8] *See* EX DE 40 (electronic order); EX DE 41 (Memorandum on [Taylors'] Motion to Quash Arrest Warrants or for Release from Detention), *In the Matter of the Extradition of Michael L. Taylor* and *In the Matter of the Extradition of Peter M. Taylor*, Nos. 20-mj-1069, 20-mj-1070, 2020 WL 3893049 (D. Mass. July 10, 2020).

around.  *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).  Regarding the subject that is properly before the Court—detention during the pendency of the extradition proceedings—Magistrate Judge Cabell properly found that Petitioners had not met their burden to show both that special circumstances warrant their release and that they are not flight risks.

*First*, none of the facts cited by Petitioners constitute special circumstances warranting their release.  Petitioners argue that they have a high likelihood of success on the merits but then fail to cite in their 40-page Motion a single analogous case where extradition was actually denied.  Petitioners' defenses are premised on a flawed interpretation of Japanese law that contravenes the plain language of the relevant statute, Japanese caselaw, the probable cause finding of the Tokyo District Court, and the explanations provided by Japan regarding its own laws.  Thus, while Petitioners may claim that this is a "close and complicated" issue, one thing is certain:  It is not grounds for habeas relief.

The other factors cited by Petitioners also do not constitute special circumstances warranting release.  The government does not dispute the seriousness of COVID-19.  However, Petitioners have not shown, as they concede they must, that the virus is "more or less unique to the supplicant[s]" rather than "one that is applicable to extraditees generally" (Motion at 30).  Peter Taylor is a 27 year old with no reported medical conditions.  While Michael Taylor notes that he underwent a partial lobectomy several years ago, he has not submitted any recent medical records reflecting the current state of his health and he was fit enough to engage in lengthy worldwide travel earlier this year.  Further, the facility in which Petitioners are detained currently has no reported COVID-19 cases and the unit in which they are housed has never had any positive cases.

*Second*, even if Magistrate Judge Cabell erred in finding there were no special circumstances, Petitioners should still remain detained because he properly concluded that they have not met their burden to show they are not flight risks.  The very offense for which Petitioners' extradition is sought

demonstrates their aptitude for hatching escape plans on a grand scale and their blatant disrespect for bond conditions. Moreover, Petitioners themselves admit that they have extensive family and business ties to countries in the Middle East that have no extradition treaties with Japan or the United States. Indeed, Peter Taylor admittedly spent most of the 15 months prior to his arrest residing in Lebanon and planned to return there to "carry on with his life and conduct his business" (EX DE 17 at 29-30) the day he was arrested. Michael Taylor, for his part, was previously found to be a flight risk and a danger to the community when he was being prosecuted for felony offenses in a domestic case in which he ultimately pled guilty. The alleged facts in the instant matter demonstrate that little has changed since that time except that Petitioners now have access to Ghosn's vast resources with which to flee. While Petitioners ask this Court to take their word that they would not engage in an escape act similar to the one that they masterminded seven months ago, they concede "[t]he best predictor of future performance is past behavior" (Motion at 27).

The balance of the equities also does not favor granting habeas relief. Petitioners waited nearly three weeks to contest detention and have since shown little interest in expediting the extradition proceedings before Magistrate Judge Cabell. Notably, on July 6, 2020, the government submitted to Petitioners' counsel a proposed scheduling order for the extradition proceedings and never received a response. Particularly given the fact that they have not contested the underlying facts of the case and their Japanese legal defenses are meritless, Petitioners' claim of irreparable injury from continued detention carries less weight. Conversely, there could be severe diplomatic repercussions if Petitioners were released and fled these proceedings. Although Petitioners contend such concerns are overblown, respectfully, they are not charged with conducting foreign policy. The Petition and Motion should be denied.

<center>**BACKGROUND**</center>

## I.     LEGAL BACKGROUND

"Extradition is largely a concern of the Executive Branch" with a limited role carved out for the judiciary pursuant to the federal extradition statute, 18 U.S.C. § 3184. *Drumm v. McDonald*, No. 15-cv-14221, 2016 WL 111411, at *4 (D. Mass. Jan. 11, 2016). Pursuant to Section 3184, the extradition court must conduct an extradition hearing and make a probable cause determination under "the same . . . standard used in federal preliminary hearings." *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) (quoting *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)). However, the country seeking extradition is not otherwise "required to try its case in a United States court." *Id.* at 804.

If the extradition court finds that the fugitive is extraditable, it so certifies such findings to the Secretary of State, who ultimately decides whether to extradite the fugitive. *See* 18 U.S.C. §§ 3184, 3186. The extradition court's certification order is not subject to direct appeal; however, limited collateral review is available by way of a petition for a writ of habeas corpus. One of the permissible inquiries on habeas review is whether there was "any evidence" supporting the magistrate's probable cause determination. *See Fernandez*, 268 U.S. at 312; *Hilton v. Kerry*, 754 F.3d 79, 86 (1st Cir. 2014).

"There is a presumption against bail in extradition cases and only special circumstances justify release on bail." *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996) (internal quotation marks and citation omitted). Moreover, even if the fugitives carry their burden to show special circumstances exist, they must also show that they are not flight risks or dangers to the community. *See, e.g.*, *Drumm*, 2016 WL 111411, at *2. The "majority rule" is that the fugitive must meet this standard with "clear and convincing evidence." *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 599 n.1 (W.D. Va. 2013).

## II.    STATEMENT OF THE FACTS

The facts of this case have never been in dispute. Japan alleges Petitioners enabled Ghosn to

<center>5</center>

flee Japan while he was awaiting trial for financial crimes he is alleged to have committed while serving as Nissan's CEO and/or Chairman of the Board of Directors.[9]  Ghosn's alleged crimes include conspiring with others to falsely state his compensation in Nissan's Annual Reports and shifting financial losses of his asset management company to Nissan.  Ghosn was arrested, indicted, and released on bail for these alleged crimes.

In the months leading up to Ghosn's escape, Peter Taylor traveled to Japan at least three times, during which he met with Ghosn at least seven times.  The day before the escape, on December 28, 2019, Peter Taylor arrived in Japan and proceeded to the Grand Hyatt Tokyo.  He checked into Room 933 and met later that afternoon with Ghosn in the lobby of the hotel.  On December 29, 2019—the day of the escape—Michael Taylor and George Antoine Zayek traveled on a private jet from Dubai, United Arab Emirates, to Kansai International Airport in Japan.[10]  The chartering of the jet appears to have cost $350,000.  *See* Ex. G (MNG Jet Single Charter Agreement).  The two men landed at approximately 10:10 a.m. transporting, among other things, two large black boxes, and they told airport workers that they were musicians.  They then proceeded to the Star Gate Hotel Kansai Airport, where they checked into rooms 4009 and 4609, and deposited the two large boxes into Room 4609.  They then left the hotel and boarded a bullet train bound for Tokyo Station.

At approximately 2:30 p.m., while Michael Taylor and Zayek were making their way to Tokyo, Ghosn left his house without luggage, walked to the Grand Hyatt Hotel Tokyo, and went to Peter Taylor's room where he changed his clothes.  Michael Taylor and Zayek arrived in Tokyo at approximately 3:24 p.m.  They joined Peter Taylor and Ghosn at the Grand Hyatt and entered Room

---

[9] Unless otherwise noted, the facts set forth herein are principally derived from the factual summary contained in Japan's "Request for Extradition of Michael L. Taylor" and Japan's substantially similar "Request for Extradition of Peter Maxwell Taylor."  The government attaches the former document hereto as Ex. F.

[10] Michael Taylor has not disclosed when he traveled to Dubai but based on information received from U.S. law enforcement, the government believes he left the United States on November 26, 2019.

933.  Then, all four men exited Room 933 together, carrying luggage.  Peter Taylor separated from the rest of the group and traveled to Narita Airport where he boarded a flight to China.  Meanwhile, Ghosn, Michael Taylor, and Zayek traveled back to the Star Gate Hotel in Kansai.

At approximately 8:14 p.m., Ghosn, Michael Taylor, and Zayek arrived back at the Star Gate Hotel.  At approximately 9:00 p.m., Michael Taylor went to Kansai International Airport by himself and approached an employee of the business-jet facility.  *See* Ex. H (Record of Statement of Kayoko Tokunaga).  Michael Taylor asked the employee whether they would be going through a security check when they departed, to which the employee replied no.  *Id.*  Michael Taylor subsequently handed the employee a "bundle of 10,000 yen bills, bundled by a hair elastic band."  *Id.*  The employee estimated that there was more than one million yen (more than $9,300 using current conversion rates) in the bundle.  *Id.*[11]  Michael Taylor then returned to the hotel.

At approximately 9:57 p.m., Michael Taylor and Zayek left Room 4609 with luggage, including the two large boxes, and departed for Kansai International Airport.  There is no image of Ghosn leaving Room 4609.  Instead, Ghosn was hiding in one of the two large black boxes being carried by Michael Taylor and Zayek.  Michael Taylor and Zayek arrived at Kansai International Airport at approximately 10:20 p.m.  Once at the airport, their baggage passed through the security checkpoint without being screened and was loaded onto a private jet.  Michael Taylor and Zayek boarded the jet and departed for Turkey at approximately 11:10 p.m.  Two days later, on December 31, 2019, Ghosn made a public announcement that he was in Lebanon.  Petitioners, for their part, did not immediately return to the United States following Ghosn's escape.  Instead, they remained in Lebanon and/or the United Arab Emirates for approximately eight weeks in the case of Michael Taylor and eleven weeks in the case of Peter Taylor.  *See* EX DE 17 at 6 (Petitioners state Michael Taylor returned on February

---

[11] The airport staff decided to return the money to Michael Taylor before he departed.  *Id.*

23, 2020 and Peter Taylor returned on March 15, 2020).

Japan's evidence, which they have submitted in support of their extradition request, includes video surveillance recordings, witness statements, meeting records, hotel records, and other proof indicating that Petitioners were behind Ghosn's escape. Petitioners do not deny these facts.

## III.    PROCEDURAL HISTORY

Judge Yukiko Yomori of the Tokyo District Court issued warrants for Petitioners' arrests on January 30, 2020, and those warrants were renewed by Judge Yomori on February 28, 2020, when Petitioners remained at large. *See* Ex. I (original arrest warrant); Ex. J (renewed arrest warrant). Japan submitted to the United States requests for Petitioners' provisional arrests under Article IX of the Treaty after learning they had returned to the United States from Dubai. On May 6, 2020, the government acted on the provisional arrest requests by filing complaints in this District and obtaining arrest warrants issued by Magistrate Judge Cabell, which were executed on May 20, 2020. *See* EX DE 1. On June 29, 2020, Japan transmitted its formal extradition requests to the State Department. *See* Ex. K.

Petitioners have been detained since their arrests. On June 8, 2020, they filed a motion to quash the arrest warrants or, alternatively, for release pending extradition proceedings. *See* EX DE 17. Thereafter, the parties engaged in extensive briefing, a hearing was held on June 22, 2020, and there were multiple rounds of post-hearing submissions. On July 7, 2020, within two business days of Petitioners' final post-hearing submission, Magistrate Judge Cabell issued an electronic order denying Petitioners' motion, and three days later he issued a written opinion. *See* EX DE 40, 41.

## IV.    RULING UNDER REVIEW

In his Opinion, Magistrate Judge Cabell set forth the well-established presumption against bail in extradition cases and reviewed the applicable caselaw, which reflects the fact that "courts have

granted bail in only truly remarkable circumstances and often when multiple special circumstances bear in the [fugitive's] favor." Op. at 6. Applying the foregoing standard to the facts present here, Magistrate Judge Cabell found that Petitioners had not met their burden to show that their release was warranted by "special circumstances" and that they were not flight risks. In so finding, Magistrate Judge Cabell rejected Petitioners' argument that they had a likelihood of success on the merits of their claim that Article 103 of the Japanese Penal Code does not apply to their conduct. Specifically, Magistrate Judge Cabell found that Petitioners "would appear to fall squarely within the heartland of this portion of Article 103 where Ghosn had been charged with a crime and the [Petitioners] then reportedly harbored and/or helped him to escape to avoid prosecution." *Id.* at 9. Magistrate Judge Cabell also found Petitioners' heavy emphasis on the fact that "bail jumping" is not a crime in Japan to be misplaced because they "have not been charged as accessories to Ghosn's bail jumping, but rather have been charged as principals for harboring or enabling a criminal's escape." *Id.* at 10 n.5. Magistrate Judge Cabell further explained why none of the other factors cited by Petitioners, including COVID-19, constituted a special circumstance. *Id.* at 10-15.

In addition, Magistrate Judge Cabell found that Petitioners had not carried their burden to show they are not flight risks. Magistrate Judge Cabell noted their roles in the planning and execution of a "most intricate, sophisticated, and deceptive scheme spanning several countries and most surely requiring massive expenditures of time and money." *Id.* at 17. Regarding Michael Taylor specifically, Magistrate Judge Cabell examined the proffered reasons why he would not flee and found that they "do not come close to mitigating the risk that would otherwise be posed by his release, particularly where he has strong ties to Lebanon and apparently has (along with Peter Taylor) substantial resources that could be exploited." *Id.* Regarding Peter Taylor specifically, Magistrate Judge Cabell also noted

his strong ties to Lebanon, including the fact that he "recently resided there while trying to establish the family's business." *Id.* at 18.

## ARGUMENT

Petitioners have not carried their burden to show that they are "in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241(c)(3). Accordingly, Petitioners' habeas petition and motion for a preliminary injunction should be denied.

## I.   STANDARD OF REVIEW

There are several standards of review applicable to the instant Petition and Motion.

*First*, "the burden of proof under § 2241 is on [Petitioners]." *See, e.g., Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009).

*Second*, a preliminary injunction "is an 'extraordinary remedy' that may only be entered if the plaintiff makes a clear showing that it is entitled to such relief." *Cavalier Coach Corp. v. Foxx*, No. 14–cv–12499, 2014 WL 2711922, at *1 (D. Mass. June 13, 2014) (Talwani, J.) (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008)). To secure a preliminary injunction, Petitioners must show: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (internal quotation marks and citation omitted). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

*Third*, review of a Magistrate Judge's bail determination in the extradition context "is limited to the issue of whether or not there were reasonable grounds for the Magistrate Judge's denial of bail."

*Kin-Hong v. United States*, 926 F. Supp. 1180, 1184 (D. Mass. 1996), *rev'd on other grounds*, *Kin-Hong*, 83 F. 3d at 525. "In applying the [reasonable grounds] standard, the court defers to the Magistrate Judge's factual findings, unless they are unsupported by the record, but reviews the Magistrate Judge's legal determinations *de novo*." *Id.*; *see also Drumm*, 2016 WL 111411, at *3 ("The determination of what constitutes a 'special circumstance' is fact-intensive and largely left to the Magistrate Judge's discretion, subject to the caveat that in order to qualify as 'special' a circumstance must be atypical.").

*Fourth*, as discussed above, there is a presumption against bail in extradition cases. *Kin-Hong*, 83 F. 3d at 524. As such, Petitioners bear the burden of showing "both: 1) that [they are] neither a flight risk, nor a danger to the community; and 2) that there are special circumstances [that] justify release on bail." *In re Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (internal quotation marks and citation omitted).

## II.  PETITIONERS HAVE NOT CARRIED THEIR BURDEN TO SHOW HABEAS OR INJUNCTIVE RELIEF IS WARRANTED

### A.  Petitioners have not shown a substantial likelihood of success on the merits.

Petitioners have not shown a substantial likelihood of success on the merits of their claims. Their independent probable cause arguments are not properly before the Court and lack merit. Moreover, Magistrate Judge Cabell reasonably found that Petitioners have not overcome the strong presumption against bail in international extradition cases.

#### 1.  Petitioners' independent probable cause arguments are not properly before the Court and lack merit.

As stated above, habeas corpus relief is available only if the subject is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The federal extradition statute, 18 U.S.C. § 3184, plainly allows for the arrest of a fugitive, to remain in custody, until the extradition hearing, whereupon a probable cause determination will be made. *See* 18 U.S.C.

§ 3184.  Pursuant to that statute, Petitioners are being held in custody pending their extradition hearing.  Accordingly, their detention is lawful.

Petitioners ask this Court to engage in an independent probable cause analysis (Motion at 15-24), outside the construct of their bail appeal and prior to the extradition hearing where Magistrate Judge Cabell is statutorily required to make a probable cause determination.  However, Petitioners cite no case, and the government is aware of none, where a habeas court sanctioned such an end-run around the extradition proceedings.  The Court should decline to be the first to do so.

As a threshold matter, Petitioners have not disputed Magistrate Judge Cabell's finding that Japan's submission of its formal extradition requests mooted their claim that they were unlawfully arrested based on Japan's provisional arrest requests.  *See* Op. at 2-3 (citing, *inter alia*, *Martinez v. United States*, 828 F.3d 451, 470 (6th Cir. 2016) (*en banc*)).[12]  Further, Petitioners' claim that the evidence contained in the formal extradition requests does not establish probable cause is unambiguously an issue for Magistrate Judge Cabell to decide in the first instance.  *See, e.g.*, *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997) ("If a warrant issues, the judicial officer then conducts a hearing to determine if 'he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty.'") (quoting 18 U.S.C. § 3184).  Under controlling Supreme Court precedent, if Magistrate Judge Cabell finds that probable cause exists, Petitioners may then seek habeas review to determine if there was "any evidence" supporting that finding.  *See Fernandez*, 268 U.S. at 312; *cf., e.g.*, *Molton v. Gronolsky*, No. 13-cv-12397, 2014 WL 3828897, at *2 (D. Mass. July 31, 2014) ("[A] federal pretrial detainee must first exhaust other available remedies to be eligible for habeas corpus relief under Section 2241[.]") (collecting cases).  Accordingly, Petitioners' attempt to bypass the extradition hearing should be

---

[12] Petitioners similarly did not contest this fact at the TRO hearing.  *See* Ex. L (07/08/20 Hr'g Tr. at 16:14-17:18).  To the extent that the Court finds the issue is not moot, the government respectfully refers the Court to its briefing before Magistrate Judge Cabell.  *See* EX DE 23 at 31-39.

rejected.  But regardless, their probable cause arguments are meritless and should be rejected for the same reasons discussed below with respect to their bail appeal.

### 2. Magistrate Judge Cabell properly found Petitioners did not overcome the strong presumption against bail in international extradition cases.

Turning to the issue that is properly before this Court—whether Petitioners should remain detained pending extradition proceedings——Magistrate Judge Cabell reasonably found that they had not overcome their burden to show special circumstances warranted release and that they were not flight risks.  That determination should not be disturbed on habeas review.

### a. Magistrate Judge Cabell properly found Petitioners had not carried their burden to show special circumstances warranted their release.

### (i) Petitioners have not shown a high likelihood of success, even if such a factor could theoretically constitute a special circumstance.

Magistrate Judge Cabell properly rejected, as a purported special circumstance warranting release, Petitioners' claim that they have a high likelihood of success on the merits of their extradition defenses (Motion at 30-31).  As a threshold matter, "most courts hold that arguments regarding the substantive merits of an extradition request are properly raised at the fugitive's extradition hearing and are immaterial to [the] prior bail determination." *United States v. Risner*, No. 3:18-mj-765, 2018 WL 6809796, at *12 (N.D. Tex. Dec. 27, 2018) (collecting cases); *see also, e.g.*, *In re Extradition of Lui*, 913 F. Supp. 50, 55 (D. Mass. 1996) (likelihood of success "does not qualify as a special circumstance in foreign extradition cases.").  While the First Circuit has noted that "[o]ther courts" have considered "a high probability of success" on the merits to be a special circumstance, it has not adopted that view. *Kin-Hong*, 83 F.3d at 524.  However, even presuming as Magistrate Judge Cabell did, that this might theoretically constitute a special circumstance, Petitioners' defenses are meritless.

**Petitioners do not have a high likelihood of success in defeating extradition based on their claim that Japan has not charged or sought their arrest under Article 103.**

Petitioners do not have a high likelihood of success of defeating extradition based on their assertion that Japan has not sought their arrests under Article 103 of the Japanese Penal Code or charged that offense (Motion at 15, 23-24). While the arrest warrants do not refer to the Penal Code provision by number, consistent with Japanese practice, they include the name of the offense corresponding to a violation of Article 103—犯人隠避 ("*han-nin-inpi*")—which can be translated as either harboring of criminals or enabling the escape of criminals. *See* Ex. I (original warrant); Ex. J (renewed warrant); Ex. M (Watanabe Decl. ¶7 n.1).[13] Indeed, Petitioners acknowledge that the named offense is the title of Article 103. *See* Motion at 6; *see also* Ex. O (Japanese treatise submitted by Petitioners at DE 2-17 noting that "Harboring of Criminals" is the title of Article 103). The fact that the arrest warrants do not contain a numeric reference to the statute does not mean they do not include Article 103. To the contrary, Japan has confirmed that the arrest warrants cover Article 103 and that citing the offense by name rather than by number is consistent with Japanese law and practice. *See* Ex. N (Watanabe Second Supp. Decl. ¶¶3, 5) (citing textbook of warrant practices). Further, the same day the arrest warrants were issued, the Tokyo District Public Prosecutors Office issued a press release announcing the fact that arrest warrants had issued for Petitioners based on their alleged violation of "Enabling the escape of criminals, Article 103 of the Penal Code." *See* Ex. P (Watanabe Supp. Decl. ¶4).[14]

---

[13] Specifically, the name of the Article 103 offense is identified in the first sentence of the Tokyo District Public Prosecutor Office's Request for an Arrest Warrant ("Request"), which is appended to the arrest warrant. *See* Exs. I, J. Incorporating the Request by appending it to the arrest warrant is consistent with Japanese practice. *See* Ex. N (Watanabe Second Supp. Decl. ¶2) ("An arrest warrant may be prepared by appending the written request for said arrest warrant") (citing Article 145 of Japan's Rules of Criminal Procedure).

[14] Petitioners also note the fact that the investigation reports included in the extradition request do not cite Article 103. But just like in the U.S., there was no requirement that Japanese investigative documents cite all the offenses which ultimately form the basis of the arrest warrants. As Japan explains, the investigative reports reference Ghosn's suspected immigration offense because "the investigation was initiated in response to Ghosn's illegal departure." *See* Ex. N

Similarly meritless is Petitioners' claim that extradition should be denied because Japan purportedly did not include in its extradition request a "charging instrument" establishing that they have been "charged" with violating Article 103 (Motion at 23-24). This claim fails for the threshold reason that the Treaty does not require Japan to submit a "charging instrument" or otherwise condition extradition on proof that charges have been filed. As a result, Petitioners' claim falls outside the scope of habeas review. *See, e.g., In re Assarsson*, 635 F.2d 1237, 1241 (7th Cir. 1980) ("The existence of formal charges can be reviewable, then, only if the treaty itself conditions extradition for the offenses listed in Article II on the existence of formal charges."). Here, the Treaty clearly sets forth the documentary requirements for the country seeking extradition and a charging document is not listed therein. *See* Treaty, Art. VIII. Indeed, the Treaty does not use the term "charge" at all. This was no accidental omission. There is a split amongst extradition treaties regarding the inclusion of a required charging document, even amongst treaties that were signed around the same time. *Compare, e.g.,* Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. TREATY DOC. NO. 97-8 (1981), Art. 9(3)(a) (request for extradition shall be accompanied by "[a] copy of the indictment or its equivalent."). The United States and Japan decided their extradition treaty should not include a charging document requirement. *See, e.g., Assarsson*, 635 F.2d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided.").[15]

---

(Watanabe Second Supp. Decl. ¶8). The facts uncovered during that investigation gave rise to the charged Article 103 offense.

[15] Even if there were any ambiguity as to what the Treaty requires, well-established canons of treaty construction mandate that it be construed liberally, and therefore not to impose an extra-textual charging document requirement. *See, e.g., Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933) ("[I]f a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."); *Grin v. Shine*, 187 U.S. 181, 184 (1902) (extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers"); *Kin-Hong*, 110 F.3d at 110 ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement . . . .").

The caselaw is clear and uniform on this issue: "Every court that has addressed this issue has concluded that a formal charging document is not required as a condition precedent for extradition." *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 987 (D. Or. 2011) (internal quotation marks omitted) (collecting cases); *Emami v. U.S. Dist. Court*, 834 F.2d 1444, 1448 (9th Cir. 1987) ("The Seventh Circuit's reasoning [in *Assarsson*] demonstrates that grafting such a requirement as Emami proposes on to the treaty in the instant case is inadvisable."); *Assarsson*, 635 F.2d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided."); *In re Lam*, 2009 WL 1313242, at *3 (E.D. Cal. May 12, 2009) (rejecting fugitive's argument that "since no charges are pending against him, extradition should be denied on that basis"); *Kaiser v. Rutherford*, 827 F. Supp. 832, 834 (D.D.C. 1993) ("[N]o court has ever held that the filing of formal charges is a prerequisite for extradition under the Treaty."). Petitioners cite no case, and the government is aware of none, where a court has granted habeas relief in the extradition context based on the absence of a charging document where the extradition treaty does not require production of such a document.

Moreover, even if the Court were to depart from the clear and uniform caselaw and accept Petitioners' extra-textual argument that a charging document was required, the arrest warrants (inclusive of the appended requests for their issuance) would satisfy any such requirement.[16] The warrants identify Petitioners, recite the charged offenses,[17] and provide a description of the facts underlying the alleged offenses. The fact that the warrants might not adhere to all the rituals of a U.S.-style charging document is immaterial. *See, e.g., Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("It is

---

[16] Indeed, based on the same document, Petitioners acknowledge in their Petition that they have been charged with an immigration offense. *See* Pet. ¶2 ("the Japanese government's only actual *charge* asserts that the Taylors aided in a misdemeanor immigration offense") (emphasis added).

[17] Japan itself uses the term "charged offense" in the context of arrest warrants. *See* Ex. N (Watanabe Second Supp. Decl. ¶¶2, 8).

common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time."); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (finding Mexican arrest warrant could constitute a charging document even if it was not analogous to a U.S. indictment based on "established approach of giving credence to foreign proceedings"). Requiring anything more of Japan would not only be inconsistent with the plain terms of the Treaty but would also improperly interfere with its domestic criminal procedures to which they have adhered in this case. *See* Ex. N (Watanabe Second Supp. Decl. ¶6) (explaining Japan's criminal process with respect to fugitives such as Petitioners).

**Petitioners do not have a high likelihood of success in defeating extradition based on their claim that their conduct falls outside the scope of Article 103.**

In addition to their procedural claims, Petitioners argue that their conduct does not fall within the substantive scope of Article 103 (Motion at 18-23). But even Petitioners appear not to be so sure. Before Magistrate Judge Cabell, they not only stated that the issue was "close and complicated," EX DE 28 at 8, but also conceded that "Article 103 might apply to the alleged actions by the Taylors in harboring Mr. Ghosn or enabling his escape from apprehension once he had committed the immigration offense with which Japan has charged him," EX DE 28 at 13. In any event, Petitioners' claims are meritless.

*First*, Article 103's applicability is evidenced by the statute's plain language, which covers a person who "harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement." Ex. M (Watanabe Decl. ¶8). Here, Petitioners allegedly enabled the escape of another person (Ghosn) who was under indictment for crimes punishable with a fine or greater punishment.[18] Accordingly, Article 103 plainly

---

[18] Japan has confirmed, with supporting caselaw, that Article 103 applies to persons who have enabled the escape of criminal defendants under indictment but who are not yet convicted. *See* Ex. Q (Yoshida Decl. ¶7).

applies. *Cf., e.g., Jimenez* v. *Quarterman*, 555 U.S. 113, 118 (2009) ("It is well established that, when the statutory language is plain, we must enforce it according to its terms.").

*Second*, the Japanese Supreme Court has held that the crime of enabling the escape of criminals "intends to punish a person who interferes with the criminal justice system in a *broad* sense, such as investigations, court proceedings and executions of sentences." *See* Ex. Q (Yoshida Decl. ¶6) (citing Judgment of Supreme Court, May 1, 1989 Kei-shu vol.43, No.5, p.405) (emphasis added). It is undisputed that Petitioners interfered with Japan's criminal case against Ghosn by enabling him to escape to Lebanon. Petitioners' narrow construction of Article 103 conflicts with the Japanese Supreme Court's instruction that Article 103 should be interpreted broadly.

*Third*, consistent with the Japanese Supreme Court's instruction, both Japan and the treatise submitted by Petitioners note that "'[e]nable to escape' refers to all acts that hinder arrest or discovery by authorities by methods other than harboring." *See* Ex. O (Japanese treatise submitted by Petitioners at DE 2-17); Ex. M (Watanabe Decl. ¶9). Petitioners' efforts to smuggle Ghosn out of Japan in a box aboard a private jet to a country that lacks an extradition treaty with Japan fits comfortably within this interpretation of the statute. Indeed, the whole purpose of the operation was to avoid detection and arrest by Japanese authorities. As Japan points out, "if Ghosn had not concealed himself and tried to openly depart Japan from an airport in the regular manner" then "he would have been certainly noticed at the immigration inspection and his bail would have been rescinded." *See* Ex. N (Watanabe Second Supp. Decl. ¶7). Thus, while Petitioners may be correct that "Japanese police were not actively pursuing Ghosn" at the time of his escape (Motion at 20), that is largely due to the elaborate steps taken by Petitioners to conceal his flight. In short, Article 103 applies because Petitioners "enabled Ghosn to avoid detection by government officials, to avoid the rescission of bail and arrest, and to

avoid the criminal prosecution by the series of acts described in the extradition requests."  *See* Ex. N (Watanabe Second Supp. Decl. ¶7).

*Fourth*, Petitioners' attempt to confine Article 103 to situations where the escapee is "fleeing the scene of a crime or breaking out of a detention facility" (Motion at 20-21) simply does not square with the cases cited by Japan that do not fit either category.  *See* Ex. Q (Yoshida Decl. ¶8).  Indeed, in one of Japan's cited cases, the escapee was presumed dead and there was no warrant for his arrest.  *Id.* Notably, Petitioners have not cited in their Motion any case where a Japanese court rejected the application of Article 103 under *any* fact pattern.

Petitioners place heavy emphasis on the fact that "bail jumping" is not a crime in Japan, but as Magistrate Judge Cabell found, that fact is "immaterial and would appear to have no bearing on whether the respondents may be prosecuted as principals for harboring or enabling the escape of someone who committed a crime."  *See* Op. at 9-10.  This is confirmed by the Japanese Ministry of Justice's Director of the Legislative Division, Masayuki Yoshida, who has been involved in the "bail jumping" legislative discussions.  *See* Ex. Q (Yoshida Decl. ¶¶10-11).[19]

Petitioners also errantly argue that their claims are supported by the fact that the arrest warrants include the term 逃走 ("*toso*") in the factual summary and, according to Petitioners, "*toso*" can only mean escape from a detention facility (Motion at 21).  As Japan explains, the factual summary appropriately includes both the terms "*inpi*" and "*toso*," and the term "*toso*" applies more broadly than Petitioners claim in this context.  *See* Ex. N (Watanabe Second Supp. Decl. ¶9).  As support for this fact, Japan has cited an example of another Article 103 case where the term "*toso*" was used, despite the fact that the escapee was not breaking out of a detention facility.  *Id.*

---

[19] Before Magistrate Judge Cabell, the government provided several unrefuted analogies to federal obstruction of justice offenses that are not predicated on establishing a separate offense. *See, e.g.,* 18 U.S.C. § 1001; 18 U.S.C § 1512; 18 U.S.C § 1621.

According to Petitioners, their proposed expert is "neutral," Public Prosecutor Naoki Watanabe is biased, and that by giving insufficient credit to their expert Magistrate Judge Cabell improperly shifted the probable cause burden to them. In fact, Petitioners have not explained how their expert is "neutral," extradition courts properly rely on foreign prosecutor declarations (just as foreign courts routinely rely on declarations from U.S. prosecutors in the reciprocal context),[20] and, in any event, Japan has now submitted a declaration from the Ministry of Justice's Director of the Legislative Division who is not involved in the case, and which supports Public Prosecutor Naoki Watanabe's statements. *See* Ex. Q (Yoshida Decl. ¶¶1, 3). In addition, Magistrate Judge Cabell considered and rejected their expert's argument that Article 103 does not apply because bail jumping is not a crime. *See* Op. at 8-10. And contrary to Petitioners' claim, Magistrate Judge Cabell did not shift the burden, or even render, a probable cause determination—which, as discussed above, is the subject of the extradition hearing—but rather considered whether Petitioners had shown a high likelihood of success on the merits for purposes of detention.

**Petitioners have not established a high likelihood of success on the merits regardless of the degree of deference the Court accords to Japan's interpretation of its own laws.**

Petitioners argue that *Animal Science Products, Inc. v. Herbei Welcome Pharmaceutical Co. Ltd.*, 138 S. Ct. 1865 (2018), and Federal Rule of Civil Procedure 44.1, provide the framework for interpreting foreign law for habeas petitions in the extradition context (Motion at 12-13). As discussed in more detail below, that is incorrect. But this Court need not wade into that thicket because Petitioners have not established a high likelihood of success on the merits of their extradition defenses regardless of the degree of deference accorded to Japan's interpretation of its own laws. As stated above,

---

[20] *See, e.g., In re Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *4 (N.D. Ill. Oct. 3, 2018). Also, contrary to Petitioners' claim, the fact that the declarations are unsworn is immaterial because they have been properly authenticated pursuant to 18 U.S.C. § 3190 (with diplomatic submission to follow) and therefore "shall" be admissible in extradition proceedings. *See* 18 U.S.C. § 3190.

Petitioners' claims are not supported by the Japanese arrest warrants, the plain language of Article 103, Japanese caselaw and criminal procedures, or U.S. extradition caselaw. Thus, even if the Court applied *Animal Science* and only accorded the declarations submitted by Japan "respectful consideration," 138 S. Ct. at 1869, or "substantial but not conclusive weight," *id.* at 1875, Petitioners' Motion and Petition should still be denied.

While Petitioners' claims fail regardless, *Animal Science*, a domestic civil litigation, does not control in the extradition context and where the foreign government confirms its interpretation of its own laws through official diplomatic channels. More than a century ago, the Supreme Court held in the extradition context that "it can hardly be expected of us that we should become conversant with the criminal laws of [the country seeking extradition], or with the forms of warrants of arrest used for the apprehension of criminals." *Grin v. Shine*, 187 U.S. 181, 190 (1902). Since *Grin*, courts have repeatedly rejected attempts by fugitives to defeat extradition based on claims regarding the foreign country's criminal laws and procedures. *See, e.g., Noeller*, 922 F.3d at 806 ("United States courts hearing extradition requests have consistently expressed an unwillingness to interpret foreign law to invalidate arrest warrants."); *Cornea v. U.S. Attorney General*, 771 F. App'x 944, 947 (11th Cir. 2019) (relying on the "authoritative statement" of the Greek government regarding its law to reject the fugitive's challenge to extradition based on the Greek statute of limitations, which had been based on a detailed expert opinion); *Sainez*, 588 F.3d at 717 ("[W]e recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles.") (internal quotation marks and citation omitted); *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (refusing to "second-guess" Bosnian government's determination of what constitutes an arrest warrant in Bosnia); *Melia v. United States*, 667 F.2d 300, 303 (2d Cir. 1981) ("We are . . . not

expected to become experts in the laws of foreign nations.").[21]  Indeed, Petitioners have cited no case, and the government is aware of none, where extradition was denied based on a fugitive's opinion of foreign law that contravenes the interpretation proffered by the foreign government seeking extradition.[22]

Contrary to Petitioners' suggestion, extradition matters are not "especially" suited for an independent analysis of foreign law.  As the First Circuit has recognized, "[e]xtradition proceedings are grounded in principles of international comity, which would be ill-served by requiring foreign governments to submit their purposes and procedures to the scrutiny of United States courts." *Koskotas v. Roche*, 931 F.2d 169, 174 (1st Cir. 1991).  Critically, unlike in domestic cases, fugitives have the opportunity to raise foreign law defenses before the foreign courts following their extradition, and those foreign courts are best suited to interpret their own law.  *See, e.g.*, *Noeller*, 922 F.3d at 806 ("If [petitioner] thinks later developments in the Mexican courts have rendered his arrest warrant invalid, that challenge belongs in a Mexican court.").

Particularly in light of the foregoing precedent, *Animal Science* is distinguishable in several respects.  *First*, in that case, the Court considered how much deference to accord an *amicus* brief submitted by China's Ministry of Commerce in connection with a domestic civil class-action suit, *see* 138 S. Ct. at 1867, rather than an extradition matter where Petitioners will have the opportunity to

---

[21] *See, also e.g.*, *In re Extradition of Nezirovic*, No. 7:12-mc-39, 2013 WL 5202420, at *15 (W.D. Va. Sept. 16, 2013) ("It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law."); *Schumann*, 2018 WL 4777562, at *4; *In re Extradition of Blasko*, No. 1:17-MC-00067, 2018 WL 6044921, at *28-31 (E.D. Cal. Nov. 19, 2018); *Schmeer v. Warden of Santa Rosa Cty. Jail*, No. 3:14-cv-285, 2014 WL 5430310, at *5-6 (N.D. Fla. Oct. 22, 2014).  Petitioners cite to *Blasko v. Thomas*, 2019 WL 1081209, at *7 (E.D. Cal. Mar. 7, 2019), but there the court "first considered the declaration" submitted by the government seeking extradition and ultimately recommended denial of the habeas petition.

[22] The principle that a foreign country should not be required to prove to a U.S. court that it is properly construing its own laws is supported by general notions of international comity and "respect for the sovereignty of other nations." *Assarsson*, 635 F.2d at 1244.  It is further supported by the prudential policy of avoiding the substantial risk that a U.S. court might erroneously interpret the law of a foreign country.  *See id.* ("The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters.").

raise arguments regarding Japanese law before the Japanese courts if extradited. *Second*, given the fact that the case was a civil matter, the Court relied heavily upon Federal Rule of Civil Procedure 44.1, *see id.* at 1874, but that Rule is inapplicable to 18 U.S.C. § 3184 extradition proceedings, which are not civil actions. *See, e.g., In re Smyth*, 61 F.3d 711, 720 (9th Cir. 1995) (finding "rules of evidence and civil procedure that govern" Article III proceedings "do not apply in extradition hearings"). Further, while habeas review of an extradition court's bail determination or certification order is civil in nature, such review is narrower, not broader, than the Section 3184 proceeding itself. *See, e.g., Fernandez*, 268 U.S. at 312. *Third*, the Court specifically distinguished an earlier case—*United States v. Pink*, 315 U.S. 203, 218 (1942)—where it treated as conclusive evidence of foreign law a declaration submitted by a foreign country through official diplomatic channels. 138 S. Ct. at 1874-75. Here, like in *Pink*, the government of Japan has expressed its view that Article 103 applies to Petitioners' conduct through official diplomatic channels by seeking their extradition for that offense and including in its formal request the June 17, 2020 declaration of Public Prosecutor Naoki Watanabe explaining how Article 103 applies. Accordingly, this case is more like *Pink* than *Animal Science*.

Fundamental principles of international comity loom large in this case. In the reciprocal context, the United States would take great exception to a foreign court going beyond the carefully negotiated terms of the extradition treaty, casting aside the U.S. government's explanation of its own procedural and substantive laws, overruling a probable cause determination made by a federal judge,[23] and denying extradition based on what the fugitive perceived to be "close and complicated" issues of federal law.

---

[23] Japan has confirmed that it similarly has a probable cause requirement for the issuance of an arrest warrant. *See* Ex. M (Watanabe Decl. ¶5).

For all these reasons, the Court should reject Petitioners' claim that they have a high likelihood of success on the merits of their extradition defenses.

> ### (ii) Magistrate Judge Cabell properly found Petitioners' other claims were not special circumstances warranting their release.

As set forth below, Magistrate Judge Cabell reasonably found that Petitioners' other claims did not constitute special circumstances warranting bail.

***COVID-19 is not a special circumstance unique to Petitioners.***

Magistrate Judge Cabell reasonably found COVID-19 is not a special circumstance unique to Petitioners. *See* Op. at 13-15; s*ee also Drumm*, 2016 WL 111411, at *3 (special circumstance "must be more or less unique to the supplicant and not be one that is applicable to extraditees generally"). Peter Taylor is 27 years old and has no reported health issues. While Michael Taylor has now provided documentation of a prior lobectomy from several years ago, he has not submitted any recent medical records reflecting the current state of his health and he was fit enough to engage in 89 days of around-the-world travel earlier this year. In his Opinion, Magistrate Judge Cabell also found it significant that no one in the unit where Petitioners are being housed at Norfolk County Correctional Facility ("Norfolk") has tested positive for the virus, and that Norfolk has made extensive efforts to ensure the safety of its population. *See* Op. at 14. Conditions at Norfolk have only improved since the time Magistrate Judge Cabell considered the matter. Currently, there are zero active cases of COVID-19 at Norfolk. *See* Ex. R (Declaration of Danielle Boomhower ¶21).

The majority of extradition courts have rejected COVID-19 as a special circumstance justifying release, including in cases where the fugitive has an underlying medical condition. *See, e.g., Risner v. Fowler*, No. 3:19-cv-03078, 2020 WL 2110579, at *4-5, 7 (N.D. Tex. May 1, 2020) (fugitive was 76 years old and had a litany of health issues which he claimed put him at higher risk); *Valentino v. United States Marshal*, No. 4:20-cv-304, 2020 WL 1950765, at *1 (S.D. Tex. Apr. 15, 2020) (fugitive

was 73 years old and had hypertension); *Flynn v. Barr*, No. 20-cv-60610 (S.D. Fla. 2020), DE 18 (denying fugitive's motion for release based on COVID-19).[24]  Petitioners cite *In re Toledo Manrique* as a counterexample.  No. 19-mj-71055, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020).  In that case, the fugitive was 74 years old and claimed he was at risk of serious illness or death based on his advanced age and hypertension.  *Id.* at *1; *see also Toledo Manrique*, 2020 WL 2617368, at *1 ("Alejandro Toledo's Second Motion for Reconsideration of Detention Order") (noting medical conditions).  Moreover, unlike here, the court in *Toledo Manrique* was concerned about the detention facility's potential lack of COVID-19 testing capabilities, and it found the risk of flight had been partially mitigated.  2020 WL 1307109, at *1.

Towards the end of their Motion, Petitioners raise a Fifth Amendment due process claim based on the allegation that Respondents acted with "deliberate indifference" to their safety (Motion at 36-38).  However, such a claim is belied by: (1) Petitioners' own prior statements acknowledging that "[t]here are clear efforts being made" by Norfolk, *see* Ex. S (06/22/20 Hr'g Tr. 23:9-13); (2) the declaration submitted by Assistant Deputy Superintendent Danielle Boomhower regarding Norfolk's robust protocols designed to ensure the safety of its population, *see* Ex. R (Boomhower Decl.); and (3) Magistrate Jude Cabell's factual finding that "the facility continues to employ significant measures to ensure the safety of its population," *see* Op. at 14.

---

[24] More generally, extradition courts routinely detain fugitives with serious health issues. *See, e.g., Nezirovic*, 990 F. Supp. 2d at 601-02; *United States v. Snyder*, No. 13-mj-7082, 2013 WL 1364275, at *8 (D. Ariz. Apr. 3, 2013); *United States v. Nolan*, No. 08–M–97, 2009 WL 4544699, at *3 (N.D. Ill. Dec. 1, 2009); *Bolanos v. Avila*, No. 09–1208, 2009 WL 3151328, at *4 (D.N.J. Sept. 24, 2009); *United States v. Latulippe*, No. 08-mj-59, 2008 WL 2704230, (D.N.H. July 3, 2008).  Myriad courts in this District and elsewhere have denied release to U.S. criminal defendants based on COVID-19, even where such defendants had underlying health issues and the more liberal standards of the Bail Reform Act applied.  *See, e.g., United States v. Hardy*, No. 18-cr-10261, 2020 WL 3495505, at *1-2 (D. Mass. June 26, 2020); *United States v. Perez*, 15-10256, 2020 WL 1991161, at *4 (D. Mass. Apr. 22, 2020); *United States v. Guzman*, 15-cr-10338, 2020 WL 1974332, at *3 (D. Mass. Apr. 24, 2020); *United States v. Oladimu*, 1:01-cr-10198, 2020 WL 1866253, at *2 (D. Mass. Apr. 14, 2020); *Boyer v. United States*, 14-cr-10163, 2020 WL 1978190, at *2 (D. Mass. Apr. 24, 2020).

***The Lebanese proceedings do not constitute special circumstances.***

Magistrate Judge Cabell reasonably concluded that the fact a Lebanese prosecutor "close[d] the case" after a family member of Petitioners asked the prosecutor to "proceed with the investigation" did not constitute a special circumstance. *See* Op. at 11-12.[25] Under Article IV, Section 2 of the Treaty, the United States "may refuse extradition when the person sought has been tried and acquitted . . . in a third State for the offense for which extradition is requested." *See* Treaty, Art. IV, Section 2. This permissive grounds for extradition denial falls exclusively within the domain of the Secretary of State to consider. *See, e.g.*, *Vo v. Benov,* 447 F.3d 1235, 1247 (9th Cir. 2006) (judicial officer "has no discretionary decision to make.") (citation omitted); *Patterson v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015) (Secretary of State decides issues for which "there is no mandatory duty that a court may enforce."). In any event, Petitioners have not shown, as they must, that they were actually "tried and acquitted" in Lebanon for the same offense for which Japan seeks their extradition.[26]

***Michael Taylor's family responsibilities are not a special circumstance warranting his release.***

Magistrate Judge Cabell also properly concluded that Michael Taylor's family responsibilities did not constitute a special circumstance. *See* Op. at 12-13; *see also, e.g.*, *Lo Duca v. United States*, No. 95-cv-713, 1995 WL 428636, at *15, 16 (E.D.N.Y. July 7, 1995) ("A review of the case law has failed to uncover any case in which the poor health of a member of the relator's family has been held to be a special circumstance sufficient to warrant the granting of bail.") (collecting cases); *In re Extradition of Budrys*, No. 19-M-179, 2019 WL 1958566, at *6 (N.D. Ill. May 2, 2019); *United States v. Snyder*, No. 13-7082, 2013 WL 1364275, at *7 (D. Ariz. Apr. 3, 2013). While Michael Taylor claims that he is the sole

---

[25] It bears noting that while Petitioners express concern about "upsetting the United States' relationship with Lebanon" (Motion at 34), they dismiss sensitivities in U.S.-Japanese relations as "sensational hyperbole" (Motion at 1).

[26] According to Petitioners, on February 17, 2020, Michael Taylor's oldest son asked a Lebanese prosecutor to proceed with an "investigation regarding the alleged unlawful departure of Mr. Carlos Ghosn from Japan on December 2019, in order to prove the innocence of his father Michael and his brother Peter." *See* DE 38-26. The very same day, the Lebanese prosecutor decided "to close the case." *Id.*

caregiver for his 81-year-old adoptive stepfather, that fact did not deter him from leaving Massachusetts for 89 days of around-the-world travel earlier this year. Michael Taylor must also have surely appreciated the risk that he could be detained in Japan for a lengthy period of time if he were caught enabling Ghosn's escape, and so it is reasonable to assume that the "arrangements" he says he made in advance of his travels (Motion at 33) anticipated such contingency. In any event, Michael Taylor concedes that his middle son and neighbors are caring for his stepfather. *See* EX DE 17 at 32.

In addition, Magistrate Judge Cabell properly determined that Petitioners did not create a special circumstance by combining their claims that individually are not special circumstances. *See* Op. at 15; *see also, e.g.*, *Budrys*, 2019 WL 1958566, at *6; *Risner*, 2018 WL 6809796, at *22; *Nezirovic*, 990 F. Supp. 2d at 605; *Drumm*, 150 F. Supp. 3d at 100; *In re Extradition of Kyung Joon Kim*, No. 04-cv-3886, 2004 WL 5782517, at *6 n.6 (C.D. Cal. July 1, 2004).

### b. Magistrate Judge Cabell properly found Petitioners have not carried their burden to show they are not flight risks.

Magistrate Judge Cabell also properly found that Petitioners had not carried their burden to show they are not flight risks. As Magistrate Judge Cabell noted, their facilitation of Ghosn's escape was an "intricate, sophisticated, and deceptive scheme spanning several countries and most surely requiring massive expenditures of time and money." *See* Op. at 17. Petitioners essentially ask this Court to trust them that they would not deploy their tradecraft to escape now that their own liberty is at stake. The strong presumption against bail in international extradition cases does not permit such a leap of faith. Moreover, there are several additional reasons why Magistrate Judge Cabell's flight risk finding is supported, as set forth below.

*First*, Petitioners have the resources with which to flee. The evidence uncovered thus far reflects that the Ghosn family has made payments to Petitioners in excess of $1.3 million and Ghosn has publicly stated that he is financially assisting "everyone who stood by me." *See* Exs. A-D. Further,

the escape plot itself, involving several advanced planning trips to Japan, multiple hotel rooms in different cities, bullet train travel, a "bundle of 10,000 yen bills" intended for the airport workers, and ultimately the chartering of a private aircraft at a cost of $350,000, further underscores Petitioners' access to resources with which to flee. Moreover, Petitioners can remain comfortably in Lebanon for an indefinite period of time to avoid the justice systems of Japan and the United States. They already own a residence there and they are in the process of expanding their business within the Lebanese market. *See* EX DE 17 at 6.

*Second*, with respect to Michael Taylor in particular, he was previously deemed to be a flight risk and danger to the community in connection with a domestic criminal case. In that case, Michael Taylor ultimately pled guilty to honest services wire fraud based on his participation in a bribery scheme whereby he agreed to give a 24-year veteran of the FBI money, a job, and equity in multimillion dollar contracts in exchange for that FBI agent impeding a grand jury investigation into Michael Taylor.[27] Prior to pleading guilty, Michael Taylor appealed the denial of bail up to the Tenth Circuit, which held "[t]he government offered ample evidence that Mr. Taylor presents a flight risk," that "[t]he government presented evidence of the extent to which Mr. Taylor was willing to go to derail the investigation and prosecution of the first indictment against him," and that "further attempts to obstruct justice cannot be assured by conditions of release." *See United States v. Taylor*, Nos. 12-4186 & 12-4187, 2013 WL 2466627, at *1 (10th Cir. June 10, 2013).

Michael Taylor continued to seek bail after the Tenth Circuit's decision and a subsequent order by the district court denying that request is highly instructive. *See United States v. Michael Taylor*, No. 12-cr-00502 (D. Utah Aug. 22, 2013), DE 351 ("Order"), attached hereto as Ex. T. The Order notes

---

[27] The facts of the case and plea are set forth in the Government's Sentencing Memorandum. *See United States v. Michael L. Taylor*, No. 2:12-cr-645 (D. Utah), DE 1011.

that Michael Taylor is a permanent resident of Lebanon, his wife is a Lebanese citizen, he has a home in Lebanon, and that the United States does not have an extradition treaty with Lebanon. *Id.* at 11. The Order emphasizes the fact that Michael Taylor "has the knowledge, skills, and access to resources that would be highly useful to him in an effort to leave the United States if he so chooses." *Id.* at 12. In fact, "Mr. Taylor's business website touts its airport security system expertise including 'the latest electronic detection and surveillance systems' and describes the vulnerability of ports." *Id.* at 13. The court then proceeded to explain why each of the release conditions offered by Michael Taylor could not reasonably assure his appearance.[28] The fact that Michael Taylor was found to be a flight risk and danger to the community in a domestic criminal case strongly weighs in favor of detention here, particularly given the considerably more exacting standards for release in international extradition proceedings.

*Third*, with respect to Peter Taylor in particular, he admits that he has "spent the majority of the past 15 months residing with his older brother in Lebanon" and conducting his business. *See* EX DE 17 at 29-30. Further, Peter Taylor says he engages "in business travel primarily to the United Arab Emirates," which is another country that lacks an extradition treaty with Japan or the United States. *Id.* at 30. Critically, Peter Taylor was arrested on the same day he was due to fly home to Lebanon, purportedly to "carry on with his life and conduct his business." *Id.* at 30. Peter Taylor thus has every incentive to flee so that he can resume his life in Lebanon. *See, e.g., United States v.*

---

[28] In an effort to secure his release in that case, Michael Taylor offered the following conditions: Surrender of his and his family's passports, GPS monitoring, restricted travel to Massachusetts and Utah, forfeit of $5.2 million seized by the government, his father's house as collateral, and waiver of extradition. Order at 13-15. Finding the surrender of passports inadequate, the court reasoned that Michael Taylor had "access to elite security professionals, experience bribing foreign nationals, and knowledge of entry and exit point security system vulnerabilities, [which] render[ed] traditional bail provisions such as surrendering one's passport ineffective." *Id.* at 13. Finding a GPS monitoring bracelet insufficient, the court ruled that "[g]iven Mr. Taylor's planning skills, experience with clandestine operations, the ease with which he travels internationally, likely access to funds necessary to travel, and a reported willingness to bribe officials, his ability to evade law enforcement (whether he leaves the country through special channels or not) is substantial." *Id.* at 14. Given Michael Taylor's financial resources, the court found that the other conditions were also insufficient to reasonably assure his appearance. *Id.* at 14-15.

*Yassine*, 574 F. App'x 455, 460 (5th Cir. 2014) (affirming the district court's detention order, finding that the defendant "(1) was a world traveler, at home in many countries, and fluent in multiple languages; [and] (2) had family in Lebanon (a country with which there is no extradition agreement)"). It also bears noting that the $1.3 million in payments from Ghosn and his family members have been sent to Peter Taylor and his company.

In arguing that they are not flight risks, Petitioners seek credit for the fact that they could have prolonged their stay in Lebanon but eventually returned to Massachusetts despite knowing the risks of such decision.[29] As other courts have found, however, this fact is not dispositive. *See, e.g.*, *In re Extradition of Azizi*, Case No. 5:14-xr-90282, 2014 WL 1995083, at *3 (N.D. Cal. May 13, 2014) ("[The fugitive] points out that he willingly came here to the United States (which has an extradition treaty with Germany) from Dubai (which does not). Still, the record presented indicates that he avoided returning to Germany . . . after learning that he was a target of a tax fraud investigation in the same case."); *see also, e.g.*, *In re Extradition of Schumann*, No. 18-cr-283, 2018 WL 4777562, at *6 (N.D. Ill. Oct. 3, 2018 (finding "fact that [the fugitive] may have been living openly is not sufficient to overcome the presumption against bail"). There are any number of reasons why Petitioners may have returned to the United States that do not bear on their current flight risk. For example, they may have simply believed that they were above the law, and their brazen acts in Japan just a few months earlier provide strong support for this theory. They may also have believed that the chances of extradition were remote at best, given that Japan had not yet submitted provisional arrest requests, the United States had not obtained arrest warrants, and a magistrate judge had not yet denied their motion to quash the

---

[29] Petitioners claim they returned to Massachusetts some weeks after one of their attorneys flew to Lebanon, in January 2020, to inform them that Japan had issued warrants for their arrests. The government notes that the Japanese arrest warrants did not issue until January 30, 2020, and Petitioners' attorney has not stated when in January 2020 he flew to meet with Petitioners in Lebanon to discuss the warrants. *See* DE 38-16.

provisional arrest warrants. Notably, in the case of Peter Taylor, his visit to the United States was supposed to be temporary, as he was scheduled to return to Lebanon the day he was arrested. Petitioners' incentive to flee now that the prospect of extradition is no longer just theoretical is much greater than it was prior to their arrests.

Petitioners' other arguments on flight risk fare no better. They claim they lack an incentive to flee because of their family and community ties, as well as the fact that they face no more than two years' imprisonment in Japan (in fact, the maximum penalty for an Article 103 violation is three years).[30] However, their arguments are undermined by the fact that they willingly put their family commitments in jeopardy by participating in Ghosn's escape, and they have resisted returning to Japan to face justice despite their purported winning Japanese legal defense. Strikingly, Michael Taylor also claims that his prior conviction arising from his role in impeding a grand jury investigation against him "demonstrates [his] respect for the law" (Motion at 27). Nothing could be farther from the truth. While Michael Taylor says he complied with his prior conditions of release pending sentencing, his subsequent criminal acts in Japan show that he has not reformed.[31]

Moreover, as the Utah district court previously found with respect to Michael Taylor, there is no foolproof way to ensure Petitioners do not flee, particularly given their expertise in the subject. *See* Ex. T (Order at 13-15); *see also, e.g.*, *Risner*, 2020 WL 2110579, at *4 ("GPS monitoring would not alleviate the flight risk. An ankle monitor—even assuming one were available—can be removed."); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001) (affirming detention order and holding that home confinement arrangements are "never one hundred percent infallible, and the presumption

---

[30] *See* Ex. Q (Yoshida Decl. ¶5 n.1 (noting penalty was enhanced in 2016)).

[31] Michael Taylor's claim that he voluntarily returned to the United States to face the prior domestic charges is inconsistent with the government's account of the facts. *See United States v. Michael L. Taylor*, 2:12-cr-00645 (D. Utah), DE 10 (United States Motion for Pretrial Detention) at 26 (Michael Taylor's "return must be described as reluctant, at best").

against bail in extradition cases counsels against incurring even a small risk absent special circumstances").

In short, Magistrate Judge Cabell reasonably concluded that Petitioners had not met their burden to show they are not flight risks, and bail should be denied for this independent reason. *See, e.g.*, *In re Extradition of Martinelli*, 263 F. Supp. 3d 1280, 1304 (S.D. Fla. 2017) (the fugitive "poses such a risk of flight that bail should not be contemplated for an extradition proceeding notwithstanding the special circumstance involved in the extradition of a former head of state").

**B. The balance of the equities does not favor injunctive relief.**

The public interest will be served by the United States complying with its binding treaty obligations to Japan, as "[s]uch proper compliance promotes relations between the two countries, and enhances efforts to establish an international rule of law and order." *Artukovic v. Rison*, 784 F.2d 1354, 1356-57 (9th Cir. 1986). Conversely, "[n]o amount of money could answer the damage that would be sustained by the United States were [Petitioners] to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined." *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963); *see also Wright v. Henkel*, 190 U.S. 40, 62 (1903) ("The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted."). Flight from extradition proceedings is not just theoretical as fugitives have indeed successfully escaped during the pendency of such proceedings. *See, e.g.*, *Parretti v. United States*, 143 F.3d 508, 509 (9th Cir. 1998) (*en banc*). It would add insult to injury if the very persons who enabled Ghosn's escape were themselves able to

evade justice, and the United States was thereby unable to fulfill its treaty obligations to Japan.[32] Further, while Petitioners claim irreparable injury from their continued detention, a preliminary injunction, like a stay application, is "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). Petitioners' irreparable injury claim also has considerably less force given that the facts are undisputed and their Japanese legal defenses are meritless. The true victim here is Japan, not Petitioners.

## CONCLUSION

For the foregoing reasons, Petitioners' habeas petition and motion for a preliminary injunction should both be denied.

Date: July 22, 2020

<div style="margin-left:50%">

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  */s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant United States Attorney

*/s/ Philip A. Mirrer-Singer*
Philip A. Mirrer-Singer
Trial Attorney

</div>

---

[32] Contrary to Petitioners' suggestion otherwise, Japan is a strong treaty partner, as evidenced by recent examples of successful extraditions. *See, e.g.*, DOJ Press Release, "Japanese Investment Company Executives Extradited on Charges Relating to $1.5 Billion Ponzi Scheme," *available* at https://www.justice.gov/opa/pr/japanese-investment-company-executives-extradited-charges-relating-15-billion-ponzi-scheme (last visited July 19, 2020).

## CERTIFICATE OF SERVICE

I, Stephen W. Hassink, Assistant U.S. Attorney, do hereby certify that on July 22, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

*/s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant U.S. Attorney