# EXHIBIT S

# Exhibit 8

```
               UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
                       WESTERN SECTION




   United States of America  )
                             )              20mj01069-DLC
        vs                   )
                             )              20mj01070-DLC
   Michael L. Taylor         )
             and             )
   Peter Maxwell Taylor      )
   _____)




                  Hearing Held Before The

           Honorable Magistrate Judge Donald L. Cabell

                     On June 22, 2020.




   APPEARANCES:

   See the following page.


                     Alice Moran, CSR, RPR, RMR
                   Official Federal Court Reporter
                      United States Courthouse
                    300 State Street, Room 303D
                       Springfield, MA 01105
                          (413)731-0086
                      alice.moran@verizon.net
```

1   **APPEARANCES**:

2

3

4   On behalf of the government:  Stephen W. Hassink, United
    States Attorney's Office MA, 1 Courthouse Way, Suite 9200
    Boston, MA 02210.

5

6   Philip A. Mirrer-Singer, United States Department of
    Justice, 1301 New York Avenue, Washington, DC 20007.

7

8   On behalf of the defendants:  Paul V. Kelly, Jackson Lewis
    PC, 75 Park Plaza, 4th Floor, Boston, MA 02116.

9   Abbe David Lowell, Winston & Strawn, LLP, 1901 L Street,
    NW, Washington, DC 20036.

10

11  Robert L. Sheketoff, One McKinley Square, Boston, MA
    02109.

12  Tillman Finley, Marino Finley LLP, 800 Connecticut Avenue,
    N.W., Suite 300, Washington, DC 20006.

13

14  Daniel Marino, Marino Finley LLP, 800 Connecticut Avenue,
    N.W., Suite 300, Washington, DC 20006.

15

16  James P. Ulwick, Kramon & Graham, P.A., 1 South Street,
    Suite 2600, Baltimore, MD 21201.

17

18

19                      Alice Moran, CSR, RPR, RMR
                        Official Federal Court Reporter
20                      United States Courthouse
                        300 State Street, Room 303D
21                      Springfield, MA 01105
                        (413)731-0086
22                      alice.moran@verizon.net

23

24

25

1    (Video conference commenced.)

2            THE CLERK:  I believe we have everyone and we

3    are ready to go.

4            THE COURT:  Okay.  Thank you.

5            THE CLERK:  These are the cases of United States

6    versus Michael Taylor and United States versus Peter

7    Maxwell Taylor, Criminal Actions No. 20mj1069 and 20mj1070

8    will now be heard before this court.

9        Would counsel please identify themselves for the

10   record?

11           MR. HASSINK:  Good afternoon, Your Honor.  Steve

12   Hassink for the United States.

13           THE COURT:  Good afternoon.

14           MR. SHEKETOFF:  Good afternoon, Your Honor.

15   Robert Sheketoff for Michael Taylor.

16           THE COURT:  Good afternoon.  I thought my screen

17   was frozen there for a minute.  Nobody was saying

18   anything.

19       All right.  Good afternoon, Mr. Sheketoff.

20           MR. LOWELL:  Your Honor, this is Abbe Lowell.  I

21   also appear on behalf of Michael Taylor and we have

22   submitted documents that are for both, but I am entered

23   for Mr. Taylor.

24           THE COURT:  Good afternoon.  Thank you.

25       Okay.  Is that it?  I just want to make sure if there

1    was anybody else chiming in as counsel?  I do see a couple

2    of other faces on there.

3            MR. LOWELL:  I don't know if Mr. Kelly is on.

4            THE COURT:  Noreen, is Paul Kelly on yet?

5            THE CLERK:  He has not come in yet.  I do have

6    Attorney Finley and Attorney Ulwick.

7            THE COURT:  Okay.  Well, why don't we have Mr.

8    Ulwick and Mr. Finley, why don't we have you introduce

9    yourselves for the record then.

10           MR. ULWICK:  Afternoon, Your Honor.  This is Jim

11   Ulwick from Kramon & Graham on behalf of Peter Taylor.

12           THE COURT:  Good afternoon.

13           MR. FINLEY:  Your Honor, Tillman Finley on

14   behalf of Michael Taylor and also on is my partner Daniel

15   Marino as well.

16           THE COURT:  Good afternoon, and I do think we've

17   just been joined by Mr. Kelly.

18           MR. KELLY:  Sorry about that, Your Honor.  I've

19   had a couple of technical difficulties but I apologize.

20           THE COURT:  That's okay.  It won't be the first;

21   it won't be the last.

22       So good afternoon and good afternoon, Mr. and Mr.

23   Taylor.

24           MR. HASSINK:  Your Honor, I apologize for

25   interrupting right at the beginning.  My apologies.

1      My co-counsel, Philip Mirrer-Singer, has indicated

2    he's in the waiting room to get on but I don't see him and

3    he's indicated he hasn't been let in yet.

4          THE COURT:  Okay.  Ms. Russo is the gatekeeper

5    so I'm sure she's hearing that.

6          THE CLERK:  Attorney Hassink, do you know what

7    he's listed under because I don't have anyone in the

8    waiting room under that name?

9          MR. HASSINK:  Just his name Philip

10   Mirrer-Singer.  I'm not aware he'd be listed as anything

11   else.

12         THE COURT:  While we start to proceed, if you

13   can reach him by email, you can ask him to let you know if

14   he's under another name.

15         THE CLERK:  I will do that.

16         THE COURT:  Then we can let him in, and that

17   actually is due to the fact that we have a lot of people

18   from outside the court who are interested in attending, so

19   to speak, the proceedings.  Some are media; some are just

20   interested folks, and we've had to thus take some steps

21   just to make sure we're limiting the screen to people who

22   are actually proceeding.

23      In that regard let me just remind members of the

24   press and the public who are participating in this Zoom

25   proceeding, as I did at the outset at the last proceeding,

1    the court has a rule prohibiting the taking of pictures,

2    screenshots or broadcasting any aspect of these

3    proceedings.  I trust that the media will continue to

4    abide by the court's rules.

5        As before, and we hope it doesn't come to this,

6    anybody who violates this may be restricted or barred from

7    participating in future proceedings.

8        Mr. Hassink, is it okay for us to begin while we

9    await your counsel coming in or do you want to wait

10   longer?

11           MR. HASSINK:  Your Honor, I certainly think it's

12   okay to proceed with the preliminaries while we try to

13   work out Mr. Mirrer-Singer's appearance.

14           THE COURT:  Okay.  So turning to the matter at

15   hand, there are three pending motions that are related.

16   Back in late May the government had filed a motion for

17   detention.  That's at Number 9 on the docket.

18       The defendants subsequently moved to quash the

19   provisional arrest warrants.  That's at Number 17 on the

20   docket.  That motion is also in the alternative for

21   release on detention, and I think it's safe to say that's

22   really the principal motion for the day.

23       Then most recently the defendants have filed a motion

24   to strike a declaration that was submitted by the

25   government when the government submitted a reply to the

1    defendants' papers.

2        So with that I'd like to -- let me just begin with a

3    question for the defendants and I don't know who is taking

4    the lead on this, but it's clear that in particular from

5    the government's submission of a declaration from the

6    Japanese prosecutor that there are competing views as to

7    whether the acts the Taylors are alleged to have committed

8    would constitute a crime under Japanese law for which they

9    may be extradited.

10        If we all agree that at some point it may be

11    appropriate or necessary for the court to consider that

12    issue, don't case law, the extradition statute, and common

13    sense all suggest that we wait to consider that issue

14    until the extradition hearing itself as opposed to now at

15    the provisional arrest stage?

16        And noting, among other things, that probably within

17    the span of two to three weeks or so the government may

18    well submit a formal request for extradition which might

19    moot even some of the issues that have been raised by the

20    defendants.

21        So with that I'll turn it over to the defendants and

22    I'll hear from you and then from the government.

23            MR. KELLY:  Good afternoon, Your Honor.  This is

24    Paul Kelly.  If I could start with the court's permission

25    what the defense would like to do, Your Honor, is divide

1    and organize our argument as follows.

2         Mr. Lowell, who's with us on the line, is prepared to

3    address the substantive issues and the special

4    circumstances.  Mr. Sheketoff is prepared to address the

5    lack of risk of flight on behalf of Michael Taylor.  Your

6    Honor, I am prepared to address the risk of flight issue

7    with respect to Peter Taylor.

8         If the court is okay with that approach, I'd like to

9    pass the baton to Mr. Lowell to respond to the court's

10   question.

11             THE COURT:  That's fine.

12        Mr. Lowell.

13             MR. LOWELL:  Thank you, judge.

14        Your what seemingly is a practical question in terms

15   of timing isn't really because of the following:  The

16   extradition process envisions two steps.  The step one

17   that we're in is one that allows us to appear as we are in

18   front of you today to seek, if you will, conditions of

19   release because there are special circumstances and to put

20   forward that there are conditions that would support that

21   release.

22        The government has tried to, if you will, accordion

23   down into one that there's no difference between the first

24   question and the ultimate question on whether extradition

25   should occur but statute and practice, the case law always

1    divides this into two different steps.

2        If that weren't the case, what it would allow is what

3    we're asking you not to allow, which is a one-sided

4    presentation by a foreign prosecutor who supplements his

5    own request with his own affidavit; sends forward a

6    request for this provisional arrest; gets it done on what

7    may be incredibly challengeable, and then gets to hook

8    these people -- put our clients in a facility where

9    anywhere longer than would have occurred even if they had

10   been accused of violating a law in the United States.  And

11   how can that be?  I mean, they would have to put forward

12   their proof in days, not weeks and weeks.

13       And so the answer to your question really is that

14   there are two substantive areas of law at work here but

15   they overlap.  One is, have we now gotten to the point

16   where we've presented to you enough issues that create

17   what is called the special circumstances that allow us to

18   argue to you and for you to consider and provide us the

19   next step with what would be reasonable conditions?

20       The second body of law is where we put forward the

21   idea that underlying all of this have been an arrest of

22   U.S. citizens in the United States that violates

23   constitutional rights under the Fourth Amendment for

24   probable cause, but the underlying facts are somewhat the

25   same in the way that you framed our point as being, number

1    one, what the prosecutor in Japan has ostensibly done I

2    think is to put forward a request that our clients be

3    provisionally arrested and now it turns out is not at all

4    clear on the basis of which of the statutes in Japan on

5    which he's relying.

6        Is it the immigration based statute in Article 71?

7    Is it the escape statute in 103?  That's piece one.  If

8    you could get to the piece of even assuming,

9    notwithstanding what I will point out in a minute because

10   I do want to just finish answering your media question,

11   then you'd have to decide whether 103 even applies.

12       That said, it would be an additional violation of the

13   theory behind special circumstances and constitutional

14   rights for us to simply say it doesn't matter whether or

15   not the original arrest was wrong.  We can just wait a few

16   weeks and let them fix it if it was.  And, by the way, in

17   a few weeks they will provide the record but it will not

18   obviate that the arrest itself took place on a piece of

19   paper presented in your court based on the legal flaws

20   that we have identified.  That cannot be erased by what

21   they do three weeks or four weeks later.

22           THE COURT:  Do I understand -- is it safe to say

23   that you are collectively or the way at least you're

24   starting really arguing for bail as opposed to, as the way

25   the motion is framed, a motion to quash the warrants?

1    Can I assume that today we're really interested in

2    arguing whether there are special circumstances present

3    that would warrant the Taylors' release on bail?

4         MR. LOWELL:  It's a very succinct and correct

5    way of phrasing what we've done, but for more than just

6    preserving our rights you'll have -- I don't know that a

7    case that I've known about or read about or that I've seen

8    in the last few weeks have this combination of an ability

9    to say that there's something so fundamentally flawed with

10   which to begin that not only does it arise to special

11   circumstances, one of the elements of which in the First

12   Circuit is ultimately having success on the merits of your

13   claim that there's something not possible to be

14   accomplished in extradition, but also that flaw is so

15   significant that it calls into question whether the

16   clients should have ever been arrested to begin with.

17        So, in effect, what you've done is said what we're

18   saying, which is, by a combination of us shown that there

19   are special circumstances and the special circumstances

20   are merits that we think that there are all kinds of flaws

21   legally, that there are conditions which we're calling in

22   your answer bail and also extraneous issues now, which is

23   the crisis the United States and the world is facing in

24   terms of the virus, that all that basically militates in

25   favor of us coming to you as we've tried to do with our

1    colleagues of the Justice Department saying, wait, this is

2    an important case.  It's going to be slogged out on the

3    merits.  We've given you enough now to see that there are

4    real issues here.

5        Why should we not provide some relief to have folks

6    be able to fight this in the courts with appropriate

7    conditions so that they are not in effect being jailed for

8    something that they could never be jailed for should the

9    extradition take place.

10       So in effect, even though that was a little

11   longwinded, I'm agreeing with you but not without regard

12   to being able not -- not waive but not to emphasize the

13   importance of those two legal steps.

14       One last point, judge, the case law is not completely

15   foreign to us and you and to federal judges.  We're often

16   in a position where we seek initial relief.  Let's take a

17   case that's a criminal case for which there was a

18   conviction and the defendant in that regard is seeking to

19   stay out pending appeal.

20       It doesn't require the defendant in that case to

21   prove ultimately that she or he is going to win.  It is to

22   show that there are sufficient issues that if they

23   succeeded would undue the conviction.  That's not a

24   perfect analogy but it's an apt analogy.  And so we are

25   seeking today you to decide that there's enough in the

1    record to basically get to the issue and achieve and

2    satisfy the requirement of special circumstances, and you

3    can do that based on the small steps we have put forward

4    that they didn't seek extradition for a statute that would

5    be incarceratable for one year so that's not extraditable;

6    or they have not invoked the article that they say they

7    do; or that if they did invoke the right article, that

8    itself is not a crime because it is not an escape if

9    somebody skipped out in his own bail.  So that gets us to

10   say to you and therefore we should be getting bail if that

11   makes sense.

12              THE COURT:  Okay.  I don't know how much I want

13   to get into those that you've raised.  You know, the

14   questions about whether the conduct does or does not

15   constitute a proper crime under Japanese law, I don't know

16   that I have a basis right now to decide that.

17        I'm still uncomfortable with the notion of that being

18   the centerpiece of the argument.  I'll certainly -- if you

19   did want to add any more to it, I'll note the government

20   not only do they have a rejoinder to that through the

21   prosecutor's declaration, but they note that the warrant

22   -- to the extent your argument was that there was a

23   disconnect between the warrant and what is articulated

24   there and what is in the complaint -- the warrant refers

25   to the harboring of criminals and by implication that

1    wraps in penal code 103.

2         So it is in fact set out in the Japanese warrant

3    which is what the government says.  But be that as it may,

4    I know that you also wanted to argue some more details

5    about some of these special circumstances and flight risk

6    and the like so I will hear from whomever would be next.

7              MR. LOWELL:  Before I pass the baton, Judge,

8    just to answer your question, my point before was you

9    don't have to today in these proceedings -- I think I've

10   lost you but I hope you're still here.

11             THE COURT:  I'm still here.

12             MR. LOWELL:  I see you.  You just went to a

13   different --

14             THE COURT:  If somebody goes in or out, it kind

15   of shifts everybody around like checkers but I'm focusing

16   right on you.

17             MR. LOWELL:  All right.  It keeps us on our

18   toes.  That's good.

19        The government is inviting you to make a decision

20   that you're not required to make.  We're not asking you

21   today to decide that they're wrong; we're right as a

22   matter of what will ultimately happen in the extradition

23   proceedings.

24        You point out that their latest salvo back to us with

25   yet is still improperly in our opinion provided

1   declaration today is to somehow say you know what?  We

2   didn't have to put Article 103 in our arrest warrant if we

3   just used words in that article and then argue after the

4   fact that by using words what we meant was Article 103.

5       I mean, I understand that's a nice approach but Lewis

6   Carroll sort of said that was not quite right when Humpty

7   Dumpty said "words mean whatever I say they mean whenever

8   I say them."  We've all become texturalists in the last

9   few weeks following the Supreme Court.  If they want to

10  say 103, let them say 103.  If they want to say --

11          THE COURT:  Well, respectfully, I think what

12  they say is -- and I don't have the Japanese statute here

13  in front of me -- that the title of the statute is

14  something like harboring criminals.  So it's not a

15  flippant argument.  They're actually taking the words that

16  appear in the code book that sets out the title and have

17  put those into the warrant.  So arguably it's a little bit

18  closer to tracking the statute than you make it out to be.

19      I'll notice part of this they also I think in their

20  opposition cite precedent that if you get past the warrant

21  issue, this conduct is in fact or has been in fact found

22  by Japanese courts to be a violation of penal code 103.

23  So to your core argument, there is precedent in Japan that

24  undermines it.

25          MR. LOWELL:  You know, I -- sorry.

1          THE COURT:  Go ahead.

2          MR. LOWELL:  No, I just want to try to correct

3     the record on that.

4          Hold on just one second, judge.

5          I just need to see if I can't correct the record.  So

6     the issue is they say that Article 103 in Japan has been

7     used in a context.  Let's separate the two context.

8          Context one, has it ever been used to charge the

9     principal, in this case Mr. Ghosn, for skipping out on

10    bail?  The prosecutor in Japan hasn't cited to a case and

11    our expert who is not vested as the prosecutor has

12    indicated that it has never happened; never happened.

13         Indeed, you know it's never happened because the

14    outcry after Mr. Ghosn left Japan was to now create a

15    statute that would make it a crime.

16         So there you have 103 as to the principle never being

17    applied to skipping bail.  If that's the case, aiding and

18    abetting somebody to do which is itself not a crime under

19    Japanese law is not a crime.

20         It's not a crime for two reasons, one is the obvious

21    but the other Japan has the statute, has a rule, has case

22    law that says the accessory has to have lesser than the

23    principal and here the principal has the crime.

24         But having said that, the second point is equally

25    important.  They have put forward cases that say people

1    like the Taylors have in fact been prosecuted under 103

2    and in our reply we have pointed out through our expert

3    who teaches and practices and understands that every one

4    of those is in a factual context at which it is an escape.

5        The statute's name may something about harboring but

6    harboring has to be viewed as to what is the statute

7    itself, and each one of those has a real escape either

8    from detention or from something like obstruction by

9    putting in false documents to prevent an arrest, and not

10   one of them has had anything to do with bail except for

11   one and that's only after bail has been revoked and then

12   the person was involved in helping and so I just wanted to

13   make sure of structure of this.

14       And lastly what I said before even if right now we

15   can only say he-said she-said only if we have dueling

16   declarations, I think ours are both weightier, more

17   independent and properly filed with somebody who's not

18   vested in the case, let put that aside, what we've done is

19   what the law in the district said.

20       When we cited to you the case under the Federal

21   Circuit which says, for example, the *Castaneda-Castillo*

22   case where it says the petitioners "have raised serious

23   issues with the required briefing and detailed analysis by

24   the court."  That triggers special circumstances.  That's

25   where we now pivot to why it is the special circumstances

1    of both not being a flight risk and having the ability to

2    deal with the Coronavirus should lead us to a humane and

3    rational result where our clients don't have to stay in a

4    facility for months and months while they are challenging

5    properly the proceedings before them to a result in which

6    months and months from now you or your colleagues will

7    agree that they should have never been arrested to begin

8    with.

9            THE COURT:  Okay.  Thank you.

10           MR. KELLY:  I think Mr. Sheketoff is going to

11   take the baton at this moment to talk about Michael

12   Taylor.

13           THE COURT:  Thank you.

14           MR. SHEKETOFF:  Good afternoon again, Your

15   Honor.

16       So I know you've read the pleadings and I don't want

17   to bore you with what you've already read, but I want to

18   suggest that Michael Taylor has earned -- and I pick that

19   word carefully -- a conclusion that he is not a risk of

20   flight.

21       I say he's earned it for four basic reasons:  His

22   strong ties to the community in Harvard.  He raised his

23   kids there.  He's a graduate of Ayre High School.  His

24   stepfather who you've read about is -- became his

25   stepfather at age 8.  He was an Army lifer, so to speak.

1    He did Army intelligence.

2         My client graduated as I said Ayre High School

3    because he lived on the base, and he spent his whole adult

4    life in that community.  He's participated in youth

5    sports, never for money.  There are football fields named

6    after him in the Ayre area, and so he has strong roots

7    there.  That's -- many people have strong roots in a

8    particular community, but he's earned his American

9    citizenship not just by being born here.

10        When he graduated Ayre High School, he was in a class

11   of recruits that allowed high school students to try out

12   for special forces.  He spent eleven years as a special

13   forces Green Beret.

14        The United Supreme Court said in 1957 that banishment

15   was more primitive a punishment than torture, and the

16   suggestion that someone that spent eleven years, many of

17   them in combat in the Middle East, would self-banish over

18   a charge in Japan that carries a maximum penalty of three

19   years I suggest is ludicrous.

20        But unlike others he's had an opportunity on two

21   separate occasions to show that he should be presumed to

22   abide by court conditions.  The first is the Utah case

23   that the government points to that says, well, he was

24   detained in that case.  It even went up to the Tenth

25   Circuit and he was detained, but the same U.S. attorney's

1    office and the same judge that detained him in Utah after

2    he pled guilty released him on conditions, very, very

3    lenient conditions.

4         He was on conditions for one year plus before he

5    showed up for his sentencing.  He violated none of those

6    conditions and came back to the court to be sentenced and

7    go and do more time.  I don't know how else you could

8    demonstrate your commitment to these requirements than to

9    do that.

10        But most importantly, Your Honor, here in this case

11   this became an international cause to left.  He was in

12   Lebanon.  He was fully aware that Lebanon had no

13   extradition treaty with Japan.  He came back to the United

14   States voluntarily.  He took up residence in Harvard where

15   everyone knew he was part of that community, and he knew

16   that there was an arrest warrant for him because it was

17   part of the international discussion and he still returned

18   to the United States and took up his normal residence.

19             THE COURT:  Do we have -- I mean, is there any

20   evidence beyond your asserting on behalf of your client

21   that he was aware that there may have been some action

22   towards extradition?

23        Do we have any concrete evidence that Japanese

24   prosecutors were seeking the extradition of the Taylors?

25   That that was, you know, part of public discourse and that

1    in the midst of that he came back to the United States

2    from Lebanon?

3              MR. SHEKETOFF:  Yes, Your Honor, I believe there

4    are attachments to the very first motion to quash.  There

5    are exhibit attachments.  He was inquired of by the

6    International Press and it was all over the international

7    scene.

8         The government says he's an expert at escape.  If

9    he's an expert at escape, he would not have returned to

10   the United States.  I mean, he is an excerpt at escape but

11   an expert at escape for himself?  Why would he return to

12   the United States?  The only reason to return to the

13   United States is because that's where he lives and

14   whatever was to come was to come and he would deal with

15   it.

16        He's expended the resources to get a team of lawyers

17   to deal with this situation.  So I believe he's

18   demonstrated in force in significant ways that this is not

19   someone that would run away.

20        Also in terms of the Utah case, he was arrested in

21   Utah after he returned from the Middle East on that

22   occasion too, already knowing that there were charges

23   about to land on him.

24             THE COURT:  So in your view what would be

25   appropriate conditions to mitigate any concerns about risk

1   of flight?

2           MR. SHEKETOFF:  So, Your Honor, I'm going to

3   take the position that I take with this court and with

4   every court in our district, which is we're open to any

5   reasonable conditions that you might want to impose.

6       I think we suggested in our papers the surrender of

7   his passport, GPS, and potentially the posting of property

8   by third parties so that he would be putting at risk the

9   assets of people that he had relationships with, or any

10  other reasonable condition that you might deem

11  appropriate.

12          THE COURT:  Okay.

13          MR. SHEKETOFF:  He does have an extremely close

14  relationship with his stepfather who's really his real

15  father and the government says, well, you know, someone

16  else can take up that task.  His 30-year-old son has been

17  taking up that task.  But if my wife was in extreme

18  difficulties, it's not that I couldn't find somebody else

19  to take up the task.  That's not -- the idea that I would

20  flee, banish myself from the country in those

21  circumstances I think is just extremely unlikely.

22      Your Honor, he does have a condition called Valley

23  Fever.  He got it as a teenager.  It resulted in about 5

24  or 10 percent of the cases, I did the reading, it's a

25  fungal infection that comes -- that gets into your lungs

1    and in about 5 or 10 percent of the cases you need to have

2    an operation.  He had an operation at Mass General

3    Hospital in 1976 to remove a part of his left lower lobe.

4        He informs me that for a long time he was symptom

5    free but as he's gotten older, he's 59 now, he has

6    shortness of breath and other issues of that nature and I

7    believe that puts him, just with common sense, at greater

8    risk for COVID-19.

9        It's not that the Norfolk County Sheriff's Department

10   has not made efforts.  I've been to visit him twice.

11   There are clear efforts being made at the Norfolk County

12   Sheriff's Department, but they can't control the spread of

13   this disease.  Just in the weeks that he's in there, the

14   numbers have gone up significantly.  I believe they are in

15   the 40s or something like that now, staff and inmates, and

16   at 59 with a prior -- with a portion of his lung gone.

17            THE COURT:  Okay.  We also get weekly reports.

18   I know the SJC gets weekly reports.  I haven't had a

19   chance to look at stats yet for last week.  I don't know

20   if you had.

21            MR. SHEKETOFF:  Well, I have in the sense that

22   Paul Kelly has shared them with us.

23            THE COURT:  That counts.

24            MR. SHEKETOFF:  I'm relying on Paul Kelly's

25   version of the stats.

1          THE COURT:  That's the most dangerous thing

2     you've said all afternoon.

3          MR. KELLY:  Are you passing the baton, Mr.

4     Sheketoff?

5          MR. SHEKETOFF:  I've run out of gas, Your Honor.

6          THE COURT:  Okay.

7          MR. KELLY:  Your Honor, if I could take just a

8     few moments and talk about Peter Taylor with the court's

9     permission?

10         Peter Taylor, Your Honor, is 27 years of age.  He's a

11    lifelong resident of Massachusetts.  He has no criminal

12    history whatsoever.  Peter is a 2011 graduate of Lawrence

13    Academy.  He then enrolled immediately in Bentley

14    University for his college studies after high school.

15         Unfortunately when the family's assets were frozen

16    for a period of time in connection with the Utah

17    prosecution, he could no longer afford the annual tuition

18    at Bentley but desperately wanted to continue his

19    education.  Peter was accepted at the Lebanese American

20    University in Byblos, Lebanon which was not far from where

21    his older brother was then residing in this small condo

22    that they have.

23         So he resided with his brother, Your Honor, from the

24    fall of 2012 until his graduation from college in early

25    2015 where he commuted back and forth from this condo to

1   the school and studied banking and finance.

2       It should be noted, Your Honor, that while he was in

3   school, you know, not unlike a college student who was

4   attending school in any state in the United States, he

5   would return home to Massachusetts both in the summer and

6   during holiday breaks and the like.

7       Upon graduation, Your Honor, in 2015 he immediately

8   moved back to the family home in Harvard, Mass. where he

9   resided and worked for the next three years.

10      It was at the end of 2018 when he decided to return

11  to Lebanon to live for a period of time with his brother

12  to help grow the family's U.S. based vitamin business into

13  that region of the world.

14      Peter's primary residence and domicile, Your Honor,

15  is and always has been in Massachusetts and it is his

16  intention to settle permanently in this area.

17      And even since 2018 as he tried to grow the business,

18  he has regularly traveled back to the family home and

19  remained for periods of time in Massachusetts which, of

20  course, is what he did in March of 2020 consistent with

21  this kind of pattern of activity that he's had from 2018.

22      So in the government's response, Your Honor, to the

23  defense motion they strain to find some way to support

24  their specious claim that Peter is a flight risk.  They

25  note that he spent time in Lebanon and that he's traveled

1    to the United Arab Emirates on business but, Your Honor,

2    we acknowledge those facts for the reasons I just

3    described.

4        However, simply because someone has traveled overseas

5    or pursued one's education internationally or is trying to

6    expand a fledging U.S. business into other countries

7    hardly suggests that that person will flout United States'

8    law or seek to flee.

9        The fact is that, like his father, Peter returned to

10   Massachusetts in March with full knowledge that Japan had

11   issued an arrest warrant for him.  He was also aware that

12   Japan had an extradition treaty with the United States and

13   yet what did he do?  He returned to the only family home

14   that he has ever known in Harvard, Mass.  He was not in

15   hiding.  He was living openly and lawfully as any U.S.

16   citizen should be.

17       The government claims that it had to move to arrest

18   Peter on May 20th because it learned that he had purchased

19   a ticket to travel to Lebanon but, of course, he did.  I

20   mean, that was his life; that was what he was doing.  This

21   was not some effort to engage in flight to avoid arrest,

22   and certainly Peter was unaware of the fact that the court

23   had authorized a provisional warrant for his arrest.

24       Just a couple of other final points, Your Honor,

25   about Peter.  First of all, Your Honor, if this was any

criminal case, perhaps apart from him being charged with
some serious violent crime, there is no question that
Peter would be entitled to release under the Bail Reform
Act most likely personal recognizance.

Second, Your Honor, Peter has no military or law
enforcement training.  And contrary to the government's
suggestion, he is no expert in flight or escape or bail
jumping or any of these alleged acts.

In fact, Your Honor, the government claims that he
was involved in harboring or concealing Mr. Ghosn when Mr.
Ghosn left the territory of Japan.

Your Honor, the fact is that Peter Taylor was not
even in Japan when those alleged actions took place.  And
as to him especially, Your Honor, there are serious and
significant questions about whether he committed any
offense, let alone an offense which is extradictable.

Finally, Your Honor, even if it was possible that
this bright young man should be extradited, what is he
facing in Japan?  The maximum penalty for this alleged
offense is three years and it is my understanding, Your
Honor, not unlike in this country, that the statutory
maximum is rarely imposed.

Does it really make sense, Your Honor, that a
27-year-old college-educated U.S. citizen with no prior
involvement with the criminal justice system is going to

1    engage in flight, be charged with more serious offenses

2    here in the United States and become a federal fugitive

3    prepared to live in exile outside of his home country and

4    apart from his family and friends for the rest of his

5    life?  You know, it's absurd.  It would make no sense

6    whatsoever.

7         Peter Taylor has no incentive to flee, Your Honor,

8    and every motivation to directly address these charges and

9    to vigorously defend himself.

10        As has been mentioned, Your Honor, we're not asking

11   the court to address the merits of the Japanese request

12   for extradition at this time, only to take reasonable and

13   justified actions to release Peter Taylor on conditions

14   because frankly, Your Honor, it would be a terrible

15   injustice if Peter Taylor were to spend more time in

16   pre-hearing detention in his own country in the midst of a

17   pandemic than he would ever face in Japan.

18        So finally, Your Honor, in closing my client and I

19   both give you our firm and sincere assurance that he will

20   fully abide by whatever conditions may be set by this

21   court and he will return to court as required.  Thank you.

22             THE COURT:  Thank you.  Mr. Hassink.

23             MR. HASSINK:  Yes, Your Honor.  So if it's

24   permissible by the court, I'll address those arguments in

25   the order that they were presented to the court starting

1    with Mr. Lowell's and the motion to quash.

2         THE COURT:  Sure.

3         MR. HASSINK:  So at bottom, the relaters need

4    this case to appear much more complicated than it is

5    because they have not at this stage challenged the factual

6    underpinning for their conduct, which is to say to travel

7    to Japan for the sole purpose of aiding Carlos Ghosn

8    escape hidden in a luggage carrier onto a private jet for

9    a flight the Lebanon, a country in which there is no

10   extradition treaty.

11        The only way they can get out from under those facts

12   is to argue that three things are true.  The first is that

13   the arrest warrant issued by Japan requested by a Japanese

14   prosecutor and issued by a Japanese judge on a finding of

15   probable cause, they have to say that that arrest warrant

16   doesn't actually charge the relaters with a violation of

17   Article 103, a crime for which extradition can be sought.

18        Your Honor already pointed out that in the first

19   sentence of the request in the arrest warrant it says on

20   the alleged charge of harboring of criminals.

21        Now, Your Honor, you don't have to take the

22   government's word that that is in fact the title of

23   Article 103.  In Exhibit J filed in support of the

24   Taylors' own brief, they attach a treaties on Japanese law

25   and in that treaties Article 103 is titled Harboring of

1    Criminals.

2         The prosecutor then attached a detailed statement of

3    fact, a statement of fact very similar to the statement of

4    fact that we filed in our sworn complaints in support of

5    the provisional arrest that details the Taylors' actions

6    relating to that charge.

7         Although not required to do so, Japan has filed a

8    declaration by the prosecutor explaining the law and the

9    basis for the judge's determination.

10        Now, the relaters would have you believe that a

11   prosecutor from a foreign country filing a declaration is

12   somehow improper.  Far from being improper, it's routine

13   as this court knows.

14        American prosecutors when seeking the detention and

15   extradition overseas in other countries regularly file

16   such declarations.  And the point is we expect the other

17   countries, our treaty partners, to accord that some

18   deference just like we ask them to accord deference when a

19   judge like yourself, Your Honor, issues an arrest warrant

20   based on a complaint establishing probable cause.  So the

21   argument that the arrest warrant doesn't charge a

22   violation of 103 is simply not true.

23        Moreover, in their reply brief they attach what they

24   purported to be a first arrest warrant issued January

25   30th.  Just very briefly, we filed a supplementary

1  declaration today because although they claimed that was

2  the first arrest warrant filed, it's not that all.  It's a

3  translation of a press release that they're purporting to

4  be the first arrest warrant.

5      Moreover, in that press release it cites a violation

6  of Article 103 so I'm not -- it's not clear how that helps

7  them at all.

8      The second thing they need to be true, Your Honor,

9  they need to be true that their conduct doesn't actually

10 constitute a violation under Article 103 of the penal

11 statute in Japan, but they make two important points in

12 their reply brief that we actually agree with.

13     The first is the court may yield some deference to

14 close questions of foreign law.  And the second is when

15 construing a foreign statute, the court certainly must

16 presume that the most pertinent and authoritative source

17 on the scope and import of any foreign law is the plain

18 language of the statute itself.

19     Those are the relaters' words in their reply brief

20 and we agree with that.  The plain language of the statute

21 states "enabling the escape of criminals; a person who

22 harbors or enables the escape of another person who has

23 either committed a crime punishable with a fine or greater

24 punishment or has escaped confinement shall be punished by

25 imprisonment with work for not more than three years or a

1    fine of not more than 300,000 yen."

2        Carlos Ghosn was undisputably a person who committed

3    a crime under the plain meaning of the statute and the

4    Taylors, just as undisputedly, aided in his escape from

5    prosecution in Japan.

6        THE COURT:  Well, let me stop you right there

7    and I'm not sure that we want to get into the weeds, but I

8    think one response from the defendants would be that the

9    word "escape" may be a term of art in this case because in

10   Japan it wouldn't be a crime for Mr. Ghosn to simply leave

11   and to bail jump.  And if it wouldn't be a crime for him

12   to jump bail, that can't be escape and so they couldn't be

13   guilty of helping him escape if what he did is not a

14   crime.

15       MR. HASSINK:  So the first thing I would point

16   Your Honor to in response to that direct question is that

17   their own declaration filed as the first Cleary

18   declaration in which in the Cleary declaration, Dr. Cleary

19   states "The case law upon which Japan relies shows that

20   Article 103 applies to instances where one enables another

21   person to escape apprehension by law enforcement."

22       The second thing I'd point this court to is that same

23   treaties I already discussed which states "enables to

24   escape refers to all acts that hinder arrest or discovered

25   by authorities by methods other than harboring."

1       I guess I'd say if hiding Carlos Ghosn in a box and

2    putting him onto a private plane was not in aid of helping

3    him avoid apprehension or evade law enforcement detection

4    as the relaters sources themselves state, then I don't

5    know what it is.  What was the point?  Because if Carlos

6    Ghosn had simply walked up to the ticket counter at the

7    Tokyo International Airport and purchased a ticket, his

8    bail would have been revoked and I assume the authorities

9    would have been sent forthwith.  The whole point was to

10   evade apprehension and to avoid arrest and that's exactly

11   what they did.

12       Your Honor, underpinning all that I want to circle

13   back to what the relaters need you to believe is that the

14   prosecutor is sort of making this up as he goes.  But what

15   they left out of all of their discussions is the fact that

16   the prosecutor can't issue an arrest warrant in Japan.  He

17   had to apply to a judge.  A Japanese judge who saw the

18   title of the statute reviewed the statement of facts and

19   issued the arrest warrants.

20       So if the court needs any further explanation, the

21   plain language of the statute, the two explanations

22   provided by the relaters' own filings, the government's

23   submissions provided by the Japanese prosecutor and the

24   Japanese arrest warrants themselves I think should dispose

25   this court of any idea that the relaters' strained view of

1   that statute is the correct one.

2       But the government takes the court's point that that

3   is very much in the weeds q5 this stage, but here's why

4   it's important, Your Honor, and I'll get off Article 103

5   now.  Here's why it's important because they're relying

6   very heavily in their brief on the special circumstance of

7   substantial liklihood of success.

8       And even if this court chooses to evaluate that claim

9   at this stage which the court we view from the case law

10  shouldn't do and is certainly not required to do,

11  substantial likelihood of success is exactly what it says

12  - substantial likelihood of success on the merits.

13      It is not this idea of throwing enough dirt around to

14  create some confusion that there might be, as the relaters

15  state, a close question of law.  If it's a close question

16  of law, how can they possibly show a substantial

17  likelihood of success?  By definition they're saying it

18  could go either way.  We disagree with that obviously.

19  But even their own admissions in their reply brief

20  suggesting that it's a close question could go either way

21  certainly cuts against the idea that they have a high

22  liklihood of success.

23      Finally, on Mr. Lowell's argument I would just point

24  out that he made a third point and this is a third point

25  he needs to be true as well and it's this:  It's that

1    Japan is somehow seeking the Taylors' extradition on the

2    basis of misdemeanor immigration offenses rather than the

3    criminal violation of Article 103.

4        Well, in the sworn complaint that we filed and I

5    signed and Your Honor reviewed and signed as well, the

6    complaint states clearly that article -- that Japan has

7    requested the extradition based on Article 103.

8        The complaint goes even further and specifically

9    disclaims any reliance on the misdemeanor immigration

10   charge.

11       Your Honor, if Japan had requested the Taylors'

12   provisional arrest based on a misdemeanor charge, this

13   case would not be in the District of Massachusetts.  It

14   would have been stopped at the State Department or the

15   Department of Justice before it ever made its way here to

16   swear out complaints on the arrest because a misdemeanor

17   cannot form the bases of extradition under a treaty if

18   it's not a crime punishable by more than one year.

19       THE COURT:  So when you say the complaint

20   actually disclaims an arrest based on misdemeanor, what

21   language are you referring to?

22       MR. HASSINK:  So in paragraph 5 of the

23   complaint, Your Honor, it states that Japan is pursuing

24   the extradition under Article 103 and then there's a

25   footnote to paragraph 5 which states that the immigration

1   charges, which they are charged with in Japan under that

2   arrest warrant, it states that the immigration charges

3   because they're a misdemeanor are not a basis for the

4   request for provisional arrest and they won't be a basis

5   for extradition in this case.  So they're in the sworn

6   complaints at our docket one in both cases.

7       So based on that I don't know how the U.S. could be

8   any clearer on what Japan has requested their provisional

9   arrest under.  And at this stage in the proceedings this

10  court looked at the sworn complaints, issued the

11  provisional arrest warrants.  They've not shown you any

12  case law suggesting that you needed to do more than that.

13      The rest of the arguments I think are an effort to

14  try to cast enough doubt to show some likelihood of

15  success to be able to shoehorn their legal arguments into

16  the detention parameters and that's what I think that

17  they're getting at.  And so I'd say that this court can

18  look basically at the case of *Drumm* and *Castaneda*, and

19  with respect to *Drumm* --

20              UNIDENTIFIED SPEAKER:  (Inaudible)

21              MR. HASSINK:  I'm sorry?

22              THE COURT:  That was not I.

23              MR. HASSINK:  I'm sorry, Your Honor.  I thought

24  I heard something.

25              THE COURT:  I heard it too, but I don't know who

1    that was.

2           MR. HASSINK:  Understood.

3           THE COURT:  Go ahead.

4           MR. HASSINK:  So I think this court can look

5    properly to the case of *Drumm* which this court decided

6    back in 2015 and find very similar arguments made to try

7    to gain release under the special circumstances prong,

8    arguments about the complexity and length of time it will

9    take to evaluate those claims.

10     They basically said -- but this court responded to

11    those arguments and says "notwithstanding the quantity and

12    complexity of the underlying criminal charges, it will not

13    be necessary for the parties to litigate the underlying

14    criminal charges or engage in extensive discovery to

15    prepare for the extradition hearing."

16     So to the extent the defendants are concerned that

17    because of these issues they will lend themselves to

18    lengthy proceedings, number one, at this stage that's too

19    speculative as the court found in *Drumm*.  But, number two,

20    as the court pointed out already Japan is prepared to

21    submit -- to transmit formally its extradition hearing I

22    think within the next two weeks, which is within the

23    45-day period.

24     Once received, the government will file it as quickly

25    as possible and request a hearing shortly after that.  The

1    length of delay that they're suggesting would cause this

2    court to take based on these legal arguments regarding

3    Article 103 are simply not the delays that courts focus on

4    when deciding whether release is appropriate.

5         For instance, in the *Castaneda* case which the

6    defendants cite in support, in that case the fugitive had

7    already been in immigration detention for five years.

8    There was a 25-year delay before the filing of charges and

9    an additional three-year delay before extradition.  And in

10   that case, by the way, the judge found that the defendant

11   wasn't a flight risk.

12        In fact, in *Kin-Hong* the First Circuit agrees with

13   this court's analysis in *Drumm* in stating that "The normal

14   passage of time inherent in the litigation process does

15   not constitute a special circumstance."

16        And to the extent that the defendants are going to

17   request additional time, the cause of the delay which

18   leads to the release cannot be based on the defendant's

19   own actions, again citing *Drumm*.  So I think, Your Honor,

20   unless you have any questions, that is -- I'm sorry, Your

21   Honor.

22             THE COURT:  No, I just have a couple to kind of

23   tease this out.

24        One of the things I think we would probably hear in

25   response is that you're not maybe giving enough credit to

1    the fact that the Taylors were in a country that has no

2    extradition treaty with Japan.

3         I don't have all the materials in front of me but

4    apparently the record suggests that they were aware of the

5    possibility of extradition proceedings being initiated and

6    common sense would have dictated they understood that

7    coming back to the United States would increase the risk

8    of being extradited.  They nonetheless came back.

9         And also at least as it relates to Peter Taylor, but

10   really for both, both have presented arguments that in

11   light of everything they are not flight risks.  There are

12   conditions that could be fashioned to mitigate the risk.

13        In particularly Peter Taylor's background is so

14   different from his father's that he really could be viewed

15   exceptionally given his lack sort of a history in this

16   part of the world, his youth.  You know, the fact that

17   he's educated and had reasons for being in Lebanon and

18   nonetheless has come back and forth.

19        So what do you say to that?  That if I were to say,

20   look, I'm not prepared to say who's got the better

21   argument in terms of whether the defendants violated or

22   the relaters violated 103, that may be an issue for the

23   Japanese courts to decide should they ever be in a

24   Japanese court.

25        At this point I'll call it a jump ball, but that

1    ambiguity or that possibility that they could prevail, if

2    though it may not be a substantial likelihood, coupled

3    with the arguments that had been advanced on their behalf

4    combined constitute a special circumstance warranting

5    bail.

6           MR. HASSINK:  So I'll separate those two out,

7    Your Honor, with respect to risk of flight and special

8    circumstances.

9        As this court's aware, they need to show by clear and

10   convincing evidence that they are both not risks of flight

11   and that special circumstances would apply.  So as opposed

12   to putting them together, I think the analysis should stay

13   separate.

14       So I'd like to address --

15          THE COURT:  Okay.  Well, except that I guess in

16   my mind what I was collapsing to was, you know, for

17   example, you cited to *Drumm*.  What the parties argued

18   there was, look, we've got all these reasons why we think

19   you should release these guys on bail.  That if one of

20   them standing alone doesn't work for you, lump them

21   altogether.  Because if you lump them altogether, it

22   amounts to a special circumstance, and I guess that's what

23   I'm getting at here.

24       Is there an argument that, you know, maybe none of

25   these standing alone is a winner, but putting them

altogether that we could view this as a special

circumstance?

MR. HASSINK:  Well, no, I don't believe so, Your

Honor.

As I've addressed again I think that they are trying

to somehow show that all you need to do to show a

substantial liklehood of success is to show some form of

argument so I would not think that standing alone or added

with anything else would constitute a special

circumstance.

With respect to their risk of flight, that shouldn't

be considered as a special circumstance at all.  That's a

completely separate analysis.  So whether or not they are

a risk of flight, they would still need to show that some

special circumstances fitting in the categories courts

have found warrant their release.

So with respect, so with respect to their flight and

their return from Lebanon, this would be my response to

the fact that Michael and Peter Taylor returned to the

U.S. from Lebanon.

Number one, I disagree with the analysis that the

record shows that they were aware of some efforts to

extradite them.  In fact, I'd point this court to the

defendants' rejoinder to the government in which they said

Peter Taylor just booked a normal flight in May 20th.  The

1    fact that he was arrested then, he had no idea that the

2    U.S. Government was going to be issuing arrest warrants at

3    the time and coming after him and so they can't have it

4    both ways.

5    They can't say that, look, they were fully aware that

6    extradition proceedings were ongoing but actually Peter

7    Taylor didn't know.  He was just on the way to the airport

8    anyway.  So I would point to that.

9    So here's what I would say to the return though.  It

10   is a very different proposition and creates a very

11   different state of mind in the defendants to return to the

12   United States at the beginning of the pandemic which was

13   referenced with the knowledge that Japan has issued arrest

14   warrants for them.

15   That is a very different set of circumstances than

16   where they are now sitting and where they would be sitting

17   if released which is not only has Japan issued arrest

18   warrants for them, but the U.S. Government has received a

19   request for their arrest and will receive a formal

20   extradition treaty and the U.S. has now acted on that and

21   gone out and arrested them and is pushing for extradition.

22   We've now added several more layers so what once was

23   a theoretical possibility that the U.S. might work with

24   its treaty partner Japan to seek their extradition is now

25   an incredibly real possibility that has them currently

1    detained under that extradition law.

2         And were you to release them, Your Honor, they would

3    be in a much different state of mind.  So their state of

4    mind when they came back from Lebanon at the time I would

5    suggest has very little to do with what their state of

6    mind will be should this court decide to release them now.

7    Now, that's my response to the recent return from Lebanon.

8         My response to Michael Taylor's return from Lebanon

9    with respect to his Utah case, well, after reading the

10   defendant's submissions in this case, we spent some time

11   looking at the docket on Utah and speaking with the

12   prosecutors in that case.

13        Number one, I think it is fair to say and maybe even

14   generous that Michael Taylor in his brief has grossly

15   mischaracterized that former criminal case.  He makes

16   comments in his brief, for instance, like was unaware of

17   the fraud; was caught up in the investigation; was then

18   contacted by an FBI agent who knew he was innocent that

19   agreed to help.

20        Well, number one, he wasn't caught up in anything.

21   He was part of a fraud scheme and the FBI agent who

22   contacted him he attempted to bribe that person to

23   obstruct a grand jury investigation and that FBI agent was

24   also convicted and spent time in prison.

25        With respect to his return from Utah, I point this

1    court to the government's brief, to the government's brief

2    for detention when he was originally brought back.  And

3    they addressed this idea that he voluntarily returned to

4    Utah from Lebanon to face the charges.

5        Citing case Number 12cr00645 at Docket Number 10

6    prosecutors write "Of course, Taylor has returned from

7    Lebanon to appear before this court, but he has returned

8    unaware that the government had uncovered his corrupt

9    obstructive scheme and plan to file new charges against

10   him.  Furthermore, his return must be described as

11   reluctant at best."  And then goes on to cite several

12   emails between Michael Taylor and the corrupt FBI agent

13   seeking again to secure the halting of a federal grand

14   jury investigation.

15       Through misrepresentation of that Utah case and

16   especially his return to the United States I think he has

17   shown himself, Your Honor, in our opinion a willingness to

18   say what he needs to in order to secure release.

19       I would encourage Your Honor to look at his filing in

20   his motion and then compare it to the detention order that

21   the government has attached to its brief, as well as

22   Docket Number 10 in the case just cited, 00645.  So that's

23   the two returns to the United States.

24       Now, Your Honor, I'll address Peter Taylor now

25   because you asked a specific question about him.  Your

1 | Honor, you said a couple of things about Peter Taylor that
2 | I want to address.  The first is you mentioned given his
3 | age he has much less experience internationally.  Recently
4 | that actually seems like it's not true.

5 | Peter Taylor, by his own admission in his motion, has
6 | lived the better part of the last 15 months in Lebanon
7 | with his brother, a member of the Taylor family, in a home
8 | owned by their parents in a business that was started by
9 | him and his father, and he was actually set to return to
10 | Lebanon the day he was arrested as we've already
11 | discussed.

12 | Your Honor, you've seen a lot of detention cases.  In
13 | the criminal context where there is not the heavy
14 | presumption of risk of flight in detention and the foreign
15 | ties which are viewed by courts in this district,
16 | including this one, which weigh in favor of detention
17 | based on risk of flight are far less than those present
18 | here between both Taylors.

19 | I should also add that although Mr. Kelly argued that
20 | Peter Taylor was somehow not as responsible for enabling
21 | the escape of Carlos Ghosn, Peter Taylor is the one that
22 | in the several months leading up to Carlos Ghosn's escape
23 | he is the one that meet with Carlos Ghosn to actually help
24 | hatch this plan.

25 | Michael Taylor didn't get to Japan until the day

1   before the escape.  Peter Taylor rented a hotel room.  He

2   was the first one to receive Carlos Ghosn after he had

3   already received Carlos Ghosn's luggage and then he in

4   fact enabled Carlos Ghosn in his hotel room to change his

5   clothes and now we're talking about avoiding apprehension

6   and evading law enforcement.

7        So the idea that Peter Taylor is less culpable in

8   this offense than Michael Taylor is just not supported by

9   the facts on the record which are included in the sworn

10  complaint in this case.

11       So because it is their burden to prove that they are

12  not risks of flight and they must do so by clear and

13  convincing evidence, they not only have a very clear and

14  present reason to flee but they're actually some of the

15  best defendants that I'm sure this court has seen

16  positioned to actually succeed in that flight.  And

17  because of that the risks associated with their flight are

18  just too great for this court to ignore and that's why

19  there's a presumption of detention in these cases.

20       Because if the court releases a domestic criminal

21  defendant and that domestic criminal defendant flees,

22  well, obviously the prosecutors are upset.  They need to

23  -- the U.S. marshals need to take efforts to find that

24  person.  But if the Taylors flee, then the United States

25  looks like an irresponsible and undependable treaty

1    partner to Japan and we depend on being seen as a

2    dependable treaty partner because we expect other

3    countries to do the same when we request extradition of

4    fugitives from our system of justice.

5         So that's why, Your Honor, in the two-step analysis

6    of risk of flight and special circumstances, I submit that

7    they don't even come close to bearing their burden of

8    clear and convincing evidence that they're not risks of

9    flight.

10        Moreover, they don't bear their burden of showing

11   that special circumstances apply by clear and convincing

12   evidence both individually -- and I'm happy to talk about

13   the individual circumstances if Your Honor would like --

14   or together.  Because simply coming up with a legal

15   argument to cast some doubt on Japan's theory of the case

16   just isn't enough to constitute a special circumstance of

17   likelihood of success.

18        Admittedly if it's a close call as the court called

19   it, assuming arguendo it's a jump ball, which we don't

20   agree, but assuming that it is a jump ball how can that

21   possibly be a substantial likelihood of success?

22        With respect to other special circumstances, it's

23   unfortunate that Mr. Taylor's father requires special care

24   but that is not a case and we've cited in our papers

25   courts that have found that even in much more dire

1   circumstances involving a spouse or a dependent child that

2   those are not the type of special circumstances warranting

3   release.  So, whether alone or together, they just don't

4   rise to the level.  And again, we can't forget it's their

5   burden to prove both things by clear and convincing

6   evidence.

7          THE COURT:  Thank you.

8      For the defendants I'll give you the final word if

9   anybody wanted to respond to the government's argument.

10     Wait.  I think we've got --

11         MR. LOWELL:  I didn't know if he was going to

12  respond.

13         THE COURT:  I couldn't tell whether he was

14  speaking to respond, but I couldn't hear him if he was so

15  I couldn't tell.

16         MR. KELLY:  Your Honor, this is Mr. Kelly.  I'd

17  like to respond initially and then maybe pass the baton on

18  to Mr. Lowell quickly.

19     Your Honor, you and I have been doing this for a long

20  time, 30 plus years.  Anybody who's facing, what, the

21  realistic possibility of two years of incarceration if

22  they're ultimately extradited and convicted, that just

23  does not create any incentive for flight.  I mean, come

24  on.

25     With respect to Michael Taylor, Your Honor, two

1    things.  He was released on the recommendation of the

2    prosecution and approved by the judge in Utah.  He was

3    released for 16 months.  He was completely compliant with

4    his release conditions.  The court if you have any

5    questions about that can contact Judy Oxford from pretrial

6    services who supervised him who gives him very high marks

7    for the entire time that he was on release.

8         One last point with respect to Michael, Your Honor.

9    I have known Michael Taylor since 1988.  As a former

10   Assistant United States Attorney, Michael Taylor worked as

11   an undercover operative in a very serious organized crime

12   case.  He worked together with the FBI, the custom

13   service, the Internal Revenue Service and others and

14   performed flawlessly an impeccable and important service

15   on behalf of the government.  And the notion that somehow

16   he's some reckless person who's going to just flee the

17   country and embarrass the state department is ridiculous

18   to the extreme.

19        With respect to Peter Taylor, Your Honor, come on.  I

20   mean, this is a young man.  I've got four kids.  They're

21   all older than this guy.  This is a college-educated kid

22   that hasn't violated the law ever in his entire life.  Do

23   you think he's going to violate this court's conditions?

24   It's not going to happen.

25        Look, Mr. Hassink is prone to saying that we're

1    misrepresenting this and exaggerating that, but look at

2    this from a realistic perspective.  The rational, fair,

3    just thing to do, even if this is going to take another

4    month -- I've done extradition cases, Your Honor.  They

5    don't take another month; they stretch out.  There's lots

6    of reasons why they stretch out and they shouldn't be

7    sitting, particularly in the midst of a pandemic, in the

8    Norfolk County Correctional Facility.

9        They can be released.  They can be in Harvard, Mass.

10   They're going to come back to every court proceeding that

11   this court holds.  This is no chance that these guys flee.

12       With that I'll turn it over to Mr. Lowell.

13           THE COURT:  Thank you.

14       Mr. Lowell, for some reason we can't hear you.

15           MR. LOWELL:  Can you hear me now?

16           THE COURT:  Barely.

17           MR. LOWELL:  I don't know -- I'll be as close as

18   I can.

19           THE COURT:  Okay.

20           MR. LOWELL:  Will this be better if I'm right up

21   against it?

22           THE COURT:  I can hear you fine now.

23           MR. LOWELL:  Okay.  Judge, I won't overdo the

24   generosity of response.

25       Let me just say that I took a couple of notes and I

1   think it's important for you to hear my response based on

2   what the prosecutors did.  Fifteen times they've asked you

3   to conflate things that should not be conflated.

4        Let me give you that list.  The first thing they did

5   was at the end basically saying, oh, my gosh, if somehow

6   something goes wrong, notwithstanding all the things that

7   Michael and Peter would do to evade conditions, this will

8   create some sort of international incident where the

9   United States will not be seen to be a vast partner.

10       The law is very clear in detention cases, whether

11  it's extradition or not extradition, that you're not

12  supposed to conflate somebody's capability of being an

13  international traveler and violate conditions with their

14  intention to do so, and the record shows their intention.

15  Let me tell you why and I won't repeat what anybody has

16  said.

17       Mr. Hassink said that Mr. Michael Taylor has grossly

18  mischaracterized the nature of the underlying offense, and

19  he said so because somehow he came back thinking there was

20  only one count against him but it turned out that there

21  was more one count is what I'm understanding him to say.

22       Well, without regard to whether that's accurate or

23  not, what we do know is that once he was let out on

24  conditions, for 16 months he obeyed them and that is the

25  truest test of whether or not somebody intends to be a

1    flight or not.

2         As to Peter, I just want to say again that Mr.

3    Hassink again conflated.  You said there's no evidence

4    that Mr. Peter Taylor has any of the skills about being a

5    bail jumper.  The prosecutor said, oh, but he has all

6    these kinds of international experiences.  That's not what

7    you asked and that's again not relevant.

8         Lots of people go back and forth and they are not

9    risks of flight.  It's the way they now further said,

10   well, wait, they came back when they thought there was an

11   arrest warrant against them but if you let them out now

12   that they know, they're even going to have a different

13   state of mind.

14        If anything what their lawyers have uncovered about

15   the legal flaws in the extradition request would make them

16   or anybody way more willing to stay and fight on as a

17   meritorious case than what they would.  And the irony of

18   what Mr. Hassink said is that as I'm sitting -- as I'm

19   standing in this case in front of you today, the United

20   States Government in various countries around the world

21   are asking on behalf of its citizens that are being held

22   for extradition the exact same thing that we're asking is

23   to be released on conditions because of the variety of

24   circumstances, including COVID.  That our government would

25   treat U.S. citizens or our soil worse than they're asking

1    others to do the same abroad is worse than ironic.

2        I only have a few more points about it.  Mr. Hassink

3    said when he was responding directly to me that we have

4    not contested the factual underpinnings of the allegations

5    in the warrant.  He's the one that's accelerating the

6    issue of fighting the extradition on the merits.  This is

7    not the time to do it.

8        It is the time to decide whether under the statute or

9    the constitution that we're citing there's enough grounds

10   to denote the special circumstances as you say in the

11   confluence of all the events under the circumstances of

12   getting conditions, and let me just give you one.

13       He said -- and you asked me whether the title of the

14   statute that says harboring a criminal doesn't do it.

15   Well, this is what he conflated.  Mr. Ghosn is not a

16   criminal vis-a-vis 103.  He's not even a criminal based on

17   the underlying Japan -- he's charged.  He hasn't been

18   convicted.  He's absent.  Maybe they can do that now but

19   that's how he conflated it.

20       The criminality over harboring depends on whether

21   it's criminal for the event underlying the harboring.

22   That has not happened because 103 does not apply to that

23   circumstance.

24       And while it's true that United States courts should

25   defer to some reading of a foreign law by the foreign

1    entities that are put forward, it doesn't mean that you're

2    supposed to simply be a rubber stamp when we have done

3    more than what Mr. Hassink said -- to use his phrase --

4    just throw a lot of dirt.

5        Oh, my gosh, pointing out as he has had to point out

6    that the underlying arrest really talks about an

7    immigration offense and the way the United States deals

8    with that is to say we disavow that as the reason for

9    extradition.  Well, they had to do that.  But if they

10   disavow that which is a crime, then they've basically

11   eliminated any crime for the reasons I said.

12       Ghosn is not a criminal under 103.  The prosecutor

13   doesn't say so and our expert doesn't say so, and the fact

14   that he was charged for the underlying Nissan offense is

15   not the criminality that 103 applies to.

16       And when Mr. Hassink says that the cases have to do

17   with evading apprehension, that's exactly right and we

18   point that out in the reply to the circumstances that we

19   have explained to you.

20       This is in some fashion what you said a jump ball but

21   it's not really a jump ball when you take it down to its

22   element and here are the four elements.  Element one, the

23   prosecutor says and we pointed out in the reply brief that

24   when he uses the word escape, what he meant was the

25   colloquial version of it.

1      Well, we do not live in a system of justice in which

2    after the fact a prosecutor can explain that when he used

3    a word in a statute which has a very specific meaning like

4    *toso*, which means escape from, when he's contested and

5    challenged he says, no, no, what I meant was some more

6    general idea.  That's not enough to hold two U.S. citizens

7    under constitutional protections they have.  That's one

8    thing.

9      Second of all, whatever they may want to argue, we

10   now know that the Japanese government is trying to change

11   103 to include that which Ghosn did which is the clearest

12   evidence that it is not an offense today and that has

13   never been responded to.

14     And finally, when I pointed out that today's events

15   is to take the two substantive areas of law what the

16   prosecutor's response was was to say, well, okay, we will

17   be back with you in two weeks, three weeks, four weeks and

18   we will present the extradition case and they completely

19   ignore what we're doing here today.

20     The issue was on the day that they --

21            THE COURT:  Mr. Lowell, would you back up?  My

22   screen was frozen for about the last 12 or 13 seconds so I

23   think I just missed the last burst of what you said so if

24   you wouldn't mind repeating that.

25            MR. LOWELL:  I'm happy to do so and I'm sorry if

1    my technology caused that to happen.

2         What I said 15 seconds ago was and I'll pick it up

3    with the prosecutors can't contest that the Japanese

4    government is now revisiting Article 103 to make what Mr.

5    Ghosn did a crime and if you can't contest that, which you

6    can't, then it shows that the harboring of the criminal

7    aspect of which you asked me and Mr. Hassink applied is

8    not what they say it is to you.

9         And what I was finally going to say was when we

10   finally get it boiled down to show that what we're here

11   today, they say don't worry about it.  It's only going to

12   be a few weeks.  Well, my colleagues have pointed out that

13   it's not, but that doesn't even matter.

14        The day they came to see you and asked you to sign

15   something based on what they did not give you or us at the

16   time, or at least us, which is the underlying arrest

17   warrant -- and, by the way, today the prosecutor in Japan

18   files a new declaration which describes the warrant and

19   says us having said what it says is not right.  You have

20   ordered them to give us the arrest warrant and they still

21   haven't done it if they're now saying there's something

22   else out there but that doesn't even matter.

23        What matters is not how they may prove their

24   extradition case three weeks from now but on the day they

25   visited you and asked that our clients be arrested, that's

1    the measuring stick.  That's the point in which you have

2    to decide if there was probable cause.  That's the point

3    at which you have to decide if there were special

4    circumstances, and for the reasons we said there are all

5    the above.

6        At the end of the day we're asking both for legal and

7    equitable and compassionate and humane relief in the

8    following way.  Each of these individuals have proven that

9    they want to contest.  Look at what we're doing here

10   today.  This will be a merited challenge to what they are

11   accused of doing in Japan.

12       To do so the question becomes who gets hurt if in

13   every other case we find conditions that will allow them

14   to avoid the risk, the virus that spreads, allow them to

15   work best with their lawyers or people that have proven,

16   and if Mr. Hassink says we have the burden to show they're

17   not flight risks, as long as you do not let him conflate

18   somebody's ability to have traveled back and forth to

19   Lebanon with their desire to do so now, then we have more

20   than satisfied the requirements as Mr. Sheketoff and Mr.

21   Kelly has pointed out in great detail.

22       Now I have to thank you for giving me that chance to

23   respond.  Thank you.

24           THE COURT:  Thank you very much.

25       All right.  Well, obviously there's a lot for me to

Case 2:20-cv-12717   Document 4919   Filed 07/06/22   Page 59 of 61
Case 2:20-cv-12717   Document 4919   Filed 07/06/22   Page 60 of 62

58

1    consider.  I understand that the defendants or relaters

2    would like to have us resolve this as soon as practicable

3    and that is our goal.  So we do hope to rule on this as

4    quickly as we can.

5         Mr. Hassink, I don't want to put you on the spot so

6    feel free to decline to answer at all, but do you have any

7    further information in terms of any developments, you

8    know, in terms of whether any more submissions will be

9    coming soon?

10             MR. HASSINK:  In terms of the formal

11   extradition?

12             THE COURT:  Yes, I was trying to be clever, but

13   yes, that's exactly right.  Any idea on the timing of

14   that?

15             MR. HASSINK:  You know, Your Honor, I would say

16   that all I can say is that they're going to file it by the

17   deadline.  But if I could defer, I don't know, my

18   colleague since he's worked on it, might have a little

19   more of a gloss on that.

20             THE COURT:  Okay.  Is that Mr. Mirrer-Singer?

21             MR. HASSINK:  Yes, Your Honor.

22             MR. MIRRER-SINGER:  Yes, it is, Your Honor.

23   Good afternoon.

24        Your Honor, the formal extradition request is well

25   underway and it's now in the process of its diplomatic

1    submission and so I expect that once it's received by the

2    State Department through diplomatic channels, the State

3    Department will then move expeditiously on releasing it to

4    the court.  So I do believe that that is coming in the

5    next few weeks.

6            THE COURT:  Okay.

7            MR. MIRRER-SINGER:  I would also note that under

8    the case law that we have cited in our brief, once that

9    submission does reach Your Honor, the motion to quash will

10    become moot as set forth in all of the authority that we

11    have cited.

12            THE COURT:  Okay.  Thank you.

13       Thank you, everybody.  If there's nothing else, and

14    sensing there's nothing else, we will be in recess.  Thank

15    you.

16    **(Hearing concluded at 3:24.)**

17    -------------------

18

19

20

21

22

23

24

25

1    (The certification of this transcript does not apply to

2    any reproduction of this transcript, unless under the

3    direct control and/or supervision of the certifying

4    reporter.  I assume no responsibility for the accuracy of

5    any reproduced copies not made under my control or

6    direction.)

7

8                          CERTIFICATION

9

10           I certify that the foregoing is a correct

11    transcript of the record of proceedings in the

12    above-entitled matter to the best of my skill and ability.

13

14

15

16    /s/ Alice Moran                    June 26, 2020
      Alice Moran, RMR, RPR
17    Federal Official Court Reporter

18

19

20

21

22

23

24

25