UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL L. TAYLOR and | ) | |
| PETER M. TAYLOR, | ) | |
| *Petitioners*, | ) | |
| | ) | |
| *v.* | ) | Case No. 1:20-cv-11272 |
| | ) | |
| JEROME P. MCDERMOTT, | ) | |
| Sheriff, Norfolk County, Massachusetts | ) | |
| and JOHN GIBBONS, | ) | |
| U.S. Marshal, District of Massachusetts | ) | |

**<u>RESPONDENTS' OPPOSITION TO PETITIONERS' EMERGENCY MOTION
FOR STAY AND RESPONSE TO SECOND EMERGENCY PETITION FOR
HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND INJUNCTIVE RELIEF</u>**

Respondents, Jerome P. McDermott, Sheriff, Norfolk County, Massachusetts, and John Gibbons, U.S. Marshal, District of Massachusetts, through their undersigned counsel, respectfully submit this memorandum of law in opposition to "Petitioners' Emergency Motion for Stay" ("Motion") filed by Michael L. Taylor and Peter M. Taylor (the "Taylors"), Docket Entry ("DE") 48, and in response to Petitioners' "Verified Second Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief" ("Petition"), DE 47.

## INTRODUCTION

The Taylors' eleventh-hour bid to thwart their extradition is meritless, and equitable principles strongly favor allowing the United States to fulfill its treaty obligations to Japan by surrendering the Taylors without any further delay. On August 28, 2020, the magistrate judge presiding over the extradition proceeding (Cabell, M.J.), conducted an extradition hearing in accordance with 18 U.S.C. § 3184. On September 4, 2020, Magistrate Judge Cabell issued a written decision finding the Taylors extraditable to Japan on the offense for which their extradition is sought. *See* Ex. 1, hereinafter, "Op."[1] Immediately following that decision, the government informed the Taylors by letter that, if they filed a habeas petition within 14 days of certification, the Secretary of State would not issue a surrender warrant unless and until that petition was denied by the district court, thus obviating the need for the Taylors to seek a stay. *See* Ex. 2 (Ltrs. from S. Hassink to A. Lowell, September 4, 2020). The Taylors, however, chose not to file a post-certification habeas petition until now.

On September 14, 2020, Magistrate Judge Cabell formally issued and transmitted an extradition certification order to the Department of State, and ordered the Taylors to remain in the

---

[1] *See In the Matter of the Extradition of Michael L. Taylor*, Case No. 20-MJ-1069 (D. Mass), DE 54 ("Extradition Certification and Order of Commitment"); *In the Matter of the Extradition of Peter M. Taylor*, Case No. 20-MJ-1070 (D. Mass), DE 51 (same). Citations to the extradition proceedings will hereinafter begin with the prefix "EX." For convenience, the government will cite only to the docket entries in Case No. 20-MJ-1069.

custody of the U.S. Marshals Service pending further decision on extradition and surrender by the Secretary of State pursuant to 18 U.S.C. § 3186. *See* Ex. 3. On October 28, 2020, the Assistant Legal Adviser for Law Enforcement and Intelligence at the State Department informed the Taylors that, following a review of all pertinent information, the Deputy Secretary of State had authorized their surrender to Japan, in compliance with "applicable international obligations as well as domestic statutes and regulations." *See* Ex. 4 (Ltr. from K. Johnson to A. Lowell and T. Cobb dated October 28, 2020). Japan has been advised that the surrender warrants have been issued, and they have made arrangements to travel to the United States in the coming days for the surrender.[2]

Now, 55 days after they were found extraditable, the Taylors have filed a second habeas petition and have demanded the extraordinary remedy of a stay of their surrender. The Taylors' Motion should be denied based on their failure to make a "strong showing" that they are likely to succeed on the merits of their claims. *Nken v. Holder*, 556 U.S. 418, 434. Four of the five counts in the Petition (Counts II-V) have previously been considered and rejected by Magistrate Judge Cabell at the certification stage, as well as by this Court in the context of the Taylors' first habeas petition and motion for injunctive relief. *See* DE 44 (Memorandum and Order) (hereinafter, "Habeas Op."). The Taylors' attempt to relitigate claims in a second habeas petition is an abuse of the writ. Regardless, if the Taylors did wish to attempt to relitigate those claims, their arguments could have been renewed

---

[2] As the government previously advised the Taylors' counsel before they filed their Motion, it had no intent to extradite the Taylors within hours of giving notice that the surrender warrants had been issued. While it goes without saying that the government will not surrender the Taylors while this Court's stay remains in effect, the government respectfully requests an expeditious ruling on the Taylors' stay motion. Due to concerns for the safety of the escorting agents and operational integrity, the government does not publicly comment on the timing of any surrenders to foreign governments; however, the government informs the Court that Japanese escort agents have already scheduled, at significant expense, to come to the United States in the coming days. If additional information would be helpful to the Court, the government is able provide the Court with the specific timing details *ex parte* and under seal.

at any point after the certification decision so as to "allow consideration of the merits without requiring a stay," but they were not, and therefore, the Court should apply a "strong equitable presumption against granting relief" on such claims. *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (internal quotation marks and citation omitted).

While Count I of the Petition is new, it is likewise meritless, and no court has ever granted the review that the Taylors seek. Therein, the Taylors seek a vast expansion of the limited scope of habeas review in the extradition context to encompass a piercing review of the Secretary of State's surrender decision, the Japanese penal system, and other humanitarian claims. This bid, however, contravenes the well-established statutory framework bifurcating extradition responsibilities between the executive and judicial branches, controlling Supreme Court and First Circuit caselaw steadfastly adhering to the longstanding rule of non-inquiry, and two congressional enactments—the Foreign Affairs Reform and Restructuring Act (the "FARR Act")[3] and the REAL ID Act of 2005,[4] all of which "tightly limits the appropriate scope of judicial analysis in an extradition proceeding." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).

## **BACKGROUND**

### I.  **Legal Background**

"In the United States, the procedures for extradition are governed by statute." *Kin-Hong*, 110 F.3d at 109. These statutes, 18 U.S.C. §§ 3181 *et seq.*, establish "a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." *Kin-Hong*, 110 F.3d at 109 (footnote omitted). The duties of the judicial officer, serving as the extradition court, are set

---

[3]  *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G, subdiv. B, title XXII, § 2242, 112 Stat. 2681-822 (8 U.S.C. § 1231 note).
[4]  *See* Pub. L. No. 109-13, Div. B, Tit. I, § 106(a), 119 Stat. 231, 310.

out in 18 U.S.C. § 3184. *Id.* The extradition court, "upon complaint, issues an arrest warrant for an individual sought for extradition." *Id.* It then conducts a hearing to determine if "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." 18 U.S.C. § 3184. Specifically, the extradition court determines whether (1) it is authorized to conduct the extradition; (2) it has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the treaty covers the offenses for which extradition is sought; and (5) there is probable cause to believe the fugitive committed the alleged offenses. *See, e.g., Zanazanian v. United States*, 729 F.2d 624, 625-26 (9th Cir. 1984). If the extradition court finds that the requirements for extradition are met, it "shall certify the same" to the Secretary of State. 18 U.S.C. § 3184. The Secretary then has "*sole discretion* to determine whether or not the [fugitive] should actually be extradited." *Kin-Hong*, 110 F.3d at 109 (citing 18 U.S.C. § 3186) (emphasis added).

As discussed in more detail below, a fugitive cannot directly appeal a certification order but may seek "limited appellate review" by filing a petition for a writ of habeas corpus. *See, e.g., Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir. 1991).

## II.   Factual Background[5]

As Magistrate Judge Cabell noted in issuing his certification decision, "[f]actually speaking, the parties agree, and the court finds support in the record, that the [Taylors] committed the conduct underlying the charges against them." Op. at 6. The Taylors are alleged to have entered Japan's sovereign territory for the sole purpose of enabling the escape of Carlos Ghosn Bichara ("Ghosn"), the multimillionaire former CEO and Chairman of the Board of Directors of Nissan Motor Co., Ltd.

---

[5] A full recitation of the facts and supporting evidence is set forth in the Government's Memorandum of Law in Support of Extradition, which the Government attaches and fully incorporates herein. *See* Ex. 5. Exhibits in support of that Memorandum will be filed forthwith.

("Nissan"), who was under indictment in Japan for committing financial crimes. The Taylors' alleged plot to smuggle Ghosn out of Japan was one of the most brazen and well-orchestrated escape acts in recent history, involving a dizzying array of luxury hotel meetups, fake personas, bullet train travel, and the chartering of a private jet. Ultimately, Ghosn was hidden in a large black box, spirited out of Japan via private jet without detection by Japanese authorities, and transported to Lebanon. Lebanon has no extradition treaty with Japan and thus Ghosn was able to thwart Japan's criminal justice system. The Taylors were paid handsomely for their services. They received more than $1.3 million from Ghosn and his family members between October 2019 and May 2020. *See generally* Ex. 5 at 1-7.

## III.  Procedural History

Judge Yukiko Yomori of the Tokyo District Court issued warrants for the Taylors' arrests on January 30, 2020, and those warrants were renewed by Judge Yomori on February 28, 2020, when the Taylors remained at large. Japan submitted to the United States requests for the Taylors' provisional arrests under Article IX of the U.S.-Japanese extradition treaty[6] after learning they had returned to the United States. On May 6, 2020, the government acted on the provisional arrest requests by filing complaints in this District and obtaining arrest warrants issued by Magistrate Judge Cabell, which were executed on May 20, 2020. On June 29, 2020, Japan transmitted its formal extradition requests to the State Department. *See generally* Ex. 5 at 7.

Prior to Japan's transmission of the formal request, the Taylors moved for the provisional arrest warrants to be quashed or, alternatively, to be released pending extradition proceedings. Magistrate Judge Cabell denied the motion in an electronic order dated July 7, 2020 that was followed by a written opinion on July 10, 2020. *See* EX DE 40, 41. On July 6, 2020, the Taylors sought habeas

---

[6] *See* Treaty on Extradition Between the United States of America and Japan, U.S.-Japan, Mar. 26, 1980, 31 U.S.T.

and injunctive relief from this Court.  On July 9, 2020, the Court denied the Taylors' motion for a temporary restraining order and, on August 7, 2020, the Court denied the Taylors' motion for a preliminary injunction and denied their habeas petition.  *See* DE 44 ("Habeas Op.").

As discussed above, Magistrate Judge Cabell held an extradition hearing on August 28, 2020, issued a written decision finding the Taylors' extraditable on September 4, 2020, and certified his findings and submitted them to the State Department on September 14, 2020.  *See* EX DE 53, 54, 56.  On October 28, 2020, the Assistant Legal Adviser for Law Enforcement and Intelligence in the Office of the Legal Adviser sent a letter to the Taylors' counsel advising them that the Deputy Secretary of State had authorized the Taylors' surrender to Japan, pursuant to 18 U.S.C. § 3186 and the Extradition Treaty between United States and Japan.  *See* Ex. 4.  The letter advised the Taylors' counsel that the decision was made "[f]ollowing a review of all pertinent information, including the materials submitted directly to the Department of State, as well as the materials and filings submitted to the U.S. District Court for the District of Massachusetts."  *Id.*  The letter further confirmed that "the decision to surrender the Taylors to Japan complies with applicable international obligations as well as domestic statutes and regulations."  *Id.*

On October 29, 2020, the Taylors filed their second Petition and the instant Motion, citing erroneous media reports that they were to be extradited with an hour of their filing. *See* DE 47, 48.  Shortly after receiving the Motion, this Court stayed any action to transport or surrender the Taylors to allow time for it to review their emergency petition.[7]  *See* DE 49.

---

[7] The government respectfully moves the Court to vacate its administrative stay (granted based on the Taylors' erroneous representation that their extradition was within an hour) for the reasons discussed herein.  To the extent that the Court's prior stay order constitutes a final order on the Taylors' stay motion, the government also respectfully requests that the Court construe this response as a motion for reconsideration.

## ARGUMENT

The Taylors have not made a strong showing on the merits of their claim that they are being held "in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241(c)(3). Nor do the equities weigh in favor of an eleventh-hour stay. Accordingly, their Motion should be denied.[8]

### I.    Standard of Review

The party requesting a stay bears the burden of showing that it is warranted based on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

Moreover, the Supreme Court has held that habeas corpus review is available in the extradition context "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and [3], by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

---

[8] The law is clear on each of the Taylors' claims—most of which this Court has already rejected; therefore, the Court may also deny the Taylors' habeas petition in its entirety based upon the arguments contained herein.

## II. The Taylors' Stay Motion Should Be Denied

The Motion should be denied for the threshold reason that the Taylors are not likely to succeed on the merits of any of their claims. Their humanitarian claims fall outside the limited scope of habeas review in extradition proceedings and the remainder of their claims are simply an attempt to relitigate in a second § 2241 petition the meritless arguments that were previously rejected by both Magistrate Judge Cabell and this Court. Moreover, the balance of equities does not favor a stay.

### A. The Taylors' humanitarian claims, and their attempts to garner review of the Secretary of State's decision on those claims, fall well outside the limited scope of judicial review in extradition proceedings.

The Taylors' argument that this Court should review their humanitarian claims, and the Secretary of State's surrender decision, is meritless. No court has ever undertaken the review that the Taylors' seek. As myriad courts have held, humanitarian claims are the sole province of the Secretary of State, whose decision is not subject to judicial review under the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA") or any other basis.

#### 1. Courts have long recognized that claims regarding the treatment a fugitive may face in the country requesting extradition are reserved exclusively for the Secretary of State.

In Count I of the Petition (Pet. ¶¶22-25), the Taylors claim that their extradition should be denied based on the treatment they purportedly would face in Japan if they were extradited, including the claim that they would be subjected to torture. However, the Supreme Court, the First Circuit, and myriad other courts have recognized, under the longstanding rule of non-inquiry, that "questions about what awaits the [fugitive] in the requesting country" are reserved for the Secretary and are not judicially reviewable. *Kin-Hong*, 110 F.3d at 111; *see also Munaf v. Geren*, 553 U.S. 674, 700 (2008) ("Habeas corpus has been held not to be a valid means of inquiry into the treatment the [fugitive] is anticipated to receive in the requesting state.") (internal quotations and citation omitted).

Pursuant to the rule of non-inquiry, "courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country." *Kin-Hong*, 110 F.3d at 110 (internal quotations and citation omitted). "The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers." *Id.* "It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed." *Id.* at 111.

The origins of the rule of non-inquiry date back well over a century. *See, e.g., Neely v. Henkel*, 180 U.S. 109, 122-23 (1901). In *Neely*, the Supreme Court held that habeas corpus was not available to defeat the extradition of an American citizen to Cuba despite the petitioner's claim that Cuba's laws violated the U.S. Constitution. *Id.* The fact that the petitioner would be subjected to "such modes of trial and to such punishment as the laws of [Cuba] may prescribe for its own people" was not a claim for which "discharge on habeas corpus" could issue. *Id.* at 123, 125.

*Neely* has stood the test of time and was reaffirmed by the Court in *Munaf*, 553 U.S. at 695-703. There, the habeas petitioners contended that a federal court should enjoin their transfer to Iraqi authorities to face trial in Iraqi courts "because their transfer to Iraqi custody is likely to result in torture." *Munaf*, 553 U.S. at 700. Relying on principles announced in extradition cases, the Court held that "[s]uch allegations are of course a matter of serious concern, but in the present context that concern is to be addressed by the political branches, not the Judiciary." *Id.*

**2. The CAT did not create a right to judicial review of torture claims in the extradition context, as confirmed by the FARR and REAL ID Acts.**

Against the historical backdrop in which the rule of non-inquiry has been consistently and repeatedly applied in extradition cases, the United States undertook international legal obligations under the Convention Against Torture (the "CAT").[9]  The CAT did not alter the longstanding rule of non-inquiry.  The CAT is not self-executing, and Congress has twice made clear that federal courts may not review CAT claims other than in the immigration context.

a.  The CAT is not self-executing, and two congressional enactments make clear that a court may not review CAT claims in the extradition context.

The CAT was adopted by the United Nations General Assembly in 1984.  Article 3 of the CAT provides, in relevant part, that no state party shall "extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[10]  That article directs the "competent authorities" responsible for evaluating torture claims to "take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."  CAT, Art. 3.

The Senate gave its advice and consent to the CAT subject to the declaration that "Articles 1 through 16 of the Convention are not self-executing."  136 Cong. Rec. 36,198.  Thus, "[t]he reference in Article 3 to 'competent authorities' appropriately refers in the United States to the competent administrative authorities who make the determination whether to extradite, expel, or return. . . .

---

[9] *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted* Dec. 10, 1984, S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85.

[10] In providing its advice and consent, the Senate stated its understanding that this provision means "if it is more likely than not that he would be tortured."  136 Cong. Rec. 36,198 (Oct. 27, 1990).

Because the Convention is not self-executing, the determinations of these authorities will not be subject to judicial review in domestic courts." S. Exec. Rep. No. 101-30, at 17-18 (1990).

Congress implemented Article 3 of the CAT by enacting Section 2242 of the FARR Act. Section 2242(a) states that it is the "policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."

Critically, Section 2242(d) of the FARR Act clarifies that the statute does not confer courts with jurisdiction to review claims under the CAT outside the context of a final order of removal entered in an immigration case. It states:

> Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), . . . . *nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the* [*CAT*] *or this section,* or any other determination made with respect to the application of the policy set forth in subsection (a), *except as part of the review of a final order of removal* pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

FARR Act § 2242(d), 112 Stat. 2681-822 (8 U.S.C. § 1231 note) (emphasis added).

Congress again addressed judicial review of claims under the CAT when it enacted 8 U.S.C. § 1252(a)(4) as part of the REAL ID Act of 2005. That provision states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be *the sole and exclusive means for judicial review* of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

8 U.S.C. § 1252(a)(4) (emphasis added).

The CAT is therefore not self-executing, the FARR Act does not create jurisdiction for judicial review of claims under the CAT except in certain immigration proceedings, and the REAL ID Act makes doubly clear that specified immigration proceedings "shall be the sole and exclusive means for judicial review of any cause or claim under the [CAT]." *See* FARR Act § 2242(d); 8 U.S.C. § 1252(a)(4). Thus, the CAT did nothing to alter the historical rule of non-inquiry; if anything, its implementing legislation cemented the fact that federal courts may not consider extradition CAT claims.

  b.  The case law uniformly supports the conclusion that courts may not consider CAT claims in the extradition context.

Consistent with the rule of non-inquiry and these congressional enactments, the case law amply supports the conclusion that courts may not consider CAT claims in the extradition context. For example, in *Mironescu v. Costner*, the petitioner asserted a CAT claim in an effort to bar his extradition to Romania.  480 F.3d 664, 674 (4th Cir. 2007).  But the Fourth Circuit held that Section 2242(d) of the FARR Act "plainly conveys that although courts may consider or review CAT or FARR Act claims as part of their review of a final removal order, they are otherwise precluded from considering or reviewing such claims."  *Id.*; *see also id.* at 677 ("Thus, in light of the absence of any other plausible reading, we interpret § 2242(d) as depriving the district court of jurisdiction to consider Mironescu's claims.").

The D.C. Circuit reached the same conclusion in *Omar v. McHugh*, holding that "[b]y its terms, the FARR Act provides a right to judicial review of conditions in the receiving country only in the immigration context, for aliens seeking review of a final order of removal."  646 F.3d 13, 17 (D.C. Cir. 2011).  The D.C. Circuit also noted that "[t]he REAL ID Act states that *only* immigration transferees have a right to judicial review of conditions in the receiving country, during a court's review of a final order of removal."  *Id.* at 18 (emphasis added).

13

The Ninth Circuit's decision in *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc) (per curiam), represents the outermost bounds to which a circuit court has ever exercised jurisdiction in the extradition habeas context to address a fugitive's CAT claim.  There, the Ninth Circuit held that the State Department may be required to confirm that it has complied with its regulations implementing the FARR Act; namely, that the Secretary considered the fugitive's torture claims and did not find it "more likely than not" that the fugitive would face torture upon surrender to the requesting country.  *See id.* (internal quotations omitted).  The *Trinidad* court made clear that if the State Department provides such confirmation, "the court's inquiry shall have reached its end." *Id.* That is because the "doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration." *Id.*

Here, the October 28, 2020, letter from the State Department's Assistant Legal Adviser for Law Enforcement and Intelligence to the Taylors' counsel confirms that "the decision to surrender the Taylors to Japan complies with applicable international obligations as well as domestic statutes and regulations." *See* Ex. 4.  Accordingly, the Taylors have received all the process that would be due even under the circuit rule most favorable to them.

   c.   The Administrative Procedures Act does not create a backdoor channel to judicial review of humanitarian claims.

Contrary to the Taylors' claim (Pet. ¶11), a district court "lacks the authority to review [a fugitive's humanitarian claim] under the APA." *Mironescu*, 480 F.3d at 677 n.15.  Indeed, the Taylors' claim that the Secretary's surrender decision should be broadly reviewed is foreclosed under Section 701(a)(2), which excepts "agency action [that] is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Here, 18 U.S.C. § 3186 provides the Secretary with discretion to either grant or deny an extradition request after the fugitive has been certified as extraditable.  *See* 18 U.S.C. § 3186 ("The

Secretary of State *may* order the person committed under section [ ] 3184 . . . to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged.") (emphasis added).  First Circuit case law reinforces the discretionary nature of the Secretary's extradition decision.  *See, e.g.*, *Kin-Hong*, 110 F.3d at 109 (following certification it is "within the Secretary of State's *sole discretion* to determine whether or not the relator should actually be extradited") (emphasis added).

Specifically with respect to the FARR Act, Section 2242(b) directs the "heads of the appropriate agencies" to prescribe regulations implementing Article 3 of the CAT.  The Secretary of State has promulgated regulations providing that, when appropriate, "the Department considers the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition."  22 C.F.R. § 95.2(b); *see also* 22 C.F.R. § 95.1(b) (defining torture).  However, the regulations expressly state that the Secretary's surrender decisions are "matters of executive discretion not subject to judicial review."  22 C.F.R. § 95.4.  The regulations also make clear that the provisions in the FARR Act providing for judicial review in the context of immigration removal proceedings are "not applicable to extradition proceedings."  *Id.*

The APA's plain language and the interpreting caselaw support the text of the regulations, which make clear that the Secretary's surrender decision is not subject to judicial review.  Section 701(a)(1) provides that APA review of an agency decision is not available if "statutes preclude judicial review."  5 U.S.C. § 701(a)(1).  Here, there are two statutes—the FARR Act and the REAL ID Act— which both preclude judicial review.  *See Mironescu*, 480 F.3d at 676 (Section 2242(d) of the FARR Act "plainly demonstrates Congress' intent to *preclude* consideration of CAT and FARR Act claims on habeas review of an extradition challenge") (emphasis added); *Omar*, 646 F.3d at 18 ("The REAL ID

Act states that *only* immigration transferees have a right to judicial review of conditions in the receiving country, during a court's review of a final order of removal.") (emphasis added).

Moreover, Section 702 of the APA, entitled "Right of review," states in relevant part that "[n]othing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground . . . ." 5 U.S.C. § 702. "These 'limitations on judicial review' would include both the FARR Act and REAL ID Act's statutory limitation on judicial review, as well as the traditional restraint in the rule of non-inquiry." *Juarez-Saldana v. United States*, 700 F. Supp. 2d 953, 961 (W.D. Tenn. 2010) (citing *Cornejo-Barreto v. Siefert*, 379 F.3d 1075, 1087 (9th Cir. 2004)).

The caselaw is uniformly in accord. The Fourth Circuit in *Mironescu* explicitly held that "[t]he district court lacks the authority to review [petitioner's] claims under the APA." 480 F.3d at 677 n.15. Other courts have reached the same conclusion. *See, e.g.*, *Juarez-Saldana*, 700 F. Supp. 2d at 961 ("Since this Court has found that the FARR Act expressly prohibits judicial review of extradition decisions based on CAT claims, the APA cannot provide an alternative basis to circumvent this restriction."); *Pena v. Daniels*, No. 1:13-cv-708, 2015 WL 13730935, at *2 (E.D. Tex. Dec. 11, 2015) (finding petitioner's claim that he is entitled to judicial review of the Secretary's extradition decision under the APA "is without merit").

The Taylors cite *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1011 (9th Cir. 2000) (*Cornejo-Barreto I*) to support their claim that the APA confers jurisdiction on this Court to review the Secretary's extradition decision. But the Taylors omit the fact that in *Trinidad*, the Ninth Circuit, sitting *en banc*, expressly overruled *Cornejo-Barreto I*. *See Trinidad*, 683 F.3d at 957. Specifically, in *Trinidad*, the Ninth Circuit held that "[t]he doctrine of separation of powers and the rule of non-inquiry block any inquiry into the substance of the Secretary's declaration," and "[t]o the extent that we have previously implied

16

greater judicial review of the substance of the Secretary's extradition decision other than compliance with her obligations under domestic law, *e.g., Cornejo–Barreto v. Seifert*, 218 F.3d 1004, 1012 (9th Cir. 2000), we *overrule that precedent.*" *Id.* (emphasis added).  Moreover, no other circuits have endorsed the review the Taylors seek.  *See Pena*, 2015 WL 13730935, at *2  ("Petitioner has cited no other case, and the undersigned's independent review has not discovered any other case, outside of cases within the jurisdiction of the Ninth Circuit which were decided before the decision in *Cornejo-Barreto* was overruled, where the 'arbitrary and capricious' standard of the APA has been used to review a Secretary's decision to extradite.").[11]

At bottom, the CAT did not displace the rule of non-inquiry and render humanitarian arguments against extradition reviewable in the federal courts.  To the contrary, the laws and regulations implementing the CAT unambiguously preclude judicial review of CAT claims in the extradition context.

### 3. The Taylors' other bases for judicial review of their humanitarian claims are meritless.

The Taylors claim (Pet. ¶23) they are entitled to review of their claims under the International Covenant on Civil and Political Rights ("ICCPR").  However, it is well settled that the ICCPR does not provide any enforceable right in extradition proceedings because the ICCPR "was ratified 'on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts.'"  *Serra v. Lappin*, 600 F.3d 1191, 1197 (9th Cir. 2010); *see also, e.g., In re Cheung*, 968 F. Supp. 791, 803, n. 17 (D. Conn. 1997) (rejecting ICCPR claim in extradition context); *In re*

---

[11] Given the fact that the Taylors have no claim under the APA, their demand for the State Department's "administrative record" is meritless.  Indeed, the Taylors have cited no precedent, and the government is aware of none, requiring the production of internal deliberative information.  Notably, complying with such a records demand could interfere with sensitive foreign policy matters.  *See, e.g., Kin-Hong*, 110 F.3d at 109 (recognizing that extraditions implicate "foreign policy considerations").

*Camelo-Grillo*, 2017 WL 2945715, at *8 (C.D. Cal. July 10, 2017) (same). The Taylors also claim (Pet. ¶23) that extradition should be denied because Japan's procedures could violate "fundamental notions of due process." However, as discussed above, the Supreme Court has recognized that "[w]hen an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people." *Neely*, 180 U.S. at 123.

### B. The Taylors' remaining claims are meritless, untimely, and have previously been considered and rejected by this Court.

In Counts II-V of the Petition, the Taylors rehash arguments that were previously considered and rejected by Magistrate Judge Cabell and this Court. The Taylors' attempt to relitigate the same arguments that this Court rejected in a prior habeas petition is an abuse of the writ. *See, e.g.*, *Roundtree v. Krueger*, 910 F.3d 312, 314 (7th Cir. 2018) (referring to "[a]n attempt to relitigate a theory, in the absence of an intervening change of law" as "a paradigm abuse of the writ"). Regardless, the Taylors have offered no new evidence to support these claims, and they should fare even less well at this stage now that they are subject to the even more exacting standard of habeas review.

At the core of Counts II-IV is the claim that the government did not show "that the Taylors violated Article 103 of the Japanese Penal Code, or that Japan has charged the Taylors under Article 103." *See* Pet. ¶¶29, 38, 44. The only relevant question on extradition habeas review is whether "any evidence" supports Magistrate Judge Cabell's probable-cause finding, *see Fernandez*, 268 U.S. at 312, and the record is replete with such evidence. Among other things, the government introduced images from video surveillance cameras, meeting records, travel records, witness statements, and other evidence demonstrating how the Taylors were instrumental in enabling Ghosn's escape from Japan while he was on bond. *See generally* Ex. 5 at 1-7. Further, the government supported the fact that these

acts constituted a violation under Article 103, as a matter of Japanese law, by introducing the original and renewed Japanese arrest warrants, declarations from two different Japanese officials, who in turn cited to Japanese caselaw, and even a Japanese treatise first submitted by the Taylors.  *See generally* EX DE 52 (Government's Reply Memorandum in Support of Extradition).  This far surpasses the "any evidence" standard.  *See Fernandez,* 268 U.S. at 312.

Moreover, in denying the Taylors' first habeas petition, this Court previously found that they had "not shown a high likelihood of success in their argument [that] Article 103 does not prohibit interfering with the Japanese criminal justice system by harboring Ghosn and enabling Ghosn to elude discovery by law enforcement and escape judgment from a Japanese court."  Habeas Op. at 13.  Similarly, after reviewing the evidence and the applicable case law, the Court rejected the Taylors' claim that they were entitled to habeas relief based on their arguments regarding Japanese charging practices.  *See id.* at 21 ("Petitioners assert that they are being improperly held because Japan has, allegedly, 'not charged the Taylors under [Article 103], or with any crime at all,' and has not sent charging documents to the United States to support their extradition request . . . evidence from the Japanese government shows otherwise."); *see also id.* ("[S]aliently, the Treaty does not require the submission of charging documents with the formal extradition request.") (citing *In re Assarsson,* 635 F.2d 1237, 1241 (7th Cir. 1980)).

Count 5 of the Taylors' Petition is a reprise of their claim that Respondents "acted with deliberate indifference to [their] serious medical needs" (Pet. ¶52) by not releasing them during the global pandemic.  This too has been previously rejected by the Court.  *See* Habeas Op. at 22.  As the Court noted, "the government has provided evidence that the Department of Corrections has taken seriously the risk posed by COVID-19 at Norfolk and have implemented a set of procedures designed to protect prisoners from the spread of the disease." *Id.*

### C. The equities weigh against a stay.

The Taylors' failure to show that they are likely to prevail on the merits of their Petition is fatal to their stay motion because "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (citation omitted). It is true that if a stay is denied, the Taylors will be extradited and their Petition would be mooted. But the weakness of their claims means that they will not suffer irreparable injury if a stay is denied as further judicial review "could only delay but not prevent extradition." *Jimenez v. U.S. Dist. Court for S. Dist. of Fla.*, 84 S. Ct. 14, 19 (1963) (Goldberg, J., in chambers). Consistent with the foregoing, the Supreme Court, circuit courts, and myriad other courts routinely deny stays of extradition notwithstanding claims of irreparable injury. *See, e.g.*, *Froude v. Milusnic*, No. 17A774 (Jan. 23, 2018) (Kennedy, J.); *Morales v. Elks*, No. 17A445 (Nov. 15, 2017) (Roberts, C.J.); *Ye Gon v. Dyer*, 137 S. Ct. 347 (2016); *Gutierrez v. United States*, 136 S. Ct. 998 (2016); *Assarsson v. United States*, 457 U.S. 1127 (1982); *Moshir v. Salina*, No. 17-3736 (2d Cir. 2018); *Artukovic v. Rison*, 784 F.2d 1354, 1356-57 (9th Cir. 1986).

Moreover, a stay is not in the public interest. The Supreme Court has stated that "[t]he surrender of a fugitive, duly charged in the country from which he has fled with a nonpolitical offense and one generally recognized as criminal at the place of asylum, involves no impairment of any legitimate public or private interest." *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933). Rather, "the public interest will be served by the United States complying with a valid extradition application" because "[s]uch proper compliance promotes relations between the two countries, and enhances efforts to establish an international rule of law and order." *Artukovic*, 784 F.2d at 1356.

Here, the United States has a strong interest in having extradition requests submitted by Japan (and other treaty partners) resolved promptly, both to comply with its treaty obligations and to further its reciprocal interest in having other nations cooperate swiftly with its own extradition

requests and other law enforcement objectives.  "At some point all litigation must end" and there is "no compelling reason for further delaying this one." *Jimenez*, 84 S. Ct. at 19.

## CONCLUSION

For the foregoing reasons, the Court should deny the Taylors' petition and emergency stay motion.

Date: October 30, 2020

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:       */s/ Stephen W. Hassink*
          Stephen W. Hassink
          Assistant United States Attorney

          */s/ Philip A. Mirrer-Singer*
          Philip A. Mirrer-Singer
          Trial Attorney

## CERTIFICATE OF SERVICE

I, Stephen W. Hassink, Assistant U.S. Attorney, do hereby certify that on October 30, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

*/s/ Stephen W. Hassink*
Stephen W. Hassink
Assistant U.S. Attorney