UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL L. TAYLOR and PETER M.
TAYLOR,

   *Petitioners*,

    *v.*

JEROME P. MCDERMOTT, Sheriff, Norfolk
County, Massachusetts, and JOHN
GIBBONS, United States Marshal, District of
Massachusetts,

   *Respondents.*

Case No. 4:20-cv-11272-IT

**MEMORANDUM IN SUPPORT OF VERIFIED SECOND EMERGENCY PETITION
FOR HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND INJUNCTIVE RELIEF**

Petitioners Michael and Peter Taylor's Verified Second Emergency Petition for Habeas

Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief (Dkt. 47) asks the Court to review

Magistrate Judge Cabell's certification ruling and the Deputy Secretary of State's apparent

authorization of the extradition of the Taylors to Japan.  The Deputy Secretary of State's decision

violates the U.S.-Japan Extradition Treaty, other treaty obligations of the United States and the

statutes and regulations thereunder, and the U.S. Constitution.  As set forth herein and in their

previous submissions, the facts alleged by Japan do not constitute the criminal offense on which

Japan bases its extradition request, thus there is not probable cause that the Taylors committed an

offense for which they may be extradited under the Treaty.  Judge Cabell's decision erroneously

gave absolute deference to Japan's assertions with respect to the putative crime for which Japan

seeks the Taylors' extradition and improperly failed to consider any of the arguments, evidence

and authority put forth by the Taylors contradicting Japan's conclusory and self-serving assertions.

Neither the State Department nor the courts should be a rubber stamp for extradition demands

made by foreign nations, especially where an extraditee raises substantial questions as to the legal merits of the theory underlying the request for extradition. If the Deputy Secretary and Judge Cabell's decisions are allowed to stand, the Taylors will have been arrested and forcibly transferred to a foreign nation to be prosecuted there all without the executive or judicial branch of the U.S. Government giving any meaningful consideration to whether such a course of action is lawful or even within the scope of the U.S.-Japan Extradition Treaty.

Further, the Deputy Secretary's decision is also unlawful because, if extradited to Japan, the Taylors will be held in conditions that would never be permitted by any U.S. court and subjected to lengthy interrogation without the presence of counsel, mental and physical torture, and a heightened risk of contracting COVID-19 (which would almost certainly be life-threatening to Michael Taylor). The Deputy Secretary's authorization of the Taylors' extradition thus violates the United Nations Convention Against Torture ("CAT"), the International Covenant on Civil and Political Rights ("ICCPR"), and the Constitution and the record produced to date does not even establish that the Secretary of State complied with any of the specific, mandatory requirements of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") and State Department regulations.

The Taylors, therefore, respectfully request that the Court grant their petition for a writ of habeas corpus and order their release from custody.

**ARGUMENT**

## I.   THE DEPUTY SECRETARY OF STATE'S DECISION TO EXTRADITE THE TAYLORS VIOLATES THE LAWS OF THE UNITED STATES

Although habeas review of extradition decisions may be narrow, the Supreme Court has long recognized that "[t]here is no executive discretion to surrender [an individual] to a foreign government, unless that discretion is granted by law." *Valentine v. U.S. ex rel. Neidecker*, 299

U.S. 5, 9 (1936).  Accordingly, even if the Secretary of State has the legal authority to make the choice to extradite the Taylors to Japan (which, for the reasons set forth in Section II, the Secretary does not), the Secretary's actions (including his decision to extradite an individual or not) must comply with U.S. law, including the Constitution and any applicable statutes, regulations and treaties.

At the very least, this means that in deciding to extradite a person, the State Department must comply with its own statutory and regulatory obligations.  *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc).  In addition, numerous courts have acknowledged that habeas corpus review may be available to determine whether the Secretary of State's extradition decisions violate constitutional rights.  *Venckiene v. United States*, 929 F.3d 843, 861 (7th Cir. 2019); *In re Burti*, 737 F.2d 1477, 1487 (7th Cir. 1984); *Prushinowski v. Samples*, 734 F.2d 1016, 1019 (4th Cir. 1984); *Escobedo v. United States*, 623 F.2d 1098, 1104-05 (5th Cir. 1980); *Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir. 1977); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960); *Mirela v. United States*, 416 F. Supp. 3d 98, 113-24 (D. Conn. 2019).

Here, the reported decision by the Deputy Secretary of State choosing[1] to extradite the Taylors to Japan would subject the Taylors to oppressive and punitive practices in violation of the United Nations Convention Against Torture ("CAT"), the International Covenant on Civil and

---

[1] We note that the action by the State Department is very much a choice in this case.  Article V of the U.S-Japan Extradition Treaty makes clear that neither country is obligated to extradite its own citizens even if the Treaty permits it, a privilege Japan has not hesitated to exercise in refusing U.S. requests for the extradition of Japanese nationals charged with far more serious crimes involving far more serious harm (including loss of life).  Indeed, in the underlying prosecution of Messrs. Ghosn and Kelly, Japan *affirmatively worked around the Treaty* by not requesting extradition in a straight-forward fashion, but instead enlisting rival Nissan officials in a ruse to lure Mr. Kelly from his home in Tennessee to Japan under false pretenses so that it could arrest and prosecute him.  Despite being under no legal obligation whatsoever, the Deputy Secretary of State apparently believes the U.S. should reward Japan's disregard of the Treaty by assenting to a permissive request to extradite the Taylors.

Political Rights ("ICCPR"), and other fundamental notions of due process (including the right to a speedy trial, the right not to be subjected to lengthy and coercive interrogation in the absence of counsel, protection against cruel and unusual punishment, the presumption of innocence, and the right against self-incrimination). Accordingly, the Deputy Secretary of State's choice to extradite the Taylors violates the Constitution, laws and treaties of the United States.

## A.     The Court Has Jurisdiction to Consider Petitioners' Claims

The United Nations Convention Against Torture ("CAT") is a treaty signed and ratified by the United States, 136 Cong. Rec. 36,198 (1990), and implemented by Congress as part of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), 8 U.S.C. § 1231 note. The statute declares it to be "the policy of the United States not to … extradite … any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.* Article 16 of the CAT further prohibits "other cruel, inhuman or degrading treatment." FARRA requires that "the appropriate agencies … prescribe regulations to implement the obligations of the United States[.]" *Id.*

The Department of State has adopted regulations requiring that, "[i]n each case where allegations relating to torture are made …, appropriate policy and legal offices review and analyze information relevant to the case in preparing a recommendation to the Secretary as to whether or not to sign the surrender warrant." 22 C.F.R. § 95.3(a). An extraditee may be surrendered only after the Secretary makes a determination regarding possible torture. *Id.* § 95.2-3. Specifically, before extradition can occur, the Secretary must consider the extraditee's torture claim and find it not "more likely than not" that the extraditee will face torture. *Id.* § 95.2; *see also Trinidad y Garcia*, 683 F.3d at 957.

"CAT and its implementing regulations are binding domestic law, which means that the Secretary of State *must* make a torture determination before surrendering an extraditee who makes a CAT claim." *Trinidad y Garcia*, 683 F.3d at 956 (emphasis in original).  Further, "FARRA and its regulations generate interests cognizable as liberty interests under the Due Process Clause[.]" *Id.*  Accordingly, an extraditee has a Due Process right that "entitles him to strict compliance by the Secretary of State with the procedure outlined in the regulations," a right which the courts have the power to enforce through habeas jurisdiction, the Administrative Procedure Act, and/or under "the Constitution itself."  *Id.* at 957; *see also Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1016-17 (9th Cir. 2000) ("An extraditee ordered extradited by the Secretary of State who fears torture upon surrender … may state a claim cognizable under the APA that the Secretary of State has breached her duty, imposed by the FARR Act, to implement Article 3 of the Torture Convention.").[2]

There is room to debate the precise scope of the Court's review of the Deputy Secretary's decision (*see infra* at Section I.C), but judicial review is available to ensure the Secretary's compliance with domestic law, including the Secretary's own statutory and regulatory obligations. *Trinidad y Garcia*, 683 F.3d at 956; *Cornejo-Barreto*, 218 F.3d at 1013-15; *cf. Venckiene*, 929 F.3d at 861; *Mirela*, 416 F. Supp. 3d at 113-24.

The government contends that judicial review of the State Department's decision and its compliance with CAT and FARRA is foreclosed by FARRA and/or the REAL ID Act.  Dkt. 50 at 12-13.  But "[n]either the REAL ID Act nor FARRA repeals all federal habeas jurisdiction[.]"

---

[2] Four years later, another panel of the Ninth Circuit subsequently concluded that the panel's discussion of judicial review in *Cornejo-Barreto* was dicta and reached a contrary conclusion. *Cornejo-Barreto v. Siefert*, 379 F.3d 1075, 1082, 1088-89 (9th Cir. 2004).  The Ninth Circuit ordered *en banc* review but, before the *en banc* court could rule, Mexico withdrew its extradition request, thus mooting the case.  The Ninth Circuit thereafter vacated the second, 2004 panel opinion, but left the original 2000 panel opinion in place.  *Cornejo-Barreto v. Siefert*, 389 F.3d 1307 (9th Cir. 2004).

*Trinidad y Garcia*, 683 F.3d at 956 (internal citations omitted).   The Suspension Clause of the Constitution expressly preserves the writ of habeas corpus, U.S. Const. art. I, § 9, cl. 2, and 28 U.S.C. § 2241 makes the writ of habeas corpus available to all persons "in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2241(c)(3).   Accordingly, given the constraints of the Suspension Clause, habeas jurisdiction may not be repealed by implication, *Felker v. Turpin*, 518 U.S. 651, 660-61 (1996), and there is a strong presumption against construing statutes to repeal habeas jurisdiction.   *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).   Any limitation of habeas review thus must be by specific and express command.   The Supreme Court has required that, before concluding a law has actually repealed habeas relief, (1) the statute must contain a "particularly clear statement" of its intention to repeal habeas jurisdiction, *Demore v. Kim*, 538 U.S. 510, 517 (2003); and (2) even where a sufficiently clear statement exists, the courts must determine whether "an alternative interpretation of the statute is 'fairly possible[.]'" *St. Cyr*, 533 U.S. at 299-300 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

The First Circuit and various other courts of appeal have previously held that FARRA lacks sufficient clarity to meet the "particularly clear statement" requirement for depriving the courts of habeas jurisdiction.   *Saint Fort v. Ashcroft*, 329 F.3d 191, 200-02 (1st Cir. 2003) ("FARRA does not expressly refer to 28 U.S.C. § 2241 or to habeas review and we would not imply an intent to repeal habeas jurisdiction from silence."); *see also Trinidad y Garcia*, 683 F.3d at 956 (en banc) & 959 (Thomas, C.J., concurring); *Wang v. Ashcroft*, 320 F.3d 130, 140-42 (2d Cir. 2003); *but see Omar v. McHugh*, 646 F.3d 13 (D.C. Cir. 2011); *Mironescu v. Costner*, 480 F.3d 664, 670-73 (4th Cir. 2007).   FARRA provides, in relevant part, that:

> Notwithstanding any other provision of law, and except as provided in the regulations [the Secretary of State promulgates pursuant to the Act], no court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to

consider or review claims raised under the [CAT] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to [8 U.S.C. § 1252].

FARRA § 2242(d) (codified at 8 U.S.C. § 1231 note).  Nothing in the foregoing purports to repeal federal habeas jurisdiction under § 2241.  Rather, the section simply states it is not conferring jurisdiction.

The REAL-ID Act does contain jurisdiction-stripping provisions, but only over final orders of removal, requiring instead direct petitions for review.  The purpose of the REAL-ID Act's jurisdiction-stripping provisions was to "consolidate judicial review of immigration proceedings into one action in the court of appeals." *St. Cyr*, 533 U.S. at 313. Indeed, the entire section is focused on orders of removal and uncodified sections of the Act state that the legislation was intended to apply only to "final administrative order[s] of removal, deportation, or exclusion." 119 Stat. 231, 311 (quoted in notes to 8 U.S.C. §1252).  "[T]he REAL-ID Act's jurisdiction-stripping provisions do *not* remove federal habeas jurisdiction over petitions that do not directly challenge a final order of removal." *Trinidad y Garcia*, 683 F.3d at 958 (Thomas, C.J., concurring) (emphasis in original).  Accordingly, the REAL-ID Act can readily be construed as being confined to addressing final orders of removal in the immigration context without affecting federal habeas jurisdiction. *Trinidad y Garcia*, 683 F.3d at 956; *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006).  Given a plausible alternative statutory construction, the Court cannot conclude that the REAL-ID Act actually operated to repeal the remedy of habeas corpus outside of a challenge to a final order of removal, which is not at issue here. *Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347, 360 (D.R.I. 2019) ("[C]onsidering the Suspension Clause questions that would arise if the Court construed the provision to divest it of habeas jurisdiction, the Court must find that [the

REAL-ID Act] does not affect its habeas jurisdiction 'to avoid such problems.'") (quoting *St. Cyr*, 533 U.S. at 300).

Nor does the rule of non-inquiry preclude review. *Trinidad y Garcia*, 683 F.3d at 956. Even courts that have found judicial review of CAT or FARRA claims unavailable on other grounds have held that the rule of non-inquiry does not deprive the courts of jurisdiction to review the legality of the Secretary's extradition decisions on habeas. *See Mironescu*, 480 F.3d at 670-7. As explained in a lengthy discussion in one of the separate opinions in *Trinidad y Garcia*,

> [T]he judicially developed rule of non-inquiry was not developed in, and does not have direct application to, judicial enforcement of obligations imposed by statute upon executive officials. The rule bars judicial examination of extraditions once it is determined that they are not contrary to the Constitution, laws, or treaties of the United States. It does not hold that we must refrain from reviewing claims that an extradition is, in fact, unlawful.

*Trinidad y Garcia*, 683 F.3d at 996 (Berzon, C.J., concurring in part and dissenting in part).

Accordingly, the Court has jurisdiction to review the lawfulness of the Under Secretary's decision to authorize the extradition of the Taylors.

### B. The Deputy Secretary of State's Decision to Extradite the Taylors to Japan Violates U.S. Treaty Obligations and the Taylors' Constitutional Rights

If the Taylors were extradited to Japan, they would then face a highly-flawed criminal-justice system that lacks many of the basic protections the Taylors would be afforded in the United States, such as a right to a speedy trial and the right to counsel during interrogations, while at the same time subjecting the Taylors to a heightened risk of contracting COVID-19 (which would almost certainly be life-threatening to Michael Taylor).

Although Japan is itself a modern democracy, its criminal-justice system appears more akin to that of an authoritarian regime.[3]  Japan's legal system allows prosecutors to detain people without charge and subject them to relentless interrogation without the presence of defense counsel until they confess or incriminate themselves, a system that is referred to as "hostage justice (*hitojichi-shiho*)."  Nearly 90% of defendants in criminal trials confess, according to the Japan Federation of Bar Associations.  Japan's criminal-justice system has been ridiculed by Japanese lawyers and academics, as well as observers around the world.  Last year, more than 1,000 Japanese academics and lawyers wrote an open letter criticizing Japan's criminal-justice system.[4] The letter details a number of alarming practices:

- "The Code of Criminal Procedure of Japan allows suspects to be detained up to 23 days before indictment" during which time detainees face continuous interrogations where "investigators [] pressur[e] suspects to answer questions and confess to their alleged crimes."[5]

- "It is not uncommon for suspects to be yelled at from close range [and] suspects are not allowed to have lawyers present during questioning."[6]

- "The 23-day detention limit often has no substance, as investigators sometimes use arrest/detention powers for separate, minor crimes as an excuse to interrogate suspects about the main crime or split up consolidated crimes in order to detain suspects repeatedly for additional periods."[7]

- "Even when the detainee is indicted and finally allowed to request bail, those who have not confessed or remained silent often have a harder time persuading a judge to approve their bail request[.]"[8]

---

[3] *Cf.* Alexander Solzhenitsyn, 1 The Gulag Archipelago 103-15 (HarperPerennial Ed. 2007) (describing Stalin-era Soviet interrogation tactics, including lengthy questioning, yelling, physical abuse, and sleep deprivation).

[4] Available at https://bit.ly/3iFGeXv.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

The letter also describes some notable examples where Japan charged innocent people with minor crimes, yet detained those who refused to confess for months or more than a year.  It concludes that these practices are systemic and violate "international human rights standards including the presumption of innocence, the prevention of torture, and access to counsel during questioning."[9]

Nobuo Gohara, a former prosecutor, expanded on these issues in international media.  He said:  "'The Japanese criminal justice system is focused on interrogation.  The aim is getting a confession ….  A suspect who admits to the crime is released from imprisonment ….  But if a person refuses to admit to a crime, the prosecutor's office will strongly oppose release until the suspect makes a confession.'"[10]  It should thus come as no surprise that Japan's conviction rate is 99.3%, a statistic that the Ministry of Justice itself not only confirms, but feels the need to explain away.[11]

These sorts of abuses have also been widely reported by non-governmental organizations reviewing Japanese practices.  In 2013, the United Nations Committee Against Torture issued a report on the Japanese criminal-justice system, which concluded, among other things:[12]

> The State party's justice system relies heavily on confessions in practice, which are often obtained while in the DaiyoKangoku [*sic*] without a lawyer present.  The

---

[9] *See also* Kageyama, Yuri, *Fugitive Ghosn brings global attention to Japanese justice* (Jan. 9, 2020) (discussing several famous cases of wrongful convictions in Japan, including of foreign nationals, and a true-life story of a man who refused to sign a confession in Japan that became a popular movie depicting his five-year legal battle for exoneration), available at https://bit.ly/3kGUiS4.

[10] Rupert Wingfield-Hayes, BBC, *Carlos Ghosn and Japan's 'Hostage Justice' System* (Dec. 31, 2019), available at https://bbc.in/33VyQCT.

[11] *See* Japan Ministry of Justice, *Frequently Asked Questions on the Japanese Criminal Justice System*, available at https://bit.ly/2FdiyLq (last accessed Aug. 12, 2020).

[12] United Nations Committee Against Torture, *Concluding Observations on the Second Periodic Report of Japan, Adopted by the Committee at its Fiftieth Session* (May 31, 2013), available at: https://bit.ly/3iHbEMP.

Committee has received reports about ill-treatment while interrogated, such as beating, intimidation, sleep deprivation, and long periods of interrogations without breaks[.]

Amnesty International made similar findings in its 2015 report:[13]

The daiyo kangoku system, which allows police to detain suspects for up to 23 days prior to charge, continued to facilitate torture and other ill-treatment to extract confessions during interrogation.  Despite recommendations from international bodies, no steps were taken to abolish or reform the system in line with international standards.

These general practices by Japan, and worse, already have been employed in the investigation and prosecution of Mr. Ghosn (who is being prosecuted by the same prosecutor who is seeking, and supporting with declarations, the Taylors' extradition).  The Japanese initially arrested Ghosn in November 2018, but repeatedly rearrested him on slightly different charges so as to prolong his detention.  Japan did not release Ghosn on bail until April 25, 2019.  During his five-month detention, Ghosn was kept in solitary confinement in a tiny cell while being allowed outside for only 30 minutes a day, but then only on weekdays.  Lights were left on around-the-clock.  Ghosn was "interrogated day and night," sometimes for up to eight hours at a time and continuing through weekends, Thanksgiving and Christmas—all without a lawyer present.[14]  As Ghosn observed, "It's not very difficult to come to the conclusion that you're going to die in Japan

---

[13] *See, e.g.*, Amnesty International, *Amnesty International Report 2014/15 – Japan* (Feb. 25, 2015), available at https://bit.ly/3iAEMpg.

[14] Simon Denyer, Liz Sly and Asser Khattab, The Washington Post, *Carlos Ghosn complains of 'corrupt,' 'inhumane' justice system in Japan in first public appearance since escape* (Jan. 8, 2020), *available at* https://www.washingtonpost.com/world/carlos-ghosn-set-to-address-media-as-his-lawyers-attack-nissan-for-perversion-of-truth/2020/01/08/d58cc948-3178-11ea-971b-43bec3ff9860_story.html; Yuri Kageyama, Associated Press, *Ghosn faced 7 hours a day of questioning in Japan: lawyer* (Jan. 12, 2020), *available at* https://www.foxbusiness.com/money/ghosn-7-hours-a-day-questioning-japan-lawyer; Kiyoshi Takenaka & Mari Saito, Reuters, *Austere Japan detention quarters contrast with Ghosn's globe-trotting lifestyle* (Nov. 22, 2018), *available at* https://www.reuters.com/article/us-nissan-ghosn-detention/austere-japan-detention-quarters-contrast-with-ghosns-globe-trotting-lifestyle-idUSKCN1NR1CY?feedType=RSS&feedName=businessNews.

or you have to get out."[15]  Ghosn's treatment, and the questionable nature of the charges against him, produced widespread international criticism of Japan's prosecution of Ghosn and its justice system in general.[16]

In addition, Ghosn's co-defendant, an American former Nissan employee, Greg Kelly, was subjected to similar treatment.  Rather than use the U.S.-Japan Extradition Treaty, the Japanese government tricked Mr. Kelly into travelling to Japan in November 2018, where he was then arrested and subjected to five weeks of solitary confinement without a bed.[17]  His family reports that he was in need of urgent neck surgery before traveling to Japan, which the Japanese government was aware of, and yet delayed.[18]  The procedure was less effective by the time he was finally allowed to have the surgery.[19]  While incarcerated, Mr. Kelly was interrogated for several hours a day without legal counsel, and Japanese officials still will not permit him or his lawyer access to evidence in electronic form.[20]  Mr. Kelly was eventually granted bail in December 2018, and his criminal trial in Japan has only recently commenced.[21]  One of the conditions of his bail is

---

[15] Denyer, et al., *supra* n.14.

[16] *See, e.g.*, Kyodo News, *Macron repeatedly told Abe he saw Ghosn's treatment as unsatisfactory* (Jan. 16, 2020), *available at* https://english.kyodonews.net/news/2020/01/4c5619c8b4b4-macron-repeatedly-asked-abe-to-improve-treatment-of-carlos-ghosn.html.

[17] *See* Ex. I (Memo and Petition from the Kelly Family describing the horrors of his treatment by Japan); Sen. Roger Wicker, Sen. Lamar Alexander & Sen. Marsha Blackburn, *Greg Kelly: U.S. Hostage of Japanese Justice* (March 10, 2020), available at https://bit.ly/2PMWzgp; *see also* The Japan Times, *Ex-Nissan exec Greg Kelly fears odds of fair trial slimmer after Ghosn's flight* (Jan 4, 2020), available at https://bit.ly/30Q9tRa; Kelly Petition to U.S. Dep't of State, available at https://bit.ly/2XX0ID7.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] According to Mr. Kelly's lawyer, James Wareham, "Greg Kelly has been caught up an effort to remove Ghosn and get Renault out of a controlling position, [and] [t]o consummate the scheme, they wanted a witness to be in their control under duress, and then they went so far as to break international extradition law to make that happen."  The Detroit News, *Emails: Ghosn takedown*

that he is not allowed to leave Japan; Mr. Kelly has not been able to return home for more than 18 months.

In view of the above, even if permissible under 18 U.S.C. § 3184 and the U.S.-Japan Extradition Treaty (which, as detailed *infra*, it is not), extraditing the Taylors to Japan in this case would violate other U.S. treaty obligations.  Article 3(1) of the CAT provides that "No State Party shall … extradite a person to another State where there are substantial grounds for believing he would be in danger of being subjected to torture."  *See also* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, § 2242, 112 Stat. 2681, 2681-761, 2681-822 (implementing CAT and reiterating that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture").  Article 16 of the CAT further prohibits "other cruel, inhuman or degrading treatment."

Further, Article 14 of the International Covenant on Civil and Political Rights ("ICCPR") provides that "everyone shall be entitled" to certain "minimum guarantees" in the determination of any criminal charge, including "to communicate with counsel of his own choosing" (Art. 14(3)(b)) and "[n]ot to be compelled to testify against himself or to confess guilt" (Art. 14(3)(g)), "[t]o be tried without undue delay" (Art. 14(3)(c)).[22]

"Torture" within the meaning of the CAT includes "[a]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a

---

*motivated by effort to stop Nissan, Renault integration* (June 16, 2020), available at https://bit.ly/2DXp1tv.

[22] International Covenant on Civil and Political Rights, *opened for signature* 19 Dec. 1966, art. 6, para. 5, S. EXEC. DOC. E, 95–2, at 23 (1978), 999 U.N.T.S. 171, 175.

third person has committed or is suspected of having committed ….."  22 C.F.R. § 95.1(b)(1). Under U.S. law, "substantial grounds" under the CAT exist if "it is more likely than not that the [person] would be" subjected to such treatment.  22 C.F.R. § 95.1(c).

It is clear that Messrs. Ghosn and Kelly, and countless others, have been subjected to torture and other cruel, inhuman or degrading treatment, including physical and mental suffering (including beatings, sleep deprivation, and absurdly-protracted interrogation while being denied access to lawyers and medical treatment) at the hands of Japanese law enforcement for the purpose of extracting confessions.  *See, e.g.*, *Guzman-Nunez v. Barr*, 822 F. App'x 563, 566 (9th Cir. 2020) (intentional denial of medical care as a form of punishment would be torture under CAT); *Kang v. Attorney Gen. of U.S.*, 611 F.3d 157, 165-67 (3d Cir. 2010) (sleep deprivation, bright lights, extended periods of remaining in uncomfortable position, along with other severe mistreatment as part of interrogation is torture).  The same fate almost certainly awaits the Taylors.

**C.  The Court Should Order the State Department to Produce the Administrative Record or, At the Very Least, Require the State Department to Comply With Its Own Statutory and Regulatory Obligations**

As set forth in Section I.A *supra*, "CAT and its implementing regulations are binding domestic law, which means that the Secretary of State *must* make a torture determination before surrendering an extraditee who makes a CAT claim."  *Trinidad y Garcia*, 683 F.3d at 956 (emphasis in original).  Before extradition can occur, the Secretary is thus required to have "appropriate policy and legal offices review and analyze information relevant to the case" and prepare "a recommendation to the Secretary as to whether or not to sign the surrender warrant," 22 C.F.R. § 95.3(a), and the Secretary is then required to consider an extraditee's torture claim and find it not "more likely than not" that the extraditee will face torture.  22 C.F.R. § 95.2.  Without access to and review of the administrative record, neither Petitioners nor the Court can properly evaluate (1) whether the required review, analysis and recommendation were made; (2) whether

the Secretary, in fact, made the required (or any) determination upon consideration of the Taylors' claims, or (3) whether any such determination, if made, was supported by the record and not arbitrary, capricious or otherwise in violation of U.S. law.

The government argues that the one-page letter from the Assistant Legal Advisor for Law Enforcement and Intelligence is all the record that the State Department need produce.  Dkt. 50 at 14.  But a perfunctory, general and conclusory assertion of compliance is insufficient to permit any meaningful review.  Accordingly, courts have ordered the production of information by the State Department necessary to permit review.  *See Trinidad y Garcia*, 683 F.3d at 957 (holding "[t]he record before us provides no evidence that the Secretary has complied with the procedure" required by CAT and FARRA and remanding for provision of more); *see also Mironescu v. Rice*, No. 1:05CV00683, 2006 WL 167981, at * (M.D.N.C. Jan. 20, 2006) (ordering production of administrative record considered by Secretary with request to question of whether petitioner would be subject to torture upon return to Romania), *vacated by* 480 F.3d 664 (4th Cir. 2007) (finding judicial review foreclosed by FARRA).

As detailed by Circuit Judge Berzon in his opinion in *Trinidad y Garcia* concurring in part and dissenting in part from the majority opinion of the *en banc* Ninth Circuit, courts "have the authority—and, indeed, the obligation—to review the Secretary of State's determination and to decide—under a standard highly deferential to the Secretary and procedures carefully tailored to ensure the protection of the Secretary's diplomatic concerns—whether it is more likely than not that petitioners … will be tortured if extradited."  683 F.3d at 986.  A bare bones declaration provides no opportunity to assess the sufficiency of the government's evidence or its weighing of the extraditee's evidence against any other relevant evidence.  Substantive review of the Secretary's determination, however, "only strengthens our constitutional system of checks and

balances, as well as the Great Writ of habeas corpus." *Trinidad y Garcia*, 683 F.3d at 1008 (Pregerson, C.J., concurring in part and dissenting in part). But there can be no substantive review of any kind, at any level of deference, if no record, explanation, or justification is provided by the Secretary.

The government contends that Ms. Johnson's letter meets the requirements of *Trinidad y Garcia*, but it does not. In that case, a majority of the *en banc* Ninth Circuit held that CAT and FARRA required, at the very least, a declaration "*signed by the Secretary or a senior official properly designated by the Secretary*" attesting "that she has complied with her obligations" under the CAT and FARRA and the regulations thereunder, specifically that appropriate policy and legal offices have made the required review, analysis and recommendation and the Secretary has considered the extraditee's torture claim and found it not "more likely than not" that the extraditee will face torture. 683 F.3d at 957. Instead, all the State Department had provided was "a generic declaration outlining the basics of how extradition operates at the Department and acknowledging the Department's obligations under the aforementioned treaty, statute and regulations," but giving no indication that the Department "had actually complied with those obligations." *Id.* The *en banc* Ninth Circuit found that insufficient and remanded the case to the district court.

Here, Ms. Johnson's letter is even more lacking than the declaration found insufficient in *Trinidad y Garcia*. First, it is a letter from the Assistant Legal Advisor for Law Enforcement and Intelligence. It is not an affidavit, declaration or certification of any kind, and it is not signed by the Secretary or by an official to whom the Secretary's extradition authority is properly delegated. Further, all that the letter does is say that "the Deputy Secretary of State authorized the Taylors' surrender to Japan," state generally that "the Department carefully and thoroughly considers all claims submitted by a fugitive," and purport to "confirm that the decision to surrender the Taylors

to Japan complies with applicable international obligations as well as domestic statutes and regulations."  (Dkt. 47-1.)

The first statement merely appears to identify the individual making the decision, which is relevant only to the extent that it establishes that this *is not* the person making the statements set forth in the letter.

The second statement is merely a generalization, and an especially vague one at that.  It says nothing about anything the Secretary or Deputy Secretary actually did in the Taylors' case; indeed, it only purports to describe what "the Department" generally does in extradition cases. This is even less informative than the generalizations the *en banc* Ninth Circuit found inadequate in *Trinidad y Garcia*.

The third statement is simply a generalized, conclusory statement.  It is not accompanied by any acknowledgement of the obligations at issue (which the State Department at least had done in *Trinidad y Garcia*), much less any specific statement that appropriate policy and legal offices have made the required review, analysis and recommendation and that the Secretary (or his delegee) has performed the consideration and made the determination required by law.

Accordingly, even if a declaration by the Secretary attesting the review, analysis and recommendation and to his review and consideration of the Taylors' claims and his determination that they are not "more likely than not" to face torture if extradited to Japan were all that the CAT and FARRA required, the State Department has not done even that.

## II.    THE U.S.-JAPAN EXTRADITION TREATY DOES NOT AUTHORIZE THE TAYLORS' EXTRADITION TO JAPAN

The decisions by both the Deputy Secretary of State and Judge Cabell that Japan's request for the Taylors' extradition falls within the scope of the U.S.-Japan Extradition Treaty are incorrect because no probable cause exists that the Taylors committed an extraditable offense.  As the

Taylors detailed in their submissions to Judge Cabell (Case No. 4:20-mj-01069, Dkt. 17, 28, & 49), Japan's request is premised upon a novel and unprecedented expansion of Article 103 that is articulated, if at all, by implication and inference in the applications for warrants for the Taylors' arrest.  Neither Taylor has been formally charged with a violation of Article 103, or any other offense.  Unlike the U.S., current Japanese law does not make it a crime for a defendant to jump bail or for someone to assist in bail jumping.  To get around this, Japan argues the Taylors committed the offense of "Harboring of Criminals" by assisting Mr. Ghosn to leave Japan and thereby "escape" trial on the charges against him.  This theory of the offense, however, is contrary to the plain language of Article 103 and the entirety of the history of prosecutions and accumulated case law thereunder.  Article 103 previously has only been applied to conduct involving working against law enforcement's active pursuit of a criminal to arrest him.  But there was no warrant for Mr. Ghosn's arrest and no one was looking for him.

A.     **The Taylors May Challenge Judge Cabell's Decision Through the Instant Habeas Petition**

The government alleges that the Taylors' habeas petition is "untimely" because they have filed it after, rather than before, the Department of State's extradition decision.  While it may be that habeas corpus petitions challenging a magistrate judge's certification order typically are filed before the Secretary of State renders an extradition decision, there is no statute, rule, or other basis that requires that this be so.  In *Venckiene v. United States*, 929 F.3d 843 (7th Cir. 2019), the Seventh Circuit recently confirmed that "we are not aware of a statute or precedent barring consideration of a habeas corpus petition filed after the Secretary of State's decision" and took no issue with a habeas petitioner simultaneously challenging both the magistrate judge's certification order and the Secretary's decision in the same habeas petition.  *Id.* at 854.  The district court decision in the *Venckiene* case (which the Seventh Circuit affirmed) specifically rejected an

argument by the government that any challenge to the magistrate judge's decision was moot once the Secretary of State made his decision. *Venckiene v. United States*, 328 F. Supp. 3d 845, 862-64 (N.D. Ill. 2018); *see also De La Rosa Pena v. Daniels*, No. 13 C 708, 2015 WL 13730935 (E.D. Tex. Dec. 11, 2015) (considering habeas petition challenging magistrate judge's certification ruling *after* Secretary issued its ruling).

Accordingly, the Taylors' petition is not untimely or otherwise procedurally improper.

**B.     The Taylors Did Not Commit an Extraditable Offense Under Then-Existing Japanese Law**

Japan's extradition request is premised upon a novel and unprecedented expansion of the scope of Article 103 of the Japanese Penal Code that is articulated, if at all, by implication and inference in the applications for warrants for the Taylors' arrest. As translated into English, Article 103 of the Japanese Penal Code states a criminal offense entitled "Harboring of Criminals" and provides as follows:

> A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 3 years or a fine of not more than 300,000 yen.

Ex. A at EX-Taylor, M.-00030; *see also* Ex. B at EX-Taylor, P.-00030.

As Dr. William B. Cleary, a noted law professor at Hiroshima Shudo University in Hiroshima, Japan, explains in his declaration, "[w]hile this English translation uses two verbs— 'harbors or enables the escape of another'—to describe the operative conduct, the original Japanese text in fact employs a single verb—蔵匿, or '*inpi*.'" Ex. E (Second Supp. Cleary Decl.) ¶ 5. This is the concept reflected in the very title of the Article 103 offense, "Harboring of Criminals." As Dr. Cleary explains, 蔵匿, or "*inpi*" comprises "a single concept that describes working against law enforcement authorities' *active* pursuit of a criminal to arrest him." *Id.*

(emphasis added).  Though translated (alternatively) as "enabling the escape" of a person who has committed a crime, 蔵匿, or "*inpi*," is a distinct and different concept from the word 逃走, or "*toso*," which is also translated into English as "escape."  This word, "*toso*," is the subject of different crimes, specifically Articles 97 ("Escape") and 98 ("Aggravated Escape"), and "has a very specific meaning in that it refers to escape from a place of physical confinement, such as a jail, prison or detention center."  Ex. E ¶¶ 6, 8.  "*Toso*" only appears in Article 103 in the portion of the statute identifying a person who "has escaped from confinement" as an individual whom one may not harbor, *i.e.*, 蔵匿, or "*inpi*."

The facts alleged in support of the arrest warrants (and the U.S. Government's allegations in the complaints seeking extradition) assert that the Taylors assisted Mr. Ghosn to escape (逃走, or "*toso*") from Japan in violation of the conditions of his release on bail pending trial on certain alleged financial crimes relating to his tenure as CEO of Nissan.  The theory appears to be that by assisting Ghosn in departing Japan when leaving the country was a violation of his bail conditions, the Taylors committed the act of harboring (蔵匿, or "*inpi*") a person who had committed a crime.

Article 103 has never been applied in this fashion before.  Although there are presently legislative efforts to change the law, violating bail conditions, or "bail jumping," is not a crime under current Japanese law.  Neither is there a Penal Code provision that prohibits assisting another person in violating his or her bail conditions.  Although Articles 97 and 98 prohibit escape and Article 103 prohibits one from harboring another who has escaped, the word used in each of those provisions (逃走, or "*toso*") references an escape from physical confinement in a jail, prison or some kind of detention facility.  Mr. Ghosn was not so confined, and Japanese law has never before recognized release on bail as a form of confinement from which one may escape (逃走, or "*toso*").

Yet this is precisely what the factual bases for the arrest warrant applications allege that the Taylors did—enabling Mr. Ghosn to escape (逃走, or "*toso*") by departing Japan in violation of his bail conditions.   However, consistent with the meaning of the different term it employs (蔵 匿, or "*inpi*"), Article 103 consistently has been interpreted and applied to criminalize working against law enforcement authorities' active pursuit of a criminal to arrest him.   Thus, while the courts have held Article 103 is violated where one assists a fugitive to evade apprehension by the police where they are fleeing the scene of a crime, they have escaped from confinement, or there is a warrant for their arrest (either initially or *after* they have violated their bail conditions and their arrest is again sought), Japanese courts have never sanctioned (and prosecutors have never even attempted) a charge under Article 103 premised solely upon an allegation that one assisted or enabled a person to violate his or her bail conditions.   Indeed, the case law does not reveal a single instance where Article 103 has ever been applied absent the factual circumstance of an active effort, at the time of the offense, by law enforcement to apprehend the person allegedly harbored.   There was no warrant for Ghosn's arrest at the time of the Taylors' alleged actions, and Japanese authorities were not seeking to apprehend him until after Ghosn had returned to Lebanon and parted with the Taylors.

Indeed, the materials accompanying Japan's extradition request make clear that Japanese law enforcement authorities were investigating suspected violations of the Immigration Control and Refugee Recognition Act by Ghosn, and the Taylors' assistance in such violations, not a suspected violation of Article 103.   Because the immigration offenses are misdemeanors for which extradition is not available,[23] the prosecutor in the Ghosn case has sought to construct a theory of

---

[23] An offense is only extraditable if it is "punishable by the laws of both Contracting Parties … by deprivation of liberty for a period of more than one year."  Treaty, Art. II § 1.

an Article 103 violation as a means to obtain extradition of the Taylors.  But that charge is wholly unprecedented in Japanese law.

Under the Treaty, extradition may be certified only where "the request for extradition … is accompanied by … such evidence as would provide probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested."  Treaty, Art. VIII, § 3.  To meet that requirement, the Japanese government must provide "evidence which would warrant a man of reasonable caution in the belief that [an extraditable offense] has been committed."  *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (quotation and citation omitted).  The Taylors are not subject to extradition because the statute that Japan claims the Taylors violated—Article 103—is inapplicable, even if all the alleged facts were true.  It is not a crime in Japan for an individual to violate his bail conditions (bail jumping).  Therefore, logic would dictate that it is also not a crime to assist someone in doing something that is not a crime as well.  And, as stated above, the misdemeanor immigration offenses cited in the arrest warrants themselves are *not* extraditable offenses.

Extraditing the Taylors thus would violate the Treaty.  DOJ and the Japanese government have specifically said that the basis of extradition was the alleged violation of Article 103.  Ex. A at EX-Taylor, M.-00030.  But as Mr. Watanabe (the Japanese prosecutor) admits, the Taylors have not been charged with violating Article 103 in Japan.  Ex. E (Second Supp. Watanabe Decl.) ¶ 6. Nor could Japan charge the Taylors; neither bail jumping, nor aiding bail jumping, are crimes under Japanese law.  Ex. C (Cleary Decl.) ¶¶ 10, 14.  Japan has *never* prosecuted any of its own citizens or anyone else, including Ghosn, for "escaping" bail conditions under either Articles 97 or Article 98, or any other provisions, and neither DOJ nor the Japanese government has argued

that what Ghosn did in violating his bail conditions was a crime under Japanese law.[24]
Recognizing this fact, the Japanese government has been scrambling to criminalize bail jumping.
On March 6, 2020, referring to Ghosn's departure from Japan, the Japanese Minister of Justice
told the legislature's Legal Committee that the Ministry had "recently consulted with the Legal
Council on the establishment of criminal law to [address] the escape of these persons."  Ex. F,
Remarks of Minister of Justice Mori to Legal Committee (3/6/2020).  She continued, "[i]n the
future, based on the results of the deliberation, we will proceed with the necessary legislation." *Id.*
Thereafter, on June 15, 2020, a committee of the Japanese Ministry of Justice met to discuss "the
establishment of new penalties for [] escape … [while] on bail."  Ex. G, Jiji Press, Start of Debate
on Escape Prevention Measures (6/15/2020); *see also* Ex. H, Jomo News, First Meeting to Prevent
Escape During Legal Bail (6/15/2020).  Allowing Japan to prosecute the Taylors when Ghosn
could not himself be prosecuted is incongruous and patently unjust.

Again, "the Japanese government has *never* attempted to apply Article 103 to *any* situation
involving violation of bail conditions."  *Id.* ¶ 13 (emphasis added); *see also* Ex. D (Supp. Cleary
Decl.) ¶ 8 ("[T]his prosecution is unprecedented.").  That is because Article 103 only criminalizes
"working against law enforcement authorities' active pursuit of a criminal to arrest him."  Ex. E
(Second Supp. Cleary Decl.) ¶ 5.  Put another way, a person can only violate Article 103 during
two periods relating to the "subject" of the escape: (1) when the subject is being pursued by police,
such as after committing the original offense, and (2) if the subject escapes from confinement.
There is no provision criminalizing the current situation, where Ghosn was not being pursued by
the police because he was released on bail.  Japan's putative prosecution of the Taylors under

---

[24] Ex. C ¶ 10; *see also, e.g.*, Ex. G, Jiji Press, Start of Debate on Escape Prevention Measures
(6/15/2020) ("The current criminal law, 'flight offenses,' targets inmates in prisons.  For this
reason, it does not apply when in bail such as Ghosn.").

Article 103 amounts to an attempt to take conduct that is widely-recognized as not constituting a crime, and repackage it as a violation of a previously-inapplicable statute taking advantage of the use of the word "escape" in the English translation to refer to both of two very different and distinct Japanese terms.  It is up to the Japanese legislature—and not a creative and embarrassed Japanese prosecutor, and certainly not the U.S. government—to repair what is an obvious gap under Japanese law.

Japanese scholars and practitioners reviewing this case agree that the Taylors did not commit a crime.  One article reported, for example: "Helping someone jump bail isn't a crime in Japan … said Yunhai Wang, a professor of criminal law at Hitotsubashi University graduate school in Tokyo.  Nobuo Gohara, a former prosecutor and a vocal critic of Japan's criminal-justice system, concurred[.]"   Robert Burnson, Bloomberg Law, *Ghosn Alleged Escape Accomplices Deny Committing a Crime* (June 9, 2020), *available at* https://bit.ly/30POwWr.  Moreover, over several months, the Taylors repeatedly cited the novelty of Japan's interpretation during the judicial proceedings.  Yet, the Japanese government *could not find even one analogous case*.

As these facts reveal, the simple truth is that the facts alleged establish, at most, probable cause that the Taylors committed non-extraditable immigration offenses.   But Japan seeks extradition for a different offense, one which has no precedent in Japanese law, has not been articulated in an indictment, information, criminal complaint or other formal charging instrument, and is only asserted vaguely and by inference (without even citing the specific Penal Code provision the Japanese prosecutor posits the Taylors violated) in an application for a now-expired arrest warrant.

C.    **Judge Cabell Erroneously Deferred to the Japanese Government's Allegations and Failed to Consider the Taylors' Contrary Evidence**

The government argues that Judge Cabell's ruling means the Taylors are unlikely to succeed on their claims based on a record that the government only imagines exists.   The government wants to pretend that this Court can quickly dispense with this petition, claiming that "[f]our of the five counts in the Petition (Counts II-V) have previously been considered and rejected by Judge Cabell at the certification stage, as well as by this Court in the context of the Taylors' first habeas petition and motion for injunctive relief."  Dkt. 50 at 3.  But the actual record reflects something different.

This Court's prior rulings were preliminary, decided in the context of whether to grant an injunction, before the matter was fully briefed before Judge Cabell.  This Court's prior decisions paved the way for that more fulsome record to be created before Judge Cabell to rule upon at the merits stage.  While the government understandably wants to state that all the issues have been decided in front of Judge Cabell in its favor, his decision failed to reach the merits of the Taylors' arguments at all by instead deferring conclusively to Japan.  Thus, the issue before the Court now is not whether Judge Cabell appropriately balanced the weight of both sides' arguments in reaching his decision; that is not even something that Judge Cabell attempted to do.  Rather, the threshold issue before this Court is whether Judge Cabell appropriately gave conclusive weight to the views of the foreign government seeking extradition.

Respectfully, Judge Cabell cannot be correct because such deference would render judicial review a meaningless exercise in the extradition context, where a foreign government always will argue that someone is prosecutable under its law, and it would strip U.S. citizens of their right to have their constitutional rights protected by Article III courts.  The Taylors deserved a meaningful hearing.  The Taylors created a record that demonstrated that their alleged conduct does not fall

under the literal language of the Japanese statute in question, and demonstrated that no similar case had ever been so much as prosecuted in Japan over the long history of the statute.  It should go without saying that U.S. courts should be careful not to subject U.S. citizens to prosecution abroad for alleged foreign crimes that the foreign government does not pursue against its own citizens.

But "[d]espite strong urging," Judge Cabell expressly "decline[d] to consider the respondents' arguments" because "[e]ven assuming an extradition court has both the authority to resolve disputed issues of foreign law, and the hopeful belief it could do so competently, that does not mean it should."  Cabell Op. at 9.  Instead, Judge Cabell refused to consider the Taylors' evidence of Japanese law at all, and only relied on the general proposition that the Japanese prosecutor seeking the Taylors' extradition believes the Taylors' acts fit the crime—at which point his own substantive analysis of the probable cause question stopped in favor of complete deference to that proposition.  Judge Cabell may have pointed to a paraphrasing of the English translation of the statute and summarily declared that he thought the Taylors' conduct qualified, *see* Cabell Op. at 8-9, but not only is this flatly wrong, he then concedes that he did not even consider the Taylors' evidence of what the statute actually means.  *Id*. at 10.  And although Judge Cabell cites the government's evidence of the statute's meaning as though he assessed its "reasonable[ness]," he could obviously not have fairly done so without considering the Taylors' counter-evidence, and regardless, he then admitted to simply "defer[ing] to the foreign country's interpretation."  *Id*.[25] Accordingly, the government is wrong to assert that "[t]he only relevant question on extradition habeas review is whether 'any evidence' supports Judge Cabell's probable-cause finding … and

---

[25] Of course, what Judge Cabell means by "country" is the Japanese prosecutor who brought the case against and then lost Ghosn and is seeking the Taylors' extradition for something that has never been a crime in Japan in order to save face—not the Japanese legal scholars or the Taylors' experts on Japanese law that disagree with him or the Japanese legislators currently amending the law after-the-fact to criminalize what the Taylors did.  *See* Dkt. 38 at 19, n.13.

the record is replete with such evidence" because Judge Cabell did not consider that evidence in making his decision.  *Id.* at 18.

All parties agree that Judge Cabell was obligated to find that the facts in the record support a finding of probable cause that the Taylors committed a crime, a standard governed by their Fourth Amendment rights.  *See* Dkt. 50 at 3; Cabell Op. at 3, 6.  Judge Cabell could not possibly have met this standard without applying the law to the facts, and while the government insists that the extradition context is unique, complete deference as Judge Cabell afforded yields no finding of probable cause at all—simply a rubber stamp by the federal judiciary based on a mere assertion by foreign authorities that may have any number of improper motives for seeking extradition of American citizens.

The Fourth Amendment is fully applicable in extradition proceedings, and its probable cause standard cannot be met by simply conclusively presuming that the government's allegations are correct.[26]  It is well-settled that the Executive Branch has no authority to extradite a U.S. citizen absent a treaty, because "the Constitution creates no executive prerogative to dispose of the liberty of the individual."  *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 9 (1936).  Moreover, the Supreme Court has clarified that the Treaty Power cannot be used to restrict an individual's constitutional rights.  *See, e.g.*, *Reid v. Covert*, 354 U.S. 1, 16-17 (1957).  So, if neither Congress nor the Executive Branch could have abrogated the Taylors' Fourth Amendment rights not to be extradited absent probable cause, the Taylors went before Judge Cabell with their full Fourth Amendment liberty interests intact.[27]  There is no watered-down variant of the Fourth Amendment for extradition proceedings.

---

[26] *See* Dkt. 38 at 16 n.9.

[27] To be sure, extradition case law is a bit of a mess with inconsistent decisions and some that treat a U.S. citizen as no more than a pawn to be exchanged among sovereigns.  But *Valentine* confirms

And Judge Cabell agreed that he "applies the same standard of probable cause in international extradition hearings as used in preliminary hearings, in federal criminal proceedings." Cabell Op. at 6.  This is not just because 18 U.S.C. § 3184 so provides, but also because the federal judiciary exercises its authority under Article III in the extradition context, as evidenced by its authority to effectuate treaties and refuse Executive Branch requests to extradite even before the Extradition Act was passed.  *See United States v. Lawrence*, 3 U.S. (3 Dall.) 42, 53 (1795).[28]  Judge

---

that the Executive Branch has no power to extradite absent a treaty, and *Reid* confirms that the Treaty Power cannot be used to strip U.S. citizens of their constitutional rights.  U.S. courts are exercising their Article III judicial power in deciding whether Fourth Amendment requirements have been met and, since the Warren Era, the Supreme Court has more fully spelled out what these rights entail than was the case when the Supreme Court previously addressed many of these extradition issues.  It is time for extradition law to catch up.  Despite some unfortunate language in some opinions, other contemporaneous cases highlighted the need to protect constitutional rights in this context.  *See, e.g.*, *Grin v. Shine*, 187 U.S. 181, 184 (1902) (holding that extradition "treaties should be faithfully observed, and interpreted with a view to fulfill our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused").  The Supreme Court has said that extradition proceedings are "of a criminal nature."  *Rice v. Ames*, 180 U.S. 371, 374 (1901); *see also United States v. Doherty*, 786 F.2d 491, 500 (2d Cir. 1986) (Friendly, J.) ("[T]he Supreme Court and we have referred to [extradition proceedings] as being of a criminal nature.").  The Supreme Court also noted that extradition proceedings "assimilate very closely those ... for the arrest and detention of an alleged criminal."  *In re Strauss*, 197 U.S. 324, 333 (1905).  More recently, the United States acknowledged in briefs before the D.C. Circuit that "[e]xtradition proceedings ... are quasi-criminal rather than civil."  Supplemental Brief for the Appellants at 11, *Lobue v. Christopher*, 82 F.3d 1081 (D.C. Cir. 1996) (Nos. 95-5293, 95-5315).  The United States stated that "Section 3184 functionally grants the extradition judge exactly the same judicial power that a judicial officer exercises with respect to authorizing an arrest or making a preliminary determination of probable cause."  Brief in Support of the United States Motion to Dismiss, or, in the Alternative, for Summary Judgment, at 20, *Lobue v. Christopher*, 893 F. Supp. 65 (D.D.C. 1995) (No. 95-1097).  "[T]he extradition judge does not exercise 'executive' authority as that concept is used in connection with separation of powers."  *Id.*  Rather, the United States argued that "the extradition statute assigns judicial duties to judicial officers, who exercise judicial powers in their execution.  These judicial powers, moreover, are recognized as the same judicial powers exercised in authorizing arrests and finding probable cause."  *Id.* at 21.

[28] Even before the first Extradition Act was passed in 1848, Presidents recognized the need to utilize courts to issue arrest warrants in the extradition context, rather than proceed by executive order, and federal judges found Article III of the Constitution self-executing in giving them authority to effectuate extradition treaties.  *See, e.g.*, *In re Rob[b]ins*, 27 F. Cas. 825, 826-27, 832-33 (D.S.C. 1799).  Federal courts recognized that the involvement of federal judges in issuing arrest warrants was one of constitutional necessity.  *In re Metzger*, 17 F. Cas. 232, 233 (S.D.N.Y.

Cabell was therefore tasked under Article III with protecting the Taylors' constitutional rights and cannot have abdicated this role to any extent in deference to another authority.

In no other context would courts conclusively presume that any government—foreign or domestic—had accurately defined the scope of a criminal offense. The opposite is true. The Supreme Court has repeatedly made clear that the Constitution is designed to limit the power of the government over U.S. citizens, and that principle would be turned on its head if courts were to presume that the government necessarily and is always interpreting those statutes correctly. Courts exist to play referee, not to entrust the foxes with guarding the hen houses. The government's claim of "trust us" is never good enough where constitutional rights are at stake. *See, e.g.*, *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018); *McDonnell v. United States*, 136 S. Ct. 2355, 2372-73 (2016); *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Given the Taylors' constitutional rights and Judge Cabell's role as an officer of the federal judiciary, deference to foreign legal authorities on the substance of foreign law should be minimal, if ever, warranted in today's world where access to foreign legal resources and authorities is a matter of a few mouse clicks.[29] But to use such deference to curtail the evidence that may be

---

1847); *see* Christopher D. Man, *Extradition and Article III: A Historical Examination of "the Judicial Power of the United States,"* 10 Tul. J. Int'l & Comp. L. 37 (2002) (analyzing early extradition law to show the need for judicial involvement); M. Cherif Bassiouni, International Extradition: United States Law and Practice 67 (3d rev. ed. 1996) ("During that period [from 1794-1848], the proponents of the view that extradition treaties are self-executing prevailed and extradition proceedings were adjudicated by federal district courts on request of the President or the Secretary of State.").

[29] If the federal courts are equipped to hear expert testimony on some of the most technical and context-specific subject matter imaginable, such as in certain patent cases where the dispute often hinges on the specific meaning of a term in a unique, scientific context, surely they can hear competing expert testimony regarding a linguistically- or culturally-based dispute regarding a term's meaning—particularly at a time when issues in foreign law may be easily researched and when constitutional rights of American citizens are on the line. *See* Dkt. 38 at 12; *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018). The older extradition cases involving deference reflect an earlier era when deciding questions of foreign law were more

considered, as did Judge Cabell, is to limit the Taylors' substantive rights to a full and fair consideration of whether the facts alleged fit the crime asserted.[30]

While no one faults U.S. courts for seeking to avoid offending foreign sovereigns, that is not a constitutional value.  Protecting the liberty interests of U.S. citizens against being removed from their homes to be prosecuted in foreign lands without the government meeting its burden to establish probable cause is such a constitutional value.  Foreign prosecutors, like American prosecutors, are entitled to courtesy; but the Court should not concern themselves with hurt feelings where either ask for relief that does not square constitutional corners.  A conclusive presumption that foreign governments are right not only diminishes the rights of the accused, but of the judges who must engage in what would become sham hearings where a federal judge is reduced to a rubber stamp.  There must be more for a federal judge to do than ask whether the foreign government seeking the extradition of a U.S. citizen really means it when they claim the U.S. citizen violated its law.

In short, this Court should do what Judge Cabell did not do and consider the merits of the Taylor's contentions that the factual allegations made against them fail to state a violation of Japanese law.  While no one would expect this Court to be an expert of Japanese criminal law or

---

difficult than they are now.  They certainly do not—and constitutionally cannot—reflect that where foreign governments want U.S. courts to approve stripping U.S. citizens of their liberty in the extradition context, Article III courts are to give conclusive deference to foreign governments and submit to their demands.

[30] Judge Cabell cites *Matter of Extradition of Lui*, 939 F. Supp. 934, 949 (D. Mass. 1996), for the proposition that "comity and common sense" suggest that the "foreign judicial officer should be presumed to be more knowledgeable than the judicial officer in the United States about the foreign law."  Cabell Op. at 10.  Maybe so in a general sense.  American judges are seldom experts on every topic that comes before them, which is why they typically require legal briefings from both sides so that they can better understand and decide legal issues for themselves.  Judge Cabell received such briefings here but chose to depart from the judicial process by refusing to consider the arguments of one side and giving conclusive deference to the other.

a host of other issues that may come before it, the Court is surely experienced in reviewing legal issues with the benefit of briefing from both sides.  If the Court considers the merits of the Taylors' arguments, based on this now expanded record, the Court should have no difficulty in concluding that the government has not met its burden of establishing probable cause.

## CONCLUSION

For the reasons set forth above and in their previous submissions to this Court and to Judge Cabell, Petitioners Michael and Peter Taylor respectfully request that the Court grant their Verified Second Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief (Dkt. 47) and order their immediate release from custody.

Dated:  November 4, 2020

Respectfully submitted,

By their attorneys,

*/s/ Paul V. Kelly*
Paul V. Kelly (BBO No. 267010)
Jackson Lewis, P.C.
75 Park Plaza
Boston, MA  02110
Tel (617) 367-0025
paul.kelly@jacksonlewis.com

*/s/ Abbe David Lowell (by permission)*
Abbe D. Lowell (*pro hac vice*)
Christopher D. Man
Zachary B. Cohen
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
Tel. (202) 282-5875
adlowell@winston.com

*Counsel for Michael and Peter Taylor*

*/s/ Daniel Marino (by permission)*
Daniel Marino (*pro hac vice*)
dmarino@marinofinley.com

Tillman J. Finley (*pro hac vice*)
tfinley@marinofinley.com
MARINO FINLEY LLP
800 Connecticut Avenue, N.W., Suite 300
Washington, DC  20006
Tel.  202.223.8888

*Counsel for Michael L. Taylor*

/s/James P. Ulwick (by permission)
James P. Ulwick (*pro hac vice*)
KRAMON & GRAHAM PA
One South Street, Suite 2600
Baltimore, MD  21202
Tel. (410) 752-6030
JUlwick@kg-law.com

*Counsel for Peter M. Taylor*

## <u>CERTIFICATE OF SERVICE</u>

I, Paul V. Kelly, counsel for Petitioners Michael and Peter Taylor, hereby certify that on November 4, 2020, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

*/s/ Paul V. Kelly*
Paul V. Kelly