# Exhibit M

September 8, 2020

**Submission in Opposition to**

**Request for Extradition of Michael L. and Peter M. Taylor**

## EXECUTIVE SUMMARY

Japan has requested that the United States extradite Michael and Peter Taylor (natural born U.S. citizens and father and son) to be investigated and prosecuted for an alleged violation of Article 103 of the Japanese Penal Code, "Harboring of Criminals," by allegedly assisting former Nissan CEO, Carlos Ghosn Bichara, to leave Japan in violation of bail conditions to which he was subject pending his trial on charges relating to Nissan's financial filings and disclosures.

The U.S.-Japan Extradition Treaty expressly provides that the United States ***is not bound*** to extradite its own citizens (Article V), ***thus the U.S. is under no obligation to do what Japan asks***. There is no good reason for the U.S. to take the extraordinary step of electively extraditing the Taylors. In fact, for the reasons summarized below and detailed in the Taylors' submission, the surrounding facts and circumstances and the Taylors' personal history make it imperative that the U.S. refuse Japan's request—as this case demands that result and the U.S. is legally-entitled to do just that.

### *1. The Taylors have not committed an extraditable offense; it is not at all clear that the facts alleged even constitute an offense under Japanese law.*

Japan's request is premised upon a novel and unprecedented expansion of Article 103, which it now argues is articulated by implication and inference in the applications for warrants for the Taylors' arrest. Neither Taylor has been formally charged with a violation of Article 103, or any other offense. Unlike the U.S., current Japanese law does not make it a crime for a defendant to jump bail or for someone to assist in bail jumping. To get around this, Japan argues the Taylors committed the offense of "Harboring of Criminals" by assisting Mr. Ghosn to leave Japan and thereby "escape" trial on the charges against him. This theory of the offense, however, is contrary to the plain language of Article 103 and the entirety of the history of prosecutions and accumulated case law thereunder. Article 103 previously has only been applied to conduct involving working against law enforcement's active pursuit of a criminal to arrest him or someone escaping from jail. But there was no warrant for Mr. Ghosn's arrest, no one was looking for him, and he was not in detention.

Japan's request here is only even legally permissible under the Treaty if one assumes the Japanese courts will accept this proposed rewriting of Article 103. In issuing a certification of extraditability, the U.S. courts declined to interpret Article 103 or the case law under the statute, but the Secretary of State is not so constrained and can see Japan's putative crime for what it is: a broad construction of a criminal statute conceived of by an embarrassed prosecutor attempting to save face for himself and his country. Further, whether this theory succeeds or not in the Japanese courts, the Taylors will be punished just the same. They likely will serve as much, if not more, time in prison awaiting extradition and trial than they will receive as a sentence even if convicted. The U.S. should not extradite its own citizens so that the Japanese can test a novel legal theory on them which, even if successful, will result in a relatively minimal punishment likely to be something approximating time served.

### *2. If extradited, Japan would subject to the Taylors to oppressive and punitive practices in violation U.S. and international standards for the treatment of those charged with a crime.*

As shown by numerous international organizations and commenters, the experience of Mr. Ghosn and Greg Kelly in the underlying case and even in reports by Japanese lawyers and scholars,

the Taylors, if extradited to Japan, would face a highly flawed criminal-justice system that lacks many of the basic protections the Taylors would be afforded in the United States. Japan's "hostage justice" system is premised upon a practice of lengthy and coercive interrogation practices that violate international norms and established human rights conventions. Even if the Treaty obligated the U.S. to extradite the Taylors (which it does not), the U.S. still could not do so because extraditing the Taylors would violate the U.S.'s other treaty obligations recognizing basic human rights and protections for those accused of crimes.

### 3. Michael Taylor's very life is exposed to substantial risk by his continued detention as result of his unique vulnerability to COVID-19.

As a result of contracting Valley Fever and having a portion of a lung removed, Michael Taylor is especially susceptible to complications if he were to contract COVID-19. He would need to be immediately hospitalized and he would face a significant risk of death. Yet he remains detained in a Massachusetts jail where he is exposed to a heightened risk of exposure to the novel coronavirus, and his extradition to Japan would only serve to continue that exposure (if not increase it). Accordingly, extraditing Mr. Taylor presents a significant risk of imposing a death sentence for a non-crime.

### 4. Michael Taylor has a demonstrated history of extraordinary service to the U.S. government and his fellow citizens.

Michael Taylor is a decorated veteran, having served in the Special Forces for over a decade. Since leaving active duty, Mr. Taylor has responded to requests for assistance from various U.S. law enforcement and intelligence agencies in their battles against narcotics trafficking, money laundering, and terrorism. Mr. Taylor also has located and returned Americans abducted and taken abroad, including children and journalists. At home, Mr. Taylor has been a mentor to hundreds of young people as a football coach and community resource. He is a credit to the United States and someone deserving of its protection, not someone who should be sent abroad to satisfy a foreign prosecutor's ego-driven desire for vengeance.

### 5. Another country (Lebanon) already has determined the Taylors did not commit a crime.

Prosecutors in Lebanon investigated the events and determined no crime had been committed. This is yet another basis on which the Treaty (Article IV, § 2) permits the U.S. to refuse extradition.

### 6. Japan has freely exercised its right not to extradite its own nationals to the U.S. in cases involving far more serious crimes, and has actually subverted the Treaty by luring Americans to Japan under false pretenses so that it can prosecute them.

Japan's request is utterly inconsistent with its repeated denial of U.S. requests for the extradition of Japanese nationals accused of far greater wrongdoing, including three executives of the Takata Corporation indicted in 2016 for their involvement in a $1 *billion* wire fraud scheme relating to defective air bags that killed at least 24 people and injured 300 more. Further, the U.S. should not countenance Japan's hubris in invoking the Treaty to request the Taylors extradition where it worked around the treaty to deceive Greg Kelly (another former Nissan executive) to leave his home in Tennessee so that it could arrest him and charge him with involvement in Mr. Ghosn's alleged crimes.

\* \* \* \* \*

The Taylors harmed no one, and simply do not deserve the way they are being treated or the fate awaiting them at the hands of the Japanese legal system if they were extradited. It is, therefore, reasonable and proper (in fact, imperative) that the State Department deny Japan's request and protect the Taylors from this unfair extradition. Under the Treaty, the U.S. is simply not obligated to extradite the Taylors and there is no compelling reason for the U.S. to do so.

**Abbe David Lowell**
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5800
adlowell@winston.com

**Ty Cobb**
Ty Cobb, PLLC
3913 49th Street, N.W.
Washington, DC 20016
(202) 957-7881
gbhshof@gmail.com

September 8, 2020

**VIA ELECTRONIC MAIL (Extradition@state.gov)**

The Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C St. N.W.
Washington, DC, 20520

Re:    Japan's Requested Extradition of Michael and Peter Taylor

Dear Secretary Pompeo:

We write to you on behalf of Michael and Peter Taylor—two natural-born U.S. citizens and father and son—respectfully requesting that you not assent to the Government of Japan's request that the Taylors be extradited from their home in Massachusetts so that Japan can prosecute them for a purported criminal offense under Japanese law that has never before been applied in this context and that appears foreclosed by the language of the statute. The U.S.-Japan Extradition Treaty expressly provides that the United States is not bound to extradite its own citizens,[1] thus the U.S. is under no obligation to do what Japan asks. As set forth more fully below, Japan frequently flaunts requests from the US, particularly in antitrust, serious economic crimes, and even in cases where the conduct of Japanese corporations or executives resulted in American deaths. There is no good reason for the U.S. to take the extraordinary step of electively extraditing the Taylors in light of the facts and circumstances of this specific case and their personal backgrounds. Indeed, even if a conviction in Japan could be obtained, unless the Taylors were treated differently than others, it would result in a minimal sentence quite likely to involve less jail time than the Taylors already have spent awaiting extradition in the U.S. and would spend detained awaiting and during trial in Japan.

The novel nature of the alleged offense and the unusually low (for an extradition request) potential punishment (three years maximum, but most often far less for first offenders) here at issue are explained by the Government of Japan's desire to save face, or at least to be perceived to be doing something to address the embarrassment from the departure of former Nissan CEO Carlos Ghosn Bichara ("Ghosn") from Japan while released on bail. Ghosn was awaiting trial in a controversial, politically tinged, and internationally maligned prosecution of both himself and Greg Kelly, another former Nissan executive (and an American), for alleged financial crimes relating to Ghosn's compensation at Nissan. In December 2019, the Taylors are alleged to have assisted Ghosn in departing from Japan via private jet in violation of

---

[1] Treaty on Extradition Between the United States of America and Japan, Mar. 3, 1978, 31 U.S.T. 892, T.I.A.S. No. 9625 ("Treaty"), at Article V.

Ghosn's Japanese pre-trial bail conditions.  In the wake of Ghosn's much-publicized departure from Japan, there has been a great push in Japan to adopt laws that would now make bail jumping a crime.  But at the time (and to this day), it was not a crime under Japanese law to jump bail or to assist another in doing so.  The Taylors may well have been accomplices to Ghosn's violation of certain Japanese immigration statutes, but any such offense is a mere misdemeanor under Japanese law and thus not an extraditable offense under the applicable Treaty.  The Taylors committed no felony offense, and hence, cannot be legally extradited.

As many commentators have observed, the Government of Japan was embarrassed with what Ghosn's departure revealed about its legal system and the ease with which Ghosn was able to leave the country.  Unable to obtain Ghosn's return from Lebanon and unable to bring charges against his wife or family members who also participated in his departure, Japan has attempted to save face by seeking the Taylors' extradition on a novel and wholly unprecedented theory that the Taylors committed a felony violation of Article 103 of the Japanese Penal Code, which prohibits the "Harboring of Criminals."  Many have agreed that Japan's relentless pursuit is a public relations effort premised upon an extraordinarily tenuous interpretation of its criminal laws designed not so much as to achieve a conviction, but to inflict punishment on those who helped Ghosn by disrupting their lives and subjecting them to the process of extradition to and interrogation and prosecution in Japan.

The U.S. courts, citing to their limited role in the extradition process, have simply deferred to Japan's expansive new interpretation of its own law and have certified the Taylors' extraditability without considering the Japanese statutory language for themselves—deference that the extradition court stated explicitly it was doing.  In that undue deference, U.S. courts have reduced their role to being mere rubber stamps for what a far from objective Japanese prosecutor has announced the law there to be.  There is not much point in asking a U.S. court whether probable cause exists if it is going to defer completely to the very government seeking extradition on the question of whether probable cause exists.  Nevertheless, the U.S. courts have not held that the United States is powerless to prevent an unjust prosecution.  Instead, they have simply stepped aside so that the U.S. State Department is functionally the only protector of U.S. citizens under the applicable Treaty.

The standard, minimal potential punishment and the highly novel nature of Japan's theory of the offense make this a case for which extradition *should not be legally permissible*.  But even if it were, the U.S.-Japan Extradition Treaty makes clear that neither country is obligated to extradite its own citizens even if the Treaty permits it,[2] a privilege Japan has not hesitated to exercise in refusing U.S. requests for the extradition of Japanese nationals charged with far more serious crimes involving far more serious harm (including loss of life).  Japan has done nothing to warrant the U.S. assenting to a dubious extradition request to permit a tenuous and pointless prosecution of American citizens that would achieve little beyond political face-saving for the Japanese government.  Indeed, in the underlying prosecution of Messrs. Ghosn and Kelly, Japan *affirmatively worked around the Treaty* by not requesting extradition in a straightforward fashion, but instead enlisting rival Nissan officials to lure Mr. Kelly deceitfully from his home in Tennessee to Japan under false pretenses so that it could arrest and prosecute him.

---

[2] Treaty, Article V.

All of the above makes this a case in which the United States has no good reason to surrender its own citizens to another country for criminal prosecution.  But the Taylors are not just any U.S. citizens.  Michael Taylor is a true American hero—a U.S. Army Special Forces, Green Beret veteran whose service to his country and others did not end with his retirement from active duty, but became the defining attribute of his life.  His empathy and commitment to service is reflected throughout the course of his life, from providing security and protection services to government officials and private companies in the U.S. and abroad, to risking his business interests and even his life to rescue children and others kidnapped or held hostage overseas, to acting as a source and operative for numerous law enforcement and intelligence operations, to serving as a football coach and mentor to countless teen boys from all manner of backgrounds.  Peter Taylor is a 27-year-old young man with no criminal history simply trying to make his way in the world and to find a way to impact the lives of others in the way his father has.  Yet, at Japan's instance, they both sit in a Massachusetts jail, unable to live their lives and subject to heightened risk of exposure to the COVID-19 virus, a risk that is very much a matter of life and death for Michael Taylor given his medical history.  Accordingly, handing the Taylors over to the Japanese to use and abuse for their own purposes would amount to a national tragedy.

As detailed herein, the Taylors should not be extradited to Japan because:

1.    They have not committed an offense under Japanese law for which extradition is authorized under the U.S.-Japan Extradition Treaty;

2.    If extradited to Japan, the Taylors (who would not be given bail or the right to return to the U.S. during proceedings) are likely to be treated in a way that violates fundamental notions of due process: the right to a speedy trial, the right not to be subjected to lengthy and coercive interrogation in the absence of counsel, protection against cruel and unusual punishment, the presumption of innocence, the right against self-incrimination, and other rights we cherish and that the U.S. and the rest of the civilized world have recognized through various international treaties and human rights conventions;

3.    Continued detention and extradition to be detained in Japan would present a substantial risk to the life of Michael Taylor, who is especially susceptible to complications (including certain hospitalization and high risk of death) if he were to contract COVID-19;

4.    Michael Taylor's history of service to this country and others, including placing himself and his business at risk to assist U.S. intelligence-gathering and law enforcement efforts and to rescue children and others held against their will overseas by kidnappers and terrorists, make him and his son people the United States should protect, not sacrifice to the face-saving zeal of foreign prosecutors;

5.    Prosecutors in Lebanon have already concluded the Taylors did not violate Japanese law and the Taylor should not have to undergo another proceeding; and

6.    Japan does not have clean hands here.  Japan's request (advanced by the very same prosecutor pursuing Messrs. Ghosn and Kelly) is utterly inconsistent with Japan's repeated denial of U.S. requests for the extradition of Japanese nationals accused of far greater wrongdoing and its own deception of Mr. Kelly in lieu of requesting his extradition.

Accordingly, we respectfully request that you refuse to issue a warrant for the surrender of either of the Taylors to Japan and direct their immediate release from the Massachusetts local jail where they already have been held for more than three months.

## I.      LEGAL AUTHORITY AND FRAMEWORK

Under the Treaty and 18 U.S.C. § 3186, you have the ultimate and absolute authority to decide whether to extradite the Taylors, since they both are U.S. citizens.[3]  Article V of the Treaty expressly provides that the U.S. "shall not be bound to extradite its own nationals," though it may do so in its discretion.

U.S. law vests the sole power to make this determination in the Secretary of State.  While a judicial officer (here, U.S. Magistrate Judge Donald Cabell) conducts an initial extradition proceeding under 18 U.S.C. § 3184, that inquiry is ordinarily limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered.  As noted below, Judge Cabell took the most minimalist approach possible.  "The larger assessment of extradition and its consequences is committed to the Secretary of State."[4]  As such, the Secretary of State has the authority to review the judicial officer's findings and conclusions *de novo*, to reject the judicial officer's certification of extraditability as erroneous, and/or to decline to extradite the Taylors for any reason whatsoever, including but not limited to any number of humanitarian and foreign policy considerations.[5]  "Extradition ultimately remains an Executive function.  After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender.  The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not."[6]

## II.      FACTUAL BACKGROUND

### A.      Michael Taylor

Michael Taylor's record demonstrates a lifetime of devotion to his country and service, whether as a soldier, private businessman, coach, or in aiding U.S. law enforcement and intelligence agencies.

#### 1.      *Personal Life*

Michael has been married to his wife, Lamia, for more than 30 years and has three sons, all college graduates.  He has lived in the same house in Harvard, Massachusetts since 1991.  He cares for his adoptive

---

[3] *See, e.g.*, *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997) ("It is … within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited."); *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs.").

[4] *Kin-Hong*, 110 F.3d at 110.

[5] *Id.* at 109; *see also Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007).

[6] *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993).

stepfather, a disabled Veteran, who suffers from limited mobility, diabetes and Parkinson's disease. Michael also coaches youth and high school football and is a highly regarded and well-known mentor to young men—many of whom come from dysfunctional or broken homes—in his neighborhood and community.

    *2.    Military Service*

    Immediately upon graduating high school, Michael decided to follow in his adoptive stepfather's footsteps and enlisted in the United States Army rather than attend college. At the time of his original enlistment, he was the distinguished honor graduate of basic and advanced training. After basic and advanced training, Michael participated in an experiment the U.S Special Forces command was conducting, which allowed new members in the Army to try out for the Special Forces. Historically, any person trying out to be a member of Special Forces had to have served at least one tour of duty, which was four years of service, and be a sergeant. Michael was one of the few men to complete the selection course at the John F. Kennedy U.S Institute of Military Assistance, Special Forces School. After successfully completing this school, he was assigned to the 10th Special Forces Group at Fort Devens, Massachusetts.

    From 1979 to 1983, Michael served on active duty as part of a High Altitude-Low Opening ("HALO") Team. HALO is a technique of parachuting from an aircraft at 30,000 to 40,000 feet by first free-falling for an extended period of time and waiting to open the parachute until at a low altitude, just about 2,000 feet. While serving in the Special Forces, he was always on-call for worldwide deployment. Some of his responsibilities included Special Atomic Demolition Munition ("SADM") missions. SADMs, sometimes referred to as "suitcase nukes," were man-portable nuclear weapons fielded by the United States during the Cold War. They were a crucial part of the government's strategic plan in the event of a Soviet invasion of Western Europe. Public sources report the SADM team was trained and prepared to parachute into the Fulda Gap (a lowland area between the former East German border and Frankfurt considered to be an obvious route for a Soviet ground assault on Germany) where they would use the SADMs to destroy, irradiate, and/or otherwise compromise key routes, power plants, bridges, dams, and so forth and then quickly exfiltrate. Michael was one of the elite Special Forces personnel entrusted with this critical and (at the time) highly secretive work and he held a Top Secret security clearance.

    Michael's other principal service while on active duty related to the Middle East. After the assassination of the Lebanese president-elect in September 1982 and the Israeli invasion of Lebanon, he was selected among his Special Forces peers to be on the first Special Forces team deployed into Beirut, Lebanon. This assignment consisted of numerous combat operations in conjunction with the Lebanese Forces whom they trained, assisted, and advised in combat operations. It was through this work that Michael began what would become a lifelong relationship with the Lebanese Christian community.

    In November 1983, Michael left active duty, receiving an honorable discharge at the rank of E-6. He served as a reservist for approximately ten years. He was activated in 1991 during the first Gulf War, but was unable to deploy due to the request of the Department of Justice as he was at the time working as an undercover operative in the midst of a four-year major international drug trafficking investigation.

Michael's military service remains the professional accomplishment of which he is proudest. It has been the defining experience of his life and he has never failed to answer the call from his country. His wife, Lamia, recalls that in 1991, when he received the telegram recalling him to active duty to serve in the Gulf War, he simply put it down on the kitchen table without hesitation, kissed their then 20- and nine-month old sons, and started packing his military gear to deploy.

3.      *Civilian Career*

After briefly working as an investigator with the office of the Massachusetts Attorney General, Michael returned to Lebanon as a private contractor providing military training to Lebanese Christian forces. Through this work and his previous time in Lebanon on active duty, he established contacts throughout Lebanon and the Middle East with a variety of individuals from all manner of backgrounds. He learned to speak Arabic, and it was during this period that he continued his courtship of his future wife, Lamia. The Taylors were married in 1985.

After the conclusion of Michael's work in Lebanon, the Taylors returned home to Massachusetts in 1985. Putting his military and contracting experience to use, Michael worked for various American security companies providing personal security and other services. In 1988, he and a partner established North America Security Consultants, Inc.

In September 1994, however, Michael struck out on his own and started American International Security Corporation ("AISC"). From 1994 through 2011, he grew AISC into a successful business serving both private sector and governmental customers. AISC offered security consulting and protection services, both domestically and internationally (including in Iraq and Afghanistan).

AISC's wide range of clients included everything from large international concerns such as airlines, oil companies, and media companies with security needs around the world to local institutions or events like hospitals and the circus. In addition, AISC performed a variety of security, training, and maintenance work for the U.S. Government as a subcontractor on various projects. Such work included projects in support of the military's efforts in Iraq, specifically (1) providing property bookkeeping and weapons maintenance services and training Iraqi nationals under a subcontract on a $20 million BPA for Iraqi Protection Details; (2) serving as a subcontractor providing security logistics and weapons support on a $6 million security contract for the U.S. Department of Justice - Iraqi Special Tribunal & Mass Grave Exhumation conducted by the Regimes Crime Liaison Office; and (3) establishing an armory and performing contractor-furnished equipment property control as a subcontractor on an $11 million security program for the NATO Military Training Academy Headquarters in Iraq.

AISC consistently provided high quality work for its customers. For example, Robert L. Rubin, the former Senior Vice President of a large security company, provides an account of how he came to know and respect Mr. Taylor professionally based upon his first-hand experience with Michael's work.[7] As Mr. Rubin recounts, he engaged AISC to represent the interests of his former employer (a large security

---

[7] Ex. 21 (Robert L. Rubin Letter).

contractor for the U.S. Government) on several projects in the Middle East and, "[i]n one particular instance, we were engaged by armed criminals who sought to take us hostage. In that instance, Mr. Taylor was smart, decisive and thoughtful in his direction of the team that caused a very dangerous situation to end safely without any loss of life."[8] "In yet another situation, Mr. Taylor tireless[ly] advocated for the fair treatment of one of **my** host country nationals employees who had been injured in our service, eventually bringing that individual to the United States for treatment."[9]

Michael, on his own and through AISC, has provided a wide-range of assistance to various U.S. law enforcement and intelligence efforts. During 1988 through 1991, he worked in the primary undercover role assisting a multi-agency investigation into an international money laundering and hashish trafficking conspiracy. Using his contacts in Lebanon and his Arabic language abilities, Michael was able to make contact and develop relationships with some of the conspirators and filmed footage of the Syrian-controlled drug fields where the hashish was produced. He provided detailed information to the government regarding the traffickers and their plans. In September 1991, the investigation culminated with the seizure of more than 6,000 pounds of hashish (with a street value in excess of $100 million) destined for distribution by a Montreal-based crime syndicate. Seven individuals were indicted for racketeering, conspiracy, and other crimes.[10] FBI Agent Thomas Daly (Ret.), who was the lead agent on the New England Organized Crime Drug Enforcement Task Force in the early 1990s, has provided a letter describing Michael's role in this matter.[11] He concludes that the operation would not "have been possible without the determined and courageous efforts of Michael Taylor. He spent hundreds of hours over several years acting in an undercover capacity, at substantial risk to himself. He should be recognized and credited for these efforts."[12]

In 1992, Michael assisted the Customs Service and Secret Service in connection with the investigation of a supernote[13] scheme in which individuals in Iran and Lebanon appeared to be involved. Upon the government's request, he traveled to Beirut and found out where and how the supernotes were being manufactured. According to sources Michael was able to identify and cultivate, the bills were being created by a group of Iranians who had worked for the Shah prior to the Iranian Revolution in 1979 utilizing information and materials they had obtained from the United States prior to the fall of the Shah. He arranged for an inside source to agree to travel to London to meet with investigators and accompanied him to the meeting.[14]

---

[8] *Id.*

[9] *Id.* (emphasis in original).

[10] *See United States v. Peter Kattar*, No. 1:91-cr-10247-DPW (D. Mass.).

[11] Ex. 22 (Letter from T. Daly).

[12] *Id.*

[13] Supernotes are very high quality counterfeit U.S. hundred-dollar bills.

[14] *See* Christopher Drew and Stephen Engelberg, New York Times, *Super-Counterfeit $100's Baffle U.S.* (Feb. 27, 1996), *available at*: https://nyti.ms/31OdKVy.

In 2012, Michael was the key player and critical link in one of the most important DEA operations in history.  Group Supervisor Agent Ric Bachour,[15] a DEA agent based in Miami (but at the time working in Bogota, Columbia) had received a call from a source highly connected in the Middle East, who had been contacted by Hezbollah for help moving $3 billion in gold bars from Egypt to Hezbollah in Lebanon.  Over the course of several months, Michael was able to work his way up the proverbial "food chain" and met with the top three targets in Cairo, Egypt.  The ultimate plan was to have the gold bars turned over to him or to any other contact he could arrange, ostensibly to move them out of Egypt by water, at which point he and the DEA would move them to the United States instead, a "clean rip" as Agent Bachour described it.  In the process, opportunities emerged for Michael to infiltrate other DEA targets, at levels the DEA had been trying, according to Agent Bachour, to "plug into" for years without success.  Specifically, Michael turned up two high-value targets on the terrorist watch list who he was aware were FBI targets and he met directly with those targets.  However, as a result of the Obama Justice Department's arrest and detention of Michael in the fall of 2012,[16] despite repeated pleas by the DEA to allow him to complete the operation or find a suitable replacement, the DEA was forced to shut down the operation and approximately $3 billion in gold presumably was received by a terrorist organization instead of being intercepted by the DEA.

In 2016, the government again requested Michael's assistance in connection with international investigative efforts of a sensitive nature.  Because it was anticipated that the Government would ask him to travel internationally in connection with these efforts, the government conferred with the Probation Office in the District of Massachusetts.  On November 3, 2016, based upon a sealed, unopposed motion, the Court granted Michael permission to travel internationally and terminated his period of supervised release early.

In 2017, Michael received a call from a man he had met while in Egypt working on the potential gold "rip" with the DEA.  The man told him about some people he knew that had swindled millions of dollars from American and European banks.  The scheme involved individuals in Italy, Jordan, and Russia, and an insider at Visa.  Having had previous contact with the Department of Treasury regarding a dual citizen of the U.S. and a Middle Eastern company evading tens of millions of dollars in taxes, Michael contacted the same agents and informed them of what the man in Egypt had reported to him.  Department

---

[15] Agent Bachour has been with the DEA for over 17 years.  Prior to that, he was a Revere, Massachusetts police officer and Massachusetts State Trooper.  He is also a Marine Reservist who served on active duty and was seriously wounded in the Battle of Fallujuh.  As the Group Supervisor for Group 44 in Miami, he was responsible for complex international money-laundering investigations.

[16] The Utah charges against Mr. Taylor resulted from an investigation by the U.S. Attorney's Office in the District of Utah of the 2007 procurement of a contract for the training of Afghan soldiers awarded to AISC and subsequent attempts by an overzealous and corrupt former FBI agent to interfere with that investigation in the hopes of currying favor with Mr. Taylor and potential employment upon his anticipated retirement.  The judge assigned to the case (who had previously made improper donations to the Obama campaign and misrepresented her occupation in doing so) initially recused herself based upon her husband's law firm's involvement in the case, but later (and in violation of the court's local rules regarding case assignment) reassigned the case to herself after her husband's law firm abruptly withdrew.  The judge then insisted on detaining Mr. Taylor while repeatedly continuing the trials over his objections.  After 14 months in a Utah jail, prosecutors desperate to end the floundering case made Mr. Taylor an offer too good to refuse: if he would plead to just something, anything, they would release him immediately to join his family for Thanksgiving, return $2 million seized from AISC, impose no fines, and recommend a sentence of time served.  Mr. Taylor agreed.

of Treasury agents got DHS and ICE involved with the case and worked it jointly.  After several meetings, the government asked Michael to travel to Jordan and meet with the mastermind of this corrupt operation. He traveled to Jordan, and while working with the internal security of Jordan, IRS and ICE, Michael had several undercover meetings.  Michael ultimately was able to convince some of the conspirators to travel to the U.S. and conduct the fraud here.  They were arrested, successfully prosecuted and sent to prison.

4.   *Michael's Long History of Repatriating Americans*

Throughout his career, Michael has located and returned to the U.S. Americans abducted and taken abroad.  He has been especially instrumental in locating children taken to the Middle East by parents without custody rights and safely returning them to their homes in the U.S.  In one instance, Michael and AISC assisted in the safe return of a young girl whose father abducted her to Lebanon in 1993, an operation that finally ended successfully four and a half years later in 1997.  In many of these cases, he went beyond the required scope of work and arranged meetings for the mothers involved with others who have gone through similar situations, to help them deal with their grief.

One of these parents, Anaiss Sebastian, recounts that when her son was illegally taken to Beirut during the Syrian occupation, the U.S. and foreign governments were unable to help her.[17]  She explains that when faced with no other options, Michael stepped up, "saved my son and returned him to me."[18]  Ms. Sebastian emphasizes that Michael did this work even though he didn't know her, wasn't expecting to profit off of his work, and had no plans to publicize it.[19]

In another example, in 2009, Michael planned, coordinated, and executed the rescue of *New York Times* journalist, David Rohde, from a Taliban stronghold in Pakistan.

5.   *Community and Kids*

Michael's generosity and eagerness to help others extends even further.  Over his numerous years coaching youth and high school football, one parent explains that Michael "has taught many young men the fundamental skills of football; but, more importantly he has taught them respect, dedication and teamwork…. I know this firsthand because my son was lucky enough to have Mike as his coach for several years."[20]  In addition to coaching football, he has served as a mentor to the young men in his neighborhood and community.[21]  Michael has assisted these youths "in all aspects of their lives – academics, social, and emotional."[22]  He has coached those in his community "not just on the field but also about life – being a man, handling responsibilities and being an upstanding citizen….  [N]ot only with words, but by walking

---

[17] Ex. 23 (Letter from Anaiss Sebastian).

[18] *Id.*

[19] *Id.*

[20] *See* Ex. 24 (Letter from K. Wallace).

[21] *See, e.g.,* Ex. 25 (Letter from H. Horne).

[22] *Id.*

his talk and demonstrating positive living through the concept of community based philanthropy."[23]   One parent reports that "[o]ne of my sons even wrote about life lessons learned from Michael for his college essay, that 'anything is possible if you work hard for your goals and believe in yourself.'"[24]

Many of the youths Michael has coached and/or mentored have been "from dysfunctional families or broken homes struggling to make ends meet."[25]   He "guided and encouraged many young lads who otherwise would have gone astray."[26]   He has had such a positive impact on these young men that "many of these kids continue to stop by and visit with Michael and Lamia, sharing their successes and seeking continued guidance."[27]

Michael assisted many of these young people in obtaining scholarships so they could pursue a higher education and strive to continue improving themselves, and in some cases he even paid for their tuition himself.[28]   Michael is known "for helping student [athletes] get in to colleges and get a free education by playing football."[29]   In one year alone, one parent explains that "out of the 15 football players in my son's graduating class of 60 students, 9 of those boys went on to a NCAA Division I or an Ivy League school to play a sport with either a full or partial scholarship" thanks in no small part to Michael's tutelage.[30]   Moreover, Michael "used his personal resources to provide equipment and meals for players in need of financial support," even as a volunteer coach for a high school team seeking a suitable replacement for the previous coach's sudden departure.[31]

It is not only football players that Michael has mentored; he helped student-athletes from other sports, particularly those "who were not as privileged as some of our other students."[32]   He even paid the tuition of a female student athlete—anonymously—when he found out her father had become unemployed and that she might be unable to return to school as a result.[33]

---

[23] *See* Ex. 26 (Letter from F. Ricci).

[24] *See* Ex. 27 (Letter from E. Sweeney).

[25] *See id.*; *see also* Ex. 28 (Letter from D. Dolan); Ex. 29 (Letter from A. Knight); Ex. 30 (Letter from J. Lark).

[26] Ex. 28 (Letter from D. Dolan).

[27] Ex. 27 (Letter from E. Sweeney).

[28] Ex. 26 (Letter from F. Ricci); Ex. 29 (Letter from A. Knight); Ex. 30 (Letter from J. Lark); Ex. 32 (Letter from D. Parker); Ex. 33 (Letter from S. Sweeney).

[29] Ex. 30 (Letter from J. Lark).

[30] Ex. 26 (Letter from F. Ricci).

[31] *See* Ex. 34 (Letter from P. Giovacchini).

[32] Ex. 31 (Letter from J. Flannery); Ex. 34 (Letter from P. Giovacchini).

[33] Ex. 31 (Letter from J. Flannery).

Michael consistently goes above and beyond for those in his community, as well as those brought into his community.[34]  Although Mr. Knight reports that he "was on a one-way train heading to disaster" and "becoming more self-destructive by the day," Michael took a chance on him and helped him receive a high school scholarship and counseling.  He even assisted Mr. Knight in finding a new school after he was expelled from his prep school.[35]  Mr. Knight credits Michael with helping him towards the college degree he is about to receive and says that he will "be a productive citizen in my country because of Coach Taylor. Though I no longer need his help like I used to, he never [ceases] to amaze me…. He'll never give up on us."[36]

## B.      Peter Taylor

Peter Taylor is 27 years old and a lifelong resident of Massachusetts.  He is a 2011 graduate of the Lawrence Academy, where he played football and basketball.  After high school, Peter enrolled at Bentley University, majoring in economics and finance.  When his family had financial issues, it was not possible for Peter to continue his studies at Bentley.  He enrolled at the Lebanese-American University in Byblos, Lebanon, where his family had a modest condominium nearby.  Peter commuted to the university and studied banking and finance; he graduated with a bachelor's degree in 2015.

For the past several years, Peter has intermittently resided in Lebanon with his brother.  Peter, who has no criminal history whatsoever, considers Massachusetts his home and plans to settle and reside there. He occasionally travelled back to Lebanon to visit with family, classmates and friends, and to start a new business.  In or about January 2019, Peter started a digital marketing business.  He has spent the majority of the past 15 months residing with his older brother in Lebanon and building his business and assisting with his father's vitamin water business.  Peter's goal has been to return to Massachusetts full-time once his business is more fully established.

## C.      Japan's Prosecution of Former Nissan CEO Carlos Ghosn Bichara

Questionable motivations, oppressive tactics, and political agendas marked the investigation and prosecution of Ghosn from the outset.  Ghosn has long been the subject of ire from the Japanese government.  He came to Nissan from Renault, where he was an executive, in the early 2000s, when Renault purchased a sizable stake in Nissan while that company was distressed.[37]  Within six years, Nissan went from the verge of calamity to being the second largest automobile manufacturer in Japan.[38]  Despite this

---

[34] Ex. 29 (Letter from A. Knight).

[35] *See id.*

[36] *Id.*

[37] Amy Chozick and Motoko Rich, New York Times, *The Rise and Fall of Carlos Ghosn* (Dec. 30, 2018), *available at* https://nyti.ms/2GiOTkF.

[38] *Id.*

success, "[a]lmost from the moment Renault salvaged Nissan in exchange for the controlling stake, the French company's power bred resentment inside [Nissan and Japan]."[39]

The discontent of the Government of Japan and like-minded employees at Nissan with a French company controlling so prominent a Japanese manufacturer combined to cause Ghosn's downfall.  In 2015, the French government decided to increase its share in Renault and double its voting rights.  This led to increased bitterness from Nissan and Japanese officials.  Various Nissan executives began colluding with the Japanese government to oppose Ghosn and his plans to strengthen the relationship between Nissan and Renault further.[40]  As one journalist put it following a lengthy investigation into the plot, "[a]larmed by Ghosn's pledge in early 2018 to make the alliance between the companies irreversible, senior managers at the Japanese automaker discussed their concern at how the chairman of both Nissan and Renault was taking steps toward further convergence," which resulted in internal campaign to remove Ghosn "'before it's too late.'"[41]  Coincidentally, the Japanese National Diet passed an amendment to the Code of Criminal Procedure to introduce a new plea bargaining framework, which became effective on June 1, 2018.[42]  People inside Nissan went to, and worked with, prosecutors who were also eager to use such new plea bargaining framework, to "cooperate" with prosecutors by providing statements supporting Ghosn's wrongdoings (so-called "confession statements"), emails, and other internal documents, and to set the prosecution into motion while securing non-indictment bargains for themselves, which appear to be just the second deal prosecutors agreed to since the enactment of the new plea bargaining framework.[43]  Ghosn was eventually arrested and charged in late 2018 with causing Nissan to file false financial reports by understating his income.

The Japanese initially arrested Ghosn in November 2018, but repeatedly rearrested him on slightly different charges so as to prolong his detention.  Japan did not release Ghosn on bail until April 25, 2019.  During his five-month detention, Ghosn was kept in solitary confinement in a tiny cell while being allowed outside for only 30 minutes a day, only on weekdays.  Lights were left on around-the-clock.  Ghosn was "interrogated day and night," sometimes for up to eight hours at a time and continuing through weekends,

---

[39] Reed Stevenson, Bloomberg, *How a Powerful Nissan Insider Tore Apart Carlos Ghosn's Legacy* (Aug. 27, 2020), *available at* https://bloom.bg/2QzpZiC.

[40] Reed Stevenson, Bloomberg, *Nissan Email Trail Casts New Light on Carlos Ghosn Takedown* (June 14, 2020), *available at* https://bloom.bg/3gV9RCU.

[41] *Id.*

[42] Nikkei Asian Review, *Ghosn's Ex-Close Aides Escape Indictment Through Plea Bargain* (May 10, 2019), *available at* https://s nikkei.com/2F6BoUX.

[43] *Id.*

Hon. Mike Pompeo
September 8, 2020
Page 13

Thanksgiving and Christmas—all without a lawyer present.[44]  As Ghosn observed, "It's not very difficult to come to the conclusion that you're going to die in Japan or you have to get out."[45]

Ghosn's treatment, and the questionable nature of the charges against him, produced widespread international criticism of Japan's prosecution and its justice system in general.[46]  There was no precedent for Japan charging someone criminally for alleged false reporting of executive compensation in company filings and, as Messrs. Ghosn and Kelly have noted in their defense, Ghosn never actually received the compensation that allegedly was not reported.  Even the Japanese Prime Minister Shinzo Abe has been quoted as suggesting that this matter should have been handled internally at Nissan, not with a criminal prosecution.[47]

## D.     History of Legal Proceedings Against the Taylors

Following Ghosn's departure from Japan and international press reports as early as January 3, 2020 identifying the Taylors as having been involved, Japanese law enforcement authorities commenced an investigation.  The investigative efforts were memorialized in a series of reports, all of which begin by describing the investigation "of suspected violations of the Immigration Control and Refugee Recognition Act by suspect Carlos Ghosn Bichara…."[48]  (None of these reports, or any other investigative documents, make any reference to Article 103 or the harboring of criminals until *June 2020*—after extradition proceedings already had begun.)

Japan issued warrants for the Taylors' arrests on January 30, 2020, and renewed the warrants on February 28, 2020.[49]  The February warrants were valid only for six months, and expired more than a week ago, on August 28, 2020.[50]  To our knowledge, Japan has not obtained a further renewal, as is specifically required under the Treaty.[51]  The arrest warrants themselves do not identify any specific crimes for which the Taylors' arrest is sought; instead, they simply reference the Requests for Arrest Warrant submitted by the Japanese prosecutor (notably the same prosecutor pursuing Messrs. Ghosn and Kelly).  Those requests

---

[44] Simon Denyer, Liz Sly and, Asser Khattab, The Washington Post, *Carlos Ghosn Complains of 'Corrupt,' 'Inhumane' Justice System in Japan in First Public Appearance Since Escape* (Jan. 8, 2020), *available at* https://wapo.st/2QY3fZy; Yuri Kageyama, Associated Press, *Ghosn Faced 7 Hours a Day of Questioning in Japan: Lawyer* (Jan. 12, 2020), *available at* https://fxn.ws/3jE6jXk.

[45] Denyer, et al., *supra* n.10.

[46] *See, e.g.*, Kyodo News, *Macron Repeatedly Told Abe he Saw Ghosn's Treatment as Unsatisfactory* (Jan. 16, 2020), *available at* https://bit.ly/2Z4cjAA.

[47] Hironori Takechi, The Mainichi, *Japan PM Abe had Hoped Nissan would 'Deal with Ghosn Case Internally': Reports* (Jan. 9, 2020), *available at* https://bit.ly/3lPcOsb.

[48] *See, e.g.*, Ex. 1 at EX-Taylor, M.-00051; Ex. 2 at EX-Taylor, P.-00051.  The two extradition requests are substantively the same.  Below, we will refer only to the extradition request with respect to Michael Taylor (Ex. 1).

[49] Exs. 3 and 4 (Warrants).

[50] *See id.*

[51] *See* Treaty, Art. VIII § 3(a).

do not cite Article 103—the only statutes cited in the Requests are Articles 71 and 25 of the Immigration Control and Refugee Recognition Act, misdemeanor offenses.[52]

The Japanese arrest warrants quickly became public and were widely reported in the press. When they became aware of the warrants in late January and early February, the Taylors were in Lebanon, which lacks an extradition treaty with Japan.[53] Fully aware of the Japanese warrants, that Lebanon did not have an extradition treaty with Japan, that the U.S. was one of the few countries that did, and that Japan would likely seek their extradition if they returned to the United States, the Taylors nonetheless returned to their home in Harvard, Massachusetts (Michael returning in mid-February and Peter following in March).[54]

On May 6, 2020, at Japan's request, DOJ filed complaints for the provisional arrests of the Taylors, obtained U.S. warrants, and arrested both Taylors at their family home in the early morning hours of May 20, 2020. They have been held in federal custody at the Norfolk County Correctional Center ever since.

The Taylors moved to quash the provisional arrest warrants, or in the alternative, for bail. Magistrate Judge Donald Cabell in Massachusetts denied both requests,[55] and District Judge Indira Talwani subsequently denied the Taylors' habeas requests for emergency injunctive relief.[56] Although Magistrate Judge Cabell and Judge Talwani reached their conclusions in different ways, two key common threads exist between the opinions: (1) both judges expressed a reticence to interpret foreign law, even when the Taylors pointed out the unprecedented application of the felony statute then being alleged, and (2) along similar lines, both judges deferred to the declarations of the very Japanese prosecutor pursuing the case against both the Taylors and Ghosn in Japan over the Taylors' neutral expert.[57] That is not surprising given the highly constrained nature of courts' review in extradition proceedings, where long-standing precedent leaves all but the most obvious flaws in the process to resolution by the State Department.[58]

Following additional briefing, Judge Cabell held the extradition hearing on August 28, 2020. During the hearing, Judge Cabell reiterated his view that the issues with the supposed Japanese crime and equities of sending the Taylors back to a country which often ignores our own requests were better heard by the State Department. On September 4, 2020, Judge Cabell issued a written opinion certifying the

---

[52] *See* Exs. 3 and 4. The Requests do begin with a declaration that employs, in part, the words that make up the *title* of Article 103 (*i.e.*, "harboring of criminals"). However, the language used in Annex 3 to describe the facts of the alleged offense are inconsistent Article 103's plain terms and with the meaning of that statute. *See* Ex. 11 (Second Supp. Cleary Decl.) ¶¶ 7-11.

[53] Ex. 5 (Marino Decl. ¶ 3).

[54] *Id.* ¶¶ 2-5.

[55] Ex. 6 (Opinion on Motion to Quash).

[56] Ex. 7 (Opinion on Preliminary Injunction).

[57] *See* Ex. 6 at 10; Ex. 7 at 10-12 and n.4.

[58] *See, e.g.*, *Kin-Hong*, 110 F.3d at 110 ("[U]nder 18 U.S.C. § 3184, the judicial officer's inquiry is limited.… Both institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch … support this division of labor.").

Taylors' extraditability under the Treaty.[59]   Critically, Judge Cabell explicitly refused to consider the Taylors' defense, stating: "Despite strong urging, however, the court **declines to consider the respondents' argument**.  Even assuming an extradition court has both the authority to resolve disputed issues of foreign law, and the hopeful belief it could do so competently, that does not mean it should."[60]

## III.    THE TAYLORS SHOULD NOT BE EXTRADITED TO JAPAN

### A.    The Taylors Did Not Commit an Extraditable Offense Under Then-Existing Japanese Law

Under the Treaty, extradition may be certified only where "the request for extradition … is accompanied by … such evidence as would provide probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested."[61]  To meet that requirement, the Japanese government must provide "evidence which would warrant a man of reasonable caution in the belief that [an extraditable offense] has been committed."[62]  The Taylors are not subject to extradition because the statute that Japan claims the Taylors violated—Article 103—is inapplicable, even if all the alleged facts were true.  And, as stated above, the misdemeanor immigration offenses cited in the arrest warrants themselves are *not* extraditable offenses.

Japan's extradition request is premised upon a novel and unprecedented expansion of the scope of Article 103 of the Japanese Penal Code that is articulated, if at all, by implication and inference in the applications for warrants for the Taylors' arrest.  As translated into English, Article 103 of the Japanese Penal Code states a criminal offense entitled "Harboring of Criminals" and provides as follows:

A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 3 years or a fine of not more than 300,000 yen.[63]

As Dr. William B. Cleary, a noted law professor at Hiroshima Shudo University in Hiroshima, Japan, explains in his declaration, 隠避, or "*inpi*," the Japanese statutory term used in Article 103, is translated as "enabling the escape," and comprises a "concept that describes working against law enforcement authorities' *active* pursuit of a criminal to arrest him."[64]  That is consistent with the Japanese Supreme Court's long-standing interpretation of "enables the escape" to mean "all other acts that hinder discovery [for] arrest by law enforcement by methods other than harboring."[65]  In other words, "*inpi*" carries that same sort of connotation as the American children's game hide-and-seek.  Just as you are not

---

[59] Ex. 8 (Opinion on Extradition).

[60] *Id.* at 9 (emphasis added).

[61] Treaty, Art. VIII, § 3.

[62] *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471, 479 (1963) (quotation and citation omitted).

[63] Ex. 1 at EX-Taylor, M.-00030.

[64] Ex. 11 (Second Supp. Cleary Decl.) ¶ 5.

[65] Supreme Ct. of Japan, Judgment, Sept. 18, 1930, P. 668 of Taishinin Keiji Hanreishu (S. Ct. Reports (criminal cases)) vol. 9.

Hon. Mike Pompeo
September 8, 2020
Page 16

playing hide-and-seek by hiding when nobody is actively seeking you, you are not engaged in "*inpi*" by hiding when nobody is actively seeking you.

The facts alleged in support of the arrest warrants (and the U.S. government's allegations in the complaints seeking extradition) assert that the Taylors assisted Ghosn to escape from Japan in violation of the conditions of his release on bail pending trial on certain alleged financial crimes relating to his tenure as CEO of Nissan. The theory appears to be that because Ghosn violated his bail conditions in departing Japan, the Taylors committed the act of "enabling the escape" (隠避, or "*inpi*") of a person who had committed a crime.

However, "the Japanese government has *never* attempted to apply Article 103 to *any* situation involving violation of bail conditions."[66] That is because Article 103 only criminalizes "working against law enforcement authorities' active pursuit of a criminal to arrest him."[67] There is no provision criminalizing the current situation, where Ghosn was not being pursued by the police because he was released on bail. There was no warrant for Ghosn's arrest at the time of the Taylors' alleged actions, and Japanese authorities were not seeking to apprehend him until after he had returned to Lebanon and parted with the Taylors. Japan's putative prosecution of the Taylors under Article 103 amounts to an attempt to take conduct that is widely recognized as not constituting a crime, and repackage it as a violation of a previously inapplicable statute by exploiting the use of the word "escape" in the English translation to refer to both of two very different and distinct Japanese terms.

Japanese scholars and practitioners reviewing this case agree that the Taylors did not commit a crime. One article reported, for example: "Helping someone jump bail isn't a crime in Japan … said Yunhai Wang, a professor of criminal law at Hitotsubashi University graduate school in Tokyo. Nobuo Gohara, a former prosecutor and Ghosn vocal critic of Japan's criminal-justice system, concurred[.]"[68] Moreover, over several months, the Taylors repeatedly cited the novelty of Japan's interpretation during the judicial proceedings. Yet, again, the Japanese government *could not find even one analogous case*.[69]

---

[66] Ex. 9 (Cleary Decl.) ¶ 13 (emphasis added); *see also* Ex. 10 (Supp. Cleary Decl.) ¶ 8 ("[T]his prosecution is unprecedented.").

[67] Ex. 11 (Second Supp. Cleary Decl.) ¶ 5.

[68] Robert Burnson, Bloomberg Law, *Ghosn Alleged Escape Accomplices Deny Committing a Crime* (June 9, 2020), *available at* https://bit.ly/30POwWr.

[69] That makes sense. After all, how could aiding bail jumping be against the law in Japan while bail jumping itself is not? *See* Ex. 9 (Cleary Decl.) ¶¶ 10, 14. Throughout the court of this process, it has remained undisputed that Japan has *never* prosecuted any of its own citizens or anyone else, including Ghosn, for "escaping" bail conditions under either Articles 97 or Article 98, or any other provisions, and neither DOJ nor the Japanese government has argued that what Ghosn did in violating his bail conditions was a crime under Japanese law. *Id.* ¶ 10; *see also, e.g.*, Ex. 13, Jiji Press, *Start of Debate on Escape Prevention Measures* (6/15/2020) ("The current criminal law, 'flight offenses,' targets inmates in prisons. For this reason, it does not apply when in bail such as Ghosn.").

Recognizing this fact, the Japanese government has been scrambling to criminalize bail jumping. On March 6, 2020, referring to Ghosn's departure from Japan, the Japanese Minister of Justice told the legislature's Legal Committee that the Ministry had "recently consulted with the Legal Council on the establishment of criminal law to [address] the escape of these persons." Ex. 14, Remarks of Minister of Justice Mori to Legal Committee (3/6/2020). She continued, "[i]n the future, based on the results of

The materials accompanying Japan's extradition request make clear that Japanese law enforcement authorities were investigating suspected violations of the Immigration Control and Refugee Recognition Act by Ghosn, and the Taylors' assistance in such violations, not a suspected violation of Article 103.[70] Because the immigration offenses are misdemeanors for which extradition is not available,[71] the prosecutor in the Ghosn case has sought to construct a theory of an Article 103 violation as a means to obtain extradition of the Taylors.

What is more, the Japanese government's zeal to prosecute the Taylors at all is purely political, and emanates from its embarrassment from Ghosn's departure to a country without an extradition treaty with Japan. Reflecting Japan's general hostility toward extraditing its own citizens, Japan has extradition treaties with only two countries, the United States and the Republic of Korea. Unable to reach Ghosn, to show the country that it is doing something, the Japanese government has identified the Taylors as scapegoats that are nearly within its grasp. To do so, however, Japan has contorted Japanese law to match the requirements of the Treaty.

Ultimately, it is up to the Japanese legislature—and not a creative and embarrassed Japanese prosecutor, and certainly not the U.S. government—to repair what are obvious gaps under Japanese law. Japan should not be allowed to extradite and prosecute American citizens based on convenient, self-serving, and politically motivated interpretations of its statutes that it does not apply to its own citizens.

## B.    Extradition of the Taylors to Japan Would Violate U.S. Human Rights Commitments and Treaty Obligations

If the Taylors were extradited to Japan, they would then face a highly flawed criminal-justice system that lacks many of the basic protections the Taylors would be afforded in the United States, such as a right to a speedy trial and the right to counsel during interrogations, while at the same time being subjected to a heightened risk of contracting COVID-19 (which would almost certainly be life-threatening to Michael Taylor). These risks are further aggravated now that Japan is preparing to enter flu season as well. All so that the Japanese government can punish the Taylors for what it cannot do against Ghosn directly, using an offense generated by a prosecutor's novel reinterpretation of Article 103 to punish Americans retroactively in a way that Japan has never applied the law to its own citizens (or to anyone else).

Although Japan is itself a modern democracy, its criminal-justice system appears more akin to that of an authoritarian regime.[72] Japan's legal system allows prosecutors to detain people without charge and

---

the deliberation, we will proceed with the necessary legislation." *Id.* Thereafter, on June 15, 2020, a committee of the Japanese Ministry of Justice met to discuss "the establishment of new penalties for [] escape ... [while] on bail." Ex. 13; *see also* Ex. 15, Jomo News, *First Meeting to Prevent Escape During Legal Bail* (6/15/2020).

[70] *Cf.* Ex. 12 (Second Supp. Watanabe Decl.) ¶ 6 (noting that the Taylors have not been charged in Japan under Art. 103).

[71] An offense is only extraditable if it is "punishable by the laws of both Contracting Parties ... by deprivation of liberty for a period of more than one year." Treaty, Art. II § 1.

[72] *Cf.* Alexander Solzhenitsyn, 1 The Gulag Archipelago 103-15 (HarperPerennial Ed. 2007) (describing Stalin-era Soviet interrogation tactics, including lengthy questioning, yelling, physical abuse, and sleep deprivation).

subject them to relentless interrogation without the presence of defense counsel until they confess or incriminate themselves, a system that is referred to as "hostage justice (*hitojichi-shiho*)."  Nearly 90% of defendants in criminal trials confess, according to the Japan Federation of Bar Associations.  Japan's criminal-justice system has been ridiculed by Japanese lawyers and academics, as well as observers around the world.  Last year, more than 1,000 Japanese academics and lawyers wrote an open letter criticizing Japan's criminal-justice system[73]  The letter details a number of alarming practices:

- "The Code of Criminal Procedure of Japan allows suspects to be detained up to 23 days before indictment" during which time detainees face continuous interrogations where "investigators [] pressur[e] suspects to answer questions and confess to their alleged crimes."[74]

- "It is not uncommon for suspects to be yelled at from close range [and] suspects are not allowed to have lawyers present during questioning."[75]

- "The 23-day detention limit often has no substance, as investigators sometimes use arrest/detention powers for separate, minor crimes as an excuse to interrogate suspects about the main crime or split up consolidated crimes in order to detain suspects repeatedly for additional periods."[76]

- "Even when the detainee is indicted and finally allowed to request bail, those who have not confessed or remained silent often have a harder time persuading a judge to approve their bail request[.]"[77]

The letter also describes some notable examples where Japan charged innocent people with minor crimes, yet detained those who refused to confess for months or more than a year.  It concludes that these practices are systemic and violate "international human rights standards including the presumption of innocence, the prevention of torture, and access to counsel during questioning."[78]

Mr. Tadashi Inuzuka, a former Senator in the Japanese Diet, elaborated on these issues in correspondence about the Taylors' case, expressing concern to Senator Roger Wicker.[79]  Senator Inuzuka explains:  "Few of my peers and countrymen have compassion for Carlos Ghosn, Greg Kelly, and countless others held 'hostage' in Japan.  Our system, media, and people, judge men and women as guilty at their arrest and not after a guilty verdict at trial.  Unfortunately, the presumption of guilt, though not a public

---

[73] *Available at* https://bit.ly/3iFGeXv.

[74] *Id*.

[75] *Id*.

[76] *Id*.

[77] *Id.*

[78] *See also* Kageyama, Yuri, *Fugitive Ghosn Brings Global Attention to Japanese Justice* (Jan. 9, 2020), *available at* https://bit.ly/3kGUiS4 (discussing several famous cases of wrongful convictions in Japan, including of foreign nationals, and a true-life story of a man who refused to sign a confession in Japan that became a popular movie depicting his five-year legal battle for exoneration).

[79] *See* Ex. 36 (Email from T. Inuzuka).

admission, is very much a reality."[80]  After recounting the nature of the Japanese criminal-justice system, and the treatment of Ghosn and Greg Kelly, Senator Inuzuka concludes:  "I would strongly encourage stopping the potential extradition of the Taylor family to Japan.  As U.S. citizens, the Taylors have a right to a fair trial in a country that practices the presumption of innocence.  They should not be judged guilty prior to a verdict[,] and they will be should they stand trial in Japan."[81]

Nobuo Gohara, a former prosecutor, has also discussed these issues in international media.  He said: "The Japanese criminal justice system is focused on interrogation.  The aim is getting a confession.…  A suspect who admits to the crime is released from imprisonment.…  But if a person refuses to admit to a crime, the prosecutor's office will strongly oppose release until the suspect makes a confession."[82]  It should thus come as no surprise that Japan's conviction rate is 99.3%, a statistic that the Ministry of Justice itself not only confirms, but feels the need to explain away.[83]

In addition to the treatment to which Ghosn was subjected in Japan, the State Department should take heed from the Japanese government's treatment of Greg Kelly, an American apprehended by Japan as part of the Nissan and Ghosn investigations, to foresee what awaits the Taylors in Japan.[84]  Rather than use the Treaty in dispute here, the Japanese government tricked Mr. Kelly into travelling to Japan in November 2018, where he was then arrested and subjected to five weeks of solitary confinement without a bed.[85]  His family reports that he was in need of urgent neck surgery before traveling to Japan, which the Japanese government was aware of, and yet delayed.[86]  The procedure was less effective by the time he was finally allowed to have the surgery.[87]  While incarcerated, Mr. Kelly was interrogated for several hours a day without legal counsel, and Japanese officials still will not permit him or his lawyer access to evidence in electronic form.[88]  Mr. Kelly was eventually granted bail in December 2018.[89]  After having had to wait

---

[80] *Id.*

[81] *Id.*

[82] Rupert Wingfield-Hayes, BBC, *Carlos Ghosn and Japan's 'Hostage Justice' System* (Dec. 31, 2019), *available at* https://bbc.in/33VyQCT.

[83] *See* Japan Ministry of Justice, *Frequently Asked Questions on the Japanese Criminal Justice System*, *available at* https://bit.ly/2FdiyLq (last accessed Sept. 4, 2020).

[84] *See* Ex. 16 (Memo and Petition from the Kelly Family describing the horrors of his treatment by Japan).

[85] Sen. Roger Wicker, Sen. Lamar Alexander & Sen. Marsha Blackburn, *Greg Kelly: U.S. Hostage of Japanese Justice* (March 10, 2020), *available at* https://bit.ly/2PMWzgp; *see also* The Japan Times, *Ex-Nissan exec Greg Kelly fears odds of fair trial slimmer after Ghosn's flight* (Jan 4, 2020), *available at* https://bit.ly/30Q9tRa; Kelly Petition to U.S. Dep't of State, *available at* https://bit.ly/2XX0ID7.

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] According to Mr. Kelly's lawyer, James Wareham, "Greg Kelly has been caught up an effort to remove Ghosn and get Renault out of a controlling position, [and] [t]o consummate the scheme, they wanted a witness to be in their control under duress, and then they went so far as to break international extradition law to make that happen."  Reed Stevenson, The Detroit News, *Emails: Ghosn takedown Motivated by Effort to Stop Nissan, Renault Integration* (June 16, 2020), *available at* https://bit.ly/2DXp1tv.

for almost two years, recently, Mr. Kelly's trial dates were finally set to begin on September 15, 2020, and continue until at least July 2021.[90]  One of the conditions of his bail is that he is not allowed to leave Japan; Mr. Kelly has not been able to return home for more than 21 months and will not be able to do so for the foreseeable future.

The State Department must act to protect the Taylors from these widely reported human rights abuses.  Indeed, even if permissible under the U.S.-Japan Extradition Treaty, extraditing the Taylors to Japan in this case would violate other U.S. treaty obligations.  Article 3(1) of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") provides that "No State Party shall … extradite a person to another State where there are substantial grounds for believing he would be in danger of being subjected to torture."[91]  "Torture" within the meaning of the CAT includes "[a]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed…."[92] Under U.S. law, "substantial grounds" under the CAT exist if "it is more likely than not that the [person] would be" subjected to such treatment.[93]

Further, Article 14 of the International Covenant on Civil and Political Rights ("ICCPR") provides that "everyone shall be entitled" to certain "minimum guarantees" in the determination of any criminal charge, including "to communicate with counsel of his own choosing" (Art. 14(3)(b)) and "[n]ot to be compelled to testify against himself or to confess guilt" (Art. 14(3)(g)), "[t]o be tried without undue delay" (Art. 14(3)(c)).[94]

It is clear that Messrs. Ghosn and Kelly, and countless others, have been subjected to physical and mental suffering (including beatings, sleep deprivation, and absurdly-protracted interrogation while being denied access to lawyers and medical treatment) at the hands of the Japanese law enforcement for the purpose of extracting confessions.  The same fate almost certainly awaits the Taylors if they are extradited.

Finally, it is important to note that the Taylors could spend more time in jail in the U.S. awaiting extradition to Japan, and in Japan awaiting trial, than they would ever be sentenced if convicted.  Article 103 used to be a two-year offense, and even since it was increased to a three-year maximum penalty, no

---

[90] Sean McLain, The Wall Street Journal, *Secret Papers on Ghosn Pay to Be Aired at Trial of Greg Kelly* (Aug. 25, 2020), *available at* https://on.wsj.com/3i5Lvrp.

[91] *See also* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, § 2242, 112 Stat. 2681, 2681-761, 2681-822 (implementing CAT and reiterating that it is "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture").

[92] 22 C.F.R. § 95.1(b)(1).

[93] 22 C.F.R. § 95.1(c).

[94] International Covenant on Civil and Political Rights, *opened for signature* 19 Dec. 1966, art. 6, para. 5, S. EXEC. DOC. E,, 95–2, at 23 (1978), 999 U.N.T.S. 171, 175.

defendant has received more than two-years imprisonment; many defendants without criminal histories received suspended execution of their sentences.[95]   The Taylors have already been in jail for months (with no guarantee of time served).   Even if the extradition were to take place immediately, the Japanese government has proved that it is in no rush—and under no obligation—to bring this matter to a speedy resolution.

**C.      Continued Detention and Extradition of Michael Taylor Poses a Substantial Risk to His Life and Health in Light of His Medical History and the COVID-19 Pandemic**

As in the U.S., jails and prisons in Japan are experiencing heightened levels of transmission of COVID-19.   In particular, it is inevitable for inmates at Japanese detention facilities, who are forced to use shared public baths and/or share rooms with other inmates, to have contacts with officers and other inmates.[96]   By April 2020, Japanese detention and correction facilities nationwide faced problematic situations.   For example, the Justice Minister revealed during a press conference that at the Osaka Detention Facility, one correctional officer was infected by COVID-19, which resulted in seven other positive workers within the following two weeks, who, collectively, have come into contact with 132 workers and 60 detainees.[97]   Workers at the Tokyo and Hokkaido Detention Facilities similarly tested positive at that time.[98]   More recently, Japanese media reported that at least one detainee at the Tokyo Detention Facility and one correctional officer at the Osaka Detention Facility were found positive.[99]   In August, the Tokyo Regional Immigration Services Bureau, which is similarly situated as detention facilities, also confirmed that one detainee tested positive, and at least four workers were tested positive.[100]

---

[95] *See, e.g.*, Osaka Dist. Ct., Judgment, Apr. 27, 2018, P. 109 of Law Cases Reports (Hanrei-Jiho) No. 2400 (sentenced to term of imprisonment of one year and eight months), *aff'd in part*, Osaka High Court, Judgment, Sept. 25, 2018; P. 72 of "Law Cases Reports (Hanrei-Jiho) No. 2406 (sentence reduced to one year and two months' imprisonment); Tokyo High Ct., Judgment, July 8, 2015, appeal dismissed, S. Ct. Mar. 27, 2017, P. 258 of Saikou Saibansho Keiji Hanreishu (S. Ct. Reports (criminal cases)) vol. 71-3 (sentenced to term of imprisonment of one year and six months' imprisonment, which includes the sentence for another crime); Osaka Dist. Ct., Judgment, Mar. 30, 2012, cited from Case No. 28181846 of "D1-Law.com Hanreitaikei" (sentenced to term of imprisonment of one year and six months; suspension of execution for three years); Osaka Dist. Ct., Judgment, Apr. 17, 2003; P. 264 of Law Times Reports (Hanrei-Taimuzu) No.1127 (sentenced to term of imprisonment of one year and ten months; defendant had five prior criminal convictions).   Under Japanese law, when execution of a sentence is suspended, the sentence will not be executed if none of the revoking events listed in the Penal Code, e.g., the defendant commits another crime and sentenced to imprisonment, is triggered within the suspension period.

[96] Tadashi Ara, President of the Japan Federation of Bar Associations, *<COVID-19>Statement Calling for Infection Spread Prevention in Penal Detention Facilities* (Apr. 23, 2020), *available at* https://bit.ly/2GBcP2Q.

[97] Magdalena Osumi, The Japan Times, *Spread of COVID-19 in Japanese Prisons Spurs Calls for Releases* (Apr. 21, 2020), *available at* https://bit.ly/2Za0p8q.

[98] *Id.*

[99] Ex. 17, Jiji News, *Detainee at Tokyo Detention Facility Found Coronavirus Positive as Well as Foreigner Detainee at Tokyo Immigration Facility – Ministry of Justice* (Aug. 7, 2020); Ex. 18, Jiji News, *Another Correction Officers at Osaka Detention Facility Infected Coronavirus, Totaling Infected Officers to be Nine* (Aug. 5, 2020).

[100] Jun Ida, Mainichi Shimbun, *Tokyo Immigration Bureau Reports 1st Coronavirus Infection of Foreigner in Detention* (Aug. 8, 2020), *available at* https://bit.ly/3jUcpmG.

Hon. Mike Pompeo
September 8, 2020
Page 22

In this regard, the Centers for Disease Control and Prevention ("CDC") issued a Level 3 Travel Health Notice for Japan due to COVID-19, and the State Department advises that "COVID-19 is still a serious concern in Tokyo and across many areas of Japan."[101]  Japan has placed a broad travel ban for entry from 146 countries, including the U.S., which even applies to foreign residents of Japan, including those with long-term resident status and working visas.[102]

Michael Taylor is particularly susceptible to COVID-19, as he previously had a portion of one of his lungs removed, a procedure called a partial lobectomy.[103]  This was necessitated by a fungal infection caused by Coccidiomycosis, known as "Valley Fever."  Mr. Taylor contracted Valley Fever as a child while living in Asmara, Eritrea (formerly Ethiopia), where his step-father was stationed.  He experienced bleeding from his lung before doctors identified the issue approximately five years later and addressed it with surgery.  As a result, Mr. Taylor has reduced lung capacity.[104]

As explained by Dr. M. Anthony Casolaro, a physician board-certified in Internal Medicine and Pulmonary Disease—and the former Clinical Chief of the Pulmonary Branch at the National Institutes of Health, where he worked with, among others, Dr. Anthony Fauci—an individual like Michael Taylor with a history of Coccidiomycosis and a partial lobectomy "is at a particularly heightened risk for serious complications if he were to contract COVID-19."[105]  If Mr. Taylor were to contract the disease, "he would be seriously compromised" and "[h]e would require immediate hospitalization and be at imminent risk of serious complications and possibly death."[106]  As Dr. Casolaro concludes, "Michael Taylor is, therefore, at a greatly heightened risk of serious adverse complications and death in a setting, such as a jail, where social distancing and other measures are impractical."[107]

Every day of the Taylors' continued detention, which Japan only seeks to prolong, places Michael Taylor at imminent and substantial risk of an effective death sentence.  With no Japanese language ability, Japanese health insurance, family, or friends in Japan, Michael Taylor's chance of receiving even basic healthcare in Japan would be extremely slim in the midst of the global pandemic – an unfair burden that should not be imposed on Michael Taylor.

---

[101] State Department, *Japan Travel Advisory* (Aug. 6, 2020), *available at* https://go.usa.gov/xGDnB.

[102] Ministry of Foreign Affairs of Japan, *Border Enforcement Measures to Prevent the Spread of Novel Coronavirus (COVID-19)* (Aug. 30, 2020), *available at* https://bit.ly/35aKj2f; Ben Dooley, The New York Times, *Japan's Locked Borders Shake the Trust of Its Foreign Workers* (Aug. 5, 2020), *available at* https://nyti ms/3byKsOb.

[103] *See* Ex. 19 (Letter from Dr. Sandeep Jain, MD.) and Ex. 20 (Declaration of Dr. M. Anthony Casolaro, MD).

[104] Ex. 20 ¶ 3.

[105] *Id.* ¶ 4.

[106] *Id.*

[107] *Id.* ¶ 5.

Hon. Mike Pompeo
September 8, 2020
Page 23

**D.      Michael Taylor's Extraordinary History of Service to His Country and His Fellow Americans Make It Imperative that His Country Not Permit Japan to Use a Prosecution of Him as a Face-Saving Measure**

As noted above, Michael Taylor is a decorated military veteran, having served in the Special Forces for over a decade.  After leaving the service, Michael started his own private security company, which has continued his service to the government, and others.  It would be fundamentally unfair for the government to cooperate in the Japanese government's efforts to seek retribution against Ghosn—a man whom they cannot touch—by persecuting the Taylors.[108]  That is particularly true in light of the horrors of the Japan's "hostage justice" system, which contains virtually none of the protections of the accused that exist in the developed world.  Given all that Michael has done for this country and Americans, the State Department should exercise its discretion here to withhold extradition.

**E.      Lebanese Prosecutors Already Have Found the Taylors Did Not Commit a Crime**

Further highlighting the lack of a crime, Lebanon actually investigated the facts surrounding Ghosn's departure from Japan and *exonerated* the Taylors of any wrongdoing.[109]  This corroborates the points above regarding the lack of a crime, and it is also an additional, independent reason supporting a decision not to extradite the Taylors.

In addition to the State Department's authority to refuse to extradite U.S. citizens generally, Article IV, Section 2 of the Treaty provides that: "The requested Party may refuse extradition when the person sought has been tried and acquitted, or has undergone the execution of punishment in a third State for the offense for which extradition is requested."  The Republic of Lebanon has itself investigated the conduct and events on which Japan's request for extradition is based.  Lebanese prosecutors concluded that no laws were violated.  If Japan has any quarrel with the Republic of Lebanon's conclusion, that is a matter for the governments of Japan and Lebanon to address among themselves.  Importantly, the Magistrate Judge and District Judge both refused to consider this argument, claiming that it is within the realm of the Executive Branch's responsibilities.[110]

In her order denying the Taylors' habeas petition, the District Judge said that the Taylors had not shown that there was "any sort of adversarial proceeding in Lebanon."[111]  Yet there is no such requirement in the Treaty.  And even if there was, the fact is that the highest prosecutor in Lebanon considered charges

---

[108] *See also* Ex. 22 (Letter from T. Daly) ("[I]t would be a serious injustice for this country to authorize the extradition of Michael Taylor and Peter Taylor.").

[109] *See* Ex. 35 (Declaration of Attorney Naoum Toubia Farah).

[110] *See* Ex. 7 at 12.  The judges also commented that the Lebanon proceedings did not involve an actual trial, but a trial is not a necessary prerequisite for an acquittal.  In the U.S., for example, criminal cases can and do end with motions for judgment of acquittal before a trial is complete or submitted to the jury.  The Lebanese action is tantamount to an acquittal under its legal system.

[111] *Id.* at 14.

under Japanese law, and decided not to proceed on them, as they were baseless.[112]  In a criminal matter, *the prosecutor is the adversary*.  It can hardly be the case that there was no adversarial proceeding where a prosecutor was actively considering whether to pursue criminal sanctions against the Taylors, and declined to do so.  And regardless of the technical aspects of the Lebanese proceedings, the fact that Lebanon investigated and found the Taylors unworthy of prosecution should inform the State Department's judgement in exercising its unfettered discretion not to extradite U.S. citizens.

## F.  Treaties Must Be Two-Way Streets and Japan Has Repeatedly Failed to Extradite Its Own Citizens Charged with Much Greater, and More Harmful Crimes

In assessing a country's request that the U.S. extradite its own citizens, our government should look to how that country has responded to our requests for similar relief.  Although Japan now demands extradition in this case, Japan has a long track record of protecting its citizens—including those who are responsible for the *deaths* of American citizens and multi-million dollar frauds—from extradition to this country.  The inequity of the Japanese request is startling.

It also has long been observed that "[e]xtradition from Japan for antitrust offenses has never occurred, and for other white collar offenses, such extradition is highly unusual."[113]  The process is also procedurally difficult for the United States, and Japan has broad discretion to grant or deny the request.[114]  This discretion has been a significant issue in extraditing Japanese nationals because, despite the damaged "hostage justice" system just described, Japan has historically condemned the U.S. justice system, particularly with respect to the prosecution of financial and white collar crimes.

One very telling case concerns three executives of the Takata Corporation, who have been under indictment in the Eastern District of Michigan since 2016.  As is well documented, in the Takata exploding-airbag scandal, the Japanese company pled guilty to a $1 *billion* wire fraud scheme involving the falsification and concealment of air bag tests and information covering up a defect that killed at least 24 people and injured 300 more.  While DOJ indicted three Japanese executives, with charges based upon the billion-dollar scheme that killed 24 people, Japan continues to protect them from extradition.[115]  Japan's hypocrisy is clear, and it is harmful not only to the rights of American citizens, but to global economic and

---

[112] *See* Ex. 35.

[113] Squire Patton Boggs, *Extradition from Japan for Antitrust Offenses Unlikely, but Risks Should Still Be Weighed* (2020), *available at* https://bit.ly/3gUDHba; *see also* The National Law Review, *Extradition from Japan: The Gamble* (May 5, 2015) ("[T]he DOJ faces many challenges when attempting to extradite Japanese nationals, both legally and procedurally."), *available at* https://bit.ly/3kFLdcs.

[114] *Id.*; *see also* Treaty, Art. V ("The requested Party shall not be bound to extradite its own nationals, but it shall have the power to extradite them in its discretion.").

[115] Automotive News: Europe, *Automakers avoid new U.S. recall of 56M Takata airbag inflators* (May 08, 2020) ("[N]one of the Japanese nationals have been arrested or appeared in a U.S. court because the Japanese do not extradite their citizens to the U.S."), *available at* https://bit.ly/3gSkbwa; Automotive News, *Japan throws stones at Ghosn from glass house* (Jan 11, 2020) ("the prosecution and post-escape pursuit of Ghosn runs contrary to the Japanese practice of protecting its own business fugitives from justice, particularly when they stand accused by other countries of crimes"), *available at* https://bit.ly/2XSTrnE.

Hon. Mike Pompeo
September 8, 2020
Page 25

business interests. As one article observed, "Ghosn was stuffed into solitary confinement without heat, internet and only limited access to his attorneys [while] … the Japanese executives from Takata airbags, criminally indicted in the US, have fought extradition with documents proving their complicity in manipulating test data to conceal the failure of their systems…. Who won't think twice before taking an assignment in Japan, now that their justice system has been revealed to be so unfair to foreigners?"[116] The Government of Japan sits on the U.S. request to return these executives for trial and has allowed them to be free on bail *for actually killing Americans*. The Taylors, at worst, assisted a person contesting politically motivated allegations of financial wrongdoing to violate the onerous conditions of his release.

This is hardly out of the ordinary for Japan. For example, in 1995, a lawyer with Tokyo's Chiyoda Law Office remarked that he would be surprised "if Japan gave in easily" to extradition requests involving white-collar crimes in the wake of the cover-up of $1.1 billion in trading losses that engulfed Daiwa Bank, Ltd., because sending elite Japanese bankers to America's "mean jails" would be too much for the country to bear politically.[117] In 1996, another Japanese attorney dismissed the possibility of extradition for Yasuo Hamanaka, the infamous "Mr. Copper" who had lost $2.6 billion trading for Sumitomo Corporation, because "[u]nlike murder, what Hamanaka did would not be considered an outright threat to the social order of any country."[118]

### CONCLUSION

As noted above, under the Treaty and the U.S. law of extradition, it is within the Secretary of State's sole authority to determine whether or not to extradite the Taylors, and any number of "humanitarian and foreign policy considerations" may warrant refusal.[119] Here, the reasons to refuse Japan's request are many, including the tenuous and unprecedented theory of an extraditable offense, the obvious face-saving nature of Japan's pursuit of the Taylors for what is at most a non-extraditable misdemeanor, the myriad "deficiencies in the judicial process" in Japan,[120] the substantial risk of hospitalization and even death faced by Michael Taylor, Mr. Taylor's extraordinary history of service to this country and its people, the fact that one member of the international community (Lebanon) has already determined that the Taylors did not commit a crime, and Japan's demonstrated history of refusing to extradite its own nationals for far, far more serious alleged crimes. The Taylors harmed no one, and simply do not deserve the way they are being treated or the fate awaiting them at the hands of the Japanese legal system if they are extradited. It is, therefore, reasonable and proper (in fact, imperative) that the State Department deny Japan's request and protect the Taylors from this unfair extradition. Under the Treaty, the U.S. is simply not obligated to extradite the Taylors and there is no compelling reason for the U.S. to do so.

---

[116] Chief Executive, *Gone Ghosn: Caveats for Global Commerce* (Jan 2, 2020), *available at* https://bit.ly/2XPtMwf.

[117] Michael McGovern, Kaede Toh, and Michael Jo, *Extradition of Japanese Nationals: A Growing Threat in U.S. Prosecutions of International Cartels?* (2015).

[118] *Id.*

[119] *Kin-Hong*, 110 F.3d at 109.

[120] *Plaster v. United States*, 720 F.2d 340, 349 (4th Cir. 1983).

Hon. Mike Pompeo
September 8, 2020
Page 26


      We look forward to your reply and would welcome the opportunity to provide any information you may require and would hope to discuss these issues with those at State with whom you would have us meet, leading to a meeting with you, if warranted.

Respectfully submitted,


**Abbe David Lowell**
Winston & Strawn LLP
1901 L Street, N.W.
Washington, DC 20036
(202) 282-5875

**Ty Cobb**
Ty Cobb, PLLC
3913 49th Street, N.W.
Washington, DC 20016
(202) 957-7881


Cc:

Department of State, Office of the Legal
Adviser for Law Enforcement and Intelligence (L/LEI)
(via email to Extradition@state.gov)

Tom Heinemann, Esq. (via email to HeinemannTB@state.gov)


ENCLOSURES

*Extradition of Michael and Peter Taylor*
**Appendix of Exhibits**

| Ex. | Description |
|---|---|
| 1 | M. Taylor Extradition Request excerpts |
| 2 | P. Taylor Extradition Request excerpts |
| 3 | M. Taylor Arrest Warrant |
| 4 | P. Taylor Arrest Warrant |
| 5 | Declaration of Daniel Marino |
| 6 | Memorandum Opinion re Motions to Quash (Cabell, J.) |
| 7 | Memorandum Opinion re Motion for Preliminary Injunction (Talwani, J.) |
| 8 | Memorandum Opinion re Extradition (Cabell, J.) |
| 9 | Declaration of William Cleary |
| 10 | Supplemental Declaration of William Cleary |
| 11 | Second Supplemental Declaration of William Cleary |
| 12 | Second Supplemental Declaration of Naoki Watanabe |
| 13 | Jiji Press, Start of Debate on Escape Prevention Measures (6/15/2020) |
| 14 | Remarks of Minister of Justice Mori to Legal Committee (3/6/2020) |
| 15 | Jomo News, First Meeting to Prevent Escape During Legal Bail (6/15/2020) |
| 16 | Memo and Petition from the Kelly Family |
| 17 | Jiji News, Detainee at Tokyo Detention Facility Found Coronavirus Positive as well as Foreigner Detainee at Tokyo Immigration Facility – Ministry of Justice (8/7/2020) |
| 18 | Jiji News, Another Correction Officers at Osaka Detention Facility Infected Coronavirus, Totaling Infected Officers to be Nine (8/5/2020) |
| 19 | Letter from Dr. Sandeep Jain, MD |
| 20 | Declaration of Dr. M. Anthony Casolaro, MD |
| 21 | Letter from Robert L. Rubin |
| 22 | Letter from FBI Agent Thomas Daly (ret.) |
| 23 | Letter from Anaiss Sebastian |
| 24 | Letter from Kathleen Wallace |
| 25 | Letter from Henry Horne |
| 26 | Letter from Francesca Ricci |
| 27 | Letter from Elizabeth Sweeney |
| 28 | Letter from David Dolan |
| 29 | Letter from Anthony Knight |
| 30 | Letter from Jeffrey Lark Jr. |
| 31 | Letter from Josh Flannery |
| 32 | Letter from Don Parker |
| 33 | Letter from Stephen Sweeney |
| 34 | Letter from Paul Giovacchini |
| 35 | Declaration of Attorney Naoum Toubia Farah |
| 36 | Email from Tadashi Inuzuka |

# Exhibit 1

DISTRICT OF COLUMBIA, ss:


## DECLARATION OF KAREN K. JOHNSON


I, Karen K. Johnson, declare and say as follows:


1.  I am an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC.  This office has responsibility for extradition requests, and I am charged with the extradition case of Michael L. Taylor.  I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2.  The relevant and applicable treaty provisions in full force and effect between the United States and Japan are found in Treaty on Extradition between the United States of America and Japan, signed on 3 March 1978 (the "Treaty").  A copy of the Treaty is attached to this declaration.

3.  In accordance with the provisions of the Treaty, the Embassy of Japan has submitted Diplomatic Note No. P59, dated 29 June 2020, formally requesting the extradition of Michael L. Taylor.  A copy of the diplomatic note is attached to this declaration.

4.  In accordance with Article XIV(1) of the Treaty, the Government of the United States of America provides legal representation in U.S. courts for the Government of Japan in its extradition requests, and the Government of Japan provides legal representation in its courts for extradition requests made by the United States.

-2-

5.  The offense for which extradition is sought is covered under Article II of the Treaty and by the Schedule annexed to the Treaty.

6.  The documents in support of the extradition request submitted by the Embassy of Japan were certified on 25 June 2020 by Karin M. Lang, Minister-Counselor for Consular Affairs and Consul General at the United States Embassy in Tokyo, in accordance with 18 U.S.C. § 3190. Ms. Lang, at the time of her certification, was the principal consular officer of the United States in Japan.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 29 , 2020.

KAREN K. JOHNSON

Attachments:
    1.  Copy of Note
    2.  Copy of Treaty

**EMBASSY OF JAPAN**
2520 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20008
(202) 238-6700

P59

## Note Verbale

The Embassy of Japan in the United States of America presents its compliments to the Department of State and has the honor to refer to the Note Verbale No. P 41, dated May 1, 2020 from the Embassy of Japan requesting the provisional detention of Michael L. Taylor, and the Extradition Treaty between Japan and the United States of March 3, 1978, and to request the extradition of Michael L. Taylor for the offense of Enabling the escape of criminals. The offense and the detail of the request are described in the documents attached hereto. The offense is covered by Article II, paragraph 1 of the Treaty and clause 38 of the Schedule annexed hereto.

The Embassy of Japan in the United States of America avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington D.C., June 29, 2020



TREATIES AND OTHER INTERNATIONAL ACTS SERIES 9625

# EXTRADITION

Treaty, With Exchange of
Notes, Between the
UNITED STATES OF AMERICA
and JAPAN

Signed at Tokyo March 3, 1978



E

*Treaty, with exchange of no*
*Ratification advised by the §*
   *November 30, 1979;*
*Ratified by the President*
   *December 13, 1979;*
*Ratified by Japan February*
*Ratifications exchanged at l*
*Proclaimed by the Preside*
   *March 4, 1980;*
*Entered into force March 26*

## NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89–497, approved
July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

". . . the Treaties and Other International Acts
Series issued under the authority of the Secretary of
State shall be competent evidence . . . of the treaties,
international agreements other than treaties, and proc-
lamations by the President of such treaties and inter-
national agreements other than treaties, as the case
may be, therein contained, in all the courts of law
and equity and of maritime jurisdiction, and in all the
tribunals and public offices of the United States, and
of the several States, without any further proof or
authentication thereof."

BY THE PRESIDENT OF

A PRC

CONSIDERING THAT:
The Treaty on Extradition
and Japan, together with a re
Tokyo on March 3, 1978, the
nese languages, is hereto anne

The Senate of the United
November 30, 1979, two-thir
therein, gave its advice and
together with a related excha

The Treaty, together with a
by the President of the Unit
1979, in pursuance of the adv
duly ratified on the part of Ja

It is provided in Article X'
enter into force on the thirtiet
the instruments of ratification

The instruments of ratifica
Washington on February 25
together with the exchange of i
1980;

For sale by the Superintendent of Documents, U.S. Government Printing Office,
Washington, D.C. 20402. Subscription Price: $110; $27.50 additional
for foreign mailing. Single copies vary in price. This issue $3.

62–682 O—80

EX-Taylor, M.-00005

# JAPAN

## Extradition

*Treaty, with exchange of notes, signed at Tokyo March 3, 1978;*
*Ratification advised by the Senate of the United States of America*
    *November 30, 1979;*
*Ratified by the President of the United States of America*
    *December 13, 1979;*
*Ratified by Japan February 19, 1980;*
*Ratifications exchanged at Washington February 25, 1980;*
*Proclaimed by the President of the United States of America*
    *March 4, 1980;*
*Entered into force March 26, 1980.*

———

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Japan, together with a related exchange of notes, was signed at Tokyo on March 3, 1978, the text of which, in the English and Japanese languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 30, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, together with a related exchange of notes;

The Treaty, together with a related exchange of notes, was ratified by the President of the United States of America on December 13, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of Japan;

It is provided in Article XVI of the Treaty that the Treaty shall enter into force on the thirtieth day after the date of the exchange of the instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on February 25, 1980; and accordingly the Treaty, together with the exchange of notes, will enter into force on March 26, 1980;

EX-Taylor, M.-00006

2

Now, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, together with a related exchange of notes, to the end that they shall be observed and fulfilled with good faith on and after March 26, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this fourth day of March in the year of our Lord one thousand nine hundred eighty and of the Independence of the United States of America the two [SEAL] hundred fourth.

JIMMY CARTER

By the President:
CYRUS VANCE
*Secretary of State*

TREATY ON EXTRA
THE UNITED STATES O

The United States of

Desiring to make mor
ation of the two countr
of crime,

Have agreed as follov

ARTIC

Each Contracting Par
tradite to the other Par
the provisions of this 'tradite to the other Par
in its territory and sov
for prosecution, for tr:
punishment for any offer
graph 1 of Article II.
committed outside the te
questing Party, the conc
paragraph 1 of Article V
be applied.

ARTICLE

1. Extradition shall be
with the provisions of t
offense listed in the S
Treaty, which forms an i
Treaty, when such an off
the laws of both Contrac
by life imprisonment, or
liberty for a period of
or for any other offense
is punishable by the fed

EX-Taylor, M.-00007

3

## TREATY ON EXTRADITION BETWEEN
## THE UNITED STATES OF AMERICA AND JAPAN

The United States of America and Japan,

Desiring to make more effective the cooperation of the two countries for the repression of crime,

Have agreed as follows:

### ARTICLE I

Each Contracting Party undertakes to extradite to the other Party, in accordance with the provisions of this Treaty, any person found in its territory and sought by the other Party for prosecution, for trial, or to execute punishment for any offense specified in paragraph 1 of Article II. When the offense was committed outside the territory of the requesting Party, the conditions specified in paragraph 1 of Article VI, inter alia, shall be applied.

### ARTICLE II

1. Extradition shall be granted in accordance with the provisions of this Treaty for any offense listed in the Schedule annexed to this Treaty, which forms an integral part of this Treaty, when such an offense is punishable by the laws of both Contracting Parties by death, by life imprisonment, or by deprivation of liberty for a period of more than one year; or for any other offense when such an offense is punishable by the federal laws of the United

EX-Taylor, M.-00008

4

States and by the laws of Japan by death, by life imprisonment, or by deprivation of liberty for a period of more than one year.

Extradition shall be granted for any offense of which one of the above-mentioned offenses is a substantial element, even if, for purposes of granting federal jurisdiction to the United States Government, interstate transporting, or the use of the mails or other interstate facilities is also an element of the specific offense.

2. In the case in which the person sought has been sentenced by a court of the requesting Party for any offense to which paragraph 1 applies, extradition shall be granted only if the person has been sentenced to death or if the sentence remaining to be served is at least four months.

## ARTICLE III

Extradition shall be granted only if there is sufficient evidence to prove either that there is probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested or that the person sought is the person convicted by a court of the requesting Party.

## ARTICLE IV

1. Extradition shall not be granted under this Treaty in any of the following circumstances:

(1) When the offense for which extradition is requested is a political offense or when

EX-Taylor, M.-00009

5

it appears that the request for extradition is made with a view to prosecuting, trying or punishing the person sought for a political offense.  If any question arises as to the application of this provision, the decision of the requested Party shall prevail.

(2) When the person sought has been prosecuted or has been tried and convicted or acquitted by the requested Party for the offense for which extradition is requested.

(3) In the case of a request for extradition emanating from Japan, when the prosecution of the offense for which extradition is requested would be barred by lapse of time, under the laws of the United States.

(4) In the case of a request for extradition emanating from the United States, when the imposition or the execution of punishment for the offense for which extradition is requested would be barred by reasons prescribed under the laws of Japan, including lapse of time;

    (a) if Japan were to have jurisdiction over the offense, or

    (b) if Japan in fact has such jurisdiction and the trial were to be held in its court.

2. The requested Party may refuse extradition when the person sought has been tried and acquitted, or has undergone the execution of punishment in a third State for the offense for which extradition is requested.

EX-Taylor, M.-00010

6

3. When the person sought has been prosecuted or has not undergone the execution of punishment in the territory of the requested Party for an offense other than that for which extradition is requested, the requested Party may defer his surrender until the conclusion of the trial and the full execution of any punishment he may be or may have been imposed.

ARTICLE V

The requested Party shall not be bound to extradite its own nationals, but it shall have the power to extradite them in its discretion.

ARTICLE VI

1. When the offense for which extradition is requested has been committed outside the territory of the requesting Party, the requested Party shall grant extradition if the laws of that Party provide for the punishment of such an offense committed outside its territory, or if the offense has been committed by a national of the requesting Party.

2. For the purposes of this Treaty, the territory of a Contracting Party means all areas of land, water and airspace under the sovereignty or authority of that Contracting Party, including any vessel registered in that Contracting Party, and any aircraft registered in that Contracting Party provided that the aircraft is in flight. For the purposes of this provision an aircraft shall be considered

7

to be in flight at any time from the moment
when all its external doors are closed follow-
ing embarkation until the moment when any such
door is opened for disembarkation.

ARTICLE VII

1. The requesting Party shall not, except in
any of the following circumstances, detain,
prosecute, try nor punish a person surrendered
under this Treaty for an offense other than
that for which extradition has been granted,
nor extradite him to a third State, provided
that these stipulations shall not apply to
offenses committed after the extradition:

(1) When he has left the territory of the
requesting Party after his extradition and
has voluntarily returned to it.

(2) When he has not left the territory of
the requesting Party within forty-five days
from the day when he has been set free to do
so.

(3) When the requested Party has consented
to his detention, prosecution, trial or punish-
ment for an offense other than that for which
extradition has been granted or to his ex-
tradition to a third State.

2. The requesting Party may detain, prosecute,
try or punish the person surrendered under
this Treaty for any offense for which ex-
tradition is to be granted in accordance with
paragraph 1 of Article II, in so far as such

EX-Taylor, M.-00012

8

measures are instituted upon the basic facts which constitute the offense for which extradition has been granted.

## ARTICLE VIII

1. The request for extradition shall be made through the diplomatic channel.

2. The request for extradition shall be accompanied by:

    (a) Documents which describe the identity of the person sought;

    (b) A statement of the facts of the case;

    (c) The texts of the laws describing the essential elements and the designation of the offense for which extradition is requested;

    (d) The texts of the laws describing the punishment for the offense; and

    (e) The texts of the laws describing the time limit on the prosecution or the execution of punishment for the offense.

3. When the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by:

    (a) A copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party;

    (b) Evidence proving that the person sought is the person to whom the warrant of arrest refers; and

EX-Taylor, M.-00013

9

    (c) Such evidence as would provide probable
cause to suspect, according to the laws
of the requested Party, that the person
sought has committed the offense for
which extradition is requested.

4. When the request for extradition relates
to a convicted person, it shall be accompanied
by:

    (a) A copy of the judgment of conviction
imposed by a court of the requesting
Party;

    (b) Evidence proving that the person sought
is the person to whom the conviction
refers; and

    (c) (i) A copy of the warrant of arrest,
if the convicted person was not
sentenced; or

        (ii) A copy of the sentence imposed and
a statement showing to what extent
the sentence has not been carried
out, if the convicted person was
sentenced.

5. The request for extradition shall be ac-
companied by all other information as may be
required by the laws of the requested Party.

6. All the documents to be submitted by the
requesting Party in accordance with the pro-
visions of this Treaty shall be duly certified
as required by the laws of the requested Party,
and accompanied by a duly certified translation
in the language of the requested Party.

EX-Taylor, M.-00014

10

7. If the executive authority of the requested Party considers that the information furnished in support of the request for extradition of a, person sought is not sufficient to fulfill the requirements of this Treaty, that authority shall so notify the requesting Party, in order to enable the requesting Party to submit additional information before that authority determines whether to submit the request to a court of the requested Party. That authority may fix a time limit for the submission of such information.

## ARTICLE IX

1. In case of urgency the requested Party may provisionally detain the person to be sought when the requesting Party submits an application for provisional detention through the diplomatic channel, notifying the requested Party that a warrant of arrest has been issued or a sentence imposed for an offense for which extradition is to be granted in accordance with paragraph 1 of Article II and assuring the requested Party that a request for extradition will be made. The application for provisional detention shall describe the identity of the person to be sought and the facts of the case, and shall contain such further information as may be required by the laws of the requested Party.

2. If the requesting Party fails to present the request for extradition within forty-five days from the date of provisional detention,

EX-Taylor, M.-00015

11

the person detained shall be set at liberty, provided that this stipulation shall not prevent the requested Party from instituting a proceeding with a view to extraditing the person sought if a request for extradition is subsequently received.

### ARTICLE X

When a person sought advises a court or other competent authorities of the requested Party that he waives his rights to internal procedures required for his extradition, that Party shall take all necessary measures to expedite the extradition to the extent permitted under its laws.

### ARTICLE XI

The requested Party, upon receiving requests from the other Contracting Party and from a third State or States for the extradition of the same person either for the same offense or for different offenses, shall determine to which of the requesting States it will extradite that person.

### ARTICLE XII

1. The requested Party shall promptly communicate to the requesting Party through the diplomatic channel the decision on the request for extradition.

2. If an order to surrender has been issued by

EX-Taylor, M.-00016

12

the competent authority of the requested Party and the requesting Party fails to receive the person sought within such time as may be stipulated by the laws of the requested Party, it may set him at liberty and may subsequently refuse to extradite that person for the same offense. The requesting Party shall promptly remove the person received from the territory of the requested Party.

## ARTICLE XIII

To the extent permitted under the laws of the requested Party and subject to the right of third parties, all articles acquired as a result of the offense or which may be required as evidence shall be surrendered if extradition is granted.

## ARTICLE XIV

1. The requested Party shall make all necessary arrangements with respect to internal procedures, including the detention of the person sought, arising out of the request for extradition and bear the expenses by reason thereof, provided that expenses incurred for the transportation of the person ordered to be surrendered shall be paid by the requesting Party.

2. The requested Party shall not make any pecuniary claim against the requesting Party by reason of any compensation paid to a person sought for the damages caused to him by his

EX-Taylor, M.-00017

13

detention, examination or surrender under the provisions of this Treaty.

## ARTICLE XV

1. Each Contracting Party shall grant to the other Party the right to transport through its territory a person surrendered to the other Party by a third State on request made through the diplomatic channel except in any of the following circumstances:

(1) When the criminal act which has given rise to the extradition would not constitute an offense under the laws of the Contracting Party through which transit is requested.

(2) When the criminal act which has given rise to the extradition is a political offense or when it appears that the request for extradition is made with a view to prosecuting, trying or punishing the person surrendered for a political offense. If any question arises as to the application of this provision, the decision of the Contracting Party through which transit is requested shall prevail.

(3) When reasons of public order are opposed to transit.

2. In the case above, the Contracting Party to which extradition has been granted shall reimburse the Contracting Party through whose territory transportation has been made for any expenses incurred by the latter in connection with such transportation.

EX-Taylor, M.-00018

14

## ARTICLE XVI

1. This Treaty shall be subject to ratification and the instruments of ratification shall be exchanged at Washington as soon as possible. It shall enter into force on the thirtieth day after the date of the exchange of the instruments of ratification.[1]

2. This Treaty shall also apply to any offense specified in paragraph 1 of Article II committed before this Treaty enters into force.

3. On the entry into force of this Treaty, the Treaty of Extradition signed at Tokyo on April 29, 1886[2] and the Supplementary Convention of Extradition signed at Tokyo on May 17, 1906[3] between the United States of America and Japan shall terminate, provided that any extradition case pending in the requested Party at the time this Treaty enters into force shall remain subject to the procedures specified in the above-mentioned Treaty of Extradition and the Supplementary Convention of Extradition.

4. Either Contracting Party may terminate this Treaty at any time by giving six months' written notice to the other Party.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and Japanese languages, both equally authentic,

---

[1] Mar. 26, 1980.
[2] TS 191 ; 24 Stat. 1015.
[3] TS 454 ; 34 Stat. 2951.

EX-Taylor, M.-00019

15

at Tokyo, this third day of March, one thousand nine hundred and seventy-eight.


For the United States of America: [1]

*Michael J. Mansfield*

For Japan:

*Sunao Sonoda* [2]


[SEAL]                    [SEAL]


---

[1] Michael J. Mansfield.
[2] Sunao Sonoda.

EX-Taylor, M.-00020

16

SCHEDULE

1. Murder, manslaughter, including causing death through solicitation or assistance

2. Assault made with intent to commit murder

3. Malicious wounding, injury or assault

4. Illegal abortion

5. Abandonment which causes bodily harm or death

6. An offense relating to kidnapping, abduction or unlawful arrest or imprisonment

7. Threat

8. Rape, indecent assault

9. An offense relating to pandering or prostitution

10. An offense relating to obscene material

11. Bigamy

12. Burglary

13. Robbery

14. Larceny

15. Extortion, blackmail

TIAS 9625

EX-Taylor, M.-00021

17

16. Fraud (obtaining property, money, valuable securities, or other things of economic value by false pretenses or by fraudulent means)

17. Embezzlement, breach of trust by a person who is in a fiduciary relationship

18. An offense relating to unlawfully obtained property

19. An offense relating to damage of property, documents, or facilities

20. An offense against the laws relating to protection of industrial property or copyright

21. Obstruction of business by violence or threat

22. Arson, burning through gross negligence

23. Leading, directing or inciting a riot

24. An offense against the laws relating to protection of public health

25. An offense endangering public safety through explosion, water power or other destructive means

26. Piracy according to the law of nations

TIAS 9625

EX-Taylor, M.-00022

18

27. An offense relating to unlawful seizure of
    exercise of control of trains, aircraft,
    vessel or other means of transportation

28. An offense interfering with or endangering
    the normal operation of trains, aircraft,
    vessel or other means of transportation

29. An offense against the laws relating to
    the control of explosive substances,
    incendiary devices or dangerous or
    prohibited weapons

30. An offense against the laws relating to
    the control of narcotic drugs, cannabis,
    psychotropic drugs, cocaine, or their
    precursors or derivatives, or other
    dangerous drugs or chemicals

31. An offense against the laws relating to
    the control of poisons or other substance
    injurious to health

32. An offense relating to forgery or counter-
    feiting

33. An offense against the laws relating to
    the control of gambling or lotteries

34. Assault or threat upon public official
    relating to the execution of his duty

35. An offense relating to false statements

36. An offense relating to perjury

EX-Taylor, M.-00023

19

37. An offense relating to escape from
    confinement of a person detained or
    serving a sentence for an offense
    specified in paragraph 1 of Article II
    of this Treaty

38. An offense relating to obstruction of
    justice, including harboring criminals
    and suppressing or destroying evidence

39. Bribery

40. An offense relating to abuse of official
    authority

41. An offense against the laws relating to
    the control of public elections or
    political contributions and expenditures

42. An offense relating to willful evasion
    of taxes and duties

43. An offense against the laws relating to
    the control of companies or other
    corporations

44. An offense against the laws relating to
    bankruptcy or rehabilitation of a company

45. An offense against the laws relating to
    prohibition of private monopoly or unfair
    business transactions

46. An offense against the laws relating to
    the control of exportation and importation
    or international transfer of funds

20

47. Attempt, conspiracy, assistance, solicitation, preparation for, or participation in, the commission of any of the above-mentioned offenses

EX-Taylor, M.-00025



U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY
## EVIDENCE ACCOMPANYING REQUISITIONS IN
## THE UNITED STATES FOR EXTRADITION
## AMERICAN FOREIGN SERVICE

Tokyo, Japan                    06-25-2020

Place and Date *(mm-dd-yyyy)*

Minister-Counselor for Consular Affairs and Consul General

Karin M. Lang

Name                                           Title

of the United States of America at          Tokyo, Japan

hereby certify that the annexed papers, being      supporting documents

proper to be used upon an application for the extradition from the United States of America

Michael Taylor

charged with the crime of      Enabling the escape of criminals

alleged to have been committed in        Japan

are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by

the tribunals of Japan

as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed

this      twenty-fifth      day of              June, 2020

Month and Year

Signature

Karin M. Lang, Minister-Counselor for
Consular Affairs and Consul General

Type Name and Title of Certifying Officer
of the United States of America.

DS-0036
08-2019

EX-Taylor, M.-00026

CERTIFICATION

I, MATSUMOTO Rei, Director of the International Affairs Division, Criminal Affairs Bureau, Ministry of Justice of Japan, hereby certificate that attached hereto is the original Request for Extradition of a Criminal to the appropriate Legal Authorities in the United States of America made by the officer of the Government.

All the documents submitted herein are duly certified and authenticated together with certified translations in English.

June 25, 2020

MATSUMOTO Rei (Ms. )
Director
International Affairs Division
Criminal Affairs Bureau
Ministry of Justice
Japan

CERTIFICATE OF TRANSLATION

I, Ryozo KITAJIMA, certify that I am competent to translate these documents from Japanese to English, and that the translation is true and accurate, to the best of my ability.

Executed on June 25, 2020

Ryozo KITAJIMA
Public Prosecutor
Special Investigation Department
Tokyo District Public Prosecutors Office

I, Rei MATSUMOTO, certify that the said officer has sufficient ability to translate these documents.

Executed on June 25, 2020

Rei MATSUMOTO
Director of International Affairs Division
Criminal Affairs Bureau
Ministry of Justice

June 25, 2020

To: The Competent Authorities in the United States of America

Chief Public Prosecutor,
Tokyo District Public Prosecutors Office of Japan

山 上 秀明

## Request for Extradition of Michael L. Taylor

The Tokyo District Public Prosecutors Office has been searching for the fugitive Michael L. Taylor to execute the arrest warrant on the allegation of enabling the escape of criminals, and aiding and abetting the violation of the Immigration Control and Refugee Recognition Act, and we hereby request the U.S. competent authorities extradite him in accordance with the Treaty on Extradition between Japan and the United States of America.

Part I.   Personal Identification Information

| | |
|---|---|
| Name: | Michael L. Taylor (Male) |
| Nationality: | American |

Part II.   Summary of the Case

The suspects Michael L. Taylor (hereinafter "Michael Taylor"), Peter Maxwell Taylor (hereinafter "Peter Taylor") and George-Antoine Zayek (hereinafter "Zayek"), in conspiracy with each other, provided assistance and enabled the escape of Carlos Ghosn Bichara (hereinafter "Ghosn"). Michael Taylor, Peter Taylor, and Zayek provided assistance and enabled Ghosn's escape from Japan to Republic of Lebanon via Republic of Turkey, on December 29, 2019, by-

- Receiving the luggage, which was delivered from Ghosn's house to the Grand Hyatt Tokyo, and providing a place for him to change his clothes;
- Escorting Ghosn from Grand Hyatt Tokyo to the Star Gate Hotel Kansai Airport (hereinafter "Star Gate Hotel") in Osaka;
- In Star Gate Hotel, hiding Ghosn inside a black musical equipment box;
- Travelling from Star Gate Hotel to the premium gate called "Tamayura" at the Kansai International Airport;
- Having the employees of the airport, who had no knowledge of their plan, clear the embarkation procedure with Ghosn hidden inside the black box and putting the black box on board of the jet (Flight TCTSR) operated by MNG Jet; and
- Departing the airport with Ghosn by Flight TCTSR and then leaving Japan's territory.

Part III.  Details of Applicable Law

1.  Enabling the escape of criminals

   Penal Code
   Article 103    A person who harbors or enables the escape of another person who has either
       committed a crime punishable with a fine or greater punishment or has escaped from
       confinement shall be punished by imprisonment with work for not more than 3 years
       or a fine of not more than 300,000 yen.
   Article 60    Two or more persons who commit a crime in joint action are all principals.

2.  Interpretation of Article 103

       As explained in more detail in the Declaration of Naoki Watanabe, attached to this
   request as Exhibit #30, the conduct of Michael Taylor constitutes the crime of enabling
   the escape of criminals pursuant to Article 103 of the Penal Code, which is one of the
   offenses for which the Tokyo District Court issued a warrant for his arrest and for which
   Japan seeks his extradition from the United States.
       In this case, Michael Taylor, Peter Taylor and Zayek provided assistance and enabled
   Ghosn's escape in violation of Article 103, by the acts described in Parts II and IV.

3.  Statute of limitations

   Code of Criminal Procedure
   Article 250 Paragraph (2)    The statute of limitations is completed upon the lapse of the
       following time periods with regard to crimes other than crimes causing the death of a
       person and punishable with imprisonment or imprisonment without work or a greater
       punishment:
       (i) ~ (v)    (Omitted)
       (vi)   3 years for offenses punishable with imprisonment or imprisonment without
           work whose maximum term is less than 5 years or with a fine
   Article 255 Paragraph (1)    If an offender is outside Japan….., the statute of limitations
       is suspended during the period when the offender is outside Japan…..

4.  Additional relevant information

       The statute of limitations has been suspended on and from December 29, 2019 since
   Michael Taylor himself left Japan when he committed the crime of enabling the escape
   of criminals on that day.


Part IV.  Supplemental Explanation of Facts

1.       From 2001 through 2018, Ghosn served as Chairman of the Board of Directors and/or
   Chief Executive Officer (CEO) of Nissan Motor Co., Ltd. ("Nissan").
       Nissan is a Japanese automobile manufacturer with securities that trade on the Tokyo
   Stock Exchange.

2.       During his time in Nissan, Ghosn committed following offenses:

    (i)       Ghosn, in conspiracy with others including Gregory Lewis Kelly, who was the representative director of Nissan, in regard to the business of the Nissan, on five occasions within the period from June 2011 to June 2015, submitted Annual Reports of five consolidated fiscal years (from April 2010 to March 2015) which falsely stated the compensation of Ghosn for these fiscal years as approximately 4,987,000,000 JPY in total, whereas his fixed compensation for these fiscal years indeed were approximately 9,855,000,000 JPY in total (Violation of Financial Instruments and Exchange Act[1]);

    (ii)      Ghosn, in conspiracy with others including Gregory Lewis Kelly, who was the representative director of Nissan, in regard to the business of the Nissan, on three occasions within the period from June 2016 to June 2018, submitted Annual Reports of three consolidated fiscal years (from April 2015 to March 2018) which falsely stated the compensation of Ghosn for these fiscal years as approximately 2,904,000,000 JPY in total, whereas his fixed compensation for these fiscal years indeed were approximately 7,175,000,000 JPY in total (Violation of Financial Instruments and Exchange Act);

    (iii)     Ghosn, being requested by the bank to provide additional collateral for a coupon swap agreement entered into between his asset management company and that bank since a heavy appraisal loss had occurred on that agreement, transferred the status of a party to that agreement from that asset management company to Nissan on October 31, 2008, and accordingly made Nissan liable for the loss incurred under that agreement including the appraisal loss of approximately 1,850,400,000 JPY incurred on that day, thus a director committed an act in breach of his duty and caused financial damages to Nissan for the purpose of promoting his own interest (Violation of Companies Act[2]);

    (iv)     Ghosn, on four occasions within the period from June 29, 2009 to March 27, 2012, transferred total amount of 14,700,000 USD from the bank accounts of Nissan Middle East F.Z.E. (hereinafter "NMEF"), a consolidated subsidiary of Nissan, to the bank account of a certain company, located in the Kingdom of Saudi Arabia and managed by Khaled Ahmed Al Juffali (hereinafter "Juffali"), one of Ghosn's friends. By making these transfers, Ghosn, as a director, committed an act in breach of his duty

---

[1] Financial Instruments and Exchange Act

Article 24(1)       When Securities…issued by a company fall under any of the categories specified in the following items, the company shall submit, for each business year, a report stating the trade name of the company, financial conditions of the Corporate Group to which the company belongs and of the company, other important matters concerning the company's business and other matters specified by a Cabinet Office Ordinance as necessary and appropriate for the public interest or protection of investors (hereinafter referred to an "Annual Securities Report") to the Prime Minister within three months after the end of that business year...pursuant to the provisions of a Cabinet Office Ordinance.

    (i)       Securities listed in a Financial Instruments Exchange

Article 197      Any person who falls under any of the following items shall be punished by imprisonment with work for not more than ten years or by a fine of not more than ten million yen, or both.

    (i)       a person who has submitted any of the following documents containing misstatement on any important matters;…, Annual Securities Reports…thereof under Article 24(1)

[2] Companies Act

Article 960(1)      When any one of the following persons, for the purpose of promoting such person's own interest or the interest of a third party, or inflicting damage on a Stock Company, commits an act in breach of such person's duties and causes financial damages to such Stock Company, such person is punished by imprisonment for not more than ten years or a fine of not more than ten million yen, or both:

    (iii)     a director, accounting advisor, company auditor, and executive officer

and caused financial damages to Nissan for the purpose of promoting his own interest and the interest of a third party (Violation of Companies Act); and,

(v)     Ghosn, on July 25, 2017 and on July 30, 2018, transferred from the bank account of NMEF to the bank account of Suhail Bahwan Automobiles LLC (hereinafter "SBA"), a company located in the Sultanate of Oman, the total amount of 10,000,000 USD, 5,000,000 USD of which was intended for Ghosn's personal profit. By making these transfers, Ghosn, as a director, committed an act in breach of his duty and caused financial damages to Nissan for the purpose of promoting his own interest (Violation of Companies Act).

3.       The above offense has been investigated by Tokyo District Public Prosecutors Office ("TPPO"). The major timelines of this investigations are;

(i)   On November 19, 2018, TPPO arrested Ghosn for the count 2(i);
(ii)  On December 10, 2018, TPPO indicted Ghosn for the count 2(i) and rearrested Ghosn for the count 2(ii);
(iii) On December 21, 2018, TPPO rearrested Ghosn for the counts 2(iii)(iv);
(iv)  On January 11, 2019, TPPO indicted Ghosn for the counts 2(ii)(iii)(iv);
(v)   On April 4, 2019, TPPO rearrested Ghosn for the count 2(v);
(vi)  On April 22, 2019, TPPO indicted Ghosn for the count 2(v).

4.       Ghosn was detained for certain periods of time from November 19, 2018. However, on March 5, 2019, and on April 25, 2019, the Tokyo District Court issued orders releasing him on bail.

         The bail condition included following provisions;

(i)   Ghosn must live in his designated house;
(ii)  When summoned, Ghosn must report to the designated place at the designated time (if he has justifiable reasons not to be able to report, he must notify the court of the reasons in advance);
(iii) Ghosn must not hide or flee, or do anything which looks suspicious to tamper evidence;
(iv)  If Ghosn take domestic trips for 3 days or more, Ghosn must get approval from the court in advance; and,
(v)   Ghosn must not take overseas trips.

         At the time of his escape from Japan, dated on December 29, 2019, these cases were still pending trial at Tokyo District Court and his bail conditions did not change.

5.       Basic facts for Ghosn's escape from Japan are:

●   Ghosn left the house (designated by the court under bail conditions), pretending just to be taking a walk;
●   Ghosn traveled to Osaka, deceiving any observer by dropping by the hotel in Tokyo and changing his clothes;
●   In the hotel room in Osaka close to the Kansai International Airport, Ghosn hid inside a box brought by Michael Taylor and Zayek, who pretended to be

                    musicians[3];

- They bypassed embarkation procedure, by using the private jet whose luggage is unlikely to be checked; and
- They departed the airport on the same day.

In order to execute the above actions, the suspects coordinated on the following actions, which are corroborated with evidence including a number of surveillance cameras installed on their route and witness statements.

6.      Peter Taylor's immigration records (January 20, 2020)[4] show that, in the past year, Peter Taylor stayed in Japan from July 8 to 11, from August 21 to 23, and from December 6 to 7, 2019. He met Ghosn on July 8, 10, 11, August 21, 22, 23, and December 6, 2019[5].

7.      On December 28, 2019, which was the day before the escape, Peter Taylor entered into Japan and checked into Room 933 of Grand Hyatt Tokyo at approximately 11:49am[6]. After check-in, he met Ghosn for about 1 hour[7] and gave him the room key[8].

8.      At 10:10am on December 29, 2019 which was the day of escape, the private jet which Michael Taylor and Zayek were on board landed at the Kansai International Airport from Dubai. They entered into Japan with their luggage including two large black boxes[9]. At approximately 11:07am, both of them checked into Star Gate Hotel close to the airport[10] and placed their luggage including the two large black boxes in room 4609. Then, at 11:50am, they departed the hotel, went to Shin-Osaka Station and, at 12:56pm, took a bullet train (Shinkansen) for Tokyo[11].

9.      At 1:19pm, Ghosn came home by Toyota Alphard which he always used for his travel. Ghosn went back and forth between inside the house and the garage to take out five suitcases from inside of the house to the garage[12].

---

[3] An employee of the private lounge in Kansai International Airport gave a statement that Michael Taylor and Zayek told the employees of Kansai International Airport that they were musicians [Exhibit #21].

[4] [Exhibit #16]

[5] Except for December 6, 2019, Ghosn's meeting records, which were made as a condition of bail, show his meetings with Peter Taylor [Exhibit #11]. With respect to December 6, surveillance cameras installed in Grand Hyatt Tokyo show their meeting [Exhibit #6].

[6] A hotel receptionist identified Peter Taylor at the check-in counter by his passport (the hotel register of Grand Hyatt Tokyo [Exhibit #8, #9], the receptionist's statement [Exhibit #24]).

[7] Surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #4] and the statement of Ghosn's driver that dropped Ghosn off at Grand Hyatt Tokyo [Exhibit #26]

[8] When Ghosn went to Room 933 of Grand Hyatt Tokyo on December 29, he alone was able to operate the elevator (surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #2, #4]), which required a room key (the receptionist's statement [Exhibit #24]). Therefore, it is obvious that he had the room key at the time. Ghosn had no other option but to get the room key from Peter Taylor, who stayed at the room. This is only when Peter Taylor met with Ghosn after Peter Taylor's check-in.

[9] Interview results report [Exhibit #18], surveillance cameras installed in the Kansai International Airport [Exhibit #1]. For your information, immigration officials identified both Michael and Zayek at the immigration counter by their passport.

[10] The hotel register of Star Gate Hotel [Exhibit #25], surveillance cameras installed in that hotel [Exhibit #1]

[11] Surveillance cameras installed in Star Gate Hotel and Shin-Osaka Station [Exhibit #1]

[12] Surveillance cameras installed in Ghosn's house [Exhibit #7]

10.    At 2:06 pm, Peter Taylor, who waited inside the parking of Grand Hyatt Tokyo, received two suitcases from Ghosn's home that were transported in the Alphard driven by Ghosn's driver. Ghosn was not in the Alphard. Peter Taylor carried those two suitcases to Room 933 of Grand Hyatt Tokyo[13].

11.    At approximately 2:30 pm, Ghosn left the house from the main entrance with a knit cap and a scarf but without baggage. He walked to Grand Hyatt Tokyo, operated the elevator at the hotel using the card key he had been given by Peter Taylor to the 9th floor, entered Room 933 at 2:53pm, and changed his clothes there[14].

At approximately 3:24pm, Michael Taylor and Zayek left Shinagawa Station in Tokyo for Grand Hyatt Tokyo by taxi, met Peter Taylor at the entrance of the hotel, entered Room 933 together, and Michael Taylor, Zayek, Peter Taylor and Ghosn came out of Room 933 with luggage including two suitcases which Peter Taylor received in the parking of Grand Hyatt Tokyo.

Michael Taylor, Zayek and Ghosn took a taxi to Shinagawa Station with one suitcase out of two suitcases which Peter Taylor received, passed the ticket gate in Shinagawa Station at 4:43pm, and left for Osaka[15].

Peter Taylor carried one suitcase which Ghosn, Michael Taylor and Zayek did not carry out of two suitcases which Peter Taylor received, and departed alone to China from Narita Airport[16].

12.    At approximately 7:24pm, Michael Taylor, Zayek and Ghosn left Shin-Osaka Station for Star Gate Hotel by taxi[17].

At 8:14pm, Michael Taylor, Zayek and Ghosn arrived at Star Gate Hotel. Zayek and Ghosn entered Room 4609, and Michael Taylor joined them later. Ghosn hid in one of the big black boxes. At 9:57pm, Michael Taylor and Zayek left that room carrying their baggage including two big black boxes, one of which contained Ghosn. There is no video surveillance camera image of Ghosn leaving Room 4609. Michael Taylor and Zayek departed from the hotel and arrived at Kansai International Airport at 10:20pm. The baggage which Michael Taylor and Zayek carried passed the security check area without being checked and was loaded into the aforementioned private jet[18].

The aforementioned private jet departed for the Republic of Turkey at 11:10pm with Michael Taylor, Zayek and their baggage including the box containing Ghosn. Ghosn and others transferred airplanes at the airport in Turkey and finally entered the Republic of Lebanon.

13.    On December 31, 2019, Ghosn made a public announcement that he was in Lebanon. On that day, based on TPPO's request, Tokyo District Court vacated all bails on the ground that he had violated the conditions referred to in the paragraph 4 above.

---

[13] Surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #4]
[14] Surveillance cameras installed in Ghosn's house, on the street and in Grand Hyatt Tokyo [Exhibit #2, #4, #5, #7]
[15] Surveillance cameras installed in Grand Hyatt Tokyo, in Shinagawa Station, and inside the Shinkansen, and the drive recorder of the taxi [Exhibit #3]
[16] Surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #4], Peter Taylor's immigration records [Exhibit #16]
[17] Surveillance cameras installed in Shin-Osaka Station and the drive recorder of the taxi [Exhibit #3]
[18] Surveillance cameras installed in Star Gate Hotel [Exhibit #3], statements of an employee of the private lounge in the Kansai International Airport and a security inspector [Exhibit #21, #23]

14.    Ghosn made wire transfers to a bank account under the name of PROMOTE FOX LLC, a company managed by Peter Taylor, as follows;[19]

- October 9, 2019      540,000 USD
- October 25, 2019     322,500 USD

15.    The Tokyo District Public Prosecutors Office obtained the information that Michael Taylor and Peter Taylor entered the U.S. on February 16, 2020, and March 22, 2020, respectively, both from Dubai, the United Arab of Emirates, and requested the U.S. competent authority to execute provisional arrest. TPPO was informed that both Michael Taylor and Peter Taylor were arrested by the U.S. authorities on May 20, 2020, after they discovered that Peter Taylor was about to board a flight to Beirut, Lebanon. Japan does not have extradition treaties with Lebanon, the United Arab of Emirates, or China. The TPPO hereby requests the U.S. competent authority to extradite both of them.


Part V. Identification of the Fugitives

The Tokyo District Public Prosecutors Office has identified the fugitives based on the following evidential facts.

1.    Michael Taylor and Zayek

(i)    The immigration officer identified Michael Taylor and Zayek by their passports when they entered Japan. Their names are on the application documents as passengers of the private jet used in this case [Exhibit #10].
(ii)    The acts of Michael Taylor and Zayek after entering Japan are almost seamlessly traceable by surveillance cameras. Especially, they have been recorded in the surveillance cameras installed in Kansai International Airport, Star Gate Hotel, the bullet train, Shinagawa Station, Grand Hyatt Tokyo [Exhibit #1, #3, #4]. In addition, there are clear images of their faces recorded by the drive recorder and surveillance cameras installed in the taxi and the private lounge in Kansai International Airport respectively [Exhibit #1, #3], and the faces on the images resemble the pictures on their passports and pictures taken when they entered Japan [Exhibit #10, #12].
(iii)    The procedures of immigration recorded in the surveillance cameras are consistent with statements of the employees of the private lounge in Kansai International Airport and the airplane handling company, who served Michael Taylor and Zayek [Exhibit #1, #3, #20, #21].
(iv)    Michael Taylor and Zayek repeatedly entered and left Room 4009 and 4609 of Star Gate Hotel, and the names on the hotel register of those rooms are respectively "Taylor Michael" and "ZAYEK GEORGE ANTOINE" and their passport numbers are on the register [Exhibit #25].

2.    Peter Taylor

(i)    The name of a man on the hotel register who stayed at Room 933 of Grand Hyatt Tokyo on December 28-29, 2019 is "Peter Taylor" and Peter Taylor's passport is attached to the register [Exhibit #8, #9, #24].

---

[19] Relevant bank records [Exhibit #29]

(ii)     The acts of aforementioned man after check-in were almost seamlessly recorded by the surveillance cameras installed in the lobby, elevators, 9th floor's elevator hall, corridors and parking lot. The records of surveillance cameras include the scenes that (i) the aforementioned man is meeting with a man who appears to be Ghosn in the hotel on December 28, (ii) the aforementioned man is receiving two suitcases at the parking lot of Grand Hyatt Tokyo on December 29, (iii) the aforementioned man is entering Room 933 together with men who appear Michael Taylor and Zayek and going out of the Room 933 with men who appear Ghosn, Michael Taylor and Zayek [Exhibit #4]. The aforementioned man in each scene is deemed to be the same based on appearance and clothes, and his face resembles the picture on Peter Taylor's passport and the picture taken when he entered Japan [Exhibit #9, #13].

3.       Ghosn

(i)      The surveillance camera installed in Grand Hyatt Tokyo has recorded a scene that a man met with Peter Taylor at Grand Hyatt Tokyo after he arrived there and got out of Alphard, which Ghosn used, on December 28, 2019 [Exhibit #4]. The surveillance camera installed in Ghosn's house has recorded a scene that a man was coming into Ghosn's house around noon on December 29, 2019 [Exhibit #7].
         Concerning these situations, the driver of Ghosn gave a statement that he drove Ghosn to Grand Hyatt Tokyo afternoon on December 28, 2019 and that he drove Ghosn to his house from a restaurant around noon on December 29, 2019 [Exhibit #26]. Taking them into consideration, the man is identified as Ghosn.

(ii)     On December 29, 2019, the acts of a man such as going to Grand Hyatt Hotel from around Ghosn's house on foot, entering Room 933 of Grand Hyatt Hotel, leaving the room together with the men who appear to be Peter Taylor, Michael Taylor and Zayek, going to Osaka by the bullet train and entering Room 4609 of Star Gate Hotel, are almost seamlessly traceable by the surveillance cameras. Specifically, surveillance cameras installed on the street from around Ghosn's house to Grand Hyatt Tokyo, in Grand Hyatt Tokyo, in Shinagawa Station, inside the bullet train, in Shin Osaka Station and in Star Gate Hotel have recorded his acts [Exhibit #2, #3].
         Concerning these situations, there are clear images of the man's face without knit cap and mask recorded by the drive recorder of the taxi going to Star Gate Hotel from Shin Osaka Station [Exhibit #3 (picture #141)], which closely resemble Ghosn's face.

Part VI. Issuance of Warrant for the Fugitive's Arrest

         The following warrant for Michael Taylor's arrest, which is valid until now, was issued:

| | |
|---|---|
| Date of Issuance: | February 28, 2020[20] |
| Issuing Judge: | Yukiko Yomori, Tokyo District Court |
| Suspected Case: | Enabling the escape of criminals, and aiding and abetting the violation of the Immigration Control and Refugee Recognition Act |
| Expiration Date: | August 28, 2020 (the term of validity is scheduled to be renewed until Michael Taylor is arrested) |

---

[20] The arrest warrant was initially issued on January 30, 2020. However, the fugitive was not arrested by the expiration date, February 28, and the warrant was reissued on that date.

Part VII. Requested Matters

We request that Michael Taylor be extradited to Japan, based upon the criminal facts mentioned above to be applicable for extradition.

The cited criminal facts come under the Article 2, paragraph (1) of the Extradition Treaty between the United States and Japan and satisfy the requirement of the Article 3 of the said Treaty, with no hindrance for the execution of extradition.


Part VIII.  Attached Materials

1.   Certified copy of the arrest warrant
2.   The fugitive's face photo and fingerprints
3.   Copies of the fugitive's passports
4.   Documentary Evidence

| Arrest Warrant (Ordinary Arrest) | |
|---|---|
| Name of the suspect | Michael L. Taylor |
| Age, Address, Occupation of the suspect, Charge for which the arrest is permitted, summary of alleged facts of crime, place where suspect is to be brought, the official title and name of the requester: | As described in the attached Request for the Arrest Warrant |
| Term of validity: | Until August 28th, 2020 |
| After the term of validity, this warrant no longer enables initiation of an arrest. In the event of its expiration, it shall be returned to the competent court.<br>Even during the term of validity, if an arrest becomes unnecessary, it must be immediately returned to the competent court. | |
| I hereby permit an arrest of the suspect based on the aforementioned alleged facts of crime.<br>　　February 28th, 2020<br>　　　Tokyo District Court<br>　　　　Judge　Yukiko Yomori | |
| Seal of the official title and name of the arrester | |
| Time/date/year and place of the arrest | Arrested at　:　on　　　　, 20·· at |
| Time/date/year and place of custody | At　:　on　　　　, 20·· at |
| Name and seal | |
| Time/date/year of the procedure to send | At　:　on　　　　, 20·· at |
| Name and seal | |
| Time/date/year of the receipt of | At　:　on　　　　, 20·· at |
| Name and seal | |

Note: When executing the arrest, on the spot, search, seizure or inspection may be simultaneously carried out; however, attention is required so that honor of the suspect is respected and that disturbance to others is avoided as much as possible.

The suspect who has been arrested by this warrant is entitled to appoint defense attorney.

EX-Taylor, M.-00038

Request for an Arrest Warrant

February 28th, 2020

To: Judge, Tokyo District Court

Tokyo District Public Prosecutors Office

Public Prosecutor    Naoki Watanabe

I hereby request issuance of an Arrest Warrant against the person specified below on the alleged harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 Ⅱ) case.

1. Suspect

Name: MICHAEL L. TAYLOR

Age: 59, born on October 21st, 1960

Occupation: Unknown

Address: Unknown

2. If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

As described in Annex 1

3. Government or public office or other place to which the suspect is taken:

Tokyo District Public Prosecutors Office, its Branch Offices or Suboffices and   Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office;

A District Public Prosecutors Office located within the jurisdiction of place of the arrest of the suspect, its Branch Offices or Suboffices and Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office; or

Tokyo Detention Center.

4. If more than one warrant is necessary, the number and the reason:

Not Applicable.

5. Probable reasons to suspect that the suspect has committed the crime:

The entire volume of the case documents, including the investigation report by the prosecutor dated on January 29th, 2020.

6. Reasons for the necessity of the suspect's arrest:

There are reasonable grounds to suspect that he is likely to tamper evidence by himself or in conspiracy with interested persons and that he may flee.

7. In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

As described in Annex 2

8. With regard to the offense which shall be punished with a fine of not more than 300,000 JPY (or 20,000 JPY with regard to crimes other than those under the Penal Code, the Act on Punishment of

Physical Violence and Others, and the Act on Penal Provisions related to Economic Activities) and a misdemeanor detention or petty fine, describe reasons stipulated by the proviso of Paragraph 1 of Article 199 of the Code of Criminal Procedure:

    Not Applicable

9. Summary of the alleged facts of a crime:

    As described in Annex 3

Annex 1

If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

1. Term
   For 6 month

2. Reason
   The suspect is currently not in Japan and the prosecutor at Tokyo District Public Prosecutors Office cannot make contact with the suspect. In addition, given that the suspect provided assistance and enabled Carlos Ghosn Bichara's escape and the suspect himself escaped from Japan, and that the fact of Ghosn's escape has been widely reported in foreign country, and therefore the suspect can easily notify the investigation against himself is on-going, it is unlikely that the suspect voluntarily enters Japan.
   We need to request other countries for cooperation to find the whereabouts of the suspect and to arrest the suspect. For that, we need a considerable long period of time in negotiating with other countries.

Annex 2

In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

Although an arrest warrant was issued on January 30th, 2020 by Judge Yukiko Yomori at Tokyo District Court in connection with the fact of the same crime, the suspect has not been arrested until today.

Annex 3

Alleged facts of a crime:

The suspect, in conspiracy with George Antoine Zayek and Peter Maxwell Taylor, knowing that Carlos Ghosn Bichara (hereinafter "Ghosn"), who held citizenships of French Republic, Republic of Lebanon, and Federative Republic Brazil, was a defendant under criminal proceedings pending at Tokyo District Court for the offences of Violation of Financial Instruments and Exchange Act and Violation of Company Act, and bailed under the conditions including neither hide nor escape and no overseas trip, for the purpose of enabling him to get off with the punishment, at the time of Ghosn's departure from Japan to Republic of Lebanon via Republic of Turkey, from 1:53pm to 11:10pm on December 29th, 2019, provided assistance and enabled Ghosn's escape by; carrying Ghosn's luggage from Ghosn's house at Azabunagasakacho 1-10, Minato-ward, Tokyo prefecture, to Grand Hyatt Tokyo at Roppongi 6-10-3, Minato-ward; in the hotel, handing the luggage to Ghosn and providing a place for him to change Ghosn's cloths; escorting Ghosn from the hotel to Star Gate Hotel Kansai Airport at Rinkuoraikita 1, Izumisano-city, Osaka prefecture; in the hotel, hiding Ghosn inside their carrying luggage; travelling from the hotel to the premium gate called "Tamayura" at the Kansai International Airport located at Tajiri-cho, Sennan-gun, Osaka prefecture, or so; having the employees of the airport, who had no knowledge of their plan, clear the embarkation procedure with hiding Ghosn inside their carrying luggage and put the luggage on board of the jet of Flight TCTSR operated by MNG Jet; and departing the airport with Ghosn by Flight TCTSR and then leaving Japan's territory, thus the suspect committed harboring of criminals by assisting Ghosn's escape and aided by easing Ghosn's illegal leaving from Japan without receiving confirmation by immigration officer.

The above is a certified copy.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

Applicant's Identity Information

1. Particulars of identity

   Nationality    United States of America
   Name           TALOR MICHAEL L
   Sex            Male
   Date of Birth  ████ 1960
   Date of Application for Landing      December 29, 2019
   Place of Application for Landing     Kansai International Airport

2. Image of fingerprints

   2  指紋画像




左示指                                    右示指

   Left index finger          Right index finger

3. Image of Face



The above is a certified extract.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

EX-Taylor, M.-00046



EX-Taylor, M.-00047

The above is a certified extract.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

EX-Taylor, M.-00048

List of Exhibits

| No. | Title |
|-----|-------|
| 1 | Report on Image Analysis Results (January 19, 2020) |
| 2 | Report on Image Analysis Results (January 18, 2020) |
| 3 | Report on Image Analysis Results (January 19, 2020) |
| 4 | Report on Image Analysis Results (January 18, 2020) |
| 5 | Report on Image Analysis Results (January 18, 2020) |
| 6 | Report on Image Analysis Results (January 20, 2020) |
| 7 | Investigation Report (January 15, 2020) |
| 8 | Copy Report (January 17, 2020) |
| 9 | Enquiry for Information Related to Investigation (January 4, 2020) *written reply is attached |
| 10 | Report on Collection of Documents (January 23, 2020) |
| 11 | Investigation Report (June 3, 2020) |
| 12 | Enquiry for Information Related to Investigation (January 4, 2020) *written reply (made on January 4, 2020) is attached |
| 13 | Enquiry for Information Related to Investigation (January 7, 2020) *written reply (made on January 7, 2020) is attached |
| 14 | Enquiry for Immigration Records (January 17, 2020) *written reply (made on January 20, 2020) is attached |
| 15 | Enquiry for Immigration Records (January 17, 2020) *written reply (made on January 20, 2020) is attached |
| 16 | Enquiry for Immigration Records (January 17, 2020) *written reply (made on January 20, 2020) is attached |
| 17 | Enquiry for Immigration Records (January 6, 2020) *written reply (made on January 7, 2020) is attached |
| 18 | Interview Results Report (January 18, 2020) |
| 19 | Record of Oral Statement to Detective by Tomoyuki Matsui (January 29, 2020) |
| 20 | Record of Oral Statement to Detective by Tomoyuki Matsui (January 29, 2020) |
| 21 | Record of Oral Statement to Detective by Kayoko Tokunaga (January 19, 2020) |
| 22 | Record of Oral Statement to Detective by Shigekuni Kawada (January 20, 2020) |
| 23 | Record of Oral Statement to Detective by Akira Baba (January 18, 2020) |
| 24 | Record of Oral Statement to Detective by Waegenaer Herlinde (January 19, 2020) |
| 25 | Report on Collection of Documents (January 21, 2020) |
| 26 | Record of Oral Statement to Prosecutor by Ticzon Danilo Ejanda (January 27, 2020) |
| 27 | U.S. Entry and Exit Records of Michael Taylor (March 31, 2020) |
| 28 | U.S. Entry and Exit Records of Peter Taylor (March 31, 2020) |
| 29 | Investigation Report (June 5, 2020) |
| 30 | Declaration of Naoki Watanabe |

Exhibit 1

Form of Attachments to Record of Statements

Report on Image Analysis Results

(Movements of two investigation subjects on 29th December from entry into Japan to arrival at Grand Hyatt Tokyo)

19th January 2020

To: Mr. Yukiharu Watarai, Judicial Police Officer and Senior Superintendent
Director of First Criminal Investigation Division of the Tokyo Metropolitan Police Department

Yoshiyuki Suzuki, Judicial Police Officer and Assistant Police Inspector
First Criminal Investigation Division of the Tokyo Metropolitan Police Department

Regarding the case of suspected violations of the Immigration Control and Refugee Recognition Act by suspect Carlos Ghosn Bichara, we have confirmed, by analyzing image data collected from security cameras, and report below, the movements of the investigation subjects, George Antoine Zayek and Michael L Taylor, from their entry into Japan to joining another investigation subject, Peter Maxwell Taylor at Grand Hyatt Tokyo.

1. Date of analysis
   Period from 2nd January 2020 to 19th January 2020
2. Persons who performed analysis
(1) This reporter
(2) The following members of the First Criminal Investigation Division of the Tokyo Metropolitan Police Department:
    Muneharu Keida, Judicial Police Officer and Assistant Police Inspector
    Hironori Takimoto, Judicial Police Officer and Police Sergeant
    Ryuji Umezawa, Judicial Police Officer and Police Sergeant
    Kei Watanabe, Judicial Police Officer and Police Sergeant
    Isao Komatsu, Judicial Police Officer and Police Sergeant
    Kazuhiro Minagawa, Judicial Police Officer and Police Sergeant
    Yusuke Kataigi, Judicial Police Officer and Police Sergeant
    Hiroshi Takei, Judicial Police Officer and Police Sergeant
3. Equipment used for analysis
   Nine analytical terminals (laptop personal computers)
4. Data analyzed
(1) Images from a security camera installed at Kansai International Airport, 1 Senshu-kuko Kita, Izumisano-shi, Osaka

(Images Nos. 1 – 8 and 17 – 24)
(2) Images from a security camera installed at the security check room of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 9 – 16 and 25 – 29)
(3) Images from a security camera installed near the entrance of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 30 – 34)
(4) Images from security cameras installed at Star Gate Hotel Kansai Airport, 1 Rinku Orai Kita, Izumisano-shi, Osaka

(Images Nos. 35 – 133)

Tokyo Metropolitan Police Department

Form of Attachments to Record of Statements

(5) Images from security cameras installed at JR Tokai Shin Osaka Station, 5-16-1 Nishi-nakajima, Yodogawa-ku, Osaka-shi, Osaka

(Images Nos. 134 − 157)

(6) Images from security cameras installed in JR Tokai Nozomi No. 162

(Images Nos. 158 − 174)

(7) Images from security cameras installed at JR Tokai Shinagawa Station, 2-1-78 Konan, Minato-ku, Tokyo

(Images Nos. 175 − 194)

(8) Images from security cameras installed near a corridor (Jiyu Tsuro) at JR Shinagawa East Building, 2-18-1 Konan, Minato-ku, Tokyo

(Images Nos. 195 − 206)

(9) Images from security cameras installed at 3-26-27 Takanawa, Minato-ku, Tokyo

(Images Nos. 207 − 218)

(10) Images from security cameras installed near the taxi stand at JR Shinagawa East Building, 2-18-1 Konan, Minato-ku, Tokyo

(Images Nos. 219 − 239)

(11) Images from security cameras installed at Grand Hyatt Tokyo, 6-10-3 Roppongi, Minato-ku, Tokyo

(Images Nos. 240 − 266)

5.  Analytical results
    As shown in the sketches and documents attached hereto.
6.  Symbols (codes) assigned to the investigation subjects
    For the purpose of the sketches and documents attached hereto:
(1) George Antoine Zayek (hereinafter referred to as "George") is assigned and indicated as code A;
(2) Michael L Taylor (hereinafter referred to as "Michael") is assigned and indicated as code B; and
(3) Peter Maxwell Taylor (hereinafter referred to as "Peter") is assigned and indicated as code C.
    These codes have been inserted, as appropriate, on the images contained in the documents to show the movements of the investigation subjects, etc.
(4) In unsharp images analyzed, the investigation subjects were identified based on what was found out in other security camera images.
7.  Measures
    To clarify the analytical results, attached to the end of this report are: (1) five sketches; and (2) a 67-page document in Excel file format containing 266 images, which are still images extracted from relevant videos, trimmed, enlarged and/or otherwise adjusted, and accompanied by legends.

End

Exhibit          2

Form of Attachments to Record of Statements

Report on Image Analysis Results

(Movements of Ghosn on 29th December from his home to Grand Hyatt Tokyo)

18th January 2020

To: Mr. Yukiharu Watarai, Judicial Police Officer and Senior Superintendent
Director of First Criminal Investigation Division of the Tokyo Metropolitan
Police Department

Ryuji Umezawa, Judicial Police Officer and Police Sergeant
First Criminal Investigation Division of the Tokyo Metropolitan Police Department

Regarding the case of suspected violations of the Immigration Control and Refugee
Recognition Act by suspect Carlos Ghosn Bichara, we have confirmed, by analyzing image
data collected from security cameras, and report below, the movements of the suspect.

1.  Date of analysis
    Period from 2nd January 2020 to 18th January 2020
2   Persons who performed analysis
(1) This reporter
(2) Yoshiyuki Suzuki, Judicial Police Officer and Assistant Police Inspector, First Criminal
    Investigation Division of the Tokyo Metropolitan Police Department
(3) Daisuke Hara, Judicial Police Officer and Assistant Police Inspector, First Criminal
    Investigation Division of the Tokyo Metropolitan Police Department
(4) Hiroshi Takei, Judicial Police Officer and Police Sergeant, First Criminal Investigation
    Division of the Tokyo Metropolitan Police Department
(5) Kazuhiro Minagawa, Judicial Police Officer and Police Sergeant, First Criminal
    Investigation Division of the Tokyo Metropolitan Police Department
(6) Kei Watanabe, Judicial Police Officer and Police Sergeant, First Criminal Investigation
    Division of the Tokyo Metropolitan Police Department
(7) Isao Komatsu, Judicial Police Officer and Police Sergeant, First Criminal Investigation
    Division of the Tokyo Metropolitan Police Department
3.  Equipment used for analysis
    Seven analytical terminals (laptop personal computers)
4.  Data analyzed
(1) Images from a security camera installed at Nagasaka Building, 1-3 Azabu-Nagasakacho,
    Minato-ku, Tokyo

(see images Nos. 1 – 2)

(2) Images from security cameras installed at Azabu Nagasaka House, 1-54 Azabu-
    Nagasakacho, Minato-ku, Tokyo

(see images Nos. 3 – 19)

(3) Images from a security camera installed at Kabushiki Kaisha Nagasaka Sarashina, 13
    Azabu-Nagasakacho, Minato-ku, Tokyo

(see images Nos. 20 – 23)

(4) Images from security cameras installed at Tokyo Metropolitan Police Department
    Toriizaka Residence, 1-1-6 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 24 – 31)

(5) Images from a security camera installed at Minato City Azabu Library, 5-12-24
    Roppongi, Minato-ku, Tokyo

(see images Nos. 32 – 34)

(6) Images from camera No. 2 of Nagasaka-kai, installed near 1-4-2 Azabu Juban, Minato-
    ku, Tokyo

(see images Nos. 35 – 38)

EX-Taylor, M.-00127

Form of Attachments to Record of Statements

(7) Images from camera No. 5 of Azabu Juban Shotengai Promotion Association, installed near 1-7-3 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 39 – 41)

(8) Images from camera No. 1 of Nagasaka-kai, installed near 1-4-6 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 42 – 46)

(9) Images from security cameras installed at Minato City Azabu Juban Public Parking Station, 1-4-10 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 47 – 54)

(10) Images from security cameras installed at Roppongi Hills Gate Tower, 6-11-1 Roppongi, Minato-ku, Tokyo

(see images Nos. 55 – 61)

(11) Images from security cameras installed at Roppongi Hills Mori Tower, 6-10-1 Roppongi, Minato-ku, Tokyo

(see images Nos. 62 – 89)

(12) Images from security cameras installed at Grand Hyatt Tokyo, 6-10-3 Roppongi, Minato-ku, Tokyo

(see images Nos. 90 – 106)

5. Analytical results

As shown in the sketches and documents attached hereto.

6. Symbols (codes) assigned to the suspect

(1) For the purpose of the sketches and documents attached hereto, suspect Carlos Ghosn Bichara (hereinafter referred to as "Ghosn") is assigned and indicated as code G. This code has been inserted, as appropriate, on in the images contained in the documents to show the movements of the suspect.

(2) In unsharp images analyzed, the suspect was identified based on what was found out in other security camera images.

7. Measures

To clarify the analytical results, attached to the end of this report are: (1) two sketches; and (2) a 27-page document in Excel file format containing 106 images, which are still images extracted from relevant videos, trimmed, enlarged and/or otherwise adjusted, and accompanied by legends.

End

Exhibit 3

Form of Attachments to Record of Statements

Report on Image Analysis Results

(Movements of the suspect and two others on 29th December from Grand Hyatt Tokyo to departure from Japan)

19th January 2020

To: Mr. Yukiharu Watarai, Judicial Police Officer and Senior Superintendent
Director of First Criminal Investigation Division of the Tokyo Metropolitan
Police Department

Yoshiyuki Suzuki, Judicial Police Officer and Assistant Police Inspector
First Criminal Investigation Division of the Tokyo Metropolitan Police
Department

Regarding the case of suspected violations of the Immigration Control and Refugee Recognition Act by suspect Carlos Ghosn Bichara, we have confirmed, by analyzing image data collected from security cameras, and report below, the movements of the suspect and the investigation subjects, George Antoine Zayek and Michael L Taylor, from Grand Hyatt Tokyo to their departure from Japan.

1. Date of analysis
   Period from 2nd January 2020 to 19th January 2020
2. Persons who performed analysis
(1) This reporter
(2) The following members of the First Criminal Investigation Division of the Tokyo Metropolitan Police Department:
   Muneharu Keida, Judicial Police Officer and Assistant Police Inspector
   Daisuke Hara, Judicial Police Officer and Assistant Police Inspector
   Hironori Takimoto, Judicial Police Officer and Police Sergeant
   Ryuji Umezawa, Judicial Police Officer and Police Sergeant
   Kei Watanabe, Judicial Police Officer and Police Sergeant
   Isao Komatsu, Judicial Police Officer and Police Sergeant
   Hiroshi Takei, Judicial Police Officer and Police Sergeant
   Yusuke Kataigi, Judicial Police Officer and Police Sergeant
3. Equipment used for analysis
   Nine analytical terminals (laptop personal computers)
4. Data analyzed
(1) Images from security cameras installed at Grand Hyatt Tokyo, 6-10-3 Roppongi, Minato-ku, Tokyo

(Images Nos. 1 – 35)

(2) Images from security cameras installed at Roppongi Hills Mori Tower, 6-10-1 Roppongi, Minato-ku, Tokyo

(Images Nos. 36 – 51 and 54 – 56)

(3) Images from the drive recorder installed in a taxi (Nerima 530U6876) of Kokusai kotsu Co., Ltd.

(Images Nos. 52, 53, 57, 58 and 60 – 63)

(4) An image from a security camera installed at Shinagawa Station Takanawa Exit Police Box of Takanawa Police Station, Tokyo Metropolitan Police Department, 3-26-30 Takanawa, Minato-ku, Tokyo

(Image No. 59)

Tokyo Metropolitan Police Department
EX-Taylor, M.-00160

Form of Attachments to Record of Statements

(5) Images from security cameras installed at JR East Shinagawa Station, 3-26-27 Takanawa, Minato-ku, Tokyo

(Images Nos. 64 – 88)

(6) Images from security cameras installed at JR Tokai Shinagawa Station, 2-1-78 Konan, Minato-ku, Tokyo

(Images Nos. 89 – 110)

(7) Images from security cameras installed in JR Tokai Nozomi No. 391

(Images Nos. 111 – 124)

(8) Images from security cameras installed at JR Tokai Shin Osaka Station, 5-16-1 Nishi-nakajima, Yodogawa-ku, Osaka-shi, Osaka

(Images Nos. 125 – 135)

(9) Images from the drive recorder installed in a taxi (Naniwa 500I5636) of Tsurumi Office of Kabushiki Kaisha Miraito

(Images Nos. 136 – 145)

(10) Images from a security camera installed at the SiS Rinku Tower, 1 Rinku Orai Kita, Izumisano-shi, Osaka

(Images Nos. 146 – 149)

(11) Images from security cameras installed at Star Gate Hotel Kansai Airport, 1 Rinku Orai Kita, Izumisano-shi, Osaka

(Images Nos. 150 – 200 and 213 – 300)

(12) Images from a security camera installed near the entrance of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 201 – 212 and 301 – 315)

(13) Images from a security camera installed at the security check room of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 316 – 333)

(14) Images from security cameras installed at Kansai International Airport, 1 Senshu-kuko Kita, Izumisano-shi, Osaka

(Images Nos. 334 – 359)

5. Analytical results

As shown in the sketches and documents attached hereto.

6. Symbols (codes) assigned to the suspect and the investigation subjects

For the purpose of the sketches and documents attached hereto:

(1) suspect Carlos Ghosn Bichara (hereinafter referred to as "Ghosn") is assigned and indicated as code G;

(2) George Antoine Zayek (hereinafter referred to as "George") is assigned and indicated as code A;

(3) Michael L Taylor (hereinafter referred to as "Michael") is assigned and indicated as code B; and

(4) Peter Maxwell Taylor (hereinafter referred to as "Peter") is assigned and indicated as code C.

These codes have been inserted, as appropriate, on the images contained in the documents to show the movements of the suspect and others.

(5) In unsharp images analyzed, the suspect and the investigation subjects were identified based on what was found out in other security camera images.

7. Measures

To clarify the analytical results, attached to the end of this report are: (1) five sketches; and (2) a 90-page document in Excel file format containing 359 images, which are still images

Form of Attachments to Record of Statements

extracted from relevant videos, trimmed, enlarged and/or otherwise adjusted, and accompanied by legends.

End

# Exhibit 2

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF KAREN K. JOHNSON

I, Karen K. Johnson, declare and say as follows:

1. I am an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Peter Maxwell Taylor. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and Japan are found in Treaty on Extradition between the United States of America and Japan, signed on 3 March 1978 (the "Treaty"). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Embassy of Japan has submitted Diplomatic Note No. P60, dated 29 June 2020, formally requesting the extradition of Peter Maxwell Taylor. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article XIV(1) of the Treaty, the Government of the United States of America provides legal representation in U.S. courts for the Government of Japan in its extradition requests, and the Government of Japan provides legal representation in its courts for extradition requests made by the United States.

5. The offense for which extradition is sought is covered under Article II of the Treaty and by the Schedule annexed to the Treaty.

6. The documents in support of the extradition request submitted by the Embassy of Japan were certified on 25 June 2020 by Karin M. Lang, Minister-Counselor for Consular Affairs and Consul General at the United States Embassy in Tokyo, in accordance with 18 U.S.C. § 3190. Ms. Lang, at the time of her certification, was the principal consular officer of the United States in Japan.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 2⁄4 , 2020.

KAREN K JOHNSON

Attachments:
1. Copy of Note
2. Copy of Treaty

**EMBASSY OF JAPAN**
2520 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C. 20008
(202) 238-6700

P60

Note Verbale

The Embassy of Japan in the United States of America presents its compliments to the Department of State and has the honor to refer to the Note Verbale No. P 43, dated May 1, 2020 from the Embassy of Japan requesting the provisional detention of Peter Maxwell Taylor, and the Extradition Treaty between Japan and the United States of March 3, 1978, and to request the extradition of Peter Maxwell Taylor for the offense of Enabling the escape of criminals. The offense and the detail of the request are described in the documents attached hereto. The offense is covered by Article II, paragraph 1 of the Treaty and clause 38 of the Schedule annexed hereto.

The Embassy of Japan in the United States of America avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington D.C., June 29, 2020



TREATIES AND OTHER INTERNATIONAL ACTS SERIES 9625

# EXTRADITION

Treaty, With Exchange of
Notes, Between the
UNITED STATES OF AMERICA
and JAPAN

Signed at Tokyo March 3, 1978



EX-Taylor, P.-00004

E

*Treaty, with exchange of n⟨*
*Ratification advised by the ⟨*
*November 30, 1979;*
*Ratified by the President*
*December 13, 1979;*
*Ratified by Japan February*
*Ratifications exchanged at ⟩*
*Proclaimed by the Preside*
*March 4, 1980;*
*Entered into force March 26*

By the President of

A PR⟨

CONSIDERING THAT:
The Treaty on Extradition
and Japan, together with a r⟨
Tokyo on March 3, 1978, the
nese languages, is hereto anne

The Senate of the United
November 30, 1979, two-thir
therein, gave its advice and
together with a related excha

The Treaty, together with ⟨
by the President of the Unit⟨
1979, in pursuance of the adv
duly ratified on the part of Ja

It is provided in Article XⅤ
enter into force on the thirtiet
the instruments of ratificatio⟨

The instruments of ratifica⟨
Washington on February 25
together with the exchange of ⟨
1980;

62-682 O—80

## NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89–497, approved
July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

"... the Treaties and Other International Acts
Series issued under the authority of the Secretary of
State shall be competent evidence ... of the treaties,
international agreements other than treaties, and proc-
lamations by the President of such treaties and inter-
national agreements other than treaties, as the case
may be, therein contained, in all the courts of law
and equity and of maritime jurisdiction, and in all the
tribunals and public offices of the United States, and
of the several States, without any further proof or
authentication thereof."

*For sale by the Superintendent of Documents, U.S. Government Printing Office,
Washington, D.C. 20402. Subscription Price: $110; $27.50 additional
for foreign mailing. Single copies vary in price. This issue $3.*

EX-Taylor, P.-00005

# JAPAN

## Extradition

*Treaty, with exchange of notes, signed at Tokyo March 3, 1978;*
*Ratification advised by the Senate of the United States of America*
*November 30, 1979;*
*Ratified by the President of the United States of America*
*December 13, 1979;*
*Ratified by Japan February 19, 1980;*
*Ratifications exchanged at Washington February 25, 1980;*
*Proclaimed by the President of the United States of America*
*March 4, 1980;*
*Entered into force March 26, 1980.*

---

### BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Japan, together with a related exchange of notes, was signed at Tokyo on March 3, 1978, the text of which, in the English and Japanese languages, is hereto annexed;

The Senate of the United States of America by its resolution of November 30, 1979, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty, together with a related exchange of notes;

The Treaty, together with a related exchange of notes, was ratified by the President of the United States of America on December 13, 1979, in pursuance of the advice and consent of the Senate, and was duly ratified on the part of Japan;

It is provided in Article XVI of the Treaty that the Treaty shall enter into force on the thirtieth day after the date of the exchange of the instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on February 25, 1980; and accordingly the Treaty, together with the exchange of notes, will enter into force on March 26, 1980;

EX-Taylor, P.-00006

2

Now, THEREFORE, I, Jimmy Carter, President of the United States of America, proclaim and make public the Treaty, together with a related exchange of notes, to the end that they shall be observed and fulfilled with good faith on and after March 26, 1980, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this fourth day of March in the year of our Lord one thousand nine hundred eighty and of the Independence of the United States of America the two [SEAL] hundred fourth.

JIMMY CARTER

By the President:
  CYRUS VANCE
    *Secretary of State*

TREATY ON EXTRA
THE UNITED STATES O

The United States of

Desiring to make mor
ation of the two countr
of crime,

Have agreed as follo

ARTIC

Each Contracting Par
tradite to the other Par
the provisions of this ~
in its territory and sou
for prosecution, for tra
punishment for any offer
graph 1 of Article II.
committed outside the te
questing Party, the cond
paragraph 1 of Article \
be applied.

ARTICLE

1. Extradition shall be
with the provisions of t
offense listed in the Sc
Treaty, which forms an i
Treaty, when such an off
the laws of both Contrac
by life imprisonment, or
liberty for a period of
or for any other offense
is punishable by the fed

EX-Taylor, P.-00007

3

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA AND JAPAN

The United States of America and Japan,

Desiring to make more effective the cooperation of the two countries for the repression of crime,

Have agreed as follows:

## ARTICLE I

Each Contracting Party undertakes to extradite to the other Party, in accordance with the provisions of this Treaty, any person found in its territory and sought by the other Party for prosecution, for trial, or to execute punishment for any offense specified in paragraph 1 of Article II. When the offense was committed outside the territory of the requesting Party, the conditions specified in paragraph 1 of Article VI, inter alia, shall be applied.

## ARTICLE II

1. Extradition shall be granted in accordance with the provisions of this Treaty for any offense listed in the Schedule annexed to this Treaty, which forms an integral part of this Treaty, when such an offense is punishable by the laws of both Contracting Parties by death, by life imprisonment, or by deprivation of liberty for a period of more than one year; or for any other offense when such an offense is punishable by the federal laws of the United

EX-Taylor, P.-00008

4

States and by the laws of Japan by death, by life imprisonment, or by deprivation of liberty for a period of more than one year.

Extradition shall be granted for any offense of which one of the above-mentioned offenses is a substantial element, even if, for purposes of granting federal jurisdiction to the United States Government, interstate transporting, or the use of the mails or other interstate facilities is also an element of the specific offense.

2. In the case in which the person sought has been sentenced by a court of the requesting Party for any offense to which paragraph 1 applies, extradition shall be granted only if the person has been sentenced to death or if the sentence remaining to be served is at least four months.

### ARTICLE III

Extradition shall be granted only if there is sufficient evidence to prove either that there is probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested or that the person sought is the person convicted by a court of the requesting Party.

### ARTICLE IV

1. Extradition shall not be granted under this Treaty in any of the following circumstances:

(1) When the offense for which extradition is requested is a political offense or when

EX-Taylor, P.-00009

5

it appears that the request for extradition
is made with a view to prosecuting, trying or
punishing the person sought for a political
offense.  If any question arises as to the
application of this provision, the decision
of the requested Party shall prevail.

(2) When the person sought has been prose-
cuted or has been tried and convicted or ac-
quitted by the requested Party for the offense
for which extradition is requested.

(3) In the case of a request for extradition
emanating from Japan, when the prosecution  of
the offense for which extradition is requested
would be barred by lapse of time, under the
laws of the United States.

(4) In the case of a request for extradition
emanating from the United States, when the
imposition or the execution of punishment for
the offense for which extradition is requested
would be barred by reasons prescribed under
the laws of Japan, including lapse of time;

      (a) if Japan were to have jurisdiction
          over the offense, or

      (b) if Japan in fact has such juris-
          diction and the trial were to be
          held in its court.

2. The requested Party may refuse extradition
when the person sought has been tried and
acquitted, or has undergone the execution of
punishment in a third State for the offense
for which extradition is requested.

EX-Taylor, P.-00010

6

3. When the person sought has been prosecuted or has not undergone the execution of punishment in the territory of the requested Party for an offense other than that for which extradition is requested, the requested Party may defer his surrender until the conclusion of the trial and the full execution of any punishment he may be or may have been imposed.

## ARTICLE V

The requested Party shall not be bound to extradite its own nationals, but it shall have the power to extradite them in its discretion.

## ARTICLE VI

1. When the offense for which extradition is requested has been committed outside the territory of the requesting Party, the requested Party shall grant extradition if the laws of that Party provide for the punishment of such an offense committed outside its territory, or if the offense has been committed by a national of the requesting Party.

2. For the purposes of this Treaty, the territory of a Contracting Party means all areas of land, water and airspace under the sovereignty or authority of that Contracting Party, including any vessel registered in that Contracting Party, and any aircraft registered in that Contracting Party provided that the aircraft is in flight. For the purposes of this provision an aircraft shall be considered

EX-Taylor, P.-00011

7

to be in flight at any time from the moment
when all its external doors are closed follow-
ing embarkation until the moment when any such
door is opened for disembarkation.

## ARTICLE VII

1. The requesting Party shall not, except in
any of the following circumstances, detain,
prosecute, try nor punish a person surrendered
under this Treaty for an offense other than
that for which extradition has been granted,
nor extradite him to a third State, provided
that these stipulations shall not apply to
offenses committed after the extradition:

(1) When he has left the territory of the
requesting Party after his extradition and
has voluntarily returned to it.

(2) When he has not left the territory of
the requesting Party within forty-five days
from the day when he has been set free to do
so.

(3) When the requested Party has consented
to his detention, prosecution, trial or punish-
ment for an offense other than that for which
extradition has been granted or to his ex-
tradition to a third State.

2. The requesting Party may detain, prosecute,
try or punish the person surrendered under
this Treaty for any offense for which ex-
tradition is to be granted in accordance with
paragraph 1 of Article II, in so far as such

EX-Taylor, P.-00012

8

measures are instituted upon the basic facts which constitute the offense for which extradition has been granted.

## ARTICLE VIII

1. The request for extradition shall be made through the diplomatic channel.

2. The request for extradition shall be accompanied by:

   (a) Documents which describe the identity of the person sought;

   (b) A statement of the facts of the case;

   (c) The texts of the laws describing the essential elements and the designation of the offense for which extradition is requested;

   (d) The texts of the laws describing the punishment for the offense; and

   (e) The texts of the laws describing the time limit on the prosecution or the execution of punishment for the offense.

3. When the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by:

   (a) A copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party;

   (b) Evidence proving that the person sought is the person to whom the warrant of arrest refers; and

EX-Taylor, P.-00013

9

(c) Such evidence as would provide probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested.

4. When the request for extradition relates to a convicted person, it shall be accompanied by:

(a) A copy of the judgment of conviction imposed by a court of the requesting Party;

(b) Evidence proving that the person sought is the person to whom the conviction refers; and

(c) (i) A copy of the warrant of arrest, if the convicted person was not sentenced; or

(ii) A copy of the sentence imposed and a statement showing to what extent the sentence has not been carried out, if the convicted person was sentenced.

5. The request for extradition shall be accompanied by all other information as may be required by the laws of the requested Party.

6. All the documents to be submitted by the requesting Party in accordance with the provisions of this Treaty shall be duly certified as required by the laws of the requested Party, and accompanied by a duly certified translation in the language of the requested Party.

EX-Taylor, P.-00014

10

7. If the executive authority of the requested Party considers that the information furnished in support of the request for extradition of a person sought is not sufficient to fulfill the requirements of this Treaty, that authority shall so notify the requesting Party, in order to enable the requesting Party to submit additional information before that authority determines whether to submit the request to a court of the requested Party. That authority may fix a time limit for the submission of such information.

## ARTICLE IX

1. In case of urgency the requested Party may provisionally detain the person to be sought when the requesting Party submits an application for provisional detention through the diplomatic channel, notifying the requested Party that a warrant of arrest has been issued or a sentence imposed for an offense for which extradition is to be granted in accordance with paragraph 1 of Article II and assuring the requested Party that a request for extradition will be made. The application for provisional detention shall describe the identity of the person to be sought and the facts of the case, and shall contain such further information as may be required by the laws of the requested Party.

2. If the requesting Party fails to present the request for extradition within forty-five days from the date of provisional detention,

EX-Taylor, P.-00015

11

the person detained shall be set at liberty,
provided that this stipulation shall not
prevent the requested Party from instituting
a proceeding with a view to extraditing the
person sought if a request for extradition is
subsequently received.

## ARTICLE X

When a person sought advises a court or
other competent authorities of the requested
Party that he waives his rights to internal
procedures required for his extradition, that
Party shall take all necessary measures to
expedite the extradition to the extent per-
mitted under its laws.

## ARTICLE XI

The requested Party, upon receiving requests
from the other Contracting Party and from a
third State or States for the extradition of
the same person either for the same offense
or for different offenses, shall determine to
which of the requesting States it will extra-
dite that person.

## ARTICLE XII

1. The requested Party shall promptly communi-
cate to the requesting Party through the diplo-
matic channel the decision on the request for
extradition.

2. If an order to surrender has been issued by

EX-Taylor, P.-00016

12

the competent authority of the requested Party and the requesting Party fails to receive the person sought within such time as may be stipulated by the laws of the requested Party, it may set him at liberty and may subsequently refuse to extradite that person for the same offense.  The requesting Party shall promptly remove the person received from the territory of the requested Party.

## ARTICLE XIII

To the extent permitted under the laws of the requested Party and subject to the right of third parties, all articles acquired as a result of the offense or which may be required as evidence shall be surrendered if extradition is granted.

## ARTICLE XIV

1. The requested Party shall make all necessary arrangements with respect to internal procedures, including the detention of the person sought, arising out of the request for extradition and bear the expenses by reason thereof, provided that expenses incurred for the transportation of the person ordered to be surrendered shall be paid by the requesting Party.

2. The requested Party shall not make any pecuniary claim against the requesting Party by reason of any compensation paid to a person sought for the damages caused to him by his

EX-Taylor, P.-00017

13

detention, examination or surrender under the provisions of this Treaty.

## ARTICLE XV

1. Each Contracting Party shall grant to the other Party the right to transport through its territory a person surrendered to the other Party by a third State on request made through the diplomatic channel except in any of the following circumstances:

(1) When the criminal act which has given rise to the extradition would not constitute an offense under the laws of the Contracting Party through which transit is requested.

(2) When the criminal act which has given rise to the extradition is a political offense or when it appears that the request for extradition is made with a view to prosecuting, trying or punishing the person surrendered for a political offense. If any question arises as to the application of this provision, the decision of the Contracting Party through which transit is requested shall prevail.

(3) When reasons of public order are opposed to transit.

2. In the case above, the Contracting Party to which extradition has been granted shall reimburse the Contracting Party through whose territory transportation has been made for any expenses incurred by the latter in connection with such transportation.

EX-Taylor, P.-00018

14

## ARTICLE XVI

1. This Treaty shall be subject to ratification and the instruments of ratification shall be exchanged at Washington as soon as possible. It shall enter into force on the thirtieth day after the date of the exchange of the instruments of ratification.[1]

2. This Treaty shall also apply to any offense specified in paragraph 1 of Article II committed before this Treaty enters into force.

3. On the entry into force of this Treaty, the Treaty of Extradition signed at Tokyo on April 29, 1886[2] and the Supplementary Convention of Extradition signed at Tokyo on May 17, 1906[3] between the United States of America and Japan shall terminate, provided that any extradition case pending in the requested Party at the time this Treaty enters into force shall remain subject to the procedures specified in the above-mentioned Treaty of Extradition and the Supplementary Convention of Extradition.

4. Either Contracting Party may terminate this Treaty at any time by giving six months' written notice to the other Party.

IN WITNESS WHEREOF, the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and Japanese languages, both equally authentic,

---

[1] Mar. 26, 1980.
[2] TS 191; 24 Stat. 1015.
[3] TS 454; 34 Stat. 2951.

TIAS 9625

15

at Tokyo, this third day of March, one
thousand nine hundred and seventy-eight.

For the United States of America:

*Michael J. Mansfield* [1]

For Japan:

*Sunao Sonoda* [2]

[SEAL]                    [SEAL]

---

[1] Michael J. Mansfield.
[2] Sunao Sonoda.

62-582 O - 80 - 3 : QL 3                    TIAS 9625

EX-Taylor, P.-00020

16

## SCHEDULE

1. Murder, manslaughter, including causing death through solicitation or assistance

2. Assault made with intent to commit murder

3. Malicious wounding, injury or assault

4. Illegal abortion

5. Abandonment which causes bodily harm or death

6. An offense relating to kidnapping, abduction or unlawful arrest or imprisonment

7. Threat

8. Rape, indecent assault

9. An offense relating to pandering or prostitution

10. An offense relating to obscene material

11. Bigamy

12. Burglary

13. Robbery

14. Larceny

15. Extortion, blackmail

TIAS 9625

EX-Taylor, P.-00021

17

16. Fraud (obtaining property, money, valuable securities, or other things of economic value by false pretenses or by fraudulent means)

17. Embezzlement, breach of trust by a person who is in a fiduciary relationship

18. An offense relating to unlawfully obtained property

19. An offense relating to damage of property, documents, or facilities

20. An offense against the laws relating to protection of industrial property or copyright

21. Obstruction of business by violence or threat

22. Arson, burning through gross negligence

23. Leading, directing or inciting a riot

24. An offense against the laws relating to protection of public health

25. An offense endangering public safety through explosion, water power or other destructive means

26. Piracy according to the law of nations

18

27. An offense relating to unlawful seizure or exercise of control of trains, aircraft, vessel or other means of transportation

28. An offense interfering with or endangering the normal operation of trains, aircraft, vessel or other means of transportation

29. An offense against the laws relating to the control of explosive substances, incendiary devices or dangerous or prohibited weapons

30. An offense against the laws relating to the control of narcotic drugs, cannabis, psychotropic drugs, cocaine, or their precursors or derivatives, or other dangerous drugs or chemicals

31. An offense against the laws relating to the control of poisons or other substances injurious to health

32. An offense relating to forgery or counterfeiting

33. An offense against the laws relating to the control of gambling or lotteries

34. Assault or threat upon public official relating to the execution of his duty

35. An offense relating to false statements

36. An offense relating to perjury

19

37. An offense relating to escape from
    confinement of a person detained or
    serving a sentence for an offense
    specified in paragraph 1 of Article II
    of this Treaty

38. An offense relating to obstruction of
    justice, including harboring criminals
    and suppressing or destroying evidence

39. Bribery

40. An offense relating to abuse of official
    authority

41. An offense against the laws relating to
    the control of public elections or
    political contributions and expenditures

42. An offense relating to willful evasion
    of taxes and duties

43. An offense against the laws relating to
    the control of companies or other
    corporations

44. An offense against the laws relating to
    bankruptcy or rehabilitation of a company

45. An offense against the laws relating to
    prohibition of private monopoly or unfair
    business transactions

46. An offense against the laws relating to
    the control of exportation and importation
    or international transfer of funds

20

47.  Attempt, conspiracy, assistance, solici-
tation, preparation for, or participation
in, the commission of any of the above-
mentioned offenses

EX-Taylor, P.-00025



U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY
### EVIDENCE ACCOMPANYING REQUISITIONS IN
### THE UNITED STATES FOR EXTRADITION
### AMERICAN FOREIGN SERVICE

Tokyo, Japan          06-25-2020

Place and Date *(mm-dd-yyyy)*

Minister-Counselor for Consular Affairs and Consul General

Karin M. Lang

Name                                    Title

of the United States of America at          Tokyo, Japan

hereby certify that the annexed papers, being          supporting documents

proposed to be used upon an application for the extradition from the United States of America

Peter Russell Taylor

charged with the crime of          Enabling the escape of criminals

alleged to have been committed in          Japan

are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by

the tribunals of          Japan

as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed

this          twenty-fifth          day of          June, 2020

Month and Year

Signature

Karin M. Lang, Minister-Counselor for
Consular Affairs and Consul General

Type Name and Title of Certifying Officer
of the United States of America.

DS-0036
08-2019

EX-Taylor, P.-00026

CERTIFICATION

I,  MATSUMOTO Rei,  Director of the International Affairs Division, Criminal Affairs Bureau,  Ministry of Justice of Japan,  hereby certificate that attached hereto is the original Request for Extradition of a Criminal to the appropriate Legal Authorities in the United States of America made by the officer of the Government.

All the documents submitted herein are duly certified and authenticated together with certified translations in English.

June 25, 2020

MATSUMOTO Rei (Ms. )
Director
International Affairs Division
Criminal Affairs Bureau
Ministry of Justice
Japan

CERTIFICATE OF TRANSLATION

I, Ryozo KITAJIMA, certify that I am competent to translate these documents from Japanese to English, and that the translation is true and accurate, to the best of my ability.

Executed on June 25, 2020

北嶋　良蔵

Ryozo KITAJIMA
Public Prosecutor
Special Investigation Department
Tokyo District Public Prosecutors Office

I, Rei MATSUMOTO, certify that the said officer has sufficient ability to translate these documents.

Executed on June 25, 2020

松本　麗

Rei MATSUMOTO
Director of International Affairs Division
Criminal Affairs Bureau
Ministry of Justice

June 25, 2020

To: The Competent Authorities in the United States of America

Chief Public Prosecutor,
Tokyo District Public Prosecutors Office of Japan

山 上 秀 明

## Request for Extradition of Peter Maxwell Taylor

The Tokyo District Public Prosecutors Office has been searching for the fugitive Peter Maxwell Taylor to execute the arrest warrant on the allegation of enabling the escape of criminals, and aiding and abetting the violation of the Immigration Control and Refugee Recognition Act, and we hereby request the U.S. competent authorities extradite him in accordance with the Treaty on Extradition between Japan and the United States of America.

Part I.   Personal Identification Information

Name:          Peter Maxwell Taylor (Male)
Nationality:   American

Part II.   Summary of the Case

The suspects Peter Maxwell Taylor (hereinafter "Peter Taylor"), Michael L. Taylor (hereinafter "Michael Taylor") and George-Antoine Zayek (hereinafter "Zayek"), in conspiracy with each other, provided assistance and enabled the escape of Carlos Ghosn Bichara (hereinafter "Ghosn"). Michael Taylor, Peter Taylor, and Zayek provided assistance and enabled Ghosn's escape from Japan to Republic of Lebanon via Republic of Turkey on December 29, 2019 by-

- Receiving the luggage, which was delivered from Ghosn's house to the Grand Hyatt Tokyo, and providing a place for him to change his clothes;
- Escorting Ghosn from Grand Hyatt Tokyo to the Star Gate Hotel Kansai Airport (hereinafter "Star Gate Hotel") in Osaka;
- In Star Gate Hotel, hiding Ghosn inside a black musical equipment box;
- Travelling from Star Gate Hotel to the premium gate called "Tamayura" at the Kansai International Airport;
- Having the employees of the airport, who had no knowledge of their plan, clear the embarkation procedure with Ghosn hidden inside the black box and putting the black box on board of the jet (Flight TCTSR) operated by MNG Jet; and
- Departing the airport with Ghosn by Flight TCTSR and then leaving Japan's territory.

Part III.  Details of Applicable Law

1.  Enabling the escape of criminals

Penal Code
Article 103   A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 3 years or a fine of not more than 300,000 yen.
Article 60   Two or more persons who commit a crime in joint action are all principals.

2.  Interpretation of Article 103

As explained in more detail in the Declaration of Naoki Watanabe, attached to this request as Exhibit #30, the conduct of Peter Taylor constitutes the crime of enabling the escape of criminals pursuant to Article 103 of the Penal Code, which is one of the offenses for which the Tokyo District Court issued a warrant for his arrest and for which Japan seeks his extradition from the United States.
In this case, Michael Taylor, Peter Taylor and Zayek provided assistance and enabled Ghosn's escape in violation of Article 103, by the acts described in Parts II and IV.

3.  Statute of limitations

Code of Criminal Procedure
Article 250 Paragraph (2)   The statute of limitations is completed upon the lapse of the following time periods with regard to crimes other than crimes causing the death of a person and punishable with imprisonment or imprisonment without work or a greater punishment:
(i) ~ (v)   (Omitted)
(vi)   3 years for offenses punishable with imprisonment or imprisonment without work whose maximum term is less than 5 years or with a fine
Article 255 Paragraph (1)   If an offender is outside Japan….., the statute of limitations is suspended during the period when the offender is outside Japan…..

4.  Additional relevant information

The statute of limitations has been suspended on and from December 29, 2019 since Michael Taylor himself left Japan when he committed the crime of enabling the escape of criminals on that day.


Part IV.  Supplemental Explanation of Facts

1.       From 2001 through 2018, Ghosn served as Chairman of the Board of Directors and/or Chief Executive Officer (CEO) of Nissan Motor Co., Ltd. ("Nissan").
Nissan is a Japanese automobile manufacturer with securities that trade on the Tokyo Stock Exchange.

2.       During his time in Nissan, Ghosn committed following offenses:

(i)      Ghosn, in conspiracy with others including Gregory Lewis Kelly, who was the representative director of Nissan, in regard to the business of the Nissan, on five occasions within the period from June 2011 to June 2015, submitted Annual Reports of five consolidated fiscal years (from April 2010 to March 2015) which falsely stated the compensation of Ghosn for these fiscal years as approximately 4,987,000,000 JPY in total, whereas his fixed compensation for these fiscal years indeed were approximately 9,855,000,000 JPY in total (Violation of Financial Instruments and Exchange Act[1]);

(ii)     Ghosn, in conspiracy with others including Gregory Lewis Kelly, who was the representative director of Nissan, in regard to the business of the Nissan, on three occasions within the period from June 2016 to June 2018, submitted Annual Reports of three consolidated fiscal years (from April 2015 to March 2018) which falsely stated the compensation of Ghosn for these fiscal years as approximately 2,904,000,000 JPY in total, whereas his fixed compensation for these fiscal years indeed were approximately 7,175,000,000 JPY in total (Violation of Financial Instruments and Exchange Act);

(iii)    Ghosn, being requested by the bank to provide additional collateral for a coupon swap agreement entered into between his asset management company and that bank since a heavy appraisal loss had occurred on that agreement, transferred the status of a party to that agreement from that asset management company to Nissan on October 31, 2008, and accordingly made Nissan liable for the loss incurred under that agreement including the appraisal loss of approximately 1,850,400,000 JPY incurred on that day, thus a director committed an act in breach of his duty and caused financial damages to Nissan for the purpose of promoting his own interest (Violation of Companies Act[2]);

(iv)    Ghosn, on four occasions within the period from June 29, 2009 to March 27, 2012, transferred total amount of 14,700,000 USD from the bank accounts of Nissan Middle East F.Z.E. (hereinafter "NMEF"), a consolidated subsidiary of Nissan, to the bank account of a certain company, located in the Kingdom of Saudi Arabia and managed by Khaled Ahmed Al Juffali (hereinafter "Juffali"), one of Ghosn's friend. By making these transfers, Ghosn, as a director, committed an act in breach of his duty and caused financial damages to Nissan for the purpose of promoting his own interest

---

[1] Financial Instruments and Exchange Act
Article 24(1)    When Securities...issued by a company fall under any of the categories specified in the following items, the company shall submit, for each business year, a report stating the trade name of the company, financial conditions of the Corporate Group to which the company belongs and of the company, other important matters concerning the company's business and other matters specified by a Cabinet Office Ordinance as necessary and appropriate for the public interest or protection of investors (hereinafter referred to an "Annual Securities Report") to the Prime Minister within three months after the end of that business year...pursuant to the provisions of a Cabinet Office Ordinance.
     (i)     Securities listed in a Financial Instruments Exchange
Article 197    Any person who falls under any of the following items shall be punished by imprisonment with work for not more than ten years or by a fine of not more than ten million yen, or both.
     (i)     a person who has submitted any of the following documents containing misstatement on any important matters;..., Annual Securities Reports...thereof under Article 24(1)
[2] Companies Act
Article 960(1)    When any one of the following persons, for the purpose of promoting such person's own interest or the interest of a third party, or inflicting damage on a Stock Company, commits an act in breach of such person's duties and causes financial damages to such Stock Company, such person is punished by imprisonment for not more than ten years or a fine of not more than ten million yen, or both:
     (iii)    a director, accounting advisor, company auditor, and executive officer

and the interest of a third party (Violation of Companies Act); and,

(v)    Ghosn, on July 25, 2017 and on July 30, 2018, transferred from the bank account of NMEF to the bank account of Suhail Bahwan Automobiles LLC (hereinafter "SBA"), a company located in the Sultanate of Oman, the total amount of 10,000,000 USD, 5,000,000 USD of which was intended for Ghosn's personal profit. By making these transfers, Ghosn, as a director, committed an act in breach of his duty and caused financial damages to Nissan for the purpose of promoting his own interest (Violation of Companies Act).

3.    The above offense has been investigated by Tokyo District Public Prosecutors Office ("TPPO"). The major timelines of this investigations are;

(i)   On November 19, 2018, TPPO arrested Ghosn for the count 2(i);
(ii)  On December 10, 2018, TPPO indicted Ghosn for the count 2(i) and rearrested Ghosn for the count 2(ii);
(iii) On December 21, 2018, TPPO rearrested Ghosn for the counts 2(iii)(iv);
(iv)  On January 11, 2019, TPPO indicted Ghosn for the counts 2(ii)(iii)(iv);
(v)   On April 4, 2019, TPPO rearrested Ghosn for the count 2(v);
(vi)  On April 22, 2019, TPPO indicted Ghosn for the count 2(v).

4.    Ghosn was detained for certain periods of time from November 19, 2018. However, on March 5, 2019, and on April 25, 2019, the Tokyo District Court issued orders releasing him on bail.

The bail condition included following provisions;

(i)   Ghosn must live in his designated house;
(ii)  When summoned, Ghosn must report to the designated place at the designated time (if he has justifiable reasons not to be able to report, he must notify the court of the reasons in advance);
(iii) Ghosn must not hide or flee, or do anything which looks suspicious to tamper evidence;
(iv)  If Ghosn take domestic trips for 3 days or more, Ghosn must get approval from the court in advance; and,
(v)   Ghosn must not take overseas trips.

At the time of his escape from Japan, dated on December 29, 2019, these cases were still pending trial at Tokyo District Court and his bail conditions did not change.

5.    Basic facts for Ghosn's escape from Japan are:

- Ghosn left the house (designated by the court under bail conditions), pretending just to be taking a walk;
- Ghosn traveled to Osaka, deceiving any observer by dropping by the hotel in Tokyo and changing his clothes;
- In the hotel room in Osaka close to the Kansai International Airport, Ghosn hid inside a box brought by Michael Taylor and Zayek, who pretended to be musicians[3];

---

[3] An employee of the private lounge in Kansai International Airport gave a statement that Michael Taylor

- They bypassed embarkation procedure, by using the private jet whose luggage is unlikely to be checked; and
- They departed the airport on the same day.

In order to execute the above actions, the suspects coordinated on the following actions, which are corroborated with evidence including a number of surveillance cameras installed on their route and witness statements.

6.     Peter Taylor's immigration records (January 20, 2020)[4] show that, in the past year, Peter Taylor stayed in Japan from July 8 to 11, from August 21 to 23, and from December 6 to 7, 2019. He met Ghosn on July 8, 10, 11, August 21, 22, 23, and December 6, 2019[5].

7.     On December 28, 2019, which was the day before the escape, Peter Taylor entered into Japan and checked in Room 933 of Grand Hyatt Tokyo at approximately 11:49am[6]. After check-in, he met Ghosn for about 1 hour[7] and gave him the room key[8].

8.     At 10:10am on December 29, 2019, which was the day of escape, the private jet which Michael Taylor and Zayek were on board landed at the Kansai International Airport from Dubai. They entered into Japan with their luggage including two large black boxes[9]. At approximately 11:07am, both of them checked into Star Gate Hotel close to the airport[10] and placed their luggage including the two large black boxes in room 4609. Then, at 11:50am, they departed the hotel, went to Shin-Osaka Station and, at 12:56pm, took a bullet train (Shinkansen) for Tokyo[11].

9.     At 1:19pm, Ghosn came home by Toyota Alphard which he always used for his travel. Ghosn went back and forth between inside the house and the garage to take out five suitcases from inside of the house to the garage[12].

10.     At 2:06 pm, Peter Taylor, who waited inside the parking of Grand Hyatt Tokyo, received two suitcases from Ghosn's home that were transported in the Alphard driven by

---

and Zayek told the employees of Kansai International Airport that they were musicians [Exhibit #21].

[4] [Exhibit #16]

[5] Except for December 6, 2019, Ghosn's meeting records, which were made as a condition of bail, show his meetings with Peter Taylor [Exhibit #11]. With respect to December 6, surveillance cameras installed in Grand Hyatt Tokyo show their meeting [Exhibit #6].

[6] A hotel receptionist identified Peter Taylor at the check-in counter by his passport (the hotel register of Grand Hyatt Tokyo [Exhibit #8, #9], the receptionist's statement [Exhibit #24]).

[7] Surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #4] and the statement of Ghosn's driver that dropped Ghosn off at Grand Hyatt Tokyo [Exhibit #26].

[8] When Ghosn went to Room 933 of Grand Hyatt Tokyo on December 29, he alone was able to operate the elevator (surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #2, #4]), which required a room key (the receptionist's statement [Exhibit #24]). Therefore, it is obvious that he had the room key at the time. Ghosn had no other option but to get the room key from Peter Taylor, who stayed at the room. This is only when Peter Taylor met with Ghosn after Peter Taylor's check-in.

[9] Interview results report [Exhibit #18], surveillance cameras installed in the Kansai International Airport [Exhibit #1]. For your information, immigration officials identified both Michael Taylor and Zayek at the immigration counter by their passport.

[10] The hotel register of Star Gate Hotel [Exhibit #25], surveillance cameras installed in that hotel [Exhibit #1]

[11] Surveillance cameras installed in Star Gate Hotel and Shin-Osaka Station [Exhibit #1]

[12] Surveillance camera installed in Ghosn's house [Exhibit #7]

Ghosn's driver. Ghosn was not in the Alphard. Peter Taylor carried those two suitcases to Room 933 of Grand Hyatt Tokyo[13].

11.      At approximately 2:30pm, Ghosn left the house from the main entrance with a knit cap and a scarf but without baggage. He walked to Grand Hyatt Tokyo, operated the elevator at the hotel using the card key he had been given by Peter Taylor to the 9th floor, entered Room 933 at 2:53pm, and changed his clothes there[14].

At approximately 3:24pm, Michael Taylor and Zayek left Shinagawa Station in Tokyo for Grand Hyatt Tokyo by taxi, met Peter Taylor at the entrance of the hotel, entered Room 933 together, and Michael Taylor, Zayek, Peter Taylor and Ghosn came out of Room 933 with luggage including two suitcases which Peter Taylor received in the parking of Grand Hyatt Tokyo.

Michael Taylor, Zayek and Ghosn took a taxi to Shinagawa Station with one suitcase out of two suitcases which Peter Taylor received, passed the ticket gate in Shinagawa Station at 4:43pm, and left for Osaka[15].

Peter Taylor carried one suitcase which Ghosn, Michael Taylor and Zayek did not carry, out of two suitcases which Peter Taylor received, and departed alone to China from Narita Airport[16].

12.      At approximately 7:24pm, Michael Taylor, Zayek and Ghosn left Shin-Osaka Station for Star Gate Hotel by taxi[17].

At 8:14pm, Michael Taylor, Zayek and Ghosn arrived at Star Gate Hotel. Zayek and Ghosn entered Room 4609, and Michael Taylor joined them later. Ghosn hid in one of the big black boxes. At 9:57pm, Michael Taylor and Zayek left that room carrying their baggage including two big black boxes, one of which contained Ghosn. There is no video surveillance camera image of Ghosn leaving Room 4609. Michael Taylor and Zayek departed from the hotel and arrived at Kansai International Airport at 10:20pm. The baggage which Michael Taylor and Zayek carried passed the security check area without being checked and was loaded into the aforementioned private jet[18].

The aforementioned private jet departed for the Republic of Turkey at 11:10pm with Michael Taylor, Zayek and their baggage including the box containing Ghosn. Ghosn and others transferred airplanes at the airport in Turkey and finally entered the Republic of Lebanon.

13.      On December 31, 2019, Ghosn made a public announcement that he was in Lebanon. On that day, based on TPPO's request, Tokyo District Court vacated all bails on the ground that he had violated the conditions referred to in the paragraph 4 above.

14.      Ghosn made wire transfers to a bank account under the name of PROMOTE FOX

---

[13] Surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #4]
[14] Surveillance cameras installed in Ghosn's house, on the street and in Grand Hyatt Tokyo [Exhibit #2, #4, #5, #7]
[15] Surveillance cameras installed in Grand Hyatt Tokyo, in Shinagawa Station, and inside the Shinkansen, and the drive recorder of the taxi [Exhibit #3]
[16] Surveillance cameras installed in Grand Hyatt Tokyo [Exhibit #4], Peter Taylor's immigration records [Exhibit #16]
[17] Surveillance cameras installed in Shin-Osaka Station and the drive recorder of the taxi [Exhibit #3]
[18] Surveillance cameras installed in Star Gate Hotel [Exhibit #3], statements of an employee of the private lounge in the Kansai International Airport and a security inspector [Exhibit #21, #23]

LLC, a company managed by Peter Taylor, as follows;[19]

- October 9, 2019      540,000 USD
- October 25, 2019     322,500 USD

15.     The Tokyo District Public Prosecutors Office obtained the information that Michael Taylor and Peter Taylor entered the U.S. on February 16, 2020, and March 22, 2020, respectively, both from Dubai, the United Arab of Emirates, and requested the U.S. competent authority to execute provisional arrest. TPPO was informed that both Michael Taylor and Peter Taylor were arrested by the U.S. authorities on May 20, 2020, after they discovered that Peter Taylor was about to board a flight to Beirut, Lebanon. Japan does not have extradition treaties with Lebanon, the United Arab of Emirates, or China. The TPPO hereby requests the U.S. competent authority to extradite both of them.


Part V. Identification of the Fugitives

        The Tokyo District Public Prosecutors Office has identified the fugitives based on the following evidential facts.

1.      Peter Taylor

(i)     The name of a man on the hotel register who stayed at Room 933 of Grand Hyatt Tokyo on December 28-29, 2019 is "Peter Taylor" and Peter Taylor's passport is attached to the register [Exhibit #8, #9, #24].
(ii)    The acts of aforementioned man after check-in were almost seamlessly recorded by the surveillance cameras installed in the lobby, elevators, 9th floor's elevator hall, corridors and parking lot. The records of surveillance cameras include the scenes that (i) the aforementioned man is contacting with a man who appears to be Ghosn in the hotel on December 28, (ii) the aforementioned man is receiving two suitcases at the parking lot of Grand Hyatt Tokyo on December 29, (iii) the aforementioned man is entering Room 933 together with men who appear Michael Taylor and Zayek and going out of the Room 933 with men who appear Ghosn, Michael Taylor and Zayek [Exhibit #4]. The aforementioned man in each scene is deemed to be the same based on appearance and clothes, and his face resembles the picture on Peter Taylor's passport and the picture taken when he entered Japan [Exhibit #9, #13].

2.      Michael Taylor and Zayek

(i)     The immigration officer identified Michael Taylor and Zayek by their passports when they entered Japan. Their names are on the application documents as passengers of the private jet used in this case [Exhibit #10].
(ii)    The acts of Michael Taylor and Zayek after entering Japan are almost seamlessly traceable by surveillance cameras. Especially, they have been recorded in the surveillance cameras installed in Kansai International Airport, Star Gate Hotel, the bullet train, Shinagawa Station, Grand Hyatt Tokyo [Exhibit #1, #3, #4]. In addition, there are clear images of their faces recorded by the drive recorder and surveillance cameras installed in the taxi and the private lounge in Kansai International Airport respectively [Exhibit #1,

---

[19]  Relevant bank records [Exhibit #29]

#3], and the faces on the images resemble the pictures on their passports and pictures taken when they entered Japan [Exhibit #10, #12].

(iii) The procedures of immigration recorded in the surveillance cameras are consistent with statements of the employees of the private lounge in Kansai International Airport and the airplane handling company, who served Michael Taylor and Zayek [Exhibit #1, #3, #20, #21].

(iv) Michael Taylor and Zayek repeatedly entered and left Room 4009 and 4609 of Star Gate Hotel, and the names on the hotel register of those rooms are respectively "Taylor Michael" and "ZAYEK GEORGE ANTOINE" and their passport numbers are on the register [Exhibit #25].

3. Ghosn

(i) The surveillance camera installed in Grand Hyatt Tokyo has recorded a scene that a man met with Peter Taylor at Grand Hyatt Tokyo after he arrived there and got out of Alphard, which Ghosn used, on December 28, 2019 [Exhibit #4]. The surveillance camera installed in Ghosn's house has recorded a scene that a man was coming into Ghosn's house around noon on December 29, 2019 [Exhibit #7].

 Concerning these situations, the driver of Ghosn gave a statement that he drove Ghosn to Grand Hyatt Tokyo afternoon on December 28, 2019 and that he drove Ghosn to his house from a restaurant around noon on December 29, 2019 [Exhibit #26]. Taking them into consideration, the man is identified as Ghosn.

(ii) On December 29, 2019, the acts of a man such as going to Grand Hyatt Hotel from around Ghosn's house on foot, entering Room 933 of Grand Hyatt Hotel, leaving the room together with the men who appear to be Peter Taylor, Michael Taylor and Zayek, going to Osaka by the bullet train and entering Room 4609 of Star Gate Hotel, are almost seamlessly traceable by the surveillance cameras. Specifically, surveillance cameras installed on the street from around Ghosn's house to Grand Hyatt Tokyo, in Grand Hyatt Tokyo, in Shinagawa Station, inside the bullet train, in Shin Osaka Station and in Star Gate Hotel have recorded his acts [Exhibit #2, #3].

 Concerning these situations, there are clear images of the man's face without knit cap and mask recorded by the drive recorder of the taxi going to Star Gate Hotel from Shin Osaka Station [Exhibit #3 (picture #141)], which closely resemble Ghosn's face.

Part VI. Issuance of Warrant for the Fugitive's Arrest

 The following warrant for Peter Taylor's arrest, which is valid until now, was issued:

| | |
|---|---|
| Date of Issuance: | February 28, 2020[20] |
| Issuing Judge: | Yukiko Yomori, Tokyo District Court |
| Suspected Case: | Enabling the escape of criminals, and aiding and abetting the violation of the Immigration Control and Refugee Recognition Act |
| Expiration Date: | August 28, 2020 (the term of validity is scheduled to be renewed until Peter Taylor is arrested) |

---

[20] The arrest warrant was initially issued on January 30, 2020. However, the fugitive was not arrested by the expiration date, February 28, and the warrant was reissued on that date.

Part VII. Requested Matters

We request that Peter Taylor be extradited to Japan, based upon the criminal facts mentioned above to be applicable for extradition.

The cited criminal facts come under the Article 2, paragraph (1) of the Extradition Treaty between the United States and Japan and satisfy the requirement of the Article 3 of the said Treaty, with no hindrance for the execution of extradition.

Part VIII.  Attached Materials

1.   Certified copy of the arrest warrant
2.   The fugitive's face photo and fingerprints
3.   Copies of the fugitive's passports
4.   Documentary Evidence

| Arrest Warrant (Ordinary Arrest) | |
|---|---|
| Name of the suspect | Peter Maxwell Taylor |
| Age, Address, Occupation of the suspect, Charge for which the arrest is permitted, summary of alleged facts of crime, place where suspect is to be brought, the official title and name of the requester: | As described in the attached Request for the Arrest Warrant |
| Term of validity: | Until August 28th, 2020 |
| After the term of validity, this warrant no longer enables initiation of an arrest. In the event of its expiration, it shall be returned to the competent court.<br>Even during the term of validity, if an arrest becomes unnecessary, it must be immediately returned to the competent court. | |
| I hereby permit an arrest of the suspect based on the aforementioned alleged facts of crime.<br>    February 28th, 2020<br>        Tokyo District Court<br>            Judge   Yukiko Yomori | |
| Seal of the official title and name of the arrester | |
| Time/date/year and place of the arrest | Arrested at   :   on               , 20·· at |
| Time/date/year and place of custody | At    :   on               , 20·· at |
| Name and seal | |
| Time/date/year of the procedure to send | At    :   on               , 20·· at |
| Name and seal | |
| Time/date/year of the receipt of | At    :   on               , 20·· at |
| Name and seal | |

Note: When executing the arrest, on the spot, search, seizure or inspection may be simultaneously carried out; however, attention is required so that honor of the suspect is respected and that disturbance to others is avoided as much as possible.

The suspect who has been arrested by this warrant is entitled to appoint defense attorney.

Request for an Arrest Warrant

February 28th, 2020

To: Judge, Tokyo District Court

Tokyo District Public Prosecutors Office

Public Prosecutor     Naoki Watanabe

I hereby request issuance of an Arrest Warrant against the person specified below on the alleged harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 Ⅱ) case.

1. Suspect

Name: PETER MAXWELL TAYLOR

Age: 26, born on February 20th, 1993

Occupation: Unknown

Address: Unknown

2. If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

As described in Annex 1

3. Government or public office or other place to which the suspect is taken:

Tokyo District Public Prosecutors Office, its Branch Offices or Suboffices and   Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office;

A District Public Prosecutors Office located within the jurisdiction of place of the arrest of the suspect, its Branch Offices or Suboffices and Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office; or

Tokyo Detention Center.

4. If more than one warrant is necessary, the number and the reason:

Not Applicable.

5. Probable reasons to suspect that the suspect has committed the crime:

The entire volume of the case documents, including the investigation report by the prosecutor dated on January 29th, 2020.

6. Reasons for the necessity of the suspect's arrest:

There are reasonable grounds to suspect that he is likely to tamper evidence by himself or in conspiracy with interested persons and that he may flee.

7. In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

As described in Annex 2

8. With regard to the offense which shall be punished with a fine of not more than 300,000 JPY (or 20,000 JPY with regard to crimes other than those under the Penal Code, the Act on Punishment of

Physical Violence and Others, and the Act on Penal Provisions related to Economic Activities) and a misdemeanor detention or petty fine, describe reasons stipulated by the proviso of Paragraph 1 of Article 199 of the Code of Criminal Procedure:

Not Applicable

9. Summary of the alleged facts of a crime:

As described in Annex 3

Annex 1

If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

1. Term
   For 6 month

2. Reason
   The suspect is currently not in Japan and the prosecutor at Tokyo District Public Prosecutors Office cannot make contact with the suspect. In addition, given that the suspect provided assistance and enabled Carlos Ghosn Bichara's escape and the suspect himself escaped from Japan, and that the fact of Ghosn's escape has been widely reported in foreign country, and therefore the suspect can easily notify the investigation against himself is on-going, it is unlikely that the suspect voluntarily enters Japan.
   We need to request other countries for cooperation to find the whereabouts of the suspect and to arrest the suspect. For that, we need a considerable long period of time in negotiating with other countries.

Annex 2

In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

Although an arrest warrant was issued on January 30th, 2020 by Judge Yukiko Yomori at Tokyo District Court in connection with the fact of the same crime, the suspect has not been arrested until today.

Annex 3

Alleged facts of a crime:

The suspect, in conspiracy with Michael L. Taylor and George Antoine Zayek, knowing that Carlos Ghosn Bichara (hereinafter "Ghosn"), who held citizenships of French Republic, Republic of Lebanon, and Federative Republic Brazil, was a defendant under criminal proceedings pending at Tokyo District Court for the offences of Violation of Financial Instruments and Exchange Act and Violation of Company Act, and bailed under the conditions including neither hide nor escape and no overseas trip, for the purpose of enabling him to get off with the punishment, at the time of Ghosn's departure from Japan to Republic of Lebanon via Republic of Turkey, from 1:53pm to 11:10pm on December 29th, 2019, provided assistance and enabled Ghosn's escape by; carrying Ghosn's luggage from Ghosn's house at Azabunagasakacho 1-10, Minato-ward, Tokyo prefecture, to Grand Hyatt Tokyo at Roppongi 6-10-3, Minato-ward; in the hotel, handing the luggage to Ghosn and providing a place for him to change Ghosn's cloths; escorting Ghosn from the hotel to Star Gate Hotel Kansai Airport at Rinkuoraikita 1, Izumisano-city, Osaka prefecture; in the hotel, hiding Ghosn inside their carrying luggage; travelling from the hotel to the premium gate called "Tamayura" at the Kansai International Airport located at Tajiri-cho, Sennan-gun, Osaka prefecture, or so; having the employees of the airport, who had no knowledge of their plan, clear the embarkation procedure with hiding Ghosn inside their carrying luggage and put the luggage on board of the jet of Flight TCTSR operated by MNG Jet; and departing the airport with Ghosn by Flight TCTSR and then leaving Japan's territory, thus the suspect committed harboring of criminals by assisting Ghosn's escape and aided by easing Ghosn's illegal leaving from Japan without receiving confirmation by immigration officer.

The above is a certified copy.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

EX-Taylor, P.-00044

Applicant's Identity Information

1. Particulars of identity

    Nationality    United States of America

    Name    TALOR PETER MAXWELL

    Sex    Male

    Date of Birth    █████████ 1993

    Date of Application for Landing    December 28, 2019

    Place of Application for Landing    Narita Airport

2. Image of fingerprints

 

左示指            右示指

Left index finger           Right index finger

3. Image of Face



The above is a certified extract.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office



The above is a certified extract.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

List of Exhibits

| No. | Title |
|-----|-------|
| 1 | Report on Image Analysis Results (January 19, 2020) |
| 2 | Report on Image Analysis Results (January 18, 2020) |
| 3 | Report on Image Analysis Results (January 19, 2020) |
| 4 | Report on Image Analysis Results (January 18, 2020) |
| 5 | Report on Image Analysis Results (January 18, 2020) |
| 6 | Report on Image Analysis Results (January 20, 2020) |
| 7 | Investigation Report (January 15, 2020) |
| 8 | Copy Report (January 17, 2020) |
| 9 | Enquiry for Information Related to Investigation (January 4, 2020) *written reply is attached |
| 10 | Report on Collection of Documents (January 23, 2020) |
| 11 | Investigation Report (June 3, 2020) |
| 12 | Enquiry for Information Related to Investigation (January 4, 2020) *written reply (made on January 4, 2020) is attached |
| 13 | Enquiry for Information Related to Investigation (January 7, 2020) *written reply (made on January 7, 2020) is attached |
| 14 | Enquiry for Immigration Records (January 17, 2020) *written reply (made on January 20, 2020) is attached |
| 15 | Enquiry for Immigration Records (January 17, 2020) *written reply (made on January 20, 2020) is attached |
| 16 | Enquiry for Immigration Records (January 17, 2020) *written reply (made on January 20, 2020) is attached |
| 17 | Enquiry for Immigration Records (January 6, 2020) *written reply (made on January 7, 2020) is attached |
| 18 | Interview Results Report (January 18, 2020) |
| 19 | Record of Oral Statement to Detective by Tomoyuki Matsui (January 29, 2020) |
| 20 | Record of Oral Statement to Detective by Tomoyuki Matsui (January 29, 2020) |
| 21 | Record of Oral Statement to Detective by Kayoko Tokunaga (January 19, 2020) |
| 22 | Record of Oral Statement to Detective by Shigekuni Kawada (January 20, 2020) |
| 23 | Record of Oral Statement to Detective by Akira Baba (January 18, 2020) |
| 24 | Record of Oral Statement to Detective by Waegenaer Herlinde (January 19, 2020) |
| 25 | Report on Collection of Documents (January 21, 2020) |
| 26 | Record of Oral Statement to Prosecutor by Ticzon Danilo Ejanda (January 27, 2020) |
| 27 | U.S. Entry and Exit Records of Michael Taylor (March 31, 2020) |
| 28 | U.S. Entry and Exit Records of Peter Taylor (March 31, 2020) |
| 29 | Investigation Report (June 5, 2020) |
| 30 | Declaration of Naoki Watanabe |

Exhibit          1

Form of Attachments to Record of Statements

Report on Image Analysis Results

(Movements of two investigation subjects on 29th December from entry into Japan to arrival at Grand Hyatt Tokyo)

19th January 2020

To: Mr. Yukiharu Watarai, Judicial Police Officer and Senior Superintendent
Director of First Criminal Investigation Division of the Tokyo Metropolitan
Police Department

Yoshiyuki Suzuki, Judicial Police Officer and Assistant Police Inspector
First Criminal Investigation Division of the Tokyo Metropolitan Police Department

Regarding the case of suspected violations of the Immigration Control and Refugee Recognition Act by suspect Carlos Ghosn Bichara, we have confirmed, by analyzing image data collected from security cameras, and report below, the movements of the investigation subjects, George Antoine Zayek and Michael L Taylor, from their entry into Japan to joining another investigation subject, Peter Maxwell Taylor at Grand Hyatt Tokyo.

1. Date of analysis
   Period from 2nd January 2020 to 19th January 2020
2. Persons who performed analysis
(1) This reporter
(2) The following members of the First Criminal Investigation Division of the Tokyo Metropolitan Police Department:
   Muneharu Keida, Judicial Police Officer and Assistant Police Inspector
   Hironori Takimoto, Judicial Police Officer and Police Sergeant
   Ryuji Umezawa, Judicial Police Officer and Police Sergeant
   Kei Watanabe, Judicial Police Officer and Police Sergeant
   Isao Komatsu, Judicial Police Officer and Police Sergeant
   Kazuhiro Minagawa, Judicial Police Officer and Police Sergeant
   Yusuke Kataigi, Judicial Police Officer and Police Sergeant
   Hiroshi Takei, Judicial Police Officer and Police Sergeant
3. Equipment used for analysis
   Nine analytical terminals (laptop personal computers)
4. Data analyzed
(1) Images from a security camera installed at Kansai International Airport, 1 Senshu-kuko Kita, Izumisano-shi, Osaka

(Images Nos. 1 – 8 and 17 – 24)

(2) Images from a security camera installed at the security check room of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 9 – 16 and 25 – 29)

(3) Images from a security camera installed near the entrance of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 30 – 34)

(4) Images from security cameras installed at Star Gate Hotel Kansai Airport, 1 Rinku Orai Kita, Izumisano-shi, Osaka

(Images Nos. 35 – 133)

Tokyo Metropolitan Police Department

Form of Attachments to Record of Statements

(5) Images from security cameras installed at JR Tokai Shin Osaka Station, 5-16-1 Nishi-nakajima, Yodogawa-ku, Osaka-shi, Osaka

(Images Nos. 134 – 157)

(6) Images from security cameras installed in JR Tokai Nozomi No. 162

(Images Nos. 158 – 174)

(7) Images from security cameras installed at JR Tokai Shinagawa Station, 2-1-78 Konan, Minato-ku, Tokyo

(Images Nos. 175 – 194)

(8) Images from security cameras installed near a corridor (Jiyu Tsuro) at JR Shinagawa East Building, 2-18-1 Konan, Minato-ku, Tokyo

(Images Nos. 195 – 206)

(9) Images from security cameras installed at 3-26-27 Takanawa, Minato-ku, Tokyo

(Images Nos. 207 – 218)

(10) Images from security cameras installed near the taxi stand at JR Shinagawa East Building, 2-18-1 Konan, Minato-ku, Tokyo

(Images Nos. 219 – 239)

(11) Images from security cameras installed at Grand Hyatt Tokyo, 6-10-3 Roppongi, Minato-ku, Tokyo

(Images Nos. 240 – 266)

5.  Analytical results
    As shown in the sketches and documents attached hereto.
6.  Symbols (codes) assigned to the investigation subjects
    For the purpose of the sketches and documents attached hereto:
(1) George Antoine Zayek (hereinafter referred to as "George") is assigned and indicated as code A;
(2) Michael L Taylor (hereinafter referred to as "Michael") is assigned and indicated as code B; and
(3) Peter Maxwell Taylor (hereinafter referred to as "Peter") is assigned and indicated as code C.
    These codes have been inserted, as appropriate, on the images contained in the documents to show the movements of the investigation subjects, etc.
(4) In unsharp images analyzed, the investigation subjects were identified based on what was found out in other security camera images.
7.  Measures
    To clarify the analytical results, attached to the end of this report are: (1) five sketches; and (2) a 67-page document in Excel file format containing 266 images, which are still images extracted from relevant videos, trimmed, enlarged and/or otherwise adjusted, and accompanied by legends.

End

Exhibit      2

Form of Attachments to Record of Statements

Report on Image Analysis Results

(Movements of Ghosn on 29th December from his home to Grand Hyatt Tokyo)

18th January 2020

To: Mr. Yukiharu Watarai, Judicial Police Officer and Senior Superintendent
Director of First Criminal Investigation Division of the Tokyo Metropolitan
Police Department

Ryuji Umezawa, Judicial Police Officer and Police Sergeant
First Criminal Investigation Division of the Tokyo Metropolitan Police Department

Regarding the case of suspected violations of the Immigration Control and Refugee
Recognition Act by suspect Carlos Ghosn Bichara, we have confirmed, by analyzing image
data collected from security cameras, and report below, the movements of the suspect.

1. Date of analysis
   Period from 2nd January 2020 to 18th January 2020
2 Persons who performed analysis
(1) This reporter
(2) Yoshiyuki Suzuki, Judicial Police Officer and Assistant Police Inspector, First Criminal
    Investigation Division of the Tokyo Metropolitan Police Department
(3) Daisuke Hara, Judicial Police Officer and Assistant Police Inspector, First Criminal
    Investigation Division of the Tokyo Metropolitan Police Department
(4) Hiroshi Takei, Judicial Police Officer and Police Sergeant, First Criminal Investigation
    Division of the Tokyo Metropolitan Police Department
(5) Kazuhiro Minagawa, Judicial Police Officer and Police Sergeant, First Criminal
    Investigation Division of the Tokyo Metropolitan Police Department
(6) Kei Watanabe, Judicial Police Officer and Police Sergeant, First Criminal Investigation
    Division of the Tokyo Metropolitan Police Department
(7) Isao Komatsu, Judicial Police Officer and Police Sergeant, First Criminal Investigation
    Division of the Tokyo Metropolitan Police Department
3. Equipment used for analysis
   Seven analytical terminals (laptop personal computers)
4. Data analyzed
(1) Images from a security camera installed at Nagasaka Building, 1-3 Azabu-Nagasakacho,
    Minato-ku, Tokyo

(see images Nos. 1 – 2)

(2) Images from security cameras installed at Azabu Nagasaka House, 1-54 Azabu-
    Nagasakacho, Minato-ku, Tokyo

(see images Nos. 3 – 19)

(3) Images from a security camera installed at Kabushiki Kaisha Nagasaka Sarashina, 13
    Azabu-Nagasakacho, Minato-ku, Tokyo

(see images Nos. 20 – 23)

(4) Images from security cameras installed at Tokyo Metropolitan Police Department
    Toriizaka Residence, 1-1-6 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 24 – 31)

(5) Images from a security camera installed at Minato City Azabu Library, 5-12-24
    Roppongi, Minato-ku, Tokyo

(see images Nos. 32 – 34)

(6) Images from camera No. 2 of Nagasaka-kai, installed near 1-4-2 Azabu Juban, Minato-
    ku, Tokyo

(see images Nos. 35 – 38)

EX-Taylor, P.-00127

Form of Attachments to Record of Statements

(7) Images from camera No. 5 of Azabu Juban Shotengai Promotion Association, installed near 1-7-3 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 39 – 41)

(8) Images from camera No. 1 of Nagasaka-kai, installed near 1-4-6 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 42 – 46)

(9) Images from security cameras installed at Minato City Azabu Juban Public Parking Station, 1-4-10 Azabu Juban, Minato-ku, Tokyo

(see images Nos. 47 – 54)

(10) Images from security cameras installed at Roppongi Hills Gate Tower, 6-11-1 Roppongi, Minato-ku, Tokyo

(see images Nos. 55 – 61)

(11) Images from security cameras installed at Roppongi Hills Mori Tower, 6-10-1 Roppongi, Minato-ku, Tokyo

(see images Nos. 62 – 89)

(12) Images from security cameras installed at Grand Hyatt Tokyo, 6-10-3 Roppongi, Minato-ku, Tokyo

(see images Nos. 90 – 106)

5. Analytical results

As shown in the sketches and documents attached hereto.

6. Symbols (codes) assigned to the suspect

(1) For the purpose of the sketches and documents attached hereto, suspect Carlos Ghosn Bichara (hereinafter referred to as "Ghosn") is assigned and indicated as code G. This code has been inserted, as appropriate, on in the images contained in the documents to show the movements of the suspect.

(2) In unsharp images analyzed, the suspect was identified based on what was found out in other security camera images.

7. Measures

To clarify the analytical results, attached to the end of this report are: (1) two sketches; and (2) a 27-page document in Excel file format containing 106 images, which are still images extracted from relevant videos, trimmed, enlarged and/or otherwise adjusted, and accompanied by legends.

End

Exhibit 3

Form of Attachments to Record of Statements

Report on Image Analysis Results

(Movements of the suspect and two others on 29th December from Grand Hyatt Tokyo to departure from Japan)

19th January 2020

To: Mr. Yukiharu Watarai, Judicial Police Officer and Senior Superintendent
Director of First Criminal Investigation Division of the Tokyo Metropolitan
Police Department

Yoshiyuki Suzuki, Judicial Police Officer and Assistant Police Inspector
First Criminal Investigation Division of the Tokyo Metropolitan Police
Department

Regarding the case of suspected violations of the Immigration Control and Refugee Recognition Act by suspect Carlos Ghosn Bichara, we have confirmed, by analyzing image data collected from security cameras, and report below, the movements of the suspect and the investigation subjects, George Antoine Zayek and Michael L Taylor, from Grand Hyatt Tokyo to their departure from Japan.

1.  Date of analysis
    Period from 2nd January 2020 to 19th January 2020
2.  Persons who performed analysis
(1) This reporter
(2) The following members of the First Criminal Investigation Division of the Tokyo Metropolitan Police Department:
    Muneharu Keida, Judicial Police Officer and Assistant Police Inspector
    Daisuke Hara, Judicial Police Officer and Assistant Police Inspector
    Hironori Takimoto, Judicial Police Officer and Police Sergeant
    Ryuji Umezawa, Judicial Police Officer and Police Sergeant
    Kei Watanabe, Judicial Police Officer and Police Sergeant
    Isao Komatsu, Judicial Police Officer and Police Sergeant
    Hiroshi Takei, Judicial Police Officer and Police Sergeant
    Yusuke Kataigi, Judicial Police Officer and Police Sergeant
3.  Equipment used for analysis
    Nine analytical terminals (laptop personal computers)
4.  Data analyzed
(1) Images from security cameras installed at Grand Hyatt Tokyo, 6-10-3 Roppongi, Minato-ku, Tokyo

(Images Nos. $1-35$)

(2) Images from security cameras installed at Roppongi Hills Mori Tower, 6-10-1 Roppongi, Minato-ku, Tokyo

(Images Nos. $36-51$ and $54-56$)

(3) Images from the drive recorder installed in a taxi (Nerima 530U6876) of Kokusai kotsu Co., Ltd.

(Images Nos. 52, 53, 57, 58 and $60-63$)

(4) An image from a security camera installed at Shinagawa Station Takanawa Exit Police Box of Takanawa Police Station, Tokyo Metropolitan Police Department, 3-26-30 Takanawa, Minato-ku, Tokyo

(Image No. 59)

Form of Attachments to Record of Statements

(5) Images from security cameras installed at JR East Shinagawa Station, 3-26-27 Takanawa, Minato-ku, Tokyo

(Images Nos. 64 – 88)

(6) Images from security cameras installed at JR Tokai Shinagawa Station, 2-1-78 Konan, Minato-ku, Tokyo

(Images Nos. 89 – 110)

(7) Images from security cameras installed in JR Tokai Nozomi No. 391

(Images Nos. 111 – 124)

(8) Images from security cameras installed at JR Tokai Shin Osaka Station, 5-16-1 Nishi-nakajima, Yodogawa-ku, Osaka-shi, Osaka

(Images Nos. 125 – 135)

(9) Images from the drive recorder installed in a taxi (Naniwa 500I5636) of Tsurumi Office of Kabushiki Kaisha Miraito

(Images Nos. 136 – 145)

(10) Images from a security camera installed at the SiS Rinku Tower, 1 Rinku Orai Kita, Izumisano-shi, Osaka

(Images Nos. 146 – 149)

(11) Images from security cameras installed at Star Gate Hotel Kansai Airport, 1 Rinku Orai Kita, Izumisano-shi, Osaka

(Images Nos. 150 – 200 and 213 – 300)

(12) Images from a security camera installed near the entrance of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 201 – 212 and 301 – 315)

(13) Images from a security camera installed at the security check room of the Premium Gate Tamayura, Terminal 2 Building of Kansai International Airport, 13 Senshu-kuko Naka, Tajiricho, Sennan-gun, Osaka

(Images Nos. 316 – 333)

(14) Images from security cameras installed at Kansai International Airport, 1 Senshu-kuko Kita, Izumisano-shi, Osaka

(Images Nos. 334 – 359)

5.  Analytical results
    As shown in the sketches and documents attached hereto.
6.  Symbols (codes) assigned to the suspect and the investigation subjects
    For the purpose of the sketches and documents attached hereto:
(1) suspect Carlos Ghosn Bichara (hereinafter referred to as "Ghosn") is assigned and indicated as code G;
(2) George Antoine Zayek (hereinafter referred to as "George") is assigned and indicated as code A;
(3) Michael L Taylor (hereinafter referred to as "Michael") is assigned and indicated as code B; and
(4) Peter Maxwell Taylor (hereinafter referred to as "Peter") is assigned and indicated as code C.
    These codes have been inserted, as appropriate, on the images contained in the documents to show the movements of the suspect and others.
(5) In unsharp images analyzed, the suspect and the investigation subjects were identified based on what was found out in other security camera images.
7.  Measures
    To clarify the analytical results, attached to the end of this report are: (1) five sketches; and (2) a 90-page document in Excel file format containing 359 images, which are still images

Form of Attachments to Record of Statements

extracted from relevant videos, trimmed, enlarged and/or otherwise adjusted, and accompanied by legends.

End

# Exhibit 3

| Arrest Warrant (Ordinary Arrest) | |
|---|---|
| Name of the suspect | Michael L. Taylor |
| Age, Address, Occupation of the suspect, Charge for which the arrest is permitted, summary of alleged facts of crime, place where suspect is to be brought, the official title and name of the requester: | As described in the attached Request for the Arrest Warrant |
| Term of validity: | Until August 28th, 2020 |
| After the term of validity, this warrant no longer enables initiation of an arrest. In the event of its expiration, it shall be returned to the competent court. Even during the term of validity, if an arrest becomes unnecessary, it must be immediately returned to the competent court. | |
| I hereby permit an arrest of the suspect based on the aforementioned alleged facts of crime.　　February 28th, 2020　　　　Tokyo District Court　　　　　　Judge　Yukiko Yomori | |
| Seal of the official title and name of the arrester | |
| Time/date/year and place of the arrest | Arrested at　∶　on　　　　　, 20·· at |
| Time/date/year and place of custody | At　∶　on　　　　　, 20·· at |
| Name and seal | |
| Time/date/year of the procedure to send | At　∶　on　　　　　, 20·· at |
| Name and seal | |
| Time/date/year of the receipt of | At　∶　on　　　　　, 20·· at |
| Name and seal | |

Note: When executing the arrest, on the spot, search, seizure or inspection may be simultaneously carried out; however, attention is required so that honor of the suspect is respected and that disturbance to others is avoided as much as possible.

The suspect who has been arrested by this warrant is entitled to appoint defense attorney.

Request for an Arrest Warrant

February 28th, 2020

To: Judge, Tokyo District Court

Tokyo District Public Prosecutors Office

Public Prosecutor    Naoki Watanabe

I hereby request issuance of an Arrest Warrant against the person specified below on the alleged harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II ) case.

1. Suspect

      Name: MICHAEL L. TAYLOR

      Age: 59, born on October 21st, 1960

      Occupation: Unknown

      Address: Unknown

2. If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

      As described in Annex 1

3. Government or public office or other place to which the suspect is taken:

      Tokyo District Public Prosecutors Office, its Branch Offices or Suboffices and   Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office;

      A District Public Prosecutors Office located within the jurisdiction of place of the arrest of the suspect, its Branch Offices or Suboffices and Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office; or

      Tokyo Detention Center.

4. If more than one warrant is necessary, the number and the reason:

      Not Applicable.

5. Probable reasons to suspect that the suspect has committed the crime:

      The entire volume of the case documents, including the investigation report by the prosecutor dated on January 29th, 2020.

6. Reasons for the necessity of the suspect's arrest:

      There are reasonable grounds to suspect that he is likely to tamper evidence by himself or in conspiracy with interested persons and that he may flee.

7. In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

      As described in Annex 2

8. With regard to the offense which shall be punished with a fine of not more than 300,000 JPY (or 20,000 JPY with regard to crimes other than those under the Penal Code, the Act on Punishment of

Physical Violence and Others, and the Act on Penal Provisions related to Economic Activities) and a misdemeanor detention or petty fine, describe reasons stipulated by the proviso of Paragraph 1 of Article 199 of the Code of Criminal Procedure:

    Not Applicable

9. Summary of the alleged facts of a crime:

    As described in Annex 3

Annex 1

If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

1. Term
   For 6 month

2. Reason
   The suspect is currently not in Japan and the prosecutor at Tokyo District Public Prosecutors Office cannot make contact with the suspect. In addition, given that the suspect provided assistance and enabled Carlos Ghosn Bichara's escape and the suspect himself escaped from Japan, and that the fact of Ghosn's escape has been widely reported in foreign country, and therefore the suspect can easily notify the investigation against himself is on-going, it is unlikely that the suspect voluntarily enters Japan.
   We need to request other countries for cooperation to find the whereabouts of the suspect and to arrest the suspect. For that, we need a considerable long period of time in negotiating with other countries.

Annex 2

In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

Although an arrest warrant was issued on January 30th, 2020 by Judge Yukiko Yomori at Tokyo District Court in connection with the fact of the same crime, the suspect has not been arrested until today.

Annex 3

Alleged facts of a crime:

The suspect, in conspiracy with George Antoine Zayek and Peter Maxwell Taylor, knowing that Carlos Ghosn Bichara (hereinafter "Ghosn"), who held citizenships of French Republic, Republic of Lebanon, and Federative Republic Brazil, was a defendant under criminal proceedings pending at Tokyo District Court for the offences of Violation of Financial Instruments and Exchange Act and Violation of Company Act, and bailed under the conditions including neither hide nor escape and no overseas trip, for the purpose of enabling him to get off with the punishment, at the time of Ghosn's departure from Japan to Republic of Lebanon via Republic of Turkey, from 1:53pm to 11:10pm on December 29th, 2019, provided assistance and enabled Ghosn's escape by; carrying Ghosn's luggage from Ghosn's house at Azabunagasakacho 1-10, Minato-ward, Tokyo prefecture, to Grand Hyatt Tokyo at Roppongi 6-10-3, Minato-ward; in the hotel, handing the luggage to Ghosn and providing a place for him to change Ghosn's cloths; escorting Ghosn from the hotel to Star Gate Hotel Kansai Airport at Rinkuoraikita 1, Izumisano-city, Osaka prefecture; in the hotel, hiding Ghosn inside their carrying luggage; travelling from the hotel to the premium gate called "Tamayura" at the Kansai International Airport located at Tajiri-cho, Sennan-gun, Osaka prefecture, or so; having the employees of the airport, who had no knowledge of their plan, clear the embarkation procedure with hiding Ghosn inside their carrying luggage and put the luggage on board of the jet of Flight TCTSR operated by MNG Jet; and departing the airport with Ghosn by Flight TCTSR and then leaving Japan's territory, thus the suspect committed harboring of criminals by assisting Ghosn's escape and aided by easing Ghosn's illegal leaving from Japan without receiving confirmation by immigration officer.

The above is a certified copy.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

EX-Taylor, M.-00044

# Exhibit 4

| Arrest Warrant (Ordinary Arrest) | |
|---|---|
| Name of the suspect | Peter Maxwell Taylor |
| Age, Address, Occupation of the suspect, Charge for which the arrest is permitted, summary of alleged facts of crime, place where suspect is to be brought, the official title and name of the requester: | As described in the attached Request for the Arrest Warrant |
| Term of validity: | Until August 28th, 2020 |
| After the term of validity, this warrant no longer enables initiation of an arrest. In the event of its expiration, it shall be returned to the competent court. Even during the term of validity, if an arrest becomes unnecessary, it must be immediately returned to the competent court. | |
| I hereby permit an arrest of the suspect based on the aforementioned alleged facts of crime.<br>    February 28th, 2020<br>        Tokyo District Court<br>            Judge   Yukiko Yomori | |
| Seal of the official title and name of the arrester | |
| Time/date/year and place of the arrest | Arrested at   :   on              , 20‥ at |
| Time/date/year and place of custody | At   :   on              , 20‥ at |
| Name and seal | |
| Time/date/year of the procedure to send | At   :   on              , 20‥ at |
| Name and seal | |
| Time/date/year of the receipt of | At   :   on              , 20‥ at |
| Name and seal | |

Note: When executing the arrest, on the spot, search, seizure or inspection may be simultaneously carried out; however, attention is required so that honor of the suspect is respected and that disturbance to others is avoided as much as possible.

The suspect who has been arrested by this warrant is entitled to appoint defense attorney.

<div style="border:1px solid">

Request for an Arrest Warrant

February 28th, 2020

To: Judge, Tokyo District Court

Tokyo District Public Prosecutors Office

Public Prosecutor    Naoki Watanabe

I hereby request issuance of an Arrest Warrant against the person specified below on the alleged harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II ) case.

1. Suspect

Name: PETER MAXWELL TAYLOR

Age: 26, born on February 20th, 1993

Occupation: Unknown

Address: Unknown

2. If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

As described in Annex 1

3. Government or public office or other place to which the suspect is taken:

Tokyo District Public Prosecutors Office, its Branch Offices or Suboffices and   Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office;

A District Public Prosecutors Office located within the jurisdiction of place of the arrest of the suspect, its Branch Offices or Suboffices and Local Public Prosecutors Offices in the jurisdiction of the abovementioned District Public Prosecutors Office; or

Tokyo Detention Center.

4. If more than one warrant is necessary, the number and the reason:

Not Applicable.

5. Probable reasons to suspect that the suspect has committed the crime:

The entire volume of the case documents, including the investigation report by the prosecutor dated on January 29th, 2020.

6. Reasons for the necessity of the suspect's arrest:

There are reasonable grounds to suspect that he is likely to tamper evidence by himself or in conspiracy with interested persons and that he may flee.

7. In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

As described in Annex 2

8. With regard to the offense which shall be punished with a fine of not more than 300,000 JPY (or 20,000 JPY with regard to crimes other than those under the Penal Code, the Act on Punishment of

</div>

Physical Violence and Others, and the Act on Penal Provisions related to Economic Activities) and a misdemeanor detention or petty fine, describe reasons stipulated by the proviso of Paragraph 1 of Article 199 of the Code of Criminal Procedure:

    Not Applicable

9. Summary of the alleged facts of a crime:

    As described in Annex 3

Annex 1

If the term of validity needs to be longer than 7 days, the necessary term and reason for it:

1. Term
   For 6 month

2. Reason
   The suspect is currently not in Japan and the prosecutor at Tokyo District Public Prosecutors Office cannot make contact with the suspect. In addition, given that the suspect provided assistance and enabled Carlos Ghosn Bichara's escape and the suspect himself escaped from Japan, and that the fact of Ghosn's escape has been widely reported in foreign country, and therefore the suspect can easily notify the investigation against himself is on-going, it is unlikely that the suspect voluntarily enters Japan.
   We need to request other countries for cooperation to find the whereabouts of the suspect and to arrest the suspect. For that, we need a considerable long period of time in negotiating with other countries.

Annex 2

In the case a warrant had been previously requested or issued against the suspect, concerning the same fact or other fact currently under investigation, mention that, and describe the reasons for requesting another Arrest Warrant concerning the same fact:

Although an arrest warrant was issued on January 30th, 2020 by Judge Yukiko Yomori at Tokyo District Court in connection with the fact of the same crime, the suspect has not been arrested until today.

Annex 3

Alleged facts of a crime:

The suspect, in conspiracy with Michael L. Taylor and George Antoine Zayek, knowing that Carlos Ghosn Bichara (hereinafter "Ghosn"), who held citizenships of French Republic, Republic of Lebanon, and Federative Republic Brazil, was a defendant under criminal proceedings pending at Tokyo District Court for the offences of Violation of Financial Instruments and Exchange Act and Violation of Company Act, and bailed under the conditions including neither hide nor escape and no overseas trip, for the purpose of enabling him to get off with the punishment, at the time of Ghosn's departure from Japan to Republic of Lebanon via Republic of Turkey, from 1:53pm to 11:10pm on December 29th, 2019, provided assistance and enabled Ghosn's escape by; carrying Ghosn's luggage from Ghosn's house at Azabunagasakacho 1-10, Minato-ward, Tokyo prefecture, to Grand Hyatt Tokyo at Roppongi 6-10-3, Minato-ward; in the hotel, handing the luggage to Ghosn and providing a place for him to change Ghosn's cloths; escorting Ghosn from the hotel to Star Gate Hotel Kansai Airport at Rinkuoraikita 1, Izumisano-city, Osaka prefecture; in the hotel, hiding Ghosn inside their carrying luggage; travelling from the hotel to the premium gate called "Tamayura" at the Kansai International Airport located at Tajiri-cho, Sennan-gun, Osaka prefecture, or so; having the employees of the airport, who had no knowledge of their plan, clear the embarkation procedure with hiding Ghosn inside their carrying luggage and put the luggage on board of the jet of Flight TCTSR operated by MNG Jet; and departing the airport with Ghosn by Flight TCTSR and then leaving Japan's territory, thus the suspect committed harboring of criminals by assisting Ghosn's escape and aided by easing Ghosn's illegal leaving from Japan without receiving confirmation by immigration officer.

The above is a certified copy.
June 25, 2020
Minako Inokura, Public Prosecutor's Assistant Officer
Tokyo District Public Prosecutors Office

# Exhibit 5

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

IN THE MATTER OF THE )
EXTRADITION OF MICHAEL L. ) Case No. 20-mj-1069-DLC
TAYLOR )
                                                    )
——————————————————— )
                                                    )
IN THE MATTER OF THE ) Case No. 20-mj-1070-DLC
EXTRADITION OF PETER MAXWELL )
TAYLOR )

## DECLARATION OF DANIEL MARINO

Pursuant to 28 U.S.C. § 1746, I, Daniel Marino, hereby declare as follows:

1.    I was counsel to Michael Taylor in the Utah case that has been referenced in the filings in this case. And I have known Michael and Peter Taylor since that time, approximately 2012.

2.    In January of this year, I met with Michael Taylor and Peter Taylor, in Beirut, after Carlos Ghosn traveled from Japan to Lebanon.

3.    Before either of them returned to the United States, they were well aware, as the entire world was, that the Japanese prosecutor had issued warrants for their arrest. They also believed that Interpol had issued Red Notices for their apprehension, at the request of the Japanese prosecutor.

4.    We discussed the fact that, because of the Japanese arrest warrants, if they returned to the United States, they would likely be subject to a request for extradition by the Japanese government. I made them aware of the fact that Japan had an extradition treaty with the United States. Nevertheless, they decided to return to the United States and face any extradition proceedings that might follow.

5.    Both also believed and understood, based on the fact that Lebanon has no

extradition treaty with Japan, that they would likely never be surrendered or deported to Japan by Lebanese authorities, if they chose to stay there. Despite that understanding, they both chose to return to their home in Massachusetts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 22, 2020

Daniel Marino

2

# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF MICHAEL L. TAYLOR | No. 20-mj-1069-DLC |
| IN THE MATTER OF THE EXTRADITION OF PETER M. TAYLOR | No. 20-mj-1070-DLC |

**MEMORANDUM ON RESPONDENTS' MOTION TO QUASH ARREST WARRANTS OR FOR RELEASE FROM DETENTION**

CABELL, U.S.M.J.

## I.    INTRODUCTION

In January 2020, a Japanese court issued arrest warrants for respondents[1] Michael Taylor and his son, Peter Taylor, for allegedly facilitating the escape of former Nissan CEO Carlos Ghosn from Japan, where Ghosn was facing significant criminal charges, to Lebanon.  The warrants sought the Taylors' arrests for the "harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II) case."  (D. 17-1, 17-2).

After learning that the respondents had returned to the United States from the United Arab Emirates, which has no extradition treaty with Japan, the government of Japan requested that the

---

[1] The requested party in an extradition proceeding has been referred to by various names over time, including "defendant," "respondent," "petitioner" or "relator." *See, e.g., United States v. Ramnath*, 533 F. Supp. 2d 662, 664 n.2 (E.D. Tex. 2008).  When not referring to the Taylors by their proper names, the court uses the term "respondent" here.

United States issue provisional arrest warrants for the respondents pursuant to the two countries' joint extradition treaty. (D. 1); Treaty on Extradition, U.S.-Japan, art. IX, *effective* Mar. 26, 1980, 31 U.S.T. 892 (the Treaty). On May 6, 2020, the United States filed a complaint in support of the respondents' provisional arrests towards extradition. The complaint indicated among other things that Japanese officials had charged the Taylors with violating Article 103 of the Japanese Penal Code, which prohibits one from harboring a criminal or helping the criminal to escape.[2] This court issued the requested provisional arrest warrants and the respondents were arrested on May 20, 2020. (D. 8).

Against that backdrop, the respondents moved on June 8, 2020 to quash the provisional arrest warrants or alternatively to be released on bail pending a formal extradition hearing. (D. 17). The court convened a hearing on the motion on June 22, 2020. (D. 30). Subsequently, on June 29, 2020, and while the motion was still pending, Japan submitted its formal request for the respondents' extradition to the State Department (D. 37), effectively mooting any issues relating to the legitimacy of the provisional arrest warrants, and leaving only the issue of bail

---

[2] Article 103 provides as follows: "A person who harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement shall be punished by imprisonment with work for not more than 2 years or a fine of not more than 200,000 yen."

2

for consideration.  *See, e.g., Martinez v. United States*, 828 F.3d
451, 470 (6th Cir. 2016) (since provisional arrest ended when
Mexico submitted its formal extradition request, challenges to
provisional arrest were moot); *United States v. Yee-Chun*, 657 F.
Supp. 1270, 1271 n.1 (S.D.N.Y. 1987) (same).  On July 7, 2020, the
court issued an order denying the respondents' motion for bail.[3]
This memorandum sets forth the court's reasoning.

## II.  **FACTUAL ALLEGATIONS**

As the world entered the year 2020, it learned that Ghosn,
awaiting trial in Japan on serious financial charges, had fled
from Japan to Lebanon to avoid prosecution.  Notably, Lebanon has
no extradition treaty with Japan, seriously impacting the
possibility of bringing Ghosn to trial.  Japan contends that the
respondents masterminded Ghosn's escape.

According to the government's complaint, immigration
documents and surveillance video indicate that Peter Taylor
traveled to Japan at least three times and visited Ghosn on at
least seven occasions in the months preceding the escape.[4]  Then,
on December 28, 2019, Peter Taylor arrived in Tokyo and checked
into a room at the Grand Hyatt.  Ghosn then arrived at the Grand
Hyatt and met with Peter Taylor for about an hour.

---

[3] Both parties submitted post-hearing supplemental pleadings which the court
has considered in ruling on the respondents' motion.

[4] Authorities installed surveillance video at Ghosn's Japanese home as a
condition of his bail.

On December 29, 2019, Michael Taylor and a third individual, George-Antoine Zayek, traveled on a private jet from Dubai, United Arab Emirates, to Japan's Kansai International Airport. At Kansai, Michael Taylor and Zayek carried large black audio equipment-style cases and told airport workers that they were musicians.

From Kansai, Michael Taylor and Zayek checked into the Star Gate Hotel Kansai. After placing the cases in one of their rooms, they caught a train bound for Tokyo at about noon.

At 2:30 p.m., also on December 29th, Ghosn left his home without luggage and walked to the Grand Hyatt, where he apparently changed into clothing from luggage that had been dropped off and received by Peter Taylor earlier in the day. Michael Taylor and Zayek arrived in Tokyo at about 3:30 p.m. and went to Peter Taylor's room at the Grant Hyatt. Shortly thereafter, the Taylors, Ghosn, and Zayek left Peter Taylor's room at the same time, each carrying luggage.

Peter Taylor then traveled to the Narita Airport to catch a flight to China. However, Ghosn, Michael Taylor, and Zayek caught a train back to the Kansai Airport area and returned to the Star Gate Hotel Kansai at approximately 8:15 p.m. At about 10:00 p.m., Michael Taylor and Zayek left the hotel with luggage, including the two audio-style cases, and went to Kansai Airport. Surveillance footage did not show Ghosn leaving the hotel.

4

Once at the airport, the baggage of Michael Taylor and Zayek was loaded onto their private jet without being checked. The jet departed for Turkey at about 11:00 p.m. On December 31, 2019, Ghosn announced that he was in Lebanon.

## III. <u>DISCUSSION</u>

### A. Legal Standard

Extraditions are not regular criminal proceedings and the familiar standards of the Bail Reform Act, 18 U.S.C. §3141, therefore do not control. *See, e.g., Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984). Instead, there is a presumption against bail in extradition cases and in favor of detention, and respondents must demonstrate "special circumstances" that justify their release on bail. *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996) (citing *Wright v. Henke*l, 190 U.S. 40, 63 (1903)). The rationale behind the presumption against bail is that "extradition cases involve an overriding national interest in complying with treaty obligations" and ensuring that the putative extraditee is delivered to the requesting country. *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990).

Determining whether a case presents special circumstances is a case specific endeavor and "the list of potential 'special circumstances' is not limited to those previously recognized in published decisions." *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 56 (D. Mass. 2010) (citing *In re Extradition of*

*Gonzalez*, 52 F. Supp. 2d 725, 736 (W.D. La. 1999)). Special circumstances, though, have typically been limited to those "situations where 'the justification is pressing as well as plain,' ... or 'in the most pressing circumstances, and when the requirements of justice are absolutely peremptory.' " *In re Extradition of Drumm,* 150 F. Supp. 3d 92, 96 (D. Mass 2015) (quoting *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979) (citations omitted)). Courts therefore have found that bail is appropriate only where the respondent's circumstances are "extraordinary" and will subject the respondent to difficulties beyond those "applicable to all defendants facing extradition." *Id.* (citing *In re Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1216 (D. Nev. 1993) (citations omitted)).

Accordingly, courts have granted bail in only truly remarkable circumstances and often when multiple special circumstances bear in the respondent's favor. *See e.g., Castaneda-Castillo*, 739 F. Supp. 2d at 58-64 (combination of charge pending in Peru more than twenty-five years, incarcerated five years pursuing amnesty petition, facing lengthy extradition proceeding); *In re Extradition of Santos*, 473 F. Supp. 2d 1030, 1035-1036 (C.D. Cal. 2006) (combination of delay and a high degree of uncertainty regarding the merits of the request for extradition); *In re Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002) (combination of financial assistance to

6

seriously ill mother, circumstances of arrest, lengthy extradition
proceedings, and criminal charges dropped and then reinstated when
petitioner left Hungary); *see also Hu Yau-Leung v. Soscia*, 649
F.2d 914 (2d Cir. 1981) (absence of a suitable facility in which
to detain juvenile extraditee); *In re Mitchell*, 171 F. 289, 290
(S.D.N.Y. 1909) (risk of petitioner's loss of "all his fortune" if
not permitted to complete his participation in a civil proceeding
underway at the time of his arrest).

In addition to establishing special circumstances, a
respondent must show by clear and convincing evidence that he is
neither a flight risk nor a danger to the community. *Castaneda-
Castillo*, 739 F. Supp. 2d at 55. Special circumstances and flight
risk/danger are both prerequisites to establishing entitlement to
bail in an extradition case and a court logically can address
either prong first. *United States v. Ramnath*, 533 F. Supp. 2d
662, 665 n.3 (E.D. Tex. 2008).

**B. Special Circumstances**

Turning first to the issue of special circumstances, the
respondents argue that special circumstances exist in this case
because: (1) they have a high likelihood of success on the merits
with respect to the Japanese criminal prosecution; (2) they have
already been adjudicated "not guilty" by a third country; (3)
Michael Taylor has significant family responsibilities; and (4)
detention will subject the respondents to a high risk of exposure

to the COVID-19 virus.  The respondents argue further that even if
each of these circumstances alone is insufficient to constitute a
special circumstance, they constitute a special circumstance when
considered together.  The court addresses each of the grounds
separately and then as a whole.

### 1. *Likelihood of Success on the Merits*

The Taylors contend that the underlying criminal case against
them is fatally flawed.  Some courts have held that a "high
probability" or "substantial likelihood" of success in defeating
the anticipated foreign prosecution may appropriately qualify as
a special circumstance.  *See, e.g., Kin-Hong,* 83 F.3d at 524-25
("high probability of success"); *Salerno v. United States,* 878
F.2d 317 (9th Cir. 1989) ("high probability of success"); *Ramnath,*
533 F. Supp. 2d at 682 ("substantial likelihood"); *Taitz*, 130
F.R.D. at 444 ("high probability of success").  Although not all
courts agree, *see, e.g., United States v. Risner,* No. 3:18-MJ-765-
BN, 2018 WL 6809796, at *12 (N.D. Tex. Dec. 27, 2018), this court
presumes that a high probability or substantial likelihood of
success may qualify as a special circumstance.

The Taylors argue that even assuming they helped Ghosn flee
Japan, their conduct was not unlawful because Penal Code Article
103 does not make it criminal to assist a person's escape unless
that person escapes from "confinement."  According to the Taylors,
the term "confinement" under Japanese law means actual physical

detention, and Ghosn was not confined at the time of his escape because he had been released on bail.  Thus, while Ghosn may have "jumped bail," he did not escape from confinement within the meaning of Article 103.  Consequently, contend the Taylors, they cannot be found to have violated Article 103 where Ghosn was not confined.  To underscore this point, the respondents have submitted various news articles as well as the declaration of a professor from a Japanese law school noting that "bail jumping" itself is not a crime in Japan.  The court credits the respondents' assertion that "bail jumping" is not a crime in Japan but still does not find this argument persuasive.

The principal problem with the respondents' argument is that it simply ignores other unambiguous language in Article 103 providing that the provision also applies to anyone who "harbors or enables the escape of another person who has. . .committed a crime," without regard to whether the criminal was or was not in confinement.  The respondents would appear to fall squarely within the heartland of this portion of Article 103 where Ghosn had been charged with a crime and the respondents then reportedly harbored and/or helped him to escape to avoid prosecution.  Even assuming that Ghosn himself did not violate Article 103 when he escaped while on bail, that to this court is immaterial and would appear to have no bearing on whether the respondents may be prosecuted as

principals[5] for harboring or enabling the escape of someone who committed a crime.

Notably, the government has cited to authority provided through the declaration of the Japanese prosecutor that Article 103 has indeed been used previously to successfully prosecute an individual who helped someone who was indicted but not in confinement to escape. (Declaration of Naoki Watanabe, D. 23-2, ¶ 12). The respondents argue that the offered precedent is distinguishable and not analogous. Perhaps, perhaps not, but the court is not versed in the nuances of Japanese criminal law and is loath to attempt to decide an issue that should most appropriately be decided by a Japanese court. *See, e.g., Skaftouros v. United States*, 667 F.3d 144, 156 (2d Cir. 2011) ("[I]t has long been recognized that an extradition judge should avoid making determinations regarding foreign law."). In any event, the respondents have not pointed to any authority holding or suggesting that Article 103 cannot apply to someone who harbors a bailed defendant or helps him to escape.

In sum, even assuming *arguendo* that the respondents have a potentially non-frivolous legal defense, they have not here shown

---

[5] The respondents also contend that because bail jumping is not a crime in Japan, punishing the respondents where Ghosn could not be punished would run afoul of another provision of Japan's Penal Code, Article 63, which provides that the punishment of an accessory shall be less than that for a principal. As with their primary argument, however, this argument fails to appreciate that the respondents have not been charged as accessories to Ghosn's bail jumping, but rather have been charged as principals for harboring or enabling a criminal's escape.

a "high probability" or "substantial likelihood" of success on the merits.  This ground therefore does not constitute a special circumstance.

### 2. *Prior Adjudication by a Third Country*

The respondents ask the court to consider that a third country, Lebanon, has already considered their conduct and determined that they did not commit a crime.  In support of this claim, the respondents have submitted a declaration from a Lebanese attorney who claims that the Lebanese prosecutor overseeing the investigation of the Taylors in Lebanon "close[d] the case" after a family member of the Taylors asked the prosecutor to "proceed with the investigation."  According to the Lebanese attorney (as opposed to the prosecutor), the closing of the case rendered the respondents "not guilty before Lebanese jurisdictions of any criminal act in the alleged unlawful departure of Mr. Carlos Ghosn from Japan . . . ."  (Declaration of Naoum Toubia Farah, D. 17-11).

The Taylors argue that this development constitutes a special circumstance because Article IV, Section 2 of the Treaty provides that "[t]he requested Party may refuse extradition when the person sought has been tried and acquitted, or has undergone the execution of punishment in a third State for the offense for which extradition is requested."  As such, the respondents suggest that they stand a more colorable chance of avoiding extradition as a

result of the Lebanese prosecutor's declination. This argument
has no force. To state the obvious, the respondents were
apparently not even charged with an offense in Lebanon, let alone
"tried and acquitted." The Treaty provision cited is thus not
even remotely implicated and provides no basis for relief here.
Moreover, because considerations of whether to grant or refuse
extradition rest exclusively with the Executive branch, and would
not take place until much later, after a court has determined
extraditability, the possibility of obtaining protection through
this Treaty provision is simply too speculative a ground at present
to constitute a special circumstance warranting bail.

### 3. *Family Responsibilities*

Michael Taylor argues that he has significant family
responsibilities militating in favor of his release. Among other
things, he claims (and the court credits) that he has been the
sole caregiver for his 81-year-old adoptive stepfather, who
suffers from many health issues, and his detention therefore would
cause a significant struggle for the Taylor family, who have had
to ask another of Mr. Taylor's sons as well as neighbors to assist
in his absence.

The court is sympathetic to Mr. Taylor's situation and credits
that his continued detention would meaningfully disrupt the
routine of care previously in place to address his stepfather's
needs. As the government notes, though, detention commonly acts

to deprive a family or loved one of the support of a helpful and vital member. Extradition courts for that reason have rejected familial caretaking responsibilities as a special circumstance. *See, e.g., In re Extradition of Russell*, 805 F.2d 1215, 1217 (5th Cir. 1986) ("[F]inancial and emotional hardship [on family members is] present in almost all cases."); *Drumm*, 150 F. Supp. 3d at 99–100 (citing *Castaneda-Castillo*, 739 F. Supp. 2d at 57) (providing financial and emotional support not a special circumstance); *Duca v. United States*, No. 95-cv-713, 1995 WL 428636, at *15, 16 (E.D.N.Y. July 7, 1995) (finding wife's advanced dementia not to constitute a special circumstance), *aff'd sub nom. Lo Duca v. United States*, 93 F.3d 1100 (2d Cir. 1996). Accordingly, Mr. Taylor's family responsibilities do not constitute a special circumstance weighing in favor of release.

> 4. *Issues Relating to COVID-19*

The respondents argue without great elaboration that "an outbreak" of the COVID-19 virus at the Norfolk County Correctional Facility (Norfolk) where they are being held should be deemed a special circumstance warranting bail. The health concerns relating to the virus are well known but the court does not find them to be a special circumstance on the basis of the present record.

As an initial matter, the respondents offer little information to meaningfully assess the severity of the risk of

13

exposure or infection should they remain detained at Norfolk
pending the resolution of the extradition proceedings.  To be sure,
they note, and the court credits, that the number of people testing
positive for the virus at Norfolk increased from four to 35 between
May 26 and June 18, 2020.  They assert further that Michael Taylor
is 59 years old and has had part of one lung removed due to a
fungal infection, which may place him at a higher risk of
complications from COVID-19 than the general public.

That being said, the respondents fail to provide medical
records for Michael Taylor or any physician's opinion that he is
at a particularly greater risk for complications should he contract
the virus.  Moreover, the government has submitted the unrefuted
declaration of the Assistant Deputy Superintendent at Norfolk, who
avers among other things that no one housed in the unit where the
respondents are being held has tested positive for the virus.
Further, the facility continues to employ significant measures to
ensure the safety of its population, including placing new
detainees in quarantine for 14 days; suspending family and friend
visits; requiring the use of masks; and cleaning housing units
three times per day.  (D. 23-4, Declaration of Danielle Boomhower).

The court is mindful that the severity of the risks posed to
any detainee by the COVID-19 virus depends on several variables
and may change quickly, such that conditions at Norfolk could at

some future point yet constitute a special circumstance.  The record does not support such a finding at present, however.

### 5. *Combination of Circumstances*

Finally, the respondents argue that the grounds offered above amount to a special circumstance if considered together, even if no ground standing alone suffices.  For the reasons noted above, however, none of the grounds offered is exceptional and they fail in the court's view to amount to a special circumstance even when viewed in the aggregate.  Even were the court to conclude otherwise, detention would still be warranted because the respondents have not demonstrated by clear and convincing evidence that their release would not pose an unreasonable risk of flight.

### C. Risk of Flight and Danger to the Community

As noted, a respondent bears the burden of demonstrating by clear and convincing evidence that he is neither a risk of flight nor a danger to the community.  *Drumm*, 150 F. Supp. 3d at 96.  No one seriously argues that the respondents' release would pose a danger to the community.  The government argues however that each poses an "exceptional" risk of flight.

### 1. *Michael Taylor*

In arguing that he does not pose a flight risk, Michael Taylor stresses that he voluntarily returned to the United States from Lebanon despite knowing of the Japanese warrants and the existence of the extradition treaty.  He concedes that he

15

has strong ties to Lebanon, where his wife is from and where he owns a home, but contends that he returned to the United States on his own, despite these ties, and despite the fact that remaining in Lebanon would have effectively shielded him from an extradition process he knew was likely to ensue.

Mr. Taylor further points out that he has on two prior occasions in 2007 and 2012 returned to the United States to answer charges against him. With respect to the 2012 charges, Mr. Taylor states that while he did plead guilty to honest services wire fraud, he was eventually released for 16 months pending sentencing and during that time fully complied with all conditions of release, and even assisted federal law enforcement in a complex overseas investigation.

Finally, Mr. Taylor offers that the maximum punishment for his alleged offense in Japan is three[6] years, and likely to be less in reality, giving him little incentive to flee.

The points raised by Mr. Taylor are not insubstantial and in a routine domestic criminal matter might provide a strong basis to warrant release on bail with conditions. In this case, however, they fail in light of the charges and Mr. Taylor's past to persuade by clear and convincing evidence that he is not likely to flee. As the magistrate judge, district judge, and

---

[6] The maximum penalty under Article 103 is in fact two years.

Tenth Circuit Court of Appeals all agreed in Mr. Taylor's 2012
case, there was "ample" evidence that he posed a flight risk due
to his planning skills and experience with clandestine
operations. *United States v. Taylor*, 524 F. App'x 386, 387
(10th Cir. 2013).

And since then, of course, Mr. Taylor is alleged to have
used his skills and experience to plan and execute a most
intricate, sophisticated, and deceptive scheme spanning several
countries and most surely requiring massive expenditures of time
and money.  Even assuming Mr. Taylor now sincerely harbors a
belief that he is not likely to be convicted or face a serious
term of incarceration if extradited and convicted, and would
intend to spend his time caring for his stepfather, those
factors do not come close to mitigating the risk that would
otherwise be posed by his release, particularly where he has
strong ties to Lebanon and apparently has (along with Peter
Taylor) substantial resources that could be exploited, including
approximately $860,000 Ghosn appears to have wired in October
2019 to a limited liability corporation controlled by Peter
Taylor and his brother.  *See* D. 38.  In light of these facts and
the spectacular allegations underlying the Japanese case, the
respondent does not merit the benefit of any doubt.

### 2. *Peter Taylor*

The court finds for similar reasons that Peter Taylor has not demonstrated by clear and convincing evidence that he would not flee if released. Among other things, he has strong ties to Lebanon, completed his college education there, and in fact recently resided there while trying to establish the family's business. Moreover, he reportedly played a significant role in facilitating Ghosn's escape from Japan. This included traveling to Japan on multiple occasions to meet with Ghosn in advance of the escape and coordinating Ghosn's transition to the Grand Hyatt. At a minimum the facts reflect a greater than passing experience in covert international planning.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Respondents' Motion To Quash Arrest Warrants Or, In The Alternative, For Release Pending Final Disposition On Request For Extradition (D. 17) is <u>DENIED</u>.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: July 10, 2020

# Exhibit 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL L. TAYLOR and      *
PETER M. TAYLOR,      *
     *
     Petitioners,      *
     *
     v.      *      Civil No. 4:20-cv-11272-IT
     *
JEROME P. MCDERMOTT, Sheriff,      *
Norfolk County, Massachusetts, and      *
JOHN GIBBONS, United States Marshal,      *
District of Massachusetts,      *
     *
     Respondents.      *

MEMORANDUM AND ORDER

August 7, 2020

TALWANI, D.J.

     Petitioners Michael Taylor and Peter Taylor allegedly assisted Carlos Ghosn Bichara, the former Chairman of the Board of Directors and Chief Executive Officer of Nissan Motor Co. Ltd., leave Japan after he was indicted by a Japanese court for financial crimes. The Taylors were arrested in this District on May 20, 2020, and are currently being held at the Norfolk County Correctional Facility ("Norfolk") pending an extradition hearing. Before the court are the Petitioners' Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief [#1] and Motion for Preliminary Injunction [#2], seeking immediate release without conditions on the ground that they are being detained in violation of the law, and alternatively, immediate release subject to reasonable conditions, on the ground that they were improperly denied bail and to protect them from COVID-19. For the following reasons, Petitioners' habeas petition and motion for preliminary injunction are DENIED.

I.      Background

In 2018, Carlos Ghosn Bichara ("Ghosn") was indicted by a Japanese court for financial crimes allegedly committed during his tenure as the CEO and/or Chairman of the Board of Directors at Nissan Motor Co., Ltd. ("Nissan"). See Ex. F – Michael Taylor Extradition Req. Part IV, ¶¶ 1-2 [#41-6]. Ghosn was later released on bond and conditions, including that he was forbidden from leaving Japan. Id. at Part IV, ¶ 4. At the end of December 2019, Ghosn secretly left the country, despite the terms of his bail.

On January 30, 2020, and February 28, 2020, a Japanese court issued and reissued warrants for Petitioners' arrest for "harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II)." Ex. I – Original Arrest Warrants [#41-9]; Ex. J – Renewed Arrest Warrants [#41-10].

Michael Taylor returned to the United States from Lebanon on February 23, 2020. Peter Taylor followed on March 15, 2020.

The government of Japan subsequently requested the United States issue provisional arrest warrants pursuant to the Treaty governing extradition between the United States and Japan. Treaty on Extradition, U.S.-Japan, effective Mar. 26, 1980, 31 U.S.T. 892, (the "Treaty") Ex. E – [#41-5]. The United States thereafter filed complaints pursuant to 18 U.S.C. § 3184 with a Magistrate Judge, asserting that the Taylors had violated Article 103 of the Japanese Penal Code. See Ex. A – Michael Taylor Compl. [#38-2]; Ex. B – Peter Taylor Compl. [#38-3].[1] The

_____

[1] The full proceedings before the Magistrate Judge are docketed at In the Matter of the Extradition of Michael L. Taylor, No. 20-mj-1069-DLC (D. Mass) ("Michael Taylor MJ Docket"), and In the Matter of the Extradition of Peter Taylor, No. 20-mj-1070-DLC (D. Mass.). For convenience, where those dockets are referenced, and the same or similar documents are filed on both dockets, (albeit with slightly different numbering), the court has cited to the Michael Taylor MJ Docket.

Magistrate Judge issued the requested warrants and the Taylors were arrested on May 20, 2020.

The United States moved for detention and the Taylors were detained pending a request for a

detention hearing. United States' Mot. for Detention, Michael Taylor MJ Docket (May 20,

2020), ECF No. 9; Elec. Clerk Notes, Michael Taylor MJ Docket (May 20, 2020), ECF No. 11.

The Taylors subsequently moved to quash their arrest warrants or for release from detention. See

Mot. to Quash Arrest Warrants or for Release from Detention, Michael Taylor MJ Docket (June

8, 2020), ECF No. 17. The Magistrate Judge held a hearing on these motions on June 22, 2020,

and took the matters under advisement.

     While the motions were pending, Japan submitted its formal extradition request. Notice

of Japan's Submission of Req. for Extradition, Michael Taylor MJ Docket (July 2, 2020) ECF

No. 37; Ex. K – Extradition Req. Transmittal [#41-11]; see also Ex. F – Extradition Req. for

Michael Taylor [#41-6]. The parties also filed further briefing and supplemental authorities with

the Magistrate Judge.

     On July 6, 2020, the Taylors filed with this court the pending petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2241 [#1] and a Motion for Temporary Restraining Order and

Preliminary Injunction [#2].

     The following day, the Magistrate Judge issued electronic orders denying the Motion to

Quash or for Release from Detention pending before him. Elec. Order, Michael Taylor MJ

Docket (July 7, 2020) ECF No. 40. Shortly thereafter, the Magistrate Judge issued his written

decision providing reasoning for denying Petitioners' motion, finding Petitioners' challenge to

the provisional arrests mooted by Japan's formal extradition request, and further finding that bail

was not warranted as the Taylors pose a flight risk and failed to establish special circumstances

warranting bail. Magistrate Judge's Mem. on Resps.' Mot. to Quash Arrest Warrants or for

Release from Detention, Michael Taylor MJ Docket (July 10, 2020) ECF No. 41, ("Magistrate

Judge's Decision"). An extradition hearing in front of the Magistrate Judge is currently set for

August 28, 2020. See Elec. Notice of Hr'g, Michael Taylor MJ Docket (August 4, 2020) ECF

No. 47.

Meanwhile, this court denied Petitioners' requested temporary restraining order and set

the matter for further hearing. Elec. Order [#33]. The parties submitted further briefing, see

Pet'rs'' Mem. in Supp. of Mot. for Prelim. Inj. ("Pet'rs' Mem.") [#38]; Government's Opp'n to

Mot. for Prelim. Inj. and Resp. to Habeas Pet. ("Gov's Opp'n") [#41], and the court heard

argument and took the matter under advisement.

II.     Analysis

The Taylors seek a preliminary injunction ordering their immediate release from custody,

or, alternatively, an order reversing the Magistrate Judge's denial of bail, arguing that special

circumstances and evidence that the Taylors are not flight risks warrant such a conditional

release. They additionally ask for release based on the government's alleged deliberate

indifference to the risk posed by COVID-19.

A.  Bail Determination

Bail decisions are properly challenged prior to an extradition hearing via a petition for a

writ of habeas corpus. Drumm v. McDonald, 2016 WL 111411, at *1 n.1 (D. Mass. Jan. 11,

2016). "There is a presumption against bail in extradition cases and only 'special circumstances'

justify release on bail." United States v. Kin-Hong, 83 F.3d 523, 524 (1st Cir. 1996)

(quoting Wright v. Henkel, 190 U.S. 40, 63 (1903)). In addition to establishing special

circumstances, the extraditee also bears the burden of establishing by clear and convincing

evidence that he is not a flight risk or a danger to the community. United States v. Castaneda-

Castillo, 739 F. Supp. 2d 49, 55 (D. Mass. 2010) (internal citation omitted). Special

circumstances must "be more or less unique to the supplicant and not be one that is applicable to

extraditees generally," Drumm, 2016 WL 111411, at *3, and are limited to "situations where the

justification [for bail] is pressing as well as plain." United States v. Williams, 611 F.2d 914, 915

(1st Cir. 1979) (per curiam) (internal citation omitted). However, the determination of special

circumstances is "case specific" and "the list of potential 'special circumstances' is not limited to

those previously recognized in published decisions." Castaneda-Castillo, 739 F. Supp. 2d at 56

(quoting In re Extradition of Gonzalez, 52 F. Supp. 2d 725, 736 (W.D. La. 1999)).

Review of a bail determination "is limited to the issue of whether or not there were

reasonable grounds for the Magistrate Judge's denial of bail." Kin-Hong v. United States, 926 F.

Supp. 1180, 1184 (D. Mass. 1996), rev'd on other grounds, 83 F.3d 523; see also Drumm, 2016

WL 111411, at *3 ("[t]he determination of what constitutes a 'special circumstance' is fact–

intensive and largely left to the Magistrate Judge's discretion . . ."). In reviewing the bail

decision, the court defers to the Magistrate Judge's factual findings and reviews legal

determinations de novo. Kin-Hong, 926 F. Supp. at 1184.

a.   The Magistrate Judge's Decision

In his decision on Petitioners' bail request, the Magistrate Judge considered each of the

four asserted special circumstances and found that the circumstances, individually and in the

aggregate, did not warrant bail.

First, the Magistrate Judge rejected Petitioners' argument that they have a high

probability of success in challenging their extradition based on a contention that their conduct

was not unlawful under Article 103 of the Japanese Penal Code. In finding the contention

unpersuasive, the Magistrate Judge observed that, based on the text of the statute and evidence

submitted by the Japanese government, the Taylors' conduct appeared to "fall squarely within the heartland" of conduct criminalized by Article 103. Magistrate Judge's Decision 9-11. Accordingly, while the Magistrate Judge assumed that Petitioners may be able to present a non-frivolous legal defense along these grounds, he found they did not establish the high likelihood of success necessary to potentially merit release on bail. Id. at 10-11.

Second, while acknowledging that Article IV § 2 of the Treaty allows for the denial of extradition if the extraditee has been "tried and acquitted" of the charged offense in a third country, the Magistrate Judge found that Petitioners were not, in fact, effectively "tried and acquitted" by the Lebanese judicial system despite Petitioners' contention to the contrary. Id. at 11-12. Though he noted evidence that a Lebanese prosecutor was asked to investigate the case at the behest of the Taylor family and decided to close the case without bringing charges, the Magistrate Judge found Petitioners' argument to have "no force" without a showing that they were actually "tried and acquitted," as defined by the terms of the Treaty. Id. Furthermore, the Magistrate Judge reasoned that the question of Article IV § 2's application was better suited for consideration by the executive branch after a determination on extraditability. Id. at 12.

Third, the Magistrate Judge recognized that ongoing detention prevented Michael Taylor from continuing in his role as the primary caretaker for his stepfather who faces heightened risks from COVID-19 because of his age and health. Id. However, the Magistrate Judge found that this concern was not unique to Michael Taylor, as opposed to other extraditees also separated from loved ones while in detention, and so declined to grant bail on this basis. Id. at 12-13.

Fourth, while the Magistrate Judge credited Petitioners' report that 35 inmates at Norfolk had in the past tested positive for COVID-19 and that Michael Taylor's medical history may put him at higher risk if he contracts the disease, he found the risk posed by COVID-19 did not, on

its own, merit bail. Id. at 13-15. In so ruling, the Magistrate Judge took into account the

government's evidence that no one has tested positive in the unit where the Taylors are located,

there are no current active cases of the virus in the entire prison, and that Norfolk has

implemented significant measures to protect the prison population. Id. at 14-15.

Finally, the Magistrate Judge found that these factors, in aggregate, did not amount to the

necessary special circumstances to warrant bail. Id. at 15.

The Magistrate Judge also made individualized rulings as to the Taylors' risk of flight. Id.

at 15-18. He first acknowledged that Michael Taylor provided "not insubstantial" arguments for

why he was not a flight risk, including his voluntary return to the United States despite

knowledge of the Japanese warrants, prior decisions to return to the United States to face

criminal charges, and low incentive to flee given the relatively short jail sentence he could

receive if convicted in Japan. Id. at 15-16. However, "in light of the charges and Mr. Taylor's

past," the Magistrate Judge nonetheless found that Michael Taylor failed to meet his burden to

show, by clear and convincing evidence, that he was not likely to flee. Id. at 16. For this finding,

the Magistrate Judge cited Michael Taylor's experience with clandestine operations, previous

determinations by Utah courts who denied him release during a case in 2012 in part on the basis

of his ability to effectuate flight, his strong ties to Lebanon, and that the pending charges allege

that Michael Taylor "used his skills and experience to plan and execute a most intricate,

sophisticated, and deceptive scheme." Id. at 16-17.

The Magistrate Judge also found Peter Taylor failed to meet his burden on the question of

flight risk for "similar reasons." Id. at 18. The Magistrate Judge specifically highlighted Peter

Taylor's strong ties to Lebanon, including that he had lived in the country until recently while

trying to establish the family business there, and his role alongside Michael Taylor in facilitating

Ghosn's escape from Japan. Id.

      b.  Review of Special Circumstances

          i.  High Probability of Success

As the First Circuit has pointed out, courts have listed a high probability of success in defeating an extradition request as a "special circumstance" for granting release on bail. Kin-Hong, 83 F.3d at 524 (citing Salerno v. United States, 878 F.2d 317, 317 (9th Cir. 1989)). Petitioners argue this applies here and that they have a high probability of success in challenging extradition. They assert, without contesting the factual allegations underlying the extradition request, that Japan is misinterpreting its own law by applying Article 103 to their conduct and that, therefore, they have not committed an extraditable crime.[2] Pet'rs' Mem. 15-24, 30-31 [#38]. They further assert the Magistrate Judge failed to adequately weigh evidence presented by their expert, Professor William Cleary of Hiroshima Shudo University. Id. at 22 (citing Ex. C – William Cleary Decl. [#38-14]; Ex. D – Suppl. William Cleary Decl. [#38-15]); see also Ex. P – Second Suppl. William Cleary Decl. [#38-27].

As an initial observation, Petitioners seek to establish a high probability of success in defeating the extradition request through a piercing inquiry into Japanese law. They offer no cases where a court has granted release on the ground that a foreign nation has misinterpreted its own law, and it seems a steep path for Petitioners to succeed in this argument, given necessary

---

[2] Under Article III of the Treaty states that "[e]xtradition shall be granted only if there is sufficient evidence to prove either that there is probable cause to suspect, according to the laws of the requested Party, that the person sought has committed the offense for which extradition is requested . . . ." Ex. E – Treaty [#41-5]. Article II defines crimes covered by the Treaty as those "punishable by the federal laws of [the United States and by the laws of Japan] by death, by life imprisonment, or by deprivation of liberty for a period of more than one year." Id. Individuals convicted of violating Article 103 face a maximum imprisonment of 3 years. See Ex. Q – Masayuki Yoshida Decl. ¶ 6 n.1 [#41-17].

deference to foreign countries' understanding of their own law and as courts liberally construe

the scope of extradition treaties. See Grin v. Shine, 187 U.S. 181, 190 (1902) (stating that, in the

context of extradition, "it can hardly be expected of us that we should become conversant with

the criminal laws of [the requesting country], or with the forms of warrants of arrest used for the

apprehension of criminals."); United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997)

("extradition treaties, unlike criminal statutes, are to be construed liberally in favor of

enforcement because they are 'in the interest of justice and friendly international relationships.'")

(quoting in part Factor v. Laubenheimer, 290 U.S. 276, 298 (1933)). In addition, extradition is

neither a civil nor a criminal proceeding and the role of the judiciary in the process is limited.

See In re Extradition of Hilton, 2013 WL 1891327, at *3 (D. Mass. May 3, 2013) ("An

extradition proceeding is not an ordinary Article III case or controversy and it is not a criminal

proceeding.") (citation omitted); see also In re Extradition of Howard, 996 F.2d 1320, 1325 (1st

Cir. 1993) ("an officer who presides over such a proceeding is not exercising 'any part of the

judicial power of the United States.'") (quoting in part In re Kaine, 55 U.S. (14 How.) 103, 120

(1852)). "[T]he procedures for extradition are governed by statute," dividing responsibility

"between a judicial officer and the Secretary of State." Kin-Hong, 110 F.3d at 109. Courts must

therefore be wary not to step into the realm of a foreign policy maker, reserved in the context of

extradition for the executive branch. See id. (stating Secretary of State retains "sole discretion to

determine whether or not [a person] should actually be extradited.").[3]

   With these considerations in mind, Petitioners do not convince this court that they have a

---

[3] Petitioners urge this court to consider Japan's alleged refusal to extradite indicted executives of
the Takata Corporation to the United States as part of an analysis of the United States' treaty
obligation (and whether bail should be granted). See Pet'rs' Mem. 2, 39 [#38]. Based on the
constitutional separation of powers, the court finds that matter outside the scope of what the
court may consider here.

high likelihood of success in proving that Japan has misinterpreted its own law and that,

therefore, their conduct is not an extraditable crime pursuant to the Treaty.[4]

Article 103 punishes "a person who [1] harbors or enables the escape of another person

[2] [a] who has either committed a crime . . . or [b] who has escaped from confinement." Ex. O –

Japanese Treatise [#41-15] (numbering added by the court). The Petitioners' expert, Professor

Cleary, argues that the verb *toso* translated to "escape from confinement" in the latter part of

Article 103, refers to an "escape from a place of physical confinement, such as a jail, prison or

detention center" and therefore does not apply to jumping bail. Ex. P – Second Suppl. William

Cleary Decl. ¶ 6 [#38-27].[5] But this explanation is of little moment where Petitioners are also

charged with harboring or enabling the escape of a person who has "committed a crime." Ex. K –

Extradition Req. Transmittal [#41-11].

---

[4] While Petitioners contend that the court has to interpret foreign law "especially in extradition cases," Petitioners cite a non-extradition case for this proposition, Animal Sci. Prod. Inc. v. Hebei Welcome Farm Co., 138 S. Ct. 1865 (2018), and urge the court to apply Fed. R. Civ. P. 44.1, as cited by the Supreme Court in Animal Sci., as guidance for interpreting Japanese law. Id. at 1869; Pet'rs' Mem. 12-13 [#38]. Applying Animal Sci in the extradition context appears dubious given the unique framework extradition proceedings operate within and given that federal rules of procedure do not apply, but even under that case, the court would still be required to accord "respectful consideration" and "substantial but not conclusive weight" to a foreign government's interpretation of its own law. Animal Sci., 138 S. Ct. at 1869, 1875.

[5] Some of Professor Cleary's opinion is based on the assertion that the Requests for Arrest Warrants only used the verb *toso*, not *inpi* and therefore did not apply to the Taylors' alleged conduct. Ex. P – Second Suppl. William Cleary Decl. ¶¶ 8-9 [#38-27]. However, the arrest warrants named the Penal Code offense using the word *han-nin-inpi*, identifying the nature of the offense in Article 103 instead of listing the statute number, as is asserted to be common practice for arrest warrants in Japan. Ex. M – Naoki Watanabe Decl. ¶ 7 [#41-13]. And the Japanese government asserts the arrest warrants included both the word *inpi* as well as *toso*. Ex. N – Suppl. Naoki Watanabe Decl. ¶ 9 [#41-14]. Regardless, the parties do not appear to contest the Magistrate Judge's finding that the challenge to the arrest warrants, and the United States' reliance on those warrants to obtain provisional arrest pursuant to the Treaty, was mooted by the submission of a formal extradition request. See Magistrate Judge's Decision 2-3 (citing Martinez v. United States, 828 F.3d 451, 470 (6th Cir. 2016); United States v. Yee-Chun, 657 F. Supp. 1270, 1271 n.1 (S.D.N.Y. 1987)).

Professor Cleary asserts further that the statute does not apply here because bail jumping is not, on its own, a crime under Japanese law. Ex. C – William Cleary Decl. ¶¶ 10-11, 15 [#38-14]. However, whether "bail jumping" is a crime under Japanese law does not appear to affect the applicability of Article 103 to the Taylors' conduct. Ghosn's alleged crime that positions him as "another person who has . . . committed a crime" are the financial crimes for which he was indicted. See Ex. Q – Masayuki Yoshida Decl. ¶ 7 [#41-17] (stating that the phrase "another person who has . . . committed a crime" is understood to either mean an individual convicted of a crime or an individual being investigated for committing a crime).

Professor Cleary argues further that the verb used in the first part of Article 103 – *inpi* – encompasses both to "harbor" and to "enable the escape of" but that this verb applies "a single concept at describes working against law enforcement authorities' active pursuit of a criminal to arrest him." Ex. P – Second Suppl. William Cleary Decl. ¶ 5 [#38-27]. That *inpi* encompasses a single concept of working against certain law enforcement activities appears consistent with both sides' understanding of the statute. However, the limitation offered by Professor Cleary – that the statute only applies to those who assist someone seeking to "flee from a scene of a crime or an arrest or to escape confinement" – is not persuasive. Pet'rs' Mem. 20 [#38] (citing Ex. C – William Cleary Decl. ¶ 14 [#38-14]; Ex. P - Second Suppl. William Cleary Decl. ¶¶ 5, 10 [#38-27].

While Professor Cleary cites cases where defendants were charged under Article 103 for assisting others evade imminent arrest, his broad assertion that *inpi* can only apply to such circumstances is contradicted by the Japanese legal treatise originally submitted by Petitioners that states that *inpi*, in the sense of an act to "enable the escape," covers acts that hinder "arrest or discovery" by law enforcement, therefore extending to situations when arrest is not law

11

enforcement's present aim. Ex. H – Japanese Treatise [#2-17] (emphasis added).

The Japanese prosecutor, on the other hand, provides case citations where Article 103 has been interpreted to encompass acts that interfere with the justice system, separate and apart from enabling escape from an imminent arrest. See, e.g., Ex. M – Naoki Watanabe Decl. ¶ 12 [#41-13] (citing case[6] from an Osaka district court in 2000 where defendant was prosecuted and convicted under Article 103 for providing a credit card to a person who had been indicted but was not confined, allowing the person to "abscond" and stay in a hotel under a different name); Ex. N – Suppl. Naoki Watanabe Decl. ¶ 9 [#41-14] (citing case where defendant was convicted under Article 103 after providing SIM card and cash to suspect, who was not fleeing the scene of a crime and who did not yet have an arrest warrant issued); Ex. Q – Masayuki Yoshida Decl. ¶ 8(i) [#41-15] (citing case where defendant was convicted under Article 103 for falsely taking blame for crime committed by another person, who was presumed dead at the time of the defendant's acts). While Professor Cleary seeks to distinguish these cases, see Ex. D – Suppl. William Cleary Decl. ¶ 4 [#38-15], he does not present any evidence, interpreting the Japanese language or interpreting case citations, that compels a finding that the statute cannot apply to assisting a person released on bail evade discovery by law enforcement. See also Ex. H – Japanese Treatise

---

[6] Professor Cleary distinguishes this case by noting that the assistee had his bail revoked before he was helped by the defendant and the assistee was thus subject to arrest. Ex. D – Suppl. William Cleary Decl. ¶ 4c [#38-15]. However, accepting Professor Cleary's interpretation as true, the case still supports the proposition that Article 103 can apply to those who assist others who have already been arrested and indicted evade the justice system. And based on this case, had the Japanese government learned that Ghosn had broken the terms of his bail (by, for example, hiding and fleeing, which was prohibited by the terms of his bail conditions, see Ex. F – Michael Taylor Extradition Req. Part IV, § 4(iii) [#41-6]), before he left Japan, and had the Taylors then assisted him, they could have been charged under Article 103. Thus, Petitioners' argument fails to convince where the mere difference in the hypothetical fact pattern from the actual facts is that the Taylors were effective in swiftly secreting Ghosn out of Japan before the authorities learned of Ghosn's violations of his conditions of bail.

[#2-17] (stating the crimes in the Chapter (Articles 103 and 104), "including the crimes in

[Article 103,] are crimes that involve encroaching upon the criminal justice functions of the state

in the broad sense of investigation, judgment, enforcement, etc. of criminal cases"). In addition,

the more capacious reading of the verb *inpi* is also supported by the Japanese Supreme Court's

interpretation of Article 103 as a statute that "intends to punish a person who interferes with the

criminal justice system in a broad sense, such as investigations, court proceedings and executions

of sentences." Ex. Q – Masayuki Yoshida Decl. ¶ 6 [#41-17] (citing Judgment of Japanese

Supreme Court, May 1, 1989, Kei-shu vol. 43, No. 5, p. 405) (emphasis added).

In sum, after considering the statements made by Professor Cleary and the other evidence

submitted by the parties, the court finds that Petitioners have not shown a high likelihood of

success in their argument the Article 103 does not prohibit interfering with the Japanese criminal

justice system by harboring Ghosn and enabling Ghosn to elude discovery by law enforcement

and escape judgment from a Japanese court. Accordingly, the Magistrate Judge had reasonable

grounds not to grant bail on this basis.

ii.   Lebanese Proceedings

Under Article IV § 2 of the Treaty, "[t]he requested Party may refuse extradition when

the person sought has been tried and acquitted, or has undergone the execution of punishment in

a third State for the offense for which extradition is requested." Ex. E – Treaty [#41-5].

Petitioners assert that a Lebanese prosecutor who was asked to investigate the matter by a family

member of the Taylors "closed the case" which, according to Petitioners, renders a finding of not

guilty under Lebanese law. Pet'rs' Mem. 34-35 [#38] (citing Ex. O – Naoum Toubia Farah Decl.

¶¶ 3, 5-6, 8 [#38-26]).

Petitioners argue the Magistrate Judge failed to recognize that "the Lebanese court

13

system concluded there was no proper charge and the decision is in the same nature as if there had been a trial and acquittal . . . ." Pet'rs' Mem. 34 [#38]. They also accuse the Magistrate Judge of violating the rule of non-inquiry, by allegedly evaluating the fairness of the Lebanese court system. Id. at 34-35.

Petitioners show some internal inconsistency by asserting the Magistrate Judge went too far in inquiring into the fairness of the Lebanese legal system, when they have seemingly invited this court to do exactly that sort of inquiry into the Japanese legal system. However, the Magistrate Judge crossed no such line in his decision and confined his inquiry to the language in the Treaty, the evidence provided by Petitioners and the government's response. The plain language of the Treaty requires a showing that the party facing extradition has been "tried and acquitted" for the conduct he is alleged to have committed in the country seeking extradition. The declaration of Petitioners' counsel does not suggest any sort of adversarial proceeding in Lebanon where Japan could, or did, participate. Instead, at the behest of the Taylors' family, a prosecutor looked into the case and closed it, finding them "not guilty" for the purposes of Lebanese jurisdiction over the alleged crime. This is not, as Petitioners contend, equivalent to a trial and acquittal. Thus, the Magistrate Judge had a reasonable basis for rejecting this ground for the grant of bail.

### iii.  Care for Father-in-Law

Michael Taylor also contends his role as a caregiver to his 81-year old stepfather is a special circumstance, different from what is faced by extraditees generally, because his stepfather has serious health concerns and is vulnerable to COVID-19. Pet'rs' Mem. 33-34 [#38].

However, Petitioners' argument misses the mark. The hardship of incarceration on family members, including those family members who have previously received care from the

incarcerated individual, is a common concern amongst extraditees and prisoners alike. Currently, this is exacerbated by COVID-19, where many family members face novel risks posed by the pandemic. Here, Petitioners do not show that concerns for caring for Michael Taylor's stepfather amount to special circumstances, different from what is faced by other extraditees who also have family who are vulnerable and do not have an extensive support network. Accordingly, the Magistrate Judge reasonably found bail was not warranted on this ground.

iv.   Risk of COVID-19

The Taylors also raise the risk of COVID-19 as a special circumstance warranting bail, especially in light of Michael Taylor's heightened vulnerability to complications if he contracts the virus.[7] Petitioners have now submitted documentation of Michael Taylor's relevant medical history. See Ex. Q – Dr. Sandeep Jain Letter (stating that partial lobectomy makes Michael Taylor more vulnerable to complications caused by COVID-19) [#38-28]; Ex. R – Dr. M. Anthony Casolaro Decl. ¶¶ 3-5 (stating that a patient with Michael Taylor's health history would require immediate hospitalization if infected by COVID-19) [#38-29]. They also point to the decision in Matter of Extradition of Toledo Manrique, where the presiding magistrate judge granted bail, and release on conditions, to the 74-year old defendant facing extradition based on the risk posed by COVID-19, and contend that the Taylors are more meritorious of release than the party in that case. 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020); Pet'rs' Mem. 32 [#38]. In response, the government provides citations to court decisions that have denied bail to extraditees despite the threat of COVID-19, even when there is evidence of underlying medical conditions. Gov's Opp'n 24-25 [#41].

---

[7] Petitioners raise a separate argument, discussed below, asserting a due process violation by the government for allegedly showing deliberate indifference to the risk that COVID-19 poses to the Taylors.

15

Here, under the present circumstances, the court cannot find that the Magistrate Judge's decision to deny bail despite the risk posed by COVID-19 was unreasonable, even with additional evidence of the risk Michael Taylor faces if he contracts the virus. In so finding, the court does not minimize the threat that COVID-19 poses nor the legitimate concern that the Taylors and thousands of other prisoners feel given the uncertainty and danger posed by the pandemic. However, as the Magistrate Judge properly considered, the government has provided evidence that shows a relatively low risk at Norfolk today, including that there are no current cases of the disease at Norfolk, that there have never been any inmates who have tested positive for COVID-19 in the Taylors' housing unit, and that the Department of Corrections have taken a number of steps to minimize risks to inmates and staff at the prison. See Ex. R – Danielle Boomhower Decl. ¶¶ 3-5, 21-22 [#41-18].[8] Based on this record, and in light of the deference to the Magistrate Judge in reviewing a bail decision, the court upholds the Magistrate Judge's decision on this factor.

v.   Combination of Factors

Finally, Petitioners urge the court to find that, even if no single factor amounts to independent justification for bail, the combination of factors establish special circumstances for release. Pet'rs' Mem. 35 [#38]. However, even in aggregate, and even crediting that the Taylors face hardships by remaining in detention pending their extradition hearing, these circumstances do not overcome the strong presumption against granting bail in extradition cases. Accordingly, as the court finds that the Magistrate Judge had a reasonable basis for denying bail in this matter, their request for bail is denied.

---

[8] Petitioners make no argument that Peter Taylor faces a greater risk from COVID-19 than any other extraditee.

16

     c.  Review of Flight Risk

Though the court has found there are no special circumstances warranting the granting of bail at this time, the court also considers the Petitioners' contention that the Magistrate Judge erred in finding that both Michael and Peter Taylor pose a flight risk. Magistrate Judge's Decision 15-18; Pet'rs' Mem. 25-29 [#38].

The Taylors are charged with implementing a sophisticated plan assisting a person, who paid them, to jump bail. This plan included hiring a private jet in the United Arab Emirates, Peter Taylor making seven trips to Japan to meet with Ghosn multiple times and to set up and participate in Ghosn's escape plan and Michael Taylor flying with an associate to Japan, traveling from the airport to meet Ghosn in Tokyo and then traveling back to an airport hotel with Ghosn, checking with airport staff about security procedures and giving an airport worker a bundle of Japanese yen, secreting Ghosn out of a hotel room in a large box and bringing him aboard the private jet, and flying Ghosn to Turkey. The Taylors do not challenge these allegations. The government, in turn, has offered evidence of substantial payments of money to the Taylors. Thus, at the outset, there is strong evidence that Petitioners have the means, knowledge, and tools to flee the United States even if conditions are put in place to try to prevent such flight.

Michael Taylor argues that he has "no reason or incentive to evade these proceedings" and notes his extensive community ties, familial obligations, and his decision to return to the United States even after Japan had issued an arrest warrant. Pet'rs' Mem. 25-27 [#38]. He also expresses confidence in his ability to defeat the extradition request and states he is unlikely to flee given the relatively short sentence he faces in Japan if extradited and convicted. Id. At the same time, as he concedes, he has strong ties to Lebanon, where he has a home and a branch of

the family business. <u>See</u> Magistrate Judge's Decision 15-18. He has also previously been found a flight risk by courts in Utah in a previous criminal proceeding. Ex. T – Utah Detention Order [#41-20].

Peter Taylor also argues that he does not pose a flight risk, as he does not have the criminal background of his father and because he has strong ties to his Massachusetts community. Pet'rs' Mem. 28 [#38]. However, he does share with his father many of the same reasons for a finding that he poses a flight risk. Peter has strong ties to Lebanon, having lived in the country for the past 15 months after starting a business there and having graduated from college in the country. Mot. to Quash Arrest Warrants 29-30, Michael Taylor MJ Docket (June 8, 2020), ECF No. 17.

The Magistrate Judge noted that the question of risk of flight for both Taylors might be a closer call in routine domestic criminal proceedings. Magistrate Judge's Decision 16. But as the Magistrate Judge explained, this is an extradition case, with a heavier burden on the Taylors to establish they are not flight risks. Here, the charges themselves – with the undisputed factual allegations – undermine a finding that they are not flight risks. While the Taylors may well seek to remain in the United States to fight extradition through available legal channels, they have also shown a blatant disregard for such safeguards in the context of the Japanese legal system and have not established sufficiently that if they find their extradition fight difficult, they will not flaunt the rules of release on bail and flee the country.

Considering the factors together, along with the presumption against bail in extradition cases, the court cannot find that there is a "tolerable bail risk" in releasing the Taylors, <u>United States v. Williams</u>, 611 F.2d 914, 915 (1st Cir. 1979), and, accordingly, finds that the Magistrate Judge had reasonable grounds to deny bail on the basis of a risk of flight.

B.  Emergency Habeas Petition

Petitioners also contend that, beyond the review of the bail decision, this court must

separately consider whether the Taylors are currently being held unlawfully. Under 28 U.S.C.

§ 2241(c)(3), a court must order the petitioner released from custody pursuant to a writ of habeas

corpus if it finds that he is "in custody in violation of the Constitution or laws or treaties of the

United States." Here, Petitioners assert that as they are being held without probable cause, they

should be released pursuant to a writ of habeas corpus. Pet'rs' Mem. 15-23 [#38].

The government responds that questions of extraditability related to the Taylors'

detention are not properly before the court. It notes that under 18 U.S.C. § 3184, the Taylors'

detention is lawful as Japan has now issued a formal extradition request and the Taylors are

being held pending an extradition hearing in front of the Magistrate Judge where he will consider

questions of probable cause for extraditability. Gov's Opp'n 11-12 [#41].[9]

The timing of Petitioners' emergency habeas petition is unusual in that it seeks review of

the legality of an extradition detention, apart from a bail determination, after a formal extradition

request has been received but before a hearing by the Magistrate Judge pursuant to 18 U.S.C. §

3184.[10] The government is correct that the statute allows for "apprehension" during this interim

---

[9] At an extradition hearing, the presiding judicial officer considers six questions: 1) whether the
United States is a party to an extradition treaty with the country seeking extradition; 2) whether a
criminal charge is pending against the person subject to extradition; 3) whether the charged
offense is an extraditable crime under the treaty; 4) whether the person charged is the same
person who the government wants extradited; 5) whether an arrest warrant is outstanding; and 6)
whether probable cause exists to believe that the person committed the crime charged. Howard,
996 F.2d at 1324 n.1; see also 18 U.S.C. § 3184 ("if on such hearing, [the judicial officer] deems
the evidence sufficient to sustain the charge under the provisions of the proper treaty or
convention . . . [the judicial officer] shall certify the same . . . to the Secretary of State . . . .").

[10] Courts have considered challenges to detention on a provisional arrest warrant, prior to receipt
of a formal extradition request and brought via a habeas petition before an extradition hearing
has been held. See, e.g., Caltagirone v. Grant, 629 F.2d 739, 744-745 (2d Cir. 1980). However,
this is not applicable where, as discussed earlier, Petitioners' challenge to the provisional

period after a formal extradition request is received and establishes the normal next step in the

procedure, where the "judicial officer then conducts a hearing to determine if 'he deems the

evidence sufficient to sustain the charge under the provisions of the proper treaty.'" Kin-Hong,

110 F.3d at 109 (quoting 18 U.S.C. § 3184; see also Lo Duca v. United States, 93 F.3d 1100,

1104 (2d Cir. 1996) (stating the extradition hearing is "essentially a preliminary examination to

determine whether a case is made out which will justify the holding of the accused and his

surrender to the demanding nation.") (quoting Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir.

1990)). If the Magistrate Judge certifies that the Petitioners are extraditable, the finding is subject

to collateral attack through a habeas petition. Howard, 996 F.2d at 1325.

Nonetheless, even accepting the government's argument that Petitioners must proceed

first before the Magistrate Judge pursuant to 18 U.S.C. § 3184 on questions of extraditability, the

court considers whether, under 28 U.S.C. § 2241, Petitioners' detention is in "violation of the

Constitution, or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); see Vardy v.

United States, 529 F.2d 404, 406 (5th Cir. 1976) (finding that while "deferring habeas review

until there is a determination of extraditability is a preferable procedure," "a prior determination

of extraditability . . . is [not] a jurisdictional prerequisite to habeas relief" and the presence of

"unusual circumstances," such as an "excessive and confusing delay in the extradition

proceedings," could be basis of such review); cf. Matter of Extradition of Manzi, 888 F.2d 204,

206 (1st Cir. 1989) (per curiam) (finding, after a magistrate judge had certified the petitioner's

extraditability, "that serious due process concerns may merit review beyond the narrow scope of

inquiry in extradition proceedings.").

---

warrants, and their provisional detention, has been mooted by the receipt of the formal
extradition request. See infra 10 n.5.

Petitioners have not presented grounds or unusual circumstances demonstrating that they are being held unlawfully. Though Petitioners assert that they are being improperly held because Japan has, allegedly, "not charged the Taylors under [Article 103], or with any crime at all," and has not sent charging documents to the United States to support their extradition request, Pet'rs' Mem. 15, 18, 23-24 [#38], evidence from the Japanese government shows otherwise. Japan asserts the normal procedure in extradition cases is to issue arrest warrants, with sufficient information about the alleged crime to establish probable cause and which "authorizes" the arrest of the suspect, and that an extraditee is formally charged once arrested in Japan after extradition. Ex. M – Naoki Watanabe Decl. ¶¶ 5-8 [#41-13]; Ex. N – Suppl. Naoki Watanabe Decl. ¶¶ 2-4, 6 [#41-14].[11] More saliently, the Treaty does not require the submission of charging documents with the formal extradition request. See In re Assarsson, 635 F.2d 1237, 1241 (7th Cir. 1980) ("The existence of formal charges can be reviewable, then, only if the treaty itself conditions extradition for the offenses listed in [the relevant Article] on the existence of formal charges.").

In addition, Petitioners have not shown any unusual circumstances to merit release. It is not contested that the procedures prescribed by 18 U.S.C. § 3184 have been followed, that an extradition hearing has now been scheduled, and that the Taylors are the individuals charged in the Japanese arrest warrants and named in the extradition request. Accordingly, while Petitioners may raise challenges to extraditability, including the alleged procedural defect and their contention that Article 103 does not apply to their conduct, with the Magistrate Judge for his assessment in the first instance, they have not shown their current detention is improper under the Constitution, the Treaty, or 18 U.S.C. § 3184.

---

[11] Professor Cleary disputes this, see Ex. E – Second Suppl. William Cleary Decl. ¶ 3 [#38-27], and Petitioners may raise this argument again at the extradition hearing, but the court cannot find based on the evidence presented by the government that the Taylors have not been charged.

C.  Due Process and COVID-19

Finally, Petitioners seek release based on an allegation that the government has been deliberately indifferent to the risk they face from COVID-19 and therefore have violated their constitutional rights. Pet'rs' Mem. 36-38 [#38] (citing <u>Grinis v. Spaulding</u>, 2020 WL 2300313, at *2 (D. Mass. May 8, 2020) (stating that a party must show "'that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety,' and second, that the deprivation alleged was 'objectively, sufficiently serious.'") (quoting <u>Leavitt v. Corr. Med. Servs., Inc.</u>, 645 F.3d 484, 497 (1st Cir. 2011)); <u>see also</u> Em. Pet. for Habeas Corpus Pursuant to 28 U.S.C. § 2241 ¶¶ 68-74 [#1]. However, Petitioners have not shown a likelihood of success of establishing deliberate indifference. As discussed earlier, the government has provided evidence that the Department of Corrections has taken seriously the risk posed by COVID-19 at Norfolk and have implemented a set of procedures designed to protect prisoners from the spread of the disease. Ex. R – Danielle Boomhower Decl. ¶¶ 3-5, 21-22 [#41-18]. While Petitioners may feel that these measures are insufficient, there is no evidence in the record that the government's response could be construed as actionable indifference. Therefore, the court shall not grant release on this basis.

III.     Conclusion

Accordingly, for the aforementioned reasons, Petitioners Michael Taylor and Peter Taylor's <u>Motion for Preliminary Injunction</u> [#2] is DENIED and their <u>Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief</u> [#1] is DENIED.

IT IS SO ORDERED.

August 7, 2020                                           /s/ Indira Talwani
                                                         United States District Judge

# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF MICHAEL L. TAYLOR | No. 20-mj-1069-DLC |
| IN THE MATTER OF THE EXTRADITION OF PETER M. TAYLOR | No. 20-mj-1070-DLC |

## EXTRADITION CERTIFICATION AND ORDER OF COMMITMENT

CABELL, U.S.M.J.

## I. INTRODUCTION

The United States seeks to extradite Michael L. Taylor and Peter M. Taylor (the "respondents") to Japan to face a charge of harboring or enabling the escape of a criminal, in violation of Article 103 of the Japanese Penal Code. The extradition proceedings were commenced by the United States pursuant to 18 U.S.C. § 3184 and the Extradition Treaty between the United States and Japan, signed on March 3, 1978, and entered into force on March 26, 1980 ("Treaty").

On May 6, 2020, this court issued a complaint for the provisional arrests of the respondents with a view towards extradition at the request of the United States, acting on behalf of the Government of Japan. (D. 1).[1] The complaint indicates that

_____

[1] Citation to the extradition dockets refer to the docket entries in *In the Matter of the Extradition of Michael L. Taylor*, Case No. 20-MJ-1069 (D. Mass).

the Government of Japan issued warrants for the respondents'
arrests for their involvement in the escape of Carlos Ghosn from
Japanese authorities. Ghosn, who was under indictment in Japan
for financial crimes, fled to Lebanon, a country with whom Japan
has no extradition treaty, effectively shielding him from
prosecution.

On May 20, 2010, the respondents were arrested in
Massachusetts and, after a detention hearing, were ordered to be
held without bail pending the outcome of their extradition hearing.
(D. 41). The respondents sought an emergency writ of habeas corpus
and injunctive relief, which was denied. *See Taylor v. McDermott*,
No. 20-cv-11272 (D. Mass. 2020).

## II.  <u>FINDINGS</u>

On August 28, 2020, this court held an extradition hearing
for both respondents pursuant to 18 U.S.C. § 3184. International
extradition proceedings are governed by 18 U.S.C. § 3181 et seq.
and by treaty. In applying an extradition treaty, the court is to
construe it liberally in favor of the requesting nation. *See
Factor v. Laubenheimer,* 290 U.S. 276, 293-94 (1933). The
extradition court's role is not to determine guilt or innocence,
but rather whether the following elements have been satisfied in
order to support extradition of the accused: (1) the judicial
officer is authorized to conduct the extradition proceeding; (2)
the court has jurisdiction over the fugitive; (3) the applicable

2

treaty is in full force and effect; (4) the crime(s) for which
surrender is requested is/are covered by the applicable treaty;
and (5) there is sufficient evidence to support a finding of
probable cause as to each charge for which extradition is sought.
*See Fernandez v. Phillips,* 268 U.S. 311, 312 (1925).

In considering the evidence presented by the Government of
Japan as contained in the extradition documents submitted in
support of the extradition request, the evidence offered by the
respondents, the Extradition Treaty between the United States and
Japan, and the applicable law, the court finds that the terms of
the Treaty and 18 U.S.C. § 3184 have been satisfied with respect
to the Taylors' extradition to Japan. More specifically, the court
finds as follows.

### 1) Authority of the Court Over the Proceedings

The parties agree, and this court finds that it has subject-
matter jurisdiction over these proceedings. 18 U.S.C. § 3184.
Section 3184 provides that:

> Whenever there is a treaty or convention for extradition
> between the United States and any foreign government, or
> in cases arising under section 3181(b), any justice or
> judge of the United States, or any magistrate judge
> authorized so to do by a court of the United States ...
> may, upon complaint made under oath, charging any person
> found within his jurisdiction, with having committed
> within the jurisdiction of any such foreign government
> any of the crimes provided for by such treaty or
> convention, or provided for under section 3181(b), issue
> his warrant for the apprehension of the person so
> charged, that he may be brought before such justice,
> judge, or magistrate judge, to the end that the evidence

> of criminality may be heard and considered.... If, on
> such hearing, he deems the evidence sufficient to
> sustain the charge under the provisions of the proper
> treaty or convention, or under section 3181(b), he shall
> certify the same, together with a copy of all the
> testimony taken before him, to the Secretary of State,
> that a warrant may issue upon the requisition of the
> proper authorities of such foreign government, for the
> surrender of such person, according to the stipulations
> of the treaty or convention .... *Id.*

Id. Further, magistrate judges in the District of Massachusetts
are authorized by local rule to "[c]onduct extradition
proceedings, in accordance with Title 18, United States Code,
Section 3184." D. Mass. Local Magistrate Rule 1(e).

### 2) Jurisdiction Over the Respondents

The parties agree, and the court finds that it has
jurisdiction over the respondents. Section 3184 gives the court
jurisdiction over a fugitive found within the court's jurisdiction
who has committed crimes in a foreign nation that are covered by
an extradition treaty set forth in section 3181. The extradition
treaty between the United States and Japan is included in section
3181. The court finds support in the record that the respondents
are the persons who appeared before the court and are the ones
against whom the instant charges are pending. The respondents
also agree that they are the ones against whom the present charges
are pending.

### 3) Treaty in Full Force and Effect

The parties agree, and the court finds that there is an

extradition treaty (Treaty) in full force and effect between the United States and Japan, for all purposes of the extradition proceeding.  18 U.S.C. §§ 3181 and 3184.

### 4) *Crime Covered by the Treaty*

The parties agree, and the court finds that the charges for which extradition is sought are crimes pursuant to both Japanese and United States law and covered by the Treaty.

Article I of the Treaty provides for the return to Japan of persons found in the United States who are sought by Japan for prosecution, trial or to execute punishment for any offense specified in Article II of the Treaty.  Article II of the Treaty provides for extradition for offenses listed in an annexed schedule which includes an offense relating to obstruction of justice, including harboring criminals.  The respondents have been charged for their involvement in harboring or enabling the escape of someone charged with a crime, in violation of Article 103 of the Japanese Penal Code.  This offense would also be subject to criminal prosecution under various United States statutes, including among others 18 U.S.C. § 1073 and 18 U.S.C. §§ 3148(a) and 401.

### 5) *Probable Cause that the Respondents Committed the Offenses*

Thus, the only issue left for the court is to determine whether there is probable cause to believe that the respondents committed the offenses charged.  The evidence from which that

determination is to be made is the evidence contained in Japan's extradition request. To certify an extradition warrant, the magistrate judge must find that there is "probable cause" or "reasonable grounds" to believe the individual is guilty of the crime charged. *See Fernandez v. Phillips,* 268 U.S. 311, 312 (1925); *see also Shapiro v. Ferrandina*, 478 F.2d 894, 904-05, 913- 14 (2d Cir. 1973). A magistrate judge applies the same standard of probable cause in international extradition hearings as used in preliminary hearings, in federal criminal proceedings. *See Castro Bobadilla v. Reno*, 826 F.Supp. 1428, 1433 (S.D. Fla. 1993). The evidence is sufficient and probable cause is established if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).

Factually speaking, the parties agree, and the court finds support in the record, that the respondents committed the conduct underlying the charges against them. Specifically, the court finds that there is probable cause to believe that Peter Taylor traveled to Japan at least three times and visited Ghosn on at least seven occasions in the months preceding the escape. Then, on December 28, 2019, Peter Taylor arrived in Tokyo and checked into a room at the Grand Hyatt. Ghosn then arrived at the Grand Hyatt and met with Peter Taylor for about an hour. On December 29, 2019, Michael Taylor and a third individual, George-Antoine Zayek, traveled on

a private jet from Dubai, United Arab Emirates, to Japan's Kansai
International Airport. At Kansai, Michael Taylor and Zayek
carried large black audio equipment-style cases and told airport
workers that they were musicians. From Kansai, Michael Taylor and
Zayek checked into the Star Gate Hotel Kansai. After placing the
cases in one of their rooms, they caught a train bound for Tokyo
at about noon. At 2:30 p.m., also on December 29th, Ghosn left
his home without luggage and walked to the Grand Hyatt, where he
apparently changed into clothing from luggage that had been dropped
off and received by Peter Taylor earlier in the day. Michael
Taylor and Zayek arrived in Tokyo at about 3:30 p.m. and went to
Peter Taylor's room at the Grant Hyatt.

Shortly thereafter, the Taylors, Ghosn, and Zayek left Peter
Taylor's room at the same time, each carrying luggage. Peter
Taylor then traveled to the Narita Airport to catch a flight to
China. However, Ghosn, Michael Taylor, and Zayek caught a train
back to the Kansai Airport area and returned to the Star Gate Hotel
Kansai at approximately 8:15 p.m. At about 10:00 p.m., Michael
Taylor and Zayek left the hotel with luggage, including the two
audio-style cases, and went to Kansai Airport. Surveillance
footage did not show Ghosn leaving the hotel. Once at the airport,
the baggage of Michael Taylor and Zayek was loaded onto their
private jet without being checked. The jet departed for Turkey at
about 11:00 p.m. On December 31, 2019, Ghosn announced that he

was in Lebanon.

Although the respondents do not dispute the foregoing facts, they argue that those facts do not make out a violation of Article 103.  This court finds that they do, however.

Among other things, Article 103 makes it a crime to "harbor[] or enable[] the escape of another person who has...committed a crime."  As this court stated previously in considering the issue in the context of the respondents' motion for bail, the respondents' conduct literally brings them squarely within the purview of this portion of Article 103 because they harbored or enabled the escape of Carlos Ghosn, who had allegedly committed a crime.  A separate court reached the same result after considering the issue in the context of the respondents' unsuccessful motion for injunctive relief.  *See Taylor v. McDermott*, No. 20-cv-11272 (D. Mass. 2020) at D. 44 ("Petitioners have not shown a high likelihood of success in their argument [that] Article 103 does not prohibit interfering with the Japanese criminal justice system by harboring Ghosn and enabling Ghosn to elude discovery by law enforcement and escape judgment from a Japanese court.").

To be sure, the respondents do not really take issue with the court's interpretation of Article 103 as it is written.  Rather, they argue that the English translation of Article 103 is misleading because it does not accurately convey the true required elements of the offense.  They argue that a proper reading of the

actual Japanese text of Article 103 requires one to do more than merely harbor or enable the escape of someone who has committed a crime to violate the provision; it requires one to harbor or enable the escape of someone who either was in physical confinement or was actively being pursued by law enforcement for a recently committed crime. They contend that they did not violate Article 103 under this interpretation because, although Ghosn was on release for charges for which he had been indicted, he was neither in physical confinement nor actively being pursued by law enforcement for a crime at the time the respondents helped him flee Japan.

Despite strong urging, however, the court declines to consider the respondents' argument. Even assuming an extradition court has both the authority to resolve disputed issues of foreign law, and the hopeful belief it could do so competently, that does not mean it should. "[E]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law," and American extradition courts therefore have consistently cautioned against doing so, particularly to invalidate arrest warrants. *See e.g., Noeller v. Wojdylo*, 922 F.3d 797, 805 (7th Cir. 2019); *Marzook v. Christopher*, No. 96 CIV. 4107 (KMW), 1996 WL 583378, at *5, n.4 (S.D.N.Y. Oct. 10, 1996) (citing *Peters v. Egnor*, 888 F.2d 713, 716 (10th Cir. 1989) ("we think that an extensive investigation of [the requesting country's] law would be

inappropriate"); *Matter of Assarsson*, 635 F.2d 1237, 1244 (7th Cir.1980), *cert. denied*, 451 U.S. 938 (1981) ("We are also not expected to become experts in laws of foreign nations.").

Moreover, where a Japanese court has now twice issued warrants alleging that the respondents' conduct violated Article 103, and the Government of Japan has through declarations and case citations presented a reasonable interpretation of Article 103 under which the respondents' conduct would constitute a violation of that provision, the prevailing view is that the extradition court should defer to the foreign country's interpretation of its own laws. *See In Matter of Extradition of Pineda Lara*, No. 97 CR. MISC. 1 (THK), 1998 WL 67656, at *7 (S.D.N.Y. Feb. 18, 1998) ("a judge in the United States should therefore defer to a foreign judicial officer's or government official's reasonable interpretation of a statute where the statute is subject to more than one interpretation"); s*ee also Matter of Extradition of Lui*, 939 F.Supp. 934, 949 (D. Mass. 1996) (comity and common sense "suggest[] that the foreign judicial officer should be presumed to be more knowledgeable than the judicial officer in the United States about the foreign law."). That is the course the court chooses to follow here. Accordingly, the court finds that there is probable cause to believe that the respondents violated Article 103 of the Japanese Penal code.

III.   **CONCLUSION**

Based on the foregoing, this matter is certified to the Secretary of State in order that warrants may issue, upon the requisition of the proper authorities in Japan, for the surrender of Michael L. Taylor and Peter M. Taylor on the charge of harboring or enabling the escape of a criminal, in violation of Article 103 of the Japanese Penal Code, according to the provisions of the Treaty between the United States and Japan.

No later than seven days after the date of this decision, the government shall file a proposed extradition certification and order of commitment.

The court will then order that the Clerk of Court forward a certified copy of this Extradition Certification and Order of Commitment, together with a copy of all the evidence taken before this Court, to the Secretary of State, Department of State, to the attention of the Office of the Legal Adviser.

The Taylors shall remain in the custody of the U.S. Marshal for this District, to be held pending final disposition of this matter by the Secretary of State, and pending each respondent's potential surrender to the government of Japan.

**SO ORDERED**.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  September 4, 2020

11

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF THE           )
EXTRADITION OF MICHAEL L.   )     Case No. 20-mj-1069-DLC
TAYLOR                         )
_____)
                              )
IN THE MATTER OF THE           )     Case No. 20-mj-1070-DLC
EXTRADITION OF PETER MAXWELL )
TAYLOR                         )

## <u>DECLARATION OF DR. WILLIAM B. CLEARY</u>

Pursuant to 28 U.S.C. § 1746, I, William B. Cleary, hereby declare as follows:

1.     My name is William B. Cleary. I am an adult citizen of the United States, and a practicing attorney and law professor in Japan. I reside in Hiroshima, Japan. I have lived and worked continuously in Japan since 1993. Prior to that, from October 1983 until June 1990, I lived in Sapporo, Japan as a Japanese Government (Monbusho) Scholarship recipient. I am making this declaration in connection with the above-captioned matters, not as an advocate, but to assist the Court in understanding Japanese criminal law which is relevant to these cases.

2.     I have a bachelor's degree from the United States International University and a juris doctor from California Western School of Law, both located in San Diego, California. I also hold L.L.M. and Ph.D. degrees in Japanese Public Law from Hokkaido University in Sapporo, Japan. The focus of my doctoral work was Japanese criminal law and procedure.

3.     Since April 2008, I have been employed as a Tenured Professor of Comparative and Foreign Law at Hiroshima Shudo University in Hiroshima. Prior to my tenure at Hiroshima Shudo University, I served as a professor at Iwate University in Morioka, Japan, and the College of International Studies at the University of Tsukuba in Ibaraki, Japan. As a professor, I have taught courses in, among other things, Japanese criminal procedure, a subject I have taught for

four years. It is to be noted that the subject of criminal procedure is an important subject and is tested on the Japanese bar examination. I was a tenured associate professor at Iwate University at the time, 2004 to 2008.

4.      In addition to my academic work, I have practiced law as an attorney with various firms, including Blakemore & Mitsuki in Tokyo and Fried Frank Harris Shriver and Jacobson in New York. From 2000 to 2002, I served as a Japanese law expert advising and assisting the U.S. Forces Japan command at Yokota Air Force Base. I also previously worked as an Assistant Attorney General in the Civil Division for the Government of Guam. In that capacity, I served as an administrative hearing officer and adviser to several government agencies.

5.      A copy of my *curriculum vitae* is attached hereto as Exhibit A.

6.      I have been asked to review the facts alleged in these matters and to provide an expert legal opinion to assist the Court in understanding relevant provisions of Japanese law, including how those provisions are understood and interpreted.

7.      Specifically, I have been asked to render an opinion on whether the allegations against Michael L. Taylor and Peter M. Taylor—who allegedly assisted Carlos Ghosn in traveling from Japan to Lebanon—would, if true, constitute a violation of Article 103 of the Japanese Penal Code. As detailed more fully herein, they do not. In fact, Mr. Ghosn's act of breaching the terms of his release in Japan is not an offense under Japanese criminal law.

8.      The Complaints in these matters assert that the Taylors have "been charged under Article 103 of the Japanese Penal Code with enabling the escape of Carlos Ghosn Bichara ('Ghosn'), who was indicted in Japan for financial crimes and had been released on bail pending his trial." (Complaint ¶ 5.)

9.      With respect to the status of Mr. Ghosn at the time of the alleged events, the

2

Complaints allege specifically as follows:

> On April 25, 2019, the Tokyo District Court released Ghosn on bond with conditions that included, among other things, (i) living in the house in Tokyo specified by the bail conditions; (ii) when summoned, reporting to a designated location or notifying the court, in advance, of the reasons that he is unable to report; (iii) not hiding or fleeing; (iv) obtaining advance approval for the court for any domestic trips lasting three days or more; and (v) not taking any overseas trips. By fleeing Japan pending trial, Ghosn violated his bail conditions.

(Complaint ¶ 7(b).)

10.     Violating one's bail conditions, such as those alleged in the Complaint, or "jumping bail," as Mr. Ghosn is alleged to have done, is not a criminal offense in Japan. Articles 97 (titled "Escape") and 98 (titled "Aggravated Escape") of the Japanese Penal Code make it a criminal offense for a person *who is confined* on a judge's order (or, under Article 98, held under a subpoena) to escape, but these statutory provisions apply to persons who are confined or detained in a prison, jail, or other such detention facility. These statutes do not apply—nor have they ever been applied—to individuals who are released on bail.

11.     The fact that "jumping bail" is not a crime in Japan has been widely recognized by Japanese officials, legal commentators, and the Japanese media. In fact, in the wake of Mr. Ghosn's departure from Japan in December 2019, there have been a number of articles on this very subject, discussing the fact that bail jumping is not illegal in Japan and that the Japanese government is considering adopting new laws that *would* make bail jumping a criminal offense. I have attached as Exhibits B through F examples of articles on this subject, from both before and after Mr. Ghosn's departure, all of which clearly acknowledge that bail jumping is not a crime in Japan.

12.     Article 103—the provision that Japan apparently alleges that the Taylors violated—makes it a crime to harbor or enable the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from

3

confinement.

13.     To my knowledge, prior to the arrest warrants issued for the Taylors, the Japanese government has never attempted to apply Article 103 to any situation involving violation of bail conditions.  Article 103 has never been interpreted or understood to encompass such a charge.  Indeed, I have not been able to identify a single prior case where Japanese prosecutors charged a person (successfully or unsuccessfully) with enabling another person to violate his or her bail conditions.

14.     Article 103 does not apply to assisting a person to violate the terms of his bail conditions.  It only applies to harboring or enabling a person *to escape* from either confinement (that is, like Article 97, confinement within a prison, jail or other detention facility) or being arrested by the police, or harboring or enabling a person to avoid arrest *after they have escaped* from confinement.

15.     Article 103 simply does not prohibit assisting someone to violate his bail conditions.  That is not within the scope of the "escape" which Article 103 prohibits harboring or enabling, which follows from the fact that bail jumping is itself not prohibited by Article 97 or any other provision of the Japanese Penal Code.  It would be Illogical to criminalize assisting someone to do something that is not criminal.  It would also be inconsistent with Article 63 of the Japanese Penal Code, which provides that an accessory to a crime must receive a lesser punishment than the principal.  Simply put, it would be incongruous for the law to impose a criminal punishment on the Taylors for assisting Mr. Ghosn in doing something for which he could not personally be held criminally liable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

4

Executed on May 25, 2020

William B. Cleary

William Bernard Cleary



EXHIBIT

A

Education

Ph.D. (1990 March). *Japanese Public Law*-Hokkaido University. Three-year course in Japanese Public Law under the direction of the late Dr. Hiroyuki Nose; major field of study - Japanese criminal procedure, minor field of study - Japanese civil law and comparative law. Title of dissertation: "The Law of Criminal Procedure in Contemporary Japan."

LL.M (1987 March). *Japanese Public Law*-Hokkaido University. Major research: The law of negligence, both criminal and civil; professional negligence, products liability, and industrial accidents.

J.D (1978 May), California Western School of Law, San Diego, California.
Apprentice for the Appalachian Research and Defense Fund, Charleston, West Virginia; major field of practice - mental health law and the right to treatment for mental patients in West Virginia.

B.A  (1975 June). United States International University, Diversified Major, San Diego, California.

Teaching Experience

Hiroshima Shudo University, Tenured Professor of Comparative and Foreign Law, April 2008 to present. Subjects taught: Comparative Law, Foreign Law, and American Law (in Japanese).

Iwate University, Tenured Associate Professor of Comparative Law, April 2004 to March 2008.
**Subjects taught: Japanese Criminal Procedure (in Japanese).**

College of International Studies, University of Tsukuba, Ibaraki, Japan; Visiting Professor of Law, April of 1993 to March 2000. Subjects included Introduction to Law and U.S./Japan Comparative Law. Also taught Debating, Discussion Seminar 11, International Political Economy, and Human Rights and Refugees, Also, conducted seminars on Japanese Law, and student advisor for foreign and Japanese students.

Attorney Experience

2000 to 2012 Blakemore & Mitsuki, Tokyo, Japan . Handling international corporate matters, contracts, securities, securitizations, litigation, and labor related matters.

**2000 to 2002 USFJ-Yokota Air Force Base-Japanese Law Expert providing in depth research and reporting to the Command.**

1993 to 2000, Tokyo City Law and Tax Partners; Of Counsel, providing international legal support for a variety of international business transactions, including: real estate matters, business matters, international licensing agreements, personnel and litigation issue, and motion picture production matters.

1991-93  Associate Attorney, Klemm, Blair, Sterling and Johnson, Agana, Guam.  Specialized in real estate transactions and construction law matters for several major Japanese construction companies and banks. In addition, worked as consultant to Sumitomo Construction Company on various corporate matters, including employment discrimination, recruitment and termination issues, and government relations and public relations.

1990-91  Associate Attorney, Fried Frank Harris Shriver and Jacobson, N.Y.C. Worked with Japanese companies on various real estate transactions and development projects in the New York area. Assisted

officials at Japan Airlines Inc. concerning negotiating a long term lease with the Port Authority of New York & New Jersey for a state of the art cargo handling facility at John F. Kennedy International Airport.

1981-83   Assistant-Attorney General, Civil Division, Government of Guam.  Served as an administrative hearing officer and adviser to several government agencies, including the Contractor's Licensing Board and Civil Service Commission.

1979-81   Legislative Counsel, Kosrae State Legislature, Federated States of Micronesia, and advisor to the Honourable Gaius F. Nedlic. Duties included the drafting of new legislation dealing with a variety of local matters, writing committee reports, and organizing the State and National Leadership Conference for the Federated States of Micronesia.

Attorney Qualifications
*California, New York, FSM - Micronesia, & Guam*

Public Presentations-Conferences

July 1999, Tokyo, Japan; The Kabuto Yama Case; a comparison of Japanese and
U. S. criminal procedure with particular emphasis on racial discrimination and racial hoax. (In Japanese)

January 1999, Osaka, Japan, The Kabuto Yama Case; a comparison of Japanese and U.S. criminal procedure with particular emphasis on the right of prosecutorial appeals. (In Japanese)

November 1997, The 24th International Student Seminar at Inter-University Seminar House (Hachioji, Tokyo); title of conference, "The Expected Role of the United Nations in the 21st Century," - co-chaired with Dr. Hideo Sato a three-day discussion seminar focusing on United States - Japan relations in the United Nations system.

May 1997, Tsukuba Institute, Ibaraki, Japan; conducted a three-hour lecture on United States and Japanese patent law with a detailed comparison of recent trends and landmark cases. (In Japanese)

June 1996, Sandoz Pharmaceuticals, Ltd., Tsukuba Research Institute; delivered a two-hour presentation concerning cross-cultural differences to a group of 40-50 physicians, pharmacologists, toxicologist, and biologists, etc.

August 1996, The European Institute of Japanese Studies, Stockholm, Sweden; Title of conference, "Japanese Influences in Asia." Invited as a guest participant to deliver a paper entitled, " The Legal System of Japan and Its Influences in the Region," which described in detail the historical influence of the Japanese legal systems on other Asian countries, particularly South Korea, Taiwan, and China.

February 1995, Tokyo Bar Association; made a two-hour presentation to a group of Japanese attorneys on attorney ethics and matters related to attorney discipline in the United States. (In Japanese)

January 1995, Sapporo Bar Association; made a two-hour presentation to a group of Japanese attorneys on attorney ethics and matters related to attorney discipline in the United States. Included in the presentation was a discussion of engagement letters, declination letters, fees, and areas of legal specialization. (In Japanese)

Publications (Articles) -in English

1. The Use of GPS Tracking Devices for Criminal Investigations in Contemporary Japan. Hiromira Law Review, Hiroshima Shudo University (December 2017)
2. The Law of Liability in Contemporary Japan to Third-Parties for Damages Caused by People with Dementia: A Review of the Tokai JR Supreme Court Case of March 1, 2016. Shudo Hogaku (Shudo Law Review) Vol. 39 No.2 (February 2017)
3. Parental Kidnapping and Multiculturalism: A Focus on Japan. Shudo Hogaku Vol. 35  No. 2, pp. 127-143.  February 2013.
4. The Use of Confessions in Contemporary Japan. Shudo Hogaku Vol. 33  No. 1,  pp. 39 - 54.  September 2010.
5. The Law of Criminal Negligence in Contemporary Japan, Part III.  Artes Liberales No. 79, Iwate University, Faculty of Humanities and Social Sciences, June 2006.
4. The Law of Criminal Negligence in Contemporary Japan, Part II;  Artes Liberales No. 78, Iwate University, Faculty of Humanities and Social Sciences, December 2006.
5. The Law of Criminal Negligence in Contemporary Japan, Part I;  Artes Liberales No. 77, Iwate University, Faculty of Humanities and Social Sciences, December 2005.
6.  The Law of Double Jeopardy in Contemporary Japan;  Artes Liberales No. 76, Iwate University, Faculty of Humanities and Social Sciences, June 2005.
7. The Law of Entrapment in Contemporary Japan, Part I;  Artes Liberales No. 75, Iwate University, Faculty of Humanities and Social Sciences, December 2004.
8. Lawyers' Ethics and the Mass Media, August 1, 2003, (Publication in Memorial of Dr. Hiroyuki Nose); Shinyama Publishing, ISBN: 4797230711
9. Police, Prosecution, and Violence in Contemporary Japan, International Criminal Justice Review, Volume 13, 2003, pp. 181-186.
10. The Law of Criminal Procedure in Contemporary Japan Part III, Hokkaido University Law Review, January 1991, Volume 42 No. 1. Pp. 360-404 December 1991.
11. The Law of Criminal Procedure in Contemporary Japan Part II, Hokkaido University Law Review, Volume 41 No. 4.  March 1991.
12. The Law of Criminal Procedure in Contemporary Japan Part I. Hokkaido University Law Review, November 1991, Volume 41- 3. Pp. 454 – 512. January 1991.
13.  Criminal Investigation in Japan,  California Western Law Review, Volume 26, Number 1, 1989-1990.
14. Problems with U.S. Jury System and the Americanization of Japan,  Comparative Law Journal, Volume 56, December 1994.

### Publications-in Japanese

1. Attorneys and the Mass Media *("bengonin no media e no ikenhyomei wa douarubekika?')* Quarterly Keiji-Bengo, No. 3 1, Autumn. 2002, p. 128.

2. Translation of "Death Row - AIDS is Turning a Prison Term into a Potential Death Sentence," by Harmeen Rowe, published by Ushio, October 1988, pp. 136-141.

3. Translation of "Police Taping of Investigative Interviews," published in Hanrei Jiho, August 11, 1986, No. 1195.

4. Translation of "Euthanasia in the Netherlands," published in the Sapporo Gakuin Law Review, February 1995, Volume 11-2.

### Chapters in Books

1. Title of Book: Women in Law, published by Greenwood Press 1996, Edited by Rebecca Mae Salokar and Mary L. Volcansek. Contributed the chapter on Takako Doi, an account of her life and accomplishments.

2. Title of Book: Constitutional Systems in Late Twentieth Century Asia, edited by Lawrence W. Beer, published by University of Washington Press, 1992. A translation of Professor Nobuyoshi Ashibe's manuscript entitled, "The United States Constitution and Japan's Constitutional Law."

Languages: Japanese



ALL GENRES

# Evident flaws in system for releasing offenders on bail before prison

*7:56 pm, June 25, 2019*



**EXHIBIT**

**B**

exhibitsticker.com

## The Yomiuri Shimbun

The latest case of a fugitive criminal must be criticized as extremely deplorable. The incident was the fault of the prosecution.

Despite his sentence of imprisonment having been finalized after he was released on bail, the man in question fled to avoid being jailed. The fugitive was arrested by the Yokohama District Public Prosecutors Office on suspicion of obstructing the discharge of an official duty. It took as many as four days to apprehend him after his flight.

While he was on the run in Kanagawa Prefecture, public elementary and junior high schools run by local governments in areas surrounding the scene of his escape were forced to suspend classes for two days. The incident also affected the day-to-day lives of local residents, as shown by the fact that weekend events were canceled.

Public prosecutors must bear a grave responsibility for having caused anxiety among community residents. They should seriously reflect on their mistake.

After his unsuspended prison sentence was finalized in February, the man did not abide by the prosecution's demand that he present himself. On one occasion, he attempted to use violence against personnel from the district prosecutors office when they came to imprison him.

Nevertheless, they did not wear knife-proof vests when they attempted to imprison him, and police officers accompanying them had no guns with them. It is safe to say that such a lenient attitude allowed the knife-wielding man to escape.

The prosecution's response to the situation following his flight was not at all timely, either.

More than three hours after the man's escape, the district prosecutors office informed local governments in the area. There were also delays in the police authorities' emergency measure of deploying officers, which happened during a period of time that coincided with the hour when children go home from school. Local residents had every reason to raise their voices in anger.

Review legislation

There is also room for controversy over the appropriateness of a court decision to release the man on bail.

The man had been charged with such crimes as theft, bodily injury and a violation of the Stimulants Control Law. During his trial in the court of first instance, the man was released on bail. He was given an unsuspended prison sentence and was taken into custody. However, he was released on bail again after appealing to a higher court.

From the standpoint of defending their rights, there is a growing tendency to flexibly permit defendants to be released on bail. Unnecessarily detaining defendants must be avoided as a matter of course. However, courts should judge whether each defendant deserves to be released on bail by closely examining the possibility of them escaping or destroying evidence.

This latest case has illustrated institutional problems related to the action of imprisoning people whose unsuspended prison sentences have been confirmed. As of the end of last year, there were a total of 26 people who had fled to avoid imprisonment.

The administrative work aimed at sending those found guilty to prison is based on the view that human nature is fundamentally good — that is, it is thought they will abide by demands for them to present themselves. Even if they go missing, it is not compulsory to inspect related matters such as records of their incoming and outgoing mobile phone calls.

If defendants or convicted prisoners run away from such institutions as detention houses and prisons, they are charged with the crime of escape. However, this does not apply to offenders who have escaped before being imprisoned. There is no penalty for those who have not abided by a demand to present themselves, either. All of these points can be described as flaws in the legislation.

If offenders whose unsuspended prison sentences have been finalized can avoid the execution of their penalties, the foundation of criminal justice will be shaken. The Supreme Public Prosecutors Office has established an inspection team with a view to preventing a repeat of the incident. The team should examine whether the current system has any problems that must be reviewed.

(From The Yomiuri Shimbun, June 25, 2019)

日本語

| Facebook | Like 0 | Share |
| --- | --- | --- |
| Twitter | | ツイート |
| Google+ | | |
| Hatena Bookmark | | 0 |
| Evernote | | CLIP  |
| linkedIn | | Share |

*Related*

China's bid for greater influence in South Pacific a cause for concern

Universities should focus on boosting research quality, not global ranking

Deciding appropriate share for hosting U.S. bases needs calm talks

Restoration work on castles provides source of pride, promotes tourism

*Sponsored Contents*


Man Who Predicted Trump's Win Makes Another Prediction
(betterlyfe.news)


Doing This Every Morning Can Snap Back Sagging Skin (No Creams Needed)
(innerskinresearch.com)


Toenail Fungus? Try This Tonight
(Fungus Eliminator)


New 750mg CBD Gummy 5Xs Better Than Hemp
(health-repair.com)


[Pics] Pole Vaulter Allison Stokke Years After The Photo That Made Her Famous
(New Arena)

People Born 1948-1979 With No Life Insurance Are In for A Treat This May
(Comparisons.org)

Recommended by



Food

Travel

Voices from Japan

Asia News



Culture & Lifestyle

**Experiencing Japan**
The Japan News staff share their experiences

Manga & Anime



**Troubleshooter**
Giving advice for over a century

Reviews

Gift Suggestions

Language Learning



A unique archive, all the way back to 1874
The Yomiuri Shimbun and The Japan News

Opinion & Analysis

Comic Strip: Neko Pitcher

Tokyo 2020



*Weather*

Tokyo 12:00 pm

# 26.2°C

| Tue | Wed | Thu | Fri |
|-----|-----|-----|-----|
| 23° | 24° | 26° | 26° |
| 17.8° | 16° | 17° | 16° |

**WASEDA ONLINE**

See the history of
WASEDA University
As it is today

**ChuoOnline**

Capturing the age,
focusing on the future
Chuo University

**Advertising with The Japan News**

SCROLL TO TOP

Web Site Policies
Web Site Policies Top
Privacy Policy Statement
Copyrights
Linking Policy
Contact us
Media Data
The Yomiuri Shimbun
The Japan News
Advertising with The Japan News Website
About Us
Subscribe Newspaper
Connect
Facebook
Twitter (English)
Twitter (Japanese)
Twitter (TheJapanNews Editor)
Links
The Japan News Partners

- Waseda Online
- Chuo Online
- Nippon TV
- YTV
- ANN
- YOMIURI College of Tokyo
- YOMIURI COLLEGE OF CAR MECHANIC

© The Yomiuri Shimbun

# The Asahi Shimbun | Asia & Japan Watch

# Ghosn with the wind: Ministry to tighten laws to nix bail jumps

By HIROYOSHI ITABASHI/ Staff Writer

January 8, 2020 at 18:10 JST



A security camera captures the moment a woman on bail flees in a car to avoid being taken into custody and the car hits a prosecutors office official in Kishiwada, Osaka Prefecture, in October. (Provided by a resident)

The clandestine escape from Japan by Carlos Ghosn was a factor in a decision by the Justice Ministry to accelerate efforts to prevent bail jumping by making it easier to investigate and charge escapees.

The beleaguered former Nissan Motor Co. chief slipped out of his monitored home in Tokyo on Dec. 29 and fled to Lebanon by private jet, apparently by hiding in oversized luggage.

It was an embarrassing cap to a string of bail-jumping incidents last year in Osaka and Kanagawa prefectures.

Justice Minister Masako Mori on Jan. 7 indicated planned legal reforms that would expand the application of "crime of escape"

under the Criminal Law to accused individuals out on bail.

Under current law, "crime of escape" only applies to jail or detention facility escapees, not those who flee while out on bail.

Mori said the ministry will soon ask the Legislative Council, an advisory panel to the justice minister, to discuss the issue and submit proposals. The ministry plans to submit a bill to revise relevant laws to the Diet based on the discussions.

Last year marked a series of getaways by defendants whose prison terms were finalized or bail was forfeited while they were free on bail.

In one case last June, a man in Kanagawa Prefecture who received a jail sentence while on bail but had not been taken into custody for more than four months, threatened officials of the prosecutors office with a kitchen knife after they arrived at his home and fled in a car.

Ghosn's dramatic escape also prompted the ministry to strengthen measures to monitor defendants released on bail.

The Legislative Council is expected to discuss ways to grant authority to law enforcement officials to investigate bail jumpers, search their homes and confiscate call logs.

EXHIBIT

C

The council is also expected to consider a policy to make such defendants wear a global positioning system (GPS) device.

Ghosn was awaiting trial over alleged financial misconduct at the time of his disappearance.

Under the Code of Criminal Procedure, defendants are not required to appear for an appeals court decision, making it impossible for prosecutors to immediately detain a defendant even if a prison sentence is served.

Figures show that as of the end of 2018, 26 individuals fled from authorities after their prison terms were finalized while they were out on bail.

In light of this, the Justice Ministry plans to make it obligatory for defendants to be present for an appeals court decision.

Copyright © The Asahi Shimbun Company. All rights reserved. No reproduction or republication without written permission.

# Japan :Ministry eyes ways to stop bail jumpers

by The Yomiuri Shimbun

**TOKYO (The Japan News/ANN) - Following a series of escapes by defendants and others while out on bail, the Justice Ministry plans to strengthen measures to prevent such flights, The Yomiuri Shimbun has learned.**

Following a series of escapes by defendants and others while out on bail, the Justice Ministry plans to strengthen measures to prevent such flights, The Yomiuri Shimbun has learned.

According to sources, the ministry is considering expanding the scope of so-called crimes of escape, which currently apply only to people who flee from jail and other facilities, and establishing such measures as penalties for accused persons who refuse to obey court summons while out on bail.

The ministry will consult in February at the earliest with the Legislative Council, an advisory body to the justice minister, about revisions to laws including the Penal Code.

Under the Penal Code, "crimes of escape" apply only to the escapes of suspects, defendants and others who are confined in penal facilities such as jails and detention facilities at police stations. The penalty is a maximum of one year in jail.

Since people who run away while out on bail cannot be prosecuted for their crimes, the Legislative Council will apparently discuss the application of the crime of escape to such cases.

In addition, the Criminal Procedure Code stipulates that a person who is summoned by the court as a witness but does not appear in court without a justifiable reason will be punished by imprisonment for up to a year or other penalties. However, there are no penalties for defendants and others who do not respond to court summons while out on bail.

The Legislative Council is expected to discuss the revision of the Criminal Procedure Code to establish similar penalties for defendants out on bail, the sources said.

On Dec. 31, it was learned that former Nissan Motor Co. Chairman Carlos Ghosn, 65, had fled Japan. If the laws are revised as planned, crimes of escape will apply to cases like that of Ghosn, who had been out on bail.

However, it is difficult to physically detain a foreigner who has fled overseas. Some say accused persons should be required to wear global positioning system (GPS) devices, in order to strengthen the monitoring of their movements after being released on bail. The Legislative Council likely will consider such issues.

In recent years, the courts have tended to actively release accused persons on bail. According to the Supreme Court, the percentage of cases in which an accused person was granted bail by a lower court before the ruling increased from 14% in 2008 to 32% in 2018.

The number of cases in which defendants out on bail were indicted in other cases has been also on the rise. According to a white paper on crime, the number of such cases increased from 102 in 2008 to 258 in 2018, an increase of about 2.5 times.

**EXHIBIT**

**D**

exhibitsticker.com

In Kanagawa Prefecture, a man whose prison sentence was finalized after being released on bail swung a kitchen knife at officials of the Yokohama District Public Prosecutor's Office, who had gone to detain him, and escaped in a car in June last year. After that case, the Justice Ministry began considering the necessity to revise relevant laws.

## Photos

No photos has been attached.

# Japan to make escapes by defendants on bail punishable

07 Jan 2020



Japan's Justice Minister Masako Mori speaks during a press conference on former auto tycoon Carlos Ghosn after he fled Japan to avoid a trial, in Tokyo on January 6, 2020. (AFP)

Short Url: https://arab.news/czhrm

TOKYO: Japan will make escapes by defendants out on bail punishable following a series of such getaways, notably by former Nissan Motor Co. Chairman Carlos Ghosn, informed sources said Tuesday.

The Justice Ministry is considering revising the Penal Code to expand the scope of the crime of escape and take other measures. It plans to consult the Legislative Council, which advises the justice minister, as early as next month.

"It's extremely important to prevent escapes by defendants out on bail," Justice Minister Masako Mori told a press conference. "We'll consider so we can consult the Legislative Council as early as possible."

The crime of escape covers prison inmates as well as detained defendants and suspects. A violator faces a prison term of up to a year.

But defendants out on bail, such as international fugitive Ghosn, are not subject to the punishment.

The council will discuss whether it is appropriate for those cases to be covered, the sources said.

Plans to oblige defendants to wear Global Positioning System tracking devices while on bail are also expected to be discussed. Other expected topics include how to monitor defendants fitted with such devices and how to protect their privacy.

Also on Tuesday, the ruling Liberal Democratic Party held a joint meeting of its judicial and foreign affairs divisions and discussed responses to Ghosn's departure to Lebanon. According to a participant, some lawmakers called for using GPS devices.

The ministry was considering preventive measures after a man on bail escaped in Kanagawa Prefecture, south of Tokyo, after his prison sentence became final last year and defendants fled in Osaka Prefecture, western Japan, after seeing their bail revoked.

Jiji Press



ALL GENRES

## Prosecution measures insufficient for preventing recurrence of escapes

*7:26 pm, August 08, 2019*



### The Yomiuri Shimbun

It can be said that the prosecution as an organization was not up to the task of jailing a defendant whose sentence of imprisonment had been finalized after being released on bail.

The prosecution has compiled a report that examines a case in which a man who, in attempting to avoid being jailed, fled with a knife from his house in Kanagawa Prefecture.

He did not abide by the prosecution's repeated demands that he present himself and was expected to be resistant to the prosecution. However, the Yokohama District Public Prosecutors Office did not sufficiently consider assigning personnel and also did not make any arrangements with the police. Despite receiving reports of his flight, the prosecution delayed informing local governments, believing that "the police would decide" on the announcement of his escape.

It is reasonable that the prosecution's report summarized the incident as being caused by insufficient measures on the part of the prosecution and its lack of risk awareness.

To prevent the recurrence of such an incident, the Supreme Public Prosecutors Office cited steps such as preparing and improving manuals and equipment for when the prosecution imprisons a defendant, and establishing a liaison system with local governments. These are all basic measures that the prosecution should already have addressed. It is unlikely that it will really be able to prevent such an incident occurring only with these countermeasures.

In the background of this escape is an increasing number of defendants being released on bail.

The number of defendants — who, like the man in this case, were released on bail until a ruling in the court of second instance was handed down, after being given an unsuspended prison sentence in the court of first instance — was 546 in 2013. But the figure was more than double that in 2018 at 1,109. It included defendants in such serious cases as murders and robberies resulting in bodily injury.

Review conventional steps

There is a view that there is a higher risk of flight if a defendant who has been given an unsuspended prison sentence in the court of first instance is released on bail after appealing to a higher court. As a defendant is not obliged to appear in the court of second instance, unlike the court of first instance, it is expected that he or she could escape and not appear on the date of the ruling.

Courts should more carefully decide on the appropriateness of and conditions for whether a defendant who has been given an unsuspended prison sentence is released on bail. It should also consider obliging a defendant to appear on the date of a ruling in the court of second instance, and make it possible to jail the defendant on the spot when they are given an unsuspended prison sentence.

It is problematic that it takes too much time to jail a defendant after they are given an unsuspended prison sentence. There were 60 defendants in 2018 who were not jailed until more than three months after their sentences of imprisonment were finalized in a higher court. There were also not a few former defendants who were temporarily missing for reasons such as fleeing overseas.

The longer the period after finalizing a sentence of imprisonment is, the smaller the effect of reflection on their crime and the higher the hurdles for imprisonment become. The prosecution must make efforts to swiftly bring defendants into custody.

There is a flaw in the legislation in that the crime of escape in the Criminal Code, which is intended for convicted prisoners and others, is not applied to defendants released on bail.

Some states in the United States and Canada make it obligatory, as a condition for release on bail, for the defendant to wear a global positioning system tracking device. In order to prevent escapes, it is hoped that effective steps will be made with reference to overseas examples.

(From The Yomiuri Shimbun, Aug. 8, 2019)



| Facebook | Like 5　Share |
| Twitter | ツイート |
| Google+ | |
| Hatena Bookmark | 0 |
| Evernote | CLIP |
| linkedIn | Share |

*Related*

China's bid for greater influence in South Pacific a cause for concern

Universities should focus on boosting research quality, not global ranking

Deciding appropriate share for hosting U.S. bases needs calm talks

Restoration work on castles provides source of pride, promotes tourism

*Sponsored Contents*



Man Who Predicted Trump's Win Makes Another Prediction

(betterlyfe.news)



New 750mg CBD Gummy 5Xs Better Than Hemp

(health-repair.com)



[Pics] Demolition Workers Made A Historic Discovery While Knocking Down A House

(Magellan Times)

If You Have Toenail Fungus, Do This Immediately (Genius!)

(Clear Nail Plus)

People Born 1948-1979 With No Life Insurance Are In for A Treat This May

(Comparisons.org)



[Pics] When Engineers Drained The Niagara Falls In 1969, They Revealed A Gruesome Sight

(Maternity Week)

Recommended by



Food

Travel

Voices from Japan

Asia News



Culture & Lifestyle

**Experiencing Japan**
The Japan News staff share their experiences

**Manga & Anime**



**Troubleshooter**
Giving advice for over a century

**Reviews**

**Gift Suggestions**

**Language Learning**



A unique archive, all the way back to 1874
The Yomiuri Shimbun and The Japan News

**Opinion & Analysis**

**Comic Strip: Neko Pitcher**

**Tokyo 2020**



*Weather*

**Tokyo** 03:00 pm

# 25.6°C

| Tue | Wed | Thu | Fri |

23°          24°          26°          26°
17.9°        16°          17°          16°



**WASEDA ONLINE**

See the history of
WASEDA University
As it is today

**ChuoOnline**

Capturing the age,
focusing on the future
Chuo University

**Advertising with The Japan News**

SCROLL TO TOP

Web Site Policies
Web Site Policies Top
Privacy Policy Statement
Copyrights
Linking Policy
Contact us
Media Data
The Yomiuri Shimbun
The Japan News
Advertising with The Japan News Website
About Us
Subscribe Newspaper
Connect
Facebook
Twitter (English)
Twitter (Japanese)
Twitter (TheJapanNews Editor)
Links
The Japan News Partners
Waseda Online
Chuo Online
Nippon TV
YTV
ANN
YOMIURI College of Tokyo

YOMIURI COLLEGE OF CAR MECHANIC

© The Yomiuri Shimbun

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF THE | ) | |
| EXTRADITION OF MICHAEL L. | ) | Case No. 20-mj-1069-DLC |
| TAYLOR | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| IN THE MATTER OF THE | ) | Case No. 20-mj-1070-DLC |
| EXTRADITION OF PETER MAXWELL | ) | |
| TAYLOR | ) | |

## SUPPLEMENTAL DECLARATION OF DR. WILLIAM B. CLEARY

Pursuant to 28 U.S.C. § 1746, I, William B. Cleary, hereby declare as follows:

1.      I write this statement to supplement my earlier declaration, dated May 25, 2020 (ECF No. 18) and in response to the declaration of Public Prosecutor Naoki Watanabe, which the Government offered in opposition to Michael and Peter Taylor's motion to quash their arrest warrants or, alternatively, to be released from detention during the extradition proceedings against them (ECF No. 22-2 ("Watanabe Decl.")).

2.      My only objective in submitting my declarations is to share my understanding of Japanese law with the Court. I recognize that this is an important and complicated case, and I want to assist the Court in understanding the complexity of the issues at stake. If my more than 30 years of experience and education dealing with Japanese law can be helpful to the Court, I am honored to help.

3.      The Government's opposition brief and Mr. Watanabe's supporting declaration raise important issues under Japanese criminal law that call into question the legitimacy of the charges against the Taylors under Article 103 of the Japanese Penal

Code.

    4.    Mr. Watanabe's declaration confirms what I stated in my prior declaration: that Article 103 has never been used to prosecute someone for assisting another in jumping bail. Rather, in support of his contention that Article 103 applies to the Taylors, Mr. Watanabe cites three cases that are factually dissimilar to the case at bar. (*See* Watanabe Decl. ¶¶ 9, 12 (citing cases).)

        a.    In Judgment of Tokyo District Court, February 16, 1999, hanji vol. 1000, p. 325 (Watanabe Decl.¶ 9), the defendants—members of a cult group that used sarin poisonous gas to kill people—were convicted under Article 103 because they created fabricated documents that enabled their fellow gang members to escape arrest.

        b.    In Judgment of Supreme Court, March 17, 1960, Kei-Shu vol. 14, No. 3, p. 351 (Watanabe Decl.¶ 9), the defendant violated Article 103 by helping his friend evade arrest.

        c.    In Judgment of Osaka District Court, May 10, 2000 (Watanabe Decl. ¶ 12), which the Government features in its opposition brief (ECF No. 22 at 28–29), the defendant was convicted under Article 103 for aiding a fugitive. At the time of the defendant's crime, the individual he was convicted of assisting had his bail revoked and therefore was subject to arrest.

    5.    Contrary to what the Government submits, the Taylors' prosecution is not "supported by Japanese caselaw." The cases cited by the Government have nothing to do with bail jumping. (ECF No. 22 at 28.) Instead, they stand for the proposition that the

2

first part of Article 103—*i.e.*, the clause which Mr. Watanabe asserts the Taylors have violated—applies to instances where one enables another person to escape apprehension by law enforcement. To my knowledge, Article 103 has never been used to prosecute assisting another in the act of jumping bail—and apparently Mr. Watanabe is not aware of such an instance either.

6.     As I wrote in my prior declaration, this is not mere happenstance. Rather, Japan does not criminalize bail jumping. It is difficult to comprehend how Japan can charge someone under Article 103 for assisting someone with engaging in conduct that is itself not a crime. Any suggestion that charging the Taylors under Article 103 represents a typical application of the statute is wrong.

7.     I am not the only expert in Japanese criminal law that believes that the Taylors have not violated Article 103. As recently reported in Bloomberg News, a professor of criminal law at Hitotsubashi University named Yunhai Wang similarly concluded that "Helping someone jump bail isn't a crime in Japan." *See, e.g.*, Robert Burnson, *Ghosn Alleged Escape Accomplices Deny Committing a Crime*, Bloomberg Law (June 9, 2020), https://news.bloomberglaw.com/white-collar-and-criminal-law/ghosn-alleged-escape-accomplices-deny-committing-a-crime-2. That same publication identified another person, a former Japanese prosecutor named Nobuo Gohara, who also doubts the legitimacy of the Article 103 charges against the Taylors. *Id.*

8.     The Government writes, "Notably, the Taylors have not cited any case where a Japanese court held that Article 103 cannot apply to situations where the defendant enabled the scape of a person who had been released on bail." (ECF No. 22 at

3

29.)  That is for good reason.  As detailed above, as far as I (and, ostensibly, Mr. Watanabe) know, the issue has never been litigated—precisely because this prosecution is unprecedented.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 20 , 2020

William B. Cleary

4

# Exhibit 11

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MASSACHUSETTS**

|                                                           |     |                             |
|-----------------------------------------------------------|-----|-----------------------------|
| IN THE MATTER OF THE<br>EXTRADITION OF MICHAEL L.<br>TAYLOR | )<br>)<br>)<br>)<br>) | Case No. 20-mj-1069-DLC |
| IN THE MATTER OF THE<br>EXTRADITION OF PETER MAXWELL<br>TAYLOR | )<br>)<br>) | Case No. 20-mj-1070-DLC |

**SECOND SUPPLEMENTAL DECLARATION OF DR. WILLIAM B. CLEARY**

Pursuant to 28 U.S.C. § 1746, I, William B. Cleary, hereby declare as follows:

1.     My name is William B. Cleary and I provide this declaration as a supplement to my two previous declarations, dated May 25, 2020 and June 20, 2020.

2.     I reiterate my great respect for the Japanese legal system and my desire not to be an advocate for, or against, any party in these matters. I simply want to assist the Court to understand the Japanese laws, legal principles and cases that bear upon the issues presented by Japan's request to extradite the Taylors.

3.     Initially, I note that the issuance of an arrest warrant does not constitute a formal charge of any kind. Instead, an arrest warrant is part of the investigative stage of a matter. An individual does not become a "defendant" until he or she is indicted, and it is that indictment that serves as the formal charge. In the Japanese system, it is the indictment that serves to let the defendant know for what crime he or she is being charged, and the facts which the government intends to prove in support of that charge. As I understand it, no indictment has been issued against the Taylors. As a result, under the Japanese legal system, the Taylors have not yet been charged with any offenses and are not yet even referred to as "defendants" in the Japanese system.

4.    I further wish to clarify the structure and terminology employed in Article 103 of the Japanese Penal Code so as to explain my previously-stated opinion that Article 103 simply does not prohibit the conduct that Japan's Requests for Arrest Warrant allege by the Taylors.

5.    Article 103 has been translated into English as providing for a criminal offense when one "harbors or enables the escape of another person who has either committed a crime punishable with a fine or greater punishment or has escaped from confinement." While this English translation uses two verbs—"harbors or enables the escape of another"—to describe the operative conduct, the original Japanese text in fact employs a single verb—蔵匿, or "*inpi.*" This word, "*inpi,*" is translated to mean, alternatively, "harbors or enables the escape of another," but it is a single concept that describes working against law enforcement authorities' active pursuit of a criminal to arrest him.

6.    While it is translated using the same English word "escape," *inpi* carries with it a separate and distinct meaning from the word 逃走, or "*toso.*" The word "toso" is the term used in Article 97 and it is the term used in the latter part of Article 103, which is translated to English as "has escaped from confinement." This word, "toso," has a very specific meaning in that it refers to escape from a place of physical confinement, such as a jail, prison or detention center.

7.    The Japanese warrants for the Taylors' arrests do not themselves identify the offense or offenses for which the Taylors' arrests are authorized. Instead, they reference the Requests for Arrest Warrant. The Requests for Arrest Warrant in turn begin with a declaration, as translated to English, that a warrant is requested "on the alleged harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II) case." The original Japanese text that is translated to "harboring of criminals" is 犯人蔵匿, which is the title of Article 103 though the Requests do not cite to Article 103. In any event,

2

Annex 3 to the Requests for Arrest Warrant, which purports to describe the alleged facts of the crime, describes the actions of the Taylors with respect to Mr. Ghosn not with the verb 蔵匿, or "*inpi*," but rather using the word 逃走, or "*toso*." Therefore, as described in the Requests for Arrest Warrant, it is clearly alleged that the Taylors committed a crime by assisting or enabling Mr. Ghosn to 逃走, or "*toso*," with the restrictions from which Mr. Ghosn is escaping being specifically identified as the conditions under which he was bailed.

8.     In his declaration, Mr. Watanabe acknowledges that the word 逃走, or "*toso*," "has the same concepts as 'escaped from confinement'" and thus "is irrelevant to the concept of 'escape' used in 'enables the escape' in Article 103, which is an English translation of "蔵匿" ("*inpi*")." I agree with this statement. But the problem is that the Requests for Arrest Warrant assert that the Taylors allegedly committed a crime by enabling the 逃走, or "*toso*," of Mr. Ghosn in reference to his bail conditions. This—the specific conduct alleged to constitute the crime—does not constitute a violation of Article 103.

9.     As I explained in my previous declarations, while there is one case where an individual was prosecuted for assisting a defendant to avoid arrest after his bail had been revoked (Judgment of Osaka District Court, May 10, 2000), there is no prior instance in which Japan has ever even attempted to charge anyone under Article 103 (or any other provision) for assisting someone to violate their bail conditions.

10.     Further, even if the Requests for Arrest Warrants had used the verb harboring—蔵匿, or "*inpi*"—to describe the Taylors' actions, that also would be an inaccurate use of the word (as employed in Article 103) because there is no allegation (and no evidence) that law enforcement authorities were actively seeking to arrest Mr. Ghosn when all of this occurred.

11.     Accordingly, to the extent the Requests for Arrest Warrant allege that the Taylors

3

violated Article 103, the facts which those Requests point to as the basis for that allegation constitute a completely unprecedented application of Article 103 that runs contrary to the manner in which that provision historically has been applied and interpreted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on  July $\underline{16}$ , 2020

William B. Cleary

4

# Exhibit 12

U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY
## EVIDENCE ACCOMPANYING REQUISITIONS IN
## THE UNITED STATES FOR EXTRADITION
## AMERICAN FOREIGN SERVICE

| | | |
|---|---|---|
| | Tokyo, Japan | 07-21-2020 |
| | Place | Date *(mm-dd-yyyy)* |
| Karin M. Lang | Minister-Counselor for Consular Affairs and Consul General | |
| Name | | Title |

of the United States of America at    Tokyo, Japan

hereby certify that the annexed papers, being    supporting documents

purporting to be used upon an application for the extradition from the United States of America

M. L. Taylor and Peter Maxwell Taylor

charged with the crime of    Enabling the escape of criminals

alleged to have been committed in    Japan

are duly and legally authenticated so as to entitle them to be received in evidence for similar purposes by

the tribunals of    Japan

as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed

on this    twenty-first    day of    July, 2020

Month and Year

Signature

Karin M. Lang, Minister-Counselor for
Consular Affairs and Consul General

Type Name and Title of Certifying Officer
of the United States of America.

DS-00
05-201

## CERTIFICATION


I, SEKI Yoshitaka, Director of the International Affairs Division, Criminal Affairs Bureau, Ministry of Justice of Japan, hereby certificate that attached each document is the original or certified copy to the appropriate Legal Authorities in the United States of America made by the officer of the Government.

All the documents submitted herein are duly certified and authenticated together with certified translations in English.


July 21, 2020


SEKI Yoshitaka (Mr. )
Director
International Affairs Division
Criminal Affairs Bureau
Ministry of Justice
Japan

CERTIFICATE OF TRANSLATION

I, KITAJIMA Ryozo, certify that I am competent to translate this document, and that the translation is true and accurate, to the best of my ability.

Executed on July 21, 2020

北嶋 良蔵

KITAJIMA Ryozo
Public Prosecutor
Special Investigation Department
Tokyo District Public Prosecutors Office

I, SEKI Yoshitaka, certify that the said officer has sufficient ability to translate this document.

Executed on July 21, 2020

関 善貴

SEKI Yoshitaka
Director of International Affairs Division
Criminal Affairs Bureau
Ministry of Justice

Supplemental Declaration

1. I write this declaration to supplement my prior declarations. This declaration incorporates, by reference, the information included in those declarations. The facts stated in this supplemental declaration are true to the best of my knowledge and belief.

2. Under Japanese law, an arrest warrant and a request thereof must contain, among other information, the name of the suspect, the charged offense, and an outline of the alleged facts of the offense, but it does not require that the applicable penal article be identified. (Article 200 1 of the Code of Criminal Procedure and Article 142 I of the Rules of Criminal Procedure). An arrest warrant may be prepared by appending the written request for said arrest warrant (Article 145 of the Rules of Criminal Procedure). The term "charged offense" in this context means the name of a crime applicable to a case which is the subject of criminal investigation, and is the information, in combination with an outline of the alleged facts of the crime, for identifying the case which is the subject of criminal investigation.

3. As I mentioned in my previous declarations, it is regular practice in Japan to include in arrest warrant requests the name of the Penal Code offense, but not the corresponding article of the Penal Code that applies. Such practice is also explained in "*Reijyojimu (saiteiban)*", a textbook of warrant practices supervised by The Training and Research Institute for Court Officials in Japan, the institution in charge of training of court officials including court clerks. The pages 6 to 7 of the book state, "it does not require that the applicable penal article be identified. However, when it comes to violations of Acts other than the Penal Code, it is desirable to clarify the applicable statute

1

by describing as *violation of the XX Act, Article XX,* because simply describing as *violation of XX Act* is not clear enough as the name of the offense which should be the name of each specific offense." (emphasis added)

4. An arrest warrant authorizes a public prosecutor, public prosecutor's assistant officer or judicial police official to arrest the suspect for the offense identified in the arrest warrant (Article 199 I of the Code of Criminal Procedure).

5. Consistent with these laws and rules, the two arrest warrants were issued by the judge respectively for Michael L. Taylor and Peter Maxwell Taylor for the offenses identified in the arrest warrants: enabling the escape of criminals under Article 103 of the Penal Code and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, Article 25 II).

6. In cases involving international fugitives, it is essential to arrest the fugitive in Japan for the purpose of securing his/her appearance at trial in order to conduct criminal trial against him/her in Japan. Thus, following the issuance of an arrest warrant in Japan, only after the fugitive is arrested on the arrest warrant, a Japanese public prosecutor will prosecute the fugitive by submitting a document called "起訴状" ("ki-so-jo") which contains the name of the accused, the charged facts, and the charged offense with applicable statutes (Articles 247 and 256 of the Code of Criminal Procedure). This document has not been submitted yet because neither Michael L. Taylor nor Peter Maxwell Taylor has been arrested in Japan yet.

7. The acts of Michael L. Taylor and Peter Maxwell Taylor constitute "enable the escape" of Ghosn by impeding his arrest or detection by government officials. When "the accused has fled or there is probable cause to suspect that the accused may flee", "[t]he court may… make a ruling to rescind

2

the bail" and the accused may be apprehended (Article 96 I (ii) of the Code of Criminal Procedure[1]). Therefore, if Ghosn had not concealed himself and tried to openly depart Japan from an airport in the regular manner, e.g., by purchasing an airplane ticket with his own name, visiting an airport, and using the ticket and his passport, he would have been certainly noticed at the immigration inspection and his bail would have been rescinded. However, Michael L. Taylor and Peter Maxwell Taylor enabled Ghosn to avoid detection by government officials, to avoid the rescission of bail and arrest, and to avoid the criminal prosecution by the series of acts described in the extradition requests.

8. The Memorandum in support of petitioners' motion for preliminary injunction dated on July 16, 2020 notes that Article 103 was not mentioned in the investigation reports included in the extradition requests. This is only because the investigation was initiated in response to Ghosn's illegal departure. The fact that the scope of the investigation conducted by the Tokyo District Public Prosecutors Office covered the suspected "enabling the escape of criminals" under Article 103 committed by Michael L. Taylor and Peter Maxwell Taylor is evidenced by the charged offenses in the arrest warrants dated the January 30, 2020 and February 28, 2020 for Michael L.

---

[1] Article 96 I The court may, upon the request of a public prosecutor or ex officio, make a ruling to rescind the bail or suspension of the execution of detention when:

(i) the accused has been summoned but does not appear without a justifiable reason;

(ii) the accused has fled or there is probable cause to suspect that the accused may flee;

(iii) the accused has concealed or destroyed evidence or there is probable cause to suspect that the accused may conceal or destroy evidence;

(iv) the accused has harmed or tried to harm the body or property of the victim, any other person who is deemed to have knowledge essential to the trial of the case or the relatives of such persons or has threatened them; or

(v) the accused has violated the conditions set by the court such as restrictions on the place of residence.

Taylor and Peter Maxwell Taylor and all of the information submitted in the extradition requests including video surveillance camera images, witness statements, and other documents.

9.  Annex 3 of the February 28, 2020 arrest warrant requests for Michael L. Taylor and Peter Maxwell Taylor uses both "隠避" ("in-pi" or "enable the escape") and "逃走" ("toso", or "escape")[2]. The meaning of "逃走" ("toso") is determined by the context in which it is used. When used in Articles 97[3] and 98[4] and used to describe "another person who has … escaped from confinement" in Article 103, it is limited by putting the condition of a certain type of confinement set forth by each article. Outside that context, e.g., in cases where the defendant enables the escape of "another person who has … committed a crime", like in this case, it is not limited in the same way. In Annex 3 of the February 28, 2020 arrest warrant requests for Michael L. Taylor and Peter Maxwell Taylor, "逃走" ("toso") used in the phrase "逃走に便宜を与え" ("toso-ni-bengi-wo-atae") ("assisting [Ghosn's] escape") means Ghosn's fleeing from the Japan's administration of criminal justice; more specifically, to avoid detection by government officials, to avoid the rescission of bail and arrest, and to avoid the criminal prosecution. The usage of "逃走に便宜を与え" ("toso-ni-bengi-wo-atae") ("assisting escape" ) is found in other cases involving the offense of enabling the escape of criminals under Article 103 of the Penal Code. For example, in one case, the defendant provided cash and SIM cards to the suspect, who was "another person who has … committed a crime" of intimidation and was not under confinement or fleeing from the scene of a

---

[2] The analysis in this paragraph also applies to the January 30, 2020 arrest warrant requests for Michael L. Taylor and Peter Maxwell Taylor.

[3] "When a sentenced or unsentenced person confined on a judge's order escapes" (*emphasis added*)

[4] "When a person who is provided for in the preceding Article or held under a subpoena escapes either by damaging the facilities or instruments of restraint for confinement, by committing an act of assault or intimidation, or together in agreement with another person escapes" (*emphasis added*)

4

.

crime to evade police apprehension, and for whom an arrest warrant had not been issued yet. The court found that the defendant's acts of "assisting escape" ("逃走に便宜を与え" , pronounced "toso-ni-bengi-wo-atae") constituted an offense of enabling the escape of criminals under Article 103 of the Penal Code (Judgment of Nagoya District Court, October 15, 2013, Hanreihisho L06850550).

July 21, 2020

Tokyo District Public Prosecutors Office
Public Prosecutor

渡邉 直布

WATANABE Naoki

5

証　　明　　文


　私，関善貴，日本国法務省刑事局国際刑事管理官は，アメリカ合衆国の権限ある司法当局に対して，別添文書が日本国政府公務員によって真正に作成された原本又は謄本であることをここに証明します。

　なお，ここに提出する関係書類は，正式に認証された書類に適正な英訳文が添付されたものです。


令和2年7月21日


日本国法務省刑事局


国際刑事管理官　　　関　善貴

翻訳証明書

　私，北嶋良蔵は，本文書を翻訳する能力を有しており，私の能力の限りで，本翻訳が真実かつ正確であることを証明します。


２０２０年７月２１日


北嶋　良蔵
東京地方検察庁
特別捜査部検察官


　私，関善貴は，前記の者が本文書を翻訳する十分な能力を有することを証明します。


２０２０年７月２１日


関　善貴
法務省刑事局
国際刑事管理官

再補足説明書

1 本説明書は，本職作成の従前の説明書を補足するものである。本説明書は，これら
 の説明書に含まれる情報を参照して援用するものである。本説明書に記載した事実
 は，本職が把握し，真実と信じるものに忠実に沿ったものである。

2 日本法において，逮捕状及び逮捕状請求書には，被疑者の氏名，罪名，被疑事実の
 要旨等の事項を記載することが求められているが，罰条は記載要件となっていない
 （刑事訴訟法第２００条第１項，刑事訴訟規則第１４２条第１項）。逮捕状は，逮捕
 状請求書及びその記載を利用してこれを作ることができる（刑事訴訟法規則第１４
 ５条）。この文脈における「罪名」は，被疑事実の要旨と相まって捜査対象の事件を
 特定するためのものであり，捜査対象の事件に適用される犯罪の名称を意味する。

3 本職作成の説明書において述べたとおり，日本の実務上，逮捕状請求書には，刑法
 犯の罪名を記載し，適用される刑法の特定の条項は記載しないことが通常である。か
 かる運用については，裁判所書記官等の裁判所職員の研修を担当する機関である裁
 判所職員総合研修所が監修する『令状事務（再訂版）』にも記載されている。同６～
 ７頁には，「罰条は記載要件とはなっていない。しかし特別法犯の場合，単に何々法
 違反と記載しただけでは，個別的構成要件の名称である罪名として不明確であるの
 で，何々法何条違反と明記してこれを明確にする措置が望ましい。」との記載がある。

4 逮捕状により，検察官，検察事務官又は司法警察職員は，逮捕状記載の罪について
 被疑者を逮捕することができる（刑事訴訟法第１９９条第１項）。

5 これらの法律や規則に則り，マイケル・エル・テイラー及びピーター・マクスウェ
 ル・テイラーについては，逮捕状記載の罪，すなわち，犯人隠避（刑法第１０３条）
 及び出入国管理及び難民認定法違反（同法第７１条，第２５条第２項）幇助を対象に，
 これまで各２通の逮捕状が裁判官により発付されている。

6 日本国外への逃亡犯罪人に関する事案では，日本で裁判を遂行するためには，その後の出廷確保のため，逃亡犯罪人の身柄を日本国内で確保することが必要不可欠であるから，日本国内での逮捕状の発付に引き続き，同逮捕状により逃亡犯罪人が逮捕されて初めて，日本の検察官は，被告人の氏名，公訴事実，罪名及び罰条を記載した起訴状を裁判所に提出して起訴をすることになる（刑事訴訟法第２４７条，第２５６条）。マイケル・エル・テイラー及びピーター・マクスウェル・テイラーはまだ日本国内で逮捕されていないため，起訴状はまだ提出されていない。

7 マイケル・エル・テイラー及びピーター・マクスウェル・テイラーの行為は，ゴーン被告人の官憲による発見・逮捕を免れさせることにより，ゴーン被告人を「隠避させた」に該当する。保釈された被告人が逃亡し又は逃亡すると疑うに足りる相当な理由があるときは，保釈が取り消され，身柄が拘束されることになる（刑事訴訟法第９６条第１項第２号）。仮に，ゴーン被告人が，実名で航空券を購入して空港に赴き，自己のパスポート及び同航空券を用いるなどの通常の方法で，空港から身を隠すことなく，公然と出国しようとしていれば，出国審査の際に確実に発覚し，保釈取消事由に該当するとして保釈が取り消されていたと考えられる。しかしながら，マイケル・エル・テイラー及びピーター・マクスウェル・テイラーは，犯罪人引渡請求書に詳述された一連の行為により，ゴーン被告人につき，官憲による発見を免れること，保釈の取消しや逮捕を免れること，そして，刑事訴追を免れることを可能にしたもの

---

: 刑事訴訟法第９６条第１項

裁判所は，左の各号の一にあたる場合には，検察官の請求により，又は職権で，決定を以て保釈又は勾留の執行停止を取り消すことができる。

一 被告人が，召喚を受け正当な理由がなく出頭しないとき。

二 被告人が逃亡し又は逃亡すると疑うに足りる相当な理由があるとき。

三 被告人が罪証を隠滅すると疑うに足りる相当な理由があるとき。

四 被告人が，被害者その他事件の審判に必要な知識を有すると認められる者若しくはその親族の身体若しくは財産に害を加え若しくは加えようとし，又はこれらの者を畏怖させる行為をしたとき。

五 被告人が住居の制限その他裁判所の定めた条件に違反したとき。

である。

8　２０２０年７月１６日付け申立書は，犯罪人引渡請求書に添付された書類に関し，刑法第１０３条への言及がないと指摘するが，これは，当初，ゴーン被告人の不法出国の罪に関して捜査を始めたことによる。東京地検がマイケル・エル・テイラー及びピーター・マクスウェル・テイラーによる刑法第１０３条の犯人隠避の被疑事実も捜査の対象にしていたことは，マイケル・エル・テイラー及びピーター・マクスウェル・テイラーに対する２０２０年１月３０日付け及び同年２月２８日付け各逮捕状に記載の罪名や，防犯ビデオ画像，参考人の供述調書その他の書面を含めた犯罪人引渡請求書記載の情報により明らかである。

9　マイケル・エル・テイラー及びピーター・マクスウェル・テイラーに対する２０２０年２月２８日付け逮捕状請求書別添３では，「隠避」（enable the escape）及び逃走（escape）を使用している[2]。逃走の意味は，それが使用される文脈により判断される。刑法第９７条[3]，第９８条[4]で用いられ，また，刑法第１０３条における「拘禁中に逃走した者」を表すために用いられる場合，それぞれの条文に規定された一定の拘禁という条件を付することにより限定される。その文脈を離れ，本件と同様に被告人が「罪を犯した者」を隠避（enables the escape）させた場合については，同様の限定はない。マイケル・エル・テイラー及びピーター・マクスウェル・テイラーに対する２０２０年２月２８日付け逮捕状請求書別添３では，「逃走に便宜を与え（assisting〔Ghosn's〕escape）」における「逃走」は，我が国の刑事司法作用から逃れることを意味し，より具体的には，ゴーン被告人につき，官憲による発見を免れること，保釈の取消しや逮捕を免れること，そして，刑事訴追を免れることを

---

[2] この段落での議論は，マイケル・エル・テイラー及びピーター・マクスウェル・テイラーに対する２０２０年１月３０日付け逮捕状請求書にも当てはまる。

[3]　「拘禁された既決又は未決の者が逃走したとき」

[4]　「前条に規定する者又は勾引状の執行を受けた者が拘禁場若しくは拘束のために器具を損壊し，暴行若しくは脅迫をし，又は二人以上通謀して，逃走したとき」

意味するものである。「逃走に便宜を与え (assisting escape)」の用法は，刑法第
１０３条の犯人隠避罪に関する他の事案でも見られるところであり，例えば，脅迫
の罪を犯したものの，いまだ拘禁されておらず，犯行現場から逃亡してもおらず，
かつ，逮捕状が発付されてもいなかった者に対し，逃走に必要な現金やシムカード
を供与して逃走(escape)に便宜を与えた行為が刑法第１０３条の犯人隠避罪を構成
すると判示した事案がある（名古屋地判平成２５・１０・１５判例秘書Ｌ０６８５
０５５０）。


２０２０年７月２１日

東京地方検察庁
検察官検事

渡部 直希

# Exhibit 13



Jiji dot com news  >  society  >
**Start of debate on escape prevention measures Received Gone defendant case-Legal Affairs Committee**

small Durin Big

# Start of debate on escape prevention measures Received Gone defendant case-Legal Affairs Committee

17:51 Jun 15, 2020

The first meeting of the Criminal Law Subcommittee, a legal council (a consultative body of the Minister of Justice), was held on the 15th to discuss measures to prevent the defendants from escaping on bail. Following the incident of former Nissan Motors President Carlos Ghosn, etc., the establishment of new penalties for the escape and the mandatory installation of Global Positioning System (GPS) equipment on bail are issues to be considered.

The current criminal law, "flight offenses," targets inmates in prisons. For this reason, it does not apply when in bail such as Ghosn. After the bail, the prison sentence was confirmed and disappeared in order to escape from imprisonment, and the legal court will also consider the application of escape charges in such cases.

There was a suspicion that a former US Army Special Forces member was involved in the escape of Ghosn, and attendees also pointed out that "it is necessary to consider how to stop the escape of those who use professional groups."

[To list of social articles] [To current affairs dot com top]

New Corona Update    "Kyo-ani" case    Gone Defendant

COMMENT/VIEW

SEE ALL COMMENTS

**Feature**

| 爵 ニュース | スポーツ・五輪 | 写真・動画 | 特集 | エンタメ・AKB48 | 地域 | ライフ | メディカル |

政治　経済　マーケット　社会　国際　ワールドEYE　計報　予定　BWリリース　PRTIMES　アクセスランキング　エクイティ　ENGLISH


JIJI.COM

2020
6月30日（火）
東京都（東京）
26℃ / 23℃
降水確率：60%

時事ドットコムニュース ＞ 社会 ＞ 逃亡防止策の議論スタート ゴーン被告事件受け—法制審部会

記事／キーワード　　　検索

# 逃亡防止策の議論スタート ゴーン被告事件受け—法制審部会

2020年06月15日17時51分

保釈中の被告らの逃亡防止策について話し合う法制審議会（法相の諮問機関）刑事法部会の初会合が15日、開かれた。日産自動車前会長カルロス・ゴーン被告の事件などを受けたもので、逃亡に対する罰則の新設や、保釈の際に全地球測位システム（GPS）機器の装着を義務付けることなどが検討課題になる。

現行刑法の「逃走罪」は、対象を刑務所などに収容されている受刑者らと定めている。このため、ゴーン被告のような保釈中の場合には適用されない。保釈後に実刑が確定して、収監から逃れるために姿をくらます事件も相次ぎ、法制審はこうしたケースへの逃走罪適用についても検討する。

ゴーン被告の逃亡には元米陸軍特殊部隊員が関与していた疑いもあり、出席者からは「プロ集団を使う者の逃亡をどう止めるか考える必要がある」との指摘もあった。

【社会記事一覧へ】【時事ドットコムトップへ】

新型コロナ最新情報　　「京アニ」事件　　ゴーン被告

コメントをする／見る

全てのコメントを見る

## 今、あなたにオススメ

国生さゆり(53)愛用「ほうれい線は食卓のアレで一瞬だよ?」9割が知らない方法が…
AD(ヴィワンアークス)

51歳で英語ペラペラ、東大生絶句したYouTube無料chで英会話教室がピンチに
AD(LS Creation)

タバコから乗りかえる人続出!? ニコチン、タール0の「新タバコ」が5000円オフ
AD(株式会社ロックビル)

東京で新たに54人感染 新型コロナ

コロナを機に中国で注目度急上昇の「日本の生活習慣」
【洞察☆中国】

JDI、純損失1014億円 6期連続の赤字—20年3月期

第2波戦略、7月中旬に モデル修正、クラスター対策—大阪府

金竜が泣いた…！頭の肝斑が多い人は「お風呂であること」をしていないと判明
AD(Health,Up 08 on 美魔女有桑 08)

Recommended by

## 特集

---

✔ 新型コロナウイルス最新情報

感染者数18624人 前日比+110人
※06月29日現在、クルーズ乗船乗員らを除く

サンデンHDが私的整理 コロナ影響、負債1648億円 (06/30 23:02)

京アニ、採用開始 新型コロナで見合わせ (06/30 22:04)

池江が五輪1年前にメッセージ 国立から世界のアスリートへ (06/30 21:50)

フォーカス

    

ポスト安倍に新展開　森友自殺妻の胸中　ジョコビッチが陽性　一国二制度が瀬死に

   

コロナ死者ゼロの奇跡　中国で注目日本の習慣　非白人キャラの声に…　香港◆台湾に強硬姿勢

    

初タイトルへ王手　渋野◆ダメダメでした　仙台上空に謎の物体　目指せ!ブランド化

f　時事通信のSNS　🐦

✔ 読まれています

米、日本支持を鮮明に 日韓紛争「WTOにそぐわず」
国際

香港の民主派団体、解散相次ぐ 黄之鋒氏の「香港衆志」も
国際

琉球朝日、北日本放送に倫理違反 BPO
社会

国内初のコロナワクチン治験 創薬ベンチャー開発—大阪市大病院で開始
社会

泉佐野市が逆転勝訴 除外基準「違法で無効」—ふるさと納税訴訟・最高裁
社会

人気記事アーカイブ　　特集トップ

# Exhibit 14

## Masako Mori, Minister of Justice, expressed his belief in the Legal Committee of the 201st Diet session

March 6, 2nd year (Fri)

First, I'm Masako Mori, Minister of Justice. We would like to express our sincere gratitude to Chairman Midori Matsushima, the directors, and the members of the committee for their continued understanding and efforts regarding the administration of legal administration.

At present, the spread of new coronavirus infection is spreading, and a great sense of anxiety is spreading among the people. The government is working together to protect the lives and health of the people, and the Ministry of Justice will also take measures to prevent the spread of infection, including thorough measures against the waterfront.

It will be March 11th. It has been nine years since the Great East Japan Earthquake and the nuclear accident. Once again, I would like to express my sincere condolences to the victims of the disaster. I will share my awareness that "all ministers are ministers of reconstruction", and I will do my utmost to work closely with the hearts of disaster victims in the recovery and reconstruction of the disaster-stricken areas and to support their lives.

Through legal administration, I will seriously work toward the realization of justice, that is, a just society in which justice is maintained. Based on this determination, the slogan of the 14th United Nations Conference on Criminal Criminal Justice (Kyoto Congress) held in Kyoto this year was changed to the slogan

"Peace and Justice for All (Peace and Justice for All). )"

. This is also the 16th goal of the Sustainable Development Goals (SDGs) adopted by the United Nations. We believe that it is the responsibility of legal administration to achieve a society in which all people can enjoy peace and justice by sticking to the rule of law.

In addition, on February 26, as a flame of reconstruction in the disaster area, the Torch Relay will start from Fukushima Prefecture and the Tokyo Olympic and Paralympic Games will be held. The Ministry of Justice will do its utmost to realize a safe and secure society by aiming for the success of the Games, including measures against various crimes, appropriate immigration control, and promotion of human rights measures, and looking after the Games.

## About approach to problem of legal administration

1 Realization of society without abuse and discrimination

(strict coping with

sex crimes ) Sex crimes seriously violate the personality and dignity of victims, and give great pain to

their minds and bodies for many years. It is a vicious and serious crime that continues, and strict measures are required.

The accusations of innocence of sex crimes led to flower demonstrations all over the country, and sexually-affected parties who could not speak until then are raising their voices.

The supplementary provisions of the "Law to Partially Revise the Criminal Code" regarding sex crimes established in 2017, will consider the comprehensive policy regarding sex crimes within three years after the enforcement. The Ministry of Justice has been working to understand the actual situation of sex crimes, etc. to contribute to this examination, and is currently working on the compilation. In the future, based on the results, we will continue to listen to the voices of sexually-affected parties and take appropriate actions.

（Child abuse prevention measures）

In order to eradicate child abuse, it is important to protect children's lives more than anything else, and to comprehensively work on prevention, early detection, and protection of children who have been damaged. Based on "Dramatic strengthening of child abuse prevention measures" compiled by the government last year and "Ministry of Justice Child Abuse Prevention Measures Enhancement Plan" formulated in February this year, work closely with related organizations such as child guidance centers. At the same time, we will steadily promote efforts such as support utilizing the specialized knowledge of psychology at the Legal Juvenile Support Center.

（Efforts to address human rights issues caused by the earthquake）

Human rights issues such as discriminatory treatment and bullying of children still exist based on rumors associated with the Great East Japan Earthquake and the nuclear power plant accident. Discrimination and slander against the disaster-stricken areas and the victims must not be refused, and we will respond resolutely through consultation and investigation and relief activities by human rights defenders.

（Response to various human rights issues）

Human rights issues concerning women, children and the elderly, discrimination based on disability, human rights violations against foreigners including hate speech, discrimination issues such as Buraku discrimination, sexual orientation, etc. In order to resolve various human rights problems such as prejudice and discrimination based on gender identity, defamation and privacy infringement that abused the Internet, we will carefully and persistently work on investigation and relief activities etc. for human rights violations while making full use of individual laws and regulations ..

As "barrier-free for the mind", we promote human rights enlightenment activities for everyone to cherish each other's human rights and to support each other in a symbiotic society. Based on the circumstances in which patients with leprosy, former patients and their families were placed. We will firmly engage in human rights awareness activities.

(Cancellation of unregistered state)

For parents who have not been notified of their birth by their parents and are unregistered, we will take measures such as thoroughly grasping the actual situation and giving careful guidance on the procedure, while also considering further measures, We will work to resolve it.

2 Reinforcement of Civil Law System

(Civil Law System Responding to Changes in Society)

We will proceed with the necessary revision of the basic civil law to respond to changes in society.

Regarding the problem of nonpayment of child support, which is one of the causes of children's poverty, we will work proactively to eliminate it in cooperation with related ministries and agencies, and will firmly protect the future of children. In addition, we will continue to steadily examine the current family law system, including issues related to face-to-face exchanges and problems related to the upbringing of children after their parents divorce.

In addition, we will make every effort to prepare for smooth enforcement and to inform the public about the reduction of the adult age that is coming into force and the revision of civil law in the field of credit law.

(Responding to the problem of land with unknown owner)

In recent years, the problem of land with unknown owner has become a problem in various situations, and we recognize that countermeasures are important issues that should be addressed by the government as a whole. To solve this problem, we will steadily implement various measures such as efforts to promote inheritance registration and work to eliminate land whose title section owner is unknown.

Furthermore, in order to fundamentally solve the problem of land with unknown owner, the Legislative Council is currently in the process of deliberation on the revision of the Civil Code and the Real Estate Registration Law. We will carry out specific examinations for the revision.

(Recovery/Reconstruction Support from Earthquakes/Disasters)

We will do our utmost to support the recovery and reconstruction of a large number of large-scale disasters. Appropriate and prompt response to registration contract cases, loss of registration due to the expropriation of the registrar of the building that collapsed, maintenance of a map equipped with the registration office, free legal consultation by "Ho terrace", etc. We will work while grasping it firmly.

(Enhancement of Litigation Functions) In

order to protect the rights and interests of the people, it is important for the country to enhance and strengthen various litigation functions. In addition to properly and effectively exercising command authority

over litigation related to national interests, we will strengthen the preventive judicial function to prevent the occurrence of legal disputes both inside and outside Japan. In addition, we will work closely with related ministries and agencies to strengthen our response to international litigation.

3 Realization of a judiciary that is close and reliable to the people

（reform of the legal profession training system）

Regarding the legal profession training system, in addition to advancing efforts to train legal profession that can meet the expectations of the people, based on the recent revision of the law. By working closely with the Ministry of Education, Culture, Sports, Science and Technology, we will proactively promote efforts for more and more talented people to become lawyers.

（Legal education）

In anticipation of the reduction of the adult age of civil law in 4th year of Reiwa, we will actively cooperate with related organizations so that many people have the opportunity to come into contact with legal education according to the needs of the target generation and field. I will work.

（Enhancement of comprehensive legal support）

At "Ho terrace", we have enhanced the efforts to cooperate with welfare institutions and other organizations to solve comprehensive problems for the elderly and provide services in various languages such as Japanese legal system. We are working to provide support to meet the diversifying needs of society. In the future, we will continue to make efforts to disseminate and publicize our efforts on the "Ho terrace", as well as to implement smooth operations and enhance the system to support the access of the public to the judiciary.

（Enhancing the judicial system）

In order to enhance the system of the court, which is the core of the judiciary, etc., we have submitted to the Diet the "Law to revise a part of the Court Staff Quota Law" that includes the increase in the number of judges. It was. We ask that you make a thorough discussion and approve it as soon as possible.

（Active use of new technologies such as AI and ICT）

Response to rapidly advancing technological innovations such as AI and ICT will streamline operations and improve the quality of judiciary and legal administration, and improve the business environment. There is also an urgent need to maintain and enhance Japan's international competitiveness. We will vigorously promote the utilization of new technologies in the fields of justice and legal administration, including the introduction of IT in civil trials, and the establishment of a foundation for their realization.

4 Realization of "Japan's safest country in the world"

（recidivism prevention measures）
 Based on the "Recidivism Prevention Promotion Plan" and the "Recidivism Prevention Promotion Plan Acceleration Plan" decided by the Crime Countermeasures Ministerial Meeting in December last year, relevant ministries and agencies. We will further promote cooperation with and local governments. Guidance necessary for recovery of persons who commit crimes or delinquency, such as securing working and housing, support for the elderly and persons with disabilities, those who have drug dependence, those who have completed criminal procedures such as full-term release persons.・Providing appropriate support, as well as support for the construction of an implementation system for preventing recidivism performed by local governments, and support for the activities of the private sector, such as guardians, rehabilitation and protection facilities, and cooperative employers. We will continue to enhance and strengthen it.

（Protection and support for victims of crime, etc.）
 In order to protect the rights and interests of victims of crime, etc. in accordance with the principles of the Basic Law for victims of crime, etc. We will properly operate the system and strive to provide detailed support.

（Strict coping with so-called "driving"）
 Considering the actual situation of casualties caused by so-called "drifting", in order to deal with the actual situation of the case, actions such as stopping in front of a moving vehicle for the purpose of obstructing traffic are added to the subject of dangerous driving fatal injury I consulted with the Legal Council about this and received the report. Based on this, we will submit a bill to the Diet to revise a part of the law on the punishment of acts such as injuring people by driving a car.

（Development of criminal law to ensure appearance on trial dates and execution of penalties）
 Recently, there have been a number of escape cases involving persons who have been sentenced to imprisonment, for example, and accused on bail. In light of this, we have recently consulted with the Legal Council on the establishment of criminal law to ensure the escape of these persons and ensure the appearance on trial dates and the execution of penalties. In the future, based on the results of the deliberation, we will proceed with the necessary legislation.

（Securing security, measures against the threat of national life）
 In order to realize a society in which all people can live safely and with peace of mind, we will cooperate with related organizations and take all necessary measures to ensure security, including dealing with organized crime. We will take measures.
 In addition, we will endeavor to understand trends related to terrorism in Japan and overseas, and will

work to strengthen information gathering and analysis functions while working closely with related organizations.

Regarding Aum Shinrikyo, which is currently active mainly in "Aleph", "Yamada et al." and "Hikari no Wa," we will continue to properly and rigorously implement observation and disposal based on the Group Regulation Law. We will endeavor to alleviate and alleviate residents' anxiety and ensure public safety.

(Response to foreign threats)

For North Korea, we will continue to appropriately implement measures to strengthen human traffic regulations, and also to provide relevant information on trends related to nuclear and missiles, external trends including the abduction of Japanese people, and domestic situations. We will proceed with collection and analysis. Also, regarding the Senkaku Islands, we will cooperate with the related organizations and provide a complete response.

5 Further strengthen immigration control and residence control, realize a multicultural society

(both strict measures at the waterfront and smooth immigration control)

Awaiting the Tokyo Olympic and Paralympic Games, threatening Japan's safety and security It is necessary to take resolute immigration control for those who may be in danger. On top of that, in order to achieve both a high level of smooth immigration control for the promotion of tourism and strict immigration control, the world's highest level technologies such as face recognition gates are used to further enhance immigration control. I will proceed.

In addition, in order to prevent improper departure from the country, we will work in cooperation with related organizations to further tighten the procedures for departure.

At the same time, in order to prevent the spread of new coronavirus infectious diseases, we will further strengthen cooperation with related organizations and make every possible effort to prevent waterfront.

(Acceptance of foreign human resources and appropriate residency management)

Regarding the specific skill system, we will strive to operate the system properly so that foreign human resources can fully exercise their power in Japan, and also for technical intern trainees and international students. We will continue to work on operational improvements to ensure proper acceptance.

Regarding the realization of a symbiotic society with foreigners, based on the "Comprehensive Countermeasures for Accepting and Coexisting with Foreign Human Resources" revised at the end of last year, the relevant immigration offices will fulfill the overall coordination function. We will work in close cooperation with and to expand support for local governments related to a unified consultation service, set up a center for residence support, and create guidelines for using friendly Japanese.

In addition, regarding the use of medical insurance by foreigners, we will work in cooperation with the Ministry of Health, Labor and Welfare to ensure proper operation based on the revision of the Health

Insurance Law.

（Appropriate and prompt protection of refugees ）

Regarding the refugee recognition system, we will continue to give consideration to applicants who really need asylum, such as giving a stable residence permit in the early stage, and applying for abuse or misuse. We will strive to ensure proper operation of the system and promptly protect refugees by taking strict measures such as not permitting residence in accordance with the content of the case.

（Responding to the issue of deportation refugees' accommodation/repatriation issues) Even if a deportation order has been issued, due consideration should be given to proper procedures for those who are refusing deportation for various reasons. At the same time, we will endeavor to realize prompt repatriation and steadily resolve long-term accommodation conditions.

Of course, we will also thoroughly implement proper treatment in consideration of the human rights of inmates.

6 Active promotion of "judicial diplomacy"

（UN Crime Prevention Criminal Justice Conference）

At Kyoto Congress, we will exercise our leadership in strongly promoting to the international community the universal and basic values such as the rule of law and respect for basic human rights, and the importance of international cooperation. In addition, at this opportunity, in order to gain a correct understanding of Japan's criminal justice system, we will actively make international communications and hold dialogues with the judicial ministers of each country. Prior to the Kyoto Congress, we will hold a youth forum to raise the interest of the youth of the world, who will lead the future, toward the realization of a safe and secure society and contribute to the development of global human resources.

（Activation of international arbitration ）

To revitalize international arbitration in Japan, while fully utilizing the arbitration facility in Toranomon, in cooperation with relevant ministries and agencies, specialized human resource development such as arbitrators, We will continue to improve the infrastructure such as public relations and awareness raising in Japan and overseas.

In addition, in order to respond more accurately to the internationalization of legal affairs and to promote the establishment of a foundation for further activation of international arbitration, the "Special Measures Law Concerning Handling of Legal Affairs by Foreign Lawyers" Bill to revise the department" was submitted to the 200th Diet session. We ask that you make a thorough discussion and approve it as soon as possible.

(International cooperation on crime prevention, legal system development, etc.)

Over the years, laws such as drafting basic laws, developing and operating a judicial system, conducting international training, and developing human resources for judicial personnel have been developed for developing countries. We have provided system maintenance support. These international cooperations are initiatives that contribute to the realization of the SDGs adopted by the United Nations, and we will actively promote them.

(Promotion of legal foreign language translation maintenance business)

Amid the rapid acceleration of internationalization of the economy and society, translating and disseminating important Japanese laws and regulations is a very important effort to improve the national infrastructure in response to internationalization. Based on the discussion at the "Public-Private Strategy Council for Promoting International Dissemination of Japanese Law" launched in December last year, we will work even more toward the international dissemination of Japanese law in cooperation with related ministries and agencies. ..

7 Establishing an environment in which employees can work vigorously

(promotion of work style reform and promotion of employment of persons with disabilities)

Based on the "At Houm Plan" by the Ministry of Justice, the slogan is the achievement of women's professional life and the acquisition of 100% leave Starting with the promotion of male employees to take childcare leave, employees with various circumstances will strive to maintain a work environment where they can play an active role and promote work-life balance.

Regarding the employment of persons with disabilities, we will steadily work on the basis of the basic policy of the government established last year.

(Promotion of seismic retrofitting and anti-aging measures for facilities)

In light of recent natural disasters, we are steadily implementing anti-seismic and anti-aging measures for the Ministry of Justice facilities, including correctional facilities such as prisons and their staff dormitories, and disasters. At the same time, we will promote the improvement of correctional facilities, which are expected to function as evacuation shelters, in order to secure the functions necessary to accept neighboring residents.

Conclusion In the future, we will continue to work on various issues together with Deputy Minister Kosuke Yoshie, Parliamentary Vice-Minister Miyahisa Miyazaki, and all the staff responsible for legal administration. First of all, I would like to ask the directors and committee members for their continued understanding.



法務省
MINISTRY OF JUSTICE

本文へ　文字の大きさ　標準　拡大　　色反更・音声読み上げ・ルビ振り

相談窓口　サイトマップ　ENGLISH

| 会見・報道・お知らせ | 法務省の概要 | 試験・資格・採用 | 政策・審議会等 | 申請・手続 | 白書・統計 |

トップページ > 会見・報道・お知らせ > 大臣会見等 > 所信表明（国会） > 第201回国会（常会）法務委員会における森まさこ法務大臣所信表明

## 第201回国会（常会）法務委員会における森まさこ法務大臣所信表明

令和2…

### はじめに

　法務大臣の森まさこです。松島みどり委員長を始め、理事、委員の皆様方には、平素から法務行政の運営について格別の御理解と御尽力を賜り、厚く御礼申し上げます。

　現在、新型コロナウイルス感染症の感染が拡大し、国民の間に大きな不安感が広がっています。政府は、国民の生命と健康を守るために、一丸となって各種取組を進めており、法務省としした水際対策を始めとして、感染拡大の防止に向けた措置を講じてまいります。

　もうすぐ3月11日です。東日本大震災及び原発事故から9年になります。改めて、震災により犠牲となられた方々に謹んで哀悼の意を表します。私は、「閣僚全員が復興大臣である」との思し、被災者の心に寄り添って、被災地の復旧・復興や被災者の生活支援に全力で取り組む所存です。

　私は、法務行政を通じ、ジャスティス、すなわち正義が保たれる公正な社会の実現に向けて、真摯に取り組んでまいります。このような決意のもと、本年京都で開催される第14回国連犯罪法会議（京都コングレス）の標語を

「ピース・アンド・ジャスティス・フォー・オール（平和と公正をすべての人へ）」

といたしました。これは、国連で採択された「持続可能な開発目標」（SDGs）の16番目のゴールでもあります。法の支配を貫徹することによって、全ての人が平和と公正を享受できる社会をことは、法務行政に課された責務であると考えています。

　また、本月26日、被災地復興の炎として、福島県から聖火リレーがスタートし、いよいよ東京オリンピック・パラリンピック競技大会が開催されます。法務省は、各種の犯罪対策、的確な出入権施策の推進など、大会の成功に向けて、そして、大会後をも見据えて、安心・安全な社会の実現に力を尽くしてまいります。

### 法務行政の課題への取組について

#### 1　虐待や差別のない社会の実現

##### （性犯罪に対する厳正な対処）

　性犯罪は、被害者の人格や尊厳を著しく侵害し、その心身に長年にわたり多大な苦痛を与え続ける悪質・重大な犯罪であり、厳正な対処が必要です。

　性犯罪の無罪判決が相次いだことをきっかけに、フラワーデモが全国各地で行われるようになり、それまで声を上げられなかった性被害当事者の方々が声を上げています。

　平成29年に成立した性犯罪に関する「刑法の一部を改正する法律」の附則では、施行後3年を目途として、性犯罪に関する総合的な施策の在り方を検討することとされています。法務省討に資するよう、性犯罪の実態把握等を進めてきたところであり、現在、その取りまとめ作業を行っています。今後、その結果を踏まえ、性被害当事者等の声にも引き続きしっかりと耳を傾け切に対応してまいります。

##### （児童虐待防止対策）

　児童虐待の根絶のためには、何よりも子どもの命を守ることを最優先として、その予防や早期発見、被害にあった児童の保護などに、総合的に取り組むことが重要です。昨年、政府が取り児童虐待防止対策の抜本的強化について」や、本年2月に策定した「法務省児童虐待防止対策強化プラン」に基づき、児童相談所等の関係機関と緊密に連携しつつ、法務少年支援センターにに関する専門的知見を活かした支援等の取組を着実に推進してまいります。

##### （震災に起因する人権問題への取組）

　東日本大震災及び原発事故に伴う風評に基づく、差別的取扱いや子どもへのいじめ等の人権問題が現在も存在しています。被災地や被災者の方々に対する心ない差別・中傷は断じてあないものであり、人権擁護機関による相談・調査救済活動等を通じ、毅然として対応してまいります。

##### （様々な人権問題への対応）

　女性や子ども、高齢者などをめぐる人権問題、障害等を理由とする差別、ヘイトスピーチを含む外国人に対する人権侵害、部落差別などの同和問題、性的指向・性自認を理由とする偏見や差ネットを悪用した名誉毀損やプライバシー侵害等の様々な人権問題を解消するため、個別法規を駆使しながら、人権侵害に対する調査救済活動等に丁寧かつ粘り強く取り組みます。

　「心のバリアフリー」として、誰もがお互いの人権を大切にし、支え合う共生社会を実現するための人権啓発活動を推進し、ハンセン病患者・元患者やその家族がおかれていた境遇を踏ま発活動にしっかりと取り組んでまいります。

##### （無戸籍状態の解消）

　親によって出生の届出がされておらず、無戸籍となっている皆様について、徹底した実態把握や丁寧な手続案内をするなどの取組を行うとともに、更なる方策をも検討し、無戸籍状態の解んでまいります。

#### 2　民事法制の強靭化

##### （社会の変化に対応する民事法制）

　民事基本法について、社会の変化に対応するために必要な見直しを進めてまいります。

　子どもの貧困の原因の一つである養育費の不払問題について、関係省庁と連携しながら、その解消に向けて積極的に取り組み、子どもの未来をしっかり守ってまいります。そのほかにも、i問題等、両親が離婚した後の子どもの養育の在り方に関する問題を含め、現在行っている家族法制等についての検討を引き続き着実に進めてまいります。

　また、施行を控えている成年年齢の引下げや債権法分野の民法等の改正については、円滑な施行に向けた準備と国民への周知に全力を尽くします。

##### （所有者不明土地問題への対応）

　近年、所有者不明土地問題が様々な場面で問題となっており、その対策は、政府全体として取り組むべき重要な課題と認識しております。その解決に向け、相続登記の促進のための取組有者不明土地の解消作業などの諸対策を着実に実施してまいります。

　さらに、所有者不明土地問題の抜本的な解決に向けて、現在、法制審議会において、民法及び不動産登記法の改正についての調査審議をいただいているところであり、引き続き関係省庁て、法改正に向けた具体的な検討を行ってまいります。

（震災・災害からの復旧・復興支援）
　相次ぐ大規模災害に対する復旧・復興支援に全力で取り組みます。登記嘱託事件等の適切かつ迅速な対応，倒壊するなどした建物の登記官の職権による滅失登記，登記所備付地図の更新，「法テ
ラス」による無料法律相談など，被災地の御要望・需要をしっかりと把握しながら取り組んでまいります。

（訟務機能の充実）
　国民の権利利益の保護を図るためには，国として，多様な訟務機能の充実強化が重要です。国の利害に関係する訴訟に対する指揮権限を適切かつ効果的に行使することはもとより，国が当事者となる
紛争の発生そのものを未然に防止するための予防司法機能の強化を図ります。また，関係省庁と緊密に連携して，国際訴訟等への対応も強化いたします。

3 国民に身近で頼りがいのある司法の実現

（法曹養成制度改革）
　法曹養成制度については，国民の期待に応えられる法曹を養成するための取組を進めることはもとより，先般の法改正に基づき，文部科学省等としっかり連携して，より多くの有為な人材が，法曹を目指すことを
望まれるための取組をも積極的に進めてまいります。

（法教育）
　令和4年の民法の成年年齢引下げをも見据え，関係機関とも連携しながら，対象世代や現場のニーズに応じ，多くの国民が法教育に触れる機会を持てるよう，積極的に取り組みます。

（総合法律支援の充実）
　「法テラス」では，福祉機関等と連携して高齢者等の総合的な問題解決を図る取組や，我が国の法制度等の情報を多言語で提供するサービスを充実させるなど，多様化する社会の要請に応えるため
の支援に取り組んでいます。今後も「法テラス」の取組の周知・広報に努めるとともに，国民の司法へのアクセスを支援するための業務の円滑な実施と体制の充実を図ってまいります。

（司法の体制充実）
　司法の中核をなす裁判所の体制の充実強化等を図るため，判事の増員などを内容とする「裁判所職員定員法の一部を改正する法律案」を今国会に提出いたしました。十分に御審議の上，速やかな成立を
御可決くださいますようお願いいたします。

（AI・ICT等の新しい技術の積極的な活用）
　急速に進展するAIやICT等の技術革新への対応は，業務を効率化し，司法や法務行政の質の向上を図るとともに，ビジネス環境を整備し，日本の国際競争力を高める上でも急務となっています。民
事裁判のIT化を始めとした司法・法務行政の分野における新たな技術の活用及びその実現に向けた基盤整備を強力に推進してまいります。

4 「世界一安全な国，日本」の実現

（再犯防止対策）
　「再犯防止推進計画」及び昨年12月に犯罪対策閣僚会議で決定された「再犯防止推進計画加速化プラン」に基づき，関係省庁や地方公共団体との連携を一層推進します。就労・住居の確保，高齢
や障害のある者，薬物依存を有する者，満期釈放者を始めとした刑事手続を終了した者への支援など，犯罪や非行をした者の立ち直りに必要な指導・支援を適切に実施するとともに，地方公共団体が
行う再犯防止の実施体制の構築に向けた支援や，保護司，更生保護施設，協力雇用主等の民間の皆様の活動への支援を，より一層充実強化してまいります。

（犯罪被害者等の保護・支援）
　犯罪被害者の御負担に関する様々な御指摘等を踏まえ，犯罪被害者等基本法の理念にのっとり，犯罪被害者等の権利・利益の保護を図るための各種制度を適切に運用し，きめ細やかな対応に努
めてまいります。

（いわゆる「あおり運転」への厳正な対処）
　いわゆる「あおり運転」による死傷事犯の実情等に鑑み，事案の実態に即した対処をするため，通行妨害目的で走行中の車の前方で停止する行為等を危険運転致死傷罪の対象に加えるととも
して，法制審議会に諮問をし，その答申を得ました。これを踏まえ，「自動車の運転により人を死傷させる行為等の処罰に関する法律の一部を改正する法律案」を今国会に提出いたしました。

（公判期日への出頭及び刑の執行を確保するための刑事法の整備）
　近時，懲役等の刑が確定した者や保釈中の被告人等の送亡事案が相次いで発生していることに鑑み，これらの者の送亡を確実に防止し，公判期日への出頭や刑の執行を確保するための刑事法
の整備について，先般，法制審議会に諮問いたしました。今後，審議結果を踏まえて，必要な法整備を進めてまいります。

（治安の確保，国民生活の脅威への対策）
　国民の皆様が安全に安心して暮らせる社会を実現するため，関係機関とも連携し，組織犯罪等への対応を含め，治安確保のための万全の対策を講じてまいります。
　また，国内外におけるテロ関連動向の把握に努め，関係機関との連携を緊密にしつつ，情報収集・分析機能の強化に努めてまいります。
　現在，「Aleph」（アレフ），「山田らの集団」及び「ひかりの輪」を中心に活動するオウム真理教については，引き続き，団体規制法に基づく観察処分を適正かつ厳格に実施し，地域住民の不安を解
消・緩和するとともに，公共の安全の確保に努めてまいります。

（国内外動向への対応）
　北朝鮮に対しては，今後も人的体系の規制強化措置等を適切に実施していくとともに，核・ミサイル関連の動向，日本人拉致問題を含む対外動向や国内状況等について，関連情報の収集・分析を
進めます。また，尖閣諸島関係についても，関係機関と連携し，遺漏のない対応をいたします。

5 出入国管理と在留管理の一層の強化，多文化共生社会の実現

（厳格な水際対策の徹底と円滑な入国審査の両立）
　東京オリンピック・パラリンピック競技大会の開催を控え，我が国の安全・安心を脅かす危険な行為に及ぶおそれがある者らに対する，毅然とした入国管理を行う必要があります。その上で，円滑な入国を
推進に向けた円滑な入国審査と，厳格な入国管理を高度な次元で両立させるため，顔認証ゲートなどの世界最高水準の技術を活用し，入国審査の更なる高度化を進めてまいります。
　また，不正な出国防止のため，関係機関と連携し，出国時の手続のより一層の厳格化に努めてまいります。
　併せて，新型コロナウイルス感染症の感染拡大の防止に向け，関係機関との連携を一層強化し，水際対策に万全を期す所存です。

（外国人材の受入れと適切な在留管理）
　特定技能制度については，外国人材の皆様に我が国で十分に力を発揮していただけるよう，制度の適正な運用に努め，技能実習生や留学生についても，適正な受入れを図るため，運用状況を注視し適切に
取り組んでまいります。
　外国人との共生社会の実現については，昨年末に改訂した「外国人材の受入れ・共生のための総合的対応策」などを踏まえ，出入国在留管理庁による総合調整機能を果たしつつ，関係府省と緊密
に連携して，一元的相談窓口に係る地方公共団体への支援の拡大，在留支援のためのセンターの設置，やさしい日本語の活用に関するガイドラインの作成などに取り組んでまいります。
　また，外国人による医療保険の利用について，厚生労働省と協力して，健康保険法の改正を踏まえた適正な運用の確保に努めてまいります。

（適正かつ迅速な難民の保護）

　難民認定制度については，引き続き，真に庇護を必要とする申請者には，早期に安定した在留許可をするなどの配慮を行い，濫用・誤用的な申請者には，事案の内容に応じて在留を許可の厳格な対応を行うことにより，制度の適正な運用に努め，難民の迅速な保護を図ってまいります。

（送還忌避者の収容・送還問題への対応）

　退去強制令書が発付されたにもかかわらず，様々な理由で送還を忌避している者に対しては，適正手続にも十分に配慮しつつ，迅速な送還の実現及び長期収容状態の着実な解消に努めす。

　もとより，被収容者の人権に配慮した，適正な処遇につきましても，改めて徹底してまいります。

6「司法外交」の積極的な推進

（国連犯罪防止刑事司法会議）

　京都コングレスでは，法の支配や基本的人権の尊重といった普遍的・基本的価値や国際協力の重要性を国際社会に強く打ち出すべく，指導力を発揮してまいります。また，この機会に，我司法制度に対する正しい理解を得るため，積極的に国際発信を行うとともに，各国の司法関係閣僚と対話を行います。京都コングレスに先だって，ユースフォーラムを開催し，未来を担う世界安全・安心な社会の実現への関心を高めてもらうとともに，グローバル人材の育成に貢献いたします。

（国際仲裁の活性化等）

　我が国における国際仲裁の活性化に向け，虎ノ門の仲裁専用施設も十分に活用しつつ，関係省庁・関係機関と連携しながら，仲裁人等の専門的な人材育成，国内外における広報・意識の盤整備を進めてまいります。

　また，法律事務の国際化等に，より的確に対応するとともに，国際仲裁の更なる活性化に向けた基盤整備を推進する等のため，「外国弁護士による法律事務の取扱いに関する特別措置法正する法律案」を第200回国会に提出いたしました。十分に御審議の上，速やかに御可決くださいますようお願いをいたします。

（犯罪防止や法制度整備等に関する国際協力）

　これまで長年にわたり，開発途上国等では，基本法令の起草，司法制度の整備や運用，国際研修の実施，司法関係者の人材育成 などの法制度整備支援を行ってまいりました。これらのは，国連で採択されたSDGsの実現にも資する取組であり，積極的に推進してまいります。

（法令外国語訳整備事業の推進）

　経済社会の国際化が急激に加速する中，重要な日本法令を翻訳して発信することは，国際化に対応した国家の基盤整備として，大変重要な取組です。昨年12月に立ち上げた「日本法令の推進に向けた官民戦略会議」での議論を踏まえ，関係省庁と連携して，日本法令の国際発信に向けて，より一層取り組んでまいります。

7 職員が生き生きと仕事のできる環境の整備

（働き方改革の推進及び障害者雇用の促進）

　法務省における「アット・ホウムプラン」に基づき，女性の職業生活における活躍や，100%育休取得をスローガンとする男性職員の育児休業の取得の推進を始めとして，様々な事情を抱え生き生きと活躍できる職場環境の整備とワークライフバランスの推進に努めます。

　障害者雇用については，一昨年定められた政府の基本方針に基づき，着実に取組を進めてまいります。

（施設の耐震化及び老朽化対策の推進）

　昨今の自然災害の発生に鑑み，刑務所等の矯正施設及びその職員宿舎を始めとする法務省施設の耐震化及び老朽化対策を着実に進めるとともに，災害時に避難所としての役割を期待施設について，近隣住民の受入れに必要な機能の確保に向けた整備を併せて推進してまいります。

　結び

　今後とも，様々な課題に対し，義家弘介副大臣，宮崎政久大臣政務官，そして，法務行政を担う全ての職員と一丸となって，全力で取り組んでまいりますので，松島みどり委員長を始め，理皆様方には，より一層の御理解と御協力を賜りますよう，よろしくお願い申し上げます。

| 会見・報道・お知らせ | 法務省の概要 | 試験・資格・採用 | 政策・審議会等 | 申請・手続 | 白書・統計・ |
| --- | --- | --- | --- | --- | --- |
| 大臣会見等 | 大臣・副大臣・政務官 | 司法試験 | 省議・審議会等 | 情報公開・公文書管理 | 白書・統計 |
| プレスリリース | 法務省幹部一覧 | 資格試験 | 司法制度改革の推進 | 個人情報保護 | 予算・決算 |
| 法務省ソーシャルメディア公式アカウント | 組織案内 | 採用試験 | 国民の基本的な権利の実現 | 行政手続の案内 | パンフレット・リーフレット・ポスター |
| 政府調達情報 | 所管法令 | その他の採用情報 | 刑事政策 | 法令適用事前確認手続 | 法務省だよりあかれんが |
| 主な法務省主催イベント | 国会提出法案など | | 出入国在留管理 | オンライン申請 | 法務図書館蔵書検索 |
| その他のお知らせ | 法務省の沿革 | | 国を当事者とする訴訟などの統一的・一元的処理 | | 法令外国語訳データベース |
| | | | 第14回国際連合犯罪防止刑事司法会議（京都コングレス） | | キッズルーム |
| | | | 政策評価等 | | 法務資料 |
| | | | パブリックコメント | | フォトギャラリー |
| | | | その他の政策・施策 | | |

# Exhibit 15

| Translate | From: | Detect language ⌄ | | View: | Translation | Original |

To: English ⌄

上毛新聞    North 🌂    South 🌂    Enter search word    Se⟩

| news | Sports | Special | Life culture | The e⟩ |

Feature/Series

Top > news > National news > society > First meeting to prevent escape during legal bail and bail Application of escape crime an

## First meeting to prevent escape during legal bail and bail Application of escape crime and consideration of GPS attachment

Jomo

[2020/06/15 17:34]

シェア 0    Tweet    0

The Ministry of Justice held the first meeting of the Legal Council (Judge of the Minister of Justice) sub-committee, which considers measures to prevent escape of bailed defendants. The agendas include the application of criminal escape crimes to those on bail and the wearing of satellite positioning system (GPS) on the body.

F⟩

While the percentage of bail approved by the courts is increasing year by year, defendants' fleeing cases occurred in Kanagawa and Osaka prefectures last year. At the end of the year, former Nissan Motor Chairman Carlos Ghosn fled to Lebanon, and there were growing calls for legislation.

視点

At the first meeting, it was said that in addition to penalties and GPS mounting, it is necessary to consider measures to prevent flight abroad.

H⟩

シェア 0    Tweet    0

## Related article

First policy decision to strengthen measures against sexual crimes, government considers GPS for suspension of execution
[2020/06/11]

Considering GPS installation as a measure against sex crimes Government policy, damage prevention from childhood

# 上毛新聞

| 北部 | 南部 | | 検索ワードを入力 | 検索 | 上毛新聞社について |

| ニュース | スポーツ | 特集・連載 | ライフ・カルチャー | イベント | 写真・動画 |

トップ ＞ ニュース ＞ 全国ニュース ＞ 社会 ＞ 法制審、保釈中逃走防止へ初会合　逃走罪の適用やＧＰＳ装着検討

## 法制審、保釈中逃走防止へ初会合　逃走罪の適用やＧＰＳ装着検討

[2020/06/15 17:34]

シェア 0　　ツイート　　0

　保釈された被告らの逃走防止策を検討する法制審議会（法相の諮問機関）部会の初会合が15日、法務省で開かれた。刑務所から逃げた場合などに限られる刑法の逃走罪を保釈中の被告にも適用することや、衛星利用測位システム（ＧＰＳ）の身体装着の是非などが議題に上がった。

　裁判所が保釈を許可する割合が年々上昇する一方、昨年、神奈川県や大阪府などで被告らの逃走事件が発生。年末には前日産自動車会長カルロス・ゴーン被告がレバノンに逃亡し、法改正を求める声が強まっていた。

　初会合では罰則やＧＰＳ装着のほか、海外への逃亡防止策についても検討が必要との意見が出た。

シェア 0　　ツイート　　0

## 関連記事

性犯罪対策強化へ、初の方針決定　政府、執行猶予にもＧＰＳ検討
[2020/06/11]

性犯罪対策でＧＰＳ装着を検討　政府方針、幼少期から被害予防も
[2020/06/10]

路線バス内の車いす固定策検討　国交相、転倒防止策で
[2020/06/24]

弘中弁護士が読売新聞を提訴　ゴーン前会長逃亡巡る記事
[2020/06/30]

「保釈、柔軟に許可を」　裁判延期、日弁連会長声明
[2020/04/16]

| 前の記事へ | 次の記事へ |
| 給付金、性風俗を除外は「差別」... | コロナ支援「留学生差別に反対」... |

## 全国ニュース ＞ 社会の記事

乗客にバス運転させる　仙台市営運転手、空き地で
[2020/06/30 22:15]

中１死亡、周囲のからかい判明　全校アンケートで、北海道登別

---

上毛新聞購読お申込み

マーケット速報

### 注目の特集

 高校野球

 視点オピニオン

### 話題の記事

《新型コロナ》男子高校生が感染　高崎在住　所属学級は当面閉鎖

感染は前橋育英高の生徒　新型コロナ 同級生ら42人PCR検査へ

「平地の3県境」荒らされる　ベンチなど壊されスタンプ盗難被害

《いにしえを巡る　太田の古墳》天神山古墳（群馬県太田市内ケ島町）　吉永小百合さんCMにも

《ぐんま 看板娘がおもてなし in 伊勢崎》女優・歌手 田村芽実さん　レトロな銘仙 息づく

関与の女性を書類送検　安中の重文・碓氷第17隧道落書き事件

噴煙の浅間山　さながら原始の姿

Bリーグ2部のサンダーズ　新社長に阿久沢毅氏　異分野での挑戦

---

# Exhibit 16

# Bring Greg Kelly Home From Japan



My father, Greg Kelly, has been trapped in Japan for the past 15 months, a victim of Japan's draconian justice system.  There is a significant amount of evidence proving my father's innocence, and furthermore, this issue should have been treated as a civil matter rather than a criminal case.  **With no end in sight and a prosecutorial system that assumes guilt, we implore the US government to push for a resolution that allows my father to return home immediately.**

My father spent 30+ years at Nissan working his way up from a corporate attorney to eventually becoming the first American member of Nissan's Board in 2012.  Along the way, he worked unbelievably long hours for the benefit of Nissan, often sacrificing time with friends and family.

Nissan rewarded my father's dedication by luring him to Japan in November 2018 under false pretenses for a business meeting, where he was arrested immediately upon arrival.  The charges were part of a conspiracy between Nissan and Japanese prosecutors.  Even worse, the senior executive who summoned my father to be arrested knew that my father was scheduled for critically urgent neck fusion surgery just two weeks later.

My father spent the next 35 days in solitary confinement, sleeping on the floor with no heat in the dead of winter.  The conditions of his incarceration and the delay in his surgery caused his neck condition to worsen.  He still suffers from shooting pains and numbness in his extremities as a result.  My father was also interrogated several hours per day without legal representation present and was prevented from contacting his family.

Ultimately my father was indicted on false allegations that he underreported the earnings of former Nissan chairman, Carlos Ghosn.  My father's arrest and detainment were based on financial reporting that had no financial impact on Nissan.  In reality, his charges were part of a power grab by Nissan executives to prevent Mr. Ghosn from merging Renault and Nissan.

The allegations against my father of underreporting Mr. Ghosn's compensation are not true and are related entirely to lawful actions that my father and others considered taking to retain the valuable services of Mr. Ghosn who was viewed as a retention risk by senior Japanese executives and directors at Nissan.  No agreement was ever executed with Mr. Ghosn and nothing was paid to him.  Japanese executives involved in the efforts to retain Mr. Ghosn were never arrested.

This matter should have been resolved within Nissan and should not have ended up in the criminal system. Nobody from Nissan ever asked my father for an explanation about the actions that were being considered to retain Mr. Ghosn.  Many Japanese scholars and lawyers agree that this is not a criminal matter.  According to published accounts, Japanese Prime Minister Shinzo Abe at a private dinner earlier this year admitted that this matter should have been dealt with internally at Nissan. The Prime Minister is correct.

I do not believe that my father can get a fair trial in Japan in large part because the chief witness in his case, Mr. Ghosn, has fled Japan and won't be available to testify. Mr. Ghosn escaped Japan's so-called "hostage justice" system and is living in Lebanon.  More than 1,000 Japanese academics and lawyers signed a letter drafted by Human Rights Watch criticizing Japan's system with a conviction rate of 99.4 percent.  We do not want my father to miss out on years of time with his friends and family, especially his two grandsons, because nobody is willing to hold Japan accountable for its archaic justice system.

**We request the U.S. government to work with Prime Minister Abe's administration to obtain Greg Kelly's release and allow him to return to his family in the U.S.**

Please help bring my father home!

Kevin Kelly

4822-0175-4057, v. 1

# Exhibit 17



Jiji dot com news  >  society  >  Foreigners admitted to corona infection in Tokyo detention center–Ministry of Justice

## Foreigners admitted to corona infection in Tokyo detention center–Ministry of Justice

08:07 2020 18:58

The Ministry of Justice announced on the 7th that a man in his 50s who was detained at the Tokyo Detention Center (Katsushika, Tokyo) was infected with the new coronavirus. This is the second infection in a prison inmate since it was confirmed there in April. The suspect or defendant was not disclosed.

According to the ministry, the man had a fever at the time of admission earlier this month, so he had a PCR test on the 6th and was found to be positive the next day. Employees wear protective clothing and gloves, and it seems that there are no heavy contacts.

A foreign man in his 50s who was in the Tokyo Immigration Bureau (Minato-ku, Tokyo) was found infected on the 7th. This is the first time that an infection has been confirmed by a resident of an immigration detention facility.

[To list of social articles] [To current affairs dot com top]

New Corona Update     Typhoon, heavy rain, earthquake information     IR corruption



COMMENT/VIEW

# Exhibit 18



Google Translate

Translate From: Detect language  To: English    View: Translation  Original  ≫

List of articles    Serialization/Special feature    Ranking

Top    Politics    Photo/Video    September 6, 2020 (Sun)

international    society    Economy    Sports    Entertainment    area    life

medical    Jiji dot com news > society > Osaka Detention Center prison officer has new corona infection total 9 people

small Durin Big

## Osaka Detention Center prison officer has new corona infection total 9 people

08:05 2020 15:50

The Ministry of Justice announced on the 5th that a male prison officer in his twenties working at the Osaka Detention Center (Osaka City) was infected with the new coronavirus. In April, eight prison officers were confirmed to have been infected in April, and this is the ninth. All the eight previously infected had recovered and had already returned to work.

Asahikawa infected prison officer in Fukuoka

According to the ministry, the prisoner had a fever before work on July 30th and was tested positive on August 4th with a PCR test. At this time, no other suspects of infection have been identified in other detainees or personnel.

[To list of social articles] [To current affairs dot com top]

New Corona Update    Typhoon, heavy rain, earthquake information    IR corruption



COMMENT/VIEW

<u>Exhibit 19</u>

 **Harvard Vanguard
Medical Associates**
**Atrius Health**

**Concord**
330 BAKER AVENUE
CONCORD MA 01742-2188
978-287-9350

www.harvardvanguard.org

July 15, 2020

Michael L Taylor
12 Babbitt Ln
Harvard MA 01451

To whom it may concern;

*My patient, Michael Taylor*, DOB 10/21/1960, had a partial lobectomy. Due to this
condition, he is susceptible to COVID 19.

Please contact my office with any questions.

Sincerely,

Sandeep Jain, MD
Internal Medicine

<u>Exhibit 20</u>

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

IN THE MATTER OF THE         )
EXTRADITION OF MICHAEL L.    )    Case No. 20-mj-1069-DLC
TAYLOR                     )

## DECLARATION OF DR. M. ANTHONY CASOLARO

Pursuant to 28 U.S.C. § 1746, I, M. Anthony Casolaro, M.D., hereby declare as follows:

1.      My name is M. Anthony Casolaro.  I am board-certified in Internal Medicine and Pulmonary Disease.  I am the immediate past president of the Medical Staff at Virginia Hospital Center.  I currently am the head team physician/medicine for the Washington, D.C. National Football League (NFL) franchise. I am also the President of the National Football League Physician Society.  In all of the above capacities I have been actively involved in defining risk in populations with regards to COVID-19.  I am also a Fellow of the American College of Physicians and a Clinical Associate Professor of Medicine at Georgetown University School of Medicine.

2.      I received my undergraduate degree from the University of Virginia and my medical degree from Georgetown University.  I completed my training in Internal Medicine at Grady Memorial Hospital and Emory University.  I received my Pulmonary Disease training as a recipient of a National Research Service Award at the National Institutes of Health (NIH). Following fellowship I became the Clinical Chief of the Pulmonary Branch at NIH where I was fortunate to spend clinical time with Dr. Anthony Fauci.  I have also served as Consultant to the White House Medical Unit since 1995.

3.      I understand that the Respondent Michael L. Taylor underwent a partial lobectomy as a result of a fungal infection caused by Coccidiomycosis, also known as "Valley Fever."  A partial lobectomy is a surgical procedure by which a lobe, or a portion thereof, is

removed from a lung.  This, as a result, reduces an individual's lung capacity.

4.     An individual such as Michael Taylor with a history of Coccidiomycosis, and a partial lobectomy is at a particularly heightened risk for serious complications if he were to contract COVID-19.  If someone with Mr. Taylor's history contracted COVID-19, he would be seriously compromised.  He would require immediate hospitalization and be at imminent risk of serious complications and possibly death.

5.     Michael Taylor is, therefore, at a greatly heightened risk of serious adverse complications and death in a setting, such as a jail, where social distancing and other measures are impractical.

6.     I have not been formally retained as an expert in this case.  I am not being compensated in any way for my time. I am offering this opinion at the request of counsel purely to assist the Court in making its judgment in this case. I am available to respond to any questions should the Court believe it necessary.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 16, 2020

_____
M. Anthony Casolaro, M.D.

# Exhibit 21

# Cyrus Strategies, LLC

5317 Wriley Road   Bethesda, MD 20816   301-785-9900

October 31, 2014

The Honorable Tena Campbell
United States District Judge
District of Utah

RE:  <u>Michael L. Taylor</u>

Dear Judge Campbell:

I am the Principal in a consulting firm and the former Senior Vice President of a large security company with over 2,500 employees worldwide.  I know Michael Taylor because I hired his firm to represent our interests in several projects in the Middle East.  Mr. Taylor acted as our Program Manager for four years.  In addition, I have continued my interaction with Mr. Taylor ever since, working with him on several other projects oversees.

I know Mr. Taylor to be a true patriot of the United States.  I know his military background and heroism not from stories he has told, but from the dozens of people he has worked with over the years who have told me these anecdotes.  He is a leader of people and an inspiration to others.  I know these things personally as he was directly responsible for my safety during several business trips to the Middle East.  In one particular instance, we were engaged by armed criminals who sought to take us hostage.  In that instance, Mr. Taylor was smart, decisive and thoughtful in his direction of the team that caused a very dangerous situation to end safely without any loss of life.  In business dealings with me he has always been forthright, respectful and fair.  He sought adjustments in our arrangement only based on seriously changed and unforeseen circumstances, yet solely for the welfare of his employees rather than his business. In yet another situation, Mr. Taylor tireless advocated for the fair treatment of one of **<u>my</u>** host country nationals employees who had been injured in our service, eventually bringing that individual to the United States for treatment.

I also know Mr. Taylor to be a straight forward partner in achieving specific military and support objectives.  In one instance, where the United States Government was investigating the mass killing of Iraqi citizens by Saddam Hussein, we were asked to provide a briefing on how to maintain the safety and security of the forensic scientists, US Deputy Marshals and US DoJ investigators.  Mr. Taylor spoke honestly of the dangers and the limitations of what we could achieve.  Other firms were also considered but had reputations for over promising and under achieving - we were awarded the assignment.  Later, when discussing another mission, the DoJ senior staff told me they gave us the assignment because of Mr. Taylor's candid nature and

honest reputation – which according to them he had lived up to and exceeded at every opportunity.  This critical work was successfully completed at a dozen different locations around the country, without injury or incident and with respect to the local tribal elders, because of Mr. Taylor's leadership and personal involvement.

Additionally, my family and I have also known him as a friend over the last 10 years, and have met and interacted with his family on many occasions.  Mike is a family man and his incarceration was devastating to them, and to all of us.  He is a dedicated father, not only as a parental authority but also as a mentor to the boys and a comforter to his wife.  They have endured many short separations as he traveled for business, but never one as completely isolating and long as his extended period of incarceration.  He has fought valiantly for his country, he has taken care of his employees - both US And foreign nationals - and he has always been a guide to his family and friends.

I respectfully urge Your Honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor.  Specifically, I understand that he has already served more than fourteen months in confinement at a county jail and I ask that the Court not require him to serve more time in incarceration.

Thank you for your consideration.


Sincerely,


Robert L. Rubin
Principal

# Exhibit 22

September 2, 2020

Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, D.C.  20520

Thomas J. Daly
Retired FBI Special Agent
Tel. (978) 852-4722
tdaly7@verizon.net

          **Re:    Michael Taylor**

Dear Secretary Pompeo:

         I served as a Special Agent with the Federal Bureau of Investigation ("FBI") for 29 years in the Springfield, IL, Boston, MA, and Lawrence and Lowell, MA resident agencies.  I am now retired from government service.  I am writing this letter in support of Michael Taylor of Harvard, Massachusetts who I have known and worked with for over 30 years.  Michael is a great American who has served this country with distinction as a member of the elite U.S. Army Special Forces, as an important ally of the U.S. law enforcement community, and in his private security work on behalf of victims through his company, American International Security Corporation.

         I have been following the travesty which has been unfolding in the U.S. District Court in Boston as our own Department of Justice has been supporting the effort by an embarrassed Japanese justice system to extradite Michael and his son Peter back to that country to face criminal prosecution.  I respectfully urge you not to authorize the extradition of these two upstanding U.S. citizens who have served this country and their fellow citizens.  Frankly, it is shameful that they have been held in detention, in the midst of a pandemic, since their arrest back in May.  There are many reasons why this request for extradition should be rejected, as I am sure Michael's counsel will describe for you and your staff.  Please allow me to share one such reason of which I am personally familiar.

         I served as the lead agent for the FBI in a multi-year operation carried out under the auspices of the New England Organized Crime Drug Enforcement Task Force.  This was a multi-agency investigative and prosecutive effort which began in 1988 and ended in 1993, in which the FBI worked together with the U.S. Customs Service, the Bureau of Alcohol Tobacco & Firearms, the Internal Revenue Service, and the U.S. Department of Justice.  Through the intensive and skillful undercover efforts of Michael Taylor, federal law enforcement was able to infiltrate a Lebanese criminal organization operating in the Merrimack Valley of Massachusetts headed by a man named Peter Kattar.  Given Michael's knowledge of Lebanon and the Middle East, his command of the Arabic language, and his familiarity with Lebanese customs, he was able to become acquainted with and gain the trust of an otherwise careful and secretive Mr. Kattar.  Michael successfully passed himself off as a mercenary with extensive international contacts.  Over many months, Michael acquired evidence through his interactions with Mr.

Honorable Mike Pompeo
Secretary of State
September 2, 2020

Kattar that was sufficient to enable the investigative team to obtain Title III electronic surveillance on various locations, vehicles, telephones and paging devices.  For several months thereafter, federal agents monitored and recorded numerous meetings and calls between Mr. Kattar and Mr. Taylor, and Mr. Kattar and his criminal associates.

During this investigation, law enforcement came to learn of the Kattar organization's involvement in firearms sales, importation and distribution of narcotics, loan sharking, money laundering and other offenses.  Most notably, the organization planned the importation of over three (3) tons of hashish from the Bekaa Valley of Lebanon, to be sold and transported to a criminal syndicate in Montreal.  As part of the elaborate plan, the conspirators bribed Lebanese and Syrian government officials and arranged to conceal the narcotics within over 600 barrels of olives inside a shipping container that was transported from the Middle East to the United States aboard a Russian freighter, the G. Gorbatov.

On August 9, 1991, law enforcement seized the shipping container when it arrived in Boston Harbor and transported it to Fort Devens for inspection.  Inside the container, agents found 3.2 tons of high-quality hashish with a street value of over $90 million dollars.  Indictments were returned against Peter Kattar and 11 of his co-conspirators and criminal associates within the United States, Canada and Lebanon.  Each defendant before the court was convicted, with Peter Kattar receiving a sentence of 10 years' imprisonment and a $500,000 order of forfeiture.  Prison sentences were also imposed on several of his co-defendants.

This was a major success for the law enforcement community, that halted a major shipment of narcotics into North America and permanently unraveled the operations of a criminal organization that had been committing serious crimes in New England over many years.  None of this would have been possible without the determined and courageous efforts of Michael Taylor.  He spent hundreds of hours over several years acting in an undercover capacity, at substantial risk to himself.  He should be recognized and credited for these efforts.

Years after the above-described case was concluded, I became acquainted with Michael's family, including his son Peter.  I found Peter to be an impressive young man, who was an excellent student and an outstanding high school athlete.  It is my understanding that Peter, who has no criminal history of any kind, went on to obtain a college degree and start a business.

In my view, it would be a serious injustice for this country to authorize the extradition of Michael Taylor and Peter Taylor.  I respectfully request that you decline this request by Japan and order the immediate release of these two fine Americans.

Sincerely,

*Thomas J. Daly*

Thomas J. Daly

# Exhibit 23

Honorable Mike Pompeo
Secretary of State
U.S. Department of State
2201 C Street N.W.
Washington, D.C.  20520

Anaiss Sebastian
22021 Apache Dr.
Lake Forest Ca. 92630
949-285-7494
SebastianAnaiss@gmail.com

September 1, 2020

Dear Mr. Secretary,

You are holding in your hands the life of a very good man and his son.  In my opinion,
Michael Taylor is one of the most extraordinary men in our world.  To understand it is to
understand the amount of love that you have for your most loved one, whom you have
lost.  Now you are a shell of a person, your senses do not work, you cannot hear or
smell, you cannot walk or talk, you cannot sit or stand, you cannot eat or sleep.  You are
done, no one can help you, no one in this giant world of billions of people.  You cannot
even die. If you die, who will rescue your loved one?

My 6-year-son was snatched out of Boston, taken to Beirut, a war zone, a chaos of a
city, with soldiers and terrorist blocking every intersection and every road.  Gun carrying
militia from different Middle Eastern countries asking for your documents as you are
going to buy groceries.

In September of 1993, the FBI watched helplessly as my young American son was
dragged from Germany to Cyprus, from Cyprus to Lebanon. They could not stop it.
Their hands were tied, I repeat - - the FBI's hands were tied - - and they were
devastated.  Dozens of government officials in several countries knew my son had been
kidnapped and was being held hostage in the hands of his crazy father.  None of them
could help me.

Then there was Michael Taylor, this remarkable man.  He does not need to help, as he is
not going to make any money off this and he does not know me or anyone that knows
me.  He is not going to advertise his efforts or get anything out of this situation at all.  All
he needs to know is that the FBI has asked him for help, and that I was granted full legal
custody of my son by a U.S. court.  Michael fully understood that my son was in an
extremely unjust, unfair and unsafe situation, being used by a mad man with other
agendas, and that law enforcement officials in our country could not help him.

Michael Taylor followed the law to the letter; he checked and rechecked all our
documents.  He worked closely with your State Department and the FBI and made sure
that he would not be breaking any laws in Lebanon if he rescued by son, because that
alone could jeopardize his safe return to our home in the United States.  Michael Taylor
then went ahead and successfully located and saved my son and returned him to me.

My son has become an outstanding human being, loved by all.  Every word out of his mouth is kind and true.  He owns multiple businesses, contributes to the society, instead of getting stuck in Beirut and forced to become part of a gun yielding militia.

The only reason I can write this letter is because my son does not have to hide anymore.  We had changed our name and been in hiding for decades.  I am sure there are number of children that have been rescued by Michael Taylor that are still in hiding and he will never ever expose their identity, betray them, or break their trust the same way he never betrayed my son, for 27 years.  Michael Taylor has been there for us for almost three decades.  Many life-altering situations have come up concerning the man who took my son, and Michael Taylor has protected my son through every single one of them.  He has pledged to continue to do so for the rest of his life.

Now Michael Taylor, an American patriot, a distinguished U.S. Army veteran, a defender of children's rights and human rights, is being betrayed by his own country, not for breaking any U.S. laws but rather because he may have helped someone who was being unfairly persecuted to break a yet-to-be written Japanese law.

Mr. Secretary, as you likely know, the Japanese justice system is notorious for its 99.7% conviction rate, its denial of legal rights, and its cruel and unusual treatment of those accused of criminal offenses.  They do not want the Taylors, they want Carlos Ghosn, and we all know it.  The charges against Mr. Ghosn were blatantly political.  They could not convict Mr. Ghosn so they kept adding new and different charges to just hold him, and also since they could not publicly acknowledge that they made a mistake by charging him.

The departure of Mr. Ghosn from Japan was a humiliating episode for the Japanese government.  What do you honestly think will happen to the Taylors back in that country, short of being dragged down the street to their death?  By extraditing Mr. Taylor and his son to Japan you would be surrendering them to an unjust, unfair and undeserved fate.  You will also be jeopardizing our own country and the rights of its citizens in the process.

Dear sir, Michael Taylor is an extraordinary man and an American treasure.  Please see the truth about this extradition; they want Carlos Ghosn, and since they cannot have him, they will take the Taylors instead, in an obvious effort to save face.  Mr. Ghosn's country saw the truth about Japan and is protecting him.  I truly hope that you also see that same truth about Japan and its legal system and protect this American patriot and his son.


Thank you,

Anaiss Sebastian

# Exhibit 24

Kathleen Wallace
13 Howard Street
Ayer, Ma 01432

November 9, 2014

The Honorable Tena Campbell
United States District Judge
District of Utah

RE: Michael L. Taylor

Dear Judge Campbell,

I am a public school teacher. I am proud to have 30 years of dedicated service to my profession. I have always been interested in the well being of the children that have been entrusted to me. It is an honor and privilege to work with and guide young people. Michael Taylor shares these beliefs.

Michael Taylor has been a trusted friend for over 30 years. He is always willing and able to help his community. He has spent numerous years coaching football on many levels. Whether it was the youth level or high school level, Michael always approached it with his trademark determination and positive attitude. He has taught many young men the fundamental skills of football; but, more importantly he has taught them respect, dedication and teamwork. These are lessons that will serve them well in life. I know this firsthand because my son was lucky enough to have Mike as his coach for several years.

Michael Taylor has supported and helped many individuals, organizations and schools over the years. He has done this quietly without fanfare or recognition. He helps because he cares. Many people have benefitted from his knowledge, kindness and generosity. Personally, he has always been there for my family in both good and bad times. It's easy to be there to share the high points, the celebrations; but, a true friend is someone you can count on when times get tough. Michael Taylor is that person.

I respectfully urge Your Honor to take into account the facts described above and hope Your Honor will exercise leniency with respect to Michael Taylor. Specifically, I understand that he has already served more than fourteen months in confinement at a county jail and I ask that the Court not require him to serve more time in incarceration.

Thank you for your consideration.

Sincerely,

*Kathleen Wallace*

Kathleen Wallace

# Exhibit 25

Henry C. Horne
6831 Dartmouth Street
Forest Hills, NY 11375
Henryhorne53@hotmail.com
612.770.7281

October 29, 2014

The Honorable Tena Campbell
United States District Judge
District of Utah
351 So. West Temple, Room 1.100
Salt Lake City, UT 84101

Re:  Michael L. Taylor

Dear Judge Campbell:

I am Henry C. Horne. I currently serve as the Director of Admission and Enrollment
Management at The Kew-Forest School an independent coed day school in Forest Hills,
NY serving students ages 3 to Grade 12. I have been in independent school education for
35 years as an assistant headmaster, principal of two high schools, and director of
admission at two other schools. I had the pleasure of helping Michael Taylor's three boys
grow and learn when I served as the assistant headmaster at Lawrence Academy from
2005-2010. I came to know Michael and his wife, Lamia, through their active
involvement in the lives of the boys and their generosity to the school. I came to know
Michael even better when he assumed the head coaching position for the football
program at the school.

Mike's commitment to excellence was only matched by his commitment to the students
and the school. I am going to speak to his involvement with the boys in the football
program and the immediate and indelible impression he had on them directly and the
school community indirectly.

Prior to his arrival as coach, the program was not functioning well and was not successful
using any metrics. Had the program been evaluated as an academic course, it would have
received a D+ at best and the "teacher" would have been placed on probation, if not fired.
Mike resurrected this program in three years to league championship and New England
championship status, and he did it by involving and including a broad cross section of
students at the school. He exuded a sense of confidence, calm individual pride, team
pride and institutional pride that resonated with the young men in grades 9-12 at the
school. All caliber of boy signed up to play football, and Mike and his staff undertook the
task of teaching them the physical and mental aspects necessary to play the sport and to
compete. To fulfill the conditioning and training regimen required to be on the team was
challenging on many levels for the boys, but they bonded with his message of teamwork
and camaraderie which sustained their effort and commitment. From a program that

struggled to field enough players for one team, within three years there was a full varsity and junior varsity team competing at a high level – and this was done with the same caliber of athlete as was available earlier.

Regardless of which level a boy played, which position, how well, or how much, everyone was accorded the respect of full membership on the team. And I should say that in this age of relentless hazing, there was never any hint of this on the team; and since many of these boys played basketball, hockey, baseball, and lacrosse in the other seasons, this ethos permeated throughout the athletic program.

In addition to the message of team camaraderie, Mike and his staff instilled in the boys an ethos of excellence in all aspects of their lives – academics, social, and emotional. The boys held one another to high standards of community behavior and academic excellence; if you were to be a student-athlete on the team, the expectations were clear and high.

And, finally, Mike made it a point to be available each and every boy that wanted/needed his assistance or advice, day or night. As a boarding school with many boys having their parents at a distance, it was a gift to the school that the 'football coach' was available to students in such a positive manner. Because he is a father himself, he understood some of the issues and difficulties these young people were confronting. While not telling them what to do, as a good counselor he provided them the necessary ear and perspective so they could grow and mature with good decisions. Forever patient and nonjudgmental, it was and still is impressive to see how many of the boys reflect back on their football experience as a seminal moment in their Lawrence Academy life.

I do not know, nor do I need to know, the circumstances that warrant this letter on Mike's behalf. I would be able to write the above without reservation regardless. Even years later and long after their football days are over, he continues to maintain strong relationships with many of the boys who are now young men. At a time when the academy was struggling to find an identity, Mike's involvement with the football program provided a tremendous sense of institutional pride for students, parents, and alums. The boys and the team comported themselves well and were a direct reflection on the coach and his staff. The lessons that the boys took away from the involvement with the program were in sync with those of the academy – excellence and commitment. We all benefited from the program and the process, and are indebted to Mike for all he brought to the academy and the boys.

I respectfully urge your honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor. Specifically, I understand that he has already served more than fourteen months in confinement in a county jail and I ask that the Court not require him to serve more time in incarceration.

Thank you for your consideration.

Henry C Horne

# Exhibit 26

Francesca Ricci
42 Charles Street #2
Hyde Park, MA 02136


October 31, 2014


The Honorable Tena Campbell
United States District Judge
District of Utah
351 So. West Temple, Room 1.100
Salt Lake City, UT 84101
Re:  Michael L. Taylor

Dear Judge Campbell:

I am a single mother living and working in Boston, Massachusetts, as a non-profit program manager serving elders and adults with disabilities. I am also a concerned citizen writing to you about Mr. Michael Taylor, a man who has had a positive impact on the life of my family, to advocate for him and his case in your court.

I first had the opportunity to meet Mike while he was a football coach at Lawrence Academy. My son applied and was accepted to the school, but due to some confusion on the application our financial aid was not approved. Mike was instrumental in helping sort out the issues so my son could attend. He did this because he could see we were a family in need of support and he could also see the potential in my son, both academically and athletically. Mike continued to coach my son, not just on the field but also about life - being a man, handling responsibilities and being an upstanding citizen. Mike provided this coaching not only with words, but by walking his talk and demonstrating positive living through the concept of community based philanthropy. And my son was not the only one who benefited from Mike's tutelage; out of the 15 football players in my son's graduating class of 60 students, 9 of those boys went on to a NCAA Division I or an Ivy League school to play a sport with either a full or partial scholarship. For several of the families, including mine, our children's futures would not have been as secure and as bright without Mike's caring, concern, and support.

In addition to developing awareness of community and philanthropy, Mike also served his country well as a member of the military, invoking national pride in his players. He is a family man, a respected community member, and a role model to many. I respectfully urge Your Honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor.  Specifically, I understand that he has already served more than fourteen months in confinement at a county jail and I ask that the Court not require him to serve more time in incarceration. Thank you for your consideration.

Sincerely,

Francesca Ricci

# Exhibit 27

Elizabeth Ann T. Sweeney
15 Babbitt Lane
Harvard, MA  01451


November 11, 1014


The Honorable Tena Campbell
United States District Judge
District of Utah

RE:  <u>Michael L. Taylor</u>


Dear Judge Campbell:


I am honored and proud to be given the opportunity to share my thoughts about my neighbor and friend, Michael Taylor.

I work, volunteer and reside in Harvard, Massachusetts.  I am the Assistant Director of Human Resources for the Harvard Ambulance Service, coordinating 70 members that comprise our volunteer service.  I have held many other positions in Harvard including, assistant manager of the local general store, PTO president, long-term substitute teacher, appointed member to the Council on Aging, and soccer coach.   I have known Michael and his wife Lamia for 24 years and I could not ask for dearer friends or better neighbors.  Michael and Lamia have three very fine sons, who have shared their entire childhood with my own three boys.

More than anyone I have ever met; Michael continues to be a strong male role model for so many boys and young men, including my three sons.  He gives his time, he shares his wisdom, and he tirelessly encourages and motivates.   He teaches respect, honor and the value of teamwork.  But even more he has been a role model by his actions, giving so much of himself in small and large ways, impacting so many individuals and families in our community.

My sons credit him with teaching them not to fear any difficult task, to believe in themselves, and to work hard as a team to achieve goals.  Whether repelling down a cliff together, challenging them at paintball, or coaching them in football, Michael has been their mentor. One of my sons even wrote about life lessons learned from Michael for his college essay, that "anything is possible if you work hard for your goals and believe in yourself".   Michael has also taught my boys to take care of others in need without being asked – quietly, because it is the right thing to do.   Michael is always the first to help a neighbor whether plowing a driveway of snow without asking or showing up with tools to jump in and help with a large task.  Several years ago following a devastating ice storm,  Michael was the first out in his four wheel drive

car, taking his sons and my boys along and together cutting up seven huge pine trees that had trapped our neighborhood while the town remained paralyzed.  When thanked for his efforts his reply is always a shrug of his shoulders and "of course, that's what neighbors do".

Michael is also a role model in what he gives back to his community, especially over the years in his work as a youth football coach and leader in youth football organizations in Ayer, and Shirley, Massachusetts.   More than a fine coach, Mike has been a builder of fine young men, teaching them self-respect, teamwork, and a hard-work ethic.  He demands excellence from his players in all aspects of their life, and he would get it through building self-esteem, teamwork and self-respect.  Many of these boys were from dysfunctional families or broken homes struggling to make ends meet. Michael took special interest in those that needed extra support in their grades or guidance from making poor choices in their lives, and would give those boys and their families his time as a mentor.  So many of these kids continue to stop by and visit with Michael and Lamia, sharing their successes and seeking continued guidance.

I am sure others can speak more directly to Michael's military service, but we know him to a honorable and true patriot, and have great respect for his service to our country.  The discipline that he demonstrates in his life and that he shares with young men clearly reflects the depth of his military training.  Michael shares his discipline of hard work and achieving goals as a strong male role model at a time when that is so lacking in our society.  My family is very proud and honored to have Michael as a neighbor and dear friend.

I respectfully urge Your Honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor.  Specifically, I understand that he has already served more than fourteen months in confinement at a county jail and I ask that the Court not require him to serve more time in incarceration.

Thank you for your consideration.

Sincerely,

Elizabeth Ann T. Sweeney

# Exhibit 28

11/14/14

The Honorable Tena Campbell
United States District Judge
District of Utah

RE: Michael L. Taylor

Dear Judge Campbell:

I am a retired Jr-Sr High School Math/Guidance educator who taught at Ayer Jr/Sr High School in Ayer, MA for 32 years. Michael was a student there during his high school years. He was an excellent citizen and actively participated in many school activities. Michael was especially active in athletics (track + football). He was captain of the football team his senior year. Michael was always a leader and was admired by the faculty and his peers.

As an adult, Michael could not have been more generous with his time as a Pop Warner Youth Football coach and as a High School Football coach. He guided and encouraged many young lads who otherwise would have gone astray.

Michael has served his country, school and the teams which he coached in exemplary fashion.

I respectfully urge Your Honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor. Specifically, I understand that he has already served more than fourteen months in confinement at a county jail and I ask that the Court not require him to serve more time in incarceration.

I thank you for you consideration.

Sincerely,
David M. Dolan
11 Fletcher St
Ayer, MA

<u>Exhibit 29</u>

Anthony Knight

2211 Remington Way

Bozeman, MT 58718

Judge Tena Campbell                                           March 3, 2015

United States District Court

Salt lake City, Utah

Dear Judge Campbell,

My name is Anthony Knight and I'm in my junior year at Montana State University. Growing up I always felt like just another kid, an average kid, a kid who never really had any big dreams, a kid who was content with being nothing special, a kid who cared solely about the near future and put no effort toward what he wanted to become one day. Coming from a lower middle class family and living in a somewhat segregated middle class town, I never had the experience of being inspired or possessing the aspirations of being something bigger than where I came from. Although I had a big heart, I led a life followed by trouble. Whether it was doing or selling drugs, stealing, robbing, or fighting, I never felt the need to change. Of course my parents didn't agree with the life I was living, but unfortunately they never helped me find a substantial reason that would make me want to change. I was in a mindset that jail wasn't a concern, and neither was pushing away the people that cared to me the most. I was on a one-way train heading to disaster.

Once high school came my parents broke their backs to get me to this private school. My older cousin had flourished there, and promising I'd do the same, provided me enough leeway to get my foot through the door. After arriving to my new school I was filled with mixed emotions. I became knowledgeable of my knack for sports and my brainpower in the classroom, but also felt like an outcast because of my background. I never seemed to find any real friends. Because of this, I always wanted to be back home and in my comfort zone. Here, I would link up with the same old friends, do the same old things and fall back into the same old life. My out-of-school antics were only hidden for so long until they finally became present during school. After being caught stealing I was expelled and sent back home.

Following my expulsion I was forced to attend my public school where matters worsened. I stopped going to most classes and racked up more detention hours than days attended. I was becoming more self-destructive by the day, until I randomly received a phone call. A good friend from back home told some football coach about me and this coach decided to get me on the phone. I'll never forget our first conversation. I was outside in the rain waiting for a bus when my whole mood shifted. My life up until that moment had been filled with nothing but proof that I was a problem child. Who would want to take another chance on me? By the graces of God, this man did. His name was Michael Taylor.

Though I had no idea who this man was, I could hear two things in his voice. First, that he meant everything he said, and second, that he was going to die trying to do it. Within a week I had a scheduled a visit to this new school and found out I would have the opportunity to attend with a scholarship. As soon as I started school I immediately

had friends who were just like me. Friends who wanted to make it out of where they were from and become something more than just average. Here is where I blossomed. The first thing I was taught was how to act professionally. Everywhere I went I wore my jeans low, rocked baggy shirts, and had poor body language. Coach Taylor was the first person to ever care about how I presented myself. Every single day he would comment on how I looked and the way I portrayed my appearance. Though we still didn't know each other too well, he one day provided me with all the hand me down dress clothes I could have asked for. Up until that point in time every piece of clothing I had, I had gotten on my own. No one ever took the time to try and teach me how I was supposed to act in public, how I was supposed to represent myself, or the fundamentals of talking and being approachable. Coach Taylor was the first person to actually take the time to constantly work with me to try and be better. He never gave up on me.

A year later I was getting looked at from several division one colleges. Schools that actually wanted me to attend their institution and pay for it. A year prior to this I was planning on dropping out of school. Literally because of one person my life completely turned around. Though many things about me had changed, I still wasn't perfect. After Coach caught wind I was still smoking and participating in certain things he shunned upon, he yet again took the time out of his busy schedule to get me help. Instead of jumping to conclusions, he understood that there were other reasons that were contributing to my behavior. From then on, every week he picked me up from school and brought me to see a counselor. At first I thought it was a waste of time but after thinking about and wanting to be more like Mr. Taylor, I was willing to do what ever he thought it took to better myself. Months on end he brought me to this counselor and never made an

excuse about bringing me, nor did I ever make an excuse about wanting to go. It ended up being very beneficial and gave me an outlet to be able to express myself and understand some of the reasons why I partook in certain things I shouldn't have. He never gave up on me.

Another football season went by and my grades had been up, I had several scholarships to colleges, and then yet again I messed up. I broke the rules by having a female in my room on the weekend without the faculty's permission. This was a big deal at prep school and again I was sent back to square one without a school to graduate from. Despite feeling like I had let him and myself down, Coach Taylor again put his reputation on the line and was going to do anything he could to get me to college. Because I had always attended private schools, I had never taken the state test. I needed that test in order to be able to move on to college if I finished out at a public school. Unfortunately it was too late in the year to take this test and my results would not be back until the following year and this could have resulted in the loss of my scholarships. Day in and night out Coach Taylor tried to find a school I could attend where I wouldn't have to take the state test and could graduate without it. Despite the fact that I would never play for him again, and no longer attended the school he worked at, for weeks he consulted and vouched for my true character and found a school that would take me. He never gave up on me.

Four years later and I am almost done getting my degree in community health sciences from an outstanding school and so close to becoming more successful than I could have ever imagined. I will have a college degree and be a productive citizen in my country because of Coach Taylor. Though I no longer need his help like I used to, he

never seizes to amaze me. Coach Taylor is always exceeding his expectations and implementing his positive characteristics on everyone. He'll never give up on us.

I could further talk about the endless nights Coach Taylor has let me stay at his house to keep me from harms way or the numerous inspirational talks he has given me to keep me going, but it really never ends. I could literally talk all day about the things Coach Taylor has done for me, but it is more than that. Being close to him for so long has led me to notice his vigorous work ethic, his positive moral, and his ambition to make the world a better place. Though he has helped me more than I could write on paper, I have also seen him do the same things, if not more for other people. He consistently shows his constructive presence as a citizen, as well as a devout, proud member of his country. I am respectfully pleading Your Honor to take into account the instances I have explained to you and express leniency with respects to the man I have grown to love. I beg you to please keep this man home with the giant family that has been built around him and that he serves no more time in incarceration.

Thank you for your time and consideration Your Honor.

Sincerely,

Anthony Knight

Anthony Knight

Exhibit 30

*Jeffrey Lark Jr.*

*University of Wyoming*

*1615 e Custer Laramie, Wyoming 82070*

*214-912-5439*

December 10, 2014

The Honorable Tena Campbell

United States District Judge

District of Utah

RE: Michael L. Taylor

Dear Judge Campbell:

I am Jeffrey Lark from Dallas, Texas. I am an African American student athlete in my Junior year at the University of Wyoming. I was raised mainly by my older sister Chrystal who has been my guardian. I know Michael Taylor because in high school I was searching for an opportunity to further my football dreams from high school, so in 2009 I emailed Coach Mike Taylor in Massachusetts asking him to possibly recruit me to his prep school in Massachusetts. I e-mailed Coach Taylor because he is known for being a players' coach who really cares about his student athletics. He is also known as a great coach of the game and for helping student athletics get in to colleges and get a free education by playing football. From the first time I contacted Coach Taylor he has been nothing less than a blessing to me getting me into prep school and helping me get recruited by some of the top college football programs in the nation. Although I wasn't able to get into the high school where he was coaching, he did get me into Cushing Academy in Massachusetts and paid for my full tuition. I needed another year of high school and Coach Taylor was able to get me admitted to Bridgeton Academy, a post graduate school in Maine, and again, out of the goodness of his heart, paid for my full tuition.

All the thing things Coach Taylor has done for me has not only helped me take my life into the right direction but it has also made me the person I am today. Coach Taylor is a loving and caring person that has done nothing but help the people around him. He has personally helped me and my friends get into the colleges that we dreamed of and helped provide opportunities to get a college education for life. I could not imagine what my life would be like if God did not bless me with Coach Mike Taylor.

I respectfully urge Your Honor to take into account the facts above and hope that Your Honor will exercise leniency with respect to Coach Taylor. He has helped so many people like me that did not have a chance at life and because of him so many people just like me now have a real opportunity to be something in life. I will have a college degree because of what Coach Taylor did to help me and I have learned so much from this man about being a good person. You simply don't find people like Coach Taylor who helped me, a complete stranger from Texas who happens to be African American from a broken family. He didn't buy me lunch, he spent tens of thousands of dollars and his time getting me on the right path to get into college. He even came to my high school graduation and I have stayed with him and his family on many occasions. He treats me like his own son as I have seen him do for everyone that comes into contact with him. I'm just one story and I know of many more.

Thank you for your consideration.

Sincerely,

Jeffrey Lark Jr.

# Exhibit 31

November 20, 2014


The Honorable Tena Campbell

United States District Judge

District of Utah


RE:  Michael Taylor


Dear Judge Campbell:

My name is Josh Flannery.  Currently I am an athletic trainer at Southeastern University, a Christian University in Lakeland, Florida.  I am responsible for taking care of the 100+ football players that we have at the university.  Prior to holding this position, I was the Head Athletic Trainer at Lawrence Academy in Groton, MA for 11 years (2002-2013).  During my time at Lawrence Academy, I had the privilege to get to know Michael Taylor in several capacities.  I was able to get to know him first as a father, then as a coach, and finally as a friend.


I met Michael for the first time in 2005 when one of his sons sustained a concussion while playing for Lawrence Academy.    Because all of his sons attended Lawrence Academy, I was able to get to know him better over the next couple of years. I know Mike to be a very loving father and husband and a very loyal friend.  I was able to first work with him when he asked me to do some athletic training coverage for the youth football team that he coached.  It was during this time that I was able to see a side of Mike that I had never seen in the past.  He genuinely cared for every single player on that team as if they were his sons.  In my 16 years of athletic training, I have seen many coaches who care about their players while they are on the field, but Mike went above just caring for them as players, he cared about them as people.  He was able to connect with every one of the boys on that team on a personal level.   It didn't matter if the boy was a starter or bench player, privileged or underprivileged, he cared about them all.   When Mike was hired by Lawrence Academy to be the football coach, I was excited for our players and for our school as a whole.  During his time coaching at Lawrence, Mike not only helped his football players, but was able to help student athletes in other sports as well

who were not as privileged as some of our other students. Our school was its own little community and the things he did to help some of our underprivileged students was amazing to me. Mike never wanted any credit for it either. I remember one specific instance where a female hockey player came into the training room in tears one day because her dad had lost his job and she didn't know if she would be able to return to school. When Mike heard this, he anonymously covered her tuition for the following year so she could stay at school.

Mike is the same way with my family. When our son was born, Michael acted as though Aiden were one of his own. We moved to Florida when Aiden was 4, but he still remembers Michael and the entire Taylor family because of the way they treated him. We didn't have family in New England, but Michael invited us over for Christmas Eve every year, so we could be with "family". When it comes to character and contributing to a community, Michael is as good as they come. If every community had more people like Michael Taylor, I feel that this world would be a better place.

I respectfully urge Your Honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor. Specifically, I understand that he has already served more than fourteen months in confinement at a county jail and I ask that the Court not require him to serve more time in incarceration.

Thank you for your consideration.

Sincerely,

Josh Flannery

# Exhibit 32

04 March 2015

Don W. Parker
47 Peabody Road
P.O. Box 443
Shirley, MA 01464

The Honorable Tena Campbell
United States District Judge
District of Utah

Re:  Michael L. Taylor

Dear Judge Campbell:

I am the former Principal of Ayer High School, Ayer, Massachusetts.  I was an administrator at the high school when Michael was a student.  I was principal when Michael made a number of significant contributions to the school and its students.

Michael was extremely helpful to our athletic department.  In a time of tight budgets, he was very helpful in purchasing equipment, rehabilitating our facilities, and offering whatever assistance that he could to our athletic department.

Michael also developed a scholarship for our students.  During the last few years of my time at Ayer, a number of students were the recipients of his generosity.  This was most helpful to a number of students and their families.

My relationship with Michael has been very positive.

If I can be of further assistance, please let me know.

Thank you for your consideration.

Sincerely,


Don W Parker
Principal(retired)
Ayer High School

<u>Exhibit 33</u>



**Varden**
TECHNOLOGIES

**www.vardentech.com**

November, 18th 2014

The Honorable Tena Campbell

United States District Judge

District of Utah

RE: Michael L. Taylor

Dear Judge Campbell:

    I am a consultant for Varden Technologies in Boston, and I have known Michael Taylor my whole life, as I grew up across the street from him and his family. After my parent's divorce, Michael remained a strong father figure and role model in my life.

    Whether by leading rock climbing exercises for the Boy Scouts of America, giving troubled youth a sense of belonging through success on the football field, snowplowing for elderly neighbors after a heavy storm or helping at-risk teens acquire scholarships to top schools, Michael exemplifies a true community leader. From coaching youth soccer, to refurbishing an entire pop-warner league's image, Michael has made an enormous impact in the public sphere leading by example. He requires no acknowledgment for his countless efforts.

    I will share with you an example of Michael's heart, passion and commitment to those around him. One morning a brutal windstorm left the neighborhood with massive power outages and numerous trees down over both the street and power lines. Michael woke up early, grabbed his chainsaw and began unblocking the road so that emergency vehicles could gain access and utility trucks could restore power. As he cleared the road of the downed trees, behind him a line of cars began to accumulate. Tree by tree the line grew, and it became evident that these people were not coming to help, but were instead commuting to work, relying on Michael to get them there. As he cut the last tree, cars sped by him eager to get on their way. Michael simply packed up, went home to shower, and left for work himself. You will never find this story in any newspaper or publication, and Michael makes a myriad of efforts such as this one, not for the sake of recognition, but out of the fondness for the people in his community.

    I respectfully wish Your Honor to take into account the testimony provided above, and I hope that Your Honor will exercise the utmost compassion and leniency with respect to Michael Taylor. Specifically, I understand that he has already served more than fourteen months in confinement at a county jail, and I ask that the Court not require him to serve more time in incarceration. Thank you for your time and consideration.

Sincerely,

*Stephen Sweeney*

Stephen C. Sweeney

<u>Exhibit 34</u>

**Paul G. Giovacchini**

**8 Meadows Lane**

**Belmont, MA  02478**


November 7, 2014

The Honorable Tena Campbell
United States District Judge
District of Utah
351 South West Temple
Room 1.100
Salt Lake City, Utah  84101

Re:  Michael L. Taylor

Dear Judge Campbell:

My name is Paul Giovacchini.  I was born and raised in Salt Lake City and I have lived in the Boston area for the last 27 years.  I have a BA degree in Economics from Stanford University, an MBA from Harvard Business School and I have worked in the private equity investment industry for over 25 years as a partner with 2 different firms.  My wife is Tanya Giovacchini. Tanya did her undergraduate work at UC Berkeley, has an MBA from Harvard Business School, and has a distinguished career in management consulting.  Currently, she is the Partner in charge of Marketing for The Bridgespan Group, the pre-eminent consulting firm for philanthropies and non-profit organizations.

Our family has known Michael Taylor for 8 years dating back to when our sons attended high school with Mike's sons.  Mike and his family have been great friends since then. We know Mike to be a tremendous mentor, supporter and friend of many young people whose lives he has improved.  We have felt his influence firsthand as Mike has had a greater positive impact on both our sons than anyone outside our family.

Our son Nick first met Mike through Mike's efforts to share his knowledge of the Middle East through a seminar at the high school campus.  Mike took a special interest in Nick and spent hours with him discussing the intricacies of the politics of the region, and over the subsequent years Mike introduced Nick to many of his personal contacts with backgrounds in government, military, the CIA, and international affairs.  Mike's influence helped Nick decide to pursue a degree in political science at George Washington University, and matriculate for a term at American University in Beirut.  Mike made sure Nick was safe during his time in Beirut, keeping tabs on Nick through his personal contacts in the area and through frequent visits with members of his wife's family in Lebanon.

Our son Dan met Mike through football.  When Dan's high school football coach suddenly left the school at the end of Dan's freshman year, leaving the school without a coach

for the next year, Mike generously volunteered to coach the team until the school could locate a suitable replacement. Mike coached the team for the next 3 years on a volunteer basis at great personal sacrifice and gave the players the experience of a lifetime. He taught the boys to work hard and care for one another like few people can. He used his personal resources to provide equipment and meals for players in need of financial support. He also provided examples of leadership like they had never seen before, especially when the team experienced the tragic loss of a teammate in a car accident.

Last year, when Mike was staying at the Davis County jail in Farmington, he attempted to phone me once. You should know that Mike was not calling on his own behalf, but to see if I could assist him in helping a young inmate at the facility who Mike had ascertained had once met my brother. That is classic Mike – at a time of great personal need he is trying to help someone else.

Mike has contributed tremendously to the welfare of our country – through his distinguished military career, through civilian services for the government, through his support of church, school and charitable organizations, and for all he does on a regular basis for people he meets in daily life. Mike loves his country more than anyone we know and demonstrates this through the way he lives his life.

I respectfully urge Your Honor to take into account the facts described above and hope that Your Honor will exercise leniency with respect to Michael Taylor. Specifically, I understand that he has already served more than fourteen months in confinement at 2 county jails and I ask that the Court not require him to serve more time in incarceration.

Thank you for your consideration.

Sincerely,

Paul G. Giovacchini

# Exhibit 35

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

IN THE MATTER OF THE                )
EXTRADITION OF MICHAEL L.           )    Case No. 20-mj-1069-DLC
TAYLOR                              )
_____)
                                    )
IN THE MATTER OF THE                )    Case No. 20-mj-1070-DLC
EXTRADITION OF PETER MAXWELL        )
TAYLOR                              )

## DECLARATION OF NAOUM TOUBIA FARAH

Pursuant to 28 U.S.C. § 1746, I, Naoum Toubia Farah, hereby declare as follows:

1.  My name is Naoum Toubia Farah.  I am an adult resident and citizen of Lebanon, and a practicing attorney in Lebanon, registered at the Beirut Bar Association (no. 2694), and practicing through the Law Offices of Naoum Farah, Farrania Building, Saïd Freyha Street, Hazmich, Lebanon.

2.  I am the duly appointed defense counsel for Mr. Michael L. Taylor and Mr. Peter Maxwell Taylor before Lebanese jurisdictions.

3.  Mr. Rudy Michael Taylor filed a petition on February 17th, 2020 under number 1115/M/2020 asking the Public Prosecutor of the Lebanese Court of Cassation to proceed with the investigation regarding the alleged unlawful departure of Mr. Carlos Ghosn from Japan on December 2019, in order to prove the innocence of his father Michael and his brother Peter.

4.  Following said petition, I met the Public Prosecutor on February 17th, 2020, and discussed with him the charges alleged by the Japanese authorities and presented all the arguments to prove the innocence of Messrs. Michael & Peter Taylor.

5.  Based on the above, the Public Prosecutor decided on February 17th, 2020 to close the case for the absence of a criminal offence in the allegations regarding Messrs. Michael and Peter Taylor's actions.

6.  As is the case in preliminary investigations, a Public Prosecutor does not initiate or continue a prosecution when he fails to meet the burden of proving, beyond a reasonable doubt, the elements of the charged offenses.

7.  A true and correct copy of the Public Prosecutor's decision is attached as Exhibit A.

8.  According to the Public Prosecutor's decision mentioned above, Mr. Michael L. Taylor and Mr. Peter Maxwell Taylor are considered as not guilty before Lebanese jurisdictions of any criminal act in the alleged unlawful departure of Mr. Carlos Ghosn from Japan on December 2019, or of any other crime.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 8th, 2020

Naoum Farah

LAW OFFICES
OF
NAOUM FARAH

**REPUBLIC OF LEBANON**
**Ministry of Justice**
**Public Prosecution Office at the Court of Cassation**



**No.: 1115/M/2020**

## <u>Certificate</u>

This is to certify that, after reviewing the records at the Public Prosecution Office at the Court of Cassation, on the date of February 17th, 2020, Mr. **Rudy Michael TAYLOR** (American citizen) holder of a courtesy residency No. /117656428/, valid till September 29th,2022, residing in Kfarhbab – Kesrwan – Main Road – Elie Haddad Bldg., filed a denunciation concerning the acquittal of his father **Mr. Michael TAYLOR,** his brother **Mr. Peter Maxwell TAYLOR,** and **Mr. Georges EL ZAYEK**, in the escape of Mr. Carlos GHOSN from Japan and being a fugitive from justice. The petition of said denunciation was registered on February 17th, 2020 at the Public Prosecution Office at the Court of Cassation under No. 1115/M/2020.

Accordingly, a decision to close the investigation was rendered on February 17th, 2020, for the absence of criminal offence.


In Witness Whereof, this statement was given.


**Beirut, February 27th,2020**
**Judicial Assistant at the Public Prosecution Office at the Court of Cassation**
**Rawan KANSO (signature and seal)**


with approval of the above mentioned certificate content,
**Beirut, February 27th, 2020**
**Chief Clerk of the Public Prosecution office at the Court of Cassation**
**Charles BOU KHEIR (signature and seal)**


**True copy certified on March 10th, 2020**
**Chief Clerk of the Public Prosecution office at the Court of Cassation**
**Charles BOU KHEIR (Signature and seal)**


----------------------------------
True and faithful translation
The Sworn Translator
Association No. 47 – richazar@inco.com.lb





Numéro : 14199
Vu par moi, Georges Tanios EL KHOURY
Notaire à Beyrouth pour l'authentification
de la signature du traducteur assermenté
M .....................................................
sur ce document sans aucune responsabilité
de son contenu, le 1 1 MAR 2020

Le Notaire à Beyrouth
Georges Tanios EL KHOURY

وزارة العدل
مديرية شؤون القضاة والموظفين
مكتب التصديق
بيروت
جورج ط. الخوري

REPUBLIQUE LIBANAISE
Ministère des Affaires Etrangères
et des Emigrés
Section des Légalisations
No.: 2286
Beyrouth, le: 1 1 MAR 2020
Vu pour légalisation de la signature
de Mr.: Hussein Tarhini
Signant pour: La Justice
Sans aucune responsabilité du
contenu du document

Droits Perçus L.L. .....................
P.i. Chef du Bureau de Légalisations

M. VICTOR NASR



333317




الجمهورية اللبنانية

وزارة العدل

<u>النيابة العامة التمييزية</u>

رقم: ١١١٥/م/٢٠٢٠

– إفـادة –

مع الافادة انه بعد مراجعة القيود والسجلات لدى قلم النيابة العامة التمييزية ، تبين أنه بتاريخ ٢٠٢٠/٢/١٧ تقدم المخبر رودي مايكل تايلور (من الجنسية الأميركية) حامل جواز إقامة مجاملة رقم /١١٧٦٥٦٤٢٨/ صالحة لغاية  تاريخ ٢٠٢٢/٩/٢٩، المقيم في كفرحباب – كسروان – الشارع العام – بناية ايلي حداد، بإخبار بموضوع براءة والده السيد مايكل تايلور وشقيقه السيد بيتر ماكسويل تايلور والسيد جورج الزايك وانتفاء أية علاقة لهم في هروب السيد كارلوس غصن من اليابان وتواريه عن وجه العدالة، سُجل لدى قلم النيابة العامة التمييزية بالرقم ١١١٥/م/٢٠٢٠ تاريخ ٢٠٢٠/٢/١٧ .

وتبين انه بتاريخ ٢٠٢٠/٢/١٧ صدر قراراً بالحفظ لعدم وجود جرم جزائي .

وللبيان اعطيت هذه الإفادة./.

بيروت في ٢٠٢٠/٢/٢٧

المساعد القضائي

لدى قلم النيابة العامة التمييزية

روان قانصو



مع الموافقة على ما ورد

في الافادة اعلاه/./.

بيروت في ٢٠٢٠/٢/٢٧

رئيس قلم النيابة العامة التمييزية

شارل بو خير





وزارة العدل
مديرية شؤون القضاة والموظفين
مكتب التسجيل

دون ان تتحمل هذه الوزارة مسؤولية ما تتضمن هذه الأوراق
بيروت في .....................

حسين علي ترجيني
رئيس قلم المصادقات
في وزارة العدل

١١ آذار ٢٠٢٠

**REPUBLIQUE LIBANAISE**
Ministère des Affaires Etrangères
et des Emigrés
Section des Légalisations
No.: ..................
Beyrouth, le: ..................1 MAR 2020
Vu pour légalisation de la signature
de Mr.: ..................Hussein Tarhini
Signant pour: ..................La Justice
Sans aucune responsabilité du
contenu du document
Droits Perçus L.L. ..................
P.i. Chef du Bureau de Légalisations

M. VICTOR NASR



333317

# Exhibit 36

From: **Tadashi Inuzuka** <tadashi@inuzuka.com>
Date: Mon, Sep 7, 2020 at 1:04 PM
Subject: A request to stop the extradition of the Taylors to Japan
To: <Michelle_Richardson@wicker.senate.gov>
Cc: gohara <gohara@gohara-law.com>

12:54 PM (0 minutes ago)

### A request to stop the extradition of the Taylors to Japan

Ms. Michelle Barlow Richardson
Chief of Staff to the United States Senator Mr. Roger Wicker
  cc. Nobuo Gohara, Gohara Compliance and Law Office

The Taylors will face Japan's *Hostage Justice* system should they be extradited

Dear Ms. Richardson,

I obtained your contact information from Carol and Carlos Ghosn, with whom I worked closely with for criminal justice reform in Japan. My name is Tadashi Inuzuka, a former Senator of Japan, and I've been pushing my peers to reform the justice system, primarily through several study sessions in parliament.
Few of my peers and countrymen have compassion for Carlos Ghosn, Greg Kelly, and countless others held "hostage" in Japan. Our system, media, and people, judge men and women as guilty at their arrest and not after a guilty verdict at trial. Unfortunately, the presumption of guilt, though not a public admission, is very much a reality.
A few facts -

·     **In Japan, over 99% of the indictments end-up in conviction.** This percentage is calculated by taking the ratio of # guilty convictions and cases tried

·     **A special prosecutor uses loopholes in the legal system to detain suspects for an indefinite period.** Japan's criminal code stipulates maximum 23-day detention before charges need to be brought. However, prosecutors routinely circumvent this by issuing arrest warrants (many times while a suspect is still in jail) for minor crimes. **Carlos Ghosn was detained for 108 days via 3 arrest warrants**

·     While in detention, s**uspects are tempted with the release in exchange for a guilty plea**

·     **Defense attorneys are not allowed to be present with their clients during interrogations**

·     **Prosecutors can delay a trial at their discretion for as long as they choose.** They will usually use this tactic as a pressure mechanism

Carlos Ghosn was detained for 108 days after his late 2018 arrest. He endured solitary confinement. He endured repeated interrogations without legal counsel present. He endured trial delay and trial date uncertainty. And most of all he endured in the knowledge that 99% of cases end in conviction. Greg Kelly, a former Nissan executive arrested with Ghosn, has also been a hostage of the Japanese legal system. Kevin Kelly, his son, said "My father's trial date has been pushed back for the 3rd time and is now not going to start until this summer, almost 18 months after my father's arrest. Once the trial begins, they will only hold court 4–6 days per month meaning that my father will return from Japan by fall 2021 at the earliest. Michael Taylor and his son Peter Taylor were arrested by US authorities in May in connection with Mr. Ghosn' escape from house arrest in Japan. The pair, who have been held in custody by US authorities since, have been fighting a request for their transfer to Japan, which has issued warrants for their arrest in connection with their alleged role in helping Mr. Ghosn flee. The US is one of the few countries that have an extradition treaty with Japan.

I would strongly encourage stopping the potential extradition of the Taylor family to Japan. As U.S. citizens, the Taylors have a right to a fair trial in a country that practices the presumption of innocence. They should not be judged guilty prior to a verdict and they will be should they stand trial in Japan.