UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL L. TAYLOR and        *
PETER M. TAYLOR,        *
       *
    Petitioners,        *
       *
    v.        *        Civil No. 4:20-cv-11272-IT
       *
JEROME P. MCDERMOTT, Sheriff,        *
Norfolk County, Massachusetts, and        *
JOHN GIBBONS, United States Marshal,        *
District of Massachusetts,        *
       *
    Respondents.        *

MEMORANDUM AND ORDER

January 28, 2021

TALWANI, D.J.

Before the court are the Petitioners Michael Taylor and Peter Taylor's Verified Second Emergency Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Injunctive Relief ("Second Habeas Petition") [#47]. The Taylors seek writs of habeas corpus halting their transfer to the custody of the Japanese government; finding the decision of the Secretary of State ("Secretary") to surrender them for extradition arbitrary and capricious and in violation of United States law; and reversing the decisions of the Magistrate Judge certifying their extraditability. Id. at 10 (prayer for relief). The Taylors also seek a stay of the transfer of their custody to the Japanese government until they have had "a full and fair opportunity to receive and review the State Department administrative record." Id. at ¶ 13. For the following reasons, the Second Habeas Petition [#47] is DENIED.

## I.      Procedural Background

In 2018, Carlos Ghosn Bichara ("Ghosn") was indicted by a Japanese court for financial crimes allegedly committed during his tenure as the CEO and/or Chairman of the Board of Directors at Nissan Motor Co., Ltd. Ex. F – Extradition Req. for Michael Taylor at Part IV, ¶¶ 1-2 [#41-6].[1] Ghosn was later released on bond and conditions, including that he was forbidden from leaving Japan. Id. at Part IV, ¶ 4.

On January 30, 2020, and February 28, 2020, a Japanese court issued and reissued warrants for the Taylors' arrest for "harboring of criminals and accessoryship of violation of the Immigration Control and Refugee Recognition Act (Article 71, 25 II)" based on allegations that they had provided assistance to Ghosn in escaping from Japan. Ex. I – Original Arrest Warrants [#41-9]; Ex. J – Renewed Arrest Warrants [#41-10].

The government of Japan subsequently requested that the United States issue provisional arrest warrants pursuant to the treaty governing extradition between the United States and Japan. Ex. K – Extradition Req. Transmittal [#41-11]; see also Ex. E – Treaty on Extradition, United States-Japan, effective Mar. 26, 1980, 31 U.S.T. 892 ("Treaty") [#41-5]. The United States thereafter filed complaints pursuant to 18 U.S.C. § 3184 in this district, asserting that the Taylors had violated Article 103 of the Japanese Penal Code. Ex. A – Michael Taylor Compl. [#38-2]; Ex. B – Peter Taylor Compl. [#38-3]. The Magistrate Judge to whom the matter was assigned issued the requested warrants, and the Taylors were arrested on May 20, 2020.

---

[1] The full proceedings before the Magistrate Judge are docketed at In the Matter of the Extradition of Michael L. Taylor, No. 20-mj-1069-DLC (D. Mass) ("Michael Taylor MJ Docket"), and In the Matter of the Extradition of Peter Taylor, No. 20-mj-1070-DLC (D. Mass.). For convenience, where those dockets are referenced, and the same or similar documents are filed on both dockets, (albeit with slightly different numbering), the court has cited to the Michael Taylor MJ Docket.

The United States moved for detention, and the Taylors were detained pending a request

for a detention hearing. See United States' Mot. for Detention, Michael Taylor MJ Docket (May

20, 2020), ECF No. 9; Elec. Clerk Notes, Michael Taylor MJ Docket (May 20, 2020), ECF No.

11. The Taylors have been held since that date at the Norfolk County Correctional Facility.

The Taylors subsequently moved to quash their arrest warrants or for release from

detention. See Mot. to Quash Arrest Warrants or for Release from Detention, Michael Taylor MJ

Docket (June 8, 2020), ECF No. 17. While the motions were pending, Japan submitted its formal

extradition request. See Notice of Japan's Submission of Req. for Extradition, Michael Taylor

MJ Docket (July 2, 2020) ECF No. 37; Ex. K – Extradition Req. Transmittal [#41-11]; see also

Ex. F – Extradition Req. for Michael Taylor [#41-6]. The Magistrate Judge denied the motions,

finding the Taylors' challenge to the provisional arrests mooted by Japan's formal extradition

request and further finding that bail was not warranted, as the Taylors pose a flight risk and

failed to establish special circumstances warranting bail. Elec. Order, Michael Taylor MJ Docket

(July 7, 2020) ECF No. 40; Magistrate Judge's Mem. on Resps.' Mot. to Quash Arrest Warrants

or for Release from Detention, Michael Taylor MJ Docket (July 10, 2020) ECF No. 41.

Meanwhile, on July 6, 2020, the Taylors filed with this court their first Petition for a Writ

of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("First Habeas Petition") [#1] and a Motion for

Temporary Restraining Order and Preliminary Injunction [#2]. This court denied the requested

temporary restraining order on July 9, 2020, Elec. Order [#33], and denied the motion for

preliminary injunction and the First Habeas Petition [#1] on August 7, 2020, Mem. & Order 22

[#44]. The court found that the Magistrate Judge's decision denying bail was properly challenged

prior to the extradition hearing via a petition for a writ of habeas corpus but that the Taylors had

not established special circumstances justifying release on bail or error in the Magistrate Judge's

finding that the Taylors posed a flight risk. Id. at 8-18. Pursuant to 28 U.S.C. § 2241, the court also considered and rejected the Taylors' contention that they were being improperly held "in violation of the Constitution or laws or treaties of the United States." Id. at 19-20. Although the court found that the Taylors had not presented grounds demonstrating that they were being unlawfully held, the court did not preclude them from raising these same issues in the extradition proceedings before the Magistrate Judge. Id. at 21. Finally, the court rejected the Taylors' allegation that the government had been deliberately indifferent to the risk they face from COVID-19 and had therefore violated their constitutional rights. Id. at 22.

The Magistrate Judge held an extradition hearing pursuant to 18 U.S.C. § 3184 on August 28, 2020, and issued a written decision finding the Taylors extraditable on September 4, 2020. Extradition Certification and Order of Commitment [#50-1]. The Magistrate Judge found that the terms of the Treaty and 18 U.S.C. § 3184 had been satisfied with respect to the extradition request, and specifically: (1) that the court had subject matter jurisdiction over the proceedings and the Taylors; (2) that the Treaty was in full force and effect between the United States and Japan; (3) that the charges for which extradition was sought were crimes pursuant to both Japanese and United States law and covered by the Treaty; and (4) that there was probable cause to believe that the Taylors had committed the offenses charged. Id. at 3-10. On September 14, 2020, the Magistrate Judge certified his findings and submitted them to the State Department. Certifications of Michael and Peter Taylor and Committals for Extradition [#50-3].

On October 28, 2020, the Assistant Legal Adviser for Law Enforcement and Intelligence at the State Department wrote to the Taylors that, on October 27, 2020, the Deputy Secretary of State ("Deputy Secretary") had authorized the Taylors' surrender to Japan. Ltr. From K. Johnson [#50-4]. The letter explained that this decision was reached "[f]ollowing a review of all pertinent

information, including the materials submitted directly to the Department of State" and material submitted to this court, and that the Department "carefully and thoroughly considers all claims submitted by a fugitive." Id. The Assistant Legal Advisor also wrote that "[a]s the official responsible for managing the Department's responsibilities in cases of international extradition," she "confirm[ed] that the decision to surrender the Taylors to Japan complie[d] with applicable international obligations as well as domestic statutes and regulations." Id.

The Taylors filed this Second Habeas Petition [#47] the next day. They also filed an Emergency Motion to Stay [#48], which the court granted, pending further order of the court, to allow the court time to review the Second Habeas Petition [#47]. Order [#49]. The court did not address the Taylors' further request for a stay until they "had a full and fair opportunity to receive and review the State Department administrative record." Elec. Order [#54].

The government subsequently filed its Opposition to Petitioners' Emergency Motion for Stay and Response to Second Emergency Petition for Habeas Corpus ("U.S. Mem.") [#50], and the court held an expedited hearing on the Second Habeas Petition [#47] on November 5, 2020. The court permitted supplemental filings, and the government filed the Declaration of Deputy Secretary Stephen E. Biegun, see U.S. Supplemental Exhibit [#60-1], while the Taylors filed additional briefing and exhibits, including the submission made on their behalf to the Department of State, see Supplemental Exhibits in Support of Verified Second Emergency Petition [#59]; Petitioners' Notices of Filing Supplemental Declarations and Exhibits [#61], [#63]; and Petitioners' Response to U.S. Supplemental Exhibit [#62].

The Taylors subsequently sought to stay these proceedings and remand the matter to the Magistrate Judge, see Motion to Stay Habeas Proceeding and Remand to Extradition Magistrate to Address Motion for Reconsideration of Probable Cause Findings [#68], while also seeking

relief from the Magistrate Judge without waiting on a remand. The Magistrate Judge denied relief, as did this court. Elec. Order, United States v. Peter Maxwell Taylor, No. 4:20-mj-01070-DLC (Jan. 15, 2021), ECF No. 60, reprinted as Ex. A – U.S. Notice [#74-1]; Elec. Order [#76]. Most recently, the Taylors have filed a Motion to Amend Habeas Petition [#79] which the court has also denied as untimely. Order [#80].

## II.     Factual Background

The Magistrate Judge has recounted the facts as follows:

Factually speaking, the parties agree, and the court finds support in the record, that the respondents committed the conduct underlying the charges against them. Specifically, the court finds that there is probable cause to believe that Peter Taylor traveled to Japan at least three times and visited Ghosn on at least seven occasions in the months preceding the escape. Then, on December 28, 2019, Peter Taylor arrived in Tokyo and checked into a room at the Grand Hyatt. Ghosn then arrived at the Grand Hyatt and met with Peter Taylor for about an hour. On December 29, 2019, Michael Taylor and a third individual, George-Antoine Zayek, traveled on a private jet from Dubai, United Arab Emirates, to Japan's Kansai International Airport. At Kansai, Michael Taylor and Zayek carried large black audio equipment-style cases and told airport workers that they were musicians. From Kansai, Michael Taylor and Zayek checked into the Star Gate Hotel Kansai. After placing the cases in one of their rooms, they caught a train bound for Tokyo at about noon. At 2:30 p.m., also on December 29th, Ghosn left his home without luggage and walked to the Grand Hyatt, where he apparently changed into clothing from luggage that had been dropped off and received by Peter Taylor earlier in the day. Michael Taylor and Zayek arrived in Tokyo at about 3:30 p.m. and went to Peter Taylor's room at the Grant Hyatt.

Shortly thereafter, the Taylors, Ghosn, and Zayek left Peter Taylor's room at the same time, each carrying luggage. Peter Taylor then traveled to the Narita Airport to catch a flight to China. However, Ghosn, Michael Taylor, and Zayek caught a train back to the Kansai Airport area and returned to the Star Gate Hotel Kansai at approximately 8:15 p.m. At about 10:00 p.m., Michael Taylor and Zayek left the hotel with luggage, including the two audio-style cases, and went to Kansai Airport. Surveillance footage did not show Ghosn leaving the hotel. Once at the airport, the baggage of Michael Taylor and Zayek was loaded onto their private jet without being checked. The jet departed for Turkey at about 11:00 p.m. On December 31, 2019, Ghosn announced that he was in Lebanon.

Extradition Certification and Order of Commitment 6-7 [#50-1]. As the Magistrate Judge

noted in his decision following the extradition hearing, the parties did not dispute the

facts of the case at the extradition hearing. Id. at 6.[2]

### III.    Discussion

Count I of the Second Habeas Petition [#47] challenges the Secretary's authorization of

the Taylors' surrender to Japan as arbitrary and capricious and in violation of United States law.

The Taylors assert that their extradition to Japan would violate the United Nations Convention

Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, Dec. 10,

1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 ("Convention Against Torture" or "CAT");

the International Covenant on Civil and Political Rights, Dec. 19, 1966, S. Treaty Doc. No. 95–

20, 999 U. N. T. S. 176 ("ICCPR"); § 2242 of the Foreign Affairs Reform and Restructuring Act,

Pub. L. No. 105–227, Div. G., § 2242(b), 112 Stat. 2681–761, 2681–822 (1998) ("FARR Act");

and other "fundamental notions of due process," "including the right to a speedy trial, the right

not to be subjected to lengthy and coercive interrogation in the absence of counsel, protection

---

[2] Peter Taylor's motion for reconsideration of the Magistrate Judge's determination asserted that, based on "newly discovered evidence," Carlos Ghosn did not need a key card to operate the hotel elevator as the Japanese government had alleged and from which it had inferred that Peter Taylor provided Ghosn with the key card. Motion to Stay Habeas Proceeding and Remand to Extradition Magistrate to Address Motion for Reconsideration of Probable Cause Findings [#68]. In opposition, the government contends that further evidence establishes that the Japanese government's original finding regarding the key card was correct. U.S. Opposition 3 [#70] and attached exhibits [#70-1], [#70-2]. The Magistrate Judge concluded that the impetus for the motion for reconsideration "no longer provides a possible basis for relief where further investigation by Japanese authorities has revealed that a key card was in fact needed to access the hotel's elevator" and that "even assuming for the sake of argument that Peter Taylor did not provide Ghosn with an elevator key card, the remainder of the evidence in the court's view, none of which moreover was disputed, still provides probable cause to believe that [Peter Taylor] assisted in the planning, financing, and execution of Ghosn's escape as alleged." Elec. Order, United States v. Peter Maxwell Taylor, No. 4:20-mj-01070-DLC (Jan. 15, 2021), ECF No. 60, reprinted as Ex. A – U.S. Notice [#74-1].

against cruel and unusual punishment, the presumption of innocence, and the right against self-incrimination." Second Habeas Petition ¶ 23 [#47]. Count II asserts that the Taylors' arrest and confinement was without probable cause in violation of the Fourth Amendment to the Constitution. Id. at ¶¶ 26-32; see also First Habeas Petition ¶¶ 36-42 [#1]. Count III asserts that the arrest and confinement violate the Treaty. Second Habeas Petition ¶¶ 33-41; see also First Habeas Petition ¶¶ 43-51 [#1]. Count IV asserts that the arrest and confinement violate 18 U.S.C. § 3184. Second Habeas Petition ¶¶ 42-45 [#47]; see also First Habeas Petition ¶¶ 52-55 [#1]. And finally, the Taylors allege that their arrest and confinement violate the Fifth Amendment to the Constitution in light of the dangers posed by COVID-19. Second Habeas Petition ¶¶ 46-52 [#47]; see also First Habeas Petition ¶¶ 56-61 [#1].

The government argues that the filing of the Second Habeas Petition [#47] is an abuse of the writ of habeas corpus; that review of the Magistrate Judge's decision should have been sought when that decision issued, rather than after the Secretary made his determination; and that this court is without jurisdiction to consider the claims in Count I. U.S. Mem. 3-4 [#50].

The court agrees that the Taylors' reiteration of the challenges to their confinement in light of the dangers posed by COVID-19 and to their initial arrest deserve no further scrutiny or reconsideration of the court's decision on their First Habeas Petition [#1]. However, the Taylors are not barred by virtue of the earlier habeas petition from challenging the Magistrate Judge's subsequent extradition decision. See e.g., United States v. Kin-Hong, 110 F.3d 103, 107-08 & n.3 (1st Cir. 1997) (recounting that petitioner, who had filed a pre-certification writ of habeas corpus, "filed an amended petition for writ of habeas corpus," and noting that the writ of habeas corpus was "the only avenue by which a fugitive sought for extradition . . . may attack the magistrate judge's decision"). And although the government may have preferred that the Second

Habeas Petition [#47] be filed immediately after the Magistrate Judge's decision, the Taylors offer some authority for considering a habeas petition after the Secretary's decision, see Pet. Mem. 18 [#57] (citing Venckiene v. United States, 929 F.3d 843 (7th Cir. 2019)), and the court has found no contrary authority barring consideration now. Accordingly, the court turns first to the Taylors' claim that their confinement violates the Treaty and 18 U.S.C. § 3184 based on a lack of probable cause that they committed an extraditable offense and then to their claims under Count I, as well as the government's challenge to this court's jurisdiction to consider those claims.

   A.  *Challenges Under 18 U.S.C. § 3184*

The statutory scheme governing extradition, 18 U.S.C. § 3181 *et seq.*, sets forth "a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." Kin-Hong, 110 F.3d at 109. Pursuant to 18 U.S.C. § 3184, the Magistrate Judge was obligated (1) to determine if the crime charged was covered by the Treaty; (2) to conduct a hearing to determine if the evidence was sufficient to sustain the charge under the Treaty; and, if so, (3) to "certify" to the Secretary that a warrant for the surrender of the relator "may issue." 18 U.S.C. § 3184; see also Kin-Hong, 110 F.3d at 109.

The Taylors did not dispute in the proceedings before the Magistrate Judge or in their Second Habeas Petition [#47] that there is probable cause to find that they assisted Ghosn in leaving Japan[3] or that, at the time, Ghosn was charged with a crime. They argue instead that, at the time of the alleged crime, Article 103 of the Japanese Penal Code did not make it unlawful to assist someone charged with a crime but released on bail in escaping from Japan. Pet. Mem. 20-

---

[3] As set forth above, Petitioners have belatedly sought to challenge the probable cause determination as to Peter Taylor, but this challenge is untimely. See Order [#80].

24 [#57]. They further contend that the Magistrate Judge erroneously gave "conclusive weight" to the Japanese government's interpretation of its laws and failed to consider the arguments offered by the Taylors. Id. at 25. In the Taylors' view, "such deference would render judicial review a meaningless exercise in the extradition context, where a foreign government always will argue that something is prosecutable under its law, and it would strip United States citizens of their right to have their constitutional rights protected by Article III courts." Id.

But "extradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law," Noeller v. Wojdylo, 922 F.3d 797, 805 (7th Cir. 2019), and the Taylors' unsupported assertion that the court must delve deeply into foreign law in order to protect United States citizens in extradition proceedings is misplaced. Citizens are protected from the threat that a foreign government will simply "argue that something is prosecutable under its laws" not by the court's opining on foreign law but by the dual criminality provisions in extradition treaties. See Kin-Hong, 110 F.3d at 114. A "dual criminality requirement" ensures "that extradition is granted only for crimes that are regarded as serious in both countries." Id. (citing United States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995); Restatement (Third) of the Foreign Relations Law of the United States § 476, cmt. d (1987); id. § 475, cmt. c). "'[U]nless a plausible challenge is raised by the person sought, the authorities in the requested state will presume that the acts alleged constitute a crime under the law of the requesting state, and will consider whether the acts alleged constitute a crime under the law of the requested state.'" DeSilva v. DiLeonardi, 125 F.3d 1110, 1113–14 (7th Cir. 1997) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 476, cmt. D); see also In re Assarsson, 635 F.2d 1237, 1244 (7th Cir.1980) (discussing dangers of delving into foreign law).

Here, the Magistrate Judge found:

that the charges for which extradition is sought are crimes pursuant to both Japanese and United States law and covered by the Treaty. Article I of the Treaty provides for the return to Japan of persons found in the United States who are sought by Japan for prosecution, trial or to execute punishment for any offense specified in Article II of the Treaty. Article II of the Treaty provides for extradition for offenses listed in an annexed schedule which includes an offense relating to obstruction of justice, including harboring criminals. The [Taylors] have been charged for their involvement in harboring or enabling the escape of someone charged with a crime, in violation of Article 103 of the Japanese Penal Code. This offense would also be subject to criminal prosecution under various United States statutes, including among others 18 U.S.C. § 1073 and 18 U.S.C. §§ 3148(a) and 401.

Extradition Certification and Order of Commitment 5 [#50-1].[4] The Taylors do not dispute that the actions they are accused of amount to a crime under United States law, as well as obstruction of justice under the Treaty. Accordingly, their fear that "foreign government always will argue that something is prosecutable under its law" and that the court must therefore deeply analyze Japanese law is unfounded.

In any event, the Taylors' complaint is misplaced, where the Magistrate Judge did engage in the limited review of Japanese law necessary to ensure that the requirements of the extradition statute and treaty were satisfied. See Skaftouros v. United States, 667 F.3d 144, 156 (2d Cir. 2011) ("Judicial officers considering extradition requests—and, by extension, district judges considering habeas petitions challenging extradition orders—should not engage in an analysis of the demanding country's laws and procedure, except to the limited extent necessary to ensure that the requirements of the federal extradition statute and the applicable extradition treaty have been satisfied"). Here, the Magistrate Judge explained that Article 103, as written, "makes it a

---

[4] Article II also defines crimes covered by the Treaty as those "punishable by the federal laws of [the United States and by the laws of Japan] by death, by life imprisonment, or by deprivation of liberty for a period of more than one year." Ex. E – Treaty [#41-5]. Individuals convicted of violating Article 103 face a maximum imprisonment of 3 years. See Ex. Q – Masayuki Yoshida Decl. ¶ 6 n.1 [#41-17].

crime to 'harbor or enable[] the escape of another person who has . . . committed a crime,'" and that "the Government of Japan has through declarations and case citations presented a reasonable interpretation of Article 103 under which the [Taylors'] conduct would constitute a violation of that provision." Extradition Certification and Order of Commitment 10 [#50-1].

The Taylors object that the Magistrate Judge should also have considered the arguments of their expert, Professor William Cleary of Hiroshima Shudo University. See Pet. Mem. 19-24 [#57]; see also Ex. C – William Cleary Decl. [#57-4]; Ex. D – Suppl. William Cleary Decl. [#57-5]; Ex. E – Second Suppl. William Cleary Decl. [#57-6]. Notably, the Taylors offer no authority for the more piercing inquiry into Japanese law that they seek.

Nor do Professor Cleary's arguments that Japan is misinterpreting its own law by applying Article 103 to the Taylors' conduct raise a plausible challenge to a finding of an extraditable offense. As noted above, Article 103 "makes it a crime to 'harbor or enable[] the escape of another person who has . . . committed a crime.'" It also punishes a person who harbors or enables the escape of a person "who has escaped from confinement." Ex. O – Japanese Treatise [#41-15]. Professor Cleary argues that the verb *toso*, translated to "escape from confinement" in the latter part of Article 103, refers to an "escape from a place of physical confinement, such as a jail, prison or detention center" and therefore does not apply to jumping bail. Ex. E – Second Suppl. William Cleary Decl. ¶ 6 [#57-6]. But this explanation is of little moment where the Taylors are charged with harboring or enabling the escape of a person alleged to have "committed a crime."

Professor Cleary further asserts that the statute does not apply here because bail jumping is not, on its own, a crime under Japanese law. Ex. C – William Cleary Decl. ¶¶ 10-11, 15 [#57-4]. However, whether "bail jumping" is a crime under Japanese law does not matter where the

Taylors are not charged with "bail jumping" and Ghosn's alleged crime that positions him as "another person who has . . . committed a crime" is not bail jumping but the financial crimes for which he was indicted. See Ex. Q – Masayuki Yoshida Decl. ¶ 7 [#41-17] (stating that the phrase "another person who has . . . committed a crime" is understood to either mean an individual convicted of a crime or an individual being investigated for committing a crime).

Professor Cleary also argues that the verb used in the first part of Article 103—*inpi*—encompasses both to "harbor" and to "enable the escape of" but that this verb applies to "a single concept that describes working against law enforcement authorities' active pursuit of a criminal to arrest him." Ex. E – Second Suppl. William Cleary Decl. ¶ 5 [#57-6]. That interpretation appears consistent with both sides' understanding of the statute, as well as that set forth in material provided by the Japanese prosecutor. Ex. Q – Masayuki Yoshida Decl. ¶ 6 [#41-17] (citing Judgment of Japanese Supreme Court, May 1, 1989, Kei-shu vol. 43, No. 5, p. 405) (Article 103 is a statute that "intends to punish a person who interferes with the criminal justice system *in a broad sense*, such as investigations, court proceedings and executions of sentences") (emphasis added). However, the further limitation offered by Professor Cleary—that the statute applies only to those who assist someone seeking to "flee from a scene of a crime or an arrest or to escape confinement," see Ex. C – William Cleary Decl. ¶ 14 [#57-4]; Ex. D - Second Suppl. William Cleary Decl. ¶¶ 5, 10 [#57-4]—is an unsupported claim delving well beyond the inquiry to be made by the extradition court. And while Professor Cleary cites cases where defendants were charged under Article 103 for assisting others evade imminent arrest, his broad assertion that *inpi* can apply only to such circumstances is contradicted by the Japanese legal treatise originally submitted by the Taylors that states that *inpi*, in the sense of an act to "enable the escape," covers acts that hinder "arrest *or* discovery" by law enforcement, therefore extending to

situations when arrest is not law enforcement's present aim. Ex. O – Japanese Treatise [#41-15] (emphasis added). The United States has thus sufficiently established that the actions the Taylors are alleged to have committed amount to an extraditable offense under then-existing Japanese law and that the Taylors' challenge to the Magistrate Judge's certification of extradition fails.

Under the extradition statute, the Secretary "has the authority to review the judicial officer's findings of fact and conclusions of law de novo, and to reverse the judicial officer's certification of extraditability if [he] believes that it was made erroneously." [5]  The Taylors have no right to review of the Secretary's decision not to reverse the Magistrate Judge's certificate of extraditability, however, for under the extradition statute, once a Magistrate Judge has certified the extradition "[i]t is then within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited." Kin-Hong, 110 F.3d. at 109.

### B.  Remaining Challenges

Count I of the Taylor's Second Habeas Petition [#47] challenges the Secretary's authorization of their surrender to Japan as violations of the Convention Against Torture, as implemented by the FARR Act, and the ICCPR, as well as "other fundamental notions of due process," "such as a right to a speedy trial and the right to counsel during interrogations." Pet. Mem. 3-4, 8 [#57].

The Taylors' objection that their detention would violate "notions of due process" is exactly the kind of claim that falls beyond the scope of the court's review under the rule of non-

---

[5] The Secretary may also "decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations. The State Department alone, and not the judiciary, has the power to attach conditions to an order of extradition. Of course, the Secretary may also elect to use diplomatic methods to obtain fair treatment for the relator." Id. at 109-10 (internal citations omitted).

inquiry. See Neely v. Henkel, 180 U.S. 109, 123 (1901) ("When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States"); see also Hilton v. Kerry, 754 F.3d 79, 84–85 (1st Cir. 2014).

The Taylors' claim that their extradition would violate the Secretary's obligations under the ICCPR, Pet. Mem. 13 [#57], fairs no better. The ICCPR is not a self-executing treaty, see Sosa v. Alvarez-Machain, 542 U.S. 692, 728 (2004), and has not been implemented domestically by statute. It is therefore not binding as a matter of domestic law and does not constitute federal law that is judicially enforceable. See Igartúa–De La Rosa v. United States, 417 F.3d 145, 150 (1st Cir. 2005) (en banc).

The Convention Against Torture claim, however, requires greater scrutiny. The Taylors argue that the Convention Against Torture, as implemented by the FARR Act, creates an independent substantive basis on which they can challenge the legality of the Secretary's decision to extradite them and, therefore, the legality of their detention pending that extradition. Pet. Mem. 5 [#57]. The government counters that, to the extent such claims exist, Congress has stripped federal courts' jurisdiction over them. U.S. Mem. 9 [#50]. The court considers first whether such a claim exists, then turns to the jurisdictional issue and the scope of habeas review before considering the merits of this claim.

1.      Existence of the Claim

Article 3 of the Convention Against Torture provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." CAT Art. 3, § 1. Following

Senate ratification in 1990, the Convention Against Torture entered into force in November 1994

for the United States. See Regulations Concerning the Convention Against Torture, 64 Fed. Reg.

8478, 8478 (Feb. 19, 1999). The Convention Against Torture is not self-executing and, by its

own force, does not confer any judicially enforceable rights on individuals. See Saint Fort v.

Ashcroft, 329 F.3d 191, 202 (1st Cir. 2003). However, Congress domestically implemented most

of the United States' obligations under the Convention Against Torture, including Article 3,

through the FARR Act.

To that end, the FARR Act reiterates the Convention Against Torture's prohibition

against extraditing to torture, stating that "[i]t shall be the policy of the United States not to

expel, extradite, or otherwise effect the involuntary return of any person to a country in which

there are substantial grounds for believing the person would be in danger of being subjected to

torture." FARR Act § 2242(a) (codified at 8 U.S.C. § 1231 note). It also directs the "heads of the

appropriate agencies"—here, the State Department—to "prescribe regulations to implement the

obligations of the United States under Article 3" of the Convention Against Torture. Id. at

§ 2242(b).

By "incorporate[ing] the language of CAT itself, enacting as U.S. domestic policy the

international obligation the United Sates undertook in ratifying CAT" and then "direct[ing] the

Executive 'to implement the obligations of the United States under' CAT and specif[ying] how

such implementation ought to occur," "the text and structure of the FARR Act confirm that it

*does* impose a binding obligation on the Secretary State not to extradite individuals likely to face

torture." Trinidad y Garcia v. Thomas, 683 F.3d 952, 987-88 (9th Cir. 2012) (en banc) (Berzon,

C.J., concurring in part and dissenting in part) (emphasis original); see also id. at 988 ("The

FARR Act's mandate to agencies that they 'implement' the United States' obligations under

CAT is a direction to put into practice the mandatory Article 3 obligations undertaken by signing CAT and incorporated into U.S. law by the FARR Act. . . . [This subsection] compels the conclusion that the FARR Act imposes upon the Executive an obligation to abide by CAT"). For these reasons, "the duty imposed upon the Secretary extends beyond simply *considering* whether [the relator] is more likely than not to face torture. [The Secretary] is required not to extradite [the relator] if there are substantial grounds to believe that he is more likely than not to face torture." Id. at 996 (emphasis original).[6] This requirement creates a substantive right against extradition if it is "more likely than not" that the petitioner will be tortured. See Saint Fort, 329 F.3d at 202 (citing Wang v. Ashcroft, 320 F.3d 130, 141 (2d Cir. 2003)).

    2.    Jurisdiction

The court turns next to the question of whether it has jurisdiction to consider the Taylors' claim that, on the information available to the Secretary, they *are* more likely than not to be tortured in Japan and that the Secretary's decision to extradite them is therefore illegal under the FARR Act. Pet. Mem. 8-14 [#57]. If their extradition is illegal under the FARR Act, it follows that there is no basis for their continued detention. This is exactly the type of claim that is addressed through habeas corpus: the writ's very foundation is as a check on the arbitrary exercise of executive discretion. See Boumediene v. Bush, 533 U.S. 723, 744-45, 785, 794, 797 (2008).

A petition for a writ of habeas corpus seeks judicial review of the legality of a prisoner's detention, and this "Great Writ" has been much celebrated as foundational to modern principles of liberty. See, e.g., Fay v. Noia, 372 U.S. 391, 402 (1963), overruled in part by Wainwright v.

---

[6] For purposes of the State Department regulations implementing the FARR Act, the term "Secretary" is defined to mean the Secretary or the Deputy Secretary. 22 C.F.R. 95.1(d).

Sykes, 433 U.S. 72 (1977) (noting that the history of the habeas corpus is "inextricably intertwined with the growth of fundamental rights of personal liberty"). But unlike in some state constitutions, see, e.g., Massachusetts Constitution of 1780, pt. 2, ch. 6, art. VII, the federal Constitution does not explicitly guarantee the availability of habeas corpus; rather, it presupposes the existence of the writ by limiting the circumstances in which Congress may suspend it. See U.S. CONST. art. I, § 9, cl. 2.

The Suspension Clause states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Id. The text of the Suspension Clause does not, itself, guarantee any content to the writ, but it is more than a negative restraint on Congress: "'at the absolute minimum' the Clause protects the writ as it existed when the Constitution was drafted and ratified." Boumediene, 553 U.S. at 746 (quoting I.N.S. v. St. Cyr, 533 U.S. 289, 313 (2001), superseded on other grounds by statute, REAL ID Act of 2005, Pub. L. No. 109–13, Div. B., § 106(a)(1)(B), 119 Stat. 231, 310 (2005) ("REAL ID Act"), as recognized in Nasrallah v. Barr, 140 S. Ct. 1683, 1690 (2020)). Much has been written about the history of habeas corpus, see, e.g., Fay, 371 U.S. at 399-415; Boumediene, 553 U.S. at 739-46, and it suffices to say here that the writ, as it existed when the Constitution was ratified, was available to those who sought to challenge their transfer beyond the jurisdiction of the habeas court. See Kiyemba v. Obama, 561 F.3d 509, 523 (D.C. Cir. 2009) (Griffith, C.J., concurring in the judgment in part and dissenting in part) ("The bar against transfer beyond the reach of habeas protections is a venerable element of the Great Writ and undoubtedly part of constitutional habeas"); see also Habeas Corpus Act, 1679, 31 Car. 2, c. 2, § 12 (Eng.) ("[N]o subject . . . may be sent . . . into parts, garrisons, islands or places beyond the seas . . . within or without the dominions of his Majesty").

The government argues that federal courts lack jurisdiction to entertain challenges to extradition based on the FARR Act and the REAL ID Act. Although Congress may not suspend habeas corpus, it may restrict access to the writ so long as it provides an "adequate and effective" substitute. Swain v. Pressley, 430 U.S. 372, 381 (1977). The court therefore considers whether Congress restricted access to the writ and provided an adequate and effective substitute that would revoke the court's jurisdiction over the Taylors' FARR Act claims.

Section 2242(d) of the FARR Act states:

> Notwithstanding any other provision of law, and except as provided in the regulations described in subsection (b), . . . nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the [Convention Against Torture] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a), except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252).

FARR Act § 2242(d) (codified at 8 U.S.C. § 1231 note). The government would have the court read this section to limit review of Convention Against Torture claims to the review process available for final orders of removal. But in Saint Fort v. Ashcroft, the First Circuit foreclosed the argument that this provision bars habeas review. See 329 F.3d at 201. The court held that the FARR Act's failure to *provide* jurisdiction had no impact on habeas cases, since a different federal statute—28 U.S.C. § 2241—already conferred the federal courts jurisdiction over habeas cases in which a petitioner claimed detention "in violation of the Constitution or laws of treaties of the United States." Id. Neither did the FARR Act *revoke* that jurisdiction because, where the statute did not "expressly refer to 28 U.S.C. § 2241 or to habeas review," the court declined to "imply an intent to repeal habeas jurisdiction from silence." Id. To do so "would give rise to grave constitutional concerns" given the "lack of an alternative forum" in which the claim could be raised. Id. But see Omar v. McHugh, 646 F.3d 13, 23 n.10 (D.C. Cir. 2011) (suggesting that the Suspension Clause applies only to the statutory claims available in 1789).

The government's reliance on the REAL ID as divesting this court of jurisdiction over the Taylors' FARR Act claim suffers from the same deficiencies. The REAL ID Act amended § 242 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252, to expressly bar habeas review of final orders of removal. See Ishak v. Gonzales, 422 F.3d 22, 28 (1st Cir. 2005). In relevant part, the REAL ID Act provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment.

8 U.S.C. § 1252(a)(4). The government is correct that the REAL ID Act expressly strips habeas jurisdiction from the federal courts. But the stripping of jurisdiction must be limited to its context.

The REAL ID Act is an immigration statute that affects specified immigration proceedings. It prescribes that the "sole and exclusive means for judicial review of an order of removal" is by way of a petition for review in the appropriate court of appeals. 8 U.S.C. § 1252(a)(5). As other courts have noted, it is highly improbable that Congress intended the REAL ID Act—the point of which was to consolidate review of immigration claims into a direct review process—to revoke the courts' jurisdiction in non-immigration cases where direct review is unavailable. See Trinidad y Garcia, 683 F.3d at 956. But, more fundamentally, such a revocation would violate the Suspension Clause. In removal proceedings, individuals can invoke the Convention Against Torture and the FARR Act as a basis to challenge deportation and to have the executive agency's factual determinations about the likelihood of torture reviewed by a federal court of appeals. See Nasrallah, 140 S. Ct. at 1694. No such alternative process exists for those detained pending extradition. Accordingly, to avoid a construction that violates the

Suspension Clause, the court concludes that it has jurisdiction to hear the Taylors' claims brought under the Convention Against Torture, as implemented by the FARR Act.

### 3. Scope of Review

The government also claims that the so-called "rule of non-inquiry" prevents the court from considering the Taylors' FARR Act claims. U.S. Mem. 9 [#50]. However, the rule of non-inquiry is not a jurisdictional rule. See Kin-Hong, 110 F.3d at 112 ("None of these principles, including non-inquiry, may be regarded as an absolute"); see also Aguasvivas v. Pompeo, No. 19-1937, 2021 WL 58142, at *3 n.6 (1st Cir. Jan. 7, 2021). Rather, it relates to the scope of the court's habeas review.

The rule of non-inquiry "bars courts from evaluating the fairness and humaneness of another country's criminal justice system, requiring deference to the Executive Branch on such matters." Hilton, 754 F.3d at 84–85 (quoting Khouzam v. Att'y Gen., 549 F.3d 235, 253 (3d Cir. 2008)). That is not to say that a foreign nation's ability and willingness to provide justice is irrelevant to the extradition decision but rather that these are issues for the executive and legislative branches. Consideration of the procedural protections in the country requesting extradition is therefore not within the scope of this court's habeas review. See Hilton, 754 F.3d at 89 (quoting Holmes v. Laird, 459 F.2d 1211, 1219 (D.C. Cir. 1972)) ("[I]t is well settled that 'surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials'").

But while the rule of non-inquiry mandates deference insofar as a petitioner's allegations concern the constitutionality of the conduct of a *foreign* jurisdiction, "it is indubitably the role of courts to ensure that *American* officials obey the law." Trinidad y Garcia, 683 F.3d at 995

(Berzon, C.J., concurring in part and dissenting in part) (emphasis added). Where a petitioner claims that the Secretary has violated his statutory obligations under the FARR Act, the court has both the authority and the responsibility to ensure that his discretion to extradite—and, therefore, to detain the petitioners pending extradition—is being exercised within the parameters of the law established by Congress. See Hamdi v. Rumsfeld, 542 U.S. 507, 536 (2004) (plurality opinion) ("[T]he Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions"). See also Trinidad y Garcia, 683 F.3d at 995 (collecting cases). The court therefore considers the scope of that review.

Development of habeas corpus has long been linked, historically and conceptually, to due process. See, e.g., Hamdi, 542 U.S. at 529 (the "most elemental" liberty interest protected by the Due Process Clause is "the interest in being free from physical detention by one's own government"). At its core, due process requires that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). It follows, then, that in the context of executive detention, the primary concern under a due process analysis is the adequacy of the procedures employed by the executive branch in subjecting an individual to detention. The one appellate court to have considered the Convention Against Torture in the context of extradition has thus concluded that "the scope of habeas review allows courts to examine whether the Secretary has complied with her non-discretionary obligations" under the FARR Act and its implementing regulations. Trinidad y Garcia, 683 F.3d at 961 (Thomas, J., concurring). In effect, this approach treats claims brought under the FARR Act as creating a liberty interest that triggers due process considerations, which are satisfied if the Secretary certifies to the court that he has

"considered" whether the petitioner is more likely than not to face torture. See id. at 957 (plurality opinion).

If the Due Process Clause, alone, governed habeas review, the Ninth Circuit's approach in Trinidad y Garcia would suffice. However, the Supreme Court has held that the Suspension Clause necessitates more than due process; it requires "a meaningful opportunity to contest the factual basis for [the] detention before a neutral decisionmaker." Hamdi, 542 U.S. at 510. "Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant." Boumediene, 553 U.S. at 785.

The adequacy of this "meaningful opportunity" to demonstrate that one's detention is unlawful depends on "the rigor of any earlier proceedings": for example, "when a person is detained by executive order, rather than, say, after being tried and convicted in a court, the need for collateral review is more pressing." Id. at 782-83. Under such circumstances, for the habeas corpus "to function as an effective and proper remedy . . . the court that conducts the habeas proceeding must have the means to correct errors that occur during the [prior] proceedings." Id. at 786. And "[i]f a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court." Id. at 790. In short, the Suspension Clause provides an independent basis for habeas corpus with its own scope of review.

As explained above, the FARR Act creates a *substantive* right not to be extradited to torture, and accordingly, under the Suspension Clause, that substantive right requires the court to consider more than procedural adequacy on habeas review. In this case, where the Taylors have had no opportunity to contest the factual basis of the Secretary's determination that they will not be tortured in Japan, this court's review "must extend not only to determining whether the

Secretary *considered* [the petitioners'] claim that [they] would be tortured but to ascertaining that

[]he complied with [his] obligation not to extradite where, on the available information, torture is

more likely than not." Trinidad y Garcia, 683 F.3d at 996 (Berzon, J., concurring in part and

dissenting in part).

      The government counters that the Supreme Court's decision in Munaf v. Geren, requires

absolute deference to the Secretary's determination regarding the likelihood of torture under the

FARR Act and its enacting regulations, U.S. Mem. 10 [#50]; however, Munaf reserved that

issue, and the court declines to read Munaf as settling a question that it explicitly did not, 553

U.S. 674, 703 n.6 (2008) ("We hold that these habeas petitions raise no claim for relief under the

FARR Act and express no opinion on whether Munaf and Omar may be permitted to amend their

respective pleadings to raise such a claim on remand"). Munaf involved habeas petitions brought

by two United States citizens who had voluntarily traveled to Iraq and allegedly committed

crimes there. Id. at 679. The petitioners were detained by the United States military in Iraq, the

Iraqi government requested that they be transferred to Iraqi criminal custody, and they objected

to transfer on the grounds that they would be tortured. Id. The court held that the federal district

court could not enjoin the United States military from transferring individuals alleged to have

committed crimes and detained within the territory of a foreign sovereign to that sovereign for

criminal prosecution. Id. at 689. And it emphasized that "prudential concerns," such as

international comity and respect for the sovereignty of foreign states, "render[ed] invalid

attempts to shield citizens from foreign prosecution" in such circumstances. Id. at 693, 699.

      Munaf contained two important caveats, though. First, the petitioners claimed that they

should not be transferred to Iraqi criminal custody because they were "innocent civilians who

ha[d] been unlawfully detained by the United States in violation of the Due Process Clause." Id.

at 692. They did not raise a claim for relief under the FARR Act, and the Court explicitly declined to consider the merits of such a claim. Id. at 703 n.6. So, while the Court in Munaf required deference to the executive branch based on the facts of that case, it did not address whether that deference could be overcome by a meritorious FARR Act claim. But see Omar, 646 F.3d at 21 ("[T]he inquiry [pursuant the FARR Act] that Omar asks this Court to undertake in this habeas case . . . is the precise inquiry that the Supreme Court in Munaf already rejected").

Second, Munaf affirmatively left open the question of whether the result would change in "a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." Id. at 702. And Justice Souter, joined by Justices Ginsburg and Breyer, suggested that he "would extend the caveat to a case in which the probability of torture [wa]s well documented, even if the Executive fail[ed] to acknowledge it." Id. at 706 (Souter, J., concurring). Given these caveats, this court declines to interpret Munaf as sharply narrowing the Supreme Court's decision in Boumediene—particularly where the two cases were decided on the same day.

While Boumediene entitles the Taylors to a "meaningful opportunity" to demonstrate that they are being detained pursuant to the erroneous application or interpretation of relevant law, the harder question is what that meaningful opportunity looks like here. The Taylors claim that, to conduct its review, the court should order the State Department to produce the entire administrative record on which the Secretary's decision is based. Pet. Mem. 14 [#57]. But the Supreme Court has emphasized the importance of judicial restraint in cases with "potential implications for the foreign relations of the United States." Sosa, 542 U.S. at 727. There needs to be an appropriate balance between a level of executive deference that recognizes the executive's primary role in foreign relations and constitutionally required judicial review. That balance falls

well short of the Taylors' proposal that the court conduct a full review of the Secretary's decision.

Instead, the court follows a "rule of limited inquiry" "designed to ensure against blatant violations of the Secretary's CAT obligations as implemented by the FARR Act." See Trinidad y Garcia, 683 F.3d at 997, 1001 (Berzon, C.J., concurring in part and dissenting in part). Under this rule of limited inquiry, a petitioner bears the burden of demonstrating through "strong, credible, and specific evidence" that, notwithstanding the Secretary's determination to the contrary, the petitioner is "more likely than not" to be tortured upon extradition. Id. at 1001; see also Kiyemba, 561 F.3d at 525 (Griffith, C.J., concurring in the judgment in part and dissenting in part) ("Critical to ensuring the accuracy of the government's representations is an opportunity for the detainees to challenge their veracity. The rudimentaries of an adversary proceeding demand no less"). To establish a prima facie case, the petitioner must demonstrate that "no reasonable factfinder could find otherwise." Trinidad y Garcia, 683 F.3d at 1001 (Berzon, C.J., concurring in part and dissenting in part). If and only if the petitioner makes this showing, the burden shifts to the Secretary to "submit evidence, should []he so choose and *in camera* where appropriate, demonstrating the basis for [his] determination that torture is not more likely than not." Id.

This "highly deferential, limited" review "minimize[s] the burden on the State Department" and "protect[s] its legitimate interest in conducting foreign affairs." Id. It ensures that, in the vast majority of cases, the reviewing court will not need to conduct a searching evaluation of the Secretary's decision to extradite, thereby maintaining a healthy level of executive deference, while reflecting the fact that "the Executive's authority to extradite is neither inherent nor unlimited." Id. at 995.

4.    Merits

Having addressed the questions of jurisdiction and scope of review, the court finally turns

to the merits of the Taylors' claims, and reviews (1) whether the Secretary considered the

Taylors' claim and determined that it is not "more likely than not" that they will face torture if

extradited to Japan, and, if so, (2) whether the Taylors have demonstrated that no reasonable

factfinder could find other than that they are more likely to face torture than not.

The State Department's regulations implementing the United States' obligations under

the Convention Against Torture state that:

> In order to constitute torture, an act must be specifically intended to inflict severe
> physical or mental pain or suffering and that mental pain or suffering refers to prolonged
> mental harm caused by or resulting from:
>
>> (i) The intentional infliction or threatened infliction of severe physical pain or
>> suffering;
>>
>> (ii) The administration or application, or threatened administration or application, of
>> mind altering substances or other procedures calculated to disrupt profoundly the
>> senses or the personality;
>>
>> (iii) The threat of imminent death; or
>>
>> (iv) The threat that another person will imminently be subjected to death, severe
>> physical pain or suffering, or the administration or application of mind altering
>> substances or other procedures calculated to disrupt profoundly the senses or
>> personality.

22 C.F.R. § 95.1(b)(2). The regulations go on to explain that "[n]oncompliance with applicable

legal procedural standards does not per se constitute torture" and that "[t]orture is an extreme

form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or

degrading treatment or punishment." 22 C.F.R. §§ 95.1(b)(3), (b)(7).

In accordance with the Convention Against Torture and the procedures set forth in State

Department regulations, the Deputy Secretary determined that the surrender of the Taylors for

extradition was not more likely than not to result in their being tortured in Japan. Declaration of Deputy Secretary [#60-1]. The burden therefore shifts to the Taylors to demonstrate that no reasonable factfinder could have made this determination.

The Taylors have submitted multiple exhibits purporting to demonstrate that they are "more likely than not" to be tortured if extradited to Japan. Many of these exhibits are news articles and reports discussing the Japanese criminal justice system's use of prolonged pretrial confinement and interrogation to coerce confession. See, e.g., AP News Article [#59-8]; BBC News Article [#59-9]; Reuters Article [#59-15]. There are also accounts claiming that Japanese prisons often place detainees in small cells, fail to provide adequate heating, dim the lights but never fully turn them off, and lack Western-style bedding. See Reuters Article [#59-15]; Gohsn Declaration [#61-2]; McIntyre Declaration [#61-3].

But although the prison conditions in Japan may be deplorable and although the criminal procedures that the Taylors may be subjected to may not satisfy American notions of due process, those allegations do not constitute the "severe physical or mental pain or suffering" contemplated by the enacting regulations. The Taylors have not claimed that they are more likely than not  to suffer "severe physical pain and suffering," to be subjected to "procedures calculated to disrupt profoundly the senses or the personality," or to be threatened with death. See 22 C.F.R. § 95.1(b)(2). They have therefore failed to establish that no reasonable factfinder could find anything other than that they are more likely than not to be subjected to torture in Japan. This ends the court's inquiry.

**IV.     Conclusion**

Accordingly, the Taylors' <u>Second Petition for Writ of Habeas Corpus</u> [#47] is DENIED, and

the <u>Emergency Stay</u> [#49] is lifted.

IT IS SO ORDERED.

January 28, 2021                                    <u>/s/ Indira Talwani          </u>
                                                         United States District Judge