UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL L. TAYLOR and PETER M. TAYLOR,<br><br>*Petitioners*,<br><br>*v.*<br><br>JEROME P. MCDERMOTT, Sheriff, Norfolk County, Massachusetts, and JOHN GIBBONS, United States Marshal, District of Massachusetts,<br><br>*Respondents*. | Case No. 4:20-cv-11272-IT |

**PETITIONERS' EMERGENCY MOTION FOR STAY OF EXTRADITION
PENDING EXERCISE OF APPELLATE RIGHTS**

Pursuant to the Court's inherent authority and Rule 8(a)(1)(A) of the Federal Rules of Appellate Procedure, Petitioners move the Court to stay their extradition to Japan through the balance of these proceedings and any appeal(s).  Failing to stay the Taylors' extradition until they have had the opportunity to exercise their appellate rights will result in their imminent extradition to Japan where they will be held in conditions that would never be permitted by any U.S. court, subjected to lengthy interrogation without the presence of counsel, subjected to mental and physical torture, and face prosecution and imprisonment for a supposed offense that may not even exist under Japanese law.  In addition to these irreparable harms, the Taylors' extradition would moot their appeal and thus deprive the Taylors of their right to obtain appellate review of the Court's rulings.

Accordingly, Petitioners respectfully request that the Court enter an Order staying the Taylors' surrender and/or extradition to Japan pending their pursuit of appellate relief.  In the alternative, Petitioners ask that the Court at least enter an Order staying the Taylors' surrender

and/or extradition pending their filing, and the First Circuit's ruling on, a motion seeking such a stay from the Court of Appeals pursuant to Rule 8(a)(2) of the Federal Rules of Appellate Procedure.

On the evening of January 28, 2021, the Government represented to counsel for Petitioners that the Taylors would not be surrendered to Japan within the next seven days. Counsel for the Taylors requested the Government's consent to the relief requested, but the Government has stated that it is not prepared to agree to anything beyond its assurance that the Taylors will not be surrendered within the next seven days. Accordingly, because the Government could unilaterally moot the Taylors' appeal and deprive them of the opportunity for any appellate review by surrendering them to Japan, and the Government has committed only to not doing so prior to February 5, 2021, we request that the Court act on the instant Motion as quickly as possible or, if the Court believes it requires more time, enter a temporary stay of the Taylors' extradition and/or surrender during the Court's consideration of the instant Motion.

## LEGAL STANDARD

In determining whether to grant a stay pending appeal, courts consider the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Each factor "contemplate[s] individualized judgments in each case, [and] the formula cannot be reduced to a set of rigid rules." *Hilton*, 481 U.S. at 777. However, "[t]hese [four] factors are not prerequisites that must be met, but are interrelated considerations that must be balanced

together." *SEIU Local 1 v. Husted*, 698 F.3d 3431, 343 (6th Cir. 2012) (internal quotation marks and citation omitted). "No one factor is determinative and all may be considered on a sliding scale." *Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, 834 F. Supp. 2d 29, 30 (D. Mass. 2011).

In particular, the first two factors—likelihood of success and irreparable harm—are "the most critical," *Nken*, 556 U.S. at 434, and they operate on a sliding scale such that a strong showing on one may offset a lesser showing on the other. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem"); *Boston Taxi Owners Ass'n, Inc. v. City of Boston*, 180 F. Supp. 3d 108, 127 (D. Mass. 2016) ("Courts balance these factors on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of success on the merits when the potential for irreparable harm is high."). Further, when the Government is the opposing party, the third and fourth factors merge. *Nken*, 556 U.S. at 435.

As detailed below, analysis of the four traditional factors warrant a stay of extradition pending appeal in this case. Indeed, where the government has committed only to not extraditing and/or surrendering during a brief period of time (here, on or before February 4, 2021) and has declined to commit to refraining from extradition or surrender after that point, and there is thus a clear threat of removal prior to the outcome of pending review, courts in this circuit and elsewhere have granted stays in *habeas* cases pending an appeal. *See, e.g.*, *Romeo v. Roache*, 820 F.2d 540, 541 (1st Cir. 1987) (where district court refused to stay extradition pending appeal, First Circuit ordered stay of extradition pending review); *United States v. Lui Kin-Hong*, 110 F.3d 103, 121 (1st Cir. 1997) ("We stay in any event delivery of the certificate of extraditability to the Secretary of State … to permit Lui to seek relief from the United States Supreme Court"); *see also Ntakirutimana v. Reno*, 184 F.3d 419, 423 n.7 (5th Cir. 1999) (stay of extradition pending appeal);

*Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997); *Then v. Melendez*, 92 F.3d 851, 853 n.1 (9th Cir. 1996); *Spatola v. United States*, 925 F.2d 615, 617 (2d Cir. 1991); *Pukulski v. Hickey*, 731 F.2d 382, 383 (6th Cir. 1984); *In re Assarsson*, 670 F.2d 722, 724 n.2 (7th Cir. 1982); *Tavarez v. U.S. Attorney General*, 668 F.2d 805, 811 (5th Cir. 1982) ("district court has 'inherent power' to stay extradition of petitioner pending his appeal of court's denial of habeas corpus") (citing *Jiminez v. Aristiguieta*, 314 F.2d 649, 652 (5th Cir.), *cert. denied*, 372 U.S. 973 (1963)); *Artunes v. Vance*, 640 F.2d 3 (4th Cir. 1981) (stay granted pending hearing on habeas corpus petition, and apparently remained in effect after timely appeal filed); *Martinez v. United States*, No. 3: 14-CV-00174, 2014 WL 4446924, at *2-6 (M.D. Tenn. Sept. 9, 2014); *Nezirovic v. Holt*, No. 7:13CV428, 2014 WL 3058571, at *2 (W.D. Va. July 7, 2014); *Zhenli Ye Gon v. Holt*, No. 7:11-cv-00575, 2014 WL 202112 at *1-2 (W.D. Va. Jan. 17, 2014); *Noriega v. Pastrana*, No. 07-CV-22816-PCH, 2008 WL 331394, at *1 (S.D. Fla. Jan. 31, 2008).

## ARGUMENT

### A. Petitioners Are Likely to Succeed on the Merits of Their Appeal or, At the Very Least, Have Presented Serious Questions on the Merits

"To obtain a stay, pending appeal, a movant must establish a strong likelihood of success on the merits or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor." *Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, 834 F. Supp. 2d 29, 30 (D. Mass. 2011) (quoting *Eon–Net, L.P. v. Flagstar Bancorp, Inc.*, 222 Fed. Appx. 970, 971–72 (Fed. Cir. 2007)). As referenced previously above, "[t]he requirements of likelihood of success and irreparable harm often operate on a sliding scale such that 'when the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm." *EEOC v. Astra USA,* 94 F.3d 738, 743–44 (1st Cir. 1996). In so stating, the First Circuit also acknowledged that the sliding scale can also move in the opposite direction. *Id.*

4

("Simply stated, more of one excuses less of the other.") (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)); *Maram v. Universidad Interamericana De Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir. 1983) (stating that "these interests must be weighed inter sese"); *see also Pub. Serv. Co. of New Hampshire v. Patch*, 167 F.3d 15, 26-27 (1st Cir. 1998) ("[W]e have considered whether at least one or more of the claims put forth by PSNH provides fair grounds for further litigation—this lesser standard being defensible in light of the rather powerful showing of irreparable injury made by PSNH.") (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977)); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) ("[I]f ... the balance of hardships tips decidedly toward plaintiff ... it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."); *In re Aerovox, Inc.*, 281 B.R. 419, 433 (Bankr. D. Mass. 2002) ("the greater the harm the less emphasis need be placed on the likelihood of success on the merits").

As such, even where courts have found that a petitioner *has not* made a strong showing that he or she is likely to prevail on the merits, courts have still granted a stay of extradition. *See Noriega v. Pastrana*, No. 07-CV-22816-PCH, 2008 WL 331394, at *1 (S.D. Fla. Jan. 31, 2008) (even though court found petitioner had not made a strong showing he was likely to prevail on the merits, "in balancing the other factors, the Court finds that they weigh heavily in favor of a stay and that a stay pending resolution of [petitioner's] appeal is appropriate and in the interest of justice"); *cf. A.W. Chesterton Co., Inc. v. Chesterton*, 907 F. Supp. 19, 22 (D. Mass. 1995) (in proving likelihood of success on the merits, "the movant need not demonstrate that there is no

5

chance that he will lose"). The Ninth Circuit addressed this question at length in *Leiva–Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011):

> There are many ways to articulate the minimum quantum of likely success necessary to justify a stay-be it a "reasonable probability" or "fair prospect," as *Hollingsworth [v. Perry*, 558 U.S. 183, 190-91 (2010)], suggests; "a substantial case on the merits," in *Hilton's* words [*Hilton v. Braunskill*, 481 U.S. 770, 778 (1987)]; or, as articulated in *Abbassi [v. I.N.S.*, 143 F.3d 513, 514 (9th Cir. 1998)], that "serious legal questions are raised." We think these formulations are essentially interchangeable, ***and that none of them demand a showing that success is more likely than not.*** Regardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that she has a substantial case for relief on the merits.

*Id.* at 967–68 (emphasis added; internal footnote omitted).

Indeed, in determining whether an appeal "raises a substantial question of law or fact likely to result in reversal or an order for a new trial" as a criminal defendant must show to obtain bail pending an appeal, the First Circuit has held that even this requirement (which is not balanced against irreparable harm) "should not be read to mean that 'it was more likely than not' that conviction would be reversed on appeal." *United States v. Bayko*, 774 F.2d 516, 521 (1st Cir. 1985). If the standard required a district court to conclude that it was likely to be reversed, then that stay or bail would never be granted pending appeal. *Id.* at 522 ("[W]e are unwilling to attribute to Congress the cynicism that would underlie the provision were it to be read as requiring the district court to determine the likelihood of its own error.") (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). Instead, the court must simply find that (1) the appeal raises a substantial question of law or fact, and (2) *if that question is determined favorably to the appellant*, the result would likely be reversal or a new trial. *Id.*

For example, in *Nezirovic v. Holt*, No. 7:13CV428, 2014 WL 3058571 (W.D. Va. July 7, 2014), the district court stayed extradition pending appeal to the Fourth Circuit. In that case, the habeas petition had raised statute of limitations and *ex post facto* challenges to the offense for

which extradition was sought, arguments which the district court had rejected in denying the petition.  *See Nezirovic v. Holt*, 990 F. Supp. 2d 606, 609 (W.D. Va. 2014), *aff'd*, 779 F.3d 233 (4th Cir. 2015).  However, the court recognized that "scant case law" existed on the issues and that "the law is not well settled on at least some" of the issues raised by the petitioner.  2014 WL 3058571, at *1.  The court also noted that its legal determinations and any mixed questions of law and fact would be reviewed *de novo* on appeal.  As such, the court stayed extradition despite its conviction that it had reached the correct conclusion in denying the petition.  *Id.*

As another example, in *Martinez v. United States*, No. 3: 14-CV-00174, 2014 WL 4446924, at *4 (M.D. Tenn. Sept. 9, 2014), the district court similarly stayed extradition pending appeal of its denial of a habeas petition without concluding that the petitioner's arguments were likely to succeed on appeal.  The district court explained as follows:

> The court agrees with [petitioner] that the legal arguments he raises present rarely-litigated and difficult issues, and there is particularly a dearth of precedent in this circuit on these types of matters.  The court finds [petitioner's] legal arguments to be well-articulated, well-argued, and supported with authority as well as possible given the scarcity of case law on these questions.  In sum, the court finds that [petitioner's] claims do raise "serious questions going to the merits," sufficient to satisfy the first prong of the stay analysis.

2014 WL 4446924, at *4.

Here, Petitioners have at the very least set forth substantial issues raising serious questions bearing upon the legal propriety of the Taylors' extradition.  Petitioners maintain that the alleged offense on which Japan bases its extradition requests is premised upon a novel and unprecedented expansion of Article 103 of the Japanese Penal Code that is articulated, if at all, by implication and inference in the applications for warrants for the Taylors' arrest.  Japan's theory of the offense is both contrary to the plain language of Article 103 and the entirety of the history of prosecutions and accumulated case law thereunder.  Accordingly, the instant extradition requests raise a new

7

and substantial issue that merits serious consideration: whether, and to what extent, U.S. courts should defer to a foreign sovereign's assertions as to its own law where a credible argument is presented that the facts alleged (even if true) do not, as a matter of law, make out the criminal offense for which extradition is sought and the foreign sovereign has never brought a prosecution under the same theory against its own citizens engaging in similar conduct (despite that the type of conduct underlying the alleged offense is a widely-recognized problem in the foreign country).

There is no case law bearing directly on this issue, and scant case law even to which the parties or the court may analogize. Unquestioning deference to the foreign sovereign (as Judge Cabell did in this case) opens a significant loophole and renders meaningless the Treaty's requirement of probable cause that the accused committed an offense within the scope of the Treaty. In denying the Petition, this Court held that "[c]itizens are protected from the threat that a foreign government will simply 'argue that something is prosecutable under its laws' not by the court's opining on foreign law but by the dual criminality provisions in extradition treaties" (Dkt. 81 at 10), reasoning that the fact that what the Taylors are alleged to have done in Japan would have been a crime under U.S. law if committed in the U.S. was sufficient assurance that the alleged conduct was criminal in Japan. But there is no authority for this analysis, which essentially turns the dual criminality concept into a single-pronged requirement. We respectfully contend that the courts cannot merely assume something is criminal in a foreign nation just because it is criminal in the U.S. any more than the courts can assume something is illegal in the U.S. simply because it is prohibited abroad. Indeed, neither the Court nor the Government dispute the point that the crime that the Taylors would have committed if they had done what they are alleged to have done in the U.S.—aiding and abetting bail jumping in violation of 18 U.S.C. §§ 2, 371, 3146, and/or 3148— actually is widely acknowledged *to not be a crime in Japan*. (*See* Dkt. at 12-13.)

Further, Peter Taylor also has raised substantial issues regarding the sufficiency of the evidence to establish probable cause that he himself committed a violation of Article 103, even if it could properly be applied to the alleged facts in these cases. The Court, however, refused to consider the substantive merits of these arguments, holding that the Taylors' Motion to Amend was untimely. (Dkt. 80.) However, the ruling by Magistrate Judge Cabell of which Petitioners sought this Court's review was not issued until January 15, 2021. (Dkt. 74-1.) Petitioners filed their Motion just nine days later. (Dkt. 79.) By refusing to permit Petitioners to amend their petition, the Court has denied them any review of Magistrate Judge Cabell's substantive ruling that the evidence (even without the disputed allegation that Peter Taylor provided Mr. Ghosn with a key to his room at the Grand Hyatt Tokyo) "still provides probable cause to believe that [Peter Taylor] assisted in the planning, financing, and execution of Ghosn's escape as alleged." (Dkt. 74-1.) As Petitioners have detailed (*see* Dkt. 68-1 at 8–9; Dkt. 75-1 at 7–10; Dkt. 79 at 3-4), this ruling is insufficient as a matter of law to meet the requirement of probable cause "that the person sought has committed the offense for which extradition is requested," Treaty Art. VIII, § 3, because Japanese law *plainly does not prohibit* "mak[ing] preparations for the purpose of committing" an Article 103 offense or "together with one or more persons, … plann[ing] to commit an act that constitutes" such an offense. And nothing in the allegations or the evidence establishes that *Peter Taylor* took any action *which enabled Mr. Ghosn* to escape. (*See* Dkt. 75-1 at 10–14; Case No. 4:20-mj-01070-DLC, Dkt. 61 at 9–13.)

Further still, the Taylors have raised substantial issues regarding their likely treatment if extradited to Japan and, under the circumstances, whether the Deputy Secretary of State's decision to do so violates U.S. law prohibiting extradition where it is more likely than not that an extraditee will be subjected to torture. The Court correctly held that it has habeas jurisdiction to review the

9

Secretary of State's determinations under the Convention Against Torture, but its ultimate conclusion that the evidence presented by the Taylors "failed to establish that no reasonable factfinder could find anything other than that they are more likely than not to be subjected to torture in Japan" (Dkt. 81 at 28) is a substantial issue for appeal on which the Taylors are likely to prevail. The Court's ruling, we believe, summarily discounts the Taylors' evidence as falling short of the "severe physical or mental pain or suffering" contemplated by the definition of torture, but this ruling, while recognizing that the treatment the Taylors receive will be "deplorable" (Dkt. 81 at 28), fails to account for or address the full body of evidence in the record, which includes, *inter alia*, the following:

- Descriptions of the specific treatment of three individuals—Mr. Ghosn, Greg Kelly, and Scott McIntyre—each of whom were subjected to treatments meeting the definition of torture, including being subjected to prolonged periods of solitary confinement (five weeks without a bed or, initially, a pillow for Mr. Kelly); forced to sleep shoulder-to-shoulder with other prisoners (Mr. McIntyre); denied a bed and forced to sleep on the floor (Mr. Kelly and Mr. Ghosn); deprived of heat in the dead of winter (Mr. Kelly) or provided "a low heated room" (Mr. Ghosn); denied medical care (Mr. Kelly) or access to medications (Mr. Ghosn); denied access to any clock, calendar or other time-keeping device (Mr. Ghosn and Mr. McIntyre); subjected to lights-on conditions at all times (Mr. Ghosn and Mr. McIntyre); required to remain seated, Japanese-style, at a low table on the floor with no chairs (Mr. McIntyre); addressed only by prisoner number, and not one's name (Mr. McIntyre); interrogated constantly, day and night without breaks (Mr. Ghosn); held for up to seven hours prior to interrogation in a tiny, cold and dark cell, shoulder-to-shoulder with up to 12 other detainees while not being permitted to stand, move or talk (Mr. McIntyre); permitted to shower just twice a week (Mr. Ghosn and Mr. McIntyre); prevented from sleeping for more than an hour or two at a time (Mr. McIntyre); and given only 30 minutes (Mr. Ghosn) or 15-20 minutes (Mr. McIntrye) time outside and only on non-holiday weekdays.  (Dkt. 57-10, 59-17, 59-19, 61-2, 61-3, 63-2, 78-2 & 78-3.)
- An Opinion issued by the Working Group on Arbitrary Detention, a body of independent human rights experts that investigate cases of arbitrary arrest and detention under mandate of the United Nations' Human Rights Council, validating Mr. Ghosn's claims with respect to his treatment, finding his detention and treatment by Japan to have violated numerous provisions of international law, concluding Mr. Ghosn should receive "compensation and other reparations" from Japan, and, significantly, observing that the practices to which Mr. Ghosn was subjected in Japan (which included solitary confinement, inability to leave his cell, deprivation of exercise, constant light to disturb sleep, absence of heating, and continuous interrogation sessions lasting on average five hours) and Japan's general "interrogation and detention practices under the *daiyo kangoku* system … may severely

limit the right to a fair trial ***and expose detainees to torture,*** *ill-treatment and coercion*" and referring the case to the Special Rapporteur ***on torture*** and other cruel, inhuman or degrading treatment or punishment for further action.  (Dkt. 63-2 (emphasis added).)

- A March 2020 article by three then sitting U.S. Senators (Roger Wicker, Lamar Alexander, and Marsha Blackburn) describing Mr. Kelly's treatment by Japan, including being "kept in solitary confinement for five weeks without a bed or, initially, a pillow" while suffering from chronic neck pain and being denied critical neck surgery.  (Dkt. 59-17.)

- A floor speech by U.S. Senator Roger Wicker Senator confirming that Mr. Kelly "was treated with cruelty by Japanese authorities from day one," describing how Mr. Kelly was kept in solitary confinement for 34 days in an unheated cell where he was forced to sleep on the floor, detailing Mr. Kelly was interrogated for multiple hours on a daily basis without the benefit of defense counsel, and confirming that Mr. Kelly's "requests for medical attention were refused."  (Dkt. 78-2 & 78-3.)

- A statement by a former Japanese senator, Tadashi Inuzuka, confirming Mr. Ghosn's subjection to solitary confinement.  (Dkt. 59-5 at 357-58.)

- A letter signed by 1,010 Japanese legal professionals reporting, *inter alia*, that "[i]t is not uncommon for suspects to be yelled at from close range," "[m]ost suspects" are "placed under constant police surveillance, including during mealtimes or in toilets," identifying as "a systemic problem" the fact that "suspects who do not confess are detained for a long period of time," confirming that Japan "uses sufferings caused by prolonged detention and interrogation to force confession" and "violates international human rights standards including … the prevention of torture."  (Dkt. 59-7.)

- An Amnesty International Report from 2015 finding that the Japanese justice system "continued to facilitate torture and other ill-treatment to extract confessions during interrogation" and "[d]espite recommendations from international bodies, no steps were taken to abolish or reform the system in line with international standards."  (Dkt. 59-12.)

While the above represents only some of the evidence submitted by the Taylors, it includes specific recognition by the United Nations, Amnesty International and more than 1,000 Japanese legal professionals that Japan's systemic treatment of detainees rises to the level of torture and the conduct detailed in these statements and reports is of the type that the courts previously have recognized as constituting torture.  *See, e.g.*, *Guzman-Nunez v. Barr*, 822 F. App'x 563, 566 (9th Cir. 2020) (intentional denial of medical care as a form of punishment would be torture under CAT); *Kang v. Attorney Gen. of U.S.*, 611 F.3d 157, 16567 (3d Cir. 2010) (sleep deprivation, bright lights, extended periods of remaining in uncomfortable position, along with other severe mistreatment as part of interrogation is torture).  Accordingly, there is a substantial basis for appeal

11

of the Court's determination that Petitioners have not produced sufficient evidence that they are likely to be subjected to torture if extradited to Japan.

These are issues that merit full and careful consideration, and the stakes are enormous for the Taylors. The very least the U.S. courts owe the Taylors is a full chance to litigate these issues, including exercising their appellate rights and options, before they are consigned to the fate that awaits them at the hands of the Japanese government. But if a stay is not entered, there will be no review at all and this Court and the First Circuit will lose jurisdiction to address any of the issues raised by the Taylors.

### B. Petitioners Will Suffer Irreparable Harm if a Stay Is Not Granted

Without a stay, the Taylors will be extradited to Japan to face criminal charges there. The United States has not promised otherwise and, in fact, has stated that Japanese law enforcement officials are traveling, or already have traveled, to Massachusetts to take custody of the Taylors. (*See* Dkt. 50 at 3, n.2.) If a stay is not granted, the Taylors will be extradited to Japan and face prosecution and loss of liberty there for an offense that might not be extraditable under the U.S.-Japan Extradition Treaty and lose their right to appeal the district court's determination that their extradition is authorized by the Treaty and otherwise lawful.

As detailed in Petitioners' Memorandum in support of their habeas petition (Dkt. 57 at 8-14) and the declarations, reports, articles and other documents they have submitted in support (Dkts. 57-10, 59-5, 59-7 through 59-19, 61-2, 61-3, 62, 63 & 78), if extradited to Japan, the Taylors (who would not be given bail or the right to return to the U.S. during proceedings) are likely to be treated in a way that violates fundamental notions of due process, the right to a speedy trial, the right not to be subjected to lengthy and coercive interrogation in the absence of counsel, protection against cruel and unusual punishment, the presumption of innocence, the right against self-

incrimination, and other rights we cherish and the U.S. and the rest of the civilized world have recognized through various international treaties and human rights conventions. Courts have recognized that the poor conditions under which a petitioner will be held upon extradition can themselves constitute irreparable harm warranting a stay of extradition pending appellate review. *Martinez*, 2014 WL 4446924 at *4 ("that [petitioner] would be housed in a facility characterized as one of the worst in [Mexico], in a country with overall poor prison conditions as documented by the U.S. State Department, constitutes irreparable harm").

Further, if a stay is not granted, the Taylors' extradition will render the instant petition and the Taylors' appeal of the Court's decision moot. *Lindstrom v. Graber*, 203 F.3d 470, 474 (7th Cir. 2000) (where petitioner was extradited pending his appeal, court found he had "nothing to gain from the further prosecution of the appeal," and thus dismissed the action as moot); *Noriega*, 2008 WL 331394 at *2 (holding once extradition occurs "the federal courts will lack jurisdiction and the appeal will effectively be mooted. Thus, even if [petitioner] prevails on his appeal, it would be a Pyrrhic victory.").

Accordingly, denial of a stay pending appeal would not just result in loss of liberty, it would deprive the Taylors of their right to appeal altogether. Numerous courts have found such devastating consequences to constitute irreparable harm. *Liuksila v. Turner*, No. 16-cv-00229 (APM), 2018 WL 6621339, at *1 (D.D.C. Dec. 18, 2018) (granting stay of extradition pending appeal and holding that "devastating consequences" of extradition and mooting of appeal constitute irreparable harm); *Nezirovic,* 2014 WL 3058571, at *2 (W.D. Va. July 7, 2014) (finding irreparable harm on the ground that habeas petitioner's appeal would be moot if he were extradited which "compels the court to stay the extradition pending appeal"); *Zhenli Ye Gon*, 2014 WL 202112, at *1 ("extradition while his appeal is pending would effectively void [petitioner's] ability

to seek meaningful appellate review of this Court's decision and thus would result in irreparable harm").

### C. The Government and Public Interest Weigh in Favor of a Stay

The third and fourth factors—harm to the opposing party and the public interest—merge when the government is the opposing party. *Nken*, 556 U.S. at 435. "There is a public interest in ensuring that a person is not wrongfully surrendered to face prosecution abroad." *Liuksila*, 2018 WL 6621339 at *2 (citing *Nken*, 556 U.S. at 436).

While the United States may have an interest in promptly fulfilling its legal obligations to its treaty partners, the United States *has no legal obligation to extradite the Taylors* under the Treaty on Extradition Between the United States of America and Japan, Mar. 3, 1978, 31 U.S.T. 892, T.I.A.S. No. 9625 ("Treaty"). Under the Treaty, the United States is not required to extradite its own citizens. Treaty Art. V. Here, the current administration *is choosing* to extradite the Taylors, U.S. citizens, and is not under any compulsion or legal obligation to do so. The distinction between a case involving the extradition of a non-citizen and one involving the requested extradition of a U.S. citizen is significant. Where it is a U.S. citizen whose extradition is sought, "staying the extradition to allow him to seek appellate review of his claims that the extradition is unlawful clearly is in the public interest." *Martinez*, 2014 WL 4446924 at *6.

However, even if the United States were under an obligation to extradite the Taylors, the devastating and irreparable harm to the Taylors of the government's doing so before their appellate rights can be exercised far outweighs any such obligation (which, again, does not exist in the case of the extradition of U.S. citizens). Indeed, the Treaty expressly contemplates that extradition takes place in accordance with the law of the requested party: "Extradition shall be granted only if there is sufficient evidence to prove either that there is probable cause to suspect, according to the

14

laws of the requested Party, that the person sought has committed the offense for which extradition is requested or that the person sought is the person convicted by a court of the requesting Party." Treaty Art 3.

As explained by the court in *Martinez*:

> The court agrees that the United States' honoring of its treaty obligations is extremely important. But it does not agree that allowing an extraditee to obtain review of his legal claims interferes with the United States' ability to comply with its treaty obligations. This country prides itself on the legal process it affords those accused of crimes, even though that legal process takes time to complete.

*Id.* at *5.

In any event, a delay pending the Taylors' exercise of their appeal rights will not, in any meaningful way, harm or otherwise adversely affect the United States, Japan, or their diplomatic relationship.

## CONCLUSION

For the reasons set forth above and in their previous submissions to this Court, Petitioners Michael and Peter Taylor respectfully request that the Court stay their extradition and/or surrender to Japan pending the conclusion of appellate proceedings in the First Circuit (including any *en banc* review) and review by the Supreme Court on a petition for a writ of certiorari.

In the alternative, if the Court denies the instant Motion, the Taylors respectfully request that the Court at least enter a temporary stay allowing the Taylors to file a motion to stay with the First Circuit pursuant to Rule 8(a)(2) and staying their extradition until the First Circuit rules on such a motion.

Further, in light of the Government's refusal to commit to deferring the extradition and/or surrender of the Taylors beyond February 4, 2021, we ask that the Court consider and rule upon

Petitioners' motion on an emergency, expedited basis or, in the alternative, enter a temporary stay pending the Court's consideration of this Motion.

Dated:  January 29, 2021                                  Respectfully submitted,

                                                          By their attorneys,

                                                          */s/ Paul V. Kelly*
                                                          Paul V. Kelly (BBO No. 267010)
                                                          Jackson Lewis, P.C.
                                                          75 Park Plaza
                                                          Boston, MA  02110
                                                          Tel (617) 367-0025
                                                          paul.kelly@jacksonlewis.com


                                                          */s/ Abbe David Lowell (by permission)*
                                                          Abbe D. Lowell (*pro hac vice*)
                                                          Christopher D. Man
                                                          Zachary B. Cohen
                                                          Winston & Strawn LLP
                                                          1901 L Street, N.W.
                                                          Washington, DC 20036
                                                          Tel. (202) 282-5875
                                                          adlowell@winston.com

                                                          *Counsel for Michael and Peter Taylor*

                                                          */s/ Daniel Marino (by permission)*
                                                          Daniel Marino (*pro hac vice*)
                                                          dmarino@marinofinley.com
                                                          Tillman J. Finley (*pro hac vice*)
                                                          tfinley@marinofinley.com
                                                          MARINO FINLEY LLP
                                                          800 Connecticut Avenue, N.W., Suite 300
                                                          Washington, DC  20006
                                                          Tel.  202.223.8888

                                                          *Counsel for Michael L. Taylor*

                                                          */s/James P. Ulwick (by permission)*
                                                          James P. Ulwick (*pro hac vice*)
                                                          KRAMON & GRAHAM PA
                                                          One South Street, Suite 2600
                                                          Baltimore, MD  21202

Tel. (410) 752-6030
JUlwick@kg-law.com

*Counsel for Peter M. Taylor*

**CERTIFICATE OF SERVICE**

    I, Paul V. Kelly, counsel for Petitioners Michael and Peter Taylor, hereby certify that on January 29, 2021, I served a copy of the foregoing on all registered parties by electronic filing on ECF.

                                        */s/ Paul V. Kelly*
                                        Paul V. Kelly